William R. Bachand, No. 020750
Holly L. Gibeaut, No. 019786
TASER International, Inc.
17800 N. 85th Street
Scottsdale, Arizona 85255-9603
Telephone: (480) 502-6265
Fax: (480) 991-0791
E-mail: hgibeaut@taser.com

Attorneys for Plaintiff TASER International, Inc.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| TASER INTERNATIONAL, INC., <br><br> Plaintiff, <br><br> v. <br><br> STINGER SYSTEMS, INC., <br><br> Defendant. | Case No: _____ <br><br> **COMPLAINT** <br><br> (Jury Trial Demanded) |

Plaintiff TASER International, Inc. ("TASER") complains and alleges as follows:

### JURISDICTION AND VENUE

1.     This is a civil action arising under 35 U.S.C. § 271 for patent infringement, 15 U.S.C. § 1051 *et seq.* for false advertising, and 35 U.S.C. § 292 for false marking.

2.     This Court has jurisdiction over the patent claims of this action pursuant to 28 U.S.C. §§ 1331 and 1338 and supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367(a).  Jurisdiction of this Court with respect to the claims for false advertising and false marking are joined with the substantial and related claim for patent infringement.

3.    This Court has personal jurisdiction over the defendant corporation because it has offered in Arizona an infringing product for sale via an interactive website, the sale contemplated by the offer would also be in Arizona, and it has offered the false statements in Arizona.

4.    Venue is properly established in this Court pursuant to 28 U.S.C. §§ 1391(b) and (c) based on deemed residence of the defendant corporation arising from personal jurisdiction over it as described above.

## PARTIES

5.    TASER is a Delaware corporation with its principal place of business at 17800 N. 85th Street, Scottsdale, Arizona 85255.

6.    Upon information and belief, Defendant Stinger Systems, Inc. ("Stinger") is a Nevada corporation with its principal place of business at 2701 North Rocky Point Drive, Suite 1130, Tampa, Florida 33607.

7.    Upon information and belief, Defendant Stinger is authorized to and is doing business in Maricopa County, Arizona.

## Nature Of The Dispute

8.    TASER manufactures and sells electronic control devices commonly known as "stun guns."

9.    Beginning in the first quarter of 2003, TASER has continuously manufactured and sold the model X26 electronic control device.

10.    The TASER model X26 utilizes compressed gas cartridges to propel two probes at high velocity toward a target. Each of the two probes is connected by a thin insulated wire to a battery powered high voltage output circuit located within the X26 device. Upon impact of the two probes with the target, a complete electrical circuit is established and a low current, but high voltage electrical charge flows through the target.

11.    The TASER model X26 device uses electrical stimuli to interfere with the signals sent by the command and control systems of the body, at the peripheral nervous

2

system level, to impair the subject's ability to temporarily control his own body.

12.    The TASER model X26 is sold only to law enforcement personnel.

13.    The TASER model X26 has been well received in the marketplace resulting in delivery of 200,000 units since the X26's introduction into the marketplace in 2003.

14.    Because TASER represents the largest supplier of dart firing electronic control devices, Stinger and its distributor and agents advertising claims have been understood within the relevant market as comparing Stinger's stun guns with the well known TASER stun guns.

15.    TASER is the sole owner of US utility patent 7,145,762 (the "'762 patent") by assignment from the sole inventor as recorded in the United States Patent and Trademark Office at reel 13770 frame 0234.   The '762 patent was granted to TASER on December 5, 2006.  A copy of the '762 patent is attached as Exhibit A and incorporated herein by reference.

16.    Stinger manufactures and sells electronic control devices commonly known as "stun guns."

17.    Stinger and TASER offer competitive electronic control devices for sale.

18.    Since before December 5, 2006, Stinger offered for sale in the United States a stun gun which Stinger refers to as the model S-200 two dart hand-held projectile stun gun.

19.    On information and belief, the Stinger S-200 is offered exclusively to law enforcement personnel.

20.    On information and belief, Stinger hosts or sponsors a website on the Internet that is accessible to Internet users in Arizona without user registration or a password (http://www.stingersystems.com) (the "Stinger website").  A copy of the home page is attached as Exhibit B.

21.    The Stinger website home page appears in Arizona in response to simple

Google search results for "stun gun", see Exhibit C, attached. Web pages that are part of the Stinger website are also accessible to Internet users in Arizona in response to simple Google search results for "S-200 stun gun", see Exhibit D, attached. Web pages that are part of the Stinger website are also accessible to Internet users in Arizona who follow links on the home page of the Stinger website.

22. The Stinger website includes an overview page describing the model S-200 two dart hand-held projectile stun gun, a features page further describing the S-200, a price list page listing a sale price for the model S-200, a page comparing the S-200 to a TASER device, and an interactive page having a form designed to be submitted over the Internet by which an Internet user can order a model S-200.

23. The Stinger website overview page (stinger200_overview.htm), attached as Exhibit E, states, *inter alia*:

a. The "barrel height of the S-200™ was roughly equivalent to the TASER® X26."

b. The S-200 output voltage is 50,000 volts "if the gun's electrodes have not yet hit a target."

c. The S-200 delivers neuromuscular incapacitation voltage and current "very efficiently."

d. The S-200 includes "high-energy switching transistors" and a "transformer circuit."

e. The S-200 has a "smaller high voltage transformer and a more controlled discharge of the energy stored in a capacitor bank."

f. The S-200 "gun's electrodes deliver high voltage energy in a precisely controlled series of energy . . . quanta." The series of quanta is described as "pulses . . . first as ionizing spark energy and then as a more immobilizing, lower-voltage, higher-current . . . once on target."

g. The S-200 has the capability "to more thoroughly incapacitate

4

nerve tissue with less total energy being delivered."

        h.     Energy is delivered in a series of pulses having a pulse width of 180 microseconds and a pulse separation of 4 milliseconds.

     24.     The Stinger website features page (http://www.stingersystems.com/Images/wasp_addfeatures.png), attached as Exhibit F, includes a picture identified as the S-200.

     25.     The Stinger website price list page (pricing.htm), attached as Exhibit G, states, *inter alia*:

        a.     "Stinger series projectile stun guns."

        b.     "The Stinger S-200™: 2 Dart Hand Held Projectile Stun Gun $699."

        c.     "Standard S-200™ Ammo Cartridges: . . . $20."

     26.     The Stinger website interactive page (try.htm), attached as Exhibit H, states or includes, *inter alia*:

        a.     "Evaluate Stinger / Request Information."

        b.     "Evaluation Registration Form."

        c.     "Stinger will contact one of our distributors to provide a Stinger test and evaluation unit for a period of up to 30 days.  After 30 days, you may return the unit or you may request to keep the unit and will be invoiced.  This offer is valid only for Law Enforcement Agencies in the United States and certain other countries.  To request a test and evaluation unit, please fill in the form below."

        d.     Spaces for the Internet user to enter, *inter alia*:  "General Information"; "First Name"; "Last Name"; "Rank"; "Department Phone"; "Department"; "Shipping Address"; "City"; "State"; and "Zip Code."

        e.     A pull-down list for the Internet user to pick a "Model", including "Stinger S-400 4 Dart Gun"; and "Stinger S-200 2 Dart Gun."

        f.     A button titled "Submit" that sends the user-entered information to

the server that hosts the Stinger website.

g. "If you have not received a Stinger Unit in 3 weeks please contact Stinger System, Inc."

h. "Limit of one Trial Stinger Unit per department."

i. "Offer valid only in countries not on the Dept. of Homeland Security Watch List."

27. The Stinger website creates in the ordinary buyer of stun guns an expectation of delivery in 30 days.

28. By hosting or sponsoring an interactive website as described in Paragraphs above, Stinger is "offering for sale" in Arizona a product that would infringe the '762 patent if the sale contemplated in the offer was completed in the United States.

29. The Stinger website constitutes an offer for sale of a stun gun that infringes TASER's '762 utility patent. A claim chart analysis of patent '762 claim 32 is attached as Exhibit I. On information and belief, other claims of the '762 patent are also infringed.

30. On information and belief, Stinger is currently making, using, and selling the S-200.

31. The Stinger website also makes direct product to product comparisons between the Stinger S-200 device and unspecified TASER products.

32. The Stinger website states that "Unlike the Taser®, the Stinger S-200™ does not require a boot up time when a unit has not been used recently. Obviously, a three second boot time to an officer is vital when a target is less than 21 feet away." This statement is false.

33. The Stinger website states that it has "extensive medical research" to back its Stinger S-200 device. This statement is false.

34. The Stinger website states that the Stinger S-200 device contains "a manual trigger which allows an officer to control a situation rather than wait for 5

seconds even if the subject complies immediately" creating a false comparison with the TASER products.

35.    On or about December 4, 2006 an account representative from Stinger made the following false statements regarding the Stinger S-200 device to a law enforcement officer:

> This new weapon has many operational and safety features that you will not find in TASER products, including;
>
> Our patented quantum flyback technology which actually senses the difference when the darts strike flesh or clothing and adjusts the voltage accordingly.
>
> Stopping power which is equal to or greater than our competition with a higher consistent pulse rate
> . . .
> Over 14,000 Stinger stun weapons in use in the United States with no deaths and no lawsuits.  A claim our competition cannot make.

36.    Currently, Stinger holds no patents for "quantum flyback technology" issued by the United States Patent and Trademark Office.

### Count One - Infringement of the '762 Patent

37.    TASER realleges and incorporates by reference the previous paragraphs of this Complaint inclusive, as though fully set forth herein.

38.    Count One arises under 35 U.S.C. § 271.

39.    Through its commercial activities regarding the S-200, Stinger directly infringed the '762 patent.

40.    Through its commercial activities regarding the S-200, Stinger infringed the '762 patent under the doctrine of equivalents.

41.    Stinger's commercial activity constitutes contributory infringement of the '762 patent.

7

42.    Stinger's infringement was without license from TASER and was willful and deliberate.

43.    On information and belief, the acts of infringement by Stinger have damaged and will continue to damage TASER, causing irreparable harm, for which there is no adequate remedy at law.  Such unlawful acts and damage will continue to occur unless enjoined by this Court.

44.    Stinger's acts of infringement have been carried out deliberately and willfully entitling TASER to treble damages under 35 U.S.C. § 284.  This is an exceptional case entitling TASER to an award of attorneys' fees under 35 U.S.C. § 285.

## Count Two –False Advertising Under 15 U.S.C. §1125 (a)

45.    TASER realleges and incorporates by reference the previous paragraphs of this Complaint inclusive, as though fully set forth herein.

46.    Count Two arises under 15 U.S.C. § 1125(a).

47.    The false statements of fact made by Stinger have been incorporated into commercial advertisements for Stinger's S-200 product and communicated to law enforcement officers and have included false and untrue statements about TASER and its products.

48.    The statements made by Stinger on its website and in its advertising were made for the purpose of influencing consumers to buy Stinger's goods.

49.    Those false statements of fact either have actually deceived or have a tendency to deceive a substantial segment of their audience.  Such deception is material in that it is likely to influence purchasing decisions.

50.    Stinger has caused its false statements to enter interstate commerce.  As a result of Stinger's conduct, TASER has been or is likely to be injured as a result of Stinger's false statements in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

## Count Three - False Advertising Under 15 U.S.C. §1125 (a)
### For Statements Made By Agent

8

51.   TASER realleges and incorporates by reference the previous paragraphs of this Complaint inclusive, as though fully set forth herein.

52.   Count Three arises under 15 U.S.C. § 1125(a).

53.   Upon information and belief, Applied Tactical Technologies, Inc., aka ATT-Tactical ("ATT"), is a New York corporation with its principal place of business in Babylon, New York.

54.   Upon information and belief, ATT is a distributor for Stinger and sells the Stinger S-200 product.

55.   Stinger benefits directly from the sale of its S-200 product by its distributors, including ATT.

56.   Upon information and belief, ATT is an agent of Stinger.

57.   On information and belief, ATT hosts or sponsors a website on the Internet that is accessible to Internet users in Arizona without user registration or a password (http://www.att-tactical.com) (the "ATT website").

58.   The ATT website makes direct product-to-product comparisons between the Stinger S-200 device and unspecified "competitor" products (see http://www.att-tactical.com/att_stinger.html).  A copy of the ATT website page offering the Stinger S-200 device is attached as Exhibit J.

59.   The ATT website states "The vast majority of the competitor's Cartridges that fall onto a hard surface are usually damaged and unable to be fired." This statement is false.

60.   The ATT website states "Unlike the competitor's, the Stinger S-200™ does not require any boot-up time when powered on. The competitor's three second boot-time requires that the officer observe its information window and to wait before firing. This distraction pulls the officer's attention away from the target when his focus should be 100% on the subject." This statement is false.

61.   The ATT website refers to the Stinger S-200 device as "feature-packed,

safety-conscious, responsibly designed product . . ." This statement falsely implies that the TASER devices are not safety-conscious or reasonably designed.

62.    The ATT website also lists the following claims related to the Stinger S-200 device which are false and/or create a false comparison with the TASER products:

a.    Stinger S-200 device contains "patented circuitry technology called Quantum Flyback Technology or QFT."

b.    Stinger S-200 device has "Greater stay-down power with less risk of lethality than competing stun methods."

c.    Stinger S-200 device does not have ". . . proprietary power magazines which cost a quarter of the price of the gun."

d.    Stinger S-200 device has "No hardware boot-up time when activated from "off" to "on"."

e.    Stinger S-200 device is supported "Extensively researched medical studies."

63.    The false statements made by ATT have been incorporated into commercial advertisements for Stinger's S-200 product and communicated to the public and consumers and have included false and untrue statements about TASER and its products.

64.    The false statements made by ATT on its website and in its advertising were made for the purpose of influencing consumers to buy Stinger's S-200 device.

65.    The false statements made by ATT were foreseeable by Stinger especially because some of ATT's false statements are almost identical to ones made by Stinger in its advertisements.

66.    Those false statements either have actually deceived or have a tendency to deceive a substantial segment of their audience.  Such deception is material in that it is likely to influence purchasing decisions.

67.    Stinger through its distributor ATT has caused false statements to enter

interstate commerce.  As a result of Stinger and ATT's conduct, TASER has been or is likely to be injured as a result of the false statements in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

### Count Four – Patent False Marking

68.     TASER realleges and incorporates by reference the previous paragraphs of this Complaint inclusive, as though fully set forth herein.

69.     The Patent False Marking Statute, 35 U.S.C. § 292, makes it an offense subject to a monetary fine for a person or company to use in advertising the word "patent" in connection with any unpatented article for the purposes of deceiving the public.

70.     The representations and advertisements made by Stinger and/or its agents regarding patented "Quantum Flyback Technology" are false and deceive the public.

71.     On information and belief, the acts of false marking by Stinger and/or its agents have damaged and will continue to damage TASER, causing irreparable harm, for which there is no adequate remedy at law.  Such unlawful acts and damage will continue to occur unless enjoined by this Court.

72.     Pursuant to 35 U.S.C. § 292, any person may sue for false markings to recover a fine of not more than $500 for every offense of false marking, which one-half shall go to the person suing and the other half to the United States Government.  TASER does not know at this time the number of times an offense of false marking has occurred, or each time the product has been made, offered for sale, sold, or advertised. Once TASER ascertains this information it will assert its damages according to proof.

### Count Five - Punitive Damages

73.     TASER realleges and incorporates by reference the previous paragraphs of this Complaint inclusive, as though fully set forth herein.

74.     Stinger's actions alleged in this Complaint were guided by an evil intent and outstrip the bounds of decency, fairness, and fair competition.  Stinger's conduct is

such that the Court is justified in assessing damages against it in an amount sufficient to deter it and others contemplating a similar course of conduct from engaging in that conduct in the future.

75.   TASER, therefore, is entitled to an award of punitive damages in an amount to be determined by the Court.

### Prayer For Relief

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in its favor and against Defendant, as follows:

1.   For a declaration that the S-200 is within the scope of the claims of the '762 patent;

2.   For a permanent injunction prohibiting infringement, including making, using, importing, offering for sale, and selling the S-200, as provided by 35 U.S.C. § 283;

3.   For a permanent injunction prohibiting Stinger's false advertising and false labeling practices;

4.   For an order stating that Stinger shall file a written report with the Court under oath, setting forth Stinger's compliance with all injunctive relief granted;

5.   For compensatory damages together with interest and costs for patent infringement as provided by 35 U.S.C. § 284;

6.   For compensatory damages in an amount sufficient to compensate TASER for the injuries proximately caused by Stinger's conduct;

7.   For treble damages as provided by 35 U.S.C. § 284 and 15 U.S.C. § 1117(a) for Stinger's willful and deliberate infringement and false advertising;

8.   For civil fine damages as provided in 35 U.S.C. § 292 for the patent false marking;

9.   For punitive damages in an amount sufficient to deter Stinger and any others similarly situated from engaging in such conduct;

10.    For attorneys' fees and costs pursuant to applicable law, including, without limitation, 35 U.S.C. § 285 and 15 U.S.C. § 1117(a).

11.    For an order stating that Stinger shall completely and immediately furnish all information in its possession, custody or control that relates in any way to responses to Stinger's offers of the S-200; and

12.    For such other and further relief as the Court deems just and proper.

### Request for Markman Hearing

TASER asks the Court to schedule a Markman Hearing for claim construction in this case.

### Jury Demand

TASER reserves its right to have all issues that are triable by a jury so decided in this case.


DATED this 5th day of January 2007.


**TASER International, Inc.**

s/ Holly L. Gibeaut
William R. Bachand
Holly L. Gibeaut
17800 N. 85th Street
Scottsdale, Arizona 85255-9603
Attorneys for Defendant TASER International, Inc.