Chad S. Campbell, Bar No. 012080
CSCampbell@perkinscoie.com
Aaron Matz, Bar No. 024108
AMatz@perkinscoie.com
PERKINS COIE BROWN & BAIN P.A.
2901 North Central Avenue, Suite 2000
Phoenix, AZ  85012-2788
Telephone:  602.351.8000
Facsimile:  602.648.7000

Holly L. Gibeaut, Bar No. 019786
hgibeaut@taser.com
TASER International, Inc.
17800 North 85th Street
Scottsdale, AZ  85255-9603
Telephone:  480.502.6265
Facsimile:  480.991.0791

Attorneys for Plaintiff
TASER International, Inc.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| TASER International, Inc., | No. CV07-0042-PHX-MHM |
| Plaintiff, | |
| v. | *Markman* Hearing: |
| Stinger Systems, Inc., | March 19, 2008, 9:00 a.m. |
| Defendant. | |

### TASER INTERNATIONAL, INC.'S
### OPENING CLAIM CONSTRUCTION BRIEF

1

## Table of Contents

2

3    Introduction ...................................................................................................... 1

4    Discussion ......................................................................................................... 2

5    I.    TASER's Claim Construction Positions Are Faithful to Settled Rules of
6          Claim Construction. ................................................................................... 2

7    II.   The Court Should Stick with the Plain Meaning of the Actual Claim
           Language Used in the '295 Patent. ............................................................ 5
8
9          A. '295 Patent Background. ....................................................................... 5

10         B. '295 Patent, Claims 2 and 40. .............................................................. 6

11              1.   Dispute 1:  "to ionize the air within the air gap" and "to maintain
                     the current flow." ......................................................................... 6
12
13                   a.   The actual claim language contradicts Stinger's proposed restriction. ...... 7

14                   b.   Unasserted claims of the '295 patent also contradict Stinger's
                          proposed restriction on claims 2 and 40. ................................... 8
15
16                   c.   The '295 patent's written description supports TASER's position. ........... 9

17                   d.   Stinger's position has no support in the prosecution history .................. 10

18              2.   Dispute 2:  "positionable." ............................................................ 12

19   III.  The Court Should Adopt the Plain Meaning of the Actual Claim Language
           Used in the '870 Patent ............................................................................. 13
20
21         A. '870 Patent Background. ....................................................................... 13

22         B. '870 Patent, Claims 1, 2, 3, and 4. ...................................................... 13

23              1.   Dispute 3:  "positionable." ............................................................ 14

24              2.   Dispute 4:  "high voltage power supply." ...................................... 14

25              3.   Dispute 5:  "a display for indicating to a user the battery capacity." .............. 15

26              4.   Dispute 6:  "a display for indicating to the user the amount of time
                     remaining in each pulse sequence." ............................................... 16
27

28

5.   Dispute 7: "a mechanism for allowing the user to extend the duration of the pre-timed series of electrical pulses." ...................................... 17

6.   Dispute 8: "a grounded user of the weapon." ................................. 18

IV.  The Court Should Adopt the Plain Meaning of the Actual Claim Language Used in the '262 Patent ........................................................................ 20

A.  '262 Patent Background. .......................................................................... 20

B.  '262 Patent, Claims 1, 2, 6, 9, 10, 11, 13, and 14. .................................. 20

1.   Dispute 9: "a high voltage pulsed current." .................................. 20

2.   Dispute 10: "a microprocessor programmed." ............................. 21

3.   Dispute 11: "to track date and time"; "to record tracked date and time"; "keeps track of current time of day"; "keeps track of current date." ............. 21

4.   Dispute 12: "trigger." .................................................................. 23

5.   Dispute 14: "signal generator." .................................................... 23

6.   Dispute 15: "means for providing a high voltage pulsed current through the target via a provided wire-tethered dart launched from the weapon." ..... 23

7.   Dispute 16: "means for recording date and time of day for each occasion that the weapon was operated to provide the current." ................................. 24

8.   Dispute 17: "means for discontinuing the provision of the current in accordance with lapse of a predefined period." ............................................ 24

9.   Dispute 18: "period of time." ....................................................... 25

Relief Requested .......................................................................................................... 25

1

**Table of Authorities**

2

**Cases** **Page**

3   Abbott Labs. v. Dey, L.P., 287 F.3d 1097 (Fed. Cir. 2002) ........................................ 20, 23

4   Altiris, Inc. v. Symantec Corp., 318 F.3d 1363 (Fed. Cir. 2003) ...................................... 23

5   Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc., 340 F.3d 1298
6   (Fed. Cir. 2003) ...................................................................................................... 4

7   Bancorp Servs., L.L.C. v. Hartford Life Ins. Co., 359 F.3d 1367 (Fed. Cir. 2004) ........... 25

8   Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.,
  249 F.3d 1341 (Fed. Cir. 2001) ................................................................................. 5

9   Brown v. 3M, 265 F.3d 1349 (Fed. Cir. 2001) .................................................................... 22

10   Elbex Video, Ltd. v. Sensormatic Elecs. Corp., No. 2007-1097,
11   2007 WL 4180138 (Fed. Cir. Nov. 28, 2007) ........................................................ 5, 11

12   Energizer Holdings, Inc. v. Int'l Trade Comm'n, 435 F.3d 1366 (Fed. Cir. 2006) ............ 25

13   Golight, Inc. v. Wal-Mart Stores, Inc., 355 F.3d 1327 (Fed. Cir. 2004) ...................... 23, 24

14   In re Kelley, 305 F.2d 909 (C.C.P.A. 1962) ........................................................................ 17

15   Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111
  (Fed. Cir. 2004) ...................................................................................................... 12

16   Intellectual Property Dev., Inc. v. UA-Columbia Cablevision, Inc.,
17   336 F.3d 1308 n.9 (Fed. Cir. 2003) ......................................................................... 17

18   JVW Enters., Inc. v. Interact Accessories, Inc., 424 F.3d 1324 (Fed. Cir. 2005) ............... 4

19   Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898 (Fed. Cir. 2004) ............................... 9

20   Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996).......................................... 2

21   Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed. Cir. 1995),
  aff'd, 517 U.S. 370 (1996) ....................................................................................... 3

22   MBO Labs., Inc. v. Becton, Dickinson & Co., 474 F.3d 1323
23   (Fed. Cir. 2007) ............................................................................................. 4, 7, 9, 10

24   Pfizer, Inc. v. Ranbaxy Labs. Ltd., 457 F.3d 1284 (Fed. Cir. 2006)................................. 20

25   Phillips v. AWH Corp., 415 F.3d 1303 (Fed. Cir. 2005) (en banc) ........................... passim

26   Salazar v. Procter & Gamble Co., 414 F.3d 1342 (Fed. Cir. 2005) .................................. 11

27   Saunders Group, Inc. v. Comfortrac, Inc., 492 F.3d 1326 (Fed. Cir. 2007) .............. passim

28   Schoenhaus v. Genesco, Inc., 440 F.3d 1354 (Fed. Cir. 2006) ........................................... 3

Smith v. Snow, 294 U.S. 1 (1935) ........................................................................ 3

TurboCare Div. v. General Elec. Co., 264 F.3d 1111 (Fed. Cir. 2001) .................. 9, 12, 14

Varco, L.P. v. Pason Sys. USA Corp., 436 F.3d 1368 (Fed. Cir. 2006) ............................. 4

Ventana Med. Sys., Inc. v. Biogenex Labs., Inc., 473 F.3d 1173 (Fed. Cir. 2006) ......... 7, 9

Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576 (Fed. Cir. 1996) ........................... 2, 3

Wilson Sporting Goods Co. v. Hillerich & Bradsby Co., 442 F.3d 1322
    (Fed. Cir. 2006) ........................................................................ 9, 12, 14, 22

**Statutes**

35 U.S.C. § 112 ........................................................................ 23

35 U.S.C. § 112[6] ........................................................................ 24

35 U.S.C. § 282 ........................................................................ 25

**Introduction**

TASER International, Inc. ("TASER") is a world leader in the development and supply of electronic control devices ("ECDs"), otherwise known as "stun guns." TASER®[1] ECDs are used to temporarily incapacitate dangerous, combative or self-threatening individuals in settings including law enforcement, medical treatment, corrections, military, and security.   TASER® ECDs use proprietary technology that TASER created through substantial investment in research and development.   TASER holds a growing number of United States Patents, including (among others) three that Stinger Systems, Inc. ("Stinger") has infringed—specifically, U.S. Patent Nos. 6,999,295, 7,102,870 and 7,234,262 (the '295, '870, and '262 patents, respectively).

The patents in suit cover inventions that have reduced the size and weight of ECDs while increasing their efficiency, effectiveness and traceability in deployment.   As a result, TASER® ECDs have become a regular part of the field equipment carried by law enforcement and other users.   TASER filed this suit because Stinger is making unauthorized use of these inventions to compete with TASER.

The claim construction disputes share important similarities.  TASER seeks to have the Court apply the plain meaning of the claim language actually used, as it would be understood by a person of ordinary skill in the art at the time of the claimed inventions.  In contrast, Stinger has proposed constructions that would improperly redefine terms or add language that is not in the claims at issue and that would significantly alter the plain meaning of those claims as issued by the U.S. Patent and Trademark Office ("PTO.")

For example, Stinger proposes to adjust the language of the asserted claims by adding limitations from unasserted claims or from examples in the written description. The Federal Circuit rules of claim construction forbid importing limitations from particular examples in the written description to narrow the reach of the claim language used.  In addition, a number of Stinger's proposed constructions would have the effect of excluding examples in the written description from the reach of the claims—an outcome

---

[1] "TASER®" is a registered trademark of TASER International, Inc.

1  that the Federal Circuit repeatedly has cautioned is almost never correct.   Finally,

2  Stinger's proposed constructions frequently contradict well-understood principles of

3  electricity.   Accordingly, TASER's proposed constructions, which follow the canons of

4  claim construction, should be adopted.

5       This brief addresses the '295, '870 and '262 patents in that order.  For the Court's

6  convenience, appendices A, B and C repeat the asserted claim language in its entirety.  An

7  accompanying counsel declaration identifies the exhibits that TASER intends to offer in

8  evidence at the *Markman* hearing and identifies the topics of expert testimony, consisting

9  of explanations about electrical principles in the patents at issue, that will be helpful in

10  understanding the technical issues raised at the hearing.

11                                   **Discussion**

I.    **TASER'S CLAIM CONSTRUCTION POSITIONS ARE FAITHFUL TO SETTLED**
12        **RULES OF CLAIM CONSTRUCTION.**

13       The interpretation of disputed language in a patent claim is a question of law for

14  the court.  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996).  Potential

15  evidentiary sources are divisible into two broad categories: "intrinsic evidence,"

16  consisting of the patent and the "prosecution history" (*i.e.*, the PTO record of examining

17  and issuing the patent); and "extrinsic evidence," consisting of sources outside patent and

18  prosecution history, such as technical articles, dictionaries and expert testimony.  *Phillips*

19  *v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) (en banc); *Vitronics Corp. v.*

20  *Conceptronic, Inc.*, 90 F.3d 1576, 1582-83 (Fed. Cir. 1996).  Between the two, intrinsic

21  evidence is preferred and usually dispositive (unless it contains no useful information)

22  because it consists of the objective and publicly-available record of what the inventor

23  meant to claim as his or her invention.[2]  *Vitronics*, 90 F.3d at 1583.

24

25       [2] District courts may listen to expert testimony to understand background or how
an invention works and to ensure that the court's understanding of technical aspects of a
26  patent is consistent with that of a person of skill in the art.  Nevertheless, "conclusory,
unsupported assertions by experts as to the definition of a claim term are not useful to a
27  court."   *Phillips*, 415 F.3d at 1318.   Similarly, a court should discount any expert
testimony "that is clearly at odds with the claim construction mandated by the claims
28  themselves, the written description, and the prosecution history."  *Id.*

1    Not all types of intrinsic evidence are entitled to equal weight.  For example, "the
2    claims of the patent, not its specifications, measure the invention."  *Smith v. Snow*, 294
3    U.S. 1, 11 (1935); *see Phillips*, 415 F.3d at 1312 ("It is a bedrock principle of patent law
4    that the claims of a patent define the invention . . . ." (quotation marks omitted));
5    *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) ("The written
6    description part of the specification itself does not delimit the right to exclude.  That is the
7    function and purpose of claims."), *aff'd*, 517 U.S. 370 (1996).

8    The claim terms "are generally given their ordinary and customary meaning,"
9    which is "the meaning that the term[s] would have to a person of ordinary skill in the art
10   in question at the time of the invention."  *Phillips*, 415 F.3d at 1312-13 (quotation marks
11   omitted).  The person of skill "is deemed to read [a] claim term not only in the context of
12   the particular claim in which the disputed term appears, but in the context of the entire
13   patent, including the specification."  *Id.* at 1313.  Often, the words of an asserted claim
14   that surround a disputed term are a "highly instructive" evidentiary source.  *Id.* at 1314.
15   In addition, "[o]ther claims of the patent . . . , both asserted and unasserted," can provide
16   useful information.  *Id.*

17   The written description is another aid in the claim construction process—although
18   important safeguards limit the way in which the written description may be used.  A
19   patentee is permitted to act as his or her own lexicographer.  *Schoenhaus v. Genesco, Inc.*,
20   440 F.3d 1354, 1358 (Fed. Cir. 2006).  Thus, when a patentee defines a claim term in a
21   way that departs from the ordinary meaning, the patentee's defined meaning will control.
22   However, any such intent to depart from the ordinary meaning of terms in the claims must
23   be clear in the written description.  *Id.* (agreeing with district court "that the specification
24   language cited by plaintiffs was insufficient to 'clearly set forth a different definition'
25   from the conventional usage of 'rigid' by ordinary practitioners in the field"); *Vitronics*,
26   90 F.3d at 1582 ("Although words in a claim are generally given their ordinary and
27   customary meaning, a patentee may choose to be his own lexicographer and use terms in a

28

1   manner other than their ordinary meaning, as long as the special definition of the term is

2   clearly stated in the patent specification or file history.")

3       In reviewing the written description for context, a construing court must never

4   import into the claim language limitations from the written description that are not

5   actually in the claims. *Varco, L.P. v. Pason Sys. USA Corp.*, 436 F.3d 1368, 1373 (Fed.

6   Cir. 2006) ("In examining the specification for proper context, however, this court will not

7   at any time import limitations from the specification into the claims." (quotation marks

8   omitted))   That prohibition against borrowing limitations from the written description

9   applies even when the patent discloses only one example (*i.e.*, one embodiment) or when

10  all of multiple examples in the written description include a given limitation that is not

11  recited in the claim language under review. *Saunders Group, Inc. v. Comfortrac, Inc*.,

12  492 F.3d 1326, 1332 (Fed. Cir. 2007) ("Even where a patent describes only a single

13  embodiment, claims will not be read restrictively unless the patentee has demonstrated a

14  clear intention to limit the claim scope." (quotation marks omitted)); *JVW Enters., Inc. v.

15  Interact Accessories, Inc.*, 424 F.3d 1324, 1335 (Fed. Cir. 2005) (refusing to limit claims

16  according to a feature that all embodiments of the written description exemplified).

17      One additional rule of construction regarding a patent's written description will be

18  important in this case.   The correct construction of a disputed term normally will not

19  exclude an embodiment in the written description from the reach of the claim. *MBO

20  Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007) ("A claim

21  interpretation that excludes a preferred embodiment from the scope of the claim is rarely,

22  if ever, correct." (quotation marks omitted)).   To depart from that rule requires "highly

23  persuasive evidentiary support." *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls,

24  Inc.*, 340 F.3d 1298, 1308-09 (Fed. Cir. 2003) (quotation marks omitted) (construing

25  "protrusion" as "something that protrudes").

26      Finally, the prosecution history may sometimes help in resolving a dispute about

27  claim language, but its utility for that purpose is frequently limited.   The prosecution

28  history "often lacks the clarity of the specification and thus is less useful for claim

construction purposes." *Phillips*, 415 F.3d at 1317.  In particular, the prosecution history cannot be used to argue that the patentee has surrendered claim scope indicated by the ordinary meaning of the claim terms that appear in the patent unless the alleged disclaimer is clear, unambiguous and unmistakable.  *Elbex Video, Ltd. v. Sensormatic Elecs. Corp.*, No. 2007-1097, ___ F.3d ____, 2007 WL 4180138, at *4 (Fed. Cir. Nov. 28, 2007); *Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*, 249 F.3d 1341, 1348 (Fed. Cir. 2001) (finding no clear disclaimer because "[a] person of reasonable intelligence would not be misled into relying on the erroneous statement, for it is contrary not only to the plain language of the claims and the specification, but also to other statements in the same prosecution document").

## II.   THE COURT SHOULD STICK WITH THE PLAIN MEANING OF THE ACTUAL CLAIM LANGUAGE USED IN THE '295 PATENT.

### A.   '295 Patent Background.

The '295 patent is entitled "Dual Operating Mode Electronic Disabling Device for Generating a Time-Sequenced, Shaped Voltage Output Waveform."  It addresses the challenge of establishing electrical contact with a target (the person to be controlled) and efficiently delivering electricity to immobilize the target temporarily.  Often, a target's clothing will prevent the ECD's electrodes from establishing direct contact with the target's skin.  For example, when electrodes are attached to small darts and wires that are launched from the ECD, the darts may lodge in the target's clothing, leaving an air gap (*e.g.*, on the order of an inch) between the electrode and the target.  The air gap impedes the flow of electricity.  Prior art ECDs used large battery packs and inefficient power supplies to generate a high voltage that would both break down the impedance of the air gap and send electricity through the target.

The invention cleverly addresses air gaps in a different way.  As taught in the '295 patent, the ECD initially generates a high voltage output to lower the impedance of the air gap by ionizing the air during a first period.  During a second period, the ECD takes advantage of the lower impedance and generates a lower voltage output to provide

1    immobilizing current through the target.  By using different voltage outputs (i) to form
2    ions in the air gap and (ii) to pass current through the target, the inventions claimed in the
3    '295 patent allow ECDs to consume less power, employ a more effective power supply,
4    and use a smaller battery pack.  Compared to the prior art, ECDs that practice the
5    teachings of the '295 patent are smaller, lighter, more efficient, and more effective in use.

6         **B.     '295 Patent, Claims 2 and 40.**

7         TASER asserts claims 2 and 40 in the '295 patent against Stinger.  Except for three
8    terms or phrases, the parties have resolved their disagreements about claim language.
9    Moreover, the disputed terms and the surrounding language are nearly identical in both
10   claims.  See Appendix A for a full recitation and comparison of claims 2 and 40.

11
12         **1.     Dispute 1:  "to ionize the air within the air gap" and "to maintain the current flow."**

13        Two of the disputed phrases that appear in both claims 2 and 40 should be
14   evaluated together in the context of the claim language that surrounds them because both
15   phrases raise the same basic issue.  As highlighted below, the claim language with the
16   disputed phrases provides:

17            . . . a first high voltage, short duration output across the first
             and second electrodes during a first time interval to ionize the
18           air within the air gap to thereby reduce the high impedance
             across the air gap to a lower impedance to enable current flow
19           across the air gap at a lower voltage level [and]

20           subsequently . . . a second lower voltage output across the first
             and second electrodes during a second time interval to
21           maintain the current flow across the first and second
             electrodes and between the first and second contact points on
22           the target to enable the current flow through the target to cause
             involuntary muscle contractions to thereby immobilize the
23           target.

24   ['295 claims 2 & 40]

25        TASER believes that the disputed phrases should have the full breadth of their
26   plain and ordinary meaning.  Thus, "to ionize the air within the air gap" should be
27   interpreted as "to enable ions to form in the air within the air gap."  Similarly, "to
28   maintain the current flow" should be interpreted as "to provide for the current flow."

1    Stinger proposes to restrict "to ionize the air within the air gap" to mean "to create
2    a glow or arc discharge across the air gap."   Stinger further proposes to restrict "to
3    maintain the current flow" to mean "to maintain a continuous glow or arc discharge
4    allowing current to pass without interruption across the air gap."   Taking the phrases
5    together, Stinger seeks to require the formation of an electrical arc across the air gap and
6    then uninterrupted and continuous delivery of immobilizing current across or through the
7    arc. Stinger's position is an improper attempt to narrow the actual claim language used.

8              a.    **The actual claim language contradicts Stinger's proposed**
9                    **restriction.**

10   "[T]he context in which a term is used in the asserted claim can be highly
11   instructive." *Phillips*, 415 F.3d at 1314 (noting that the claim language "steel baffles"
12   "strongly implies that the term 'baffles' does not inherently mean objects made of steel").
13   In addition, where a proposed limitation does not appear in the actual language of a claim,
14   the limitation cannot be added through the guise of a proffered construction. *See MBO*
15   *Labs.*, 474 F.3d at 1331 (requiring "a textual reference in the actual language of the claim
16   with which to associate a proffered construction" (quotation marks omitted)) (citing
17   cases); *Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*, 473 F.3d 1173, 1180 (Fed. Cir.
18   2006) ("To start with, claims 1 and 5 do not contain any language that could be read to
19   limit the term 'dispensing' to require 'direct dispensing.'").

20   In the '295 patent, asserted claims 2 and 40 do not mention or refer to the
21   formation of an arc across an air gap.  They refer instead to "a first high voltage, short
22   duration output . . . during a first time interval to ionize the air within the air gap to
23   thereby reduce the high impedance . . . to a lower impedance to enable current to flow."
24   Although the formation of ions in the air gap may lead to formation of an electrical arc,
25   the ions and the arc are not the same thing.  ['295 col. 2:61-62 (noting separately that "the
26   air is ionized" and "a blue electric arc forms")]  Ions are formed when electrons are
27   stripped from their associated air molecules.  An arc is formed by the release of photons,
28   which happens when ions recombine with free electrons—it is those photons, not the ions

-7-                                   No. CV07-0042-PHX-MHM

1    themselves, that make the arc visible.  [Expected Testimony; *see* Counsel Decl. Ex. 7 ¶ 8,

2    at p. 2]  As the patent confirms, ions must be formed within an air gap before an arc can

3    appear.  ['295 col. 5:64-65 (example circuit "forms an electrical arc having ionized air

4    within the air gap")]  And when an arc is extinguished, ions within the air gap will remain

5    for some period of time.  Significantly, current flow is the movement of electrons (or

6    other charged particles), not photons.  [Expected Testimony; *see* Counsel Decl. Ex. 7 ¶ 8,

7    at p. 2]

8        Claims 2 and 40 also do not state any requirement that the current flowing through

9    a target after an air gap has been ionized must be conducted across an arc formed during

10    the first period or must be continuous or uninterrupted.  Instead, the claims provide for a

11    "subsequent[]" and "second lower voltage output . . . during a second time interval to

12    maintain the current flow . . . to enable the current to flow through the target to cause

13    involuntary muscle contractions."  Current flow sufficient to cause involuntary muscle

14    contractions can be maintained during an interval even if the flow is interrupted or is not

15    continuous.  [Expected Testimony; *see* Counsel Decl. 7 ¶ 11, at p. 2]

16

17           **b.**     **Unasserted claims of the '295 patent also contradict Stinger's proposed restriction on claims 2 and 40.**

18        Differences between claims of a patent regarding a particular limitation "can also

19    be a useful guide in understanding the meaning of particular claim terms."  *Phillips*, 415

20    F.3d at 1314.  In the '295 patent, in contrast to claims 2 and 40, claim 1, which TASER

21    has not asserted in this case, states a requirement that an arc be formed and that current to

22    immobilize the target flow across the arc.  Unasserted claim 26 also includes a

23    requirement that an arc be formed.  The fact that some claims define the invention by

24    reference to the formation of an arc and the flow of current across the arc, while others

25    define the invention without mentioning such a requirement, is a powerful indication that

26    the requirement is not part of the claims where it does not expressly appear.  *See Saunders*

27    *Group*, 492 F.3d at 1332 ("[A] change to only some of the claims, however, is a strong

28    indication that the claims not reciting pressure activated seals were not intended to require

them."); *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1329 (Fed. Cir. 2006) (use of term "rigid insert" in one claim and a mere "insert" in another meant that that the term "insert" "does not inherently carry a 'rigid' limitation"); *TurboCare Div. v. General Elec. Co*., 264 F.3d 1111, 1123 (Fed. Cir. 2001) (claim terms should not be read to contain a limitation "where another claim restricts the invention in exactly the [same] manner").

Contrary to Stinger's position, there is no requirement that each claim of the '295 patent cover every feature that is part of the specification.  Patentees are permitted to claim their inventions by including different features in different claims.  *See Ventana Med. Sys.*, 473 F.3d at 1181 (rejecting proposal to read limitation from one claim into another by implication; "[w]hen the claim addresses only some of the features disclosed in the specification, it is improper to limit the claim to other, unclaimed features").

### c.    The '295 patent's written description supports TASER's position.

During meet and confer, Stinger has argued that claims 2 and 40 must be read to require that an arc be formed and that current to immobilize the target be maintained over the arc because some of the figures and associated text in the written description of the '295 patent provide such a feature.  But the premise of Stinger's argument is mistaken, because there is no requirement that a claim's scope be "limited to inventions that look like the ones in the figures." *MBO Labs.*, 474 F.3d at 1333.  Even if the examples noted by Stinger were the ***only*** embodiment disclosed in the patent, claims 2 and 40 would not be confined to that scope.  *See Saunders Group*, 492 F.3d at 1332 (even though the only examples in the written description showed a "pneumatic cylinder" with a pressure activated seal, the term could not be restricted from its ordinary meaning to require such seals).  The Federal Circuit has explicitly rejected Stinger's argument.  *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) ("[T]his court has expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment.").

1    Significantly, the written description explains and summarizes the invention

2    without any reference to the formation of an arc or to current flowing across such an arc.

3    ['295 col. 3:30-48 ("Summary of the Invention") & '295 abstract]  Moreover, Stinger's

4    claim construction position must be rejected because it would exclude a preferred

5    embodiment from the reach of the claims.  *See MBO Labs.*, 474 F.3d at 1333 (refusing to

6    adopt construction of term that would exclude two of the figures in the patent; "[a] claim

7    interpretation that excludes a preferred embodiment from the scope of the claim is rarely,

8    if ever, correct" (quotation marks omitted)).  Specifically, as noted above, Stinger

9    proposes to read claims 2 and 40 to require that the current flowing to immobilize the

10   target during the second period be continuous and uninterrupted from the formation of an

11   arc by the high voltage during the first period.  As confirmed by Figure 17 and the

12   discussion at column 7, lines 63 to 65, one preferred embodiment of the patent shows the

13   voltage across the electrodes (and by necessity the current flowing to the target) reversing

14   polarity and occupying a momentary point of zero voltage and current after the second

15   period of lower voltage has commenced.  In other words, the immobilizing current during

16   a second period in Figure 17 is neither continuous nor uninterrupted from the formation of

17   an arc in the first period.  Adding a requirement of continuous, uninterrupted current

18   would therefore improperly exclude the preferred embodiment of Figure 17 from the

19   reach of the claims.[3]

20              **d.      Stinger's position has no support in the prosecution history.**

21   The prosecution history of the '295 patent fails to justify any restriction of the

22   ordinary meaning of the claim language actually used in claims 2 and 40.  In particular,

23   the prosecution history provides no support for adjusting those claims to add an unstated

24   limitation that an arc must be created by the high voltage output during the first period and

25   the immobilizing current must pass across the arc during the second period with the lower

26   voltage output.  To find a disclaimer of claim scope, the prosecution history must include

27   ───────────────
          [3]  Adding such a requirement also would improperly exclude the preferred
28   embodiments shown in Figures 10-14B, 18-20, and 24 and 25.  A skilled artisan would
     recognize that the output reverses polarity.

a clear and unmistakable surrender of scope by the applicant.  *Elbex Video*, 2007 WL 4180138, at *5 (refusing to find disclaimer notwithstanding statement inconsistent with ordinary meaning of claim terms in prosecution history).

During meet and confer, Stinger has pointed to the patent examiner's stated reasons for allowance as justification for adding requirements for an arc and current across the arc to claims 2 and 40.  [Counsel Decl. Ex 4, '295 File History at p. 198 (Notice of Allowability dated 9/16/2005, at p. 2)]  The examiner explained that the claims were valid notwithstanding a prior art reference (Gowan) because its teachings were used in a spark plug, not in a "stun gun type device that uses a second transformer with a lower output voltage to flow current across an arc to disable a subject."   [*Id*.]   Nevertheless, the examiner's statements provide no support for Stinger's position.  First, the examiner's statement was obviously directed to claim 1, which recites the limitation that a transformer provides a lower output voltage to maintain current across an arc created by an earlier higher output voltage.  Claims 2 and 40 recite no such limitation.  Second, the statements were made by the examiner, not by the applicant.  An examiner's unilateral statements cannot effect a disclaimer of claim scope where, as here, the applicant remained silent about them.  *See Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1347 (Fed. Cir. 2005) ("[Appellee] does not present any case law that stands for the proposition that an examiner's unilateral statements in a Notice of Allowance constitute a clear and unambiguous disavowal of claim scope.  Once again, the applicant has disavowed nothing.").

Finally, the applicant's affirmative conduct during prosecution of the '295 patent contradicts adding Stinger's proposed limitations to claims 2 and 40.  As originally submitted, claim 1 was the only claim that addressed the problem of overcoming an air gap.  It expressly included a requirement that an arc be created and that current pass across the arc to disable a subject.  [Counsel Decl. Ex 4, '295 File History at pp. 50-52 (Original Claims)]  In a preliminary amendment, however, the applicant added claims 2 and 40, which omit any reference to an arc or to current passing across an arc in an

1    uninterrupted and continuous manner.  [*Id.* at p. 89-106 (Preliminary Amendment dated

2    2/4/2005)]   Making that change to the later added claims is a strong indication that

3    Stinger's proposed additional requirements do not apply.  *See Saunders Group*, 492 F.3d

4    at 1332 (omission of limitation from some but not all claims was "strong indication" that

5    the limitation applied solely to claims that recited it).

6                    **2.     Dispute 2: "positionable."**

7         Claims 2 and 40 both require "first and second electrodes positionable to establish

8    first and second spaced apart contact points on the target."  The term "positionable" is not

9    a technical term of art that requires elaborate construction by the Court.  *Phillips*, 415 F.3d

10   at 1314 ("In some cases, the ordinary meaning of claim language as understood by a

11   person of skill in the art may be readily apparent even to lay judges, and claim

12   construction in such cases involves little more than the application of the widely accepted

13   meaning of commonly understood words.").  "Positionable . . . on the target" should be

14   construed to carry its commonly understood meaning as "capable of being

15   positioned . . . on the target."  [*See, e.g.*, definition at http://www.wordwebonline.com/

16   en/POSITIONABLE (last visited Dec. 28, 2007)]

17        Stinger improperly seeks to add a requirement that the electrodes be capable of

18   being placed on a target that is "***remote.***"  But the requirement of a "remote" target

19   appears nowhere in claims 2 or 40.  In contrast such a requirement does appear in

20   unasserted claims 37 and 38.  As noted above, including a "remote" target requirement in

21   some claims but not others strongly indicates that the requirement does not apply where it

22   does not appear.  *See Wilson Sporting Goods*, 442 F.3d at 1329; *TurboCare*, 264 F.3d at

23   1123.[4]

24   _____

25        [4] Moreover, claims 37 and 38 depend from independent claim 31, which, like
     claims 2 and 40, recites a "target" as opposed to a "remote target."  Where a requirement
26   appears in a dependent claim (here claims 37 and 38), there is a strong presumption that
     the requirement is not part of the independent claim (i.e., claim 31).  *Phillips*, 415 F.3d at
27   1315.  And where the same term (*i.e.*, "target" without the modifier "remote") appears in
     multiple claims in the ***same*** patent (*i.e.*, claims 31, 2 and 40), the term should be given the
28   same meaning throughout.  *Id.* at 1314; *see Innova/Pure Water, Inc. v. Safari Water
     Filtration Sys., Inc.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004).

III.   **THE COURT SHOULD ADOPT THE PLAIN MEANING OF THE ACTUAL CLAIM LANGUAGE USED IN THE '870 PATENT.**

A.   **'870 Patent Background.**

The '870 patent is entitled "Systems and Methods for Managing Battery Power in an Electronic Disabling Device."  Four of the inventions claimed in the '870 patent are at issue in this case.  The invention of claim 1 addresses the problem an ECD user (*e.g.*, a police officer) has in keeping track of the battery capacity available to use the ECD to control a target.  The invention of claim 2 gives a user information about the duration that an ECD may operate in light of operating conditions.  The invention of claim 3 enables a user to extend the time that an ECD will immobilize a target.

The invention of claim 4 reduces the voltage levels within the ECD, which increases electronic component life, allows the use of smaller and lighter components, and enhances user safety.  In one example, the '870 patent discloses an ECD transformer with a center-tapped or two secondary windings, with each winding coupled to one of the two output electrodes of the ECD.  ['870 col. 8:55-col. 9:4 & Fig. 20]  Through one winding, the ECD generates a negative voltage compared to common ground of the ECD.  Through the other winding, the ECD generates a positive voltage compared to common ground.  Because common ground is at zero voltage, the total voltage across the two electrodes is twice the voltage of either electrode compared to common ground.  The result is less electrical stress on the ECD's internal components, and a reduced risk of shock to the user (*e.g.*, if the user becomes coupled to the common ground of the ECD while using the ECD to immobilize a target).  [*Id.*; '870 col. 16:43-64]

B.   **'870 Patent, Claims 1, 2, 3, and 4.**

TASER asserts claims 1 through 4 of the '870 patent against Stinger.  The full text of the claim language is replicated at Appendix B.  TASER and Stinger have six disputes regarding the proper construction of the claim language in those claims.

1

    **1.    Dispute 3:  "positionable."**

2       Claims 1 through 4 each require "first and second electrodes positionable to

3  establish first and second spaced apart contact points on the target."  That language

4  mirrors the "positionable" language of claims 2 and 40 of the '295 patent.  In addition, the

5  '295 and '870 patents share the same written description.  For the reasons set out above

6  (at p. 12), the Court should reject Stinger's request to add an unstated "remote target"

7  requirement to the claims and interpret "positionable" according to its plain meaning as

8  "capable of being positioned."

9

    **2.    Dispute 4:  "high voltage power supply."**

10      Claims 1 through 4 each require a "high voltage power supply for generating an

11  output voltage."  The term "high voltage power supply" should be read according to the

12  full breadth of its ordinary meaning as "a power supply that produces a voltage capable of

13  immobilizing a target."

14      Stinger proposes to restrict the meaning of "high voltage" to a voltage high enough

15  to ionize air in an air gap between an electrode and the target.  Stinger's proposal is

16  another improper attempt to import an unstated limitation into the actual language of '870

17  claims 1 to 4 as allowed by the PTO.  Claims 1 through 4 do not refer in any way to an air

18  gap or to ionizing air within an air gap.  Other claims in the '870 patent (*e.g.*, claims 22

19  and 23), however, do refer to air gaps and explicitly require a power supply capable of

20  generating voltages high enough to ionize the air within an air gap.  The presence of that

21  requirement in some but not other claims indicates that it does not apply where it does not

22  appear. *See Wilson Sporting Goods*, 442 F.3d at 1329; *TurboCare*, 264 F.3d at 1123.

23      Moreover, the "high voltage power supplies" shown in the Figures of the '870

24  patent illustrate that the Stinger's proposed construction is impermissibly narrow.  The

25  "high voltage power supply" shown in Figure 11, for example, produces only two

26  thousand volts—enough to trigger the device's internal spark gaps but not nearly enough

27  to reliably ionize the air in an air gap between an electrode and the target.  ['870 Figs. 11,

28  12B & 13 & col. 7:17-30]   A separate transformer (designated **T1** in Figure 13) is

1    required to multiply the two thousand volts from the high voltage power supply up to the

2    roughly fifty thousand volts needed to ionize the air in the air gap at the target.  [*Id.* col.

3    7:32-42]

4         In addition, the '870 patent explicitly points out that not all stun gun power

5    supplies are designed to overcome air gaps between an electrode and a target.  ['870 col.

6    1:27-39 (distinguishing stun guns that operate on remote targets where air gaps may exist

7    from "[a] first stun gun design [that] requires the user to establish direct contact between

8    the first and second stun gun output electrodes and the target.")]  Even stun guns that

9    work by direct contact, however, still deliver "high voltage pulses" to a target.  ['870 col.

10   1:19-25]  Each of claims 1 through 4 is directed to an "electronic disabling device for

11   immobilizing a target" without further limiting the claims to devices that overcome air

12   gaps.  The term "high voltage power supply" should therefore be read according to the full

13   breadth of its ordinary meaning as "a power supply that produces a voltage capable of

14   immobilizing a target."

15

16         **3.     Dispute 5: "a display for indicating to a user the battery capacity."**

17        Claim 1 requires "a display for indicating to a user the battery capacity."  That

18   language should be given its plain meaning as "a display that provides a user with

19   information concerning the battery capacity."

20        Stinger proposes to narrow that language to require "an output device reporting a

21   decline in the energy available for output from the battery while the battery is in use."  By

22   requiring the display to report a decline in the energy available for output from the battery,

23   Stinger seeks to narrow claim 1 to one example set out in the written description.  As

24   noted, absent affirmative and clear indications from the intrinsic record, however, the

25   ordinary meaning of claim language cannot be restricted to match one particular example

26   of the written description.  *Saunders Group*, 492 F.3d at 1332 (refusing to limit claim term

27   to configuration from written description, even though every disclosed example included

28   the feature).

1   Here, the intrinsic record undercuts Stinger's position.  First other limitations of

2   claim 1 contradict the notion that the claim is limited to reporting a "decline" in available

3   battery capacity.  In addition to the "display" limitation, claim 1 requires "a digital

4   memory device for storing battery capacity data indicating the amount of battery capacity

5   ***consumed or remaining***." ['870 col. 19:65-67 (emphasis supplied)]  That language makes

6   clear that the claim is not confined to reporting the battery capacity that has been

7   consumed.  Reporting battery capacity that remains also would suffice.

8   Second, the prosecution history makes clear that information about "battery

9   capacity" in claim 1 is not confined to measured energy.  In its original form, claim 1

10   required the "digital memory device" to store information related to the "amount of

11   battery power consumed or remaining," and required the "display" to indicate the "battery

12   capacity status."[5]  In a preliminary amendment (*i.e.*, before the PTO examiner began to

13   review the application), the language was broadened by eliminating the references to

14   "power" and "status" as follows:

15   … a digital memory device for storing ~~information related to~~
     ~~battery capacity~~ data indicating the amount of battery ~~power~~
16   ~~capacity~~ consumed or remaining; …

17   … a display for indicating to ~~the~~ a user the battery capacity
     ~~status~~.
18

19   [Counsel Decl. Ex. 5, '870 File History at p. 90 (Preliminary Amendment dated

20   2/19/2004, at p. 6)]  Consequently, Stinger's attempt to restrict the display of claim 1 to

21   reporting a decline of available energy (as in the status of battery power) should be

22   rejected.  A display with any indication of battery capacity is sufficient.

23   **4.    Dispute 6:  "a display for indicating to the user the amount of
                time remaining in each pulse sequence."**

24   Claim 2 requires "a display for indicating to the user the amount of time remaining

25   in each pulse sequence."  That language should be given its plain meaning as "a display

26

27   [5] Claim 1 originally was application claim 2.  [Counsel Decl. Ex. 5, '870 File
     History at p. 215 (Issue Classification)]   The claim was renumbered when the first
28   application claim 1 was cancelled.  [*Id.* at p. 165 (Amended claims dated 4/19/2006, at p.
     3)]

1  that provides a user with information concerning the amount of time remaining in each
2  pulse sequence." Stinger incorrectly proposes to restrict the display to "reporting the
3  remaining duration . . . in descending numerical units." As with claim 1, Stinger seeks to
4  use limitations from a few particular examples of the written description to narrow the
5  broader language of the claim. There is no basis to do that here. The plain meaning
6  comes from history and the world at large, which are filled with displays of remaining
7  time that do not involve "descending numerical units." [Expected Testimony; *see*
8  Counsel Decl. Ex. 7 ¶ 19, at p. 3]

9
10    **5.    Dispute 7: "a mechanism for allowing the user to extend the duration of the pre-timed series of electrical pulses."**

11       Claim 3 requires "generating an output voltage" that is "delivered in a pre-timed
12  series of electrical pulses to the target." The claim further requires a "trigger mechanism
13  to initiate the pre-timed series of electrical pulses." Finally, the claim requires "a
14  mechanism for allowing the user to extend the duration of the pre-timed series of
15  electrical pulses." That language should be given its plain meaning, which is "a
16  mechanism that allows the user to extend the duration of the pre-timed series of electrical
17  pulses."

18       Stinger incorrectly seeks to rewrite the limitation to read "a mechanism separate
19  from the trigger mechanism causing continuous uninterrupted operation of the pre-timed
20  series of electrical pulses with no additional signal from the trigger mechanism." There is
21  no basis to preclude the "trigger mechanism" from also serving as the "mechanism for
22  allowing the user to extend the duration." Indeed, it is settled law that a single component
23  or piece of an apparatus may serve to satisfy more than one limitation in a patent claim.
24  *Intellectual Property Dev., Inc. v. UA-Columbia Cablevision, Inc.*, 336 F.3d 1308, 1320
25  n.9 (Fed. Cir. 2003) ("[T]wo limitations hypothetically can read on the same structure.");
26  *In re Kelley*, 305 F.2d 909, 914 (C.C.P.A. 1962) (same cylinder is both the "means for
27  reducing said actuator force" and the "power driven actuator"). Nor is Stinger's proposed
28  re-write consistent with the written description. At column 19, lines 15 to 35, the '870

1   patent includes alternative examples of a mechanism to extend the duration of electrical

2   pulses.  In each, additional pulls of the trigger are used to send signals to extend the

3   duration.  Stinger's proposed extra requirements would have the impermissible effect of

4   excluding the preferred embodiments from the reach of the claim language.

5           **6.     Dispute 8:    "a grounded user of the weapon."**

6           Claim 4, paragraph b, of the '870 patent refers to "a grounded user of the weapon":

7                   b.  a high voltage power supply for generating an output
                    voltage delivered across the first and second contact points on
8                   the target to generate a positive voltage potential at one
                    electrode and a negative voltage potential at the other
9                   electrode, thereby increasing the total voltage drop across the
                    target while decreasing the maximum voltage potential
10                  between either electrode and a grounded user of the weapon.

11  TASER maintains that a "grounded user" includes (for example) a user who becomes

12  coupled to the primary circuit ground of the weapon while using it to subdue a target.

13  Stinger contends that a "grounded user" must be coupled to the earth.  If Stinger's

14  construction were correct (it is not), claim 4 would not encompass the benefit taught in the

15  written description and would exclude a preferred embodiment of the claimed invention.

16          Some background on basic terminology may be useful.  Voltage is the difference in

17  electrical potential between two points in a circuit.  Frequently, voltage is measured

18  against a common or reference conductor in the circuit that is called "ground" and has

19  zero electrical potential.  In commercial transmission systems, power lines are coupled to

20  a stake driven into the earth, which serves as the reference conductor for safety purposes.

21  But in ECDs (as in battery-operated products generally) there is no expected connection to

22  earth and no significant voltage measured with respect to earth.  In ECDs, ground is not

23  the earth but a common reference conductor (with zero electrical potential) built into the

24  product.  [Expected Testimony; *see* Counsel Decl. Ex. 7 ¶ 21, at p. 4]

25          Consistent with ordinary usage, the '870 patent explains a safety benefit of one

26  embodiment of the invention by using "ground" to refer to a common reference conductor

27  in the ECD circuit.  As detailed at column 16, lines 42 to 63, an ECD user (*e.g.*, a police

28  officer subduing a target) may be shocked if the user inadvertently becomes coupled to the

1    "primary weapon ground" (i.e., to the common reference conductor in the ECD).  At the

2    high voltages used in ECDs, such coupling can happen even if the user is not touching the

3    primary weapon ground.  The ECD's high voltage electricity ionizes the air and can leap

4    several inches to contact the user's body.  The higher the voltage in reference to primary

5    weapon ground, the longer will be the distance the electricity may leap, the greater will be

6    the risk of shock to the user, and the higher will be the value of any resulting accidental

7    shock current to the user of the ECD.

8        In "prior art stun guns," "the maximum voltage from one electrode (E1 or E2)

9    referenced to primary weapon ground would reach 50 KV" or  50,000 volts.  ['870 col.

10   16:52-54]  In contrast, in the circuit of Figure 24, although the peak voltage across the

11   electrodes E1 and E2 may reach 50 KV (i.e., 50,000 volts), "the peak voltage measured

12   from either electrode E1 or E2 to primary weapon ground will not exceed 25KV [or

13   25,000 volts]."  [Id. col. 16:42-50]  That reduction in the voltage of the electrodes

14   referenced to primary weapon ground arises because the circuit of Figure 24 generates a

15   voltage with negative polarity at one electrode and a voltage of positive polarity at the

16   other electrode.  [Id. col. 16:43-47]  As the patent concludes:

17              Since a 25 KV output can establish an arc across a gap less
             than half the size of a gap that can establish an arc with a 50
18           KV output, reducing the peak output terminal to ground
             voltage by fifty percent from 50 KV to 25 KV reduces by
19           more than a two to one ratio the risk that the user of this
             version of the X26 system will be shocked by the high voltage
20           output pulses.

21   [Id. col. 16:55-61]

22       To summarize, in explaining the benefit of Figure 24 over the prior art, the '870

23   patent uses the term "ground" solely to refer to a common or reference conductor in the

24   ECD.  That usage is consistent with the rest of the patent in which the common or

25   reference conductor within an ECD is identified with the customary circuit symbols for

26   ground: " ≡ " (e.g., in Figures 1, 2, and 9-11) and " ▽ " (e.g., in Figures 23 and 24).  If

27   the concept of ground in claim 4 were restricted to earth, the claim would not encompass

28

1  the benefit explained in the patent or the embodiment of Figure 24.  Such a construction is

2  incorrect.

3  **IV.   THE COURT SHOULD ADOPT THE PLAIN MEANING OF THE ACTUAL CLAIM**
   **LANGUAGE USED IN THE '262 PATENT.**

4

5      **A.   '262 Patent Background.**

6      The '262 patent is entitled "Electrical Weapon Having Controller for Timed

7  Current Through Target and Date/Time Recording."  Eight claims in the '262 patent are at

8  issue in this case (claim 1 and its dependent claim 2; claim 6; claim 9 and its dependent

9  claims 10 and 11; and claim 13 and its dependent claim 14).  The full text of the claim

10 language is included at Appendix C.  The '262 patent addresses ways to help law

11 enforcement track the use of an ECD by a law enforcement officer or other user.

12     Significantly, the '262 patent is not part of the patent family to which the '295 and

13 '870 patents belong.  As a result, the prosecution histories of the '295 and '870 patents (or

14 any other member of that family of patents) are not part of the intrinsic record of the '262

15 patent.  *Pfizer, Inc. v. Ranbaxy Labs. Ltd.*, 457 F.3d 1284, 1290 (Fed. Cir. 2006)

16 ("[S]tatements made during prosecution of [a] later, unrelated . . . patent cannot be used to

17 interpret claims of the [patent in suit].");  *Abbott Labs. v. Dey, L.P.*, 287 F.3d 1097, 1105

18 (Fed. Cir. 2002) (arguments made during prosecution of one patent were irrelevant to

19 construction of patent not part of same formal family, even though the patents were

20 commonly owned).

21     **B.   '262 Patent, Claims 1, 2, 6, 9, 10, 11, 13, and 14.**

22        **1.   Dispute 9:   "a high voltage pulsed current."**

23     Independent claims 1 and 13 require "a high voltage pulsed current" to be

24 conducted or initiated from the ECD.  TASER submits that the phrase "high voltage

25 pulsed current" should be read to mean a "pulse or train of pulses of electrical current

26 including a high voltage," which is the ordinary meaning of the language used.

27     Stinger seeks to add unstated requirements to the phrase, so that the phrase would

28 be read to require "a pre-timed series of electrical electron flows as pulses in response to

1  similar high voltage applied pulses."   The claim language does not include any

2  requirement that the pulses qualify as a "pre-timed series."  Nor does the language include

3  a requirement that certain pulses are similar to others or that pulses be in response to other

4  pulses.  Nothing in the patent suggests that Stinger's proposed special limitations are a

5  necessary part of the claimed invention.  Even the written description acknowledges that

6  the current pulses may have varying lengths and varying power characteristics.  [*E.g.*,

7  '262 col. 3:63-64 ("The pulse [from] capacitor 15 is a 0.80 to 10 joule pulse, and has a

8  pulse width of 9 to 100 microseconds.")]  Stinger's proposed special requirements should

9  not be added to the claim language.

10  **2.    Dispute 10:  "a microprocessor programmed."**

11  Independent claims 1 and 13 also require a microprocessor that is "programmed" to

12  accomplish several specified tasks.   The term "programmed" is a common term that

13  requires no elaborate construction.   *Phillips*, 415 F.3d at 1314 ("In some cases, the

14  ordinary meaning of claim language as understood by a person of skill in the art may be

15  readily apparent even to lay judges . . . .")  A microprocessor is programmed when it

16  includes a program to execute.   Stinger proposes to narrow the ordinary meaning by

17  adding a requirement that the program be "provided with the necessary instructions to

18  execute an automatic sequence of functions once initiated."  In other words, Stinger seeks

19  to exclude programs in which events such as user input or operating conditions may alter

20  the sequence of execution.   There is no basis for such a restriction.   The plain meaning

21  comes from the fact that microprocessor-executed programs of all sorts (*e.g.*, a word

22  processing program or an air-conditioning thermostat controller) alter the sequence of

23  operations based on user input or operating conditions.   [Expected Testimony; *see*

24  Counsel Decl. Ex. 7 ¶ 24, at p. 4]

25  **3.    Dispute 11: "to track date and time"; "to record tracked date**
   **and time"; "keeps track of current time of day";**
26  **"keeps track of current date."**

27  Independent claims 1 and 13 require a microprocessor that is programmed "to track

28  date and time" and "to record tracked date and time" when the ECD is used.  Independent

1  claim 9 (addressed in more detail below) requires the function of "recording date and time

2  of day."  Those terms are non-technical, common words that do not require construction

3  by the Court.  *Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001) (claim term "or"

4  required no elaborate construction).  Nevertheless, Stinger seeks to alter and narrow their

5  meaning in two ways, both of which should be rejected.

6      First, Stinger seeks to modify the terms "date and time" to be read as "current date"

7  and "current time."  For support, Stinger relies on one of the examples set out in the

8  "Summary of Invention" section of the written description, which discusses a circuit that

9  keeps track of current time of day and current date in the memory.  ['262 col. 2:33-41]

10  Stinger's argument, however, completely overlooks the first example in the same section

11  of the written description, which describes an "apparatus [that] includes a circuit to track

12  date and time . . . and to record tracked date and time" each time the ECD is used.  [*Id.*

13  2:25-33]  Unlike the second example, the first example makes no mention of tracking

14  current date or current time.  Stinger's attempt to restrict the claim language with a

15  limitation in but one of multiple examples is plainly improper.  *See Saunders Group*, 492

16  F.3d at 1332 (refusing to limit claim term to configuration from written description, even

17  though every disclosed example included the feature)

18      The same difference is reflected in the various claims of the '262 patent.  Thus,

19  claim 6 requires a circuit that "keeps track of ***current*** time of day" and "keeps track of

20  ***current*** date," while claims 1 and 13 require a microprocessor that needs only to "track

21  date and time" and "record tracked date and time."  The deliberate omission of the term

22  "current" as a modifier of "date" and "time" from all but claim 6 of the patent is a strong

23  indication that "date and time" in claims 1 and 13 are not necessarily limited to the present

24  date and time. *See Wilson Sporting Goods*, 442 F.3d at 1329 (use of term "rigid insert" in

25  one claim and a mere "insert" in another meant that that the term "insert" "does not

26  inherently carry a 'rigid' limitation"); *Phillips*, 415 F.3d at 1314 ("[T]he claim in this case

27  refers to 'steel baffles,' which strongly implies that the term 'baffles' does not inherently

28  mean objects made of steel.").

1    Stinger's second proposed limitation on the plain meaning of "track date and time"

2    and "record tracked date time" is to require the information to be "absolute date and

3    time (e.g., 8:00 a.m. Nov 15, 2007)."  During meet and confer, Stinger's proposed basis

4    for that restriction on the claims of the '262 patent is one of the examples from the '870

5    patent.  The '870 patent names a different inventor and claims priority from a different

6    application than does the '262 patent.  Because the two patents are not part of the same

7    patent family, the '870 patent is not part of the intrinsic record of the '262 patent and

8    cannot be used to narrow the reach of the claims of the '262 patent.  *See Abbott Labs.*, 287

9    F.3d at 1105 (one patent irrelevant to construction of patent not part of same formal

10   family, even though patents were commonly owned).

### 4.   Dispute 12:  "trigger."

12   TASER is uncertain whether Stinger continues to seek a construction of the term

13   "trigger," which appears in dependent claim 2 and independent claim 6.  Because it is a

14   common, well-understood term, no construction from the Court is required.

### 5.   Dispute 14:  "signal generator."

16   TASER is uncertain whether Stinger continues to seek a construction of the term

17   "signal generator," which appears in independent claim 6.  The term "signal generator"

18   should be given its common meaning as a "device that outputs a signal."

### 6.   Dispute 15: "means for providing a high voltage pulsed current through the target via a provided wire-tethered dart launched from the weapon."

21   Claim 9 of the '262 patent includes a series of so-called "means plus function"

22   limitations.  Pursuant to Federal Circuit authority interpreting 35 U.S.C. § 112, paragraph

23   6, limitations that include the term "means for" followed by the recitation of some

24   function are presumptively construed in a way that differs from the ordinary rules of claim

25   construction as follows.[6]  The Court first identifies the function that the means are to

26   perform.  *Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1333 (Fed. Cir. 2004).

---

27   [6] The presumption that arises from the "means for" format can be rebutted if the

28   claim language includes enough structure to perform the specified function. *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1375 (Fed. Cir. 2003).

1   The scope of the specified function is construed according to the usual rules of claim

2   construction.  *Id.* at 1334.  The "means" are then defined to include (i) the structures that

3   are disclosed in the written description as "corresponding to" the claimed function (*i.e.*, as

4   structures that perform the function) and (ii) equivalents of such disclosed and linked

5   structures.  35 U.S.C. § 112[6].  To qualify as "corresponding structure," a disclosed

6   structure must be clearly linked in the specification to the claimed function.  *GoLight*, 355

7   F.3d at 1334.

8          The function for the first means-plus-function limitation of claim 9 is "providing a

9   high voltage pulsed current through the target via a provided wire-tethered dart launched

10   from the weapon."  The term "high voltage pulsed current" should be given the plain

11   meaning construction identified above (at p. 21).  The corresponding structure disclosed

12   and linked to the function in the specification comprises capacitor 15 and transformer 14

13   as shown in Figure 2 and described at column 3, line 46 through column 4, line 11.

14                    **7.      Dispute 16: "means for recording date and time of day for each**
                              **occasion that the weapon was operated to provide**
15                            **the current."**

16          The function for the second means plus function limitation of claim 9 is "recording

17   date and time of day for each occasion that the weapon was operated to provide the

18   current."  The term "date and time of day" should be given the plain meaning construction

19   identified above (at p. 22).  The corresponding structure disclosed and linked to the

20   function in the specification comprises microprocessor 32 and associated memory as

21   depicted and described at Figure 2 and at column 3, lines 38 to 45.

22

23                    **8.      Dispute 17: "means for discontinuing the provision of the current**
                              **in accordance with lapse of a predefined period."**

24          The function for the third means plus function limitation of claim 9 is

25   "discontinuing the provision of the current in accordance with lapse of a predefined

26   period."  The corresponding structure disclosed and linked to the function in the

27   specification comprises microprocessor 32 of Figure 2 or a mechanical or other device

28   that can turn off current as specified at column 3, lines 48 to 53.

1

## 9.   Dispute 18:  "period of time."

2

Claim 11 depends from claim 9 and includes the requirement that "the period of

3

time extends about 7 seconds."  The term "period of time" should be construed to refer to

4

the "predefined period" recited at the end of claim 9 after which the current being

5

supplied to a target is discontinued.  Stinger argues that the term should be held to be

6

indefinite, which would invalidate claim 11.  In making that argument, Stinger carries a

7

heavy burden, which it cannot meet.  *See* 35 U.S.C. § 282 ("Each claim of a

8

patent . . . shall be presumed valid . . . .").  A claim term is not indefinite merely because it

9

poses a claim construction question—even a difficult question.  If a meaning can be

10

discerned, "even though the task may be formidable and the conclusion may be one over

11

which reasonable persons will disagree," a claim is "sufficiently clear to avoid invalidity

12

on indefiniteness grounds." *Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d

13

1367, 1371-72 (Fed. Cir. 2004) (quotation marks omitted) (refusing to find claim term

14

indefinite even though it was not used anywhere but the claims).

15

Here, Stinger's argument is that "period of time" in claim 11 has no explicit

16

antecedent that exactly matches the term in claim 9.  But "the failure to provide explicit

17

antecedent basis for terms does not always render a claim indefinite." *Energizer*

18

*Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1370-71 (Fed. Cir. 2006) (quotation

19

marks omitted) ("[W]e conclude that 'anode gel' is by implication the antecedent basis for

20

'said zinc anode.'").  A person of skill in the art would understand that the "period of

21

time" referred to in claim 11 must be the "predefined period" recited in claim 9.  The

22

Court should adopt that construction.

23

24

## Relief Requested

25

TASER requests an order adopting the claim construction positions set out above.

26

27

28

1

2      Dated:  December 31, 2007                    **PERKINS COIE BROWN & BAIN P.A.**

3

4                                                   By:/s/ Chad Campbell/Aaron Matz
                                                        Chad S. Campbell, Bar No. 012080
5                                                       CSCampbell@perkinscoie.com
                                                        Aaron Matz, Bar No. 024108
6                                                       AMatz@perkinscoie.com
                                                        2901 North Central Avenue, Suite 2000
7                                                       Phoenix, AZ  85012-2788
                                                        Telephone:  602.351.8000
8                                                       Facsimile:  602.648.7000

9                                                       Holly L. Gibeaut, Bar No. 019786
                                                        hgibeaut@taser.com
10                                                      TASER International, Inc.
                                                        17800 North 85th Street
11                                                      Scottsdale, AZ  85255-9603

12                                                  Attorneys for Plaintiff TASER International,
                                                    Inc.
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on December 31, 2007, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Chad S. Campbell:   cscampbell@perkinscoie.com

Holly L. Gibeaut:     hgibeaut@taser.com

Attorneys for Plaintiff

        —and—

Ray K. Harris:       rharris@fclaw.com

Attorneys for Defendant

                                    By /s/Indy Fitzgerald

| U.S. Patent No. 6,999,295 ||
|---|---|
| **Claim 2** | **Claim 40** |
| **2.** A dual operating mode electronic disabling device for immobilizing a target comprising: | **40.** A method for immobilizing the muscles of a target, comprising the steps of: |
| a. first and second electrodes positionable to establish first and second spaced apart contact points on the target wherein a high impedance air gap may exist between at least one of the electrodes and the target; and | a. providing first and second electrodes positionable to establish first and second spaced apart contact points on the target wherein a high impedance air gap may exist between at least one of the electrodes and the target; |
| b. a power supply for operating in a first mode to generate a first high voltage, short duration output across the first and second electrodes during a first time interval to ionize the air within the air gap to thereby reduce the high impedance across the air gap to a lower impedance to enable current flow across the air gap at a lower voltage level and for subsequently operating in a second mode to generate a second lower voltage output across the first and second electrodes during a second time interval to maintain the current flow across the first and second electrodes and between the first and second contact points on the target to enable the current flow through the target to cause involuntary muscle contractions to thereby immobilize the target. | b. applying a first high voltage, short duration output across the first and second electrodes during a first time interval to ionize the air within the air gap to thereby reduce the high impedance across the air gap to a lower impedance to enable current to flow across the air gap at a lower voltage level; and |
| | c. subsequently applying a second lower voltage output across the first and second electrodes during a second time interval to maintain the current flow across the first and second electrodes and between the first and second contact points on the target to enable the current flow through the target to cause involuntary muscle contractions to thereby immobilize the target. |

**Appendix A: Asserted Claims of U.S. Patent No. 6,999,295**

| U.S. Patent No. 7,102,870 | |
| --- | --- |
| **Claim 1** | **Claim 2** |
| **1.** An electronic disabling device for immobilizing a target comprising: | **2.** An electronic disabling device for immobilizing a target comprising: |
| a. first and second electrodes positionable to establish first and second spaced apart contact points on the target; | a. first and second electrodes positionable to establish first and second spaced apart contact points on the target; |
| b. high voltage power supply for generating an output voltage delivered in a series of electrical pulses to the target; | b. a high voltage power supply for generating an output voltage delivered in a pre-timed series of electrical pulses to the target; and |
| c. a battery system including<br>  i. a battery;<br>  ii. a digital memory device for storing battery capacity data indicating the amount of battery capacity consumed or remaining;<br>  iii. a data interface for communicating between the battery system and the memory device to adjust the battery capacity data stored in the memory device; and | c. a display for indicating to the user the amount of time remaining in each pulse sequence. |
| d. a display for indicating to a user the battery capacity. | |

**Appendix B: Asserted Claims of U.S. Patent No. 7,102,870**

| U.S. Patent No. 7,102,870 | |
|---|---|
| **Claim 3** | **Claim 4** |
| **3.** An electronic disabling device for immobilizing a target comprising: | **4.** An electronic disabling device for immobilizing a target comprising: |
| a. first and second electrodes positionable to establish first and second spaced apart contact points on the target; | a. first and second electrodes positionable to establish first and second spaced apart contact points on the target; and |
| b. a high voltage power supply for generating an output voltage delivered in a pre-timed series of electrical pulses to the target; | b. a high voltage power supply for generating an output voltage delivered across the first and second contact points on the target to generate a positive voltage potential at one electrode and a negative voltage potential at the other electrode, thereby increasing the total voltage drop across a target while decreasing the maximum voltage potential between either electrode and a grounded user of the weapon. |
| c. a trigger mechanism to initiate the pre-timed series of electrical pulses; and | |
| d. a mechanism for allowing the user to extend the duration of the pre-timed series of electrical pulses. | |

**Appendix B: Asserted Claims of U.S. Patent No. 7,102,870**

| U.S. Patent No. 7,234,262 | |
|---|---|
| **Claims 1 & 2** | **Claim 6** |
| **1.** A dart weapon for interfering with locomotion by a human being or animal target, the weapon for use with each of a plurality of replaceable cartridges, each cartridge having at least one wire-tethered dart and a propellant that propels the dart, the weapon comprising:<br><br>a receiver that receives a particular cartridge of the plurality of cartridges;<br><br>a power supply coupled to the receiver for conducting a high voltage pulsed current from the power supply through the wire-tethered dart of the particular cartridge; and<br><br>a microprocessor programmed<br>(1) to track date and time,<br>(2) to activate via the power supply the propellant of the particular cartridge,<br>(3) to maintain for a period the current from the power supply, and<br>(4) to record tracked date and time in accordance with activation of the propellant of the particular cartridge and in accordance with respective activation of each other cartridge of the plurality received by the receiver, wherein the current, through the target, interferes with use by the target of the skeletal muscles of the target during the period. | **6.** A dart weapon for interfering with use by a human being or animal target of skeletal muscles of the target, the weapon operative with a provided cartridge, the device comprising:<br><br>a trigger that provides a first signal responsive to operation of the trigger; and<br><br>a circuit, comprising a memory, that<br>(1) keeps track of current time of day,<br>(2) keeps track of current date,<br>(3) receives the first signal to determine a first time, and<br>(4) responds to the first signal by recording current date and current time of day in the memory, by applying power to a signal generator, by keeping track of a period of time from the first time, and by disabling the signal generator upon lapse of the period, wherein<br><br>the signal generator activates the cartridge to propel a wire-tethered dart of the cartridge toward the target; and<br><br>a current from the signal generator via the wire-tethered dart and through the target interferes with use by the target of the skeletal muscles of the target during the period. |
| **2.** The weapon of claim **1** further comprising a trigger, wherein the microprocessor is further programmed to respond to operation of the trigger to activate the propellant. | |

**Appendix C: Asserted Claims of U.S. Patent No. 7,234,262**

| U.S. Patent No. 7,234,262 | |
|---|---|
| **Claims 9-11** | **Claims 13 & 14** |
| **9.** A dart weapon for interfering with locomotion by a human being or animal target, the apparatus comprising:<br><br>    means for providing a high voltage pulsed current through the target via a provided wire-tethered dart launched from the weapon;<br><br>    means for recording date and time of day for each occasion that the weapon was operated to provide the current; and<br><br>    means for discontinuing provision of the current in accordance with lapse of a predefined period. | **13.** An apparatus for causing involuntary contractions of skeletal muscles of a human or animal target, the apparatus comprising:<br><br>a circuit having a microprocessor that is<br>   (1) programmed to track date and time,<br>   (2) programmed to initiate a high voltage pulsed current from the circuit, and<br>   (3) programmed to record tracked date and time in accordance with each initiation of the current, wherein<br><br>the current launches a provided wire-tethered dart toward the target to conduct the current through the target and, when passing through the target, causes involuntary contractions of skeletal muscles of the target. |
| **10.** The weapon of claim **9** wherein a microprocessor with memory implements the means for recording and the means for discontinuing. | **14.** The apparatus of claim **13** wherein the microprocessor is further programmed to determine a period, and programmed to terminate the current after lapse of the period. |
| **11.** The weapon of claim **9** wherein the period of time extends about 7 seconds. | |

**Appendix C: Asserted Claims of U.S. Patent No. 7,234,262**