1   FENNEMORE CRAIG, P.C.
    Ray K. Harris (No. 007408)
2   3003 North Central Avenue
    Suite 2600
3   Phoenix, AZ  85012-2913
    Telephone:  (602) 916-5000
4   Email:  rharris@fclaw.com

5   Attorneys for Defendant
    Stinger Systems, Inc.

6

7

8                   UNITED STATES DISTRICT COURT

9                       DISTRICT OF ARIZONA

10  Taser International, Inc.,              No. CV-07-0042-PHX-MHM

11              Plaintiff,                  **CLAIM CONSTRUCTION BRIEF**

12          v.

13  Stinger Systems, Inc.,

14              Defendant.

15

16      **Notice of Request for Stay**

17          Stinger has filed a petition for re-examination of all claims in the '262 patent

18  because they were anticipated by Taser's own device, as evidenced by the Taser manual

19  copyrighted in 2000.  Stinger has requested a stay of this infringement action pending re-

20  examination of the '262 patent.

21      **Motion to Exclude Taser Expert Testimony**

22          The court's scheduling order provided

23              The parties shall fully disclose any evidence extrinsic to the
                patent in suit and prosecution history (including, but not
24              limited to, expert declarations) for use at the Markman claim
                construction hearing by November 16, 2007.
25

26  Scheduling Order dated May 2, 2007, ¶ 4.

FENNEMORE CRAIG, P.C.
    PHOENIX

2018940.1/19862.001

1   Stinger disclosed the declaration of Tom Saliga on November 16, 2007.  See
2   Exhibit A attached.  Taser did not disclose the substance of its expert's testimony until
3   approximately 6 weeks later when it filed its claim construction brief on December 31.
4   Taser did not provide any disclosure of its proposed claim construction until November 30
5   (Exhibit B attached).

6   Stinger moves to exclude any testimony from Dr. Rodriguez as untimely and not
7   properly disclosed.

8   **The Disputed Claim Terms**

9   Taser did not provide any list of disputed claim terms or claim construction prior to
10   November 16.  After receiving Stinger's proposed claim construction on November 30,
11   the parties were able to significantly narrow the issues.  Letter dated December 14, 2007
12   attached as Exhibit C.  This memorandum addresses only the disputed terms.

13   A claim must be "sufficiently precise to permit a potential competitor to determine
14   whether or not he is infringing".  *Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d
15   1313, 1342 (Fed. Cir. 2003), *quoting Morton International, Inc. v. Cardinal Chemical
16   Co.*, 5 F.3d 1464, 1470 (Fed. Cir. 1993).  To determine the scope of the claim "the court
17   should look first to the intrinsic evidence of record, i.e., the patent itself, including the
18   claims, the specification and, if in evidence, the prosecution history."  *W.E. Hall Co., Inc.
19   v. Atlanta Corrugating, LLC*, 370 F.3d 1343, 1350 (Fed. Cir. 2004).

20          The specification "is always highly relevant to the claim
       construction analysis.  Usually it is dispositive.  It is the single
21       best guide to the meaning of a disputed term."

22   *Phillips v. AHW Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005), *cert. denied*, 126 S.Ct. 1332
23   (2006) (*quoting Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir.
24   1996).

25          When the patent applicant defines the terms of claim in the
       specification he becomes "his own lexicographer".
26

1    *Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002), *see*

2    *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002); *Vitronics*

3    *Corp.*, 90 F.3d at 1582.   Thus the specification is the primary source of guidance on the

4    meaning of disputed claim terms.   "When the specification explains and defines a term

5    used in the claims, without ambiguity or incompleteness, there is no need to search further

6    for the meaning of the term."   *Multiform Desiccants, Inc. v. Medzan, Ltd.*, 133 F.3d 1473,

7    1478 (Fed. Cir. 1998).

8    **THE '295 PATENT**

9    **1.    Ionize the Air Within the Air Gap**

10    The '295 patent specification explains high voltage is applied so that "the high

11    impedance air gap forms an electrical arc having ionized air within the gap".   '295 patent

12    col. 5, lines 63-65.   See also Figure 5(b) of the '295 patent referring to "electric arc across

13    air gap".

14    The invention described in the '295 patent operates as follows:   two electrodes are

15    placed in "contact" with a target.   It is assumed a high impedance air gap exists between at

16    least one electrode and the target.   A high voltage current is used to enable current to flow

17    across the air gap.   This is defined as the "first mode" ('295 patent claim 2) or the "first

18    time interval" (claim 40).   In both cases the high voltage must be "sufficient to ionize the

19    air within the air gap" (Taser's proposed construction of high voltage).   The purpose is not

20    "to enable ions to form" (Taser proposed definition) but in the language of the claims to

21    "enable current flow across the air gap".   '295 patent claim 2 and claim 40.

22         stun guns have been required to generate fifty thousand volt
         output pulses because this extreme voltage level is capable of
23         establishing an arc across the high impedance air gap which
         may be presented between the stun gun output electrodes E1
24         and E2 and the target's skin.   As soon as this electrical arc has
         been established, the near infinite impedance across the air
25         gap is promptly reduced to a very low impedance level which
         allows current to flow between the spaced apart stun gun
26         output electrodes E1 and E2 and through the target's skin and

1                       intervening tissue regions.

2 Col. 2, ll 23-33.

3             At somewhere around fifty thousand volts, the M26 stun gun air gap between output electrodes E1 and E2 breaks down, the

4             air is ionized, a blue electrical arc forms between the electrodes and current begins flowing between electrodes E1

5             and E2. As soon as stun gun output terminals E1 and E2 are presented with a relatively low impedance load instead of the

6             high impedance air gap, the stun gun output voltage will drop to a significantly lower voltage level.

7 Col. 2, ll 59-66.

8

9             The discharge of C1 is known as the "arc" phase. The discharge of C2 and C3 is known as the muscle "stimulation" pulse.

10 Col. 16, ll 48-50.

11      "When a patentee uses a claim term throughout the entire patent specification, in a

12 manner consistent with only a single meaning, he has defined that term 'by implication'".

13 *Bell Atlantic Network Services, Inc. v. Covad Communications, Group, Inc.*, 262 F.3d

14 1258, 1271 (Fed. Cir. 2001). The whole specification and the pertinent language of the

15 patent claim disclose the high voltage output "forms an electrical arc" across the high

16 impedance air gap.

17      Taser's proposed construction "enable ions to form in the air within the gap" is

18 incomplete. It ignores the very purpose disclosed in the claim and the specification: "to

19 enable [and then "maintain"] current flow across the air gap".

20      **2.**     **Maintain the Current Flow**

21      Stinger's proposed construction is confirmed by the further requirement in both

22 claims 2 and 40 of the '295 patent that a lower voltage (during the "second mode" or

23 "second time interval") must "maintain the current flow." The low voltage cannot

24 "maintain" a current flow unless the current flow previously existed during the first mode

25 or first time interval. To avoid this obvious inconsistency, Taser proposes to define

26

1   maintain the current flow as "provide for the current flow". Taser's definition ignores the

2   continuity required to "maintain" the current flow. Thus it is inconsistent with the plain

3   language of the claim. Moreover, Taser's proposed construction is inconsistent with the

4   specification which provides "once this low impedance ionized path has been established"

5   (col. 6, lines 4-5) the low voltage output will "continue and maintain the previously

6   initiated discharge across the arced over air gap for a significant additional time interval."

7   Col. 6, lines 16-23. Thus "maintain the current flow" should be defined as "continue and

8   maintain the previously initiated discharge across the arced over air gap" as defined by the

9   applicant. This is confirmed by figure 6 of the '295 application which shows that the

10   voltage out remains above zero until the end of the low voltage "second mode/second time

11   interval" output.

12               **Taser's Extrinsic Evidence was Not Disclosed and Must be Excluded**

13       Taser claims that "current flow sufficient to cause involuntary muscle contractions

14   can be maintained during an interval even if the flow is interrupted or is not continuous".

15   Taser Brief at 6, lines 13-15. This "evidence" is extrinsic, was not timely disclosed and is

16   immaterial in light of the claimed language requiring the lower voltage to "maintain the

17   current flow".

18               **Claim Differentiation Does Not Support Taser's Construction**

19       "We have characterized the doctrine of claim differentiation generally as the

20   'presumption that each claim in a patent has a different scope.'" *Sinorgchem Co.,*

21   *Shandong, v. International Trade Commission*, 2007 WL 4465270 (Fed. Cir. December

22   21, 2007) at *6, *quoting Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374,

23   1380 (Fed. Cir. 2006) (internal citation omitted). Where claims are not identical they

24   "present no claim differentiation problem". *Sinorgchem* at *7.

25       The reference to an arc in claim 26 of the '295 patent is not inconsistent with the

26   construction proposed by Stinger. All of the claims contemplate an arc. Claim 26 recites

1    an additional element -- a "second switch" to engage a "second energy storage capacitor"

2    after the high voltage output "establishes an arc allowing current to flow at a lower

3    voltage".   The point of differentiation in Claim 26 is the switch, not the arc.   The arc

4    simply is recited to identify the time at which the switch is engaged.

5               **The Specification Does Not Support Taser's Construction**

6               Figure 17, which shows a reverse in polarity during the second mode/second time

7    interval, is not inconsistent with Stinger's construction.   The claims require that the

8    current be "maintained" during the transition from the first time interval/first mode to the

9    second time interval/second mode.   What happens to the current during the second time

10   interval/second mode is not relevant to the construction of the claims at issue or the claim

11   terms requiring that the invention "maintain the current flow" during the transition.

12              Moreover, "[w]here, as here, multiple embodiments are disclosed, we have

13   previously interpreted claims to exclude embodiments where those embodiments are

14   inconsistent with unambiguous language in the patent's specification or prosecution

15   history." *Sinorgchem* at *6.   A construction that does not create and maintain the current

16   flow is inconsistent with the specification and the prosecution history.

17              **The Prosecution History Does Not Support Taser's Construction**

18              Finally, the prior art confirms Stinger's interpretation.   Taser specifically stated

19   during the prosecution of the related '762 patent that it had solved a problem not

20   addressed by the prior art: "switching capacitors without interrupting ionization in an air

21   gap".   Response to Office Action dated November 9, 2005 at 19.   The examiner indicated

22   he understood and relied upon Taser's position by repeatedly reciting "a second

23   capacitant" that discharges "to provide energy through the current through the established

24   arc".   Notice of Allowability dated May 11, 2006.   In addition, Taser again confirmed

25   "energy at high voltage is used for forming the arc" in its Response to Notice of

26   Allowance dated August 18, 2006.

The prosecution history is unambiguous. What Taser believed it invented, what Taser claimed, and what the examiner allowed, was a device using high voltage to create an arc and maintain that arc through a transition to lower voltage.

Taser asserts that a preliminary amendment in February 4, 2005 added claims that were free of any reference to an arc or current passing across an arc in an uninterrupted and continuous manner. However, Taser claims its patent is a continuation of application No. 10/364,164 filed on February 11, 2003. Taser cannot claim priority to 2003 for inventions that were not disclosed. What Taser disclosed in 2003 was the invention creating and maintaining an arc.

## THE '870 PATENT

Taser asserts Claims 1-4 of the '870 patent do not pertaining to ionizing air within an air gap and claim "stun guns that work by direct contact". Memorandum at 15 lines 8-9. Although it would be otherwise improper to read a limitation into the claim that is not expressed, Stinger accepts Taser's interpretation of the claim as limited to stun guns that work by direct contact.

1.    A display for indicating to a user the battery capacity.

Stinger accepts Taser's construction that "a display with any indication of battery capacity is sufficient". Brief at 16, line 22.

2.    A display for indicating to the user the amount of time remaining in each pulse sequence.

"A display for indicating" is interpreted by Taser to cover any "display that provides the user with information" concerning the "amount of time" remaining in each pulse sequence. Stinger agrees the claim requires "a display that provides the user with information concerning the amount of time remaining" in each pulse sequence.

3.    A mechanism for allowing the user to extend the duration.

Claim 3 of the '870 patent relates to a "pretimed series of electrical pulses initiated

1  by a trigger mechanism." The claim separately recites "a mechanism for allowing the

2  user to extend the duration of the pretimed series of electrical pulses." Stinger agrees the

3  mechanism can be the "trigger mechanism".

4      4.    A grounded user.

5      The parties have agreed that "positive voltage potential" and "negative voltage

6  potential" mean voltage that is positive [or negative] with respect to ground. Taser's

7  November 30 proposed construction of grounded [user] was "a user of the weapon who is

8  coupled to ground". Stinger agreed with this definition, Letter dated December 14, 2007,

9  understanding ground means "earth ground". Taser asserts it did not intend grounded to

10  mean "earth ground".

11      Taser asserts that "coupled to ground" includes a user "coupled to the primary

12  circuit ground of the weapon". Taser's construction defining grounded with respect to "a

13  common or referenced conductor in the circuit", Brief at 18, line 17, is extrinsic to the

14  patent and relies on the untimely expert report. This extrinsic evidence was not timely

15  disclosed and is properly excluded.

16      The portion of the '870 patent specification cited by Taser (Col. 16, ll 43-62) refers

17  to the intended benefit of a design using two secondary windings. The circuit containing

18  each winding has only 1/2 the total peak voltage. This reduces the voltage applied if a

19  user unintentionally becomes part of the circuit. A user in this hypothetical situation is

20  grounded to earth and the voltage passes through the user to Earth.

21      The purpose of the two separate secondary windings described in the '870 patent is

22  to deliver a peak voltage of 50,000 volts to the target while exposing the user to only 1/2

23  that voltage if the user inadvertently "short circuits" either one of the secondary winding

24  circuits. If, as suggested by Taser, "grounded user" is defined as "a user who becomes

25  coupled to the primary circuit ["common"] ground of the weapon", (Taser Claim

26  Construction Brief at 18, lines 11-12), the very problem addressed in the specification

1    would be defined out of existence.  A user in contact with only the primary circuit ground

2    would receive no voltage.   In order to draw voltage from the circuit, the user must contact

3    the circuit and earth ground.  Only by defining grounded user in terms of earth ground can

4    the "significant safety enhancement" described in the specification be understood and

5    achieved.  While the specification does refer to "primary weapon ground" in defining the

6    peak voltage of the circuit, the specification does not refer to "primary weapon ground" in

7    discussing the "risk" to the "user".  The risk to the user can only arise if the user is

8    grounded to earth.  There is no risk if the user is grounded to the common or reference

9    conductor within the weapon.

10                    **THE '262 PATENT**

11           Stinger submits the '262 patent should not be subject to claim construction until the

12    U.S. Patent and Trademark Office completes the re-examination process initiated

13    December 21, 2007.  Half of the claims and half of the disputed terms addressed in

14    Taser's claim construction brief relate to the '262 patent.  Moreover, the '262 patent

15    relates to the same allegedly infringing device (the Stinger S200) as the previous two

16    patents.

17           Taser previously asserted all claims in the '262 patent except claim 5.  Taser now

18    asserts eight claims (1, 2, 6, 9-11, 13, 14).

19           1.      <u>Track Date and Time</u>

20           The specification of the '262 patent describes a circuit that "keeps track of <u>current</u>

21    <u>time of day</u>, keeps track of <u>current</u> date … and responds to the first signal by recording

22    <u>current</u> date and <u>current</u> time <u>of day</u> in the memory."  Col. 2, lines 37-41 (emphasis

23    added).  "Each time trigger 34 is squeezed and weapon 30 is fired, the memory in

24    microprocessor 32 retains a record of the date and time the weapon was filed."  Col. 3,

25    lines 42-45.  The invention as disclosed in the specification equates track date and time to

26    "store current, absolute date and time" (e.g. 8:00 a.m. November 15, 2007).  Taser cites no

1   example from the specification that excludes the use of current date and current time or

2   defines any alternative method of calculating date and time.

3   Taser acknowledges that Claim 6 requires a circuit that "keeps track of <u>current</u> time

4   of day" and "current date" and that Claim 9 refers to "recording date and time <u>of day</u>".

5   Claims differentiation does not turn on the method of calculating time in of Claims 6 and

6   9 (or Claims 10 and 11 which depend from Claim 9). Claim 6 differs from claim 1

7   without reference to the reference to current time. Claim 1 describes a dart weapon

8   including a microprocessor to activate the cartridge propellant and track date and time.

9   Claim 6 describes a dart weapon comprised of a circuit with a memory to track date and

10  time, and a <u>signal generator</u> to activate the cartridge propellant. Claim 9 describes a dart

11  weapon comprising means for providing, means for recording and means for

12  discontinuing.

13      2.      <u>The Means Plus Function Claims</u>

14  Claim 9 of the '262 patent recites "means for providing", "means for recording"

15  and "means for discontinuing". Stinger agrees "means for providing" is defined in the

16  patent specification:

17      "When trigger 34 is squeezed to fire weapon 30, a signal is generated
        which is received by microprocessor 32. Microprocessor 32 sends a signal
18      to switch 12 to turn switch 12 "on" for about 7 seconds. Any mechanical
        or other means can be utilized in place of microprocessor 32 to operate
19      switch 12. Switch 12 can be mechanical, constructed from semiconductor
        materials or constricted from any other desired materials. When switch 12
20      is turned "on", it allows power 11 to travel to transformer 13."
21

22  Col. 3, line 47-57.

23      "Means for recording" is defined in the specification:

24      "Microprocessor 32 preferably includes memory and includes a sensor
        attached to trigger 34 or to some other desired portion of dart weapon 30 to
25      generate for the memory in microprocessor 32 a signal each time trigger 34
26

is squeezed and weapon 30 is fired.  Each time trigger 34 is squeezed and weapon 30 is fired, the memory in microprocessor 32 retains a record of the date and time the weapon was fired."

Col. 3, lines 38-45.

"The circuit includes a memory, keeps track of current time of day, keeps track of current date, receives the first signal to determine a first time, and responds to the first signal by recording current date and current time of day in the memory."

Col. 2, lines 38-42.

"Means for discontinuing" is defined in the specification:

"Microprocessor 32 sends a signal to switch 12 to turn switch 12 "on" for about 7 seconds."

Col. 3, lines 50-52.

As stated in the Examiner's Notice of Allowability dated January 25, 2007, "the means for providing a high voltage pulsed current, means for recording date and time and the means for discontinuing provision of the current are comprised of the disclosed inter-related circuit elements of a power source, microprocessor, and controlled switches".

3.    "Period of Time"

Claim 11, which depends from Claim 9, has as its only element "the period of time extends about 7 seconds".  The term "period of time" does not appear in Claim 9.  Taser contends "period of time" refers to "predefined time" the last two words of Claim 9.  Stinger contends the term "period of time" is indefinite.

**Conclusion**

Ionize the Air Within the Air Gap means the high voltage "forms an electrical arc having ionized air within the gap to enable current flow across the air gap".

Maintain the current flow means  "continue and maintain the previously initiated discharge across the arced-over air gap".

FENNEMORE CRAIG, P.C.

PHOENIX

2018940.1/19862.001

1    Grounded [user] means "a user of the weapon who is coupled to earth ground".

2    Track Date and Time means "store current, absolute date and time" (e.g. 8:00 a.m.

3    November 15, 2007).

4    DATED this 30th day of January, 2008.

5    FENNEMORE CRAIG, P.C.

6

7    By  s/ Ray Harris

8    Ray K. Harris
     Attorneys for Defendant
     Stinger Systems, Inc.

9

10   **CERTIFICATE OF SERVICE**

11   I hereby certify that on January 30, 2008, I electronically transmitted the attached
     document to the Clerk's Office using the CM/ECF System for filing and transmittal of a
     Notice of Electronic Filing to the following CM/ECF registrants:

12

13   Chad Campbell
     Aaron Matz
     Perkins Coie Brown & Bain
14   2901 N. Central Avenue, Suite 2000
     Phoenix, AZ  85012-2788
15

16   Holly L. Gibeaut
     Taser International, Inc.
17   17800 N. 85th Street
     Scottsdale, AZ  85255-9603
18

19   s/ Melody Tolliver

20

21

22

23

24

25

26

FENNEMORE CRAIG, P.C.
PHOENIX

2018940.1/19862.001

- 12 -

## <u>EXHIBITS</u>

A.   Letter from Ray K. Harris dated November 16, 2007

B.   Letter from Chad S. Campbell dated November 30, 2007

C.   Letter from Ray K. Harris dated December 14, 2007

EXHBIT "A"

# FENNEMORE CRAIG, P.C.

3003 North Central Avenue, Suite 2600
Phoenix, Arizona 85012-2913
(602) 916-5000

**Ray K. Harris**
Direct Phone: (602) 916-5414
Direct Fax: (602) 916-5614
rharris@fclaw.com

**Law Offices**
Phoenix    (602) 916-5000
Tucson     (520) 879-6800
Nogales    (520) 281-3480
Las Vegas  (702) 692-8000
Denver     (303) 291-3200

November 16, 2007

**VIA FACSIMILE**

Chad S. Campbell
Perkins Coie Brown & Bain
2901 N. Central Avenue, Suite 2000
Phoenix, AZ 85012

Re:   *Taser International v. Stinger Systems, Inc.*

Dear Chad:

Enclosed is the Declaration of Tom Saliga pursuant to the  Rule 16 Scheduling Order. The signature page will follow on Monday.  Of course, we reserve the right to rebut any external evidence offered by Taser with regard to claim construction.

Please let me know which claim terms (if any) are disputed by Taser.

Yours truly,

Ray K. Harris

RKH/bjk
Enclosure

cc:  James McNulty

2002438.1/19862.001

1

FENNEMORE CRAIG, P.C.
Ray K. Harris (No. 007408)
3003 North Central Avenue
Suite 2600
Phoenix, AZ 85012-2913
Telephone: (602) 916-5000
Email: rharris@fclaw.com

Attorneys for Defendant
Stinger Systems, Inc.

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

9

DISTRICT OF ARIZONA

10

11

12

13

14

15

| Taser International, Inc., | No. CV-07-0042-PHX-MHM |
| Plaintiff, | **DECLARATION OF TOM SALIGA** |
| v. | |
| Stinger Systems, Inc., | |
| Defendant. | |

16

17    I, Tom Saliga, am employed by Electronic Design Associates, 12918 Commodity

18    Place, Tampa, Florida 33626.  I am familiar with the technical design of the S-200

19    electronic immobilization device sold by Stinger Systems, Inc.  I participated in the design

20    of the S-200.

21

22    This report contains my opinions regarding claim construction for the three patents

23    asserted by Plaintiff Taser International, Inc.: US Patents 6,999,295; 7,102,870 and 7,

24    234,262.  I have reviewed the patents and base this report on that review and my training

25    and experience in the industry together with my knowledge of the Stinger S-200 device.

26

1    Attached is my curriculum vitae showing my professional qualifications, all
2    publications authored by me within the past ten years, and all cases in which I have
3    testified as an expert (at trial or by deposition) within the past four years.

4    I am being paid $143 per hour by Stinger for my services in connection with this
5    matter.

6    1.    Claims 2 and 40 of the 295 patent contain the following terms necessary to
7    construe the scope of the claim:  positionable; hi-voltage; ionize the air within the gap;
8    second mode; lower voltage; and maintain the current flow.

9    a.    Positionable as used in the 295 patent and the 870 patent means capable of
10   being placed or located on a remote target.

11   b.    High voltage within the meaning of all three patents means voltage
12   sufficient (or more than sufficient) to initiate the flow of electrical current through the air
13   gap between a dart and the body of the target.

14   c.    Ionize the air within the gap means to create a glow or arc discharge across
15   the   air   gap   between   the   dart   and   the   body   of   the   target.

16   d.    Second mode means a separate circuit to maintain current flow through the
17   ionized air within the gap at lower voltage.

18   e.    Lower voltage means low relative to the high voltage used to ionize the air
19   within the gap.

20   f.    Maintain the current flow means maintain a continuous glow or arc
21   discharge allowing current to pass without interruption across the air gap between the dart
22   and the body of the target.

23   2.    In addition to the terms positionable and high voltage defined above, claims
24   1-4 of the 870 patent require construction of the following terms:  digital memory device;
25   data interface; adjust the battery capacity data; a display for indicating to the user the
26   battery capacity; pretimed series of electrical pulses; a display for indicating to the user

1    the amount of time remaining in each pulse sequence; trigger mechanism; mechanism for

2    allowing the user to extend the duration; positive voltage potential; negative voltage

3    potential; grounded.

4         a.    <u>Digital memory device</u> is an electronic storage device maintaining a record

5    of data in digital form.

6         b.    <u>Data interface</u> is an input and output device for the digital memory device.

7         c.    <u>Adjust the battery capacity data</u> means update the record of data on the

8    <u>digital memory device</u> to record a decline in the energy available for output from the

9    battery while the battery is in use.

10        d.    <u>A display for indicating to the user the battery capacity</u> means an output

11   device reporting a decline in the energy available for output from the battery while the

12   battery is in use.

13        e.    <u>Pretimed series of electrical pulses</u> means a sequence of electrical

14   discharges at a predetermined rate for a predetermined time.

15        f.    <u>A display for indicating to the user the amount of time remaining in each</u>

16   <u>pulse sequence</u> means an output device reporting the remaining duration of each <u>pretimed</u>

17   <u>series of electrical pulses</u> in descending numerical units.

18        g.    <u>Trigger mechanism</u> means the device for initiating the discharge of the

19   <u>pretimed series of electrical pulses.</u>

20        h.    <u>Mechanism for allowing the user to extend the duration</u> means a mechanism

21   separate from the <u>trigger mechanism</u> causing continuous uninterrupted operation of the

22   <u>pretimed series of electrical pulses</u> with no additional signal from the <u>trigger mechanism.</u>

23        i.    <u>Positive voltage potential</u> means positive in reference to ground.

24        j.    <u>Negative voltage potential</u> means negative in reference to ground.

25        k.    <u>Grounded</u> means in contact with earth to allow current to pass through a

26   user to the earth.

1          3.      The 262 patent contains the following terms to be defined for purposes of

2   claim construction:   a receiver that receives a particular cartridge; high voltage pulse

3   current; program; track date and time; record tracked date and time; a trigger; operative

4   with a provided cartridge; circuit, comprising a memory; signal generator; means for

5   providing; means for recording; means for discontinuing; each occasion the weapon was

6   operated to provide the current; predefined period; period of time; programmed to track

7   date and time; initiate a high voltage pulsed current from the circuit; and programmed to

8   determine a period.

9          a.      A receiver that receives a particular cartridge means the weapon uses a

10  specific cartridge that can only be loaded at a specific location

11         b.      High voltage pulsed current means a pretimed series of electrical electron

12  flows as pulses in response to similar high voltage applied pulses.

13         c.      Programmed means provided with the necessary instructions to execute an

14  automatic sequence of functions once initiated.

15         d.      Track date and time means store current, absolute date and time (e.g.,

16  8:00:00 am Nov 15, 2007).

17         e.      Record tracked date and time means to track date and time and store the data

18  in a digital memory device as defined above.

19         f.      A trigger is an initiator.

20         g.      Operative with a provided cartridge means the weapon is made and sold

21  with the cartridge that must be used.

22         h.      Circuit, compromising a memory means a circuit including a digital

23  memory device as defined above.

24         i.      Signal generator means a device initiating a signal.

25         j.      Means for providing as disclosed in the 262 patent means a microprocessor

26  controlling a switch in response to a signal from the trigger

FROM :ELECTRONIC DESIGN ASSOCIATES      FAX NO. :7272340920          Nov. 19 2007 09:01AM P2/2

1    k.    Means for recording as disclosed in the 262 patent means a microprocessor

2    progrsmmed to track and record current, absolute date and time (e.g., 8:00:00 am Nov 15,

3    2007).

4    l.    Means for discontinuing as disclosed in the 262 patent means a

5    microprocessor controlling a switch.

6    m.    Each occasion the weapon was operated to provide the current means each

7    time the trigger initiates high voltage pulsed current.

8    n.    Predefined period means a fixed period of time set in advance.

9    o.    Period of time as used in claim 11 has no antecedent and is indefinite.

10    p.    Programmed to track date and time means programmed to record tracked

11    date and time as described above, without initiation by a separate signal.

12    q.    Initiate a high voltage pulsed current from the circuit means a

13    microprocessor will initiate the high voltage pulsed current and record tracked date and

14    time initiated.

15    r.    Programmed to determine a period means there is no predefined period and

16    the microprocessor must select from alternative time periods based on the instructions

17    programmed.

18    Pursuant to 28 USC 1746, I declare under penalty of perjury that the foregoing is

19    true and correct.

20

21    Executed this 16ᵗʰ day of November 2007.

22

23    _Tom Saliga_

24

25

26

FENNEMORE CRAIG, P.C.
PHOENIX

2001976.1/19862.001

**THOMAS V. SALIGA**
BSEE (High Honors), MSEE, Adjunct Professor, EDA Chief Engr.
www.EDAofFlorida.com

---

* Founder of Electronic Design Associates (EDA), a New Products Design Firm - since 1986
* New Products Inventor: over fifteen Electronics Related Patents
* Prior Adjunct Professor (DSP Technology) at Univ. of South Florida
* Listed in Strathmore's Who's Who
* Management of Electronics Engineering Groups and Projects
* Advanced Analog and Digital Circuit Design in:
   * Biomedical Instruments
   * Wireless Control and Telemetry
   * Telecommunications Systems and Devices
   * Industrial Security, Control and LAN Electronics
   * Digital and Analog Filters
* Software Specification and Embedded Code Design in C, ASSEMBLERS, Proton BASIC

---

**SUMMARY:**
More than twenty-five years experience in electronics design and signal processing disciplines in the capacity of systems and products design, circuit design, management of R & D teams, and company founder. Creative design and management experience has been demonstrated in a wide range of instrumentation and communication technologies in start-up, medium, large company, government and consulting environments. This has ranged from small microcomputer- based instruments to large real-time computer based communications systems. Over fifteen patents have been granted in the areas of circuits, communication systems, and instruments and many technical articles have been authored and published in these same disciplines. Mr. Saliga has also taught Digital Signal Processing at USF as an adjunct professor. He is currently Manager and Chief Engineer of Electronic Design Associates and is a member of the Board of several corporations.

**EDUCATION:**
BSEE  with high honors from Univ. of Maryland  and MSEE from Univ. of Maryland (1968) ; Master's Thesis: "A Comparison of Sequential Decoding Metrics By Computer Simulation", NASA Supported Telemetry Work

**POST GRAD. COURSES** ( Partial List ): Modulation & Coding (USF), Digital Signal Processing (UCLA), Fiber Optics (UCSD), IEEE Management Games Seminar, Microcomputer Programming (GWU), Medical Instrumentation (UW)

**TECHNOLOGY KEYWORDS:**
Some keywords of the technologies for which he has had design responsibility for or is experienced in are:

**"Industrial & Communications":** Automobile, truck, and aircraft security/ activity monitoring systems (data logging with short range wireless upload), optical pharmaceutical pill package sterility detection system, variable Joule rated stun-gun with PC-USB activity-log upload, electro-facial sculpting instrument, ultra-sonic-ranged precision trailor coupling system, large industrial-valve servo-control product, advanced portable LCD-magnetic-daubed bingo game, numerical controlled industrial machines, LSI wireline high-speed modems, digital FIR and IIR filters, active RC  filters, phase-lock loops, VHF RF antennas and radio design (50MHz through 1.5 GHz), helical multi-pole filters, low-noise amplifiers, direct-sequence spread- spectrum secure data link, radio command and range/ range rate coding, Shannon-limit coded data systems, wireless LAN's, wireless telemetry and control at 433MHz, 920 MHz, digital automatic equalizers, stepping and dc motor controllers, digital music synthesis/ MIDI interfacing,;  bar-code and credit card readers/ electronics, human engineered control panels, phone-line test instruments, satellite telemetry, error correction coding, orthogonal and convolutional coded communications, coded power-line communicators, frequency synthesizers, function generators, A/D converters, AM/FM/ PM/DPSK modulation, correlation sync/signal detection, ATE instruments, spectrum analyzer, low-distortion oscillator, digital multimeter, switching power supplies.

**"Medical":** vital signs monitors and related measurement devices: EKG, EEG, EMG, oscillometric BP, trans- cutaneous pO2 critical care monitor, temperature, patient-isolated interfaces, inter-cranial pressure monitor, multi-wave oximetry, Rife-Resonator bacterial-mortality instrument, In-Vivo oximeter instrument, Advanced picture-archiving and comm. System (PACS: RadFax$^{TM}$), endoscopic surgical motor controller; wireless vital signs measurement and transmission.

**Software/uC/ Standards:**  IEEE488, RS232/422, U/L 544, IEC60601, U/L 1244, IBM-PC bus cards, PIC 16/17 uC, 80C52 uC, TI msp430 uC, embedded tools: ProBasic,"C",  QuickBASIC, Visual Basic, CAD Tools: CadSoft "Eagle", TurboCAD, MicroSoft Office; Corel Draw; & ProTracs management tool.

**WORK HISTORY:**

EDA: Electronic Design Associates (Tampa, FL), Oct., 1986 to present
     Founder and Chief Engineer for new and enhanced products for clients ranging from start-ups to Fortune 500's. This successful consulting business averages six associates: hardware, software & mechanical designers along with technical support staff. Medical, industrial, and commercial products are designed and brought to production stage.

EMC (Electronic Mfg. Company) (Tampa, FL), Nov. 1988 - Jun. 1996
     Co-founder and past president of this company which contract manufactures client's electronic products. Company is successfully growing and servicing Fortune 500 companies through start-ups. Company sold to its manager to permit focus on product design. FDA registered.

KeyTrak Inc. (Tampa & Orlando, FL), Nov. 1987 - 1991
     V.P. R&D, inventor and developer of a PC based automobile key control system (KeyTrak$^{TM}$).  This patented system lowered cost per key stored by a factor of five. Company is successfully growing nationwide.

Vistar Corp. (Tampa, FL), Jan.1982 to Oct., 1986.
     V.P. of Development and co-founder; creation, design and team management of IBM-PC based automatic electronics test and measurement equipment. Successful product line sold world-wide by Zenith Corp.

Critikon Corp. (J & J Corp.) (Tampa, FL), Apr. 1981 to Dec. 1981
     Prior company purchased by J & J; his new position was as the lead Design Engineer responsible for their major new product effort: a line of transcutaneous neonatal gaseous patient monitors. His design of the original DinaMAP$^{TM}$ monitor supported the rapid multi-million dollar growth of that industry.

Applied Medical Research Corp. (Tampa, FL) Nov. 1978 to Apr. 1981
     Sr. Design Engineer for Monitors and Director of Engineering for a line of non-invasive blood pressure and other patient monitors. Built engineering dept. from two to a thirty person dept. in less than three years. Very successful company bought by Johnson and Johnson for over nine million dollars.

Wavetek (San Diego, CA), Aug. 1974 to Oct. 1978
     Project Manager and Engineer for a line of telecommunications and frequency synthesizer/ function generator products. This line initiated the company's successful synthesizer product line and many of his product descendents are being sold to this day.

Paradyne Corp. (Largo, FL), Oct. 1969 to Aug. 1974
     Co-inventor, chief designer, and project manager of a new high-speed, LSIC based telephone modem product line. Based on these early products, the company has enjoyed over $150M annual world-wide sales and was bought by AT&T.

Honeywell Inc. (St.. Petersburg, FL), Jul. 1968 to Oct. 1969
     Design Engineer and inventor for various HF radio and wireline military  comm. projects; was successful in the technical proposal and contract for a new NSA listening accessory. (Secret clearance)

NASA-Goddard Space Flight Center (Greenbelt, Md.) to Jul. 1968
     Advanced R & D Engineer responsible for all advanced telemetry systems for scientific satellites and the technical direction of a team of over ten engineers. His new Shannon-limit coded telemetry systems were used in the Explorer class orbiting satellites and were used in a Galactic Jupiter Probe. His command, range and range-rate technology lived on at JPL to become the now famous Galileo spacecraft project.

**AWARDS and HONORARIA:**
     1. Elected to Strathmore's Who's Who; 1997
     2. NASA-Goddard Space Flight Center: Sustained Superior Performance Award", May, 1967
     3. Univ. of Maryland: --Certificate of Distinguished Scholarship Awards for BSEE Undergraduate studies.
     4. Elected to membership in the Tau Beta Pi and Eta Kappa Nu Engineering Honorary Societies.

**PROFESSIONAL AFFILIATIONS/ACTIVITIES:**
     1. Member IEEE and the following societies: Instrumentation and Measurement (IM), Communications (COM), and Acoustics, Speech, and Signal Processing (ASSP).

2. (1981/82) Chairman of the Florida West Coast Chapter of the IEEE-ASSP group, one of Florida's most active chapters.
3. Adjunct Professor at Univ. of South Florida. Taught graduate level course in digital signal processing.(1980's)

PATENT APPLICATIONS/ GRANTED  (partial list)
    1. HONEYWELL-----1968 "A Tunable RF Band Notch Filter Device";  Patent Granted , (3,659,212)
    2. PARADYNE -----1971 "An Error-Free Telecommunications System"; Co-submitted, (3,956,589)
    3. CRITIKON -----1982 "A Patient Isolated Interface of High Bandwidth"  (4,338,951)
    4. KEYTRAK --1989 "System and Method For Controlling Keys and Similar Articles"; (KeyTrak),  5,038,023
    5. EDA/ AMAC--1994 "Automated High Resolution Medical Image Storage,
            Retrieval, & Transmission System"; (RadFax);(5,321,520)
    6. EDA  --1995 "Electronic Key Storing Time-Varying Code Segments
      ..and Operating With .. Off-Line Locks", (Elite Key) 5,397,884
    7. EDA  --1995 "Electronic Tag With Source Certification Capability" ("VeriTag"), 5,469,363
    8. EDA/Raytheon --1996  "Aircraft Engine Cycle Logging Unit", ("TrendTrak System"), 5,552,987

SELECTED PUBLICATIONS:
    1. "A Comparison of Phase-Coherent and Non-Phase-Coherent Coded Communications"; 1965 Proceeding of In-ternl. Space Electronics Symp.
    2. "Comparison of a Correlation Versus a Probability Measure in a Coded, Sequential Detection Telemetry System"; Invited paper at 1969 Nat'l Telemetering Conference.
    3. "A New Band Notch Filter for LF and HF Applications"; 1970 Internt'l Confer. on Communications, Wash. D.C.
    4. "An All-Digital LSI 9600 BPS Modem"; 1974, National  Tele- communications Conference, San Diego, CA.
    5. "A New Versatile Transcutaneous Blood Gas Monitor"; 1981 at Annual Conference On Engineering in Medicine and Biology (Houston, TX, co-author)
    6. "RadFAX: A Solution to the Telemedical Imaging Paradox"; May, 1995, for Fall issue of Diagnostic Imaging Magazine.

## RECENT PRODUCT DESIGNS AT E.D.A:
    Products recently designed at EDA for which he had lead designer responsibility include:

Industrial:
    * Ultra-sonic trailor coupler assistant (TrailorBuddy$^{TM}$)
    * Handheld high-speed milling machine RPM analyzer (uC based FFT analyzer: BestSPEED$^{TM}$),
    * High speed lathe drill bit pre-breakage detector and shutdown instrument (DSP PWA and machine interfaces)
    * Service Truck Activity Monitor/ data logger with wireless upload to display PC (JobTrak$^{TM}$)
    * Commercial building air-conditioner monitor with wireless LAN to central data collector (for Pacific NW Labs)
Medical:
    * Dual channel, high-peformance EEG monitor with USB interface
    * Miniature high-artifact rejection oximeter PWA module
    * Four motor Endoscopic motor controller
    * Sixteen Channel EMG Monitor
    * Advanced EMG Amplifier front end for a back surgery instrument
Consumer:
    * Wireless Motor-bike Remote Kill Devices (920 MHz, OuttaController$^{TM}$)
    * Remote controlled Lamp-dimmer (high volume design, custom plastic cases)

HOBBIES:
uC Based Hydroponic Gardening, amateur radio (N4OXN), ancient technology civilizations, zero-point "free" energy de-vices, RC boats, golf, tennis, swimming, new product conceptualizing, and health foods cooking.
    His amateur radio hobby included a complete design from the "ground-up" of a VHF communication radio system between his car and home with custom rolling code security access and X10 device control. This included design of the FM transmitter, receiver and remote control circuits and antennae  (53 Mhz and 145MHz).

Depo as Expert Witness Info:

Case: SPS Technologies Vs Motorola Inc.
In the Circuit Court of the 17th Jud. Circuit in/for Broward County, FL
Sept 16, 2006

Expert in mobile Telematics Info Systems

EXHBIT "B"



Chad S. Campbell
PHONE: (602) 351-8393
FAX:   (602) 648-7193
EMAIL: CSCampbell@perkinscoie.com

2901 N. Central Avenue, Suite 2000
Phoenix, AZ 85012-2788
PHONE: 602.351.8000
FAX: 602.648.7000
www.perkinscoie.com

November 30, 2007

**VIA EMAIL and U.S. MAIL**

Ray K. Harris
FENNEMORE CRAIG, P.C.
3003 North Central Avenue, Suite 2600
Phoenix, AZ  85012-2913

   **Re:** *TASER International, Inc. v. Stinger Systems, Inc.*

Dear Ray:

  As promised, enclosed is a chart that lists Stinger's proposed claim construction of the identified claim language alongside TASER's positions with respect to that language. I would like to discuss with you the issues raised in our most recent exchange of correspondence as soon as possible and will attempt to reach you by telephone early next week.

  Have a nice weekend.

       Sincerely,

       Chad S. Campbell

CAM:mw

Copy with enclosure to:  Holly L. Gibeaut, Esq. (by email)

13770357.1

ANCHORAGE · BEIJING · BELLEVUE · BOISE · CHICAGO · DENVER · LOS ANGELES · MENLO PARK
OLYMPIA · PHOENIX · PORTLAND · SAN FRANCISCO · SEATTLE · SHANGHAI · WASHINGTON, D.C.

Perkins Coie LLP and Affiliates (Perkins Coie Brown & Bain P.A. in Arizona)

| Patent:Claim | Term | TASER's Proposed Construction | Stinger's Proposed Construction |
|---|---|---|---|
| '295:2 | | | |
| A dual operating mode electronic disabling device for immobilizing a target comprising: | | | |
| a. first and second electrodes positionable to establish first and second spaced apart contact points on the target wherein a high impedance air gap may exist between at least one of the electrodes and the target; and | "positionable" | The term should be given its plain meaning, and no construction is required. To the extent the term is construed, it should be construed as "capable of being positioned." | "capable of being placed or located on a remote target" |
| b. a power supply for operating in a first mode to generate a first high voltage, | "high voltage" | The term should be given its plain meaning, and no construction is required. To the extent the term is construed, it should be construed as "voltage sufficient to ionize the air within the air gap." | "voltage sufficient (or more than sufficient) to initiate the flow of electrical current through the air gap between a dart and the body of the target" |
| short duration output across the first and second electrodes during a first time interval to ionize the air within the air gap | "ionize the air within the air gap" | The term should be given its plain meaning, and no construction is required. To the extent the term is construed, it should be construed as "enable ions to form in the air within the gap." | "to create a glow or arc discharge across the air gap between the dart and the body of the target" |
| to thereby reduce the high impedance across the air gap to a lower impedance to enable current flow across the air gap at a lower voltage level and for subsequently operating in a second mode | "second mode" | The term should be given its plain meaning, and no construction is required. To the extent the term is construed, it should be construed as "mode different from the first mode." | "a separate circuit to maintain current flow through the ionized air within the gap at lower voltage" |

1

| Patent:Claim | Term | TASER's Proposed Construction | Stinger's Proposed Construction |
|---|---|---|---|
| to generate a second lower voltage output across the first and second electrodes during a second time interval | "lower voltage" | The term should be given its plain meaning, and no construction is required. To the extent the term is construed, it should be construed as "voltage lower than the first high voltage." | "low relative to the high voltage used to ionize the air within the gap" |
| to maintain the current flow across the first and second electrodes and between the first and second contact points on the target to enable the current flow through the target to cause involuntary muscle contractions to thereby immobilize the target. | "maintain the current flow" | The term should be given its plain meaning, and no construction is required. To the extent the term is construed, it should be construed as "provide for the current flow." | "maintain a continuous glow or arc discharge allowing current to pass without interruption across the air gap between the dart and the body of the target" |
| '295:40 | | | |
| A method for immobilizing the muscles of a target, comprising the steps of: | | | |
| a. providing first and second electrodes positionable to establish first and second spaced apart contact points on the target wherein a high impedance air gap may exist between at least one of the electrodes and the target; | "positionable" | The term should be given its plain meaning, and no construction is required. To the extent the term is construed, it should be construed as "capable of being positioned." | "capable of being placed or located on a remote target" |
| b. applying a first high voltage, | "high voltage" | The term should be given its plain meaning, and no construction is required. To the extent the term is construed, it should be construed as "voltage sufficient to ionize the air within the air gap." | "voltage sufficient (or more than sufficient) to initiate the flow of electrical current through the air gap between a dart and the body of the target" |

2

| Patent:Claim | Term | TASER's Proposed Construction | Stinger's Proposed Construction |
|---|---|---|---|
| short duration output across the first and second electrodes during a first time interval to <u>ionize the air within the air gap</u> | "ionize the air within the air gap" | The term should be given its plain meaning, and no construction is required. To the extent the term is construed, it should be construed as "enable ions to form in the air within the gap." | "to create a glow or arc discharge across the air gap between the dart and the body of the target" |
| to thereby reduce the high impedance across the air gap to a lower impedance to enable current to flow across the air gap at a <u>lower voltage</u> level; and | "lower voltage" | The term should be given its plain meaning, and no construction is required. To the extent the term is construed, it should be construed as "voltage lower than the first high voltage." | "low relative to the <u>high voltage used to ionize the air within the gap</u>" |
| c. subsequently applying a second lower voltage output across the first and second electrodes during a second time interval to <u>maintain the current flow</u> across the first and second electrodes and between the first and second contact points on the target to enable the current flow through the target to cause involuntary muscle contractions to thereby immobilize the target. | "maintain the current flow" | The term should be given its plain meaning, and no construction is required. To the extent the term is construed, it should be construed as "provide for the current flow." | "maintain a continuous glow or arc discharge allowing current to pass without interruption across the air gap between the dart and the body of the target" |

| Patent:Claim | Term | TASER's Proposed Construction | Stinger's Proposed Construction |
|---|---|---|---|
| '870:1 | | | |
| An electronic disabling device for immobilizing a target comprising: <br><br> a. first and second electrodes positionable to establish first and second spaced apart contact points on the target; | "positionable" | The term should be given its plain meaning, and no construction is required. To the extent the term is construed, it should be construed as "capable of being positioned." | "capable of being placed or located on a remote target" |
| b. high voltage power supply for generating an output voltage delivered in a series of electrical pulses to the target; <br><br> c. a battery system including <br><br> i. a battery; | "high voltage" | The term "high voltage," as used in this limitation, cannot be construed in isolation. The term "high voltage power supply" should be given its plain meaning and requires no construction. To the extent the term is construed, it should be construed as "a power supply that produces a voltage capable of immobilizing a target." | "voltage sufficient (or more than sufficient) to initiate the flow of electrical current through the air gap between a dart and the body of the target" |
| ii. a digital memory device for storing battery capacity data indicating the amount of battery capacity consumed or remaining; | "digital memory device" | The term should be given its plain meaning, and no construction is required. To the extent the term is construed, it should be construed as "memory device that stores information in digital form." | "an electronic storage device maintaining a record of data in digital form" |

| Patent:Claim | Term | TASER's Proposed Construction | Stinger's Proposed Construction |
|---|---|---|---|
| iii.  a data interface for communicating between the battery system and the memory device | "data interface" | The term should be given its plain meaning, and no construction is required. To the extent the term is construed, it should be construed as "interface that transfers data." | "an input and output device for the digital memory device" |
| to adjust the battery capacity data stored in the memory device; and | "adjust the battery capacity data" | The term should be given its plain meaning, and no construction is required. To the extent the term is construed, it should be construed as "adjust the data relating to battery capacity." | "update the record of data on the digital memory device to record a decline in the energy available for output from the battery while the battery is in use" |
| d.  a display for indicating to a user the battery capacity. | "a display for indicating to a user the battery capacity" | The term should be given its plain meaning, and no construction is required. To the extent the term is construed, it should be construed as "a display that provides a user with information concerning the battery capacity." | "an output device reporting a decline in the energy available for output from the battery while the battery is in use" |
| '870:2 | | | |
| An electronic disabling device for immobilizing a target comprising: | | | |
| a.  first and second electrodes positionable to establish first and second spaced apart contact points on the target; | "positionable" | The term should be given its plain meaning, and no construction is required. To the extent the term is construed, it should be construed as "capable of being positioned." | "capable of being placed or located on a remote target" |

5

| Patent:Claim | Term | TASER's Proposed Construction | Stinger's Proposed Construction |
|---|---|---|---|
| b.  a <u>high voltage power supply for generating an output voltage</u> | "high voltage" | The term "high voltage," as used in this limitation, cannot be construed in isolation.  The term "high voltage power supply" should be given its plain meaning and requires no construction.  To the extent the term is construed, it should be construed as "a power supply that produces a voltage capable of immobilizing a target." | "voltage sufficient (or more than sufficient) to initiate the flow of electrical current through the air gap between a dart and the body of the target" |
| delivered in a <u>pre-timed series of electrical pulses</u> to the target; and | "pre-timed series of electrical pulses" | The term should be given its plain meaning, and no construction is required.  To the extent the term is construed, it should be construed as "series of electrical pulses with one or more predetermined timing characteristics." | "a sequence of electrical discharges at a predetermined rate for a predetermined time" |
| c.  <u>a display for indicating to the user the amount of time remaining in each pulse sequence.</u> | "a display for indicating to the user the amount of time remaining in each pulse sequence" | The term should be given its plain meaning, and no construction is required.  To the extent the term is construed, it should be construed as "a display that provides the user with information concerning the amount of time remaining in each pulse sequence" | "an output device reporting the remaining duration of each pretimed series of <u>electrical pulses</u> in descending numerical units" |

6

| Patent:Claim | Term | TASER's Proposed Construction | Stinger's Proposed Construction |
|---|---|---|---|
| **'870.3** | | | |
| An electronic disabling device for immobilizing a target comprising: | | | |
| a. first and second electrodes positionable to establish first and second spaced apart contact points on the target; | "positionable" | The term should be given its plain meaning, and no construction is required. To the extent the term is construed, it should be construed as "capable of being positioned." | "capable of being placed or located on a remote target" |
| b. a high voltage power supply for generating an output voltage | "high voltage" | The term "high voltage," as used in this limitation, cannot be construed in isolation. The term "high voltage power supply" should be given its plain meaning and requires no construction. To the extent the term is construed, it should be construed as "a power supply that produces a voltage capable of immobilizing a target." | "voltage sufficient (or more than sufficient) to initiate the flow of electrical current through the air gap between a dart and the body of the target" |
| delivered in a pre-timed series of electrical pulses to the target; | "pre-timed series of electrical pulses" | The term should be given its plain meaning, and no construction is required. To the extent the term is construed, it should be construed as "series of electrical pulses with one or more predetermined timing characteristics." | "a sequence of electrical discharges at a predetermined rate for a predetermined time" |

7

| Patent:Claim | Term | TASER's Proposed Construction | Stinger's Proposed Construction |
|---|---|---|---|
| c.   a trigger mechanism to initiate the pre-timed series of electrical pulses; and | "trigger mechanism" | The term should be given its plain meaning, and no construction is required. To the extent the term is construed, it should be construed as "mechanism that allows the user to trigger the generation of electrical pulses." | "the device for initiating the discharge of the pretimed series of electrical pulses" |
| d.   a mechanism for allowing the user to extend the duration of the pre-timed series of electrical pulses. | "mechanism for allowing the user to extend the duration" | The term should be given its plain meaning, and no construction is required. To the extent the term is construed, it should be construed as "mechanism that allows the user to extend the duration." | "a mechanism separate from the trigger mechanism causing continuous uninterrupted operation of the pretimed series of electrical pulses with no additional signal from the trigger mechanism" |
| '870:4<br><br>An electronic disabling device for immobilizing a target comprising: | | | |
| a.   first and second electrodes positionable to establish first and second spaced apart contact points on the target; and | "positionable" | The term should be given its plain meaning, and no construction is required. To the extent the term is construed, it should be construed as "capable of being positioned." | "capable of being placed or located on a remote target" |

8

| Patent:Claim | Term | TASER's Proposed Construction | Stinger's Proposed Construction |
|---|---|---|---|
| b. a high voltage power supply for generating an output voltage delivered across the first and second contact points on the target | "high voltage" | The term "high voltage," as used in this limitation, cannot be construed in isolation. The term "high voltage power supply" should be given its plain meaning and requires no construction. To the extent the term is construed, it should be construed as "a power supply that produces a voltage capable of immobilizing a target." | "voltage sufficient (or more than sufficient) to initiate the flow of electrical current through the air gap between a dart and the body of the target" |
| to generate a positive voltage potential at one electrode and | "positive voltage potential" | The term should be given its plain meaning, and no construction is required. To the extent the term is construed, it should be construed as "voltage that is positive with respect to ground." | "positive in reference to ground" |
| a negative voltage potential at the other electrode, thereby increasing the total voltage drop across a target while decreasing the maximum voltage potential between either electrode | "negative voltage potential" | The term should be given its plain meaning, and no construction is required. To the extent the term is construed, it should be construed as "voltage that is negative with respect to ground." | "negative in reference to ground" |

9

| Patent:Claim | Term | TASER's Proposed Construction | Stinger's Proposed Construction |
|---|---|---|---|
| and a grounded user of the weapon. | "grounded" | The term "grounded," as used in this limitation, cannot be construed in isolation. The term "a grounded user of the weapon" should be given its plain meaning and requires no construction. To the extent the term is construed, it should be construed as "a user of the weapon who is coupled to ground." | "in contact with earth to allow current to pass through a user to the earth" |
| '262:1<br><br>A dart weapon for interfering with locomotion by a human being or animal target, the weapon for use with each of a plurality of replaceable cartridges, each cartridge having at least one wire-tethered dart and a propellant that propels the dart, the weapon comprising: | | | |
| a receiver that receives a particular cartridge of the plurality of cartridges; | "a receiver that receives a particular cartridge" | The term should be given its plain meaning, and no construction is required. To the extent the term is construed, it should be construed as "a portion of the weapon that serves as a receptacle for a cartridge." | "the weapon uses a specific cartridge that can only be loaded at a specific location" |

10

| Patent:Claim | Term | TASER's Proposed Construction | Stinger's Proposed Construction |
|---|---|---|---|
| a power supply coupled to the receiver for conducting a high voltage pulsed current from the power supply through the wire-tethered dart of the particular cartridge; and | "high voltage pulsed current" | The term should be given its plain meaning, and no construction is required. To the extent the term is construed, it should be construed as "pulse or train of pulses of electrical current including a high voltage." | "a pretimed series of electrical electron flows as pulses in response to similar high voltage applied pulses" |
| a microprocessor programmed | "programmed" | The term should be given its plain meaning, and no construction is required. To the extent the term is construed, it should be construed as "including a program." | "provided with the necessary instructions to execute an automatic sequence of functions once initiated" |
| (1) to track date and time,<br>(2) to activate via the power supply the propellant of the particular cartridge,<br>(3) to maintain for a period the current from the power supply, and | "track date and time" | The term should be given its plain meaning, and no construction is required. To the extent the term is construed, it should be construed as "keep track of date and time" | "store current, absolute date and time (e.g., 8:00:00 am Nov 15, 2007) |
| (4) to record tracked date and time in accordance with activation of the propellant of the particular cartridge and in accordance with respective activation of each other cartridge of the plurality received by the receiver, wherein the current, through the target, interferes with use by the target of the skeletal muscles of the target during the period. | "record tracked date and time" | The term should be given its plain meaning, and no construction is required. To the extent the term is construed, it should be construed as "store information regarding tracked date and time." | "to track date and time and store the data in a digital memory device |

11

| Patent:Claim | Term | TASER's Proposed Construction | Stinger's Proposed Construction |
|---|---|---|---|
| **'262:2** | | | |
| The weapon of claim 1 further comprising | | | |
| a trigger, | "a trigger" | This term should be given its plain meaning and requires no construction. | "an initiator" |
| wherein the microprocessor is further programmed to respond to operation of the trigger to activate the propellant. | "programmed" | The term should be given its plain meaning, and no construction is required. To the extent the term is construed, it should be construed as "including a program." | "provided with the necessary instructions to execute an automatic sequence of functions once initiated" |
| **'262:6** | | | |
| A dart weapon for interfering with use by a human being or animal target of skeletal muscles of the target, | | | |
| the weapon operative with a provided cartridge, the device comprising: | "operative with a provided cartridge" | The term should be given its plain meaning, and no construction is required. To the extent the term is construed, it should be construed as "capable of operating with a provided cartridge." | "the weapon is made and sold with the cartridge that must be used" |
| a trigger that provides a first signal responsive to operation of the trigger; and | "a trigger" | This term should be given its plain meaning and requires no construction. | "an initiator" |

12

| Patent:Claim | Term | TASER's Proposed Construction | Stinger's Proposed Construction |
|---|---|---|---|
| a circuit, comprising a memory, that (1) keeps track of current time of day, (2) keeps track of current date, (3) receives the first signal to determine a first time, and (4) responds to the first signal by recording current date and current time of day in the memory, by applying power to a signal generator, by keeping track of a period of time from the first time, and by disabling the signal generator upon lapse of the period, wherein | "a circuit, comprising a memory" | The term should be given its plain meaning, and no construction is required. To the extent the term is construed, it should be construed as "a circuit that includes a memory." | "a circuit including a digital memory device as defined above" |
| the signal generator activates the cartridge to propel a wire-tethered dart of the cartridge toward the target; and a current from the signal generator via the wire-tethered dart and through the target interferes with use by the target of the skeletal muscles of the target during the period. | "signal generator" | The term should be given its plain meaning, and no construction is required. To the extent the term is construed, it should be construed as "circuit that outputs a signal." | "a device initiating a signal" |
| '262:9 | | | |
| A dart weapon for interfering with locomotion by a human being or animal target, the apparatus comprising: | | | |

13

| Patent::Claim | Term | TASER's Proposed Construction | Stinger's Proposed Construction |
|---|---|---|---|
| means for providing | "means for providing" | The term may be construed in accordance with 35 U.S.C. § 112, ¶ 6. The function is "providing a high voltage pulsed current through the target via a provided wire-tethered dart launched from the weapon." The corresponding structure disclosed in the specification is high voltage supply comprising capacitor 15 and transformer 14 as shown in Fig. 2 and described, for example, at col. 3:46-4:11. | "a microprocessor controlling a switch in response to a signal from the trigger" |
| a high voltage pulsed current through the target via a provided wire-tethered dart launched from the weapon; | "high voltage pulsed current" | The term should be given its plain meaning, and no construction is required. To the extent the term is construed, it should be construed as "pulse or train of pulses of electrical current including a high voltage." | "a pretimed series of electrical electron flows as pulses in response to similar high voltage applied pulses" |

14

| Patent:Claim | Term | TASER's Proposed Construction | Stinger's Proposed Construction |
|---|---|---|---|
| means for recording date and time of day | "means for recording" | The term may be construed in accordance with 35 U.S.C. § 112, ¶ 6. The function is "recording date and time of day for each occasion that the weapon was operated to provide the current." The corresponding structure disclosed in the specification is microprocessor 32 shown in fig. 2 and memory described, for example, at col. 3:38-45. | "a microprocessor programmed to track and record current, absolute date and time (e.g., 8:00:00 am Nov 15, 2007)" |
| for each occasion that the weapon was operated to provide the current; and | "each occasion that the weapon was operated to provide the current" | The term should be given its plain meaning, and no construction is required. To the extent the term is construed, it should be construed as "each time the weapon was used." | "each time the trigger initiates high voltage pulsed current" |
| means for discontinuing provision of the current in accordance with | "means for discontinuing" | The term may be construed in accordance with 35 U.S.C. § 112, ¶ 6. The function is "discontinuing provision of the current in accordance with lapse of a predefined period." The corresponding structure disclosed in the specification is microprocessor or mechanical or other means as described, for example, at col. 3:48-53. | "a microprocessor controlling a switch" |

15

| Patent:Claim | Term | TASER's Proposed Construction | Stinger's Proposed Construction |
|---|---|---|---|
| lapse of a predefined period. | "predefined period" | The term should be given its plain meaning, and no construction is required. To the extent the term is construed, it should be construed as "predefined period of time." | "a fixed period of time set in advance" |
| '262:10 | | | |
| The weapon of claim 9 wherein a microprocessor with memory implements the means for recording and | "means for recording" | See claim 9, above. | "a microprocessor programmed to track and record current, absolute date and time (e.g., 8:00:00 am Nov 15, 2007)" |
| the means for discontinuing. | "means for discontinuing" | See claim 9, above. | "a microprocessor controlling a switch" |
| '262:11 | | | |
| The weapon of claim 9 wherein the period of time extends about 7 seconds. | "period of time" | The term should be given its plain meaning, and no construction is required. To the extent the term is construed, it should be construed as "the predefined period." | Stinger contends this term has no antecedent and is therefore indefinite. |
| '262:13 | | | |
| An apparatus for causing involuntary contractions of skeletal muscles of a human or animal target, the apparatus comprising: a circuit having a microprocessor that is | | | |

16

| Patent:Claim | Term | TASER's Proposed Construction | Stinger's Proposed Construction |
|---|---|---|---|
| (1) programmed to track date and time, | "programmed to track date and time" | The term should be given its plain meaning, and no construction is required. To the extent the term is construed, it should be construed as "including a program that tracks date and time." | "programmed to record tracked date and time as described above, without initiation by a separate signal" |
| (2) programmed to initiate a high voltage pulsed current from the circuit, and<br>(3) programmed to record tracked date and time in accordance with each initiation of the current wherein<br>the current launches a provided wire-tethered dart toward the target to conduct the current through the target and, when passing through the target, causes involuntary contractions of skeletal muscles of the target. | "initiate a high voltage pulsed current from the circuit" | The term should be given its plain meaning, and no construction is required. To the extent the term is construed, it should be construed as "begin a pulse or train of pulses of electrical current including a high voltage." | "a microprocessor will initiate the high voltage pulsed current and record tracked date and time initiated" |
| '262:14<br>The apparatus of claim 13 wherein the microprocessor is | | | |
| further programmed to determine a period, and programmed to terminate the current after lapse of the period. | "programmed to determine a period" | The term should be given its plain meaning, and no construction is required. To the extent the term is construed, it should be construed as "including a program that establishes a period." | "there is no predefined period and the microprocessor must select from alternative time periods based on the instructions programmed" |

17

EXHBIT "C"

# FENNEMORE CRAIG, P.C.

3003 North Central Avenue, Suite 2600
Phoenix, Arizona 85012-2913
(602) 916-5000

**Ray K. Harris**
Direct Phone: (602) 916-5414
Direct Fax: (602) 916-5614
rharris@fclaw.com

**Law Offices**

| | |
|---|---|
| Phoenix | (602) 916-5000 |
| Tucson | (520) 879-6800 |
| Nogales | (520) 281-3480 |
| Las Vegas | (702) 692-8000 |
| Denver | (303) 291-3200 |

December 14, 2007

**VIA FACSIMILE**

Chad S. Campbell
Perkins Coie Brown & Bain
2901 N. Central Avenue, Suite 2000
Phoenix, AZ 85012

   Re: *Taser International v. Stinger Systems, Inc.*

Dear Chad:

  As I indicated in my letter dated November 29, Judge Murguia's scheduling order required you to disclose any extrinsic evidence to be offered at the Markman hearing, including declarations of experts, by November 16. We will seek to exclude any expert testimony offered by Taser on the ground that no disclosure was made.

  We have provided the declaration of Tom Saliga and will rely on that declaration to the extent necessary at the claim construction hearing. An opposing expert disclosure with the submission of your opening brief will be untimely and will be opposed by Stinger. Because you have not disclosed your expert's testimony, I cannot ascertain whether any rebuttal testimony would be required from Mr. Saliga. Stinger cannot be expected to foreclose rebuttal testimony without timely disclosure of the testimony Taser intends to offer. At this point, I do not anticipate any testimony from Mr. Saliga (other than rebuttal in the event you are permitted expert testimony despite noncompliance with the Court's order). As I indicated in our telephone conference, Judge Murguia's scheduling order clearly anticipated the submission of expert testimony through declarations; consequently, we do not anticipate presenting live testimony for Mr. Saliga.

  As I indicated in my email dated December 5, the patent specification clearly supports the claim constructions we have proposed for "ionize the air within the gap" and "maintain the current flow". Those constructions are further supported by the file history we cited in our response to your previous motion to dismiss the inequitable conduct defenses.

  You have rejected our proposed construction without any explanation of how the inventor can avoid the definitions adopted in the specification and prosecution history.

2010052.1/19862.001

# FENNEMORE CRAIG, P.C.

Chad S. Campbell
December 14, 2007
Page 2


Your only justification for failing to provide any disclosure regarding your expert or the proposed claim terms constructions, it is that you "could not anticipate" the definitions we have provided. To the contrary, however, our definitions were disclosed in our response to the motion to dismiss, in the settlement memoranda and in the file history for the three patents at issue. Indeed, the definitions you have proposed are circular and tautological (for example "positionable" construed as "capable as being positioned", "ionize the air within the gap" construed as "enable ions to form in the air within the gap" and "mechanism for allowing user to extend the duration" construed as "mechanism that allows the user to extend the duration").

In a further effort to focus the issues for the Markman hearing, we believe the claim specification related to "track, date and time" and "record track, date and time" requires a weapon that "keeps track of current time of day, keeps track of current date ... and responded to the first signal by recording current date and current time of day in the memory." '262 Patent Col. 2 lines 37-41. "Each time trigger 34 is squeezed and weapon 30 is fired, the memory in microprocessor 32 retains a record of the date and the time the weapon was fired." Col. 3 lines 42-45. In addition, the '870 patent states "the X26 System includes a real time clock." (Column 10 line 39) and "the stun gun clock always remains set to GMT". Col. 19, line 40.

Thus, your proposed constructions "keep track of date and time" and "store information regarding track, date and time" are correct in general terms, but ignore the specific language of the specification that discusses current date separately from current time of day based on a real time clock.

With regard to the '295 patent we will agree to your proposed construction of high voltage, second mode and lower voltage. With regard to the '870 patent we will agree to your definition of "positive voltage potential", "negative voltage potential", "grounded" digital memory device, data interface, adjust the battery capacity data, pretime series of electrical pulses, trigger mechanism, a receiver that receives a particular cartridge, operative with a provided cartridge, and programmed to determine a period.


Yours truly,


Ray K. Harris


RKH/mt
cc:    James McNulty