Chad S. Campbell, Bar No. 012080
CSCampbell@perkinscoie.com
Aaron Matz, Bar No. 024108
AMatz@perkinscoie.com
PERKINS COIE BROWN & BAIN P.A.
2901 North Central Avenue, Suite 2000
Phoenix, AZ  85012-2788
Telephone:  602.351.8000
Facsimile:  602.648.7000

Holly L. Gibeaut, Bar No. 019786
hgibeaut@taser.com
TASER International, Inc.
17800 North 85th Street
Scottsdale, AZ  85255-9603
Telephone:  480.502.6265
Facsimile:  480.991.0791

Attorneys for Plaintiff
TASER International, Inc.

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| TASER International, Inc., | No. CV07-0042-PHX-MHM |
| Plaintiff, | |
| v. | *Markman* Hearing: |
| Stinger Systems, Inc., | April 17, 2008, 9:00 a.m. |
| Defendant. | |

**TASER INTERNATIONAL, INC.'S
REPLY CLAIM CONSTRUCTION BRIEF**

# Table of Contents

**Page**

Table of Authorities.................................................................................................iii

Introduction .......................................................................................................... 1

Discussion............................................................................................................. 1

I.  U.S. Patent No. 6,999,295 ("'295 Patent"). ............................................. 1

    A.  "To Ionize the Air Within the Air Gap." ........................................ 1

    B.  "Maintain the Current Flow." ......................................................... 3

    C.  "Positionable." ................................................................................ 7

II.  U.S. Patent No. 7,102,870 ("'870 Patent"). ............................................ 7

    A.  "Positionable." ................................................................................ 7

    B.  "High Voltage Power Supply." ....................................................... 8

    C.  "A Display for Indicating to a User the Battery Capacity." ........... 8

    D.  "A Display for Indicating to the User the Amount of Time Remaining in Each Pulse Sequence."............................................. 8

    E.  "A Mechanism for Allowing the User to Extend the Duration of the Pre-Timed Series of Electrical Pulses." ............................. 8

    F.  "A Grounded User of the Weapon."................................................ 8

III.  U.S. Patent No. 7,234,262 ("'262 Patent"). ............................................ 9

    A.  "A High Voltage Pulsed Current." ................................................. 9

    B.  "A Microprocessor Programmed." ............................................... 10

    C.  "To Track Date and Time;" "To Record Tracked Date and Time;" "Keeps Track of Current Time of Day;" "Keeps Track of Current Date."............................................................................ 10

    D.  "Trigger."...................................................................................... 10

    E.  "Signal Generator."...................................................................... 10

    F.  "The Means Plus Function Limitations." ..................................... 10

    G.  "Period of Time." ......................................................................... 11

IV.  Conclusion............................................................................................... 11

1

**Table of Authorities**

2

<u>**Cases**</u>                                                                                              <u>**Page**</u>

3
*Bell Atlantic Network Services, Inc. v. Covad Communications Group, Inc.*,
   262 F.3d 1258 (Fed. Cir. 2001) ........................................................................... 2

4
*CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359 (Fed. Cir. 2002) ........................... 2

5
*Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349 (Fed. Cir. 2006) ................... 4

6
*Energizer Holdings, Inc. v. Int'l Trade Comm'n*,
7   435 F.3d 1366 (Fed. Cir. 2006) ......................................................................... 11

8
*GoLight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327 (Fed. Cir. 2004) ........................ 11

9
*LG Elecs., Inc. v. Bizcom Elecs., Inc.*, 453 F.3d 1364 (Fed. Cir. 2006) ........................... 1

10
*MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323 (Fed. Cir. 2007) .............. 5

11
*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ........................................... 1, 5, 6

12
*Salazar v. Procter & Gamble Co.*, 414 F.3d 1342 (Fed. Cir. 2005) .......................... 6, 11

13
*Saunders Group, Inc. v. Comfortrac, Inc.*, 492 F.3d 1326 .............................................. 10

14
*Tate Access Floors, Inc. v. Interface Architectural Resources, Inc.*,
   279 F.3d 1357 (Fed. Cir. 2002) ....................................................................... 2, 4

15
*Transco Prods. Inc. v. Performance Contracting, Inc.*,
16   38 F.3d 551 (Fed. Cir. 1994) ............................................................................ 6-7

17

<u>**Other Authorities**</u>

18
35 U.S.C. § 112 .......................................................................................................... 11

19
35 U.S.C. § 120 ............................................................................................................ 6

20
35 U.S.C. § 282 .......................................................................................................... 11

21

22

23

24

25

26

27

28

**Introduction**

In accordance with well-established principles of claim construction, TASER's proposed constructions are based on the plain meanings of the claim terms in dispute, as those terms would be understood by one of ordinary skill in the art at the time of the claimed inventions. By contrast, most, if not all, of Stinger's proposed constructions attempt to narrow the plain meaning of the claim language by importing limitations from the patents' specifications into the claims. Moreover, Stinger has repeatedly argued that well understood claim terms should be redefined based on statements in the specification or file history, even though those statements fall far short of manifesting the required "intentional disclaimer, or disavowal, of claim scope," *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc), or "clear lexicographic definition" necessary to overcome the plain meaning of a claim term, *LG Elecs., Inc. v. Bizcom Elecs., Inc.*, 453 F.3d 1364, 1374 (Fed. Cir. 2006). Each of Stinger's arguments is rebutted below with respect to each of the claim terms in dispute.[1]

**Discussion**

I.   U.S. PATENT NO. 6,999,295 ("'295 PATENT").

   A.   "To Ionize the Air Within the Air Gap."

Stinger proposes to narrow the plain meaning of "to ionize the air within the air gap" by importing two limitations from the specification—namely, forming an electrical arc and having current flow across that arc. [Stinger Brief at pp. 3-4] Stinger's argument is that the "purpose [for ionization] disclosed in the claim[s] and the specification" is "to enable [and then 'maintain'] current flow across the air gap." [*Id.* at 4] Tellingly, Stinger cites no authority for the proposition that a claim term with a plain meaning should be redefined away from that meaning in view of the term's "purpose" as set out in the

---

[1] Stinger's Opposing *Markman* brief has raised an objection to TASER's announced intention to present live expert testimony at the *Markman* hearing. [Stinger Brief at pp. 1-2] On February 21, 2008, at the hearing on Stinger's motion to stay, the Court inquired about the objection, and TASER explained why there has been no prejudice to Stinger and why there was no violation of the Court's scheduling order in connection with the disclosure of potential live expert testimony in opposition to Stinger's claim construction positions. Rather than repeat those arguments here, TASER incorporates the arguments made on the record at the February 21 hearing.

specification, nor is TASER aware of any such authority.   Rather, "limitations from elsewhere in the specification" (whether based on a claim term's "purpose" or otherwise) "will not be read in where . . . the claim terms are clear."   *Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*, 279 F.3d 1357, 1371 (Fed. Cir. 2002).   Moreover, as detailed below, the purpose for ionization of the air gap as explained in the patent is not to create an arc but to lower the impedance so that current may flow to and through the target more efficiently.

The figure and passages from the '295 patent's written description that Stinger cites at pages 3 and 4 of its brief fall far short of overcoming the "heavy presumption" that "to ionize" should be given its ordinary and customary meaning:  "to enable ions to form." *See CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) (stating that accused infringer cannot overcome "heavy presumption" that "claim term carries its ordinary and customary meaning" merely by "pointing to the preferred embodiment or other structures or steps disclosed in the specification").  Figure 5(b) and the passages at column 2, lines 23-33, and column 16, lines 48-50, show or mention an "arc" but do not mention ionization at all.   The passage at column 5, lines 63-65, explains only that an electrical arc has "ionized air within the air gap"; it uses "ionized" as an adjective, not a verb, and says nothing about whether the term "to ionize" necessarily includes the formation of an arc or the flow of current.   And the passage at column 2, lines 59-66, supports TASER's construction, not Stinger's—rather than lumping ionization, arc formation, and current flow under the single rubric of "to ionize," that passage teaches that those three processes (along with a fourth process, the "break down" of the air gap) are separate and distinct.

Stinger cites a single case in support of its attempt to import the "arc formation" and "current flow" limitations from the specification into the claim term "to ionize":  *Bell Atlantic Network Services, Inc. v. Covad Communications Group, Inc.*, 262 F.3d 1258, 1271 (Fed. Cir. 2001).  [Stinger Brief at p. 4]  That case does not apply here.  In *Bell Atlantic*, the patent at issue repeatedly used the claim term "mode" in the written

1   description in a manner that consistently indicated that "mode" meant something different

2   from "rate."   262 F.3d at 1270-73.   In view of that repeated and consistent usage, the

3   Court held that the patentees had defined the term "mode" by implication.   *Id.* at 1273.

4       In the '295 patent, by contrast, there is no repeated and consistent usage of the term

5   "to ionize" in a manner that indicates that it should be construed differently from its plain

6   meaning.   Each of the passages that Stinger cited is consistent with the plain meaning of

7   the term, as explained above.   And the only passage in the written description that uses the

8   term "ionize" as a verb (as it is used in asserted claims 2 and 40) also supports TASER's

9   plain meaning construction:   At column 7, line 66 though column 8, line 3, the written

10   description states "In one preferred embodiment of the FIG. 10 circuit, capacitor C1, the

11   discharge of which provides the relatively high energy level required *to ionize* the high

12   impedance air gap between E1 and E3, can be implemented with a capacitor rating of 0.14

13   microFarads and two thousand volts."   Contrary to Stinger's assertions regarding the

14   "purpose" of the "ionize" limitation, the passage above indicates that the purpose of the

15   high voltage provided by the high energy level stored on capacitor C1 is merely "to

16   ionize" the air in the air gap.   The passage mentions ionization only and says nothing

17   about the formation of an arc or the flow of current.   Elsewhere, the specification and the

18   asserted claims themselves expressly explain that the purpose of ionizing air within the air

19   gap is to lower the impedance so that current may flow to and through the target more

20   efficiently.   [*E.g.*, '295 pat. abstract, col. 3:19-24, 3:35-41, 20:58-60, 24:46-48]

21       **B.**    **"Maintain the Current Flow."**

22       Stinger proposes that the Court narrow the plain meaning of "maintain the current

23   flow" by requiring that the recited "current flow" be "the previously initiated discharge

24   across the arced over air gap."   [*Id.* at 5]   That attempt to narrow the plain meaning of the

25   term by importing a limitation from the specification is improper and should be rejected.

26       First, contrary to Stinger's assertion, [*Id.*], the "plain language" of the claim

27   imposes no requirement that the current flow "maintained" in the second mode (claim 2)

28   or during the second time interval (claim 40) must be continuous with an arc or current

1   flow formed in the first mode (claim 2) or during the first time interval (claim 40).

2   Indeed, claims 2 and 40 do not require an "arc" at all, nor is there any requirement for

3   "continuity."  Moreover, the use of the term "to maintain" in the claims is restricted to the

4   second mode (claim 2) or second time interval (claim 40) only.  In claim 2, for example,

5   only the second mode is associated with maintaining the current flow.  Similarly, in claim

6   40, maintaining the current flow occurs only "during a second time interval."

7           Second, Stinger's citation to column 6 of the written description in support of its

8   construction is unavailing.  [*Id.*]  Column 6 is simply a description of a preferred

9   embodiment, and it is improper to import limitations from a preferred embodiment into

10  the claims.  *See Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1357-58 (Fed.

11  Cir. 2006) ("[A]n inventor may use the specification to intentionally disclaim or disavow

12  the broad scope of a claim[, but] this intention must be clear and cannot draw limitations

13  into the claim from a preferred embodiment." (citations omitted)).  Nor does Figure 6

14  support Stinger's strained claim construction.  In the first place, Figure 6 is a "simplified"

15  diagram that shows only the general characteristics of the output waveform without

16  showing the level of detail that Stinger claims.  ['295 pat. col. 7:34-35]  In the second

17  place, even if Figure 6 showed what Stinger claims it shows (it does not), it is merely an

18  illustration of one embodiment of the claimed invention, and "additional limitations from

19  [the] figures cannot be imported into the unambiguous claim language."  *Tate Access*

20  *Floors*, 279 F.3d at 1371.

21          Third, the specification supports TASER's plain meaning construction of "maintain

22  the current flow" and is inconsistent with Stinger's overly narrow construction of that

23  term.  As explained in TASER's Opening Brief, Figure 17 (along with other figures in the

24  specification) shows that the current flow in the preferred embodiment is neither

25  continuous nor uninterrupted during the second mode or second time period.  [TASER

26  Brief at p. 10 & n.3]  Stinger does not dispute that Figure 17 shows an interruption and

27  lack of continuity in the current flow.  Instead, it argues that Figure 17 is irrelevant

28  because "[t]he claims require that the current be 'maintained' during the transition from

the first time interval/first mode to the second time interval/second mode." [Stinger Brief at p. 6] As discussed above, however, the plain language of the claims requires no such thing. Rather, as used in the claims, "maintain the current flow" applies only to the second mode (claim 2) or second time interval (claim 40). Accordingly, Figure 17 is relevant to understanding the construction of "to maintain." Because Stinger's attempt to import limitations regarding continuity or lack of interruption into "maintain" would read the Figure 17 embodiment out of the claims, it must be rejected. *See MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007) ("A claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct." (quotation marks omitted)).

Fourth, the argument at page 5 of Stinger's brief—that evidence that "current flow sufficient to cause involuntary muscle contractions can be maintained during an interval even if the flow is interrupted or is not continuous" is extrinsic, untimely, and immaterial—is misplaced. As noted at the hearing on Stinger's motion to stay, the substance of Dr. Rodriguez's expected testimony regarding the above topic was timely disclosed to Stinger. There is thus no reason to exclude it. Moreover, although Dr. Rodriguez's expected testimony is extrinsic, it is by no means immaterial. *See Phillips*, 415 F.3d at 1318 ("[E]xpert testimony can be useful to a court for a variety of purposes, such as to provide background on the technology at issue, to explain how an invention works, [and] to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art . . . .") Finally, the intrinsic evidence also demonstrates that "[c]urrent flow sufficient to cause involuntary muscle contractions can be maintained during an interval even if the flow is interrupted or is not continuous." [TASER Brief at p. 8] For example, columns 1 and 2, which describe general stun gun technology as part of the "background of the invention," consistently teach that stun guns can provide immobilizing current in the form of "pulses," which are neither continuous nor uninterrupted. [*E.g.*, '295 pat. col. 1:49, 1:55, 2:18, 2:24, 2:58] In addition, the specification teaches that embodiments of the invention can deliver their

1  immobilizing output current as a series of pulses, rather than a continuous current flow.

2  [*E.g.*, *id.* col. 18:29-39]

3      Fifth, contrary to Stinger's assertion, an examination of the language used in the

4  unasserted claims supports TASER's construction.  [Stinger Brief at p. 5]  *See Phillips*,

5  415 F.3d at 1314 ("Differences among claims can also be a useful guide in understanding

6  the meaning of particular claim terms.")  For example, like claim 26 (which is discussed

7  in TASER's opening brief at pages 8-9), and unlike asserted claims 2 and 40, claim 1

8  includes an explicit reference to an "arc" and expressly recites that the current flow is

9  maintained "across the arc."  If the drafter of the claims intended to limit the scope of

10  claims 2 and 40 to maintaining current flow across a previously established arc, he would

11  have used express language like that found in claim 1.  The fact remains that he did not.

12      Sixth, the prosecution history does not support Stinger's proposed construction.

13  The applicant's statement in the Response to Office Action dated November 9, 2005,

14  [Stinger Brief at p. 6], refers to uninterrupted "*ionization*," not uninterrupted current flow

15  or an uninterrupted arc.  That statement is thus fully consistent with ionization being

16  distinct from arc formation and current flow.  The examiner's response in the Notice of

17  Allowability dated May 11, 2006, [*Id.*], is irrelevant because an "examiner's unilateral

18  remarks [do] not alter the scope of the claim."  *Salazar v. Procter & Gamble Co.*, 414

19  F.3d 1342, 1347 (Fed. Cir. 2005).  The applicant's response to the examiner's statements,

20  [*Id.*], rather than acquiescing in the examiner's reasons for allowance, merely

21  acknowledged that energy at high voltage can be used to form an arc; it said nothing about

22  whether current during a second time interval or second mode must be maintained through

23  such an arc.

24      Finally, Stinger's argument that "T[ASER] cannot claim priority to 2003 for

25  inventions that were not disclosed" confuses the facts and the law.  [*Id.* at 7]  What

26  matters for the purpose of claiming priority is the disclosure, not the claims, and the scope

27  of the claims in a continuation application need not be the same as the scope of the claims

28  in the priority application.  35 U.S.C. § 120; *see Transco Prods. Inc. v. Performance*

1   *Contracting, Inc.*, 38 F.3d 551, 555 (Fed. Cir. 1994) ("A 'continuation' application claims

2   the same invention claimed in an earlier application, although there may be some variation

3   in the scope of the subject matter claimed."). The Preliminary Amendment of February 4,

4   2005, made only insignificant changes to the written description "to correct minor textual

5   errors." [Counsel Decl. dated 12/31/07 Ex. 4 ('295 File History), at pp. 84-89]  The

6   application was thus entitled to the 2003 priority date. The amended claims that became

7   claims 2 and 40, however, were different in scope from original claim 1 because unlike

8   that claim, they did not include any reference to an arc or to current passing through that

9   arc. As discussed in TASER's Opening Brief, that change to claims 2 and 40 is a

10  compelling indication that Stinger's proposed additional requirements regarding an arc

11  and uninterrupted current flow through that arc do not apply to claims 2 and 40. [TASER

12  Brief at pp. 11-12]

13          **C.      "Positionable."**

14          Stinger did not address the term "positionable" in its Brief. If Stinger no longer

15  advances the construction of that term as advanced in Mr. Saliga's declaration, then

16  TASER submits that "positionable" should be given its plain meaning and requires no

17  construction by the Court.

18  **II.     U.S. PATENT NO. 7,102,870 ("'870 PATENT").**

19          As a preliminary matter, Stinger's assertion that TASER has somehow conceded

20  that claims 1-4 of the '870 patent are limited to "stun guns that work by direct contact" is

21  incorrect. [Stinger Brief at p. 7] TASER's Opening Brief stated only that, in contrast to

22  the '295 patent, there is nothing in the '870 patent to limit the claims to stun guns

23  designed to overcome air gaps. [TASER Brief at p. 15] Thus, claims 1-4 of the '870

24  patent are broad enough to cover both stun guns that work by direct contact and stun guns

25  designed to overcome air gaps. [*Id.*]

            **A.      "Positionable"**

26          As discussed above, Stinger did not address the term "positionable" in its Brief. To

27  the extent that Stinger no longer advances the construction of that term suggested by

28

Mr. Saliga's declaration, TASER submits that the term should be given its ordinary meaning and requires no construction by the Court.

**B.  "High Voltage Power Supply."**

Stinger did not address the term "high voltage power supply" in its Brief.  If Stinger is no longer advancing the construction of that term suggested in Mr. Saliga's declaration, then TASER submits that "high voltage power supply" should be given its plain meaning and requires no construction by the Court.

**C.  "A Display for Indicating to a User the Battery Capacity."**

Stinger apparently concedes TASER's construction of this term.  [Stinger Brief at p. 7]  TASER's proposed construction, however, is not "a display with any indication of battery capacity is sufficient," as Stinger suggests.  [*Id.*]  Rather, it is "a display that provides a user with information concerning the battery capacity."  [TASER Brief at p. 15].

**D.  "A Display for Indicating to the User the Amount of Time Remaining in Each Pulse Sequence."**

Stinger apparently concedes TASER's construction of this term.  [Stinger Brief at p. 7]

**E.  "A Mechanism for Allowing the User to Extend the Duration of the Pre-Timed Series of Electrical Pulses."**

Stinger apparently concedes TASER's construction of this term.  [*Id.* at 7-8]

**F.  "A Grounded User of the Weapon."**

Stated briefly, the sole remaining dispute with respect to this term is whether "ground" refers to the claimed electronic disabling device's "primary weapon ground," as is consistent with the ordinary meaning of the term, the teachings of the specification, and the understanding of one skilled in the art, or, instead, whether it refers to "Earth" ground, as Stinger contends.  [*Id.* at 8-9]  Stinger first argues that TASER's proposed plain meaning construction is based on "extrinsic evidence" that "was not timely disclosed" and that "is properly excluded."  [*Id.* at 8]  Not so.  As discussed above, the expected testimony of Dr. Rodriguez was timely disclosed and should be considered by the Court.

In addition, as explained at length in TASER's Opening Brief, TASER's construction is based on intrinsic evidence, namely, the patent specification itself. [TASER Brief at pp. 18-19]  In a vain attempt to overcome the plain meaning of the term "ground" and the clear statements in the written description equating that term with the weapon's circuit ground, Stinger offers only the following attorney arguments:

- "A user in this hypothetical situation is grounded to earth and the voltage passes through the user to Earth."
- "If, as suggested by T[ASER], 'grounded user' is defined as 'a user who becomes coupled to the primary circuit ["common"] ground of the weapon' . . . , the very problem addressed in the specification would be defined out of existence."
- "In order to draw voltage from the circuit, the user must contact the circuit and earth ground."
- "Only by defining grounded user in terms of earth ground can the 'significant safety enhancement' described in the specification be understood and achieved."
- "The risk to the user can only arise if the user is grounded to earth.  There is no risk if the user is grounded to the common or reference conductor within the weapon."

[Stinger Brief at pp. 8-9]  That Stinger cited absolutely no evidence in support of any of the above statements is not surprising, given that each of those statements is demonstrably incorrect.  The specification never mentions "Earth" ground and discloses no way to electrically connect the weapon's circuitry to Earth ground.  The only disclosed ground in the figures and written description is the primary weapon ground.  [*E.g.*, '870 pat. figs. 2, 9-11, 13, 15, 19, 20-25 & col. 16:43-62]  Because all voltages in the circuit are relative to that primary weapon ground, the risk to the user of the weapon arises when the user becomes coupled to the primary weapon ground; "Earth" ground is simply irrelevant.

### III.  U.S. PATENT NO. 7,234,262 ("'262 PATENT").

#### A.  "A High Voltage Pulsed Current."

Stinger did not address this term in its Brief.  If Stinger is no longer advancing the construction suggested in Mr. Saliga's declaration, then TASER submits that the term should be given its plain meaning and that no construction by the Court is necessary.

B.   **"A Microprocessor Programmed."**

Stinger did not address this term in its Brief.  If Stinger is no longer advancing the construction suggested in Mr. Saliga's declaration, then TASER submits that the term should be given its plain meaning and that no construction by the Court is necessary.

C.   **"To Track Date and Time;" "To Record Tracked Date and Time;" "Keeps Track of Current Time of Day;" "Keeps Track of Current Date."**

Stinger's arguments with respect to these terms once again boil down to an improper attempt to read limitations from the specification into the claims.  That the specification may include examples that "store current, absolute date and time," [Stinger Brief at p. 10], does not change the rule that it is improper to import into the claim language limitations from the written description that are not actually in the claims.  *See Saunders Group, Inc. v. Comfortrac, Inc.*, 492 F.3d 1326, 1332.  Morevoer, the fact that TASER "cites no example from the specification that excludes the use of current date and current time or that defines any alternative method of calculating date and time," [*Id.*], is irrelevant.  There is no canon of claim construction that holds that a clear limitation in a patent claim should be construed by narrowing it as much as possible until it conflicts with an example in the specification.

D.   **"Trigger."**

Stinger did not address this term in its Brief.  If Stinger is no longer advancing the construction suggested in Mr. Saliga's declaration, then TASER submits that the term should be given its plain meaning and that no construction by the Court is necessary.

E.   **"Signal Generator."**

Stinger did not address this term in its Brief.  If Stinger is no longer advancing the construction suggested in Mr. Saliga's declaration, then TASER submits that the term should be given its plain meaning and that no construction by the Court is necessary.

F.   **The Means Plus Function Limitations.**

Stinger states without any support that the three disputed "means plus function" limitations in the '262 patent are "defined in the specification" and then cites to passages

1  from the written description.  [Stinger Brief at pp. 10-11]  That is not the procedure for

2  construing claim limitations under 35 U.S.C. § 112, paragraph 6.  Instead, the Court

3  should first identify the function performed and then identify the structures in the written

4  description that correspond to that function, as set out at pages 23-24 of TASER's

5  Opening Brief.  *See GoLight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1333-34 (Fed.

6  Cir. 2004) (describing construction of means plus function limitations).  TASER's

7  proposed constructions are based on that procedure; Stinger's are not.  Moreover, the

8  unilateral examiner's statements that Stinger cites at page 11 of its brief have no effect on

9  claim scope.  *See Salazar*, 414 F.3d at 1347.

10          **G.     "Period of Time."**

11          Stinger argues that claim 11 is indefinite because the term "period of time" does

12  not appear in claim 9, from which claim 11 depends.  [*Id.* at 11]  But as set out more fully

13  at page 25 of TASER's Opening Brief, the mere lack of an explicit antecedent for a claim

14  term does not automatically render the corresponding claim invalid.  *See Energizer*

15  *Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1370-71 (Fed. Cir. 2006).  Stinger's

16  conclusory argument fails to overcome the statutory presumption of validity.  35 U.S.C.

17  § 282.

**IV.    CONCLUSION**

18          The Court should recognize Stinger's proposed claim constructions for what they

19  are—an improper attempt to import limitations from the patents' specifications into their

20  claims that contravenes long-established principles of claim construction.  TASER's

21  proposed constructions, by contrast, track the plain meaning of the claim terms and are

22  consistent with the patents' specifications.  The Court should adopt TASER's proposed

23  constructions.

24

25

26

27

28

| | |
|---|---|
| 1 | Dated:  February 22, 2008 |

**PERKINS COIE BROWN & BAIN P.A.**


By: /s/ Aaron Matz
     Chad S. Campbell
     Aaron Matz
     2901 North Central Avenue, Suite 2000
     Phoenix, AZ  85012-2788

     Holly L. Gibeaut
     TASER International, Inc.
     17800 North 85th Street
     Scottsdale, AZ  85255-9603

Attorneys for Plaintiff TASER International, Inc.

1

**CERTIFICATE OF SERVICE**

2       I hereby certify that on February 22, 2008, I electronically transmitted the

3  foregoing document to the Clerk's Office using the CM/ECF System for filing and

4  transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

5       Chad S. Campbell:   cscampbell@perkinscoie.com

6       Holly L. Gibeaut:    hgibeaut@taser.com

7       Aaron Matz:          amatz@perkinscoie.com

8       Attorneys for Plaintiff

9           —and—

10      Ray K. Harris:        rharris@fclaw.com

11      Attorneys for Defendant

12
                                        By /s/ Mary Wadsworth
13                                         _____

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28