**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

TASER INTERNATIONAL,            )
                                )
                    Plaintiff,  ) No.  **CV 07-0042-PHX-MHM**
        vs.                     )
                                )
STINGER SYSTEMS, INC.,          )       **Phoenix, Arizona**
                                )       **May 7, 2008**
                    Defendant.  )       **9:17 a.m.**
_____ )


**BEFORE:  THE HONORABLE MARY H. MURGUIA**
**UNITED STATES DISTRICT JUDGE**


(*MARKMAN HEARING*)


Official Court Reporter:
Laurie A. Adams, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 43
Phoenix, Arizona 85003-2151
(602) 322-7256

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

```
 1                      A P P E A R A N C E S

 2    For the Plaintiff:
                   PERKINS COIE BROWN & BAIN P.A.
 3                 By:  Chad S. Campbell, Esq.
                   By:  Aaron Matz, Esq.
 4                 2901 N. Central Avenue
                   Suite 2000
 5                 Phoenix, AZ 85012

 6                 TASER INTERNATIONAL, INC.
                   By:  Holly L. Gibeaut, Esq.
 7                 17800 N. 85th Street
                   Scottsdale, AZ 85255
 8
      For the Defendant:
 9                 FENNEMORE CRAIG, PC
                   By:  Ray K. Harris, Esq.
10                 3003 N. Central Avenue
                   Phoenix, AZ 85012
11

12                      I N D E X

13
      WITNESS:                  DIRECT CROSS REDIRECT RECROSS EXAM
14

15    RODRIGUEZ, Jeffrey

16    By Mr. Campbell            62
      By Mr. Harris                   75
17    By The Court                                           101
      By Mr. Matz               140
18    By Mr. Harris                  144

19    SALIGA, Tom
      By Mr. Harris             108
20    By Mr. Campbell                124
      By Mr. Harris             157
21

22                      INDEX OF EXHIBITS
      EXHIBIT                              IDENT   RECEIVED
23
      1        Information Disclosure Statement   98     166
24
      2        Supplemental Report              166     166
25
```

```
 1                    P R O C E E D I N G S
```

 2          THE COURTROOM DEPUTY:  Civil Case 07-42, Taser

 3   International, Inc., versus Stinger Systems, Inc., on for

 4   Markman hearing.

 5              Counsel, please state your appearances for the record.   09:17:45

 6          MR. CAMPBELL:  Good morning, Your Honor.  Appearing

 7   for Taser International, I'm Chad Campbell, from the firm of

 8   Perkins Coie.  I'm joined at counsel table by my colleague,

 9   Aaron Matz.  We'll both be speaking a bit today.

10          Little bit behind us is Holly Gibeaut, in-house        09:17:58

11   counsel at Taser.  Behind her is Will Bachand.  He's a patent

12   in-house attorney at Taser.  This is Professor Jeff Rodriguez

13   from the University of Arizona, and he'll be testifying today.

14          THE COURT:  Good morning, and welcome to all of you.

15   You may be seated.                                           09:18:16

16          Mr. Harris.

17          MR. HARRIS:  Ray Harris, Your Honor, appearing on

18   behalf of defendant Stinger Systems, Incorporated.  With me is

19   our expert witness, Tom Saliga.

20          THE COURT:  What's the last name again?              09:18:27

21          MR. HARRIS:  Saliga, S-A-L-I-G-A.

22          THE COURT:  Welcome.  Good morning.

23          We're here for the *Markman* hearing.  I understand -- I

24   have received your proposed schedule.  I am fine with the

25   proposed schedule.  Basically, we have all day today.  So we   09:18:39

```
1    have until 5.  I thought we would take a brief recess, 10 to 15
2    minutes this morning.  And then I have a judge's meeting at
3    lunch that should last about an hour.  So we'll probably break
4    at noon and resume around -- if I can get back at 1:15 or 1:20,
5    we'll resume.  I just don't know how tight it is.  I could try        09:19:05
6    to make sure -- I could try to come back earlier from the
7    meeting, if possible, if we need to.  And then we'll have until
8    5 with the brief recess in the afternoon.
9         MR. CAMPBELL:  I think that schedule sounds fine.  I
10   doubt that it's going to be necessary for Your Honor to rush         09:19:22
11   back.
12        THE COURT:  Okay.  Mr. Harris, do you agree?
13        MR. HARRIS:  This should not take all day, Your Honor.
14        THE COURT:  Okay.  Well, then just because it's a lot,
15   I think also for the court reporter, she's very capable, but I      09:19:34
16   know some of the terms may be a bit technical.  I want to
17   recess for at least 10 to 15 minutes this morning.  So let's
18   proceed.
19        I understand you are going to begin with a tutorial,
20   is that correct, Mr. Campbell?                                      09:19:53
21        MR. CAMPBELL:  Yes, Your Honor.  We thought it might
22   be helpful to at least acquaint ourselves with some of the
23   terminology that we'll be hearing later when we talk in more
24   detail about the arguments, figures, and technical stuff from
25   the patent.                                                         09:20:09
```

1        I am assuming, by the way, because I don't know, that

2    all of this is new, that we're kind of starting from ground

3    zero together.  And if that's not the case and you want me to

4    speed up or do something different, we're flexible.

5        THE COURT:  No.  I think it would be a good inception    09:20:26

6    to start from new.  I have read all your pleadings and so I'm

7    familiar with the terms, and I understand what the different

8    arguments are.  And I will have some questions for you

9    regarding some of the cases that have been cited and the briefs

10   and ask you about some of the ones that Mr. Harris cited in his   09:20:42

11   brief and see how you distinguish those or compare those to

12   some of the cases.

13       But let's go ahead and begin with the tutorial.

14       MR. CAMPBELL:  Very good.  I have a couple things that

15   we could display on the screen.  This is a figure from one of   09:21:02

16   the patents.  It -- I'm simply going to use it to talk

17   initially about what an electronic control device, or stun gun

18   weapon, is and what its purpose is.

19       You can see that it looks like a pistol.  You can hold

20   it in your hand.  There's a trigger mechanism that is          09:21:25

21   activated.

22       When the trigger is pulled, there are two dart

23   electrodes that are ejected out of the end of the weapon, and

24   they travel with a tether to a wire, each one has a wire, that

25   hooks back up to internal circuitry inside the weapon.         09:21:45

1          The objective of those two darts is to propel them

2     towards the target.  It could be, you know, an animal; it could

3     be a human being.  When the patents talk about targets, that's

4     what they are talking about.

5          It's propelled towards the target, and the objective          09:22:03

6     of the darts is to establish electrical contact points with the

7     target.

8          Once the electrical contact points are established,

9     there is a power supply circuit that delivers current.  And the

10    current passes between the electrodes and through the target,          09:22:23

11    and in the process of that current passing through the target,

12    the electrical signals from the brain through the nerves to the

13    muscles are interrupted, and the muscles go rigid and unusable,

14    and the target then is immobilized temporarily.  When the

15    current stops passing through, that effect goes away.          09:22:47

16          So that's the basic idea behind these devices.  They

17    are used by law enforcement officers to address situations in a

18    wide variety of circumstances where other means can't be used

19    to bring the person to bear, and obviously, the idea behind it

20    is that you would use something like this instead of a gun or          09:23:11

21    something more violent to bring a person under control.

22          Now, because there is a fair amount that's going on

23    inside the gun, or the weapon, that relates to these patent

24    disputes, I wanted to spend just a few minutes, both myself and

25    Mr. Matz, dividing up the subject area and just talking about          09:23:34

```
 1    some of the components and the concepts that go into this

 2    delivery of current to pass through the target to effect all of

 3    this.  So we're going to begin -- let me get to the right

 4    presentation here.

 5              We're going to begin with the concept of charge.  A        09:24:06

 6    charge's attraction and movement is really what electricity is

 7    basically about.  Some of this is maybe a little bit familiar.

 8    You may be familiar with a magnet, you know, that has two ends.

 9    There's a magnetic field with opposite polarity, and if you put

10    two magnets of the same kind of polarity, positive to positive,    09:24:36

11    they are going to push away from each other, whereas if you

12    matched up the positive and negative ends of two different

13    magnets, they would attract each other.  That's a magnetic kind

14    of attraction.

15              In electricity, when we're talking about charge, we        09:24:52

16    also have a positive and a negative concept, and the basic rule

17    is that like charges will push away from each other.  So a

18    positive and a positive will push away from each other, and a

19    negative and a negative will push away from each other.

20    Positive and negative will come together.  They attract each        09:25:13

21    other.

22              Particles, atoms, molecules, and other things have

23    charge.  An atom that's stable, that's complete, has an overall

24    charge that's zero.  And that's because it has an equal number

25    of electrons and positive charged protons.  So the charge on       09:25:41
```

1   each basically cancels out and comes to zero, so it's stable.

2   That's what an atom is.

3          There are circumstances when you can create, when you

4   have more complex molecules, something called an ion.  An ion

5   is a molecule or an atom that's missing an electron.  The            09:26:04

6   electron that needs to be stable has been knocked off away from

7   it, and so it assumes a positive charge.

8          Correspondingly, the missing electron that was taken

9   off and away from the atom has a negative charge.  So the

10  concept of an ion is a positively charged particle, and then        09:26:24

11  you have got electrons, free electrons, that is the rough

12  opposite of that.

13         You will notice that with the molecule on the

14  left-hand side, I think it's the left, even for you, yes, the

15  left-hand side of the screen, we have an equal number.  We're       09:26:45

16  supposed to have, at least, I didn't count them exactly.  But

17  we should have an equal number of positive particles and then

18  matching that up to the electron so that we've got a stable

19  molecule where the overall charge is zero.  And on the

20  right-hand side we're missing an electron.  It's only got one,      09:27:04

21  two positive charges, so we've got a positively charged

22  particle.

23         Now, current is, again -- and the basic idea that

24  we're trying to accomplish with respect to the target, current

25  is the flow of charge.  Now, there are -- there's at least one      09:27:27

1    convention, a rule, that engineers and others made up a long

2    time ago to talk about the direction of charge.  You can have

3    current flowing by having electrons move.  You can also have

4    current flowing by having positive charged particles move.  If

5    we confine ourselves just to a wire, a metal wire, like we have          09:27:52

6    down at the bottom, there in that circumstance along the wire,

7    the current is carried by electrons.  But we'll talk about

8    current flowing in other media, like a plasma or an ionized air

9    gap a little bit later.  And there you can have movement of

10   both.                                                                    09:28:15

11         One thing you will notice if you look carefully at

12   this is, is that the current, the direction of the current, is

13   opposite the direction of the flow of the electrons.  That will

14   be true, and that's the way engineers talk about current

15   flowing regardless of whether we're talking about positive              09:28:34

16   charged particles that are making the movement or the electrons

17   that are making the movement.

18         So even though the positive charged particles are

19   moving in an opposite direction of the negative charged

20   particles here, the convention is to talk about current flowing         09:28:48

21   in the opposite direction of the way the electrons move.

22         Now, it is sometimes, not always, but quite frequently

23   useful for people like me and others to think about electricity

24   in comparison to different kinds of water systems.  There are

25   comparisons between the properties of water moving through a            09:29:14

1  pipe system or a reservoir system that you can use to analogize

2  to a system and electricity flowing.  And we're going to use a

3  water analogy here today a little bit.  This is the first one

4  of these.

5       Here, to kind of get across the idea of, you know, the       09:29:32

6  quantum of current, we can think of a small amount of water

7  flowing, like just a drip coming out of a garden hose onto the

8  flower there on the top, corresponding to a small amount of

9  current flowing in an electrical system.

10       The reverse of that would be a large amount of current       09:29:54

11  flowing, and that would be like opening up the fire hydrant on

12  the side of the street where you have got a lot of water that's

13  going to come gushing out.  A lot of movement of charge would

14  correspond to that.  So, you know, how much current is flowing,

15  roughly analogous to how much water is flowing.       09:30:14

16       Voltage is another property that's very important.

17  This one is a little bit elusive, but it will be important for

18  some of the topics we're going to go over today.

19       The first point about voltage is that we need to

20  remember that it's a relative concept.  In other words, when we       09:30:37

21  talk about voltage, we're always talking about the potential,

22  the electrical potential for charge to move at one point

23  compared to another.  And so we always need to understand, you

24  know, what our two reference points are to talk about voltage

25  because it's a comparison between two points.  It's a       09:31:02

1    comparison of electrical potential at two different points.

2            The analogy that we've got here is an airplane flying

3    over terrain, and if you want to ask the question what's your

4    altitude, it will be more useful for the pilot, in some

5    circumstances, to show altitude compared to what?  Compared to        09:31:25

6    sea level or mountainous terrain.  And depending on what your

7    reference point is, that answer about the altitude is going to

8    be different.

9            The same would be true of voltage.  You need to be

10   paying attention to, you know, what your two points of              09:31:44

11   comparison are to have a meaningful conversation about voltage.

12   So voltage is a relative concept.  You can use a water analogy

13   to talk a little bit about that here.

14           If you imagine a water tower with a pipe coming down,

15   there's going to be more pressure at the bottom of the water       09:32:09

16   tower at the end of the pipe because if you have got a taller

17   water tower, because you are going to have more pressure

18   pushing down in that column on the water, the same thing is

19   roughly true of voltage.  At a higher voltage, you have got

20   more potential, more electrical potential and, therefore, kind    09:32:31

21   of a higher pressure.

22           So voltage is sometimes called electrical pressure in

23   a very loose sense, but it would be analogous to pressure in a

24   water system.  And there again, you need to be remembering

25   we're talking about relative points that we're making the         09:32:54

1    comparison against.

2         Impedance is another important concept.  Impedance is

3    a ratio.  It's a ratio, and this is simplified a little bit.

4    We could have really complicated discussions about what

5    impedance is, but the beginning point for talking about it is          09:33:13

6    to recognize that it's a ratio.  It's a ratio of the voltage or

7    the electrical potential between two points and the current

8    that is passing there.

9         So as with all ratios, if you adjust the numerator,

10   something will happen to the impedance.  If you adjust the           09:33:38

11   denominator, something will happen to the impedance.  But

12   impedance is, roughly speaking, how much electrical potential

13   you have and how much current is passing over your points of

14   comparison.

15        Impedance can be high, and it can be low.  If you look        09:33:53

16   at the diagram here, on the wire, a low impedance where we have

17   a lot of charged particles that are moving, and that will

18   produce a small voltage and a large current.  Going the other

19   way, with few charged particles on the wire, we have a higher

20   impedance, we've got a larger voltage potential between those        09:34:26

21   two ends and a small amount of current passing.

22        There are a number of factors that affect impedance.

23   These are a few.  We could talk about many, but just to give a

24   general sense for what would, you know, tend to cause higher

25   impedance versus lower impedance, your pathway, first of all,        09:34:53

1    is something you need to pay attention to; how big is the

2    distance between the two points that you are trying to think

3    about impedance.

4         So the longer the path, the higher the impedance is

5    going to be; the shorter the path, all else being equal, the          09:35:08

6    lower the impedance is going to be.

7         The area over which your charge is moving or the

8    potential is being measured is also an influencing factor on

9    impedance.  A small area is going to create higher impedance if

10   the area is confined; if it's a larger area, there's going to       09:35:34

11   be lower impedance.

12        And then at the bottom, the number of charge carriers

13   that you have is going to affect your impedance as well.  If

14   you have very few charge carriers, you are going to have a

15   higher impedance.  If you have lots of charge carriers, you         09:35:49

16   will have a lower impedance.

17        Wrong way.  Apologies.

18        Back to our water analogy, you know, you could hook up

19   a garden hose to the fire hydrant if you had the right kind of

20   coupling nozzle.  That garden hose is not going to be able to       09:36:22

21   deliver as much water as a fire hose would.  And there are lots

22   of reasons for that.  It's a smaller diameter.  It's not

23   designed to carry the water flow quite the same way, and

24   that -- in that sense, it would be roughly analogous to those

25   concepts of having a more confined space when we were talking       09:36:45

1    about, you know, current passing.  So that a high impedance is

2    going to lead to smaller current, whereas a lower impedance is

3    going to allow you to push more current through in much the

4    same way that a fire hose would allow you to deliver more water

5    out of a fire hydrant than a garden hose would.                   09:37:13

6           We will come back to this a few times today, but I

7    think it's good to approach ionization in layers, or multiple

8    times, just to kind of get familiar with it.  And I'm just

9    going to mention a few things right now.  We will get into more

10   depth when we get into some of the figures and the teachings of  09:37:41

11   the patent.

12          But the general idea of ionization of air is that in

13   normal ambient air, there are always a few charged particles,

14   not very many, but a few.  And the way they come about is

15   typically cosmic rays, which are around us all the time, every   09:38:05

16   once in a while will cause one of these air molecules to

17   separate from one of its electrons so that you have got a free

18   electron, and you have got a corresponding charged particle and

19   they are separate.  So you have created an ion by doing that.

20          The more ions that you create in a given space of air,    09:38:26

21   the higher the ionization of that air space is.

22          Now, when you apply a voltage, an electric potential,

23   across a confined space of air, you set up a field, and that --

24   we aren't going to go into great detail about fields.  But the

25   effect of the field will be that it will begin to accelerate     09:38:53

1    the available electrons that are in that air and cause them to

2    pick up speed.

3         And as the voltage goes up, that field gets stronger

4    and that effect of pushing the electrons that are free faster

5    accelerates.  As you boost the voltage high enough, you can          09:39:13

6    create an effect where the free electrons will bump into other

7    stable molecules, and in the process of bumping into them with

8    enough force, cause additional electrons to spring free.  And

9    those, in turn, create a cascading or multiplying effect.  They

10   go off because of the effects of the field picking up speed and     09:39:41

11   accelerating, bumping into other stable molecules, which

12   causes, you know, sort of a cascading, mushrooming effect where

13   you used to have very few free electrons, now all of a sudden

14   you have got many.

15        And that is the process of ionization.  It is the              09:40:01

16   creation of ions by this process of setting up a voltage, an

17   electrical potential across a space, causing that field to go

18   into effect and accelerating the available electrons that are

19   there to bump into others and create more.

20        With all that activity that goes on, once you have an          09:40:23

21   ionized air space, every once in a while the electrons are

22   going to bump into one of the ions.  And if the circumstances

23   are right, the geometry, et cetera, is right, that electron can

24   recombine with an ion.  And if it does, the energy that both of

25   those particles had has to go somewhere, because if they            09:40:57

1    recombine they have created a stable molecule again.

2         In the process of recombining, the way they get rid of

3    their energy is they emit a photon.  And photons are light.

4    There's a wide spectrum of light.  Some of it we can see; some

5    of it we can't.  But this process of recombination of an ion          09:41:23

6    and a free electron is the event that causes a photon to be

7    released.  So when we get to talking about arcs, what we're

8    talking about there are the visible -- in some circumstances,

9    if it is in the visible range, the visible photons that we can

10   see from these recombination of events taking place in an            09:41:48

11   ionized air space.

12        Now, this is an analogy that I think will be helpful

13   and useful as we move further into talking about the patent.

14   But I just wanted to introduce it at a very general level

15   first.                                                                09:42:15

16        Charged particles and electricity move very, very

17   quickly.  And when you are talking about what's going on in an

18   electrical circuit, there's a time scale that doesn't

19   correspond to our lives in the real world.  So this analogy

20   only works if we kind of recognize that we've got to apply a         09:42:37

21   different kind of time scale.  So we're going to think on the

22   left-hand side in charged particle electron kinds of time,

23   electricity kinds of time, which compared to our lives and our

24   life span and the life span of trees, for example, is way out

25   of whack.  It's disproportionate.  But the relative concept is       09:42:58

1    taught by this analogy.

2        If we begin with air, just regular air, where we have

3    a very high impedance because we don't really have very many of

4    these free electrons, we might think of that as a very dense

5    forest that we need to move through.  Charge can't move through    09:43:19

6    air because it has such a high impedance.  We would have a

7    difficult time moving through the dense forest because the

8    trees are in the way.  So the high air impedance and the

9    absence of charged particles correspond to the dense forest.

10       As we ionize the air, we free up electrons so that    09:43:40

11   they can move and charged particles so they can move.  The

12   impedance goes down because we have more charged particles

13   there.  That would be like clearing a path through the forest.

14   So charge would be able to move on the left because of the

15   lower impedance, more readily, because the charged particles    09:44:01

16   are present.  We would be able to move through the forest more

17   easily because the path has been cleared.

18       We move down further, if the effect that was creating

19   the ionized air space was removed, then the process would kind

20   of reverse itself.  It would -- without the effect of the    09:44:26

21   electrical field to accelerate all of these free electrons,

22   they would begin to recombine.  And the number of charged

23   particles would go away.  It's not instantaneous.  It takes a

24   certain amount of time.  And we can talk later about the amount

25   of time.    09:44:47

UNITED STATES DISTRICT COURT

1        But the fact that the voltage is removed and the

2   process begins, does not mean that the impedance jumps back to

3   where it was at the beginning of the process, just like if we

4   stopped using the road and didn't maintain it, eventually the

5   trees would start growing back up.  But there would be a period        09:45:01

6   of time when you could still use the road, maybe not as

7   elegantly, but the road would be usable.  And you would have a

8   circumstance that would not be comparable to the dense forest.

9   It would still be easier to get through even though the effects

10  of the road building and keeping it maintained had been              09:45:20

11  removed.  So that, roughly speaking, is our ionization analogy.

12        Couple of words about capacitors.  These are devices

13  that will be featured in some of the discussion later.  A

14  capacitor is a device that can be charged and then it will

15  discharge in the right circumstances.  A really good example of        09:45:53

16  a capacitor that most of us would take for granted would be the

17  flash in our camera.  You have got a battery in the camera and

18  the battery will take some time to load its charge into a

19  capacitor.  The capacitor stores that charge as it's being

20  loaded, and once it gets to the point where it's full there's        09:46:17

21  some kind of indicator light and the camera is ready to go.

22  You push the button to take the picture, and the flash goes

23  off.  And the discharge, the very rapid discharge, is out of

24  that capacitor.  So capacitors can absorb charge slowly,

25  discharge it quickly, depending upon the circumstances that you        09:46:39

1   are dealing with.

2        The other thing that's important to point out about

3   capacitors is that they have a voltage.  They have a couple of

4   terminals, and you can think about the electrical potential

5   between those two terminals.  So there's a voltage across          09:47:00

6   that -- across that -- across those two terminals, and the

7   amount of charge that's being stored in a capacitor is going to

8   be proportional to the voltage.  If you have got more charge

9   stored, meaning you have got a larger number of these charge

10  particles in the right orientation with respect to the            09:47:25

11  capacitor elements, you are going to have a larger voltage.  If

12  you have a smaller number of them lined up you are going to

13  have a smaller voltage.

14       A transformer is another element that is featured in

15  some of the figures of the patent, and I just wanted to very      09:47:47

16  briefly talk about transformers.  They can be very complex, but

17  understanding a little bit about them, I think, is helpful.

18       Their name is descriptive.  A transformer does change

19  something.  And there are a couple of elements that go into

20  making a transistor.  There's a magnetic core around which you    09:48:11

21  wrap wires, basically.  And there's a primary winding and a

22  secondary winding.  The turns ratio, or the number of times you

23  have wrapped the primary compared to the secondary is going to

24  affect what the transformer does.

25       So it's possible to have transformers whose job in           09:48:36

```
 1    life is to step up voltage, and there's -- it's also possible
 2    to have transformers whose job in life is to step down the
 3    voltage.  And you do that by adjusting the turns ratios.  For a
 4    step-up transformer, a small voltage in with a relatively large
 5    current can be used to generate a much higher voltage out but a      09:48:58
 6    correspondingly smaller current.  Adversely, the step-down
 7    transformer works in the reverse.
 8         This water analogy might be useful to kind of get the
 9    sense for what transformers do.  The comparison here is a scale
10    that's lopsided in terms of not being centered.  And we're          09:49:26
11    going to put, on the upper picture, a large amount of water in
12    the scale with the short arm, and it's going to be able to move
13    a small amount of water much further away.  Because it's much
14    further away on the longer arm on the right, the movement, the
15    change in height, is going to be much greater.                      09:49:54
16         That will correspond roughly to voltage and current
17    in, voltage and current out.  You have got a relatively small
18    amount of current coming out but a very -- a relatively large
19    amount of change in the height, which corresponds to the
20    voltage.  So this is a way of thinking about what a                 09:50:15
21    transformer -- what a transformer does.
22         I'm going to turn the podium over to Mr. Matz to
23    address a couple of other points, and then we'll come back to
24    wrap up with the tutorial and move into the argument phase.
25         MR. MATZ:  Good morning, Your Honor.                           09:51:21
```

UNITED STATES DISTRICT COURT

1          There are just two topics I would like to discuss

2    briefly with respect to two of the patents in suit that will

3    become important later when we get into claim construction.

4          And the first topic I would like to discuss is the

5    operation of the Figure 19 circuit in the '295 patent.                    09:51:39

6          And the circuit is shown on the screen here.  It's

7    obviously a complicated circuit, but the basic operation, which

8    I will go through now, is not too difficult to understand.  And

9    then later today we'll probably get into it in more detail.

10         What Figure 19 of the '295 patent shows is an              09:52:04

11   embodiment of the invention in which the voltage and current

12   are in one direction, or one polarity during a particular time

13   period, and then they later reverse to an opposite polarity in

14   an opposite direction in a later time period.

15         And the important elements in this figure, in the          09:52:29

16   circuit shown here, are mainly those on the right-hand side of

17   the diagram.  And that is the two capacitors that are labeled

18   here as C1 and C2; the two spark gaps that are labeled Gap 1

19   and Gap 2; the transformer, which is the same symbol that you

20   just saw a moment ago but it's turned on its side.  It's        09:52:55

21   labeled T1 step-up transformer.  And then there are two output

22   electrodes on the extreme right-hand side of the figure.  Those

23   are labeled E1 and E2.

24         And Figure 19 is read in conjunction with Figure 18 of

25   the patent, which discusses in detail the timing of this        09:53:19

 1    circuit.

 2          As shown here on Figure 18 of the '295 patent, there

 3    are four different time intervals that are associated with the

 4    circuit in Figure 19.  And the differences between them have to

 5    do with which of the spark gaps are on and which of the spark            09:53:44

 6    gaps are off.

 7          So just beginning with Interval Number 1 shown on

 8    Figure 18, you can see that both spark gaps, Gap 1 and Gap 2,

 9    are off.  And during that time period, Gap 1 and Gap 2 are

10    essentially open circuits.  No current can flow through them.            09:54:08

11    And as a result, both capacitors are charged during that time

12    interval by the high voltage power supply here.

13          And I have represented that on this annotated figure

14    with the red arrows which are meant to show the current flowing

15    out of the high voltage power supply and into the two                    09:54:29

16    capacitors.  And as they are charged, their voltage increases,

17    as we saw a little while ago.

18          And if we consider the next time interval shown on

19    Figure 18, Interval Number 2, you can see there that Gap 1 is

20    now on, and Gap 2 is off.                                                09:54:51

21          Again, looking at an annotated version of this figure,

22    I have represented Gap 1 being on there, with the blue

23    highlighting.  And for a gap to be on simply means it's a very

24    low impedance so that it can pass current.

25          During this interval, the C1 capacitor discharges, and            09:55:15

1    that's shown here by the red highlighting.  The current flows

2    out of C1 to the right, through Gap 1, and then through the

3    primary winding of the transformer T1 and then down into the

4    ground terminal.  We'll discuss what a ground terminal is

5    later.                                                                              09:55:42

6            And because of the configuration of the step-up

7    transformer T1, a very high voltage is generated on the

8    secondary of the transformer.  And because of the way the

9    transformer is configured as described in the patent, the

10   voltage on the E1 electrode will be negative relative to the       09:55:59

11   voltage on the E2 electrode.  And I have indicated that here

12   with plus and minus symbols on the right-hand side.

13           Eventually, the voltage will become high enough that

14   the two air gaps shown on the right-hand side will become

15   conductive, and that high negative voltage between E1 and E2       09:56:21

16   will cause a current to flow through the load which is labeled

17   Z1 on the right-hand side.

18           And I have represented that current by the green

19   arrow.  And as you can see, because the voltage is negative at

20   E1 with respect to E2, the current flows in an upward direction    09:56:42

21   through the load.

22           Finally, if we consider Interval Number 3 that's shown

23   on Figure 18 of the '295 patent, now the gaps have reversed.

24   Gap 1 is turned off, and Gap 2 has turned on.

25           And referring back to Figure 19, now Gap 1 is off so       09:57:08

```
1    that no current can flow out of the C1 capacitor.  Gap 2 is on,
2    meaning that current does flow out of the C2 capacitor.  And as
3    the C2 capacitor discharges, it will discharge in a similar way
4    to the C1 capacitor except it's connected to a different part
5    of the circuit.                                                    09:57:36
6         So the current will flow to the right and then through
7    the secondary, which is the upper portion of the transformer,
8    and then down through the load.  So in this time interval, the
9    current has reversed, whereas before it was flowing up, now
10   it's flowing down.  And similarly, the voltage reverses during   09:57:53
11   this time interval.  I have indicated that here with the plus
12   and minus symbols.  So during this time interval the voltage at
13   E1 is positive with respect to E2.
14        Again, we will likely discuss this circuit in more
15   detail later today, but the important point that I have          09:58:17
16   illustrated here, is that during one time interval, the voltage
17   at E1 is negative with respect to E2, the current through the
18   load is in an upward direction, and then during the later
19   interval, the voltage at E1 is positive with respect to E2 and
20   the current through the load is in a downward direction.          09:58:40
21        The second topic that I would like to discuss has to
22   do with how date and time are tracked and stored in the
23   electronic circuits.  And the short answer is that there are
24   many different ways to do it, some of which we will -- you will
25   probably hear later this afternoon.                               09:59:10
```

UNITED STATES DISTRICT COURT

1      It's certainly possible to track date and time and

2   store them as current absolute quantities, and it's also

3   possible to store date and time as separate quantities, that

4   is, storing the date as one quantity and the time as a separate

5   quantity.                                                        09:59:34

6      But in electronic circuits, there are also other ways

7   to do it, and just to give you an example of that, that may be

8   familiar to you, is the Microsoft Excel program that's probably

9   on your computer.  If you enter a time and a date into a cell

10   in Microsoft Excel, Excel does not actually store it as current   09:59:56

11   absolute date and time, although it does display it that way in

12   some circumstances.

13      What Excel actually does is it stores the date and

14   time as the number of days and fractions of a day that have

15   elapsed since January 1st, 1900.  So in other words, it's       10:00:17

16   storing date and time as a relative quantity rather than an

17   absolute quantity.  It's relative to a reference date, which is

18   January 1st, 1900, and it stores the date and time as a single

19   number or quantity that is representative of both date and

20   time.                                                           10:00:43

21      And just to show you how that works, if I open up an

22   Excel spreadsheet here and enter in an example, the time and

23   date, Excel, by default, displays it as an absolute time and

24   absolute date.  But if I reformat this cell to show what's

25   actually stored in it by simply formatting it as a number, it   10:01:15

```
 1   will come back with a number here, 39,401.33.  The 39,401
 2   represents the number of days that have elapsed since January
 3   1st, 1900.  The .33 just indicates that 8:00 a.m. is one-third
 4   of the way through a 24-hour day.
 5            So there's a single number here that's representative      10:01:45
 6   of both date and time, and it's stored as a relative quantity
 7   rather than an absolute quantity.
 8            And, of course, aside from what I have shown you here
 9   and the other alternative, which is storing current absolute
10   date and time as separate quantities, there are a number of       10:02:08
11   other ways that this is commonly done in electronic circuits,
12   some of which we will see this afternoon.
13            Thank you, Your Honor.
14            THE COURT:  Thank you.
15            Do you have any tutorial to supplement this, to add or    10:02:42
16   anything like that?
17            MR. HARRIS:  I think we ought to just proceed to the
18   evidence, Your Honor.
19            THE COURT:  All right.
20            MR. CAMPBELL:  My apologies, Your Honor.  If I could      10:02:57
21   just take a second to get loaded.
22            THE COURT:  Certainly.
23            MR. CAMPBELL:  If I may, Your Honor, I have some
24   old-fashioned binders that are very thin that are a backup in
25   case the electronics don't quite do it for us.  May I hand it     10:03:44
```

1   up?

2          THE COURT:  Yes, please.

3          MR. CAMPBELL:  Your Honor, may I put one at the

4   witness stand?

5          THE COURT:  You may.                              10:04:04

6          MR. CAMPBELL:  The first several tabs in the binder

7   are simply a repeat of the hard copies of the graphics that we

8   have used and may use later.  And then in the back, beginning

9   at Tab 20 is the jointly proposed procedure for the *Markman*

10  hearing with the tables that reflect the various claims        10:05:13

11  constructions.

12         Tab 21 has the '295 patent, which is US 6999295.  Tab

13  22 has the '870 patent, which is US 7102870.  And Tab 23 has

14  the '262 patent, which is US 7234262.

15         I thought, actually, long and hard about how to begin   10:05:41

16  here.  And although I believe that the issues boil down to a

17  fairly simple dispute, there are a few things that I think

18  would be helpful to walk through in a little bit more detail

19  than we were able to do in our briefs.  And so I want to begin

20  with the claim language and see if I can't succeed in trying to 10:06:14

21  frame what the disagreement is between the parties so that it's

22  in sharp relief.

23         Then I'd like to move into the specification and talk

24  about how the disputed terms in the '295 patent are, in fact,

25  used in the specification.  And from there, I will have a few   10:06:35

1    comments about the prosecution history and some of the cases

2    which I think are actually quite instructive for the '295

3    debate that's before the Court.

4         I'm going to begin with Claim Number 40.  The two

5    claims that are an issue under the '295 patent are really very      10:07:25

6    close to each other in terms of the words they use.  Claim 2 is

7    an apparatus claim, so it talks about things that the

8    apparatuses, the practices the claim must have.

9         Claim 40, the other claim in dispute, is a method

10   claim.  And it recites a series of steps that must be done to      10:07:49

11   infringe that particular claim, and one could do that by using

12   a weapon with the right set of operating characteristics.

13        So we are beginning with Claim 40, and I have

14   highlighted here on the screen in different colors the two

15   paragraphs that make up the claim.                                 10:08:13

16        One reason why I'm spending as much time as I plan to

17   on the actual claim language is because the disputed claim

18   terms cannot be understood in isolation.  As the federal

19   circuit has repeatedly instructed, we first look to the claim

20   language, and the context in which disputed claim terms appear     10:08:36

21   can frequently be helpful if not decisive.

22        And so here, in the top paragraph, in B, up on the

23   screen, we have one of the disputed terms, and on the bottom

24   paragraph labeled C, we have the second disputed term.  And to

25   understand the disagreement between the parties, we really have    10:08:58

1    to understand the interplay between both of these limitations

2    in the claim, Paragraph B and C, and the way the disputed claim

3    language operates in each.

4         Now, when we spoke at the beginning, we talked about

5    how those two darts come out of the end of the gun and the          10:09:21

6    objective is to establish electrical contact points on the

7    target.

8         I'm wearing a suit coat today.  If one of those guns

9    was pointed at me, it may well be that they actually would

10   not -- those little darts would not penetrate far enough to          10:09:38

11   touch my skin.  They might hit the lapel.  And depending on the

12   geometry of the way my body was at that time, there could be a

13   significant air gap.  There might be an inch, possibly more.

14        That air gap, as we talked about in the tutorial, has

15   a very high impedance.  And so to get electricity to flow, to        10:10:00

16   get current to flow through me, the weapon would have to

17   overcome that air gap in some fashion.

18        And the way that it does that is to use a high voltage

19   to overcome the air gap.  You get the voltage high enough, you

20   can lower the impedance by causing ionization of the air, the        10:10:25

21   creation of these charged, these freely moving charged

22   particles.  You have got the electrons and the ions.  That

23   ionization, that separation of molecules to create carriers in

24   that air space is what's needed.  And the weapons do that by

25   creating a very high voltage.                                        10:10:47

1          Now, it's important to recognize that that process of

2     overcoming an air gap is not, by itself, the invention that's

3     claimed here.  The reason for that is that there are weapons

4     that were on the market and being sold before the invention

5     date of this patent that also overcame air gaps.          10:11:09

6          This invention in the '295 patent is how to overcome

7     the air gap elegantly, efficiently; to do it with a smaller

8     overall power supply and to use less power in the process to

9     deliver that current to the victim, pass through the victim, to

10    cause that temporary incapacitation.  So it's not just          10:11:39

11    overcoming the air gap.  The invention is overcoming air gaps

12    elegantly.

13         Now, what the inventors recognized in the '295 patent

14    was that you could approach this process with two different

15    steps, or two different modes.  You could overcome the air gap          10:12:04

16    by using a very high voltage in the first mode so that you

17    create the ionized pathway over which, because it has a lower

18    impedance, electricity can travel, and then switch to a

19    different mode, going to a different step, where you use a

20    lower voltage output to drive the current through the target.          10:12:30

21         So there are really two things that are happening

22    here.  We're overcoming the air gap first and then driving the

23    current second.

24         There are a couple of things about these two

25    paragraphs that are significant.  If we look at Paragraph B, it          10:12:49

UNITED STATES DISTRICT COURT

1    talks about applying a first high voltage, short duration

2    output across the first and second electrodes during a first

3    time interval -- and here's the disputed claim language -- to

4    ionize the air within the air gap.

5           So to ionize the air within the air gap is actually --        10:13:08

6    it doesn't sit in isolation.  It is something that is supposed

7    to be accomplished by applying a first high voltage, short

8    duration output.  So we've got a first high voltage output, and

9    that's going to be used to ionize the air gap.  There's a

10   further purpose that's specified in that claim language that is    10:13:34

11   significant.  The point of ionizing the air within the air gap

12   is to reduce the high impedance across the air gap to a lower

13   impedance to enable current to flow across the air gap at a

14   lower voltage level.

15          So what we have there with the plain meaning of the         10:13:53

16   claim language is a requirement that you have this step where

17   you're taking a high voltage first, overcoming the air gap,

18   lowering the impedance, to create and enable current to flow at

19   a lower voltage.

20          Then we move to C.  And it says subsequently, meaning       10:14:17

21   later, we apply a second lower voltage output across the first

22   and second electrodes during a second time interval to maintain

23   the current flow across the first and second electrodes and

24   between the first and second contact points on the target to

25   enable the current flow through the target to cause involuntary   10:14:39

1    muscle contractions.  So the point of the second lower voltage

2    output is to drive that current.

3        We create the pathway with the high voltage, and we

4    use the lower voltage to drive the current.  And that allows us

5    in the process to reduce the overall power that we're using to        10:15:00

6    cause this effect, and that, in turn, allows you to shrink the

7    size of the power supply, the size of the weapon, and make it

8    perform better for its intended use.

9        THE COURT:  And B is in Claim 40, is that right?

10       MR. CAMPBELL:  Correct.                                            10:15:23

11       THE COURT:  And C is in Claim 2?

12       MR. CAMPBELL:  No.  C is in Claim 40 as well.  I'm

13   sorry.  I color coded them differently only to point out that

14   we've got the B paragraph and the C paragraph.  These are the

15   last two steps in the method Claim 40.                                 10:15:36

16       THE COURT:  Okay.  You referenced Claim 2, and I just

17   wanted to make sure.

18       MR. CAMPBELL:  The reason I reference Claim 2 is you

19   will find, in Claim 2, very similar language.  Instead of a

20   step, it's going to be, you know, a piece of a weapon.  It's an       10:15:52

21   apparatus component.

22       And so it talks about modes, a first mode and a second

23   mode.  But this language about using a first high voltage short

24   duration output to overcome the air gap in a first mode,

25   followed by a subsequent second mode where you are using a             10:16:13

UNITED STATES DISTRICT COURT

```
 1    lower voltage, is laid out in Claim 2.

 2         Okay.  Now, with respect to the dispute between the

 3    parties, the first thing that we can see is that in the

 4    language of the claims, if we look at Stinger's construction,

 5    the idea of an arc isn't mentioned.  The term "arc" doesn't          10:16:54

 6    appear.  Likewise, in the C paragraph we were just talking

 7    about, the term "arced over air gap" doesn't appear.

 8         So right off the bat, one of the problems we have with

 9    the claims construction as being proposed by the defendant is

10    that we are inserting terms and concepts into the claim             10:17:17

11    language that isn't there.  And it doesn't need to be there and

12    shouldn't be there.  I'm going to talk about why that's so.

13         The --

14         THE COURT:  And then you will talk -- because I think

15    the defendants say because the specification, I believe, refers    10:17:39

16    to that.

17         MR. CAMPBELL:  Right.  I'd like to --

18         THE COURT:  Go ahead.

19         MR. CAMPBELL:  -- march through those arguments, but

20    I'm happy to answer questions in the interim.                      10:17:50

21         THE COURT:  Go ahead.  I'm going to want to find out

22    your position as to why I wouldn't look at the specification.

23    I think I know what your position is, but I just want you to

24    elaborate on that today.

25         MR. CAMPBELL:  Okay.  Now, I'd like to take us to the         10:18:03
```

```
 1   place in the specification that the defendants rely on

 2   primarily.  And if you pick up the binder, this one is kind of

 3   split over two columns, so they don't allow me to do the remote

 4   at home, and I'm not very good with this program.  So I'm going

 5   to use the paper for just a second in the binder, if I could.      10:18:23

 6           And I'm going to -- I'd like to take Your Honor, if I

 7   may, to Columns 5 and 6 of the '295 patent, which is behind Tab

 8   21 of that little binder that we handed up.

 9           Okay.  The defendant's position, in a nutshell, is if

10   we look at the bottom of Column 5, beginning on about Line        10:19:03

11   63 --

12           THE COURT:  And just -- what page are you?

13           MR. CAMPBELL:  It's Column Number 5, right here at the

14   top, these column numbers is what I was planning on using as a

15   way of navigating around.                                          10:19:21

16           THE COURT:  All right.  Yes.  I'm there.

17           MR. CAMPBELL:  And then right down the middle of the

18   page, about every five lines or so, there's a little number

19   that is small but readable.  I'm at the bottom of Column 5 at

20   about Line 63.  It's the last paragraph on that column, where     10:19:35

21   it says application of the V High voltage.

22           THE COURT:  I just want to make sure.

23           MR. CAMPBELL:  Did I -- I hope I did not send you to

24   the wrong patent.  Is it the '295 patent?

25           THE COURT:  It is the '295 patent.  And on that Column     10:20:17
```

```
 1    5, I'm just looking for 63.

 2          MR. CAMPBELL:  I'm sorry.  There isn't a 63 number.

 3    These numbers that go down the center of the page, they only

 4    give you a number about every five lines or so.

 5          THE COURT:  I see.                                        10:20:34

 6          MR. CAMPBELL:  So you kind of have to eyeball it.  And

 7    approximating it's 63 without counting.

 8          THE COURT:  Thank you.  I'm with you.

 9          MR. CAMPBELL:  So that paragraph that begins,

10    "Application of the V High voltage multiplied output across the  10:20:44

11    E1 to E3 high impedance air gap forms an electric arc having

12    ionized air within the air gap."

13          That's a place that the defendants rely upon to

14    suggest that that should just be adopted, more or less

15    wholesale, as the meaning of "to ionize the air gap."          10:21:06

16          The next place that I want to take you to is in Column

17    6.  This would be about Line 16, from about Line 16 down to

18    about Line 23.  There's a sentence in the middle of the line

19    that begins, "Because the ionization of the air gap during time

20    interval T1 to T2 dropped the air gap impedance to a low level,  10:21:45

21    application of the relatively low second capacitor voltage V

22    Low across the E1 to E3 air gap during time interval T2 to T3

23    will allow the second energy storage capacitor to continue and

24    maintain the previously initiated discharge across the arced

25    over air gap for a significant additional time."               10:22:10
```

1       There again, the defendant's position is that ought to

2   be adopted more or less as a definition of what it means to

3   maintain the current, in Limitation C of Claim 40.

4       Why is that wrong?  Why shouldn't we do that?  There

5   are a number of claims construction principles that go into the          10:22:35

6   why.  But I believe the answer is clear, that it would be a

7   mistake that the federal circuit would disapprove of this claim

8   construction that is being advanced by the defendants.

9       We begin with what are claims.  Claims claim, and

10  specifications or written descriptions teach.  So if we want to          10:22:58

11  figure out what the limitations and boundaries of the claim

12  are, we begin with the claim language.  To quote the federal

13  circuit from one of the cases that we cited, this is *Ventana*

14  *Medical Systems versus Biogenics Laboratories*, it is a bedrock

15  principle of patent law that the claims of a patent define the           10:23:24

16  invention to which the patentee is entitled the right to

17  exclude.

18      So the claims themselves are what set the boundaries.

19  For that bedrock principle to have any application, the federal

20  circuit has instructed that it's improper to go look at the              10:23:46

21  specification and see what is taught there as a specific

22  implementation, and then rearrange the claims or interpret the

23  claims so that they match only the breadth of what's shown in

24  the specification.  Patentees are allowed to claim more broadly

25  than what is taught in the specification.                                 10:24:07

1          So principle number one is that it is a mistake, the

2     federal circuit has taught over and over again, to take

3     features that are shown in a preferred embodiment, and confine

4     the ordinary meaning of claim language to just those features.

5     If the ordinary meaning of the claim language is broader than          10:24:28

6     the preferred embodiment that is taught or embodiments, in the

7     case of a patent like this, if the claim language is broader

8     than the embodiments that are taught in the patent, the

9     invention, the right to exclude, is as broad as the claim

10     language goes.  Written descriptions teach; claims claim.          10:24:49

11          Now, if I can continue with *Ventana Medical Systems*,

12     the federal circuit, after announcing that bedrock principle,

13     which is very old and has been cited many times, provides,

14     "Although the specification often describes a very specific

15     embodiment of the invention, we have repeatedly warned against          10:25:14

16     confining those claims to those embodiments.  While the fact

17     that the disclosed embodiments are limited can assist in

18     interpreting claim language, the mere fact that the A61 patent

19     discloses embodiments in which the reagent container is also

20     the reagent dispenser does not in and of itself mean that the          10:25:35

21     method claims at issue are limited to the disclosed

22     embodiments."

23          In that case, the defendant had made an argument very

24     similar to what's being made here that all of what was taught

25     in the written description provided that you had a direct          10:25:56

dispensation, or kind of a little beaker that held the reagent

that would be poured on top of the film that it needed to

interact with, all of the embodiment showed this kind of a

direct concept as opposed to other concepts where you could

have, you know, a syringe come and drop it down.

And the argument of the patentee was if you looked

really hard at the claim language and lined it up with what was

taught in the written description, you really needed to treat

this dispenser limitation as one that required only direct

limitation as specifically taught in the written description,

and the federal circuit said no, that's wrong.

Even though every embodiment in that patent taught

that dispenser method, it didn't say direct dispenser.  It just

said "dispenser," or "dispense," depending on which claim it

was, and the plain meaning was broader than what was taught

inside the specification.  And so we go with the ordinary

meaning of the words that were used because the patentee is

authorized by statute to dictate the boundaries of the

invention they claim in the enumerated paragraphs at the end of

the document.  The claim language is where the patentee is

allowed to state how broad they are claiming the invention.

And they do not have to provide illustrations that go

to the outer boundaries of what they are claiming.  They simply

have to provide an enabling disclosure in a best mode that

adequately teaches a person of ordinary skill in the art how to

```
 1    do what they are claiming and implementation of what they are
 2    claiming, not everything that they are claiming.
 3           So it is fundamentally getting us off on the wrong
 4    foot to begin by saying, well, let's look at the specification,
 5    find some language we like, and import that language into the        10:28:01
 6    claims.
 7           THE COURT:  The defendant does cite, I think it's the
 8    Phillips case, for the proposition that specification is always
 9    highly relevant to the claim construction analysis.  Usually it
10    is dispositive.  It is the single best guide to the meaning of       10:28:20
11    a disputed term.
12           MR. CAMPBELL:  Yes.
13           THE COURT:  So is this a disputed term?
14           MR. CAMPBELL:  It is.  But let me address what
15    Phillips is talking about there.                                     10:28:30
16           When we speak of a specification in a patent, we're
17    talking about not only the written description but also the
18    claims at the end of it.  When Phillips is saying that, when
19    it's saying the specification is usually dispositive, it's the
20    single best guide, it's the patent document in its entirety.         10:28:50
21    It's not just the written description.
22           If you go look at Phillips, it has -- I mean, it's
23    obviously a complicated opinion in a sense that the federal
24    circuit was trying to say a lot about how to do claims
25    construction.  But there are specific passages that talk about       10:29:10
```

```
 1    these principles here where you go look at the claim language
 2    the disputed terms, in context.  You look at other claims that
 3    may not be asserted to see how terms are used.
 4         So you look at the claim language and do your best
 5    with the plain meaning of it.  You also read it in view of the        10:29:28
 6    written description.  But when *Phillips* says that the
 7    specification is the single best guide, it is not saying that
 8    the written description alone is the best guide.  That isn't
 9    the holding, and it's not the teaching of *Phillips*.  So it's
10    the whole patent document.                                            10:29:46
11         I'd like to give the Court an illustration of that
12    that I think is actually pretty helpful.
13         This is a case that post-dates *Phillips*.  It's one
14    that we cited in our papers and alluded to a little bit.  It's
15    the *Wilson Sporting Goods* case versus *Hillerich & Bradsby*, 442    10:30:00
16    F3.d 1322.
17         And the technology at issue in that case was a little
18    bit more simple.  It involved a baseball bat.  It was a hollow
19    bat, and it had an insert in the middle, you know, inside the
20    bat.  And the idea of the technology was that that insert would       10:30:28
21    act like a leaf spring so when you made contact with the ball,
22    the ball would cause the outer portion of the bat to indent,
23    and that would come in contact with that insert piece.  And the
24    two of them acting together like a leaf spring would cause the
25    ball to bounce off really far.  One of those bats that they           10:30:48
```

```
 1    don't let them use in the major leagues because there would be
 2    too many out of the park home runs.  But they get to use them
 3    in softball.
 4              In that case, there were three independent claims that
 5    were at issue:  Claims 1, 15, and 18, I believe, in the              10:31:04
 6    opinion.  And as you go through the case, there were five or
 7    six -- excuse me -- three or four terms that were in dispute.
 8    There was a term called gap, G-A-P.  And the gap was a term
 9    that dealt with, you know, the relative position of the insert
10    to the outer portion of the bat.  And the claims, the claim        10:31:28
11    language, the surrounding language around gap, the federal
12    circuit ended up concluding, required you to treat the meaning
13    of the word "gap" differently in each of the claims.
14              There was another term that the district court
15    concluded was implicitly present in one of the claims, and that    10:31:52
16    was that the insert for Claim 15 had to be hollow.  And the
17    defendant argued that because, you know, that implicit teaching
18    in Claim 15 said that the insert had to be hollow, and all of
19    the other things that were taught in the written description
20    showed only hollow inserts, that that was enough under the         10:32:14
21    Phillips case, applying the Phillips analysis, to require that
22    all of the claims be limited to hollow inserts even if the word
23    "hollow" was not in, for example, Claim 1 or Claim 18.
24              And the federal circuit said no, that's wrong.  You
25    get to use the ordinary meaning of claim language.  And where      10:32:36
```

1    that ordinary meaning encompasses more than is taught in the

2    written description, even if it exceeds all of what is taught

3    in the written description, you get the full extent of the

4    claim terms.

5            So there, even though -- so there precisely because          10:32:54

6    some of the independent claims did not include the term, the

7    Court said you can't import that limitation by going to look at

8    the written description and saying aha, there it is.

9            That's what's going on in this case with the

10   defendant's construction.  They are looking at one of the           10:33:16

11   embodiments that is talked about in the patent, latching on to

12   some language that describes what that embodiment does.

13   There's no question that the embodiment that's shown there is

14   within the scope of these claims.  The dispute is about whether

15   it defines the outer boundaries of the claims, and the answer      10:33:35

16   is clearly no.  There is no arc mentioned in Step B.  There's

17   no arced over air gap mentioned in Step C.

18           It is improper to adjust the language of the claims

19   that were selected by the patentee to define the scope of the

20   invention by looking at the written description and importing      10:33:58

21   those limitations.  That's what *Wilson Sporting Goods* teaches

22   us applying the language and the teachings of the *Phillips*

23   case.

24           Now, it is important, I think, to look at the rest of

25   the specification as well.  There is an argument that's made in    10:34:20

1    the papers that defendants submitted that goes something like

2    this:   Look at the *Bell Atlantic* case, which, by the way, is a

3    case that precedes *Phillips*.   But look at the *Bell Atlantic*

4    case.   There you had a situation where the construction ended

5    up being a particularized definition of words that were taught          10:34:42

6    in the specification.

7         If you go read *Bell Atlantic* in its entirety, you will

8    find the word "mode" and "rate" were the two terms that were

9    being debated.   And in the context of that patent, and the

10   specification that was -- or that the written description that        10:35:05

11   was contained in the patent, the term "rate" and "mode" was

12   used over and over again to mean two different things, very

13   specifically, over and over and over again throughout the whole

14   patent.

15        And the Court said, okay, this looks like a situation          10:35:23

16   where the patentee has elected to be its own lexicographer.   To

17   say regardless of whether what the ordinary meaning of the term

18   might be, I'm going to use it in a particularized way.   And the

19   way I'm going to illustrate that is by using it over and over

20   again in this very particular manner.   So that there, the          10:35:45

21   patentee made the election to treat those two terms in a very

22   specific way.   And as *Phillips* instructs, the Court is duty

23   bound to honor that election.   There's no election like that

24   here.

25        And I'd like to illustrate why that's so with some          10:36:03

1    specifics.  First, we can go to the very language that the

2    defendants rely upon for the arc limitation in the first of the

3    two paragraphs that we were talking about in Claim 40.  If we

4    look back at Column 5, about Line 63, you will notice there

5    that it says, "The application of V High voltage multiplied          10:36:31

6    output across E1 to E3 high impedance air gap forms an

7    electrical arc having ionized air within the air gap."

8         Now, the electrical arc forms, as we went over in the

9    tutorial, the arc that you see is the byproduct of the

10   ionization, not the cause of it.  And that's what this sentence     10:37:01

11   says.  It's consistent with the way it happens in the real

12   world.  The arc is formed because of the ionization, not the

13   other way around.

14        So we've got ionization as a process where you are

15   creating ions in the air gaps, and the arc as a manifestation      10:37:22

16   of ionization in particular circumstances, the two are not

17   equated.  Having ionized the air gap leads to the electrical

18   arc.  They are not conflated into the same thing.

19        Now, there are other places in the patent where the

20   invention is described without reference to an arc at all.  If     10:37:43

21   we go to the paragraph near the beginning, it's at Column 3,

22   it's entitled, "Summary of the Invention."  The paragraph

23   begins at about Line 30 of Column 3 and goes on for a

24   paragraph, and then you get to the description of the drawings.

25   But in that paragraph, that summary of the invention, it           10:38:18

1    begins, "Briefly stated and in accord with one embodiment of

2    the invention," and it goes on to use language that will sound

3    familiar now that we have been over the claim language a bit,

4    "An electric disabling device includes first and second

5    electrodes position to establish first and second space to part          10:38:38

6    contact points on a target wherein a high impedance air gap may

7    exist between at least one of the electrodes and the target.

8    The electronic disabling device includes a power supply for

9    generating a first high voltage, short duration output across

10   the first and second electrodes, during the first time interval         10:38:58

11   to ionize the air within the air gap, to thereby reduce the

12   high impedance across the air gap to a lower impedance to

13   enable current flow across the air gap at a lower voltage

14   level, and for subsequently generating a second lower voltage,

15   longer duration output across the first and second electrodes           10:39:19

16   during a second time interval."

17        There's no mention of an arc there.  The invention is

18   described without using the word "arc."  It's described by

19   simply talking about the formation of ions in the air gap and

20   the lowering of impedance as a result of that.                          10:39:40

21        THE COURT:  So there's no mention of an arc there, so

22   does that mean -- is there any way to ionize the air within the

23   air gap other than creating an electrical arc?

24        MR. CAMPBELL:  The answer is yes and no.  And let me

25   explain why.                                                            10:40:02

UNITED STATES DISTRICT COURT

1          There is no way to create an arc without ionizing the

2     air.  Okay.  So if we think about this process, creating ions

3     in an air gap, ionizing air in an air gap, is a larger circle.

4     The formation of an arc can't be done without ionizing the air.

5     It's a particular manifestation or event that happens as a                    10:40:30

6     result of having ionized the air in the right circumstances.

7          Correspondingly, that's when you are using an electric

8     field that's created by a voltage across that air gap.  Okay.

9     If you take the voltage away, and so that the ionized -- the

10    ionization process is going to start reversing itself, the arc            10:40:58

11    can extinguish before the ionization is eliminated.  So there's

12    a process over which the ionized air gap, once the voltage is

13    removed, will relax back to a non-ionized state.  But that

14    takes some time, again, measuring time in the fast world of

15    electrons and electricity, it takes some time.  And the arc can          10:41:28

16    be extinguished before you are done with the relaxation

17    process.

18         So you still have an ionized air gap with a somewhat

19    lower impedance level after the arc is extinguished.  And

20    that's the critical point, that the two are not coterminous.             10:41:46

21    They are not the same thing physically.  They are not recited

22    as the same thing in the patent.  And in the claim language,

23    for Claims 2 and 40, the patentee elected to measure the

24    boundaries of the invention without referring to the arc.  And

25    that decision by the patentee should be honored.                           10:42:12

1    So the questions should be -- not should we be

2    limiting the claim to arc formation, but on the infringement

3    side of the fence, how does the arc play into what the claims

4    require?  Most of the arguments that the defendants are making

5    are really non-infringement arguments as opposed to claims          10:42:32

6    construction arguments.

7    The -- did I answer the Court's question?  It is an

8    important point, and I want to make sure I got it completely

9    answered.

10   THE COURT:  I think I understand what you just said.               10:42:50

11   MR. CAMPBELL:  Okay.  There are other places in the

12   patent where this election by the patentee not to use the

13   metric of arc formation but to use the metric of ionization of

14   the air gap is reflected in the way the embodiments are

15   described.                                                          10:43:11

16   We could look at the bottom of Column 7 and the top of

17   Column 8, beginning at about Line 66 on the bottom of Column 7.

18   And here, the invention for one embodiment, one preferred

19   embodiment of the 10 Circuit, Capacitor C1 discharge, and it

20   goes on, is described all the way over in Column 2 all the way      10:43:47

21   down to Line 15, in language that talks about the high

22   impedance air gap, but it never -- and it talks about the high

23   voltage and the low voltage, the low voltage driving the

24   current, and it never talks about an arc.  The arc language

25   isn't used there.  So it is simply incorrect to suggest that       10:44:09

1  everywhere in the patent we always have an arc that's being

2  used as a way to describe the invention.

3        This is an illustration of the patentee's election of

4  a way to describe the invention, consistent with the claims,

5  should be honored.                                        10:44:30

6        There's another passage, Column 9, bottom of Column 9

7  top of Column 10 there are a couple of paragraphs here, again,

8  where we have the description of the air gap being transformed

9  to a low impedance configuration, and then a second low voltage

10 output being used to drive the current, okay.  And we're not   10:44:55

11 talking about air gaps.  So the invention, there again, is

12 being described without reference to an air gap.

13       One of the most powerful illustrations of why this

14 election by the patentee ought to be honored by the Court with

15 respect to Claims 2 and 40, is Claim 1.  If I could direct the  10:45:17

16 Court's attention just for a moment to Column 20, that's where

17 Claim 1 begins, you will notice in Claim 1 it says, "An

18 electronic device having a first high voltage transformer for

19 creating an arc, and a second transformer with a lower output

20 voltage to maintain current across the arc to disable a      10:45:46

21 subject."

22       Now, that use of the arc and then maintaining current

23 across the arc, that's the construction that plaintiffs are

24 pushing for with respect to -- that's the kind of limitation

25 that they are pushing for with respect to Claims 2 and 40.  The  10:46:04

```
 1  problem is that that language isn't in the claim, in 2 and 40.
 2  The patentee opted, in Claims 2 and 40, to use different
 3  language to claim the invention.  And they did not claim all of
 4  the features in the invention.
 5          THE COURT:  I think we're going to need to take our          10:46:28
 6  break at this time.
 7          MR. CAMPBELL:  Sure.
 8          THE COURT:  Thank you.  We'll just be in recess for
 9  about 10 to 15 minutes.  Thank you.
10          (Recess from 10:46 a.m. until 11:06 a.m.)                    11:04:27
11          THE COURT:  All right.  Thank you.
12          The record should reflect the presence of counsel for
13  both sides and the representatives also mentioned previously.
14          You may be seated.  And you may resume with your
15  presentation.                                                        11:06:44
16          MR. CAMPBELL:  Thank you, Your Honor.
17          We were talking -- I was about to talk about another
18  couple of passages that I think would be helpful to feature and
19  highlight from the Ventana Medical Systems versus Biogen case.
20  I'm citing from Page 1181.  There are -- I cited before the          11:07:03
21  idea that it's a bedrock principle of patent law that the
22  claims of the patent define the invention to which the patentee
23  is entitled.
24          In the process of going over what was wrong with the
25  construction that showed up at the federal circuit in this          11:07:27
```

1    case, the federal circuit paused to point out a couple of more

2    principles that I think are extremely applicable to the claims

3    construction that is being advanced by defendants.  And these

4    are principles that really do draw into fairly sharp relief

5    what's wrong with that proposed construction by them.          11:07:47

6         Speaking from the Court again, "The second problem

7    with Biogenics's argument is that each claim does not

8    necessarily cover the feature disclosed in the specification.

9    When the claim addresses only some of the features disclosed in

10   the specification, it is improper to limit the claim to other   11:08:05

11   unclaimed features.  Patentees are not required to include

12   within each of their claims all of the advantages or features

13   described as significant or important in the written

14   description.  An invention may possess a number of advantages

15   or purposes, and there is no requirement that every claim       11:08:25

16   directed to that invention be limited to encompass them all."

17        So here, we have a situation where there are different

18   things that are being taught in the written description of the

19   '295 patent.  Claim 1 is addressed to an arc and passing

20   current over the arc, but Claims 2 and 40 are not.  They are    11:08:49

21   not addressed to that particular feature of an arc followed by

22   current passing over the arc.  They are measured in a different

23   way.

24        And the absence of that relationship between the arc

25   and passing current over the arc admittedly is a feature.  It   11:09:07

1    may have advantages.  It may have significant advantages in

2    some circumstances.

3         But the patentee in this instance opted not only to

4    claim that feature in Claim 1 but to adjust the scope to a

5    larger scope of what they would claim in Claims 2 and 40.  And    11:09:27

6    *Ventana Medical Systems*, again, the federal circuit is being

7    very specific here, that a patentee is not required to claim

8    every feature in every claim.

9         In this case and also the *Wilson Sporting Goods* case,

10   there are illustrative facts with those rules being applied    11:09:47

11   where different claims with different terms were held to have

12   different claim scope even though they were broader than what

13   was disclosed in the specification.

14        I wanted to take just a minute -- and I don't expect

15   to be too much longer with this.  I would like to call Dr.    11:10:09

16   Rodriguez to the stand in a minute.

17        But I wanted to take just a minute to sort of round

18   out where we've been with the claim language.

19        THE COURT:  Can I ask a question?

20        MR. CAMPBELL:  Oh, sure.    11:10:23

21        THE COURT:  Does Section B contemplate a different

22   time interval than Section C?

23        MR. CAMPBELL:  Yes.  Absolutely.

24        THE COURT:  So how does Section B or Section C involve

25   the ionization of the air within the air gap without the    11:10:41

1    electrical arc?

2          MR. CAMPBELL:  Okay.  That's actually what I was going

3    to next.

4          THE COURT:  Okay.

5          MR. CAMPBELL:  C is a separate time period because        11:10:55

6    we're talking about subsequently.  That's how C begins.  In B,

7    we have applied a first high voltage, short duration output to

8    overcome the air gap, and in C, subsequently, meaning later,

9    we're going to apply a second lower voltage output across the

10   first and second electrodes.                                   11:11:19

11         So in B, we've got those first and second electrodes

12   we have applied a high voltage output to overcome the air gap.

13   In C now we're going to use, subsequently, a lower voltage

14   output, and we're going to do it during a second time interval.

15   So it's not the first time interval which is the one discussed  11:11:38

16   in B, it's a second time interval.  And we're going to maintain

17   the current flow during that time interval.

18         THE COURT:  Is there an arc at that time interval, at

19   that time interval?

20         MR. CAMPBELL:  In some of the embodiments in the          11:11:53

21   patent, the answer is yes.  For example, Claim 1 says you get

22   an arc, and then you pass current over that arc.  So the way

23   the embodiments that would -- that Claim 1 would read on work,

24   they would have that extra requirement that you have got an arc

25   that you are working with in the work of what C is covering.    11:12:16

```
 1          C -- in Claims 2 and 40, however, that requirement
 2    isn't there.  The requirement that is there is that you are
 3    applying a second lower voltage output across the first and
 4    second electrodes in order to drive current, to maintain
 5    current during that second time period, to drive it and do the      11:12:39
 6    incapacitation work.  That's made easier by the ionization that
 7    happened in B.
 8          And, in fact, if you look up in B, that's one of the
 9    points of ionizing the air gap.  It's to lower the impedance to
10    enable current to flow at a lower voltage level.  So C is sort      11:12:56
11    of taking advantage of what B did.
12          Now, the difference between the parties is this:
13    Defendants want to say you have got to strike an arc, visible
14    arc, while you are doing the work in B, and you have got to
15    maintain that visible arc when you go to the subsequent period      11:13:22
16    and do the work in C. They want to inject into the claims a
17    transition requirement, sort of a B plus 1 between B and C
18    where they have got this transition of an arc staying there and
19    the current passing over the arc and maintaining that arc into
20    C.                                                                  11:13:47
21          THE COURT:  So is it undisputed that during what's
22    described in B, in Section B, the first time interval, that you
23    will always have an arc, an electrical arc that --
24          MR. CAMPBELL:  It is not undisputed.  What I can tell
25    you is -- that's undisputed is this --                             11:14:15
```

UNITED STATES DISTRICT COURT

1          THE COURT:  I guess another way of saying it, so is

2     there any way in Section B, the first time interval, which is

3     where this disputed phrase is, to have anything other than an

4     electrical arc?

5          MR. CAMPBELL:  Yes.  That is a point of dispute.  And      11:14:30

6     let me explain why.

7          As I mentioned earlier, if in the right circumstances,

8     if you ionize an air gap, if you create enough ions in the air

9     gap and you have got the right kind of voltage set up, an arc

10    will be formed.  However, this limitation B is being measured   11:14:51

11    not from the point of view of the visible arc which, again, is

12    the release of those photons when those charged particles

13    sometimes recombine, it is the process of using the field

14    that's set up by the voltage to ionize the air.  And that is

15    the literal meaning and language and intent of what's here on   11:15:15

16    the page.

17         THE COURT:  So sometimes you can have that without

18    forming an arc.  That ionization doesn't always create an arc?

19         MR. CAMPBELL:  They are not -- I'm going to actually

20    let Dr. Rodriguez speak to that and answer that question.       11:15:31

21    That's a very good question.

22         The point that I'm trying to make is a little bit

23    different from that.  And it is that you can measure or decide

24    what you are going to use to measure whether someone is inside

25    or outside of this invention by looking at different           11:15:52

1 attributes.  And for Claims 2 and 40, the attribute that was

2 selected for measurement or, you know, boundary drawing, was

3 not the arc formation.  That's in Claim 1.

4        In these claims, you know, if an arc gets formed

5 that's fine.  It's within the scope of the claims.  But the          11:16:10

6 thing that needs to be done is ionizing the air gap.  If you do

7 form an arc, you will necessarily have ionized the air gap.

8        THE COURT:  Okay.  And you were also, though, drawing

9 another distinction.

10       MR. CAMPBELL:  Yeah.  The back end -- I was trying to          11:16:27

11 put in sharp relief the difference between the parties.  On the

12 back end, let's assume that you have got an arc formed from the

13 high -- the first high voltage, short duration output.  And

14 there are examples of that in the patent where the arc gets

15 formed.  There are examples of that in the real world.  We're          11:16:44

16 not trying to dispute that.

17       If the arc is formed, when your high voltage short

18 duration output is over, okay, when the voltage is removed from

19 B, there is a debate between the parties about whether the

20 claim requires that the arc not go out before you get to C.          11:17:09

21 Okay.

22       So if the defendants say, yes, that's a requirement,

23 the arc must not go out, and our point, plaintiff's point, is

24 there is no such requirement in the language of the claims in 2

25 and 40.  If we focus on 40, we're talking about subsequently          11:17:33

UNITED STATES DISTRICT COURT

```
 1    applying a second lower voltage output across the first and
 2    second electrodes during a second time interval to maintain,
 3    during that time interval, this current flow.
 4         So there is a difference between -- that is the
 5    primary fundamental difference between the parties.        11:17:56
 6         THE COURT:  Okay.
 7         MR. CAMPBELL:  It is that combination of the
 8    interrelationship of the arc formation and the work that's done
 9    in C.  And our point on the claim language is there simply is
10    no such requirement.                                       11:18:10
11         I wanted to make one other brief point about the
12    prosecution history, and then I'd like to call Dr. Rodriguez.
13         Prosecution history is in the bucket of intrinsic
14    evidence on a hierarchy of things that the federal circuit
15    teaches us to use.  So it's on the side of intrinsic evidence. 11:18:28
16    It is, however, more difficult to use quite frequently because
17    the back and forth between the patentee and the examiner very
18    rarely leads to something that's crystal clear on a claims
19    construction point.  So it tends to be more difficult to use,
20    and the Phillips case recognizes that difficulty.         11:18:50
21         What the defendants are attempting to do here is to
22    take plain language, ionize the air within the air gap, and say
23    well, really what that means is strike an arc.  So they are
24    trying to narrow the scope of the claim, and they are trying to
25    rely on prosecution history to do that.  That's what's known as 11:19:10
```

1    an argument for disclaimer, an argument that says

2    notwithstanding the clear language, the plain meaning of the

3    language in the claims, plaintiff -- or patentee did or said

4    something during the prosecution to make it clear to the public

5    that it was surrendering that scope.  For that doctrine to          11:19:33

6    apply, it has to be clear, unmistakable, and unambiguous.

7    Otherwise, if you find something that's marginally relevant in

8    the prosecution history, it doesn't count.  It has to be

9    unmistakable and unambiguous.

10          The only prosecution history that is in the record          11:19:53

11   right now is the prosecution history of the '295 patent.  There

12   are arguments in defendant's papers about another patent in the

13   family, and I will address those arguments in just a second,

14   but that '762 patent file history is not -- it's not, you know,

15   it's not part of the record at this point.                          11:20:17

16          Let me focus first on the '295 history and talk about

17   what's in there.  What's in the '295 history that's relevant to

18   this claims construction point is not a surrender of claim

19   scope.  It's the opposite.  And the *Saunders* case that we have

20   cited in our papers recognizes that when a patentee makes an       11:20:39

21   amendment to add new claims that don't include narrow features

22   in the first set of claims, that's a powerful indication that

23   the patentee knew what it was doing and intended to expand

24   claim scope.

25          So here, when the application was first filed, Claim         11:20:57

1, I'm not sure that it's the application Claim 1, but that

claim that became Claim 1 in the patent was in the application,

the initial set of claims.  There was an amendment before the

patent was issued in which Claims 2 and 40 were added.

So we've got Claim 1, we're starting off with Claim 1          11:21:25

and it's talking about the arc and maintaining the arc to drive

the current, a narrower set of claim limitations of what we're

dealing with here.  And then the patentee says, I want to claim

something broader, so I'm going to add these additional claims

that don't mention the arc.                                    11:21:45

The *Saunders* case addresses a fact pattern where you

had a continuation application and basically the same thing

happened.  In the first application they were dealing with some

narrow claims, and then they dropped those narrow limitations

in the continuing application and the Court said, you know,     11:22:05

we're dealing with the same written description here, but the

fact that the patentee made an obvious choice to broaden the

scope of the claims means we don't look to that other, you

know, that other set of claims.  This is a powerful indication

that they meant what they said.  So that's the *Saunders* case.  11:22:22

In that sense, the prosecution history is relevant to what's

going on here.

The '295 prosecution history is not relevant and does

not support an argument for a disclaimer here.  It doesn't

support the defendants.  They have mentioned a time or two in    11:22:42

1    some of the meet and confer, and we have talked a little bit

2    about it in our briefs, that the examiner made some comments in

3    the notice of allowance.  The notice of allowance is that

4    document that comes kind of at the end after all the back and

5    forth is done and the examiner says, okay.  Here.  I'm going to    11:23:03

6    let you have these claims.  I'm going to -- these claims will

7    issue.

8         Attached to the back of that notice of allowance in

9    the '295 file history is a couple of paragraphs where the

10   examiner kind of goes through and rattles off why he thinks the    11:23:17

11   patent should issue.

12        Two points that are significant on this:  Point number

13   1, the examiner is clearly, in those comments, talking about

14   Claim 1.  He's addressing two transistors, and he's talking

15   about an arc.  So he's not even addressing Claims 2 and 40 at     11:23:35

16   all.  There really isn't anything relevant in that notice of

17   allowance explanation by the examiner that bears on what we're

18   doing here.  That's Point 1.  No substantive relevance.

19        No legal relevance, either.  The federal circuit's

20   been very clear that a unilateral statement by the patent         11:23:56

21   examiner in an explanation attached to a notice of allowance is

22   not a disclaimer by the patentee because it's a one-way

23   communication.  It's a communication from the patent office,

24   the examiner, after he's done with his or her examination.  And

25   it's a one-sided event, and it's also not a statement by the      11:24:14

```
 1    patentee so the patentee cannot, as a matter of law in that
 2    circumstances, can be held to have disclaimed anything.  So no
 3    substantive relevance, no legal relevance to anything that's in
 4    that prosecution history that would help defendants support
 5    their claims construction here.                                    11:24:34
 6          They argue in their briefs that we ought to be looking
 7    at the '762 file history.  That's wrong as well for the
 8    following reason.  In the '762 file history, which, you know,
 9    all of this is not in the record.  I'm just addressing the
10    arguments that have been made in the briefs.                       11:24:52
11          If it were in the record what you would find is that
12    in the '762 patent, there were some claims that had this arc
13    concept mentioned explicitly and other claims that did not.
14    They had other limitations that were also different from 2 and
15    40, but on this question of arc versus not arc, some of them     11:25:10
16    had it and some of them didn't.
17          Ultimately -- and this is a mistake that's made in the
18    defendant's papers -- ultimately when that patent went to
19    issue, it almost went to issue once, and then it was pulled
20    back because the patentee had some additional art that they      11:25:30
21    wanted to submit to the examiner to look over, to make sure
22    that everything was okay, that there couldn't be any argument
23    about inequitable conduct.  So it was pulled back from that
24    issue.
25          And in that continuing examination process, there was      11:25:45
```

another subsequent notice of allowance.  And in that notice of

allowance, the examiner goes through and talks a little bit

about both flavors of claims, talks about the claims that have

the arc limitation stuff in it, also talks about the claims

that don't have it.                                          11:26:04

        In the paragraphs that address the arc limitation --

excuse me -- the claims, the paragraphs that address the claims

that have the arc limitation, the examiner talks about an arc.

In the paragraphs that address -- and this is significant on

the substantive relevance -- on the paragraphs that address the  11:26:17

claims that do not have the arc limitation in it, there's no

mention of an arc.

        So this idea that somehow there's something going on

in a different patent file history that ought to bear on this

is just wrong.  Where there are analogous claims that don't    11:26:35

have reference to an arc, the examiner is not talking about an

arc.  He's using the language in claim terminology and

measurement paradigm that the patentee chose to set up in the

claim.

        I'm happy to address questions.  I also wanted to      11:26:50

address a couple of questions to Dr. Rodriguez when it's

convenient.

        THE COURT:  Why don't we do that now.

        MR. CAMPBELL:  Taser will call Professor Jeffrey

Rodriguez.                                                     11:27:06

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1          THE COURT:  Please come forward and be sworn, sir.

2          Come right here first.

3          THE COURTROOM DEPUTY:  Would you spell your name for

4     the record, please?

5          THE WITNESS:  Rodriguez, R-O-D-R-I-G-U-E-Z.  Jeffrey,          11:27:17

6     J-E-F-F-R-E-Y.

7                    JEFFREY RODRIGUEZ,

8     called as a witness herein, having been duly sworn, was

9     examined and testified as follows:

10                  DIRECT EXAMINATION

11    BY MR. CAMPBELL:

12    Q.  Dr. Rodriguez, can you tell us by whom you are employed?

13    A.  University of Arizona.

14    Q.  And how long have you been employed by the University?

15    A.  For 18 years.                                                  11:28:00

16    Q.  Are you a faculty member?

17    A.  Yes, I am.

18    Q.  An associate professor there?

19    A.  That's correct.

20    Q.  What department are you a professor in?                        11:28:08

21    A.  The department of electrical and computer engineering.

22          THE COURT:  Can you position that microphone so that

23    you are speaking into it?

24          Thank you.

25    BY MR CAMPBELL:                                                    11:28:17


                    UNITED STATES DISTRICT COURT

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1    Q.  Could you tell us briefly about your educational

2    background?

3    A.  I received my Bachelor of Science degree from the

4    University of Texas at Austin in 1984 and then continued on to

5    my Master of Science degree at the Massachusetts Institute of      11:28:38

6    Technology in 1986.  And that was followed by my doctorate

7    in -- also in electrical engineering from University of Texas

8    at Austin in 1990.

9    Q.  Have you had occasion to review the three patents that

10   we're here to talk about, the '295, '870 and '262 patents?      11:29:01

11   A.  Yes, I have.

12   Q.  With respect to your academic training, are the topics that

13   are discussed and dealt with in each of those patents topics

14   that you have training in?

15   A.  Yes, they are.      11:29:19

16   Q.  I gather over the last 18 years you have taught a few

17   students.  Is that true?

18   A.  Yes.  I have taught a number of courses that are related to

19   the topics that are at issue here.

20   Q.  Can you give us some examples, please, of courses that you      11:29:37

21   have taught that are relevant?

22   A.  I teach courses in circuit analysis as well as various

23   courses in signal processing, the circuit analysis courses that

24   I have taught cover, obviously, the fundamental issues of

25   electrical circuits, many of the topics that have been      11:29:58

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1  discussed here today, how electrical devices work, how circuits

2  are designed, et cetera.

3  Q.  Have you also taught courses in microprocessor-based

4  systems?

5  A.  I have not taught specific courses solely on                    11:30:20

6  microprocessor-based systems, but I certainly have taught

7  signal and image processing courses where microprocessor-based

8  systems are part of the curriculum.  And in addition, through

9  my research, I supervise students that are working on projects

10  that very often involve the design and implementation of        11:30:44

11  microprocessor-based systems.

12  Q.  This research would be done by graduate students?

13  A.  That is correct.

14  Q.  How many graduate students have you supervised?

15  A.  Well, I typically have about six to eight graduate students   11:30:57

16  working under me at any given time, so over 18 years, it's been

17  many.

18  Q.  Has any of that work, either in your academic training or

19  the research that you have been involved in, dealt with

20  biomedical systems?                                               11:31:16

21  A.  Yes.  The research that I have been involved with has

22  covered a couple of disciplines, primarily one of which is

23  biomedical instrumentation, biomedical signal processing

24  applications.  The other area is telecommunications circuits.

25  I am -- I, over the past five years, I have served as the        11:31:34

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1    director of the National Science Foundation Research Center on

2    communication circuits and systems.  That's at the University

3    of Arizona where that's been one of the major research areas.

4    Q.  Have you published articles?

5    A.  Yes.                                                      11:31:55

6    Q.  Are you comfortable addressing the technology that is

7    disclosed in the three patents that are at issue here?

8    A.  Yes.

9    Q.  Have you -- you prepared a report, correct?

10   A.  That is correct.                                          11:32:13

11   Q.  That report has been -- I can represent to you that report

12   has been submitted as Exhibit 7 to the declaration of Aaron

13   Matz in connection with the hearing here.

14          Can you verify that the report truthfully and

15   correctly sets forth your opinions?                           11:32:32

16   A.  It does.

17   Q.  And you authored that report and signed it?

18   A.  Yes.

19   Q.  Now, have you had a chance to review the brief that the

20   defendant submitted in this case?                             11:32:45

21   A.  Yes, I have.

22   Q.  Was that done -- was that review -- let me state that

23   another way.

24          Did the brief become available to you after you had

25   completed your report?                                        11:32:57

UNITED STATES DISTRICT COURT

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1  A.  Yes.

2  Q.  I'd like to direct your attention, if I may, to the claim

3  language that is up on the screen and also to the competing

4  claims constructions of the parties.  And I have got several

5  questions that I want to ask you about electrical arc formation        11:33:24

6  and ionization of air gaps.

7         First of all, can you briefly describe for the Court

8  what an ion is and how it's formed?

9  A.  An ion is a charged particle.  It's formed, as was

10  mentioned earlier, typically when an electron collides with an        11:33:45

11  atom or molecule and causes one of the orbiting electrons to be

12  freed.  Normally the electrons orbit around the protons within

13  the molecule, but upon collision by an external particle, such

14  as another electron, one of those electrons can be freed and

15  transition to a higher energy state.  That causes the rest of        11:34:15

16  that molecule to then have a positive charge.  So it becomes a

17  positively-charged ion.

18  Q.  Can you describe how placing an electrical field with a

19  voltage across an air gap would influence ion formation?

20  A.  Sure.  So when you have a large electric field that has        11:34:43

21  been formed across an air gap, what happens is at some point

22  there will be an electron freed.  That can be caused by various

23  sources, one would be cosmic rays hitting it and freeing up an

24  electron.

25         That freed-up electron then proceeds to collide with        11:35:10

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1    other particles such as air molecules, and that collision then

2    frees up an additional electron.  Now we have two electrons.

3    Those two electrons then fall into this avalanche effect where

4    they collide with other molecules freeing up even more

5    electrons.  And so you end up with an -- what's called an          11:35:30

6    ionized air gap, also referred to as a plasma by the physicist,

7    and it's manifested by a large supply of free electrons that

8    can then move around, which causes electrical current to flow.

9    Q.  Can you explain in a little bit more detail than we have

10   been over today how photon emission relates to this process?      11:36:03

11   A.  Sure.  When you have these freed electrons flying through

12   this air gap, there will come a time where they will recombine

13   with ions.  They will collide with a positively-charged ion and

14   recombine to form a neutral molecule again.

15        As a byproduct of that collision, there will be a            11:36:30

16   photon freed.  A photon is a fundamental particle of light.  It

17   may be visible light, it may not be.  It depends on many

18   factors.  The wavelength, the frequency of that photon that's

19   emitted depends on various factors such as what kind of gas is

20   in that gap, what is the pressure of the gas in that gap,          11:36:53

21   what's the physical size of that gap, parameters of that sort.

22   And so the release of these photons is what ultimately may

23   appear as a visible arc, but not always.

24   Q.  The Court earlier asked a question about that distinction

25   between ionization of an air gap and arc formation.  Can you       11:37:20

UNITED STATES DISTRICT COURT

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1   elaborate on that a little bit and see if we can't answer the

2   Court's question?

3   A.   There is a gradual process that takes place.  As the high

4   voltage is applied to the air gap, electrons get freed forming

5   ions.  Initially you have a few ions.  The population of ions        11:37:43

6   continues to grow until you have achieved a dense ionized gas

7   within this air gap.

8          At that point, you have reached ionization.  You have

9   a plasma formed.  The current flow at that point may still be

10  small.  There may not be any visible photon emission.  The          11:38:15

11  photon emission may be small enough in quantity so that it's

12  not visible, or depending on the type of gas and other

13  parameters as I alluded to, the emitted photons may be a

14  wavelength that's visible outside the spectrum, infrared,

15  ultraviolet, that we can't see.                                     11:38:40

16         So consequently, ionization and the formation of a

17  visible arc are two separate events.  One can occur without the

18  other.  Indeed, you may be familiar with air ionizers that are

19  sold commercially to, quote, clean the air for use inside a

20  home.  There, those air ionizers are certainly ionizing the        11:39:00

21  air.  That's their primary function.  They do ionize the air,

22  but they don't create a visible arc.  So that's a good example

23  of how you can have ionization of the air without the visible

24  arc.  Yes, they operate at a lower voltage than you would need

25  to create a high voltage arc.                                       11:39:20

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1        So you need to keep these two concepts as separate

2    events.  They often appear in tandem, because in a high voltage

3    application after creating the ionized gas, if you continue to

4    apply high voltage and if the circumstances are right, you can

5    then end up with an arc.  But the arc is the consequence of       11:39:45

6    having formed the ionized air in the gap and having the right

7    conditions.

8    Q.  When you say that the arc is the consequence of having

9    ionized the air, is it possible to have an arc without first

10   ionizing the air?                                                 11:40:02

11   A.  I don't think so.  The reason you have the arc is from the

12   recombination of free electrons with ions, and so you need

13   those ions to have formed.

14   Q.  We had some discussion earlier today about a circumstance

15   where if we had an air gap that was ionized by a voltage         11:40:19

16   applied across it and we removed the voltage, or the voltage

17   went away, in some sense, that we would start recombining and

18   relaxing the ionized state of the air gap, but that that

19   process would take time.

20        Can you comment on that and correct or do whatever you      11:40:43

21   need to to fix it and elaborate it a bit?

22   A.  That is correct.  Once you have ionized the air in an air

23   gap and created a visible arc due to the continued application

24   of a high voltage across that air gap, once that high voltage

25   is removed, the ionized air will begin to return to its          11:41:08

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1  original relaxed state.  So you will have a short transition

2  period where that visible arc, if it had been formed, will

3  become extinguished, no longer visible, but the gas in the air

4  gap remains ionized.  And that degree of ionization then

5  continues to diminish over time, a very short amount of time in    11:41:39

6  order of microseconds, probably, and then at some point, the

7  ionization has diminished to such degree that current no longer

8  flows easily across that air gap.

9  Q.  Can you talk a little bit about the effect of impedance and

10 that property of an air gap in a relaxed state and also in an    11:42:05

11 ionized state and tell us how the ionization affects the

12 impedance?

13 A.  The impedance is a term that describes how easily current

14 can flow.  So normally in an air gap, the gas or air in that

15 air gap acts as an insulator.  Current does not flow across the    11:42:34

16 air gap easily.  In order to get current to flow, one has to

17 apply a very high voltage so that the air or gas in that gap

18 becomes ionized providing a rich supply of freed electrons.

19 Those freed electrons are what allow the current to flow easily

20 across that air gap.    11:43:03

21 Q.  When you say "ionized" in describing that circumstance, are

22 the stripping off of the electrons equivalent to the formation

23 of actual ions in the air gap?

24 A.  Yes.

25 Q.  And the ions are the positive charged particles?    11:43:18

UNITED STATES DISTRICT COURT

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1    A.   Yes.

2    Q.   Is there a correlation between the number of ions that are

3    created in the gap and the impedance?

4    A.   Yes.   Or more precisely, the number of electrons, the

5    number of freed electrons in the air gap is what most directly          11:43:34

6    determines the effective impedance of that air gap.

7    Q.   And can you give us a sense for the correlation?   Is it --

8    A.   The more electrons that are freed in that air gap, the

9    lower the impedance of the air gap.

10   Q.   Now, if we focus on that circumstance we talked about just          11:43:56

11   a minute ago where you take the electrical field away and the

12   process of relaxing the air gap begins, what happens to the

13   impedance there?

14   A.   When the high voltage source is removed from the air gap,

15   the ionized air will begin to return to its normal relaxed             11:44:17

16   state so that electrons become recombined with ions to form

17   neutral particles again.   And in so doing, the population of

18   free electrons becomes diminished.   Consequently, the impedance

19   of the air gap is increased.

20   Q.   Now, when you say that there's a correspondence between the        11:44:46

21   number of free electrons and the impedance, is it the case that

22   the impedance and the number of free electrons available as

23   they go down, they go down in tandem?

24   A.   Well, the operation of -- well, the physics of an air gap

25   is rather complex.   It's a highly non-linear process.   So that       11:45:08

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1  there's not a direct proportional relationship, as you suggest.

2  At some point, when you have reached a sufficient state of

3  ionization, the impedance across that air gap drops

4  dramatically from a very high impedance state to a very low

5  impedance state.  So at that point, the relationship is no          11:45:36

6  longer a simple linear relationship.

7  Q.  So long as you do have more ionization than the relaxed

8  state, is it correct that you are also going to have lower

9  impedance than you will have with a non-ionized air gap?

10  A.  Yes.                                                            11:46:02

11  Q.  I'd like to direct your attention if I could just very

12  briefly to Figure 19 in the patent.  It's in the book, but I'm

13  also, while you are looking that up, going to try to get it up

14  on the screen.

15      What I'd like to have you do, and maybe as a point of         11:46:38

16  context for this question, let me just briefly direct your

17  attention back to this table with the competing claims

18  construction positions.  Under Stinger's construction, for --

19  to maintain the current flow, do you see the language there,

20  "Continue and maintain the previously initiated discharge         11:46:58

21  across the arced air gap"?

22  A.  Yes.

23  Q.  I'd like to have you describe for us the discharge or

24  discharges that happen with the operation of Figure 19.  And if

25  you want to -- I'm told if you want to draw on this you can       11:47:17

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1   with your finger.

2   A.   Figure 19 shows two capacitors, Capacitor C1 and Capacitor

3   C2.   Each of those will be providing a discharge to the target

4   at different phases in the operation of the circuit.

5   Initially, Capacitor C1, after it has been charged up to a          11:47:43

6   sufficiently high voltage, the associated spark gap, Gap 1,

7   will become conductive.   At that point, the voltage across

8   Capacitor C1 is delivered to the primary side of the

9   transformer that's shown as T1 in this diagram.

10        At that point, the transformer steps up that voltage          11:48:19

11  to a much higher voltage on the secondary side of the

12  transformer, and that very high voltage, on the order of 50,000

13  volts, is then delivered to the target.

14        So at that point, the energy from Capacitor C1 is

15  discharged into the target.   This continues until the energy in    11:48:43

16  Capacitor C1 has been mostly diminished, mostly released into

17  the target.

18        That brings us to the beginning of Phase 2 in the

19  operation of this circuit when the second capacitor, Capacitor

20  C2, takes over.   At that point, Capacitor C2 then becomes the      11:49:11

21  dominant player in delivering current or charge to the target.

22  And so in the second phase, Capacitor C2 is discharging its

23  stored charge to the target.

24  Q.   If we talk about voltage outputs in connection with the

25  operation of Figure 19, can you give us some idea of the           11:49:39

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1   relative value in terms of high and low for the discharge out

2   of C1 compared to the later discharge out of C2?

3   A.   In the first phase, Capacitor C1 is the dominant factor

4   here.  Its voltage has been charged up to about 2,000 volts,

5   since that's the rating of Spark Gap 1.  When Capacitor C1 has          11:50:12

6   been charged up to 2,000 volts, Spark Gap 1 becomes conductive.

7   And at that point, Capacitor C1 starts discharging to the

8   target.

9         That 2,000 volt charge on Capacitor C1 gets multiplied

10   through the effect of this transformer, so that a 50,000 volt          11:50:36

11   charge is delivered to the target.

12         Because of -- now, I think what you may be getting at

13   here is the sign or polarity of that voltage, that 50,000 volt

14   -- that 50,000 volts that's delivered to the target happens to

15   be a negative 50,000 volts because of the specific way this          11:51:02

16   circuit is designed.  And I know that from looking at the dots

17   that are illustrated on this transformer.  Since the voltage

18   from Capacitor C1 is entering a dotted terminal on the primary

19   side of the transformer, and the target is connected to the

20   undotted terminal of the secondary of the transformer, that          11:51:29

21   indicates that it's the negative 50,000 volts that's going to

22   the target.

23         And then in Phase 2, Capacitor C2 is being connected

24   to the target, and there it's delivering a much lower voltage

25   that would be on the order of 3,000 volts since that's the          11:51:48

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1   rating of Spark Gap 2.  And that would be a positive 3,000

2   volts being connected to the target.

3   Q.  Based on your review of the '295 patent and the work that

4   you have done on this case, I'd like to have you comment on

5   whether the approach that is claimed in Claims 2 and 40 of the        11:52:12

6   '295 patent could be used in a circuit that had a little bit of

7   a delay between the first high voltage output in Element B of

8   Claim 40, for example, and the onset of the lower voltage

9   output in Element C of Claim 40.

10  A.  In my opinion, yes.  You could achieve the same              11:52:42

11  functionality, even if there's a small time delay between those

12  two events, as long as that time delay is small enough so that

13  you do not lose sufficient ionization in that air gap.  As long

14  as there's sufficient ionization still present, the subsequent

15  delivery of a lower voltage would be able to continue a          11:53:14

16  delivery of current to the target.  Okay.

17       And this should be pointed out this can happen even if

18  the visible arc had been extinguished during that transitionary

19  period.

20       MR. CAMPBELL:  I will pass the witness.                   11:53:35

21       THE COURT:  Thank you.

22                    CROSS-EXAMINATION

23  BY MR. HARRIS:

24  Q.  Dr. Rodriguez, I want to start sort of at the end.

25       You were talking about Figure 19 in the patent that        11:54:18

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1   has two capacitors and two slightly different rated spark gaps

2   that cause those capacitors to become connected to the circuit.

3         Why is that referred to as a spark gap?

4   A.  Well, it's physically constructed as to if -- it's a device

5   that has two electrodes that are separated by a gap.          11:54:46

6   Q.  Is it fair to say that that gap is arced over when the

7   capacitor reaches the desired voltage?

8   A.  When the capacitor reaches the -- when the capacitor

9   reaches a voltage that exceeds -- meets or exceeds the rating

10  of that spark gap, it will cause current to flow across that   11:55:07

11  spark gap.  Depending, I guess, upon the type of material or

12  gas that's in that device, I guess there may or may not be a

13  visible spark, or arc, that's formed.

14        Again, this is inside of a package, so it's not

15  something that's normally visible to the outside observer.     11:55:36

16  Inside is -- are there photons being emitted?  That would

17  depend upon, again, many factors; the type of gas, the

18  pressure, the type of electrodes, their physical geometry, et

19  cetera.

20  Q.  Nevertheless, that's ordinarily referred to and understood  11:55:53

21  as a spark gap?

22  A.  Yes.  The spark gap is a common term used for such a

23  device.

24  Q.  Now, you also said that you understand the device we're

25  talking about here operates in two modes:  A high voltage mode   11:56:05

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1    followed by a lower voltage mode.  You understand that?

2    A.  That is what is described by these particular claims.

3    Q.  Yes.  And in particular, Figure 18 that we were just

4    looking at, the high voltage mode is on the order of 50,000

5    volts, correct?                                                    11:56:28

6    A.  You said Figure 18?

7    Q.  19.  I'm sorry.

8    A.  Figure 19.  Can you repeat the question?

9    Q.  The high voltage mode in Figure 19 is on the order of

10   50,000 volts?                                                      11:56:39

11   A.  Yes.

12   Q.  And the low voltage mode in Figure 19 is on the order of

13   3,000 volts?

14   A.  Yes.

15   Q.  If the air gaps between the electrodes and the target were   11:56:49

16   not arced over at 50,000 volts, I want you to assume that, can

17   they be arced over by 5,000 volts?

18   A.  Well, it's a strange hypothetical, but I am trying to

19   envision a scenario where that would happen.  But I guess

20   hypothetically, if 50,000 volts wasn't sufficient to create a     11:57:29

21   visible arc, then 5,000 volts probably would not be sufficient,

22   either.

23   Q.  Okay.  Would -- let's talk about the process by which

24   ionization leads to flow of current.

25           It would be helpful in this regard if you looked to       11:57:55

UNITED STATES DISTRICT COURT

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1    Figure 6 of the '295 patent.

2         Have you looked at Figure 6 before?

3    A.  Yes.

4    Q.  What is it?

5    A.  It's a rough illustration of the output voltage as a          11:58:19

6    function of time.

7    Q.  Okay.  So in the first time period shown in Figure 6, that

8    would correspond to the points T0 to T1 on the time axis.  Is

9    that the period when the capacitors are charging?

10   A.  Yes.                                                          11:58:46

11   Q.  Okay.  And then the period from T1 to T2, is that the

12   period when Capacitor 1 is discharging?

13   A.  Capacitor 1 is discharging during that time period.  It's

14   mostly discharged.  It's stored charge during that period.  Of

15   course, there will be some tiny trickle that gets discharged     11:59:11

16   even later.

17   Q.  And the purpose of that is to create conditions so currents

18   can flow through these air gaps between the electrodes and the

19   targets, correct?

20   A.  The -- can you -- I'm sorry.  Can you repeat that question?   11:59:26

21   Q.  Why is there a high voltage output in the first mode of

22   this taser device?

23   A.  To -- well, Claims 2 and 40, let's just go back and look at

24   that claim language specifically.  It was to ionize -- let's

25   see -- to ionize the air within the -- within the air gap to     11:59:55

UNITED STATES DISTRICT COURT

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1   thereby reduce the high impedance across the air gap to a lower

2   impedance to enable current flow across the air gap.

3   Q.  Ultimately, they are trying to enable current flow at a

4   lower voltage level, correct?

5   A.  Yes.                                                12:00:16

6   Q.  Okay.  Now, the shape of the diagram in Figure 6 shows a

7   sharp drop in voltage at the time designated T2.  Does that

8   reflect a reduction in the impedance of the air gap at time T2?

9   A.  Yes.

10  Q.  Okay.  And would that be, as depicted in Figure 6 -- I want  12:00:47

11  to see if I can find your words -- a dramatic drop to a very

12  low resistance?

13  A.  Yes.

14  Q.  Okay.  The point at which that dramatic drop to a low

15  resistance occurs, can that be referred to as a tipping point?  12:01:19

16  A.  That's not a term that I am accustomed to seeing.

17  Typically, it's referred to as having achieved a breakdown of

18  the air gap.

19  Q.  So Figure 6 shows breakdown of the air gap at time T2?

20  A.  Approximately time T2, yes.  This is a rough illustration.  12:01:40

21  Q.  And would a plasma state be associated with that air gap

22  breakdown?

23  A.  This patent doesn't explicitly refer to plasma states being

24  achieved usually.  Instead, it's talking about ionizing the air

25  gap to achieve a low impedance state.  Okay.  I understand that  12:02:05

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1   to be equivalent to having formed a plasma.

2   Q.   From an engineering point of view, you understand that

3   that's probably what's going on here?

4   A.   Yes.

5   Q.   Okay.   Now, when that plasma is formed, does current pass          12:02:23

6   between the electrodes at time T2?

7   A.   Which two electrodes?   The ones that are on the target?

8   Q.   Yes.

9   A.   Yes.

10  Q.   All right.   And is the passage of a current between those          12:02:45

11  two electrodes accompanied by an arc?

12  A.   That depends.   As I have explained, even when you have a

13  strong current flowing across that air gap, whether there is a

14  visible arc depends on many factors such as the type of gas,

15  the gas pressure, the size of the gap, the physical geometry of          12:03:13

16  the electrodes, how sharp are the electrode points.   For

17  example, there will become -- if the -- if the high voltage is

18  taken away at some point, even if there was a visible arc, that

19  visible arc will disappear, even though some current continues

20  to flow across that air gap.                                              12:03:42

21  Q.   Putting aside for the moment whether the arc is visible,

22  would it be your understanding that all electrical arcs are in

23  the visible wavelength?

24  A.   Oh, no.

25  Q.   Okay.                                                                12:03:56

UNITED STATES DISTRICT COURT

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1   A.  I guess it depends on one's usage of the term "arc."  I

2   guess in the lay community, yes, people think of an arc as

3   something you can see.  But to a plasma physicist, there can be

4   photon emission at other wavelengths that are not visible.

5   Q.  So if the patent specification refers to an electrical arc,   12:04:14

6   that's not necessarily a visible arc, correct?

7   A.  I guess I have not taken time to really think that question

8   through.  That hasn't occurred to me.  I guess I had been

9   assuming that they are referring to an arc in the lay sense,

10  that as an arc that's visible.                                     12:04:44

11  Q.  Is it fair to say that it would be common when you reach

12  the breakdown threshold here over this air gap that the

13  reduction in impedance would be accompanied by an electrical

14  arc?

15  A.  That's a good question.  I am not sure.  Again, it depends   12:05:12

16  on various factors; the type of gas pressure, the geometry of

17  the air gap, et cetera, as to whether a visible arc would be

18  formed.  Clearly, it often would be formed, but I can't say

19  whether it would be formed in every scenario.

20  Q.  Okay.  I know the judge has a lunch meeting.  I want to      12:05:36

21  come back to where we started if I can ask two more questions.

22          If current -- if the 50,000 volt charge from Phase 1

23  did not reach the breakdown voltage for the air gaps presented

24  between the darts and the target, could the second phase,

25  second mode, 3,000 voltage charge, break down that air gap?      12:06:16

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1    A.  In the scenario that's envisioned in this patent, I think

2    the answer is no.  If 50,000 wasn't enough to achieve breakdown

3    of the air gap, 3,000 would not be able to achieve breakdown of

4    the air gap.

5           MR. HARRIS:  I think that's a good stopping point for      12:06:42

6    me, Your Honor.

7           THE COURT:  Okay.  Thank you.  We're going to take our

8    lunch recess.  Why don't we resume at 1:30.

9           Thank you.

10          (Recess from 12:06 p.m. until 1:35 p.m.)                   12:06:51

11          THE COURT:  Thank you.  The record should reflect the

12   presence of counsel and representatives here.  We may resume

13   where we left off.

14          Professor, if you don't mind taking the stand.

15          You may resume your cross-examination.                     13:35:52

16   BY MR. HARRIS:

17   Q.  Dr. Rodriguez, I think we were talking about the '295

18   patent that is tabbed at Number 21 in the notebook.  And just

19   before lunch, I apologize, I didn't hold my hand over my ear

20   and a lot of what I learned this morning leaked out.  But just   13:36:13

21   over lunch we were talking about the breakdown threshold and

22   the cascade effect that will follow from the ionization to lead

23   to this dramatic decrease in impedance.

24          Do you recall that?

25   A.  Yes.                                                         13:36:35

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1   Q.  Column 17 of the '295 patent has some discussion using the

2   word "breakdown," and I want to find out if it's being used in

3   that same sense that we were talking about just before lunch.

4   At the bottom of Column 17, there's a paragraph numbered 2.

5          Do you see where I am?                                    13:37:02

6   A.  Yes.

7   Q.  And it begins -- it's talking about the T1 to T2 time

8   period.  And this is when Capacitor 1 is discharging.  Okay?

9   This is the high voltage mode.

10         Do you understand that?                                   13:37:18

11  A.  Yes.

12  Q.  It talks about the circuit that is being formed, and it

13  says, "T1 to T2, Gap 1 has switched on allowing C1" -- that's

14  the capacitor, correct?

15  A.  Yes.                                                         13:37:37

16  Q.  -- "to pass a current through the primary winding of the

17  high voltage spark transformer, T2, which causes the secondary

18  voltage across E1 to E2 to increase rapidly.  At a certain

19  point, the high output voltage caused by the discharge of C1

20  through the primary transformer winding will cause voltage      13:37:59

21  breakdown across Gap 2, across E1 to E2 and across Gap 3."

22         Do you see that?

23  A.  I see that.

24  Q.  If we refer to -- it refers to a number of figures there,

25  just above where the numbered paragraphs start, it says         13:38:21

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1    illustrated in Figures 21 to 24 based on the time periods in

2    Figure 26.  I'm trying to figure out if these gaps that they

3    are talking about are the same gaps between the target and the

4    electrode or whether these are spark gaps internal to the

5    circuitry.                                                    13:39:08

6          Do you know the answer?

7    A.  Well, do you want to focus on one particular figure?

8    Q.  Let's try Figure 24.

9    A.  In Figure 24, it appears that Gap 1, Gap 2, and Gap 3 are

10   spark gaps that are internal to the circuit.                 13:40:05

11   Q.  Okay.  So it would be this reference to across E1 to E2

12   referring to the two electrodes that would have to address any

13   air gap that may exist?

14   A.  That's the way it appears, yes.

15   Q.  Okay.  The next sentence after what I just read says, "This  13:40:23

16   voltage breakdown completes the secondary circuit current path

17   allowing output current to flow."

18          What does that mean?

19   A.  The secondary circuit is referring to the path at the

20   secondary windings of the transformer.  So there's a, I guess,  13:40:53

21   a transformer T1 in the figure, the coil, has a primary side

22   and a secondary side.  In this figure, the primary side is on

23   the left and the secondary side is on the right.  And so the

24   secondary circuit current path is the path formed through the

25   coil on the right-hand or secondary side of that transformer.  13:41:25

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1    Q.   And then through the electrodes and through the target?

2    A.   Yes.

3    Q.   Okay.  So it would have to have crossed any air gap in

4    order for current to flow, correct?

5    A.   The figure doesn't explicitly show an air gap and a target,      13:41:41

6    but I'm assuming that in the context of the rest of this patent

7    it's understood that there is a target there as the load, along

8    with an air gap or two air gaps around that load.

9    Q.   So where it refers to voltage breakdown there, this voltage

10   breakdown completes the secondary circuit current path allowing      13:42:09

11   output current to flow.  Is that the dramatic reduction in

12   impedance, is that what they are referring to as voltage

13   breakdown there?

14   A.   That's my understanding.

15   Q.   Okay.  So with that background, if we look back to Figure        13:42:24

16   6, again, this drop in the voltage associated with Time 2 that

17   we have talked about already, I just want to make sure I

18   understand, that drop is a consequence of the voltage

19   breakdown?

20   A.   Yes.  And while we're talking about it, I should clarify         13:43:04

21   that this Figure 6 is a very rough illustration of the voltage

22   wave form.  And that Figure 17 shows a slightly more precise

23   illustration where that drop is not quite as sharp as Figure 6

24   indicates.

25   Q.   Okay.  I'm looking at Figure 17.  And in this case, the          13:43:44

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1    drop is below the zero point rather than above the zero point

2    showing an opposite polarity?

3    A.  Correct.

4    Q.  But for our purposes, it doesn't matter whether the

5    polarity of the voltage was positive or negative, it will still          13:44:04

6    create the ions?

7    A.  That's correct.  The current will be flowing a different

8    direction.

9    Q.  Okay.  And this Figure 17 shows -- well, where is the point

10   T2?  Is that on the axis of Figure 17, or is it where the line          13:44:26

11   crosses the axis here?

12   A.  Well, again, this is a sketch rather than an actual wave

13   form plot.  T2 is near the origin, near that vertical axis.

14   Q.  Okay.  So this would show that there's some voltage

15   continuing to drop into this second mode, the T2/T3 time          13:44:56

16   period, correct?

17   A.  That's my understanding.

18   Q.  And it actually crosses zero because of the structure of

19   the specific circuitry associated with this timing diagram,

20   correct?          13:45:13

21   A.  Correct.

22   Q.  But the fact that the voltage crosses zero doesn't affect

23   its ability to create or maintain an ionized path, does it?

24   A.  If the voltage is at zero only for a very short time, then

25   that does not affect the ionization in the air gap.          13:45:35

UNITED STATES DISTRICT COURT

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1   Q.  And referring back to Figure 6, which, as you have said, is

2   somewhat simplified, in comparison to Figure 17, Figure 6 shows

3   the two modes, the high voltage first mode and the lower

4   voltage high current second mode as being contiguous, correct?

5   A.  It does show that.                                        13:46:06

6   Q.  Okay.  Is there something in Figure 17 that shows any break

7   in continuity between the first mode and the second mode in

8   terms of maintaining that current flow?

9   A.  Well, in -- yes.  In figure 17, there is a transition

10  period between what we've been calling the first mode and the  13:46:35

11  second mode.  The first mode in Figure 17 is presumably

12  before -- at a time before this graph begins.

13  Q.  So it's not shown?

14  A.  Not shown.  Okay.  And just immediately prior to T2, it's

15  clearly experienced some transition from minus -- the original  13:47:03

16  minus 50 kilovolts, to the voltage that this graph begins at,

17  which is approximately minus 40 kilovolts.

18  Q.  Right.

19  A.  So there is a transition period there before you reach this

20  T2 instant, and again, there's a further transition before you   13:47:25

21  experience the polarity reversal before this voltage crosses

22  zero.

23  Q.  Okay.

24  A.  So the second mode is experienced a short time following

25  that first mode.                                               13:47:47

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1  Q.  Is there anything in Figure 17 that shows that there is a

2  period at T2, the transition from the first mode to the second

3  mode, at which no current is flowing?

4  A.  No.  There's nothing in Figure 17 that shows that no

5  current is flowing.                                        13:48:20

6  Q.  Are you aware of anything in the patent that describes a

7  period intervening between T1 and T2 during which no current

8  flows?

9  A.  Let me take a moment to modify my prior answer.

10       There is one instant in Figure 17 where there's no      13:48:40

11  current flowing, and that's the instant where this voltage

12  waveform crosses zero.  So that would be one instant where

13  there is no current flowing to the target.

14  Q.  Okay.  I didn't want to interrupt you.

15       But that current crosses through zero after T2,          13:48:59

16  correct, according to Figure 17?

17  A.  According to Figure 17, that zero crossing is after T2.

18  Q.  So that instant, however long, is in -- is during the

19  second mode, correct?

20  A.  If you define the second mode to begin at T2.            13:49:22

21  Q.  Okay.  It's taking longer than I intended because my

22  computer timed out.

23       I have several excerpts from Exhibit 295 that I have

24  put on the screen, so it's a little easier to follow them.  And

25  I want to ask you questions about these.                    13:50:07

UNITED STATES DISTRICT COURT

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1         At the bottom of each screen I have given the location

2    of this language in the patent.  If you want to check or prefer

3    to use the patent, that would be fine with me.

4         Column 2, Lines 59 to 66, there's a discussion about,

5    again, this breakdown created by the 50,000 volts.  And it says      13:50:31

6    "The air is ionized.  A blue electric arc forms between the

7    electrodes and current begins flowing between the electrodes E1

8    and E2."

9         Do you see where I'm reading from?

10   A.  Yes.                                                             13:50:58

11   Q.  Do you disagree that that's what occurs during the

12   breakdown resulting from the application of high voltage in

13   Mode 1?

14   A.  Well, first, this statement appears in the background of

15   the invention and is discussing how the M26 weapon operates.        13:51:17

16   So this isn't -- my understanding is that this is not

17   necessarily describing the way the claimed invention is

18   intended to operate.

19   Q.  Well, let me step back and ask you a little bit about the

20   claimed invention, because Mr. Campbell spent some time on          13:51:43

21   that, and I think I agree with him.  But let me make sure that

22   I understand the same way you do.

23        The prior art already allowed stun guns that had a 50

24   volt charge.  It was already known that that 50 kilovolt charge

25   could break down an air gap between a dart and a target,            13:52:11

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1   correct?

2   A.  That's my understanding.

3   Q.  Okay.  That wasn't the invention here that was being

4   claimed.  Just by itself, that wasn't the invention, correct?

5   A.  Correct.                                                    13:52:24

6   Q.  The enhancement here, as I understand it, is that once you

7   create that breakdown and you have a low impedance condition,

8   then you have a second mode which allows you to use less power

9   and have advantages in terms of batteries required, how the

10  circuitry is designed.  That second mode at a low voltage high   13:52:52

11  current is an important part of this invention, correct?

12  A.  Yes.

13  Q.  So the fact that a prior art gun used the 50 kilovolt

14  charge to complete the circuit for an electrode that doesn't

15  have physical contact with the skin, that was something that    13:53:19

16  was already known as far as you know, correct?

17  A.  Yes.

18  Q.  And that's what it's talking about here in Column 2, line

19  59 to 66?

20  A.  Yes.                                                         13:53:28

21  Q.  Okay.  And it's this same technology that causes the

22  breakdown of the high impedance during the first mode of what's

23  being described in Claim 2, isn't it?

24  A.  I don't feel comfortable going so far as to say it's the

25  same.  It's a similar phenomenon.  What's being claimed in this   13:53:50

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1    patent, in the claims that are at issue today, doesn't

2    explicitly refer to creating this arc.

3    Q.  If you create a plasma and you have crossed the breakdown

4    threshold, whatever that is for the gap in the circuit, do you

5    know of any way to prevent the arc from occurring once the          13:54:22

6    plasma condition has been established?

7    A.  Well, again, whether or not a visible arc appears is going

8    to depend on many factors.  So when you ask how would you

9    prevent it, well, it may not occur naturally anyway if you have

10   the right conditions.  Even if there is an -- a visible arc       13:54:53

11   that does get formed, it has been well documented in the

12   literature that you can have a streaming arc that perhaps only

13   spans half of the gap and doesn't reach the other electrode

14   depending upon the density of ions within the gap.

15         So yes, you could have a scenario where current is          13:55:23

16   flowing across the air gap and there is no visible arc.

17   Q.  Okay.  Since our proposed claim construction doesn't

18   require a visible arc, I want to talk about an electrical arc.

19   Okay?

20         Can you have a condition where the plasma state has         13:55:47

21   been created by the application of high -- discharge of high

22   voltage and current, the impedance drops because that's what's

23   contemplated in Mode 1, and -- and, further assume, that you're

24   going to have a low voltage high current condition in Mode 2.

25   Do you know of a way to get from the plasma state in Mode 1, to   13:56:25

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1   a low voltage high current condition in Mode 2 without an

2   electrical arc?

3   A.   Yes.

4   Q.   How?

5   A.   That has been documented.                                    13:56:41

6   Q.   How does that happen?

7   A.   You would have to consult with a physicist if you really

8   want to get into the details of how it happens.  But my

9   understanding, after recently doing a little further

10  investigation to confirm what I already believed, is that there  13:56:55

11  are situations where you can have breakdown occurring across an

12  air gap with current flowing, but no arc.

13  Q.   And that's an ordinary air gap.  We're not talking about 90

14  vnon or something.  We're talking about the air around us now.

15  A.   Again, I'm not a physicist, so I can't tell you precisely    13:57:24

16  what type of gas, what type of air pressure, et cetera, what

17  type of geometry of the air gap would be required in order to

18  produce such a situation.  But my understanding is it's been

19  reported in the literature.

20  Q.   And where could I find that if I was looking for it?         13:57:46

21  A.   One such reference that I am familiar with is the book that

22  I cited in my report on spark discharge.

23  Q.   E.M. Bazelyan, B-A-Z-E-L-Y-A-N, and U.P. Raizer,

24  R-A-I-Z-E-R spark discharge?

25  A.   Correct.                                                     13:58:21

UNITED STATES DISTRICT COURT

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1  Q.  And do you recall wherein that treatise that information

2  was?

3  A.  I don't recall a specific page number.

4  Q.  Okay.  Incidentally, while we're thinking about it, that

5  was in Exhibit B to your report, that citation to that                    13:58:43

6  treatise.  Exhibit B also refers to the S-200 owner's manual

7  and the S-200 training manual.

8        Did you make any use of the S-200 manuals in forming

9  your opinions for claim construction?

10 A.  I did not.                                                            13:59:08

11 Q.  The same Exhibit B also refers to the file history of seven

12 patents.  Do you recall why you reviewed the file history of

13 two patents that are not at issue here?

14 A.  Those file histories were provided to me.  I suppose

15 initially, they believed all those patents might be at issue.              13:59:39

16 Eventually, I learned that it was just these three patents that

17 were at issue for this hearing.  And so those are the patent

18 histories that I focused on.

19 Q.  Okay.  Turning, again, to the language on the screen that

20 talks about the breakdown and the formation of an ionized air,             14:00:06

21 a blue arc and current flow, am I correct that there's current

22 flow in the first time period or the first mode when the high

23 impedance air gap is broken down?

24 A.  To clarify your question, the first mode, are you asking

25 about during the first mode or are you asking about when the               14:00:52

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1    air gap incurs breakdown?

2    Q.  I like your question better.  When does the air gap incur

3    breakdown?

4    A.  The air gap incurs breakdown when the voltage applied

5    reaches a sufficiently high level that you formed enough ions          14:01:21

6    in the gap and consequently a rich enough supply of free

7    electrons that you get, effectively, a short circuit across

8    that air gap resulting in current flowing through the air gap.

9    Q.  Okay.  So part of the breakdown would be current flow?

10   A.  Yes.                                                              14:01:57

11   Q.  All right.  And the last sentence of what is on the screen

12   says, "As soon as stun gun output terminals E1 and E2 are

13   presented with a relatively low impedance load instead of the

14   high impedance air gap, the stun gun voltage will drop to a

15   significantly lower voltage level."                                   14:02:19

16          Is that just a law of nature?

17   A.  Yes.

18   Q.  And is it also true that the voltage and current are

19   inversely related here, so that the current is likely to go up

20   in that situation?                                                    14:02:40

21   A.  The relative behavior between voltage and current has two

22   different states.  Prior to voltage breakdown of your air gap,

23   it acts in a traditional linear fashion in accordance what is

24   known as Ohm's law, and voltage is proportional to current.

25   Once you achieve breakdown of the air gap, things change.  You       14:03:14

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1   end up with a non-linear phenomenon where you have a inverted

2   relationship between voltage and current.

3   Q.  So in simple terms, because it's inverted, as the voltage

4   reduces the current would increase?

5   A.  Yes.  After breakdown as voltage is decreased, current is      14:03:40

6   increased and vice versa.

7   Q.  And that's not because of any specific circuitry, that's

8   because of the way impedance works in nature, correct?

9   A.  That's because of the way the impedance works in an air gap

10  after voltage breakdown.                                           14:04:01

11  Q.  When you were being questioned, Mr. Campbell was asking you

12  about Claim 40.  But I agree with his characterization that the

13  language of Claim 2, for our purposes, is the same.

14       I have on the screen the language from Claim 2 that

15  relates to the high voltage first mode.  And do you agree that    14:04:39

16  at least one purpose of this high voltage first mode is, as

17  indicated by the underlying language, to enable current flow

18  across the air gap at a lower voltage level?

19  A.  That's a consequence of ionizing the air.  The primary goal

20  as stated in this claim is to ionize the air, and that            14:05:12

21  consequently enables the current flow at a lower voltage.

22  Q.  And ultimately, what you want from this stun gun is to

23  disable the target with that current flow at a lower voltage,

24  correct?

25  A.  Yes.                                                          14:05:32

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1    Q.  Do you recall from the patent that there is a reference

2    that defines the discharge of C1 as the arc phase?

3    A.  I believe I do.

4    Q.  It's at Column 16, Lines 48 to 49.

5            And then it refers to the discharge in the second mode    14:06:28

6    as the stimulation phase, correct?

7    A.  Yes.

8    Q.  Do you disagree with that characterization?

9    A.  I agree that's the characterization that they provided.

10   Q.  The second mode in Claim 2 talks about generating a lower    14:07:07

11   voltage output across the first and second electrodes.

12           Do you see that?

13   A.  Yes.

14   Q.  And indeed, we have the same language with regard to the

15   first mode, except instead of low voltage it's talking about    14:07:30

16   generating a high voltage short duration output across the

17   first and second electrodes.

18           Is it common to refer to voltage as an output across a

19   distance -- or let me put it another way -- an output across

20   two points?    14:07:53

21   A.  Yes.

22   Q.  Okay.  Finally, Mr. Campbell asked you some questions about

23   this issue of maintaining the current, and he correctly noted

24   that for our proposed claim construction we have referred to

25   Column 6, Lines 16 to 23 of the 295 patent.    14:08:33

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1              Do you agree that the referenced material in the

2     patent, which is not in the claim but in the specification of

3     the patent, refers to "continue and maintain the previously

4     initiated discharge across the arced over air gap"?

5     A.  Yes.  That's what it says.                                    14:09:06

6     Q.  Okay.  And at least with regard to the two patent drawings

7     that we have looked at, Figure 6 and Figure 17, I believe you

8     referred me to, in both of those cases, in fact, at least as

9     far as those figures are concerned, there was a discharge

10    across the arced over air gap at T2, the dividing point between  14:09:28

11    the first mode and the second mode.  Correct?

12    A.  No.

13    Q.  How is that not correct?

14    A.  Those figures don't refer to an arc.

15    Q.  And neither did I.  I referred to a discharge.  Let me        14:09:49

16    change what I said then.  I didn't mean to refer to the arc.

17             Is there a discharge across the electrodes to the

18    target and back so that we have a complete circuit at T2, the

19    dividing point between the first mode and the second mode in

20    the two referenced figures?                                      14:10:16

21    A.  There is a discharge to the target during the first time,

22    during the first mode and the second mode.  The only time where

23    there may not be a discharge would be in some transition period

24    between those two modes, or during that instant as shown in

25    Figure 17 when the voltage happens to cross exactly zero.        14:10:52

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1    Q.  And is there anything that you are aware of in the patent

2    that says you don't have to have these two modes contiguous,

3    you can wait for some defined period of time before starting

4    the second mode?

5    A.  The word "subsequently" is used in the claim language, and    14:11:14

6    so that's one indicator that gives me that belief.  But on the

7    other hand, I didn't see anything that would lead me to believe

8    that the claim intends to restrict itself to having the two

9    modes be contiguous in time.

10   Q.  Okay.  And would you agree with me that "subsequent"    14:11:41

11   certainly would include "contiguous"?

12   A.  Yes.  Of course.

13   Q.  Okay.  May I approach and have an exhibit marked, Your

14   Honor?

15           THE COURT:  You may.    14:11:58

16           MR. HARRIS:  If you could give that to the witness.

17   Thank you.

18           THE COURTROOM DEPUTY:  Defendant's 1.

19   BY MR. HARRIS:

20   Q.  As we mentioned just a couple minutes ago, Exhibit B to    14:13:10

21   your report identified what you had reviewed, including the

22   file history for the '295 patent.  And what I have marked as

23   Exhibit 1, actually, what the clerk has marked, is an

24   Information Disclosure Statement that was filed by Taser in the

25   prosecution of the '295 patent.  And I have not included all of    14:13:36

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1    the pages attached.  As you can see from the numbering, the

2    attachments were extensive.  But I have included three pages

3    that were attached from the product literature for the Taser

4    product.

5         Is this something that you reviewed at all in                    14:14:04

6    connection with the file history?

7    A.  Well, I won't be able to recall specifically whether these

8    specific pages were ones that I dwelled upon.  What I was

9    provided with was an electronic form of the file history.  It

10   was quite long.  But I will take your word for it.                    14:14:25

11   Q.  Okay.  The next to last page says at the top, X26 advanced

12   features, and then it has two paragraphs describing their

13   shaped pulse technology.  I want to focus on the second

14   paragraph that talks about the arc phase.

15        Exhibit 1 says in the second sentence of the second            14:15:04

16   paragraph, "The arc phase is a very high voltage, short

17   duration pulse that can arc through up to two inches of

18   clothing or barriers.  Once the arc is created, the air in the

19   arc is ionized and becomes a low impedance electrical conductor

20   that conducts the second pulse phase into the body."                  14:15:24

21        Did I read that correctly?

22   A.  I believe so.

23   Q.  Is that an incorrect statement of what happens?

24   A.  Yes.

25   Q.  Go on.  It's your testimony that what happens is ionization     14:15:36

UNITED STATES DISTRICT COURT

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1    comes first, then what?  Is there then current flow without an

2    arc, or it could be an arc might not be an arc?

3    A.  Yes.  The ionization state is achieved first, which creates

4    the supply of free electrons.  Those free electrons begin

5    moving, which is current.  The movement of these electrons is          14:16:17

6    manifested as current.  So we define it as current.

7            Eventually, with a margin of voltage, that initially

8    smaller current will grow to form a strong current coinciding

9    with what we call breakdown, achieving a low impedance state.

10           The arc, on the other hand, may or may not form, may          14:16:52

11   or may not form over the entire gap, and could happen at any

12   point once you have electrons freed and moving.

13           MR. HARRIS:  If I could have just a moment, Your

14   Honor, I think I'm done.  I'd like to check with my colleague.

15           THE COURT:  You may.                                          14:17:22

16   BY MR. HARRIS:

17   Q.  I don't want to belabor this longer than two questions.

18           Once a plasma state is created, if I understand

19   correctly, that is characterized by a large number of ions and

20   electrons available in the air gap to carry current?                  14:18:21

21   A.  Yes.

22   Q.  Isn't it at least possible that some of those ions and

23   electrons will find each other and recombine?

24   A.  Absolutely.

25   Q.  And that would emit a photon, if I understand the physics         14:18:43

UNITED STATES DISTRICT COURT

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1   of this combination correctly?

2   A.  Most definitely.  Once you have a plasma, there will be

3   collisions between electrons and ions that will emit photons.

4   The question is how many photons per microsecond, let's say,

5   are being emitted.  Is it sufficient quantity to produce a            14:19:06

6   visible arc, and what's the wavelength of that arc.  Is it

7   within our visible spectrum.  There's some wavelengths we can't

8   see with our human eyes.

9   Q.  Which simply means, in lay terms, there could be photons

10  and a wavelength that we can't see that are being emitted?           14:19:27

11  A.  Exactly.

12          MR. HARRIS:  That's all I have, Your Honor.

13          THE COURT:  Any redirect?

14          MR. CAMPBELL:  No thank you, Your Honor.

15          THE COURT:  I have just a few questions, if you don't         14:19:40

16  mind.

17          And the last question here touched on one of them.

18                          EXAMINATION

19  BY THE COURT:

20  Q.  You referred to visible arc.  Does visible arc imply that        14:19:52

21  there's always an arc, it's just not visible, or -- well, I

22  guess I'd like for you to kind of detail, if you could, your

23  use of the term "visible arc."

24  A.  To me, an arc and a visible arc are synonymous.  I have

25  been emphasizing the word "visible" because I don't want there       14:20:19

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1   to be a misunderstanding.

2         In this plasma, there will be photons being emitted,

3   definitely, all the time.  So do we call that an arc or not?

4   So, you know, there is -- if there are photons or light being

5   emitted, one might call that an arc.  But to me, an arc has a        14:20:46

6   more specific meaning.  It's -- it provides -- it implies a

7   concentration of light or photons along a narrow path across

8   the air gap that would be visible as what we know of as an arc.

9         To me, if there are photons being emitted that we

10  can't see because there's not enough of them, I would not call     14:21:29

11  that an arc.  For example, in this very room, right now, there

12  are photons buzzing all around us but I wouldn't call that an

13  arc.  I don't -- I would not say there's an arc present in this

14  room right now, although there are plenty of photons which we

15  see as light.  So that's how I distinguish the two.  To most,      14:21:58

16  an arc is a highly concentrated line or filament of photons.

17  Q.  And so do the claims in question only contemplate, or do

18  they contemplate visible arcs, or do they contemplate both

19  visible and non-visible arcs, which is, I guess, is just the --

20  or does a current flow require an electric arc visible or          14:22:32

21  non-visible?

22  A.  To me, the claims don't -- well, Claim 1, for example,

23  requires an arc.  There, my opinion is that that could -- that

24  could be a visible -- well, it doesn't characterize it one way

25  or another.  But to me, an arc is going to be a highly             14:23:13

UNITED STATES DISTRICT COURT

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1   concentrated filament of photons rather than just random

2   photons being emitted that needs to be in such a high

3   concentration that it would be seen as a strong narrow

4   filament.

5          It's possible that could occur at a wavelength that's          14:23:36

6   not visible to the human eye in which case if you had a proper

7   instrument to view this, in, for example, the infrared region

8   or ultraviolet region, there you might see an arc formed even

9   though it's not visible to the human eye.

10  Q.  Let me put it a different way:  Can you have a current flow   14:24:00

11  without an electric arc visible or non-visible?

12  A.  Yes.  Of course.

13  Q.  It's just, I guess, a different way of asking a lot of the

14  same questions, and please forgive me if this is repetitive.

15  But if an electrical arc is formed by using high voltage, would   14:24:35

16  that arc continue to exist if the voltage was lower but not

17  completely cut off?

18  A.  It could continue, or at some point when the voltage is

19  lowered enough, it will, of course, cut off.  So there will be

20  some threshold.  You can certainly, as this invention teaches,   14:25:01

21  you can lower the voltage and continue to maintain an arc as is

22  pointed out in Claim 1.

23         But when you lower the voltage too much, the arc will

24  extinguish.  When you lower the voltage even more, your

25  ionization will extinguish and then you have to start over       14:25:29

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1   again to achieve breakdown of the air gap.

2   Q.  So the purpose for the ionization of the air gap is not

3   necessarily to create an arc?

4   A.  Exactly.  The purpose for the ionization in this first mode

5   is not to create the arc, it's to get this air gap into this          14:25:52

6   weak state so that current can flow through it.  Normally,

7   current can't flow through air.  So the whole goal in the first

8   mode is to achieve ionization so that you get low impedance,

9   thereby allowing current to flow.  That's the key.  You don't

10  need an arc one way or another in order for this weapon to             14:26:19

11  operate.  It might be a consequence.  It might be a byproduct.

12  A particular weapon may, according to this invention, very

13  well, may always arc when there's current flowing.

14         But this particular claim, these claims at issue,

15  don't specifically require an arc.  The whole purpose for that         14:26:39

16  first mode is just to get the air gap into this low impedance

17  state so that current can flow to the target.

18  Q.  And simply because there is reference to an arc, I guess,

19  in the specification, which is what the defendants focus on, I

20  guess I do have another question.                                      14:27:00

21         For purposes of this patent, would lowering the

22  voltage to the second mode continue the arc if it was formed in

23  Mode 1?

24  A.  It might or it might not.  I could imagine both scenarios

25  being possible.                                                        14:27:25

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1   Q.  And so if there's just a current flow, would there

2   necessarily be a break in the current between Modes 1 and 2?

3   A.  No.  Not necessarily.  Could be, could not be.  If there is

4   a break in the current flow -- well, if -- it's possible that

5   there could be a break which I'm interpreting as a substantial          14:27:50

6   reduction in the current but still be able to maintain that

7   ionization state in which case you could then provide that

8   lower voltage in the second mode and have the current continue.

9   Q.  Does the voltage matter?  Is it just any current regardless

10  of the voltage between 1 and 2, the intervals.  It just needs         14:28:39

11  to be some current that exists?

12  A.  I'm not sure I understand your question.

13  Q.  Well, I think I just asked you if there would always be a

14  current flowing between Modes 1 and 2.  And I guess, is that --

15  how relevant is the voltage at that point?                            14:28:59

16  A.  In my opinion, there is not a specific voltage that has to

17  be maintained in that transition period.  And there's not a

18  specific current that must be maintained in that transition

19  period between Mode 1 and Mode 2.  The important thing is to

20  not wait too long before hitting the air gap with that second        14:29:24

21  voltage.  If you wait too long, then your ions start

22  disappearing.  But the ionization can remain there, even in the

23  absence of a continued applied voltage or current.

24  Q.  So when Claim 2 says maintain the current flow, do you take

25  that to mean maintain the current flow that was established in        14:29:54

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1    claim 1?

2    A.  No.  I guess when I read that, I understood that to mean

3    maintain it during the second mode.

4    Q.  So -- and is voltage relevant to maintaining the current

5    flow?                                                          14:30:21

6    A.  Yes.  In Mode 2, you would not be able to maintain the

7    current flow unless there was a voltage applied.

8    Q.  And does it have to be the same that was in Claim 1?

9    A.  In Mode 1?  No.  The whole point is in Mode 2, you can

10   apply a lower voltage and still be able to maintain the current  14:30:44

11   flow.

12   Q.  But I thought you said there would always be a current flow

13   between Modes 1 and 2.  Is that correct, just a different

14   possible voltage.

15   A.  Let me elaborate on that a little bit.  What is current   14:31:15

16   flow?  In this air gap, there are many free electrons.  They

17   are not frozen in space, they are moving around.  So at one

18   level, one could say that there is current because these

19   electrons are bouncing around, okay.

20          If that current is not consistent, in a constant       14:31:51

21   direction, if they are not all moving in the same direction

22   toward the target, one would say that there's no -- that there

23   is no current, there's no useful or effective current going to

24   the target, even though the electrons are bouncing around

25   within this air gap, okay.                                     14:32:15

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1    So in the transition between Mode 1 and Mode 2, it's

2    possible that there is a very brief moment where there's no

3    overall current going to the target, or maybe a very minimal

4    current but yet there's still motion of the electrons within

5    the air gap.  So within the air gap, you could talk about tiny    14:32:41

6    little currents flowing within the air gap.

7        So it's a complicated scenario.  I'm trying to keep it

8    simple.  But the point is, in my opinion, there is no

9    requirement that you continue a voltage or continue a current

10   during the transition between Mode 1 and Mode 2.  Once you have   14:33:11

11   ionized the air and achieved this low impedance air gap, then

12   even if you wait some microseconds later before applying that

13   lower voltage in Mode 2, you can still restart the flow of

14   current to the target.

15   Q.  And that's what my question is trying to understand, is the   14:33:38

16   connection or relationship of the current flow in Mode 2 and

17   its relationship to Mode 1.  So I guess is the current flow in

18   Mode 2, at least, is it initialized by the voltage input in

19   Mode 1, and is that how it's maintained?

20   A.  It's made possible by the voltage in Mode 1.  High voltage    14:34:08

21   in Mode 1 sets the stage.  It breaks down this air gap, into

22   this low impedance state so that in Mode 2, you are able to

23   apply a lower voltage to achieve current flow to the target.

24       THE COURT:  Thank you very much.

25       Do any of you have any questions based on my    14:34:42

—May 7, 2008 - Markman Hearing - Testimony of Tom Saliga—

1    questions?

2           MR. CAMPBELL:  No, thank you, Your Honor.

3           MR. HARRIS:  No, Your Honor.

4           THE COURT:  Thank you.  You may step down.

5           MR. CAMPBELL:  Your Honor, in view of the time I think    14:34:54

6    we'll just reserve any rebuttal comments we may have and pass

7    the podium to Mr. Harris.

8           THE COURT:  All right.

9           MR. HARRIS:  Stinger calls Tom Saliga.

10          THE COURT:  Please come forward and be sworn, sir.    14:35:18

11          THE CLERK:  Would you please spell your name for the

12   record?

13          THE WITNESS:  First name Tom.  Last name is spelled

14   S-A-L-I-G-A.

15          THE COURTROOM DEPUTY:  Thank you.    14:35:26

16                       TOM SALIGA ,

17   called as a witness herein, having been duly sworn, was

18   examined and testified as follows:

19                     DIRECT EXAMINATION

20   BY MR. HARRIS:

21   Q.  Mr. Saliga, did you attend college?

22   A.  Yes, I did.

23   Q.  And where did you attend college?

24   A.  I got my Bachelor's and Master's degree at the University

25   of Maryland.    14:36:08

─────May 7, 2008 - Markman Hearing - Testimony of Tom Saliga─────

1   Q.  Did you take coursework towards a Ph.D.?

2   A.  Yes, I have.

3   Q.  Did you complete that Ph.D. program?

4   A.  No.  I stopped purposely about three courses before

5   completing.                                                      14:36:20

6   Q.  Why did you stop?

7   A.  Well, in my profession, I found that I couldn't get to do a

8   lot of the really interesting work down at the -- how shall I

9   say -- low level circuit design.  If you had a Ph.D. they

10  thought they had to pay you too much and they had to put you     14:36:33

11  off into the more R&D type of work.  So I stopped

12  three-quarters, approximately, short and a thesis.

13  Q.  I take it your degrees related somehow to circuit design?

14  A.  My coursework emphasis, graduate and post-graduate, were

15  primarily on communications, biomedical electronics.            14:36:57

16  Q.  And you have electrical engineering-related degrees?

17  A.  Yes.  They are all electronics engineering, yes.

18  Q.  And I take it you have been involved in circuit design

19  professionally since you obtained those degrees?

20  A.  Before and since, yes.                                       14:37:16

21  Q.  How long have you been involved in electronic circuit

22  design?

23  A.  You mean at a hobby level or at a professional level?

24  Q.  Where someone paid you to do it.

25  A.  Right.  So I started actually practicing as a junior design  14:37:28

—— May 7, 2008 - Markman Hearing - Testimony of Tom Saliga ——

1    engineer while I was working at John Hopkins Applied Physics

2    Lab in about 1958/59 doing summer program work.  And then I got

3    my degree in 1962 and started practicing again at John Hopkins

4    University Applied Physics Lab in the telecommunications arts

5    and went on from there.                                      14:38:06

6    Q.  Now, you have been engaged by Stinger in connection with

7    this litigation, correct?

8    A.  Yes.

9    Q.  You were previously engaged by Stinger, in fact, to do

10   engineering work for their product, correct?              14:38:17

11   A.  Yes.

12   Q.  Has that experience influenced in any way the opinions that

13   you have rendered here?

14   A.  No.  No.  These are purely technical opinions.

15   Q.  I have had marked and placed in front of you Exhibit 2.   14:38:36

16        This is a supplemental report that you provided on

17   April 24th.  Is that your signature on the last page?

18   A.  Yes, it is.

19   Q.  And above your signature on the last page are the

20   definitions that you have proposed for the claim terms in    14:39:03

21   dispute today, correct?

22   A.  Yes.

23   Q.  The first of those definitions relates to, "ionize the air

24   within the gap"?

25   A.  Yes.                                                      14:39:17

—————May 7, 2008 - Markman Hearing - Testimony of Tom Saliga—————

1  Q.  And what do you propose as the definition for that term in

2  the Claims 2 and 4 -- I'm sorry -- Claims 2 and 40 of the '295

3  patent?

4  A.  Well, I think, as already been highlighted earlier today,

5  once you pass the breakdown voltage in the air gap due to an          14:39:36

6  applied high voltage potential, you begin to --

7  Q.  Let me stop you there, because my question is really -- I

8  want to start with what do you think it means, and then we'll

9  get to why.  Okay?

10 A.  Well --                                                            14:39:55

11 Q.  Is the statement on the last page of Exhibit 2, ionize the

12 air within the air gap means the high voltage, quote, "Forms an

13 electrical arc having ionized air within the air gap to enable

14 current flow across the air gap," close quote.

15       Is that your opinion?                                            14:40:13

16 A.  Yes.

17 Q.  And why did you reach that opinion?

18 A.  Well, basically, in the context of this stun gun

19 application, if you don't ionize the air sufficiently to form a

20 highly conductive path which automatically leads to arc-type          14:40:26

21 conditions, then the gun doesn't work and the whole thing is

22 null and void, the whole patent, really.

23 Q.  You understand that the Taser patent relates to a two-mode

24 technology, high voltage and low voltage?

25 A.  Yes.                                                               14:40:43

UNITED STATES DISTRICT COURT

May 7, 2008 - Markman Hearing - Testimony of Tom Saliga

1   Q.  Do you have experience with high voltage current?

2   A.  Yes.

3   Q.  Do you have experience creating ionization for purposes

4   other than reducing a high impedance?

5   A.  Yes.                                                    14:41:04

6   Q.  What other circumstances are there where you create

7   ionization but you are not trying to reduce a high impedance?

8   A.  Well, in the business that I have, we're basically a small

9   group of consulting engineers, and we've had to design, gee,

10  over the past 20 years, I have designed way over 100 products.   14:41:27

11  One of the ones that's most relevant to our discussion today

12  is, for example, a high voltage product that I designed for a

13  client approximately about three years ago.  And it was an

14  ongoing project up until maybe a year, year and a half ago.

15       And basically, this is an electronic air cleaner as       14:41:47

16  was alluded to earlier by Dr. Rodriguez, and got very specific

17  experience in that air cleaner.  We have a number of electrodes

18  that go inside an air duct, and each of these electrodes,

19  they've got little fingers and little points sticking out, if

20  you will, and quite purposely by design, we ionize the air,     14:42:10

21  okay, between these electrodes that are in the air stream of an

22  air conditions system.

23       But what you don't do, don't want to do, is to break

24  down, okay, the ionized path, if you will, that exists between

25  these electrodes.  So it would be a good example of, yes, we    14:42:30

——May 7, 2008 - Markman Hearing - Testimony of Tom Saliga——

1   are applying a high voltage; yes, we are putting out small but

2   finite levels of currents.

3        And just to put a number on it, if I may, in this

4   particular design, we had one plate charged at minus 5,000

5   volts in this air cleaning device and another set of plates          14:42:47

6   that were charged at plus 5,000 volts again with respect to

7   earth ground, and the current levels that we quite purposely

8   set, and that were controlled, was set to approximately 10 to

9   15 micro amps for a three-foot-by-three-foot square air

10  section.                                                             14:43:14

11       So that's a good example of ionizing the air, but the

12  impedance was so high, in fact, if you take the 10 micro amps

13  or so that it was drawing and the 10,000 volts involved, I

14  think you will see that the impedance was up into the many

15  hundreds of megaohms if not thousands of megaohms.  So that's a      14:43:32

16  dramatically higher impedance than certainly what you would

17  need in the case of stun gun technology here.

18  Q.  Now, with regard to the ionized air filter, you did not

19  want to achieve a breakdown of that high impedance air gap?

20  A.  Yeah.  They would have fired me if it started arcing             14:43:52

21  because I would carbonize the electrodes and generate ozone,

22  and they wouldn't like that.

23  Q.  Now, you understand that with regard to the Taser patent,

24  the '295 patent it is an objective to complete a circuit from

25  the gun to the target across, if necessary, an air gap between      14:44:11

114

May 7, 2008 - Markman Hearing - Testimony of Tom Saliga

1  the electrode and the skin of the target.

2          Do you understand that?

3  A.  Yes.

4  Q.  And that air gap is the high impedance air gap?

5  A.  It is until you do a strong ionization, yes.                    14:44:25

6  Q.  And is it also your understanding that the 50,000 volts

7  that are applied during the first mode would be sufficient to

8  overcome that impedance and reduce it to a lower impedance?

9  A.  It's been my experience for air gaps in somewhere between,

10 say, one and one and-a-half inches with air at sea level,          14:44:49

11 50,000 to 55,000 volts is sufficient to begin the breakdown

12 voltage process such that the air becomes highly ionized

13 plasma, if you will.

14 Q.  Okay.  Now, tell me what happens when that breakdown

15 voltage is achieved.                                               14:45:11

16 A.  Things change very dramatically as was pointed out earlier

17 by Dr. Rodriguez.  In fact, if you look at the impedance at the

18 point where it's beginning to break down, and let me take, in

19 fact, this air cleaner as an example.  It's maybe 10 to 15

20 micro amps, very small current, suddenly as you get this         14:45:31

21 cascade, a chain reaction effect, if you will, where, as it was

22 described earlier, where there's this -- each of the whatever

23 stray ions might exist in the gap between the aforementioned

24 electrodes, now the electrons begin to pick up such a fast and

25 high velocity, if you will, that they smash into other atoms     14:45:58

UNITED STATES DISTRICT COURT

—— May 7, 2008 - Markman Hearing - Testimony of Tom Saliga ——

1   and that creates additional electrons and positive charge

2   carriers beyond what you initially had.  And it's just a very

3   rapid crescendo.  It's been my experience with actual

4   measurements on an oscilloscope in a laboratory that once you

5   reach that breakdown process the whole process crescendos in        14:46:19

6   somewhere in the order of 10 to 15 nanoseconds, so way under a

7   microsecond, limited only by the circuit parameters.

8          That process is -- it's -- in my judgment, there's no

9   practical machine that certainly I have ever been able to see

10  that could be made that -- in which you would have this sudden      14:46:39

11  and dramatic breakdown and not have a plasma basically develop.

12  It might be a small plasma.  It might be only a few photons

13  that come off, but indeed it is a current, very significant

14  current draw quite suddenly.

15         So you go from 10 micro amps up to whatever the              14:46:58

16  circuit limitations are, which are primarily determined by what

17  charge might be left in a stored capacitor that you may have

18  driving the circuit and the series stray inductance and

19  resistance.

20  Q.  I think there may have been some confusion in terminology       14:47:16

21  there.  Let me ask some specific questions.

22         In overcoming the high impedance, would you agree that

23  a plasma state is created?

24  A.  Yes.

25  Q.  And is it your understanding that Dr. Rodriguez agrees with     14:47:34

May 7, 2008 - Markman Hearing - Testimony of Tom Saliga

1   that based on his testimony today?

2   A.   I believe he did, yes.

3   Q.   Okay.  Now, when that plasma state is created, is that the

4   same thing as an arc?

5   A.   Well, I guess, as was suggested earlier, an arc might mean          14:47:51

6   different things to different people.  And I'm not even sure

7   that's a good term.  But I think we can, in a common parlance,

8   we can say that an arc to normal people would mean something

9   that's visible.

10          I might point out in our laboratory, when we were          14:48:12

11  doing some initial developments to the stun gun, we were

12  attempting to break down the air gap using a minimal amount of

13  energy, we could hear the little zap, you may say, doing a very

14  narrow pulse.  Couldn't see it.  We had to turn off all the

15  room lights which were comparable to light intensity here.  And          14:48:30

16  we could just barely see a little tiny blue, if you will,

17  spark, okay, arc, if you will, taking place due to this very

18  narrow tiny pulse.  But nonetheless, it did emit photons, and

19  in our case, at least, it was visible.

20  Q.   When the breakdown occurs, does current flow?          14:48:48

21  A.   Yes.  By definition you have got ions moving, and that, by

22  definition, is current.

23  Q.   And one manifestation of this breakdown is the voltage will

24  rapidly go down as we saw in Figure 6, correct?

25  A.   Yeah.  Negative resistance or negative impedance          14:49:12

───── May 7, 2008 - Markman Hearing - Testimony of Tom Saliga ─────

1   characteristic is set up by the plasma breakdown.  So any

2   available current voltage sources that are available in the

3   circuit due to stored capacitance, whatever the native source

4   impedance is of the generator, basically it will suck all the

5   energy out of it again and make this plasma more often than not          14:49:31

6   light up.

7   Q.  Do you agree with Dr. Rodriguez that there's an inverse

8   relationship as that voltage reduces due to the negative

9   resistance?

10  A.  Yes.  I'm sorry.                                                       14:49:45

11        THE COURT:  Hold on.  Just one of you speak at a time.

12  Hard enough.  So can you repeat your question, and let him

13  finish the question before you answer.

14        MR. HARRIS:   Okay.

15  BY MR. HARRIS:                                                            14:49:59

16  Q.  We have seen that there's a dramatic drop in impedance when

17  breakdown occurs in the high impedance air gap.

18  A.  Yes.

19  Q.  At that point, the voltage also goes down dramatically?

20  A.  Yes.                                                                  14:50:15

21  Q.  What happens to the current?

22  A.  Typically, the current will increase, and this inverse

23  relationship between voltage and current is commonly known in

24  the industry as a negative impedance or negative resistance.

25  Q.  Okay.  And that's due, in part, to Ohm's law?                         14:50:30

—————May 7, 2008 - Markman Hearing - Testimony of Tom Saliga—————

1   A.  No.  Ohm's law doesn't apply.  As Dr. Rodriguez pointed out

2   earlier, it's a very non-linear situation.

3   Q.  Okay.  Are you aware of any circumstance where current can

4   flow at the five volts or thereabout level of Mode 2 and

5   incapacitate a target if no arc occurred during the first mode?   14:51:06

6   A.  Well, kind of yes and no.  If our model, circuit model, is

7   that there is an air gap between the darts, okay, if we assume

8   that model, and in our standard model we use in our laboratory

9   I use a quarter inch gap for each of the darts, by the way.  If

10  we have that air gap there, and we have a typical human body   14:51:33

11  load, which, by the way, we model as approximately 500 Ohms,

12  okay, then when you first apply any voltage, substantially less

13  than in this case, 10,000 volts, there will not be enough

14  potential across the air gaps to cause this plasma breakdown

15  condition to exist.   14:52:02

16  Q.  Okay.  Do you know of any circumstances under which the

17  plasma condition will increase the flow of current?  And we're

18  looking now at the breakdown point at the end of first mode,

19  and an arc will not occur?

20  A.  Let me make sure I have got that quite correct.   14:52:24

21       You are saying at the point of breakdown, as, say,

22  some increasing voltage is being applied to an air gap.

23  Q.  Right.

24  A.  What was the next step?  I missed that.

25  Q.  You have the breakdown, and current flows.   14:52:45

—————— May 7, 2008 - Markman Hearing - Testimony of Tom Saliga ——————

1   A.   Correct.

2   Q.   Do you know of any circumstances where that can occur

3   without an electrical arc?

4   A.   Not in practice, no.  As was pointed out, I think in my

5   supplemental report, in practice, any real circuit that,        14:53:01

6   believe me, if I could have made it in a lab I would have, any

7   real circuit that generates high voltage is going to have some

8   native source capacitance.  It might be as little as 50 pica

9   farad or could be much larger.

10          But the point is that when you get up to, say, near     14:53:21

11  the breakdown voltage, and let's use this 50,000 volts as an

12  example, as you creep up on 49,000, 49,500, 50,000, then the

13  currents take this dramatic increase, i.e., this plasma begins

14  to be generated due to the sharp increase in the ionization

15  content between the two electrodes, and the current will       14:53:50

16  typically dramatically increase.  And even though you might

17  have a very impedance-limited generator, because of the

18  inevitable capacitance that occurs at the generator output

19  leads, and I took that as an example 50 pica farad, that energy

20  will dump quite suddenly and generate a plasma.                14:54:12

21          Now, might be a very tiny plasma for a very short

22  period of time but it is a plasma.  And as soon as you get a

23  plasma, I allege you are going to get photons because there's

24  going to be some recombination.  And I think Dr. Rodriguez is

25  correct in his assessment of that earlier.  Might not be       14:54:29

—May 7, 2008 - Markman Hearing - Testimony of Tom Saliga—

1    visible.  It might be of a different wavelength, but you are

2    going to get some photons generated.  And the current will go

3    up fairly dramatically.  The impedance certainly does decrease

4    dramatically.

5             And, by the way, if you look at the ratio, I think the      14:54:43

6    words were made earlier that it's dramatic decrease in

7    impedance and it's about a million to one.  We're not talking

8    about little numbers here.  You go from maybe 500 or 5,000

9    megaohms down to, not uncommonly 3, 4, 5, 600 ohms across the

10   air gap, those are some really, really big ratios.              14:55:05

11   Q.  Do you understand the purpose of this high voltage

12   condition to enable current flow across the air gap?

13   A.  Please repeat it again, Ray.

14   Q.  Is the purpose of this high voltage application, this high

15   voltage discharge, to enable current to flow across the air      14:55:25

16   gap?

17   A.  Absolutely.  Yes.

18   Q.  Now, when you get into the second mode, there's also been

19   discussion about the meaning of "maintain the current flow" in

20   the second mode.  And the definition you have given in Exhibit    14:55:40

21   2 is "continue and maintain the previously initiated discharge

22   across the arced over air gap."

23             Why do you propose that definition?

24   A.  Well, as any good design engineer would know, when you just

25   spent maybe 10 percent of your energy allocation on trying to     14:56:02

—— May 7, 2008 - Markman Hearing - Testimony of Tom Saliga ——

1  generate a conductive spark, if you will, a conductive ionized

2  path between the darts and the underlying target, you don't

3  want to waste it.  And so one way you would waste it, for

4  example, is why on earth would a designer wait and delay once

5  he established that arc to send through this lower voltage          14:56:30

6  higher current such that you do maintain the arc by reason of

7  that current being dumped through the arc path.  I mean, you

8  know, the engineer would have had to -- well, it wouldn't be

9  reasonable for him to consider doing that, to wait.

10        And so Taser did it right, frankly.  They said look,      14:56:49

11  we just established an arc, and I want to immediately, the

12  sooner the better, apply my second lower voltage which,

13  incidentally, has a higher current capability than the original

14  Mode 1.  And that's exactly right.  That's what they should

15  have done and they did do.  And I agree with what they did.    14:57:07

16  Q.  Why do you link the maintain current flow in Mode 2, to the

17  previously initiated discharge?

18  A.  Well, that's the whole goal of this two-mode thing in my

19  judgment.  Once you have established a minor, if you will,

20  current flow, plasma, if you will, to establish this conductive  14:57:30

21  path -- and, by the way, the total energy to have done that

22  might have been relatively small, and now you want to take the

23  big locomotive, okay, dump it, now that you have established

24  this conductive path, sort of throwing a locomotive down a

25  railroad track.  Now you want to dump the big energy out there   14:57:49

UNITED STATES DISTRICT COURT

─── May 7, 2008 - Markman Hearing - Testimony of Tom Saliga ───

1    now that you have established this conductive path and do the

2    muscle contraction.

3    Q.  Does Exhibit 2, your supplemental report, discuss the

4    portions of the claim specification that you rely upon in

5    forming your opinions?                                        14:58:08

6    A.  Yes.

7              MR. HARRIS:  Your Honor, I offer Exhibit 2.

8              THE COURT:  Any objection?

9              MR. CAMPBELL:  Your Honor, we -- I suppose we would

10   have no objection if we could deal with this as a group.  There   14:58:23

11   are reports from the various experts.  They are technically

12   hearsay, but they have been subject to cross-examination.  If

13   the proffer is an indication that Stinger doesn't object to

14   having Dr. Rodriguez's report received in evidence, then we're

15   fine with that trade.                                         14:58:45

16             MR. HARRIS:  I have no objection.

17             THE COURT:  All right.  They will both be admitted.

18   Are they marked?

19             MR. CAMPBELL:  Dr. Rodriguez's report is in the record

20   as Exhibit 7 to the declaration of Mr. Matz.  It was submitted   14:58:56

21   at the time of our opening papers.

22             THE COURT:  We should make --

23             MR. CAMPBELL:  A separate exhibit?

24             THE COURT:  A separate exhibit just to be clear,

25   because I have this one.                                      14:59:09

—— May 7, 2008 - Markman Hearing - Testimony of Tom Saliga ——

1          Did you say you have no more questions, Mr. Harris?

2          MR. HARRIS:  Correct, Your Honor.

3          THE COURT:  Perhaps we can do that over this brief

4   recess we're going to take.

5          MR. CAMPBELL:  Do you mind a double-sided copy?  That        14:59:21

6   may be what I'm left with.

7          THE COURT:  No.  That's fine.  So we're going to take

8   our brief recess, and you will conduct your cross-examination.

9          Are we planning on getting through all of the claims

10  today?                                                            14:59:35

11         MR. CAMPBELL:  That was the plan and the expectation

12  at the beginning of the day.

13         THE COURT:  Do you have -- are the experts you are

14  using only relevant to these claims or are they --

15         MR. CAMPBELL:  No.  They are relevant to the other two    14:59:47

16  patents.

17         THE COURT:  You are going to call them again for the

18  other two?

19         MR. CAMPBELL:  That was the plan, to try to keep the

20  subject matter germane to what we were talking about at the      14:59:55

21  time.

22         THE COURT:  Okay.

23         MR. CAMPBELL:  But I do believe that the '295 patent

24  will end up occupying most of our time.

25         THE COURT:  All right.  See how we do this afternoon      15:00:07

UNITED STATES DISTRICT COURT

—May 7, 2008 - Markman Hearing - Testimony of Tom Saliga—

1   then.

2          We're going to take a brief recess.  Thank you.

3          (Recess from 3:00 p.m. until 3:17 p.m.)

4          THE COURT:  All right.  Looks like everyone is present

5   and we're ready to proceed.                                   15:17:46

6          Sir, you can take the stand.

7          You may.

8          MR. CAMPBELL:  Your Honor, we found a single-sided

9   copy of Dr. Rodriguez's report.  May we have it marked?

10         THE COURT:  Please.                                     15:18:17

11         MR. CAMPBELL:  Your Honor, I'm holding Plaintiff's

12  Exhibit 1.  We would offer it in evidence.

13         THE COURT:  It's admitted.

14         MR. CAMPBELL:  Thank you.

15                   CROSS-EXAMINATION                            15:18:53

16  BY MR. CAMPBELL:

17  Q.  Mr. Saliga, just a couple of questions.

18         In your deposition, you gave an answer that I just

19  wanted to make sure we were in sync with.  You were asked a

20  question about what happens when you have an ionized plasma in 15:19:10

21  an air gap and you remove the voltage so that the current

22  settles down and the process of the air gap reverting back to a

23  normal non-ionized state begins.

24         Are you roughly with me in terms of the circumstance?

25  A.  I understand what you are saying, yes.                     15:19:34

UNITED STATES DISTRICT COURT

May 7, 2008 - Markman Hearing - Testimony of Tom Saliga

1    Q.  You were asked a question along the lines of, you know,

2    does that process where you have removed the current and the

3    voltage field and the ionized plasma is now reverting back to

4    its non-ionized state, take some time.  And your answer at the

5    time was it's not instantaneous.  It does take some time.  It's          15:19:58

6    on the order of 10 milliseconds.  Might be more, might be less.

7    A.  I don't think 10 milliseconds.  Maybe 10 microseconds.

8    Q.  I'm sorry.  I meant microseconds.  I apologize.

9         But you stand by that answer, that it would be on the

10   order of 10 microseconds; might be more, might be less?              15:20:18

11   A.  Yes.  It depends -- well, depends on a lot of factors, but

12   yeah.  That's order of magnitude.

13   Q.  That's the way you testified in your deposition?

14   A.  I don't recall exactly, but that sounds correct.

15   Q.  Your deposition was taken last Friday, correct?              15:20:37

16   A.  Yeah.  As I'm getting older I can't remember as well.

17   Q.  I'd like to ask you to pick up your report, if I could for

18   just a minute.  I have a couple of questions about preparation

19   of the report.  This is Exhibit Number 2, Defendant's Exhibit

20   2.                                                              15:20:57

21   A.  Yes.

22   Q.  This report was prepared sometime in the month of April of

23   this year, correct?

24   A.  Yes.

25   Q.  And the circumstances in which it was prepared was that you          15:21:06

UNITED STATES DISTRICT COURT

─── May 7, 2008 - Markman Hearing - Testimony of Tom Saliga ───

1   received a document from counsel, looked it over, and made

2   whatever revisions you felt you needed to, signed it and sent

3   it back, and that's what we have here, correct?

4   A.  I could amplify on that a tad.  I could say we had a phone

5   conversation previous to this to clarify these issues and my          15:21:27

6   position on it.  He did the formal writing up and I made

7   corrections subsequent to that, yes.

8   Q.  Now, are you aware that substantial portions of this report

9   are word-for-word verbatim from the brief that was filed by

10  Stinger earlier this year?                                            15:21:49

11  A.  Verbatim?  I can't say I'm aware of that, no.

12  Q.  You haven't looked to see?

13  A.  Which?

14  Q.  I'm sorry.  I didn't mean to be unclear.

15      You have not looked at Stinger's brief and, therefore,          15:22:05

16  haven't made the comparison, was my question?

17  A.  I don't recall reading a brief, no.

18  Q.  The name of your company is Engineering Design Associates,

19  is that correct?

20  A.  No.                                                               15:22:24

21  Q.  Can you help me with it?

22  A.  Yes.  Electronic Design Associates.

23  Q.  Thank you for that correction.

24      And you said it was a small consulting group?

25  A.  Yes.                                                              15:22:37

127

May 7, 2008 - Markman Hearing - Testimony of Tom Saliga

1   Q.  How many people?

2   A.  Full time, we have five.

3   Q.  When is the first time that your consulting group began

4   doing work for Stinger?

5   A.  I believe it was spring of 2006.                      15:22:48

6   Q.  And was that the time that you began working on the S-200?

7   A.  Yes.

8   Q.  And have you worked on the S-200 periodically ever since

9   that time?

10  A.  Yes.                                                  15:23:07

11  Q.  Are you still working on the S-200?

12  A.  Yes.

13  Q.  You are still making design changes to the product?

14  A.  Yes.

15  Q.  Are you keeping track of those changes?                15:23:16

16  A.  In a normal engineering sense with revision control, yes.

17  Q.  Now, it's also true that you are a stockholder in Stinger,

18  correct?

19  A.  Small, but yes.

20  Q.  You purchased something on the order of 10,000 shares or  15:23:32

21  so?

22  A.  Yes.

23  Q.  And you purchased that when?

24  A.  I believe it was more or less fall of last year.

25  Q.  Was any of that stock paid to you as compensation for work  15:23:47

UNITED STATES DISTRICT COURT

May 7, 2008 - Markman Hearing - Testimony of Tom Saliga

1   you have done with Stinger?

2   A.  No.

3   Q.  Am I correct that as you reviewed the patent you had

4   already been working on the S-200 device for years?

5   A.  You mean the first time I saw the patent or just          15:24:06

6   subsequent?  Could you clarify, please?

7   Q.  Of course.  Maybe we can -- I won't make a guess game out

8   of it.

9        If you started working on the S-200 in 2006, when did

10  you first pick up the patent, the '295 patent and have a look?   15:24:28

11  A.  Okay.  Fair.

12       As best I recall, the sequence of events was that they

13  approached our company somewhere in the spring.  I don't know

14  if it was April or May.  Somewhere in that ballpark of 2006.

15       They presented what their challenge and problem was.    15:24:49

16  We almost didn't take the job because I hadn't worked

17  specifically on stun guns before, although we had worked on

18  high voltage devices and were working on high voltage devices

19  on air cleaners aforementioned.

20       We just very briefly determined the original concept.    15:25:08

21  The technology wasn't going to work within the size package

22  they demanded.  I literally invented another way of doing it

23  based upon some earlier biomedics work I had done and basically

24  demonstrated a very crude working model to them in one weekend.

25  Q.  Mr. Saliga, I think I have confused you.  Because my      15:25:35

UNITED STATES DISTRICT COURT

May 7, 2008 - Markman Hearing - Testimony of Tom Saliga

1   question was not when did you --

2   A.  I'm sorry.  It seemed relevant, because I had basically

3   developed the concept for the stun gun before I ever even

4   thought about looking at patents that Taser had.  So it wasn't

5   until, I'd say, late summer that year, well after we had done      15:25:52

6   the basic invention of this device that I even looked at a

7   patent.  And that was because one of my engineers said, I heard

8   Taser has patents.  Maybe we ought to look at it and see what

9   it was all about.

10  Q.  So the first time you saw the '295 patent was two or three     15:26:08

11  months after you had been working on the S-200?

12  A.  Probably more like three or four months, yes.

13  Q.  Would you agree with me that you have a little bit of a

14  stake in the outcome of the case?

15  A.  Yeah.  A little bit.  Sure.                                     15:26:24

16          MR. CAMPBELL:  I don't have any more questions, Your

17  Honor.

18          MR. HARRIS:  How much did you pay for the 10,000

19  shares?

20          THE WITNESS:  50 cents.                                     15:26:42

21          MR. HARRIS:  50 cents a share?

22          THE WITNESS:  That's correct.

23          MR. HARRIS:  Nothing further, Your Honor.

24          MR. CAMPBELL:  Your Honor, we don't have any more

25  questions of Mr. Saliga at this time.                              15:26:57

—————May 7, 2008 - Markman Hearing - Testimony of Tom Saliga —————

1          THE COURT:  Okay.

2          So he can step down?

3          MR. CAMPBELL:  Yes.

4          We would propose to move on to the next patent unless

5    the Court has more questions.                                    15:27:09

6          THE COURT:  I just have one question of your expert,

7    or I don't know, maybe you can tell me what your position is,

8    and then you can let me know if I need to ask -- you may step

9    down -- if I need to ask your expert this.

10         But before we move on, do you agree that the gun or     15:27:23

11   the invention doesn't work if it doesn't produce an arc?  The

12   reason I'm asking is that was a question that Mr. Harris asked.

13         MR. CAMPBELL:  I think I would defer to Dr. Rodriguez

14   on that question.

15         THE COURT:  Doctor, if you don't mind, you can just    15:27:52

16   come to the podium and then we can move on to the next.

17         THE WITNESS:  Here?  So you have asked whether the

18   invention would work if there is not an arc?

19         THE COURT:  Right.

20         THE WITNESS:  That's a difficult question to answer    15:28:17

21   definitively.  Since I'm not a plasma physicist, I can't

22   comment conclusively on every possible scenario one might

23   encounter where you have an air gap with a high voltage being

24   applied to produce current.

25         My understanding is that from what I have read and     15:28:54

UNITED STATES DISTRICT COURT

—— May 7, 2008 - Markman Hearing - Testimony of Tom Saliga ——

1  from speaking with physicists, my understanding is that not all

2  cases of voltage breakdown in an air gap would be manifested by

3  an arc.  But clearly, the description in the '295 does mention

4  in Claim 1 and in the -- in one of the preferred embodiments,

5  an arc being formed.                                          15:29:37

6          So in my opinion, in many cases, yes, there would be

7  an arc formed.  I can't say conclusively that an arc would have

8  to be formed.  I think in normal air, normal atmospheric

9  pressures with a device very similar to the stun guns that are

10  currently commercially on the market, I would expect that there  15:30:02

11  would be an arc formed.  But whether someone down the road

12  figures out a way to achieve the same result without forming an

13  arc, I wouldn't be able to speculate.

14          But I guess my point is the way I read that claim

15  language, which was in Claim 2 and Claim 40, it didn't          15:30:29

16  explicitly require the arc to be formed.  It might very likely

17  be a natural consequence.

18          THE COURT:  Okay.  Thank you.

19          MR. CAMPBELL:  Your Honor, your question actually

20  causes me to want to make just one tiny comment.              15:30:45

21          THE COURT:  Well, I was going to ask you if you could

22  comment whether that fact or assertion by the defendant, how

23  relevant that is with respect to the construction of the claim

24  language at issue.

25          MR. CAMPBELL:  I think it is not relevant to the       15:31:06

UNITED STATES DISTRICT COURT

———May 7, 2008 - Markman Hearing - Testimony of Tom Saliga———

1   construction of claim language for the following reason.  I'm

2   going to repeat just a couple of things that I said earlier,

3   because I think they are in sharper relief now.

4        I'm going to invite you to turn to Tab 13 of the

5   binder.  And also, if I can get it up quick enough, I'd like to        15:31:22

6   have before us the table that kind of shows the -- shows the

7   two competing claims constructions.

8        I really do think that the problem that's presented to

9   the Court for resolution requires that both of these things be

10  looked at together because they are related to each other.  And      15:32:15

11  the way that I look at this, and the way that I can articulate

12  the difference between defendants and plaintiffs in terms of

13  claims construction the crispest, is to focus on the fact that

14  they are asking with respect to the B paragraph of paragraph --

15  of Claim 40, to have the formation of an arc be a requirement.       15:32:38

16       And then they are tagging along with that, dropping

17  down to Paragraph C of Claim 40, and asking that you use the

18  formation of the arc as a way to measure continuity.  So they

19  are trying to insert a limitation that ties an arc being formed

20  in the first mode, or step, to a delivery of current in the          15:33:03

21  second.

22       And their position is there can be no interruption.

23  Our position is the claim language doesn't read that way.

24  There are clear indications in the claim language that suggest

25  the patentee meant to claim more broadly than that.  So that if      15:33:25

UNITED STATES DISTRICT COURT

May 7, 2008 - Markman Hearing - Testimony of Tom Saliga

1   you, for example, did have an arc in the first mode, and the

2   arc was extinguished, so you really didn't have current flowing

3   for a small period of time, before you started applying the

4   second lower voltage output to drive the current to the target,

5   we say the claims allow that.  And they say the claims don't.          15:33:50

6   But there can't be any separation, and that really is the crux

7   of the matter.

8           So while we've been attempting to be very helpful and

9   be complete in our presentation, I did not want that point to

10  be lost, because you really need to understand the differences        15:34:10

11  between the parties by looking at what Stinger is proposing to

12  do together, because it's of a piece.

13          There are two tiny last things that I wanted to

14  mention.  This analogy with the forest thing is meant to

15  address that point, that there can be ionization of the air gap       15:34:34

16  after, you know, the voltage is removed.  And if there were an

17  arc there, there can be ionization that remains for a time

18  after the current stops flowing and the arc is extinguished.

19  So that's a critical piece of the difference between us.

20          There's one final point of caution I wanted to throw          15:35:00

21  out now because I think it is germane.  Hearkening back to the

22  *Wilson Sporting Goods* case, in that case, at the end of the

23  opinion, there's a discussion by the federal circuit about the

24  dangers and risks of using information about accused products

25  in order to do claims construction.  And we have had a load of        15:35:26

—————May 7, 2008 - Markman Hearing - Testimony of Tom Saliga—————

1    that here today.

2           Mr. Saliga is the, you know, the designer, for lack of

3    a better word, of the accused product.  And in his testimony,

4    he talked about things that he did in the lab with that product

5    in order to, you know, prove up some of the points or to make        15:35:45

6    comments about the claims construction.

7           That sort of stuff is the kind of thing that the

8    federal circuit has warned against doing.  We really do need to

9    be focusing on the claim language, the specification, and the

10   intrinsic record as opposed to, you know, things that would be      15:36:05

11   relevant to the infringement analysis in the case.  There is no

12   question that the testimony and what was said here today by Mr.

13   Saliga would be relevant to an infringement kind of an

14   argument.  But claims construction is a different story.

15          And with that, we would propose to move on to the '870       15:36:26

16   patent.  And I will turn the podium over to Mr. Matz.

17          THE COURT:  Okay.

18          MR. MATZ:  Your Honor, in the interest of trying to

19   speed things up a little bit, we thought it might make sense to

20   go through the '870 and the '262 patents, that is the two          15:37:10

21   remaining patents, before calling Mr. Rodriguez and then giving

22   Stinger an opportunity to go through and cross-examine.  Mr.

23   Harris has agreed to that.

24          THE COURT:  Okay.

25          MR. MATZ:  Fortunately, I think the two remaining            15:37:28

May 7, 2008 - Markman Hearing - Testimony of Tom Saliga

1    patents are quite a bit simpler than the '295 patent that we

2    have spent most of the day looking at today.

3         I'd like to begin with the remaining disputed language

4    in the '870 patent which I have put up on the screen here.

5    This is Claim 4 of the '870 patent.  And I have highlighted      15:37:50

6    some language here.  Positive voltage potential at one

7    electrode; negative voltage potential at the other electrode;

8    and grounded user of the weapon.

9         As we discussed earlier today, voltages are always

10   measured relative one point to another.  The parties have       15:38:13

11   agreed that positive voltage potential and negative voltage

12   potential, as used in Claim 4 of the '870 patent, are both

13   measured relative to ground.

14        The dispute, the sole remaining dispute, concerns the

15   meaning of ground.  And that's also found in the very last      15:38:38

16   portion of the claim, which refers to a grounded user of the

17   weapon.

18        Taser contends that grounded, or ground, simply refers

19   to a common reference conductor in the device.  Stinger's

20   position is that ground, or grounded, refers to earth ground.   15:39:02

21   That really is what the dispute boils down to.

22        And to try to illustrate the difference between the

23   two positions, I'd like to put up a few slides that are in the

24   binder that we distributed this morning.

25        This slide shows that, indeed, there are electric         15:39:27

UNITED STATES DISTRICT COURT

—May 7, 2008 - Markman Hearing - Testimony of Tom Saliga—

1   circuits that make use of earth ground.  And one example that's

2   shown here that may or may not be familiar to the Court is a

3   very early telegraph system.  This is shown at the top portion

4   of the slide.

5        And in the early days it was very expensive to string          15:39:48

6   telegraph wire, so oftentimes, the telegraph company would

7   string only a single wire.  But because circuits always have to

8   run in a complete loop, these systems actually used the earth

9   ground as the return current path.  And quite literally, the

10  system is staked into the earth ground.                             15:40:13

11       Another common example of the use of earth ground in

12  an electric circuit is simply the outlet that you would have at

13  your home or at work.  The middle prong in the outlet typically

14  connects to earth ground.  And that's done for safety reasons.

15  And again, this is quite literally taking a wire and staking it    15:40:37

16  into the ground.

17       But in contrast to that, most battery-powered

18  circuits, and I have shown some examples here, a TV, remote

19  control, cell phone, a laptop and so on.  Most of these types

20  of circuits are meant to be portable, and for that reason they     15:41:05

21  don't typically connect to earth ground.  And the reason is

22  fairly simple:  If a circuit is meant to be portable it's very

23  difficult to connect it to planet earth.  It has to be able to

24  move around.

25       And in battery-powered circuits of this type,                 15:41:27

—————May 7, 2008 - Markman Hearing - Testimony of Tom Saliga—————

1  engineers quite often still refer to the word "ground."  But it

2  means something different from earth ground.  It simply refers

3  to a common voltage point within the circuit.  Oftentimes it's

4  the negative terminal of the battery.  And all other voltages

5  in the circuit are measured relative to that point.                    15:41:52

6        And on this slide there are a couple of symbols that

7  are commonly used to designate that point in the circuit.  One

8  of them simply looks like a triangle that's pointing down, and

9  the other one is similar, but it's four horizontal lines that

10 roughly form a downward pointing triangle.                             15:42:15

11       Those same symbols are actually used in many of the

12 figures of the '870 patent.  This is Figure 24 of the patent,

13 and highlighted here is one version of the symbol which

14 represents the ground in the circuit.

15       And this shows Figure 20, again, similar symbol, not       15:42:42

16 quite identical, but it's meant to represent the same thing,

17 which is this common reference point in the circuit.

18       And shown here is an excerpt from Column 16 of the

19 patent.  And this passage here discusses the invention that's

20 claimed in Claim 4 of the '870 patent.  And the highlighted      15:43:14

21 portion here refers to the advantage of the claimed circuit

22 configuration.

23       That advantage is when measured relative to the

24 primary weapon ground, the voltage at either of the output

25 electrodes is roughly half what it would otherwise be in terms   15:43:35

UNITED STATES DISTRICT COURT

—————— May 7, 2008 - Markman Hearing - Testimony of Tom Saliga ——————

1    of magnitude.  And because of that, the risk of receiving a

2    shock, for example, to a grounded user, is approximately cut in

3    half.

4        This slide is meant to illustrate the concept.  The

5    upper drawing shows the prior art configuration for stun guns.    15:44:02

6    And the output transformer shown there, it develops

7    approximately 50,000 volts between one electrode and the other.

8    And if one of the electrodes is connected to the primary weapon

9    ground, then the other electrode will be at 50,000 volts

10   relative to that primary weapon ground and also relative to      15:44:28

11   other parts of the circuit that are referenced to that primary

12   weapon ground.

13       The bottom diagram in this slide shows one way of

14   implementing the invention in Claim 4, and that is to split the

15   output of the transformer, attach the center of the transformer  15:44:52

16   to the primary weapon ground, and then the advantage of that is

17   that even though the voltage from one electrode to the other is

18   still 50,000, the voltage between either electrode and the

19   primary weapon ground is now only 25,000 volts.

20       And one of the electrodes will be positive with            15:45:15

21   respect to the primary weapon ground, and the other electrode

22   will be negative in that situation.

23       If you read through the '870 patent, it does not use

24   or refer to earth ground.  And it does not disclose any way to

25   connect the weapon to earth ground.  And indeed for a            15:45:41

UNITED STATES DISTRICT COURT

May 7, 2008 - Markman Hearing - Testimony of Tom Saliga

1  battery-powered device such as those that are disclosed in the

2  '870 patent it would be very difficult to do that.

3       Instead, the '870 patent uses ground or grounded in

4  the ordinary sense in which it's used in portable circuits of

5  this type, and that is to refer to the common reference point     15:46:04

6  in the circuit.

7       Stinger's primary argument for why grounded should

8  refer to earth ground is that the benefit of the invention in

9  Claim 4, which is a lower risk of shock to the user of the

10 weapon, would not occur unless the user of the weapon were        15:46:27

11 actually coupled to earth ground.  And we contend that that

12 assertion is incorrect.  In fact, the benefits of the invention

13 in Claim 4 apply when the user is coupled to the primary weapon

14 ground.

15      If we could then move on to the final patent, which is      15:46:52

16 the '262 patent, there are five remaining disputes.  Three of

17 them are found in Claim 9.  And each of those three disputes

18 concerns a so-called means plus function limitation.  Taser

19 would like to submit issues regarding construction of those

20 three means plus function limitations on the briefs.             15:47:26

21      The other remaining dispute is the term "track date

22 and time," which is found in Claims 1 and 13 of the '262

23 patent.

24      Stinger's proposal for track date and time as used in

25 those claims is track current absolute date and time, and then   15:47:53

—May 7, 2008 - Markman Hearing - Testimony of Tom Saliga—

1   they give an example, which is 8:00 a.m. on November 15th of

2   2007.

3          As we saw earlier today, it's commonly known that

4   there are many different ways to track date and time in a micro

5   processor-based circuit.  Certainly one can independently track   15:48:14

6   current absolute date and time, but there are also alternate

7   ways to do that that are known to those of skill in the art of

8   circuits of this type.

9          And with that, I'd like to call Dr. Rodriguez to

10  testify again.                                                    15:48:37

11          THE COURT:  Okay.

12                 JEFFREY RODRIGUEZ,

13  called as a witness herein, having been previously sworn, was

14  examined and testified further as follows:

15                 DIRECT EXAMINATION

16  BY MR. MATZ:

17  Q.  Dr. Rodriguez, did you review Claim 4 of the '870 patent?

18  A.  Yes, I did.

19  Q.  And in that claim, did you form an opinion regarding the

20  meaning of the term "grounded" or "grounded user of the          15:49:09

21  weapon"?

22  A.  Yes.

23  Q.  And what was that opinion?

24  A.  In my opinion, it's referring to a user that is coupled to

25  or connected to the common ground of the weapon, or the weapon   15:49:22

UNITED STATES DISTRICT COURT

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1    ground.

2    Q.  Did you express that opinion in your expert report?

3    A.  Yes, I did.

4    Q.  What did you base that opinion on?

5    A.  Well, I based it upon a number of things.  One is the        15:49:37

6    context of this, the wording in the claim as well as the

7    written description in the patent and also my experience as an

8    engineer in terms of how this term is typically used.

9    Q.  Would the circuit or a circuit such as the ones that are

10   described and claimed in Claim 4 of the '870 patent have a      15:50:04

11   benefit even if the user of the weapon were coupled to the

12   primary weapon ground and not to the earth ground?

13   A.  Yes.  That's the whole point of this claim.

14   Q.  And just briefly, what would that benefit be?

15   A.  Well, consider the following scenario where there might be   15:50:25

16   a risk to the user.

17          When you are holding -- when the user is holding this

18   weapon, there is a potential risk of a contact, direct or

19   indirect, forming between the user 's hand and the internal

20   circuitry of the weapon.  This could potentially happen if      15:50:55

21   there's some penetration or crack in the housing of the weapon,

22   for example.

23          So imagine a case where the user's hand has become

24   coupled to the primary weapon ground inside the circuit.  If

25   the electrodes of the weapon, the darts, happen to then become  15:51:25

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1    in close proximity to some other part of the user's body,

2    there's a risk of shock.  Any time you touch two sides of an

3    electrified source, you have a risk of shock if that voltage is

4    high enough.

5         So to protect yourself, you would want that voltage to      15:51:55

6    be small.  So if you have one hand holding the weapon coupled

7    to primary weapon ground, you would want those electrodes at

8    the end of the weapon to be, say, 25 kilovolts instead of 50

9    kilovolts because if you happen to bring one of those

10   electrodes in close proximity to the rest of your body, you       15:52:24

11   would be less likely to incur a shock or the shock would be

12   less.

13   Q.  Dr. Rodriguez, if you could please turn to Figure 24 of the

14   '870 patent, or you can just look at what's on the monitor.

15   A.  Okay.                                                         15:52:48

16   Q.  Do you see in Figure 24 there are a number of symbols, it

17   looks like six of them, that look like downward pointing

18   triangles?

19   A.  There are a number of downward pointing triangles, yes.

20   Q.  What do you understand those symbols to represent?            15:53:08

21   A.  Well, first, just to be clear, there are some blackened

22   triangles that are part of the diodes.  We are not talking

23   about those.  We're talking about the unblackened downward

24   pointing triangles in this figure.

25   Q.  Correct.  We're talking about ones that are not filled in.    15:53:32

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1  A.  Correct.  And those are representing the ground of this

2  circuit sometimes referred to as the common ground, or the

3  common.

4  Q.  Okay.  And if you could please turn back to Figure 20 of

5  the patent.                                                    15:54:00

6       In that figure, beneath Terminals 5 and 4 of the

7  transformer T1, do you see two symbols that are made up of four

8  horizontal line segments that look approximately like downward

9  pointing triangles?

10  A.  Yes.                                                      15:54:35

11  Q.  What do you understand those symbols to represent?

12  A.  They represent the same as the other symbols.  Again, this

13  is another symbol that is commonly used to represent the common

14  ground of the circuit.

15  Q.  Is there any difference between the two symbols in terms of  15:54:48

16  what they represent?

17  A.  In this case, no.

18  Q.  Dr. Rodriguez, could you turn to the '262 patent, please.

19       Did you review Claims 1 and 13 of the '262 patent?

20  A.  Yes, I did.                                               15:55:15

21  Q.  And did you form an opinion regarding the meaning of the

22  term, "track date and time" that is found in those claims?

23  A.  Yes, I did.

24  Q.  What was that opinion?

25  A.  In my opinion, tracking date and time means that you,     15:55:31

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1   through one way or another, have the ability to keep track of

2   the date and the time.  And that could be done directly or

3   indirectly.

4   Q.  Could you give some examples of ways that it could be done?

5   A.  Sure.  One way would be to, through some means, record what      15:56:18

6   the date is and then separately record what the time is.

7           Another way would be, as was discussed earlier today,

8   to record, keep track of how many seconds, for example, have

9   elapsed since some reference point in time.

10          So, for example, you could keep track of how many       15:56:53

11  seconds have elapsed since January 1, 1900.  And then based on

12  that information, you could easily reconstruct what the full

13  date and time would be.

14  Q.  Those different ways that you have described tracking date

15  and time there, in your opinion, would they have been familiar      15:57:13

16  to a person of skill in designing microprocessor-based

17  circuitry in, say, the late 1990s or early 2000s?

18  A.  Yes.  Absolutely.  Very commonly used, especially the

19  latter, where you just keep track of how much time has elapsed

20  and it's from some reference point.  That's a common scheme       15:57:36

21  that's used in circuits.

22  Q.  Thank you very much.  That's all the questions I have.

23                      CROSS-EXAMINATION

24  BY MR. HARRIS:

25  Q.  Dr. Rodriguez, is there a standard convention for       15:57:43

UNITED STATES DISTRICT COURT

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1    indicating in a diagram earth ground?

2    A.  Depends on what you mean by "standard."  In my experience,

3    the two symbols that have been discussed are often used

4    interchangeably in electric circuit diagrams.

5    Q.  There's no convention that you are aware of with regard to          15:58:42

6    which symbol or, perhaps, some other symbol that should

7    indicate exclusive earth ground?

8    A.  I am not specifically aware of such a standard, but I

9    wouldn't be surprised if some standards organization did have

10   some standard.  If there is such a standard, clearly, it's not       15:59:04

11   widely followed.

12   Q.  Okay.  With regard to the risk to the user from contact to

13   the common ground, the internal ground, the user would have to

14   be in contact with more than just the internal ground in order

15   to be part of the circuit, correct?                                  15:59:32

16   A.  Yes.

17   Q.  So in a sense, in the simple version where you have a

18   50,000-volt electrode and a ground electrode, that ground

19   electrode would be grounded to the internal common, correct?

20   A.  Correct.                                                         16:00:01

21   Q.  So if the user shot himself, he would be grounded to the

22   common, grounded to the 50 volts, and he would get the 50

23   volts, or 50,000, actually it is.

24   A.  So if a user shot himself with the weapon using the first

25   configuration where you have one ALP electrode connected to the      16:00:28

UNITED STATES DISTRICT COURT

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1   primary weapon ground and the other electrode at 50,000 volts

2   above that, then yes, you would incur a shock because you would

3   have zero and 50,000 volts at two different parts of your body.

4   Q.  Okay.  But it would be -- let me go at it this way.

5        It would also be possible for the user to receive a            16:01:06

6   shock if the user was in contact with earth and an electrode

7   was in contact with earth that allowed a charge to pass through

8   the user.  Wouldn't that be another possible way of receiving a

9   shock?

10  A.  Can you describe that again?                                    16:01:35

11  Q.  Yes.  In the simple system, the 50,000 volt electron, or

12  electrode, comes in contact with earth.  You missed the target

13  and you hit earth.  Could that pose a risk of shock to the user

14  of the weapon -- if the user is also in contact with earth?

15  A.  If the user is standing on earth, and his hand is holding       16:02:16

16  the weapon?  Is that what you're describing?

17  Q.  I'm not sure that it even matters whether his hand is

18  holding the weapon.  But he's fired the weapon, it has hit the

19  ground, a circuit is trying to complete the circuit, complete

20  back to that user.                                                  16:02:58

21  A.  No.  I don't see how the circuit would complete if you have

22  a person standing on earth, and all that happens is a 50

23  kilovolt dart hits the ground somewhere else, I don't see

24  necessarily how -- well, let's back up.

25       When you say 50 kilovolts on that dart, that's              16:03:29

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1    measured relative to the weapon ground.

2    Q.  Okay.

3    A.  Right?

4    Q.  Right.

5    A.  So if the weapon is floating, then when that dart hits        16:03:40

6    earth, nothing happens except that that dart then becomes reset

7    to earth ground.  It's in contact with earth ground.  So its

8    potential is ground, earth ground.  Okay.  That doesn't harm

9    me, the bystander, that's standing somewhere nearby.

10   Q.  Okay.  Are there any conditions under which you would be at   16:04:10

11   risk as a user of the weapon that you can think of because you

12   are in contact with earth ground?

13   A.  Because you are in contact with earth ground.  Well, I'm

14   not seeing it.  Maybe you could be more specific.

15   Q.  Okay.  Is it fair to say you need to be in contact with the   16:04:36

16   circuit and at -- in at least two locations in order to be at

17   risk of a shock?

18   A.  To be at risk of a shock, you need to have a large voltage

19   placed across two parts of your body.  So two parts of your

20   body have to come in contact with different voltage potentials.  16:05:10

21   Q.  Okay.  With regard to tracking date and time, is there any

22   disclosure in the patent specification that you rely upon at

23   all for your interpretation of those terms?

24   A.  Only to the extent that the '262 patent never mentions

25   using an absolute date and time, never mentions using a real    16:06:22

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

 1    time clock, never discusses the use of any specific time system

 2    like GMT time.

 3            Based on that, my assumption was that anyone skilled

 4    in the art would be free to implement a method of tracking date

 5    and time any way that an engineer would do in any circumstance.          16:06:49

 6    Q.  Would you agree that there's also no discussion in the

 7    specification for the -- I'm sorry, is it the '262 patent --

 8    that refers to a timer, or any specific method of tracking the

 9    passage of time?

10    A.  Again, I don't recall any specific mention in the patent          16:07:30

11    specification as to how to implement this tracking of date and

12    time.  It's something that would be obvious to anyone skilled

13    in the art.

14    Q.  In reviewing the '870 patent, did you notice that it

15    referred to any sort of internal clock or method of keeping          16:07:54

16    track of time?

17    A.  I didn't notice that specifically.  I wasn't looking for

18    that in the '870 patent.

19    Q.  Okay.  Would it be your position that that information

20    would not be relevant to interpretation of the '262 patent?          16:08:11

21    A.  I would assume it wouldn't be relevant unless there's some

22    legal basis that I'm not familiar with.

23    Q.  Okay.  So when you tried to interpret the '262 patent, you

24    looked only at that patent and perhaps its file history?

25    A.  Correct.          16:08:34

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1   Q.  Was there anything in the file history that discussed any

2   specific methodology of tracking date and time?

3   A.  In my scan through the file history, I didn't encounter

4   anything that would specifically indicate otherwise.

5   Q.  Do you agree that the patent requires that both date and          16:08:48

6   time be handled somehow?

7   A.  The claim at issue does clearly require that one track date

8   and time, both.

9          MR. HARRIS:  That's all I have, Your Honor.

10         THE COURT:  Any redirect?                                       16:09:17

11         MR. MATZ:  No, Your Honor.

12         THE COURT:  I have a question on this, and I don't

13   know if I should direct it to the lawyers first and then see if

14   you want me to ask the expert here.

15         But could -- I guess the plaintiff is, on the ground          16:09:33

16   issue, Taser, I believe, is saying its user coupled common to

17   the reference conductor in the weapon.  And defendant Stinger

18   is saying, "user coupled to the earth."  And I guess I will ask

19   Mr. Campbell first, and then I will ask Mr. Harris.

20         But could your meaning also include the earth, or is          16:10:08

21   it just limited to what you are saying could it encompass both?

22   And then I would ask the same thing for Mr. Harris.  But you

23   can go first, Mr. Campbell.

24         MR. CAMPBELL:  I can explain what the term "ground" --

25   I can argue what the term "ground" means.  I'm not an expert.       16:10:28

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1    I'm not standing here in front of you as one.

2         The term "ground," just by itself, is a term that

3    without context could include both, you know, the primary

4    common reference, conductor inside a battery powered device, or

5    earth ground.  You would need to ask more questions and have a          16:10:49

6    look before you could say specifically which is which.

7         The point that seems to be significant here for claims

8    construction is that there is a discussion in the '870 patent

9    of an embodiment that matches the claim.  We know that -- I

10   mean, that's the presumption that the embodiment is going to          16:11:15

11   fall inside the reach of that claim.  It would be anomalous and

12   highly unlikely in the words of the federal circuit to have a

13   circumstance where you have got a claim, you've got a preferred

14   embodiment.  It's in the written description.  And the

15   preferred embodiment lies outside of the reach of that claim.          16:11:33

16        So what's wrong with the defendant's construction is

17   this:  If you limit that, if you define that term grounded user

18   of weapon to earth ground, there 's an explicit discussion of

19   an embodiment in the very patent document that is clearly not

20   talking about earth ground but is talking about the primary          16:11:54

21   weapon ground and is explaining the benefit of the reduction of

22   the shock risk that Professor Rodriguez has just talked about

23   in the context of primary weapon ground and not earth ground.

24        So that embodiment and that discussion would be

25   outside the scope of the claim if you define it to be earth          16:12:13

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1    ground.

2           THE COURT:  To also include earth ground.

3           MR. CAMPBELL:  If you define it to also include earth

4    ground?

5           THE COURT:  That's my question.  I mean, why should it    16:12:23

6    be restricted?  I'm trying to understand because you both are

7    restricting it and not including the other possible --

8    possibility for that term.  And so that's my question.

9           MR. CAMPBELL:  That is a good question, and as I'm

10   standing here right now, I'm not certain of the answer.  Can I    16:12:43

11   have just a second to confer with my colleague?

12          THE COURT:  Sure.  Sure.

13          MR. CAMPBELL:  That's a question that we think we

14   ought to put to Dr. Rodriguez.

15          THE COURT:  Okay.                                          16:13:33

16          MR. HARRIS:  He doesn't look enthusiastic about it.

17          THE COURT:  Okay.  Doctor --

18          DR. RODRIGUEZ:  So the way I understand your question

19   is if we construe grounded user to mean a user coupled to

20   either primary weapon ground or earth ground, would that still    16:14:01

21   be consistent with intent of this claim?

22          THE COURT:  Grounded user of the weapon.  That's

23   another way of asking it, I guess.

24          I guess what in this language anywhere limits it to

25   not include the earth?  And then I'm going to ask Mr. Harris      16:14:30

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1  the same thing, what in this language wouldn't include the

2  interpretation that the plaintiff has.

3          DR. RODRIGUEZ:  In Claim 4, there isn't any context

4  that I see that does limit it to a user connected to primary

5  weapon ground.  That limitation I saw arising from two things:      16:14:57

6  The fact that the written description never mentions earth

7  ground; and second, the fact that the written description does,

8  indeed, mention primary weapon ground when discussing this

9  embodiment.

10          So that's why I naturally got the impression that the      16:15:30

11  intended meaning of grounded user was a user that was coupled

12  to the primary weapon ground.

13          If you construe that instead as an either/or, I'm not

14  sure I see any harm.  I think it would perhaps still have

15  meaning.  I guess that's more of a legal question.      16:15:55

16          THE COURT:  Thank you.

17          And then Mr. Harris, if you could just --

18          MR. HARRIS:  First of all, Your Honor, with regard to

19  positive and negative, I don't think there's any dispute that

20  those are being defined with regard to the common ground, the      16:16:21

21  internal ground.  It indeed wouldn't make sense otherwise.

22          Our contention was that the benefit described in the

23  patent indeed covered a person grounded to earth.  If you

24  construe it as covering both, I have no objection to that.

25          Just as an offer, Mr. Saliga would testify as to how      16:16:50

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1   someone in contact with earth could be at risk of a shock.  But

2   if we're going to define it to include grounded, either way,

3   other than the fact that makes the claim very broad, that's a

4   reasonable interpretation of the claim, I think.

5        THE COURT:  Okay.  Thank you.  So I think the doctor          16:17:15

6   gets to step down now, doesn't he?  Okay.

7        And then Mr. Harris, what do you have on these two

8   claims?

9        MR. HARRIS:  Your Honor, our contention with regard to

10  the need to record or track or store the -- what does date and     16:17:45

11  time mean also might be susceptible to a similar kind of

12  compromise.  What the Taser attorneys have described are a

13  couple of alternatives that are self-contained.  In other

14  words, all of the information necessary to determine a date and

15  time is internal to the weapon, whether it's a timer counting      16:18:33

16  from a preset date, or whether it's a clock.

17       And as long as the definition of date and time store

18  or report date and time, record, I'm sorry, as long as the

19  definition is self-contained and it's internal to the device

20  that's described in the patent, we're fine with that.              16:19:05

21       THE COURT:  Okay.  Mr. Campbell.

22       MR. CAMPBELL:  Your Honor, that is actually a way to

23  import a limitation that's not here.  The language, if you look

24  at the claim -- and I'm just going to use Claim 1 as an

25  illustration -- the language we're talking about here is a         16:19:27

UNITED STATES DISTRICT COURT

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1   couple of paragraphs in.  We have a micro processor programmed

2   to do four things.  One is track date and time.

3        So it really is -- it's not a question of saying,

4   okay, everything I need, you know, to have is self-contained in

5   the weapon.  We need to look at the context of the claim        16:19:50

6   language.  And it simply is, what does track date and time mean

7   when you are going to program a microprocessor?  How do you

8   program that function into a microprocessor?

9        And we have had testimony that a person of skill would

10  recognize that there are various ways to do that, to program a   16:20:11

11  microprocessor so that it tracks date and time.  And one of the

12  ways is this relative concept of keeping track of seconds, et

13  cetera.

14       So we don't agree that you can add an extra limitation

15  that says, and, oh, by the way, anything and everything that     16:20:28

16  you would ever need in order to do all that you would want to

17  know about date and time has to be contained inside the weapon.

18  The claim language won't bear that freight.

19       THE COURT:  So that's the difference on that time and

20  date issue?                                                     16:20:48

21       MR. CAMPBELL:  Yes.

22       THE COURT:  How about on the grounded though?  Do you

23  think you would be able to reach agreement or compromise or

24  stipulation?

25       MR. CAMPBELL:  We'll go back and take a look at that        16:20:57

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1    and be a little smarter at that in a couple days, if that's

2    okay.

3            THE COURT:  If you could meet and confer with Mr.

4    Harris and submit something in about a week, week from today.

5            MR. CAMPBELL:  If I could beg your indulgence for                16:21:09

6    sometime after the 20th, I have got an extended

7    out-of-the-country trip I'm about to leave on.

8            THE COURT:  That's fine.  How about the 27th?

9            MR. CAMPBELL:  That will be great.

10           THE COURT:  After you get back.                                  16:21:28

11           MR. CAMPBELL:  That will be fine.

12           THE COURT:  Let me know.

13           But I did want to ask Mr. Harris about the means plus

14   function, if you could come forward.  Because the plaintiff

15   submitted that on the briefs, but I think it was in the briefs         16:21:44

16   that -- the reply to your briefing was simply that basically,

17   the Court should ignore the defendant's discussion on this

18   issue because defendant allegedly didn't conduct the proper

19   analysis for means plus function limitations.  And I guess I'd

20   like to have you address that here in court.                           16:22:11

21           Do I accept that, or do you dispute that?  And then I

22   think I will ask Mr. Matz to comment on that after you.

23           MR. HARRIS:  I dispute that we have made the wrong

24   analysis.  I think that both sides are citing essentially to

25   the same language in the specification.                                16:22:38

May 7, 2008 - Markman Hearing - Testimony of Jeffrey Rodriguez

1          And frankly, I'm not sure what they perceive the

2     difference to be between what we have recited and what they

3     have recited.

4          Again, if we had another opportunity to confer in

5     light of what has transpired, we may be able to come to a more          16:22:56

6     definitive agreement here.  I do think that there's a

7     microprocessor here and switches, and the claim language

8     broadly says anything that could reasonably understood to

9     perform that same function.  I think those are the needs.

10         THE COURT:  Why don't you all confer on that as well          16:23:18

11    and then see what you come up with.  And include that, if you

12    can, in whatever you submit on the 27th.

13         MR. HARRIS:  Yes, Your Honor.

14         THE COURT:  Is that fair?

15         MR. CAMPBELL:  Yes.  That's fine.          16:23:31

16         THE COURT:  All right.  And what else did you have,

17    Mr. Harris, if anything?

18         MR. HARRIS:  Well, I'm just trying to figure out if I

19    need any testimony from Mr. Saliga on the track date and time

20    issue.  I think it would help your understanding, do it in          16:23:43

21    about five minutes.

22         THE COURT:  Go ahead.

23         MR. HARRIS:  I recall Mr. Saliga.

24

25

---

May 7, 2008 - Markman Hearing - Testimony of Tom Saliga

1                           TOM SALIGA,

2    called as a witness herein, having been previously sworn, was

3    examined and testified further as follows:

4                        DIRECT EXAMINATION

5    BY MR. HARRIS:

6    Q.  Mr. Saliga, you recall that you are under oath.

7    A.  To me, as an engineer --

8    Q.  Let me ask a question.

9    A.  Yes.  I'm sorry.

10   Q.  You have given an opinion that track date and time means        16:24:18

11   store current absolute date and time?

12   A.  Yes.

13   Q.  Why are you of that opinion?

14   A.  Well, as every good engineer knows, when you are making a

15   data logging system and probably, I don't know, I have been       16:24:30

16   making data logging systems for 20, 30 years.  When one stores

17   date and time or tracks date and time to those with average

18   skill in the art, it means exactly that.  Namely, you have a

19   real time clock of some type running interior to your device so

20   that when some event occurs that you would like to log, okay,     16:24:52

21   and in the context of the stun gun, this implies that someone

22   has pulled the trigger.  Okay.

23          Well, when you pull the trigger, that implies that you

24   say, record the event G.  I pulled the trigger.  And some

25   number is put off into a memory location somehow saved.  That     16:25:11

UNITED STATES DISTRICT COURT

May 7, 2008 - Markman Hearing - Testimony of Tom Saliga

1   means a certain date.  Hey, it's November 1st, year

2   such-and-such and such-and-such a time.

3           So now, when you retrieve that information later, from

4   this memory you can look at that number, and even if you have

5   to use a little formula or something, as was suggested earlier          16:25:31

6   from, say, year 2000, January 1st, the present time, that event

7   can be associated with an absolute time and date.  That is the

8   conventional wisdom for data logging, okay.

9           Now, there's other ways of doing things that are

10  novel.  And we did something, in fact, in this system that was          16:25:55

11  novel.  And I don't know if it's appropriate to go into it

12  here, but let me just say --

13  Q.  I don't want you to talk about your trade secrets here

14  today.

15  A.  Okay.  But if someone could somehow -- well, let me take by          16:26:09

16  way of comparison.  If I went down to the store and bought a

17  timing device and I brought it home and I gave it to my wife

18  and she looked at it and she said, oh, that's a 60-minute

19  kitchen timer and I said yeah, and it tells date and time.

20  Well, she would laugh at me, because there's no way that this          16:26:30

21  60-minute kitchen timer tells date and time.  Tells time,

22  perhaps, relative to when you turn the knob, okay.

23          So I allege that unless you have an actual clock-type

24  mechanism that allows you to associate a recorded number with

25  an absolute and then maybe we shouldn't use the word absolute,          16:26:53

May 7, 2008 - Markman Hearing - Testimony of Tom Saliga

1  but with a date and time, then it's impossible, in and of

2  itself, to track or record an event in a data logger that's got

3  date and time in it.  End of story.

4          And so indeed, the technology, conventional technology

5  of data logging implies that you have a real time clock, and          16:27:17

6  that's the conventional name given to it, which means that

7  someone had to set that clock at some point before its actual

8  use to coincide with whatever local time is, or whatever your

9  time reference is, whether it would be Greenwich Mean Time or

10 otherwise.                                                            16:27:39

11          MR. HARRIS:  I have nothing further, Your Honor.

12          THE COURT:  Any cross?

13          MR. CAMPBELL:  No, Your Honor.

14          THE COURT:  Thank you.  You may step down.

15          MR. CAMPBELL:  There is one remaining issue that we          16:27:46

16 have not discussed.  It's in the '262 patent and it's the very

17 last limitation.  There is a disagreement with respect to the

18 term period of time in Claim 11.  It's briefed on Page 25 of

19 our opening brief.  I just read that section again.  I don't

20 think I can improve on what's written there, so our proposal is    16:28:15

21 simply to submit on the papers.

22          THE COURT:  I'm sorry.  Repeat that.  '262?

23          MR. CAMPBELL:  The '262 patent, the very last item in

24 our opening papers on Page 25 is a dispute about period of

25 time.  The defendants take the position that period of time in      16:28:32

—————————— May 7, 2008 - Markman Hearing ——————————

1   Claim 11 is indefinite.  And what that means is, in the federal

2   circuit paradigm, is that they are alleging that there is no

3   construction possible, that that's what indefiniteness

4   requires.  You have got to show by clear and convincing

5   evidence that there is no construction possible at all.  So the          16:28:59

6   test is, can the Court arrive at a construction, even if

7   reasonable people could disagree about it.  And if the answer

8   is yes, the fact that it's hard, or maybe not completely free

9   of ambiguity is a don't care under indefiniteness analysis.

10  That's the only dispute.  It's not a pure claims construction            16:29:19

11  question.  It is a claims construction question that's raised

12  in the context of this indefiniteness defense with respect to

13  Claim 11.

14          We have briefed it.  I think the relevant authorities

15  and arguments are adequately stated in our papers.                       16:29:33

16          THE COURT:  Okay.  Do you have anything to add to

17  that, Mr. Harris?

18          MR. HARRIS:  No, Your Honor.  We will stand on the

19  papers as well.

20          THE COURT:  I guess, Mr. Harris, I will ask you just             16:29:44

21  based on your expert's last statement, I think he said -- well,

22  maybe I shouldn't call it absolute date and time.

23          If you could, I guess, maybe give me your argument as

24  to what then we would call it.  I mean, because it says date

25  and time, and that's the plain meaning.  Looks like I'm                  16:30:04

—— May 7, 2008 - Markman Hearing ——

1    supposed to look at the plain meaning first.

2              And so I'm trying to understand your position.

3    Somehow you are arguing that that means more than date and

4    time, current date and time?

5              MR. HARRIS:  May Mr. Saliga answer?  Because I don't      16:30:23

6    know why he said that, Your Honor.

7              THE COURT:  Go ahead.

8              MR. SALIGA:  The word "absolute" I added to clarify

9    that the number that's being associated with some data logged

10   event is trackable, that is, computable to what we would       16:30:44

11   consider the date and time that might be, say, on your

12   wristwatch or on any normal clock that's properly set.  For

13   instance, your laptop has a realtime clock in it that Windows

14   normally displays.

15             We could say yes, that's date and time, and I would      16:31:09

16   simply like to say, if I can underscore it, as absolute date

17   and time what does that add to it?  It adds just a touch more

18   clarity to say that there are other ways of ultimately getting

19   the time when an event may have occurred to go beyond what's

20   normally done in the trade, if you will.                          16:31:36

21             So I simply wanted to underscore that date and time

22   means exactly that.  It's in the conventional wisdom, a -- like

23   for example, today, more or less 4:30 p.m., 5th of May, year

24   2008.  That would be date and time, and more precisely,

25   absolute date and time.                                           16:32:01

UNITED STATES DISTRICT COURT

─── May 7, 2008 - Markman Hearing ───

1      THE COURT:  Let me -- what -- and so how are you

2  different on this, Mr. Campbell, or Mr. Matz if you want to

3  take this.  I'm just trying to understand the distinction here.

4      MR. CAMPBELL:  If I were to summarize the distinction,

5  I believe the plaintiffs want you to rule that if you are doing     16:32:16

6  a -- tracking of date and time where you have got some kind of

7  initial reference number and you are just measuring how many

8  ticks of the second clock have gone by, you are not tracking

9  date and time.  You have to be logging in some discrete fashion

10  when the trigger gets pulled a record that's different than the    16:32:40

11  ticks of the clock that you could then use knowing the

12  reference, you know, to figure it out.

13      So for example, they are arguing that the

14  demonstration that Mr. Matz made for you of the Excel program,

15  that the piece of the program that's just counting the ticks of   16:33:03

16  the clock, that wouldn't be enough to track date and time.

17  That's their argument.  You have to have something more.

18      THE COURT:  Okay.

19      MR. HARRIS:  Our position is, Your Honor, that a timer

20  alone cannot satisfy the terms of the claim.  It cannot track      16:33:24

21  date and time.  The timer with the additional information that

22  is available in the Excel program, I don't know.  You are going

23  to have to decide whether that tracks date or time.

24      But a timer, by itself, something in the patented

25  device that says it's been 12 seconds since I was turned on,       16:33:55

─── May 7, 2008 - Markman Hearing ───

1   does not tell you date and time.  If you know when it was

2   turned on, now then maybe there's something to talk about.  But

3   none of that is disclosed in the patent.

4         So the reasonable construction of the patent absent

5   some algorithm for doing the calculation some other way is a                16:34:25

6   clock.

7         THE COURT:  Okay.  Mr. Campbell.

8         MR. CAMPBELL:  My only final observation is that

9   really is a classic non-infringement argument.  The words,

10  "track date and time" we think have a clear and ordinary                    16:34:46

11  meaning.  And the question is going to be, okay, how have you

12  implemented whatever it is you do with respect to time in the

13  accused device, and whether that qualified as tracking date and

14  time in the accused device is going to be an issue apparently

15  given the arguments we have heard.  I just don't see it as a                16:35:07

16  claims construction issue.  Tracking date and time is -- it

17  does have an ordinary meaning.  There's nothing in the patent

18  record that would cause us to depart from it.  There isn't a

19  reason now to try to infuse a bunch of additional limitations

20  in the claim language.                                                      16:35:28

21        The question is going to be, do the accused devices

22  track date and time.  And how they go about it and whether

23  they've got enough, what you need to do to have date and time

24  tracked, that's going to be an infringement question.  But it

25  doesn't strike me as a claims construction question.                        16:35:45

─── May 7, 2008 - Markman Hearing ───

1    THE COURT:  I guess based on what I read and heard,

2    Mr. Harris, I'm inclined to agree with Mr. Campbell on that.

3    You think this is a claims construction issue.  I can see where

4    you can maybe argue this later.  But I guess what's your

5    support as to why this is a claims construction issue?          16:36:01

6          MR. HARRIS:  Because we see the words track date and

7    time, and we need to ascertain the scope of the claim, what do

8    those words mean?  To an engineer, at least to Mr. Saliga,

9    those words mean, I have got a clock.  And when an event

10   happens I'm going to tag that event with the date and time     16:36:24

11   shown on my clock.  It doesn't mean, you know, I'm going to

12   just adopt my own time keeping system, and from now on, date

13   and time is going to mean, you know, some number between zero

14   and seven million.  What track date and time, what those words

15   mean is a claim construction issue in my mind.                 16:36:56

16         Now, I am certainly not going to tell you that you are

17   not going to be hearing from me once you construe that claim

18   about whether we infringe it or not.  You will.  But first, we

19   need to know what is the scope of this claim.  We may not

20   infringe it.  It may be invalid.  But we need to know what     16:37:15

21   track date and time means to make those determinations.

22         THE COURT:  Okay.

23         MR. HARRIS:  That's why I think it's a claim

24   construction issue.

25         THE COURT:  All right.  Thank you.                       16:37:26

──────── May 7, 2008 - Markman Hearing ────────

1    All right.  What else do we have?  Anything else?

2    MR. CAMPBELL:  Nothing further --

3    THE COURT:  Okay.

4    MR. CAMPBELL:  -- on the *Markman* hearing.  Thank you,

5    Your Honor, for your patience.  We very much appreciate it.          16:37:35

6    THE COURT:  Do you have anything, Mr. Harris?

7    MR. HARRIS:  No, Your Honor.

8    THE COURT:  All right.  Then I will wait to see what,

9    if anything -- hopefully you can confer and see what you can

10   submit on the 27th, and then I will try to issue an order          16:37:51

11   regarding the claim construction as soon as possible.

12   So thank you.  You all have been very pleasant.

13   Appreciate the discussion and your experts' willingness to

14   answer all the questions here today.

15   So thank you all.  Have a good evening.          16:38:14

16   (Proceeding concluded at 4:38 p.m.)

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

```
1
2
3
4
5                      C E R T I F I C A T E
6
7        I, LAURIE A. ADAMS, do hereby certify that I am duly
8   appointed and qualified to act as Official Court Reporter for
9   the United States District Court for the District of Arizona.
10       I FURTHER CERTIFY that the foregoing pages constitute
11  a full, true, and accurate transcript of all of that portion of
12  the proceedings contained herein, had in the above-entitled
13  cause on the date specified therein, and that said transcript
14  was prepared under my direction and control.
15       DATED at Phoenix, Arizona, this 15th day of May, 2008.
16
17                         s/Laurie A. Adams
18                         Laurie A. Adams, RMR, CRR
19
20
21
22
23
24
25
```