1  Chad S. Campbell, Bar No. 012080
   CSCampbell@perkinscoie.com
2  Aaron Matz, Bar No. 024108
   AMatz@perkinscoie.com
3  PERKINS COIE BROWN & BAIN P.A.
   2901 North Central Avenue, Suite 2000
4  Phoenix, AZ  85012-2788
   Telephone:  602.351.8000
5  Facsimile:  602.648.7000

6  Holly L. Gibeaut, Bar No. 019786
   hgibeaut@taser.com
7  TASER International, Inc.
   17800 North 85th Street
8  Scottsdale, AZ  85255-9603
   Telephone:  480.502.6265
9  Facsimile:  480.991.0791

10 Attorneys for Plaintiff
   TASER International, Inc.

11

12              IN THE UNITED STATES DISTRICT COURT

13              FOR THE DISTRICT OF ARIZONA

14 TASER International, Inc.,            No. CV07-0042-PHX-MHM

15            Plaintiff,

16     v.                               **TASER'S STATEMENT OF FACTS IN OPPOSITION TO STINGER'S MOTION FOR SUMMARY JUDGMENT OF PATENT INVALIDITY OR NONINFRINGEMENT**

17 Stinger Systems, Inc.,

18            Defendant.

19

20        Pursuant to L.R. Civ. 56.1(b), TASER International, Inc. ("TASER") submits the

21 following statement in opposition to Stinger Systems, Inc.'s ("Stinger") Motion for

22 Summary Judgment of Patent Invalidity or Noninfringement.  As set forth in L.R. Civ.

23 56.1(b), Part I of this statement addresses each numbered paragraph in Stinger's Statement

24 of Facts in Support of Defendant's Motion for Summary Judgment of Patent Invalidity or

25 Noninfringement, and Part II of this statement includes additional facts that establish a

26 genuine issue of material fact or otherwise preclude judgment in favor of Stinger.

27

28

**PART I: TASER'S RESPONSES TO EACH NUMBERED PARAGRAPH IN STINGER'S STATEMENT OF FACTS**

**I.      THE '295 PATENT**

| | Stinger's Statement of Facts | TASER's Opposition |
|---|---|---|
| 1. | The U34000 Air Taser was manufactured and sold in the U.S. by Plaintiff Taser, itself, and in public use in the U.S. prior to 1995.  Smith Declaration dated October 27, 2005 ¶ 3 Depo. Ex. 29.  The Taser Public Defender or TF1 Taser, was manufactured and sold in the U.S. by Taser Systems, Inc. and in public use in the U.S. prior to 1976.  ATF Rule 76-4, attached as Exhibit A (judicial notice requested).  Each element or limitation of Claims 2 and 40 of the '295 patent is found in the U34000 and Taser Public Defender prior art devices when operated.  Statement of Tachner at pages 3 (U34000) and 5 (Taser Public Defender); Supplemental Statement of Tachner ¶ 8. | **Disputed**.  As an initial matter, Stinger has not submitted any competent evidence that "[e]ach element or limitation of Claims 2 and 40 of the '295 patent is found in the prior art Taser U34000[1] and in the Taser Public Defender [prior art devices] when operated."  The cited "Supplemental Statement of Tachner" merely asserts that conclusion without any factual support.  *See, e.g., PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1310 (Fed. Cir. 2008) (rejecting "conclusory expert declaration" submitted on summary judgment); *TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1372 (Fed. Cir. 2002) (same).  In fact, the M34000 and Taser Public Defender devices do not include each element or limitation of claims 2 and 40 of the '295 patent.  ['295 pat. col. 20:6-25 (claim 2), col. 24:37-56 (claim 40) (Ex. 5)][2]  Neither the M34000 nor the Taser Public Defender is a "dual operating mode electronic disabling device," as required by claim 2 of the '295 patent.  ['295 patent col. 20:6 (claim 2); Rodriguez Rebuttal Report at ¶¶ 11-12 (Ex. 13); Nerheim Decl. at ¶¶ 10-13 (Ex. 2)]  Further, neither the M34000 nor the Taser Public Defender includes |

[1]   TASER assumes that references to the "U34000," the "Air Taser 34000," the "Air Taser," and the "Air Taser U34000" in Stinger's Statement of Facts all refer to the same device, namely, the AIR TASER Model 34000.  This statement refers to that device as the "M34000."

[2]   As used in herein, and unless otherwise indicated, citations to "Ex. ___" refer to the exhibits attached to the counsel declarations filed concurrently with this Statement.

| Stinger's Statement of Facts | TASER's Opposition |
|---|---|
|  | at least the following limitation recited in claim 2 of the '295 patent: "a power supply for operating in a first mode to generate a first high voltage, short duration output across the first and second electrodes during a first time interval to ionize the air within the air gap to thereby reduce the high impedance across the air gap to a lower impedance to enable current flow across the air gap at a lower voltage level and for subsequently operating in a second mode to generate a second lower voltage output across the first and second electrodes during a second time interval to maintain the current flow across the first and second electrodes and between the first and second contact points on the target to enable the current flow through the target to cause involuntary muscle contractions to thereby immobilize the target."  ['295 patent col. 20:12-25 (claim 2) (Ex. 5); Rodriguez Rebuttal Report at ¶¶ 11-12 (Ex. 13); Nerheim Decl. at ¶¶ 10-13 (Ex. 2)]]  In addition, neither the M34000 nor the Taser Public Defender includes at least the following limitation recited in claim 40 of the '295 patent:  "subsequently applying a second lower voltage output across the first and second electrodes during a second time interval to maintain the current flow across the first and second electrodes and between the first and second contact points on the target to enable the current flow through the target to cause involuntary muscle contractions to thereby immobilize the target." ['295 patent col. 24:50-56 (claim 40) |

| | Stinger's Statement of Facts | TASER's Opposition |
|---|---|---|
| | | (Ex. 5); Rodriguez Rebuttal Report at ¶¶ 11-12 (Ex. 13); Nerheim Decl. at ¶¶ 10-13 (Ex. 2)] |
| 2. | The U34000 and Taser Public Defender prior art devices operate as a dual mode electronic disabling device, which generates and applies a first high voltage, short duration output that reduces an air gap impedance to enable or maintain a current flow at the second, later, lower voltage output. [fn. No limitation of either Claim 2 or 40 precludes the shock from alternating polarity.  Taser's own expert Dr. Jeffery Rodriquez's uncontroverted testimony at the May 7, 2008 Markman Bench Trial is that either a positive or negative voltage will reduce an air gap impedance by ionizing atmosphere, even in the absence of current flow, and that Fig. 17 of the '295 patent illustrates that either a positive or negative voltage will reduce an air gap impedance by ionizing atmosphere (See also Fig. 16).  Rodriguez Testimony p. 86, 1. 4-p. 88, 1. 25; p. 105, 11. 13-23.  Dr. Rodriquez also implies by his testimony that it is desirable that the flow of current is continuous through the first high voltage and subsequent low voltage outputs, but he testifies that slight interruptions of current between the two outputs can occur in an enablement of the invention. *Id.* at p. 75, 11. 3-16 and p. 105 11. 13-23.] Statement of Tachner at 3-6. | **Disputed.**  Neither the M34000 nor the Taser Public Defender was a dual mode device.  [Rodriguez Rebuttal Report at ¶¶ 11-12 (Ex. 13); Nerheim Decl. at ¶¶ 10-13 (Ex. 2)] |
| 3. | Taser's expert, Dr. Jeffrey Rodriguez, testified at the *Markman* hearing (on May 7, 2008) that prior art weapons used high voltage output to breakdown an air gap and enable current to flow. | **Objected to.**  Dr. Rodriguez's testimony is not an operative material fact.  At best, it may constitute <u>evidence</u> of material facts that Stinger fails to identify.  Because Stinger has |

| Stinger's Statement of Facts | TASER's Opposition |
|---|---|
| May 7 Transcript at 89-90. [fn. This was confirmed by the inventor, Mr. Nerheim (Nerheim Depo. at 75).]<br><br>   The air gap incurs breakdown when the voltage applied reaches a sufficiently high level that you formed enough ions in the gap and consequently a rich enough supply of free electrons that you get, effectively, a short circuit across that air gap resulting in current flowing through the air gap.<br><br>Rodriquez testimony, May 7, 2008, Transcript at 94, 11. 4-8.<br><br>   Q. Alright.  And the last sentence of what is on the screen says "as soon as stun gun output terminals E-1 and E-2 are presented with the relatively low impedance load instead of the high impedance air gap, the stun gun voltage will drop to a significantly lower voltage level." Is that just a law of nature?<br><br>   A. Yes.<br><br>*Id.* at p. 94, 11. 11-17.<br><br>   Q. So in simple terms, because it is inverted, as the voltage reduces the current out increase?<br><br>   A. Yes.  After breakdown as voltage is decreased current is increased and vice versa.<br><br>   Q. And that's not because of any specific circuitry, that's because of the way impedance works in nature.  Correct?<br><br>   A. That's because of the way impedance works in an air gap after voltage breakdown. | not specified the operative facts at issue, Taser can neither admit nor deny those facts. |

|   | Stinger's Statement of Facts | TASER's Opposition |
|---|---|---|
|   | *Id.* at p. 95, ll. 3-10. | |
| 4. | The examiner's statement of reasons for allowance of the '295 patent stated:<br><br>Gowan (US Patent Number 5,471,362) teachers an arc generating circuit that has a first transformer 1 to create an arc and a second transformer 21 with a different output voltage to flow current across the arc.  The teachings of Gowan differ from the claims by not using the current flow across the arc to disable a subject (person or other living being).  The arc in the Gowan teaching is used to fire a spark plug in an automotive internal combustion engine.  The prior art of record in this application (which includes Gowan) fails to teach or fairly suggest the use of a stun gun type device that uses a second transformer with a lower output voltage to flow current across an arc to disable a subject.<br><br>Reasons for Allowance September 16, 2005.  Depo. Exhibit 18 attached.  The Gowan patent renders the '295 patent obvious because the electrical principles applied are a well understood law of nature.  [fn: The examiner's contemporaneous statement of reasons for allowance of the 870 patent states: "in the art of devices that use high voltage to stun or disable a person or living thing, the use of dual transformers with one unit striking an arc and the other unit producing a lower voltage to flow current in the arc to disable the person or living thing, is not taught or fairly | **Disputed.**  Stinger's assertion that "[t]he Gowan patent renders the '295 patent obvious" is a conclusion of law, not a statement of fact.  Stinger has provided no evidence that U.S. Patent No. 5,471,362 to Gowan renders any claim of the '295 patent obvious.  Indeed, the United States Patent and Trademark Office examiner who examined the application that issued as the '295 patent expressly allowed the claims of the '295 patent over U.S. Patent No. 5,471,362 to Gowan. [Office Action dated Sept. 16, 2005 (Depo. Ex. 19 filed with Stinger's Motion, (Doc. 158-9))]  Nor has Stinger provided any evidence that "the electrical principles applied are a well understood law of nature." |

|   | Stinger's Statement of Facts | TASER's Opposition |
|---|---|---|
|   | suggested by the prior art of record. The only prior art that uses two transformers to produce an arc is used to fire a spark plug for an automotive engine, which is highly unrelated to the stun gun art." Reasons for Allowance September 19, 2005. Depo. Exhibit 19 attached. Again the subsequent KSM holding dictates a contrary result.] | |
| 5. | The Police Special Model Taser produced and sold by Taser Industries Inc. in 1982-83 used two capacitors in parallel to discharge an arcing shock. McNulty Depo. at 144-45, 147-48, 159. The device would necessarily provide a high voltage arc to overcome resistance and the circuit would necessarily drop to a lower voltage once the resistance is overcome based on the law of nature identified by Dr. Rodriguez. | **Disputed.** Stinger has provided no competent evidence to support these facts. The citation to the deposition of Mr. McNulty provides no foundation for his assertion that the Police Special Model Taser "used two capacitors in parallel to discharge an arcing shock." Stinger cites absolutely no evidentiary support for its statement that "[t]he device would necessarily provide a high voltage arc to overcome resistance and the circuit would necessarily drop to a lower voltage once the resistance is overcome based on the law of nature identified by Dr. Rodriguez." Moreover, Stinger has provided absolutely no evidence to corroborate the statements regarding the structure and operation of the "Police Special Model Taser" made by Mr. McNulty (who is Stinger's in-house attorney). *See Finnigan Corp. v. Int'l Trade Comm'n,* 180 F.3d 1354, 1369 ("[C]orroboration is required of any witness whose testimony alone is asserted to invalidate a patent, regardless of his or her level of interest."). |
| 6. | To distinguish a prior art patent (Ragner U.S. Patent 5,698,815), Taser specifically stated during the prosecution of the related Taser patent | **Undisputed,** aside from typographical errors. In the cited Office Actions, the examiner referred to "a second *capacitance*" not a "second |

| | Stinger's Statement of Facts | TASER's Opposition |
|---|---|---|
| | 7,145,762 that it had solved a problem not addressed by the prior art: "switching capacitors without interrupting ionization in an air gap". Response to Office Action dated November 9, 2005 at 19.  Depo. Exhibit 12 attached.  The examiner indicated he understood and relied upon Taser's position by repeatedly reciting "a second capacitant" that "discharges ... to provide energy through the current through the established arc".  Notices of Allowability dated May 11, 2006 (Exhibit B attached) and October 13, 2006 (Depo. Exhibit 8 attached). Taser confirmed "the output signal of the present invention is formed by combining energy from two sources at different voltages." Response to Notice of Allowance dated August 18, 2006.  Depo. Exhibit 28 attached. This '762 patent was in the same family of patents as the '295 patent. | *capacitant*," as Stinger has alleged. [Office Action dated May 11, 2006, at pp. 2-4 (Ex. B filed with Stinger's Statement of Facts (Doc. 156-2)); Office Action dated Oct. 13, 2006, at pp. 3-5 (Depo. Ex. 8 filed with Stinger's Motion (Doc. 158-9))]. |
| 7. | The Frus Patent 5,754,011 taught an ignition system.  Taser argued in obtaining the '762 patent:<br><br>The Examiner has taken the position that it would have been obvious to combine the teachers of *Frus* and *Cover* "to provide variety of energy level".  The Examiner's statement of motivation is incorrect as to combining the teachings from the field of igniters (e.g., *Frus*) and weapons (e.g., *Cover*) to solve problems faced by Applicant.  The problems are different as discussed above.  Further, the documents discussed above explain the desirability of | **Disputed**.  Stinger has provided no support for its allegation that "[t]he Frus and Gow[a]n (5,471,362) patents show use of two capacitors or transformers was well understood," or indeed understood at all, "as a means to provide different voltages" to those of ordinary skill in the art in the field to which the '295 patent pertains (i.e., electronic weapons design).  Stinger concedes that the Frus patent is directed to an ignition system, not an electronic weapon or projectile stun gun.  [Stinger Statement of Facts ¶ 7] Similarly, the Gowan patent (U.S. 5,471,362) is directed to igniter devices, not electronic weapons or projectile stun guns.  [Rodriguez |

|  | Stinger's Statement of Facts | TASER's Opposition |
|---|---|---|
|  | "providing variety of energy level" as to ignitors is for reducing wear on electrodes and producing a spark suitable for reliable ignition of an air-fuel mixture. These purposes are important to ignitor design but irrelevant to electronic weapons design.<br><br>Response dated August 18, 2006 at p. 10 (Depo. Exhibit 28). The Frus and Gowen (5,471,362) patents show use of two capacitors or transformers was well understood as a means to provide different voltages. | Rebuttal Report at ¶¶ 18, 23 (Ex. 13)] Moreover, Stinger's quotation from TASER's Response dated August 18, 2006 contains a typographical error: "teachers" should be "teachings" in the first sentence. |
| 8. | The Tasertron, Taser U34000 and Taser M26 stun guns were made and sold using two transformers more than one year prior to February 2003. Smith Depo. at 27, 53, 56 and 89. | **Disputed.** Stinger's reference to the "Tasertron" stun gun is vague and ambiguous. The M34000 and TASER M26 stun guns did use two transformers, but those transformers were configured as shown in the prior art circuit described in the '295 patent. The transformers were configured in series that to operate in a single mode. [Nerheim Decl. at ¶¶ 24-26 (Ex. 2)] Neither the M34000 nor the TASER M26 used dual operating modes as described and claimed in the '295 patent. [*Id.*] |
| 9. | A preliminary amendment to the application resulting in the '295 patent in February 4, 2005 added claims. Taser cannot claim priority to 2003 for inventions that were not disclosed. What Taser disclosed in 2003 was the invention creating and maintaining an arc while switching capacitors. The inventor admits the two mode method was conceived in July 2002 (Nerheim Depo. at 109-10, 142), more than one year before the February 2005 amendment. The X26 sold in May | **Disputed.** Stinger's assertion that "T[ASER] cannot claim priority to 2003 for inventions that were not disclosed" is a conclusion of law, not a statement of fact, as is Stinger's assertion that "[t]he X26 sold in May 2003 . . . bars the invention claimed in the 2005 amendment." Stinger has cited no evidence to support its allegation that "[w]hat Taser disclosed in 2003 was the invention creating and maintaining an arc while switching capacitors." The Preliminary |

| | Stinger's Statement of Facts | TASER's Opposition |
|---|---|---|
| | 2003 (Nerheim Depo. at 16, 111) bars the invention claimed in the 2005 amendment.  Depo. Exhibit 21 (X-26 introduced May 30, 2003). | Amendment dated February 4, 2005, made only minor changes to the written description to correct typographical errors and thus did not disclose any matter that was not already disclosed in the priority applications filed on February 11, 2003, and May 29, 2003.  [Prelim. Amend. dated Feb. 4, 2005, '295 File History (Ex. 14); *compare* App. as amended Feb. 4, 2005, '295 File History (Ex. 14), *with* App. filed May 29, 2003, '870 File History (parent) (Ex. 15) and App. filed Feb. 11, 2003, '762 File History (grandparent) (Ex. 16)]  Stinger concedes that the TASER X26 was not introduced until May 30, 2003, after the filing dates of both of the '295 patent's priority applications. [Stinger Statement of Facts ¶ 9]. |
| 10. | The Stinger technology practices the one capacitor/one transformer prior art described in figure 1 of the '295 patent and does not combine energy from 2 different transformers or capacitors to output different voltages. Supplemental Statement of Tachner ¶ 8. | **Disputed.**  The prior art circuit described in Figure 1 of the '295 patent operates in only a single mode, whereas the Stinger S-200 uses a dual operating mode circuit.  [Nerheim Decl. at ¶¶ 13-15, 20 (Ex. 2) Rodriguez Infringement Report at ¶¶ 16, 20-21 (Ex. 28)]  The Stinger S-200 uses two transformers, not one. [Tachner Depo. at p. 70:1-4 (Ex. 9)] In addition, the Stinger S-200 uses a bank of multiple capacitors, not one capacitor.  [Tachner Depo. at p. 65:7-11] |

## II.    THE '870 PATENT

| | Stinger's Statement of Facts | TASER's Opposition |
|---|---|---|
| 11. | More than one year prior to February 11, 2003 Taser itself had sold both the M26 and Air Taser 34000. | **Undisputed.** |

|  | Stinger's Statement of Facts | TASER's Opposition |
|---|---|---|
|  | Declaration of Smith dated October 25, 2005 ¶ 4 (Depo. Exhibit 29).  As early as 1995 the "second generation 34000 series" included "battery level indicators" and "an automatic discharge timer".  Manuals Depo. Exhibit 22 at p. 3, of 21; Depo. Exhibit 23.  See Smith Depo. at 25 (Air Taser 34000 had an indicator to inform the user of the condition of the battery). |  |

**Claim 1**

| 12. | Stinger accepted Taser's construction that "a display with any indication of battery capacity is sufficient".  Stinger Claim Construction Brief at p. 16,1. 22. | **Undisputed.** |
|---|---|---|
| 13. | The elements of claim 1 of the '870 patent (except the memory interface to store battery capacity data) are contained in the M26 and Air Taser 34000 prior art. | **Disputed.**  As an initial matter, Stinger cites no evidence in support of this assertion.  Moreover, claim 1 of the '870 patent does not recite a "memory interface to store battery capacity data."  ['870 pat. col. 19:56-20:5 (claim 1) (Ex. 6)]  In addition, both the M26 and the M34000 lack at least the following limitations of claim 1 of the '870 patent:  "a digital memory device for storing battery capacity data indicating the amount of battery capacity consumed or remaining," and "a data interface for communicating between the battery system and the memory device to adjust battery capacity data stored in the memory device."  [Nerheim Decl. at ¶ 27 (Ex. 2)] |
| 14. | The Stinger S200 display indicates voltage, not battery capacity.  Saliga August 27, 2008 Depo. at 138, 164-65, 174; Gruder Depo. at 91; Statement of Tachner p. 8; Rodriguez Report ¶ 44. | **Disputed.**  The S-200 display indicates battery capacity.  [Rodriguez Infringement Report at ¶ 44 (Ex. 28)] |

| | Stinger's Statement of Facts | TASER's Opposition |
|---|---|---|
| 15. | The Kaufman patent (U.S. No. 5,193,048) includes "a low battery indicator circuit wherein a visual display of a low battery condition is provided". See Kaufman '048 patent FIG. 2 ("aperture through which the low battery indicator LED may be viewed"); Col. 3:55-56; Col. 2:46-53; Poole Patent 6,237,461 claim 26 ("a personal defense device ... comprising a light-emitting diode ... for indicating battery status"). The use of a battery status monitor is well known in the prior art and obvious. Statement of Tachner at 8; '870 patent Col. 10:27-30; Kaufman patent 5,193,048; Rice patent 6,615,814. | **Disputed.** Stinger's assertion that "[t]he use of a battery status monitor is . . . obvious" is a conclusion of law, not a statement of fact. The "low battery indicator circuit" disclosed in the Kaufman patent (U.S. 5,193,048) does not actually display battery capacity or life; it merely indicates that the weapon has been operated for more than a predetermined period of time, as the Kaufman patent itself teaches. [*See* '048 pat. col. 5:53-55 ("[T]he above-described low battery indication circuit functions as a counter, and not as an actual evaluation of the batteries comprising the power source BT1 . . . .") (Ex. 18)] |
| 16. | The M26 battery display used an algorithm implemented by a microprocessor using memory. Nerheim Depo. at 121-22. | **Disputed.** TASER does not dispute that the TASER M26 device included a microprocessor that used memory. However, Stinger has provided no evidence that the memory in the M26 device stored "battery capacity data indicating the amount of battery capacity consumed or remaining," as claim 1 of the '870 patent requires. ['870 pat. col. 19:65-67 (Ex. 6)] Nor has Stinger provided any evidence that the M26 included a "data interface for communicating between the battery system and the memory device to adjust the battery capacity data stored in the memory device." ['870 pat. col. 19:65-67 (Ex. 6)] In fact, the M26 included neither such requirement of claim 1. [Nerheim Decl. at ¶ 27 (Ex. 2)] |
| 17. | The M26 was sold by Taser since 1999. Declaration of Smith ¶ 4 (Depo. Exhibit 29). | **Undisputed.** |
| 18. | Most devices with a batter have "some | **Undisputed**, assuming that "batter" is |

|  | Stinger's Statement of Facts | TASER's Opposition |
|---|---|---|
|  | sort of battery indication". Smith Depo. at 26. | a typographical error and that Stinger means "battery." |
| **Claim 2** | | |
| 19. | Stinger accepted Taser's construction "[A] display for indicating to the user the amount of time remaining in each pulse sequence" requires "a display that provides the user with information concerning the amount of time remaining" in each pulse sequence. Stinger Claim Construction brief at 7. | **Undisputed.** |
| 20. | "[A]n automatic discharge timer" was prior art. See, e.g. Kaufman Patent 5,193,048 Col. 5:64-6:16 and claims 5 and 12. The addition of a discharge time display and implementation using a microprocessor is obvious. Statement of Tachner pp. 8-9. Displays were well known for indicating date and time of activation (Morris patent 4,541,191) and battery level (Kaufman patent 5,193,048). | **Disputed.** Stinger's assertion that "[t]he addition of a discharge time display and implementation using a microprocessor is obvious" is a conclusion of law, not a statement of fact. Although the Morris patent (U.S. 4,541,191) discloses a display for indicating a date and time in connection with a firearm and the Kaufman patent (U.S. 5,193,048) discloses a display of low battery condition, Stinger has provided no evidence that such displays were "well known" in the field of electronic control devices. |
| 21. | The Stinger device incorporates four LED lamps which light in sequence as 25% increments of the pulse charge are consumed. Depo. of Gruder at 92-95; Saliga August 27, 2008 Depo. at 138-39, 177, 190-92. Consequently, the four lights on the S-200 do not indicate time remaining in each pulse sequence as required by Claim 2 of the '870 patent; instead, they indicate the amount of charge delivered to the target. *Id.* Statement of Tachner at p. 7, 1. 18 to p. 8,1. 4. | **Disputed.** The four LED lamps on the Stinger S-200 device indicate the amount of time remaining in each pulse sequence, as confirmed by Stinger's own S-200 documentation. [Rodriguez Infringement Report at ¶ 50; Stinger Student Manual, at pp. 44, 46 (Ex. 28)] |
| 22. | Upon test firing the U34000, the | **Disputed.** As an initial matter, the |

| | Stinger's Statement of Facts | TASER's Opposition |
|---|---|---|
| | operator observes that the LED under the translucent plastic safety slide continues to flash, but only during pulse bursts and, then, more dimly, and that the U34000 discharges a 30 second pulse sequence with a 7 second pulse burst followed after a 2 second interruption by a 6 second pulse burst followed after a 2 second interruption by a 7 second pulse burst, which is followed after a 2 second interruption by a 6 second pulse burst, which is, then, followed after a 2 second interruption by a final 4 second pulse burst.  Gruder Declaration. | M34000 could not possibly discharge a "30 second pulse sequence" with the alleged timing characteristics because such a pulse sequence would have a duration of 38 seconds, not 30 seconds.  Moreover, Stinger has provided absolutely no evidence to corroborate Stinger's CEO's statements regarding the operation of the M34000. *See Finnigan Corp.*, 180 F.3d at 1369 ("[C]orroboration is required of any witness whose testimony alone is asserted to invalidate a patent, regardless of his or her level of interest.").  The M34000 has no display to indicate much time is left in a pulse sequence after the trigger has been pulled.  [Nerheim Decl. ¶ 28 (Ex. 2)] |
| 23. | The Air Taser manual states that its pulse sequence is 30 seconds in duration and is periodically interrupted.  Air Taser Manual (1994) p. 2 (Exhibit C attached).  An Air Taser operator observes on pulling back the weapon's translucent safety slide and until she fires the weapon by depressing its electronic switch trigger that an LED under the slide flashes brightly at 1 second intervals to indicate that the battery is charged. *Id.* at 2 and 12. | **Disputed.**  The "Air Taser manual" does not indicate or imply that the LED flashes at one-second intervals.  [Manual pp. 2, 12]  The M34000 has no display to indicate much time is left in a pulse sequence after the trigger has been pulled.  [Nerheim Decl. at ¶ 28 (Ex. 2)] |
| 24. | The Air Taser U34000 owner's manual is dated 1994.  Manual, Exhibit C attached.  The U34000 schematic is dated 1994.  U34000 Schematic, Tachner Exhibit D. | **Disputed.**  There is no legible date on the "U34000" schematic provided by Stinger.  [Tachner Depo. at pp. 44:25-45:12 (Ex. 9)] |
| **Claim 3** | | |
| 25. | Stinger agreed with Taser's construction defining the "mechanism for allowing the user to extend the | **Undisputed.** |

| | | Stinger's Statement of Facts | TASER's Opposition |
|---|---|---|---|
| | | duration of the pretimed series of electrical pulses" as the trigger. Stinger Claim Construction Brief at 8. The user extends the duration of the pulses by holding down the trigger. *Id.* | |
| | 26. | Prior art automatic weapons continue firing as long as the trigger is held down. Nerheim Depo. at 64. Application of this technology to an electronic incapacitation device is obvious. See Kaufman '048 patent Col. 1:61-62 (the circuit thus operates to produce the high voltage for long as the trigger switch is operated) (discussing Denning Patent 4,872,084). The M26 will continue to fire until the battery discharges if the trigger is held down. Nerheim Depo. at 63-64. | **Disputed.** Stinger's assertion that "[a]pplication of this technology to an electronic incapacitation device is obvious" is a conclusion of law, not a statement of fact. The automatic weapons referred to at the cited passage from Mr. Nerheim's deposition fire bullets, not electrodes. [Nerheim Depo. at p. 64:9-23 (Ex. 4)] They thus lack "electrodes," "a high voltage power supply for generating an output voltage delivered in a pre-timed series of electrical pulses to the target," "a trigger mechanism to initiate the pre-timed series of electrical pulses," and "a mechanism for allowing the user to extend the duration of the pre-timed series of electrical pulses," (or, indeed, any sort of "pre-timed output"), all of which are required by claim 3 of the '870 patent. ['870 pat. col. 20:17-25 (Ex. 6)] The circuit disclosed in the Kaufman patent (U.S. 5,193,048) has no "mechanism for allowing the user to extend the duration of the pre-timed series of electrical pulses," as required by claim 3 of the '870 patent. [Rodriguez Rebuttal Report at ¶ 37 (Ex. 13)] In addition, the Dunning Patent (U.S. 4,872,084) lacks a "pre-timed series of electrical pulses" and "a mechanism for allowing the user to extend the duration of the pre-timed series of electrical pulses," both of which are required by claim 3 of the |

| | Stinger's Statement of Facts | TASER's Opposition |
|---|---|---|
| | | '870 patent.  [*Id.*] |
| **Claim 4** | | |
| 27. | The inventor admitted in his deposition that the Stinger S-200 has not used a center tapped transformer since 2007.  Nerheim Depo. at 31.  The testimony of Mr. Saliga confirmed that the center tap was eliminated by October 2007.  Saliga August 27, 2008 Depo. at 152, 156.  The earlier prototypes were not the final product.  *Id.*  The final product did not infringe claim 4.  Nerheim Depo. at 125. | **Undisputed.**  TASER does not dispute that only certain versions of the S-200—those that use a center-tapped output transformer—infringe claim 4 of the '870 patent.  [Rodriguez Infringement Report at ¶¶ 62-65 (Ex.28 )] |
| 28. | In the Darrell patent 4,370,696, a DC voltage appears at electrode (22) and an AC voltage at electrode (20).  Every other half cycle of the AC voltage a positive voltage potential appears at one electrode and a negative voltage potential appears at the other electrode.  Thereby, the total voltage drop across electrodes (22) and (20) on a target is increased when compared to the decreased maximum voltage potential between either electrode and common or "ground" (21) and a grounded user of the weapon.  Supplemental Statement of Tachner at ¶ 6. | **Disputed.**  Stinger's expert admitted that, in the circuit disclosed in the Darrell patent (4,370,696), the transistor switch that connects the transformer center tap to the positive battery terminal may be open during the half cycle described, and that would prevent a positive voltage (with respect to ground) from appearing at one electrode while a negative voltage (with respect to ground) appears at the other electrode.  [Tachner Depo. at pp. 106:13-107:2 (Ex. 9)] |
| 29. | In the Stinger S200 there is not a positive voltage at one electrode and a negative voltage at the other because of the coupling diode bridge.  See Supplemental Statement of Tachner at ¶¶ 3-4. | **Disputed.**  Those versions of the S-200 that use a center-tapped output transformer (i.e., the versions of the S-200 that infringe claim 4 of the '870 patent) do not include a bridge rectifier circuit, as the bridge rectifier circuit was not added until late 2007 or early 2008, whereas the center-tapped output transformer was removed earlier.  [Saliga Depo. at pp. 90:20-91:17 (Ex. 11)] |

| | Stinger's Statement of Facts | TASER's Opposition |
|---|---|---|
| 30. | In the Stinger S200 a bridge rectifier circuit on the secondary (of T2) reverses any negative polarity at the secondary so "the polarity at the electrodes remains positive." Rodriquez Report ¶ 17. | **Disputed.**  Those versions of the S-200 that use a center-tapped output transformer (i.e., the versions of the S-200 that infringe claim 4 of the '870 patent) do not include a bridge rectifier circuit, as the bridge rectifier circuit was not added until late 2007 or early 2008, whereas the center-tapped output transformer was removed earlier.  [Saliga Depo. at pp. 90:20-91:17 (Ex. 11)] |
| 31. | Use of a center tap to minimize shock hazard was known in the prior art. Parker patent 5,892,646; Darrell patent 4,370,696. | **Disputed.**  Neither the Parker patent (U.S. 5,892,646) nor the Darrell patent (U.S. 4,370,696) shows the use of a center tap to increase voltage across a target while decreasing voltage between the electrodes and a grounded user of the weapon.  [Rodriguez Rebuttal Report at ¶ 40 (Ex. 13)]  The Darrell patent does not teach the use of a center tap to minimize shock hazard; as discussed above, it does not even disclose a circuit that produces a positive voltage at one electrode and a negative voltage at the other electrode. [Tachner Depo. at pp. 106:13-107:2 (Ex. 9)] |

## III.    THE '262 PATENT

| | Stinger's Statement of Facts | TASER's Opposition |
|---|---|---|
| 32. | The Taser Petition to Make Special discusses prior art weapons that record elapsed time (Morris U.S. patent 4,541,191), record place, time, date, direction etc of firing (O'dwyer U.S. patent 6,477,801 at col. 2, 11. 44-46) and transmit date and time to a monitoring station (Poole U.S. patent 6,237,461 at col. 3, 11. 61-64). | **Undisputed.** |

|   | Stinger's Statement of Facts | TASER's Opposition |
|---|---|---|
|   | Exhibit D attached. | |
| 33. | A microprocessor will not operate without memory.  Nerheim Depo. at 122.  Use of a programmed module with memory to record elapsed time is well known.  Morris patent 4,541,191 Col. 2, 11. 46-58. | **Disputed.**  The Morris patent (U.S. 4,541,191) discloses a Control Module that is preprogrammed and a Recording Module that includes memory; it does not disclose a microprocessor, does not disclose a "programmed module with memory," nor does it establish that the use of such a module was well known. [Rodriguez Rebuttal Report at ¶ 44 (Ex. 13)] |
| 34. | Use of a microprocessor to determine the duration of the pulse is obvious.  See Kaufman Patent No. 5,193,048 (e.g. Col 2:27-28 "in particular, a timer circuit is provided to toll the period of continuous use of the oscillator").  Substitution of the microprocessor for a timer circuit would be obvious and well known in the prior art.  Statement of Tachner at 8-9. | **Disputed.**  Stinger's assertions about what is supposedly "obvious" are conclusions of law, not statements of fact.  Moreover, the Kaufman patent, U.S. Patent No. 5,193,048 does not disclose a microprocessor.  [Rodriguez Rebuttal Report at ¶ 46 (Ex. 13); Tachner Depo. at p. 119:18-22 (Ex. 9)] |
| 35. | The specification of the '262 patent recites a trigger sensor signaling memory to record date and time.  '262 patent Col. 3, 11. 39-45.  The application filed September 17, 1999 contained no other language discussing the operation of the microprocessor.  No programming is described except with regard to the operation of switch 12 and no signals are described other than the signal from the microprocessor to switch 12 and the trigger sensor signal "for the memory in microprocessor 32 ... each time trigger 34 is squeezed and weapon 30 is fired".  *Id.*  Col. 3, 11. 39-45. | **Disputed.**  The priority application filed September 17, 1999 (application no. 09/398,388) contains numerous additional statements about the operation of the microprocessor.  [*See* '388 File History, App. filed Sept. 17, 1999, at pp. 6:26, 7:14-18, 7:21-26, 10:16-18, 11:22-12:4, 12:7-12, 12:15-22, Fig. 2, Fig. 3 (Ex. 19)] |

|  | Stinger's Statement of Facts | TASER's Opposition |
|---|---|---|
| 36. | The only other discussion of the use of the microprocessor to record date and time is contained in the summary of the invention of the '262 patent which was inserted by amendment on December 2, 2005.  Exhibit E attached.  Prior to December 2, 2005 the patent specification contained no reference to a "circuit," a "signal generator", "disabling the signal generator", apparatus that "keeps track of current time of day, keeps track of current date" or "keeping track of a period of time". | **Disputed.**  The asserted claims discuss the use of the microprocessor to record date and time.  ['262 pat. col. 7:37-60 (claim 1), col. 8:57-9:4 (claim 13) (Ex. 7)].  The fact that the specification did not include the exact phrases "circuit," "signal generator," "disabling the signal generator," apparatus that "keeps track of current time of day, keeps track of current date," or "keeping track of a period of time," does not imply that one of ordinary skill in the art would not understand that the concepts associated with those phrases were disclosed in the application filed on September 17, 1999. |
| 37. | Each claim in the '262 patent contains terms that have no antecedent in the specification prior to the December 2005 amendment.  Indeed, operative language in the claims also was added by a preliminary amendment on August 11, 2006.  Exhibit F attached. | **Disputed.**  Stinger provides no support for its assertion that "[e]ach claim in the '262 patent contains terms that have no antecedent in the specification prior to the December 2005 amendment."  Moreover, even if certain claim terms did not appear verbatim in the written description, that fact does not imply that the corresponding claims lacked support in the specification. |
| 38. | The Stinger X-26 was first sold in May 2003.  Nerheim Depo. at 16, 111.  Depo. Exhibit 21.  Taser concedes the X-26 practices the claimed invention of the '762 patent application.  Declaration of Nerheim ¶ 4 (Exhibit G attached). | **Undisputed**, assuming Stinger meant to refer to the TASER X26 rather than the "Stinger X-26**.**" |
| 39. | The specification of the '262 patent does not recite use of an internal clock (which is recited in other Taser patent applications _not_ claiming priority to application No. 09/398,388) nor any other means for "keeping" or | **Disputed.**  Although the specification of the '262 patent does not expressly use the phrase "internal clock," one of ordinary skill in the art at the time the '262 patent was filed would have been aware of multiple well-known means |

| | Stinger's Statement of Facts | TASER's Opposition |
|---|---|---|
| | "tracking" date and time. | of keeping or tracking date and time. [*E.g.*, Rodriguez Claim Construction Report, at ¶ 25 (Ex. H filed with Stinger's Statement of Facts (Doc. 156-4)]. |
| 40. | Taser's expert, Dr. Jeffrey Rodriguez, stated<br><br> One of ordinary skill in the art would know that there are many ways to track date and time. Examples include, but are not limited to, a real time clock, a counter, a timer circuit, or even a circuit using capacitive relays. Date and time may be measured and tracked as absolute quantities or, alternatively, they may be measured and tracked relative to a reference date and time. In addition, the date and time can be determined from a running count of seconds instead of tracking date and time separately or independently from one another.<br><br>Declaration dated December 31, 2007 ¶ 25 (Exhibit H attached). Dr. Rodriguez conceded "the '262 patent never mentions using 'absolute' date and time, never mentions a 'real time clock,' and never discusses the use of a specific time system such as GMT." *Id*. | **Objected to.** What Dr. Rodriguez "stated" is not an operative material fact. At best it may constitute <u>evidence</u> of material facts that Stinger fails to identify. Because Stinger has not specified the operative facts at issue, TASER can neither admit nor deny those facts. Stinger's assertion also appears to contain a typographical error. "[C]apacitive relays" should be "capacitive delays." |
| 41. | The S-200 contains a seconds timer. The S-200 contains circuitry for recording this count upon activation of the S-200 trigger during the count. The count can be indirectly referenced to date and time, but the reference can not be performed by the S-200 internally. A computer and program, external to the Stinger S-200, is | **Disputed.** Stinger's own documentation confirms that the S-200 stores information sufficient to determine the date and time of each firing of the weapon. [Rodriguez Infringement Report at ¶ 87; Stinger Student Manual, at p. 47 (Ex. 28)] None of the claims of the '262 patent require the use of a calendar. [*See* |

|  | Stinger's Statement of Facts | TASER's Opposition |
|---|---|---|
|  | required to extract the date and time of the event. Saliga May 2, 2008 Depo. at 161-65. The undisputed evidence in this case is that the microprocessor in the S-200 has no such programming which can reference a particular day or date of any calendar. Statement of Tachner at 8. See Report of Rodriquez ¶ 87-88 (the elapsed time stored "is sufficient to derive the current date and current time of day" by "showing a count of seconds elapsed from some reference time") (emphasis added). The S-200 microprocessor has no programming to itself derive date and time from "elapsed time". Supplemental Statement of Tachner at ¶ 7. | '262 pat. col. 7:36-10:7 (claims) (Ex. 7)] |
| 42. | The notice of allowance of the means plus function claim (now '262 patent claim 9) states "the means for providing a high voltage pulsed current, means for recording date and time and means for discontinuing provision of current are comprised of the disclosed inter-related circuit elements of a power source, microprocessor, and controlled switches." Exhibit I attached. See Report of Meet and Confer (means "for recording date and time of day are the "microprocessor and memory as described" in '262 patent Col. 2:38-42 and Col. 3:38-45) (Exhibit J attached). | **Undisputed.** |
| 43. | The parties also have agreed the "means for providing" a high voltage pulse current requires two transformers ("Transformers 13 and 14 and capacitor 15 coupled as shown in Fig. 2") (emphasis added). Joint Report on Meet and Confer (citing '262 Patent Col. 3:46 to Col. 4:11). | **Disputed.** Although the S-200 uses a single *output* transformer, it uses two transformers (one output transformer and a separate transformer that steps up the battery voltage to an intermediate voltage applied to the weapon's capacitor). [Tachner Depo. at p. 70:1-4 (Ex. 9)] Those |

| | Stinger's Statement of Facts | TASER's Opposition |
|---|---|---|
| | Exhibit J. The Stinger S200 uses a single output transformer.  Statement of Tachner, Exhibit F.  [fn:  The period the S-200 discharge defaults to 4 seconds (Nerheim Depo. at 120), not "about 7 seconds" as recited in Claim 11 and as disclosed in the specification at Col. 3:51-52.  Apparently Taser no longer asserts claim 11.] | transformers are coupled as shown in Figure 2 of the '262 patent.  [Tachner Depo at pp. 110:12-111:13 (Ex. 9); Rodriguez Infringement Report at ¶ 99 (Ex. 28)]; *see* '262 pat. Fig. 2 (Ex. 7)] |

## IV.    INEQUITABLE CONDUCT

| | Stinger's Statement of Facts | TASER's Opposition |
|---|---|---|
| 44. | Prior to 2003 Taser had knowledge of a competitor's Police Special Model Taser stun gun using 2 capacitors.  Testimony of McNulty at 144-45, 147-48, 159.  This technology was not disclosed to the patent examiner. | **Disputed.**  Stinger has provided no competent evidence to support these facts.  The citation to the deposition of Mr. McNulty provides no foundation for his assertion that the Police Special Model Taser "used two capacitors in parallel to discharge an arcing shock" or that TASER had knowledge of that supposed feature.  In addition, Stinger has provided absolutely no evidence to corroborate Mr. McNulty's statements regarding TASER's alleged knowledge of the "Police Special Model Taser," or his statements regarding the design of that device.  *See Finnigan Corp.,* 180 F.3d at 1369 ("[C]orroboration is required of any witness whose testimony alone is asserted to invalidate a patent, regardless of his or her level of interest.").  Moreover, TASER disclosed the single-mode, "conventional stun gun circuit" technology purportedly used in the "Police Special Model Taser" (as described by Mr. McNulty) to the examiner by citing multiple patents disclosing that technology and by |

| | Stinger's Statement of Facts | TASER's Opposition |
|---|---|---|
| | | expressly discussing that technology in the patent applications themselves. [Nerheim Decl. at ¶¶ 14, 15, 23, 24, 26 (Ex. 2); Tachner Depo at pp. 64:20-66:21, 116:14-117:5, 119:9-120:13 (Ex. 9); '295 pat. col. 1:21-2:2:58, Fig. 1 (Ex. 5)]  Even if the "Police Special Model Taser" used two capacitors, as Stinger claims, that does not imply that it used anything other than the "conventional stun gun circuit" discussed in the '295 patent.  [Tachner Depo at p. 64:20-66:21, 116:14-117:5, 119:9-120:13 (Ex. 9); Nerheim Decl. at ¶ 23 (Ex. 2)] |
| **The '762 Patent** | | |
| 45. | Taser specifically disclosed the Taser model M26 was "known prior to the priority date of the [`762 patent] application".  Response to Office Action dated April 11, 2006 at 18. Depo. Exhibit 7. | **Undisputed.** |
| 46. | Taser did not disclose the prior art stun gun sold by its competitor (Taser Industries, Inc.) to the Los Angeles police department.  Taser acquired the successor to Taser Industries Inc. (known at Tasertron) in 2003. Declaration of Smith dated October 27, 2005 (Depo. Exhibit 29 ¶ 4). | **Disputed.**  TASER disclosed the single-mode, "conventional stun gun circuit" technology purportedly used in Tasertron devices to the examiner by citing multiple patents disclosing that technology and by expressly discussing that technology in the '762 patent application itself.  [*E.g.*, '762 File History, App. filed Feb. 11, 2003, at pp. 2-4, Fig. 1 (Ex. 16); *see* Nerheim Decl. at ¶¶ 14, 15, 23, 24, 26 (Ex. 2); Tachner Depo at p. 64:20-65:3-66:21, 116:14-117:5, 119:9-120:13 (Ex. 9)] |
| 47. | In approximately 1982-83 Taser Industries, Inc. sold a product named Police Special Model Taser that used two capacitors in parallel to discharge an arcing shock with one capacitor | **Disputed.**  Stinger has provided no competent evidence to support these facts.  The citation to the deposition of Mr. McNulty provides no foundation for his assertion that the Police Special |

| | Stinger's Statement of Facts | TASER's Opposition |
|---|---|---|
| | discharging a current at lower voltage into the existing ionization path established by discharge of the first capacitor.  Testimony of McNulty at 144-45, 147-48, 159.  This prior art, which was not disclosed by Plaintiff to the U.S.P.T.O., invalidates some or all of the claims in the '762 patent. | Model Taser "used two capacitors in parallel to discharge an arcing shock." In addition, Stinger has provided absolutely no evidence to corroborate Mr. McNulty's statements regarding the design and operation of the "Police Special Model Taser."  *See Finnigan Corp.,* 180 F.3d at 1369 ("[C]orroboration is required of any witness whose testimony alone is asserted to invalidate a patent, regardless of his or her level of interest.")  Moreover, TASER disclosed the single-mode, "conventional stun gun circuit" technology purportedly used in the "Police Special Model Taser" (as described by Mr. McNulty) to the examiner by citing multiple patents disclosing that technology and by expressly discussing that technology in the '762 patent application itself.  [*E.g.,* '762 File History, App. filed Feb. 11, 2003, at pp. 2-4, Fig. 1 (Ex. 16); *see* Nerheim Decl. at ¶¶ 14, 15, 23, 24, 26 (Ex. 2); Smith Decl. at ¶ 5 (Ex. 1); Tachner Depo at p. 64:20-65:3-66:21, 116:14-117:5, 119:9-120:13 (Ex. 9)] In addition, Stinger has provided no evidence for its assertion that "[t]his prior art . . . invalidates some or all of the claims of the '762 patent," which is a legal conclusion, not a statement of fact. |
| 48. | Taser had obtained and examined this competitors' product.  McNulty Depo. at 150, 152-54. | **Disputed.**  Stinger has provided no competent evidence to support these facts.  As the cited deposition testimony discloses, Mr. McNulty has no personal knowledge of the "facts" asserted.  In fact, when TASER acquired Tasertron (the successor of Taser Industries, Inc.), TASER |

| | Stinger's Statement of Facts | TASER's Opposition |
|---|---|---|
| | | personnel immediately destroyed all of Tasertron's inventory without examining it.  [Smith Depo. at pp. 46:17-47:15 (Ex. 3)]  TASER's CEO, Rick Smith, never took apart any Tasertron devices to see how they operated internally, and TASER never saw any value in reverse engineering any Tasertron device.  [*Id.* at pp. 53:21-54:13 (Ex. 3)] |
| | **The '870 Patent** | |
| 49. | The examiner initially allowed the '870 patent on September 19, 2005. The examiner's statement of reasons for allowance refers to<br><br>    the use of dual transformers with one unit striking an arc and the other unit producing a lower voltage to flow current in the arc to disable the person or living thing ... the only prior art that uses two transformers to produce an arc is used to fire a spark plug for an automotive engine, which is highly unrelated to the stun gun art.<br><br>Depo. Exhibit 19 attached.  Inventor Nerheim was involved in prosecution of the '870 patent, but he did not disclose the single transformer implementation.  Nerheim Depo. at 114-19. | **Disputed.**  TASER does not know what Stinger means by "the single transformer implementation." |
| 50. | On March 9, 2006 the application was withdrawn from issue and rejected for double patenting in view of the '295 patent which had issued February 14, 2006.  In the office action summary the examiner stated the claims of the '295 patent and the claims in the application that ultimately lead to the | **Undisputed**, assuming that "disability" is a typographical error and that Stinger meant "disabling." |

| | Stinger's Statement of Facts | TASER's Opposition |
|---|---|---|
| | '870 patent are both "directed toward electronic disability devices that use two different transformers to first create an arc and then maintain current flow across the arc to disable a subject." Exhibit K attached. | |
| 51. | In response, Taser cancelled the claims in the '870 patent that related to use of two different transformers but did not amend the claims in so far as they related to maintaining current flow across an established arc.  Again the stun gun sold to the LAPD was never disclosed. | **Disputed.**  As discussed above, Stinger has provided no evidence that anyone at TASER was ever aware of the alleged materiality of the alleged "stun gun sold to the LAPD." (TASER assumes that the "stun gun sold to the LAPD" is the same device as the "Police Special Model Taser" referred to elsewhere in Stinger's Statement of Facts.)  Moreover, TASER disclosed the single-mode, "conventional stun gun circuit" technology purportedly used in the "Police Special Model Taser" (as described by Mr. McNulty) to the examiner by citing multiple patents disclosing that technology and by expressly discussing that technology in the '870 patent application itself. [*E.g.*, '870 File History, App. filed Feb. 11, 2003, at pp. 2-4, Fig. 1 (Ex. 15); *see* Nerheim Decl. at ¶¶ 14, 15, 24, 26 (Ex. 2); *see* Smith Decl. at ¶ 6 (Ex. 1); Tachner Depo at p. 64:20-65:3-66:21, 116:14-117:5, 119:9-120:13 (Ex. 9)] |
| 52. | In addition the '870 patent claims a battery indicator display.  Claim 1.  At no point in prosecuting its application for the '870 patent did Taser disclose to the examiner that for several years prior to the date of application Taser manufactured both the U34000 and M26 embodying a battery indicator display. | **Disputed.**  The '870 patent claims a "display for indicating to a user the battery capacity," not a "battery indicator display." ['870 pat. col. 20:5 (claim 1) (Ex. 6)]  Although TASER did not expressly disclose the M34000 or M26 during prosecution, Stinger has not shown or suggested that the battery indicators on those two devices were materially different from battery |

| | Stinger's Statement of Facts | TASER's Opposition |
|---|---|---|
| | | indicators disclosed in prior art references cited during prosecution of the '870 patent, and Stinger concedes that several such references disclosed battery indicators. [*E.g.*, Tachner Invalidity Claim Chart at p. 2 (Ex. B filed with Stinger's Motion, Doc. No. 160-2); *see* Nerheim Decl. at ¶ 27 (Ex. 2)] |
| **The '295 Patent** | | |
| 53. | The examiner allowed the '295 patent because there was no prior art using two transformers in a stun gun. Statement of Facts ¶ 4. | **Disputed.** The cited examiner's statement referred to two transformers configured so as to create a dual-operating mode circuit, not merely to two transformers in any circuit configuration:<br><br>Gowan (US Patent number 5,471,362) teaches an arc generating circuit that has a first transformer 1 to create an arc and a second transformer 21 with a different output voltage to flow current across the arc. The teachings of Gowan differ from the claims by not using the current flow across the arc to disable a subject (person or other living being). The arc in the Gowan teaching is used to fire a spark plug in an automotive internal combustion engine. The prior art of record in this application (which includes Gowan) fails to teach or fairly suggest the use of a stun gun type device that uses a second transformer with a lower output voltage to flow current across an arc to disable a subject.<br><br>[Office Action filed Sept. 16, 2005, at p. 2 (Depo. Ex. 18 filed with Stinger's Motion (Doc. 158-9))] |

|  | Stinger's Statement of Facts | TASER's Opposition |
|---|---|---|
| **Duty of Disclosure** | | |
| 54. | Mr. Nerheim was substantively involved in the preparation or prosecution of the applications. Testimony of Nerheim at 42, 87, 117. He is an inventor on both the `870 and `295 patents. | **Undisputed.** |
| 55. | Mr. Patrick Smith was substantially involved in the prosecution of the '782 patent application. See Depo. Exhibit 29 (Smith Declaration, dated October 25, 2005, regarding Application 10/364,164). | **Disputed.** TASER is unaware of any "'782 patent application." To the extent that Stinger meant to refer to the '762 patent application, Stinger has provided no evidence that Mr. Smith was "substantially" or substantively involved in the prosecution of that application. Mr. Smith merely signed a single declaration in his capacity as TASER's CEO that described TASER's business. [Smith Decl. at ¶ 4 (Ex. 1)] Mr. Smith is not named as an inventor on the '762 patent, and he was not involved in developing the claims. [*Id.*] |
| 56. | Patrick Smith was "ultimately responsible" for development of the Air Taser 34000. Smith Depo. at 21. The starting point for the circuitry for the Air Taser 34000 was the prior Tasertron devices. *Id.* at 27, 53. The Air Taser and Tasertron had two transformers. *Id.* | **Disputed.** The cited testimony of Mr. Smith was only that, as he was sitting at his deposition, he "believe[d]" that the M34000 and Tasertron device had two transformers. [Smith Depo at p. 27:4-9 (Ex. 3)] Stinger's expert, Mr. Tachner, testified that the M3400 had only one transformer. [Tachner Depo. at p. 42:5-17 (Ex. 9)] Even if the Tasertron or M34000 devices in fact used two transformers, that would not imply that such devices were material to any claim in the '870 patent, '295 patent, or '762 patent. Traditionally stun guns have used two transformers in series with each other. The first transformer boosts voltage to an intermediate level. The next transformer boosts voltage to a higher |

| | Stinger's Statement of Facts | TASER's Opposition |
|---|---|---|
| | | level, with both transformers operating in a single mode. Such a configuration is irrelevant to the claims of the patents-in-suit. [Nerheim Decl. at ¶ 24 (Ex. 2); Smith Decl. at ¶ 6 (Ex. 1); Tachner Depo. at pp. 70:18-71:3 (Ex. 9)] |
| 57. | Patrick Smith also led the development team for the M26. *Id.* at 32. Mr. Nerheim did the circuit design. *Id.* at 36. The M26 also had two transformers. *Id.* at 56. [fn: Both the Air Taser and M26 had one power capacitor. Smith Depo. at 56. The X26 has two transformers and three capacitors. *Id.* at 56-57.] | **Undisputed.** The two transformers in the M26 were configured as shown in Fig. 2 of the '262 patent, with the first transformer used to charge the weapon's capacitor bank and the second transformer used to step up the capacitor bank voltage to the final output voltage. [Nerheim Decl. at ¶¶ 24, 26 (Ex. 2)] |
| 58. | Mr. Smith believes the Tasertron TE586, TE03 and TE95 indicate the year in which the product was released and they contain two transformers. *Id.* at 89. | **Disputed.** TASER is unaware of any "TE586" or "TE03" device. The cited passage from Mr. Smith's deposition relates to the "TE-86," "TE-93," and "TE-95" devices. [Smith depo. at pp. 88:23-89:25 (Ex. 3)] Even if the Tasertron devices in fact used two transformers, that would not imply that such devices were material to any claim in the '870 patent, '295 patent, or '262 patent. [Nerheim Decl. at ¶ 24 (Ex. 2); Smith Decl. at ¶ 6 (Ex. 1); Tachner Depo. at pp. 70:18-71:3 (Ex. 9)] |
| 59. | Taser was fully aware of the LAPD device M26 and Air Taser U34000 before Taser filed the applications and during prosecution for the '870 and '295 patents. McNulty Depo. at 152-53; Smith Declaration IN 3 and 4 (Depo. Exhibit 29). Taser was aware of the materiality of these devices from the statements of the examiner in the prosecution of these patents and the '762 patent (previously asserted). | **Disputed.** Although TASER was aware of the M26 and M34000 devices at the time it filed the applications for, and during prosecution of, the '870 and '295 patents, Stinger has provided no evidence to support its statement that "T[ASER] was fully aware of the LAPD device." (TASER assumes that the "LAPD device" is the same device as the "Police Special Model Taser" referred to elsewhere in Stinger's |

| Stinger's Statement of Facts | TASER's Opposition |
|---|---|
| See Statements of Allowance Depo. Exhibits 18 (`295 patent September 16, 2005), 19 (`870 patent September 19, 2005) and 8 (`762 patent October 13, 2006) attached.  Taser had purchased their competitor Tasertron and repurchased the LAPD devices (McNulty Depo. at 152-53; Smith Declaration IN 3 and 4 (Depo. Exhibit 29)) and did not disclose this known prior art to the patent office in seeking patent protection. | Statement of Facts.)  Mr. McNulty has no personal knowledge of the design and operation of that device or of TASER's alleged knowledge of it and is not competent to testify on the issues.  In addition, Stinger has provided absolutely no evidence to corroborate Mr. McNulty's statements regarding the device.  *See Finnigan Corp.*, 180 F.3d at 1369 ("[C]orroboration is required of any witness whose testimony alone is asserted to invalidate a patent, regardless of his or her level of interest.")  Moreover, Stinger has provided no evidence that the TASER M26 or M34000 would have been material to the claims of the '870 or '295 patents.  Both those devices, like other prior art stun guns, used single-mode circuits,  [Nerheim Decl. at ¶ 11 (Ex. 2); Smith Decl. at ¶ 7 (Ex. 1)]. Both used battery monitoring techniques very different from that claimed in the '870 patent.  [Nerheim Decl. at ¶ 27 (Ex. 2)]  The M34000 did not have a display like that claimed in the '870 patent.  [*Id.* at ¶ 28 (Ex. 2)] The M26 did not extend pre-timed pulses as claimed in the '870 patent. [*Id.* at ¶ 29 (Ex. 2)]  Nor has Stinger provided any evidence that the alleged "LAPD device," even if it used two capacitors as Stinger alleges, would have been material to the claims of the '870 or '295 patents.  Stinger concedes that two capacitors connected in parallel behave like one capacitor.  [*Id.* at ¶ 23 (Ex. 2); Tachner Depo at p. 64:20-65:3-66:21, 116:14-117:5, 119:9-120:13 (Ex. 9); Smith Decl. at ¶ 5 (Ex. 1)] |

|  | Stinger's Statement of Facts | TASER's Opposition |
|---|---|---|
| 60. | Output delivered in a series of electrical pulses to the target is prior art. Report of Dr. Bernstein, Feb. 12, 1976. Exhibit L Attached. Current compromising of two to forty pulses per second is known in the prior art. Cover patent 4,253,132 claims an apparatus generating "from one to less than twenty" pulses per second. Claims 7 and 12. Ragner patent 5,698,815 states the stun effect can be enhanced by pulsing the current. "Twenty to forty pulses per second have been found very effective in commercial stun guns. . ." Col. 2:40-46. John Murray and Barnet Reznick "A Guide to Laser Technology: Stunguns, Lies and Videotape" (1997) discloses pulses of one per second would not be effective. "If the pulses were at one second intervals, involved muscles would recover in roughly .2 seconds and have .8 seconds to respond voluntarily, e.g. fire a weapon." Page 94. Exhibit M attached. At forty or more pulses per second muscles "seemed to vibrate in more a seizure than a convulsion". *Id.* Consequently, a pulse rate from two to forty pulses per second would be obvious to someone familiar with the prior art. | **Undisputed.** |
| 61. | Use of a programmed microcontroller and a display on a weapon is prior art. Horne patent 5,005,307. Use of microprocessor to control a firearm is prior art. Microprocessors enjoyed wide use by the mid 1990's due to reduced manufacturing costs, enhanced product capability, reduced development cost and increased product reliability. McGraw Hill | **Disputed.** Stinger has provided no evidence to support its statement that "[u]se of a microprocessor to control a firearm is prior art." |

| Stinger's Statement of Facts | TASER's Opposition |
|---|---|
| Concise Encyclopedia of Science and Technology (1984) *Microprocessor* at 1078-79.  Exhibit N Attached.  "A relaxation oscillator . . . adjusted to generate a rectangular waveform having an extremely short duration . . . is referred to as a pulse generator. . . . The term pulse generator is often applied . . . to an electronic instrument designed to generate sequences of pulses with variable delays, pulse widths and pulse train combinations, programmable in a predetermined manner, often microprocessor controlled." *Id.  Pulse Generator* at 1414. | |

### PART II: ADDITIONAL FACTS THAT ESTABLISH A GENUINE ISSUE OF MATERIAL FACT OR OTHERWISE PRECLUDE JUDGMENT IN FAVOR OF STINGER

### Significant Background Facts

**A.     Early stun gun technology.**

62.     Electronic control devices (ECDs or stun guns) have been around since the 1970's or earlier.  [Smith Decl. at ¶ 7 (Ex. 1); *see* '262 pat. col. 1:28-47 (Ex. 7); '295 pat. col. 1:22-23 (Ex. 5)]

63.     Early versions of ECDs were large, heavy, and only marginally effective at incapacitating a target.  [Smith Decl. at ¶ 7 (Ex. 1); *see* '262 pat. col. 1:49-2:21 (Ex. 7); '295 pat. col. 2:50-58 (Ex. 5)]

64.     Early ECDs attempted to use pain as the means of imposing control, whereas TASER's modern products incapacitate a target by interrupting the target's ability to control muscle movement.  [Smith Decl. at ¶ 7 (Ex. 1); *see* Smith Depo. at p. 32:16-21 (Ex. 3); '262 pat. col. 1:49-2:21 (Ex. 7); '295 pat. col. 2:33-44 (Ex. 5)]

**B.     TASER's start as a family business.**

65.     TASER International, Inc. began as a family business in 1993.  The initial name of the company was ICER Corporation.  Patrick ("Rick") Smith and his brother Tom started the company with a business plan that Rick developed while at the University of Chicago earning his MBA.  The Smiths set out to enhance the sate of the stun gun art to make effective ECDs available to ordinary citizens and law enforcement officers.  [Smith Decl. at ¶ 7 (Ex. 1); *see* Smith Depo. at pp. 5:1-7, 6:18-19, 147:18-148:3 (Ex. 3)]

66.     With some backing from family members, the Smiths acquired patent rights and some ECD designs from Jack Cover, an early pioneer in the field.  [Smith Decl. at ¶ 7 (Ex. 1); *see* Smith Depo. at p. 8:6-10 (Ex. 3)]

**C.     TASER's commitment to research and development.**

67.     Some of TASER's early products met with only modest success.  Periodically, Rick and Tom Smith had to decide whether to let the company go out business.   TASER has continuously increased its investment in technological development.  [Smith Decl. at ¶ 7 (Ex. 1)]

68.     Today, TASER trades on the NASDAQ and is the world's leading supplier of less lethal ECD equipment.  Rick Smith still serves as company CEO.  [Smith Decl. at ¶ 7 (Ex. 1); Smith Depo. at p. 4:18-19 (Ex. 3)]

**D.     TASER's M26 product.**

69.     The M26 was developed before the X26.  The motivation to develop the M26 crystallized in 1995, while Rick Smith was in Europe demonstrating the company's then-latest product to the Czech National Police Academy.  A volunteer from the audience was able to "fight through" the effects of the product and to place Rick in a wrestling headlock.  [Smith Decl. at ¶ 7 (Ex. 1); *see* '262 pat. col. 1:49-2:21 (Ex. 7)]

70.     Following his experience with the 1995 demonstration, Rick Smith launched and personally led an overhaul of TASER's ECD product, focusing on fundamental research into a new concept for ECD's.  Rather than relying on pain to control the target, that research led to a new ECD power supply designed to deliver energy to interrupt temporarily the nerve signals sent to the target's skeletal muscles, thereby locking up the

target and eliminating any ability to flee or fight back.  [Smith Decl. at ¶ 7 (Ex. 1); Smith Depo. at pp. 32:6-21, 33:10-35:2 (Ex. 3); *see* '262 pat. col. 4:17-59 (Ex. 7)]

### E.   Inventions claimed in the '262 patent.

71.   Part of Rick Smith's development of the M26 focused on features to enhance the utility and user-friendliness of ECDs deployed to law enforcement officers. [Smith Decl. at ¶ 7 (Ex. 1); Smith Depo. at p. 32:14-25 (Ex. 3)]

72.   Proving the circumstances in which a law enforcement office has deployed an ECD was a long-standing problem.  Prior to the M26, Rick Smith and his team at TASER had developed the idea of having an ECD scatter confetti-like tags with a particular serial number when the ECD was fired to provide identifying evidence of deployment and use.  [Smith Decl. at ¶ 7 (Ex. 1); Smith Depo. at p. 23:18-21 (Ex. 3)]

73.   In developing the M26, Rick Smith invented a better technique that relies in part on the ECD's microprocessor to facilitate capturing and storing data about an ECD's deployment and use.  That technique was also included in the later-developed TASER X26 device.  [Smith Decl. at ¶ 7 (Ex. 1); Smith Depo. at p. 23:18-21 (Ex. 3)]

74.   The time and date recording feature of the TASER M26 and X26 devices is covered by the '262 patent.  [Smith Decl. at ¶ 7 (Ex. 1); Smith Depo. at p. 32:14-24 (Ex. 3)]

### F.   Development of TASER's X26 product.

75.   The M26 was introduced in 1999.  The X26 was introduced in 2003.  [Smith Decl. at ¶ 7 (Ex. 1); Smith 10/27/05 37 C.F.R. § 1.132 Decl. at ¶ 4 (Ex. 8); Nerheim Depo. at p. 16:9-15 (Ex. 4)]

76.   After the M26 had become an established market success, TASER sought to make an even better ECD product for law enforcement.  The research and development effort was led by TASER's head of engineering, Magne ("Max") Nerheim.  [Smith Decl. at ¶ 7 (Ex. 1); Smith Depo. at pp. 35:24-36:6 (Ex. 3); Nerheim Decl. at ¶ 16 (Ex. 2); Nerheim Depo. at pp. 18:25-19:20 (Ex. 4)]

77.     Max Nerheim is an electrical engineer.   Before accepting full-time employment at TASER, Mr. Nerheim had also worked as a consultant on the circuit implementation of Rick Smith's inventions and specifications for the M26.   [Nerheim Decl. at ¶¶ 5-7 (Ex. 2); Nerheim Depo. at pp. 12:12-14:25 (Ex. 4)]

78.     Unlike the M26, the X26 was Mr. Nerheim's creation from the ground up. [Nerheim Decl. at ¶ 16 (Ex. 2); Smith Decl. at ¶ 7 (Ex. 1); Smith Depo. at pp. 35:24-36:6 (Ex. 3); Nerheim Depo. at pp. 18:25-19:20 (Ex. 4)]

79.     A principal objective for the X26 design was the elimination or reduction of three drawbacks of the M26—size, weight and energy consumption.   [Nerheim Decl. at ¶ 16 (Ex. 2); Smith Decl. at ¶ 7 (Ex. 1); Smith 10/27/05 37 C.F.R. § 1.132 Decl. at ¶ 9 (Ex. 8); Smith Depo. at p. 90:14-25 (Ex. 3); Nerheim Depo. at p. 44:20-24 (Ex. 4); *see* '295 pat. col. 10:4-25 (Ex. 5)]

80.     Although far more compact and efficient than prior ECD designs, the M26 still required a large battery pack and a bulky form factor.   [Nerheim Decl. at ¶ 16 (Ex. 2); Smith Decl. at ¶ 7 (Ex. 1); *see* '295 pat. col. 2:50-58 (Ex. 5)]

81.     Mr. Nerheim invested months in the development effort that led to the X26. Early on, he determined that radically new power supply and energy delivery techniques would be needed to shrink the size and weight and boost the energy efficiency of the new ECD.   After experimenting unsuccessfully with many possible approaches, Mr. Nerheim finally developed a novel solution that met the design objectives for the X26.   [Nerheim Decl. at ¶¶ 17-19 (Ex. 2); Smith Decl. at ¶ 7 (Ex. 1); Nerheim Depo. at pp. 19:5-20:19; 109:19-111:2 (Ex. 4)]

**G.     The prior "blunt pulse" approach.**

82.     The M26 relied on the traditional approach of using a blunt pulse or a blunt waveform to incapacitate a target.   When operated, the M26 repetitively sends out blunt pulses at the rate of around 15-20 blunt pulses per second.   [Nerheim Decl. at ¶ 10 (Ex. 2); Smith Decl. at ¶ 7 (Ex. 1); Nerheim Depo. at p. 20:9-11 (Ex. 4); Smith Depo. at p. 39:13-14 (Ex. 3)]

83.     When fired, the M26 shoots out two electrodes, in the form of small barbed darts, that remain tethered to the device by thin electrical wires.  If one or both of the barbed darts do not penetrate the skin of the target (e.g., if the target is wearing thick clothing), an air gap may be formed between the electrodes and the skin of the target.  Because air has near infinite impedance to electric current, the level of impedance within the air gap must be reduced for current to flow from the ECD to the target under those circumstances.  [Nerheim Decl. at ¶ 10 (Ex. 2); Smith Decl. at ¶ 7 (Ex. 1); see Nerheim Depo. at pp. 11:10-14, 67:25-68:6, (Ex. 4); Smith Depo. at p. 39:13-14 (Ex. 3); '262 pat. col. 3:14-28 (Ex. 7); '295 pat. col. 1:32-42, col. 2:19-3:27 (Ex. 5)]

84.     The M26 is capable of generating a high voltage across the air gap, which ionizes the air within the gap and lowers the impedance.  The reduction of impedance allows current to begin to flow to the target and lock up muscle movement.  [Nerheim Decl. at ¶ 11 (Ex. 2); Smith Decl. at ¶ 7 (Ex. 1); see '295 pat. col. 2:19-3:27 (Ex. 5)]

85.     The output of the M26 is called a "blunt pulse" because the output is one big pulse that is generated by a single mode of operation of the power supply.  The single pulse has enough energy both to lower the impedance in the case of an air gap and to deliver current to the target once the impedance is low enough.  [Nerheim Decl. at ¶ 11 (Ex. 2); Smith Decl. at ¶ 7 (Ex. 1); Nerheim Depo. at p. 20:9-15 (Ex. 4); see '295 pat. col. 2:19-3:27 (Ex. 5); see also Saliga Depo. at pp. 21:7-22:9 (Ex. 11)]

86.     When viewed on an oscilloscope, the blunt pulse of the M26 appears as a damped sinusoid—a waveform that oscillates up and down with an amplitude that tapers off with each succeeding oscillation.  [Nerheim Decl. at ¶¶ 13-14 (Ex. 2); Smith Decl. at ¶ 7 (Ex. 1); Smith Depo. at p. 37:12-19, (Ex. 3); SS-WP-11 at Fig. 1 (Ex. 12)]

87.     A tracing of the M26 waveform appears as follows:



[SS-WP-11 at Fig. 1 (Ex. 12)]

88. The operation of the blunt pulse approach of the M26 can be analogized to a spring connected to a weight above the ground. When the weight is dropped, the spring will extend and contract like a yo-yo except the up and down movement of the weight will grow smaller until it eventually reaches a resting point. [Nerheim Decl. at ¶ 15 (Ex. 2)]

**H.  Mr. Nerheim's novel improvement over the blunt pulse approach.**

89. Mr. Nerheim discovered that the blunt pulse approach wasted energy and required a large battery pack because the single large pulse, damped sinusoid was forced to do two jobs with only one mode of operation. The blunt pulse had to be large enough both to overcome an air gap and to deliver and incapacitating current. [Nerheim Decl. at ¶ 10 (Ex. 2)]

90. In his invention, Mr. Nerheim replaced the single large blunt pulse operation with a power supply capable of operating in two modes. In the first mode, the power supply was configured to efficiently generate a large voltage to ionize air within an air gap between one of the ECD electrodes and the target. The effect of ionizing the air was to lower the impedance within the air gap. In the second mode of operation, the power

supply was configured to efficiently deliver current to the target, taking advantage of the ionization generated by the first mode of operation.  [Nerheim Decl. at ¶¶ 17-19 (Ex. 2); Nerheim Depo. at pp. 20:9-19, 69:3-17 (Ex. 4); *see* '295 pat. col. 3:30-49, col. 20:6-25 (claim 2), col. 24:37-56 (claim 40) (Ex. 5)]

91.     Mr. Nerheim's invention allowed the X26 power supply and battery pack to be smaller, lighter and more efficient in comparison to the M26 and other prior ECDs. [Nerheim Decl. at ¶ 19 (Ex. 2); Nerheim Depo. at p. 44:20-24 (Ex. 4); Smith 10/27/05 37 C.F.R. § 1.132 Decl. at ¶ 9 (Ex. 8); Smith Depo. at p. 90:14-25 (Ex. 3); *see* '295 pat. col. 9:28:43, 10:17-25 (Ex. 5)]

**I.     The Nerheim patents (including the '295 and '870 patents).**

92.     Mr. Nerheim's work on the X26 led to a collection of related patent applications, many of which issued as United States patents, among which are the '295 patent and the '870 patent.  [*See* '295 pat. front page (Ex. 5); '870 pat. front page (Ex. 6)]

93.     The '295 patent includes the asserted claims that relate to the dual-mode power supply described above.  ['295 pat. col. 20:6-25 (claim 2), col. 24:37-56 (claim 40) (Ex. 5)]

94.     The '870 patent includes the asserted claims that relate to other features, such as a center-tapped output transformer and a novel battery capacity monitoring system.  ['870 pat. col. 19:56-20:48 (claims 1-4) (Ex. 6)]

**J.     Stinger's decision to copy TASER's patented technology.**

95.     Prior to making the S-200, Stinger had been marketing an ECD product called the S-400.  The S-400 was large and unwieldy.  [Gruder Depo. at. pp. 38:11, 39:14-25 (Ex. 10)]

96.     Lacking internal design expertise, Stinger hired an outside electronics firm, EDA of Florida, to come up with a smaller, more effective product.  [Gruder Depo. at. pp. 38:9-41:2 (Ex. 10); Saliga Depo. at p. 12:4-11 (Ex. 11)]

97.     Stinger's outside design consultant, Tom Saliga, acknowledged to Stinger's CEO, Robert Gruder, that anyone could make an ECD with the incapacitating power of

TASER's products if the ECD were as big as a coffee can. The "challenge" was making the ECD as small and efficient as TASER had achieved with its products. [Gruder Depo. at. pp. 87:24-88:9 (Ex. 10)]

98. At his deposition, Mr. Saliga conceded that he and his staff obtained and tested TASER's X26 product, and they retrieved and studied the invention disclosed in the Nerheim patent applications as an initial step in their work. [Saliga Depo. at pp. 19:8-29:3, 81:19-82:6, 131:1-133:6 (Ex. 11); *see* Gruder Depo. at pp. 47:8-18, 82:8-83:21 (Ex. 10)]

99. The written description and figures common to the Nerheim patent applications were first published by the United States Patent and Trademark Office in August of 2004. [*See* '870 pat. front page (referencing pre-grant publication no. US 2004/156163 A1, published Aug. 12, 2004) (Ex. 6)]

100. Tom Saliga and his staff began working on the S-200 in approximately the late spring of 2006. [Saliga Depo. at p. 12:4-11 (Ex. 11); Gruder Depo. at p. 39:7-13 (Ex. 10)]

101. The S-200 infringes claims 2 and 40 and of the '295 patent and various claims of the '870 and '262 patents. [Rodriguez Infringement Report at ¶¶ 11, 36, 65 (Ex. 28)]

102. Robert Gruder commissioned a technical white paper that was authored by Tom Saliga. [SS-WP-11 (Ex. 12); Saliga Depo. at pp. 214:15-215:16 (Ex. 11); Gruder Depo. at pp. 146:3-148:10, 196:16-197:8 (Ex. 10)]

103. The technical white paper includes the following analogy:

> . . . What is needed is something akin to a two-speed gear shift automobile—one gear gets you going from a dead stop and the other does the fast moving. Guns which can 'switch gears' is a big factor which separates the men from the boys in effectiveness. . . .

> **Guns With a Two-Speed Gear Shift:**

> The design of an effective stun gun electrical waveform requires that the fired darts manage to arc and spark through the target's outer clothes and the, once an ionized-air and

highly conductive plasma arc is established, the gun must somehow automatically shift gears, so to speak, and drive home (to the target body) a much larger electrical current but with lower voltage to cause effective involuntary muscle contraction.  Further, once the plasma arc has been established, then the wave shape and timing of the subsequent electrical waveform is important for "smart" muscle contraction. . . .

[SS-WP-11 at p. 1 (Ex. 12)]

**K.    The commercial success of the claimed inventions at issue.**

104.    Today, the X26 is the best selling ECD product in the world.  It sells in greater volume and at a significantly higher price than TASER's M26.  [Smith Decl. at ¶ 9 (Ex. 1); *see also* Smith 10/27/05 37 C.F.R. § 1.132 Decl. at ¶¶ 12-18 (Ex. 8)]

**I.    CLAIMS 2 AND 40 OF THE '295 PATENT ARE VALID.**

**A.    Each Cited Prior Art Reference Omitted Limitations of Claims 2 and 40 and Therefore Failed to Anticipate Those Claims.**

**1.    Stinger has failed to establish by clear and convincing evidence that the M34000 anticipated the asserted claims.**

105.    The M34000 is an early model stun gun developed by TASER that uses the same single mode blunt pulse approach used in the TASER M26.  [Nerheim Decl. at ¶¶ 6, 11 (Ex. 2)]  The M34000 does not have a first mode or second mode as recited in the '295 patent.  [*Id.* at ¶ 11; Rodriguez Rebuttal Report at ¶ 11 (Ex. 13)]

106.    The '295 patent illustrates the M26 in Figure 1 and distinguishes the M26 from claims 2 and 40.  ['295 pat. Fig. 1, col. 1:43-3:49, 16:12-14 (Ex. 5); Nerheim Decl. at ¶ 14 (Ex. 2)]

107.    The M26 and M34000 output a single large pulse of energy that is used both to overcome the air gap and to deliver current to the target.  [Nerheim Decl. at ¶ 11 (Ex. 2); Smith Decl. at ¶ 7 (Ex. 1); Nerheim Depo. at p. 20:9-15 (Ex. 4); *see* '295 pat. col. 2:19-3:27 (Ex. 5); *see also* Saliga Depo. at pp. 21:7-22:9 (Ex. 11)]

108.    Stinger's expert Leonard Tachner contends that the damped sinusoid waveform taken with an oscilloscope connected to the M34000 shows two modes.

[Statement of Tachner, at p. 4 (Ex. A-2 to Decl. filed with Stinger's Motion (Doc. 157-2))]

109.   The M26 circuitry shown in Figure 1 of the '295 patent outputs a damped sinusoid waveform.  [Nerheim Decl. at ¶¶ 13-15 (Ex. 2); Smith Depo. at p. 37:12-19, (Ex. 3); SS-WP-11 at Fig. 1 (Ex. 12)]

110.   One cannot tell from an output waveform alone how the internal circuits of a stun gun are designed.  [Nerheim Decl. at ¶ 12 (Ex. 2); Tachner Depo. at p. 49:19-25 (Ex. 9)]

### 2.   Stinger has failed to establish by clear and convincing evidence that the M34000 anticipated the asserted claims.

111.   Stinger's evidence regarding the design and operation of the purported "Taser Public Defender" consists of a paper discussing supposed testing and uncorroborated statements by Stinger's expert Mr. Tachner that he used such devices in the long ago past.  [Ex. L filed with Stinger's Statement of Facts (Doc. 156-5); Statement of Tachner, at p. 4 (Ex. A-2 to Decl. filed with Stinger's Motion (Doc. 157-2)); Tachner Depo. at pp. 52:15-53:8 (Ex. 9)]

### B.   The X26 Does Not Anticipate Because the Priority Date of the '295 Patent is 2003.

112.   The X26 is the stun gun that Max Nerheim designed using his inventions from claims 2 and 40 of the '295 patent.  [Nerheim Decl. at ¶ 16 (Ex. 2); Nerheim Depo. at pp. 19:5-20:19 (Ex. 4); *see* '295 pat. col. 10:26-27, col. 16:12-14 (Ex. 5)]

### 1.   The effective filing date of the '295 patent is May 2003 or earlier.

113.   The '295 patent is a continuation of an earlier application (No. 10/447,447) filed on May 29, 2003.  ['295 pat. front page (Ex. 5)]

114.   The written description and figures of the '295 patent are the same as the written description and figures of the May 2003 parent application (No. 10/447,447).  [*Compare* '295 pat. (Ex. 5) *with* '870 File History (Ex. 15)]

115.   Both the '295 patent and the May 2003 parent application (application No. 10/447,447) name Max Nerheim as an inventor.  ['295 pat. front page (Ex. 5); '870 File History, Transmittal for Utility Patent Application filed May 29, 2003, at p. 1:3 (Ex. 15)]

116.   The application for the '295 patent was filed on February 5, 2005.  ['295 pat. front page (Ex. 5)]  The May 2003 parent application (No. 10/447,447) remained pending in the PTO until it issued as U.S. Patent No. 7,102,870 on September 5, 2006.  ['870 pat. front page (Ex. 6)]

117.   The '295 patent specifically refers to the May 2003 parent application (No. 10/447,447).  ['295 pat. front page & col. 1:12-16 (Ex. 5)]

**2.   Stinger cannot meet its burden to show by clear and convincing evidence that the May 2003 parent application failed to disclose the invention of claims 2 and 40 of the '295 patent in the manner required by 35 U.S.C. § 112, first paragraph.**

118.   The written description and figures of the '295 patent are the same as the written description and figures of the May 2003 parent application (No. 10/447,447).  [*Compare* '295 pat. (Ex. 5) *with* '870 File History (Ex. 15)]  Moreover, the written description and figures of the May 2003 parent application expressly disclose all limitations of claims 2 and 40 of the '295 patent.  [*See, e.g.*, '870 File History, Specification filed May 29, 2003 at pp. 7:17-8:6, 14:20-15:21, 18:10-19:14, 23:21-25:4, 43:9-44:13 & Figs. 2, 3A, 3B, 4A, 4B, 9, 10, 11, 13, 15, 19, 20, 24, 25 (Ex. 15)]

**3.   Stinger's arguments about the prosecution history of the '762 patent are wrong, but also completely beside the point.**

119.   The prosecution history statements that Stinger cites at pages 3 and 4 of its Motion related to the '762 patent, not the '295 patent.  [Motion at p. 3]  Some of the claims in the '762 patent expressly recite (in general terms) delivering a first high voltage output from a first capacitor in one configuration and a second lower voltage output from a second capacitor in a second configuration.  [*E.g.*, '762 pat. col. 9:60-10:33 (claim 1) (Ex. 25)]  That is one way, but not the only way, to implement claims 2 and 40 of the '295 patent.  [Nerheim Depo. at p. 116:10-21 (Ex. 4)]

120.   The '762 patent application was filed on February 11, 2003.  ['762 pat. front page (Ex. 25)]

**C.**   **Claims 2 and 40 Cover Patentable Subject Matter, Not an Abstract Law of Nature.**

    **1.**   **New devices or methods that incorporate laws of nature <u>are</u> patentable.**

    **2.**   **'295 claims 2 and 40 claim a new machine and a new method of using the machine, not an unpatentable abstract principle.**

121.   When an electrode of an ECD (stun gun) hits a target's clothing without touching the skin, the air gap between the electrode and the target has near infinite impedance to the delivery of incapacitating current to the target.  ['295 pat. col. 1:35-42 (Ex. 5); Nerheim Decl. at ¶ 10 (Ex. 2)]  To allow current to reach the target, a high voltage needs to be applied, which will have the effect of ionizing the air molecules in the gap and reduce impedance through the formation of free electrons.  ['295 pat. col. 3:15-27 (Ex. 5); Nerheim Decl. at ¶ 10 (Ex. 2); *see also Markman Tr.* at 66:18-67:23 (describing ionization process)]

122.   The '295 patent explains that the principle of ionizing an air gap to reduce air gap impedance was recognized and used in prior art ECDs, such as the single mode ECD depicted in Figure 1 of the patent.  ['295 pat. col. 2:20-30 (Ex. 5)]

123.   The '295 patent discloses and claims a new dual-mode power supply that harnesses the principle of decreased impedance through increased ionization to provide a more efficient, compact and effective ECD.  ['295 pat. col. 20:5-25 (claim 2) (reciting a "dual mode electronic disabling device" with a power supply that operates in two modes to generate a first high voltage output to deliver incapacitating current), 24:38-56 (claim 40) (reciting a method of using an ECD to apply a first high voltage output to ionize air and to subsequently apply a second lower voltage output to deliver incapacitating current) (Ex. 5); Nerheim Decl. at ¶ 19 (Ex. 2)]

**D. The Subject Matter of Claims 2 and 40 of the '295 Patent Was Not Obvious When Max Nerheim Invented It.**

    **1. Stinger's motion mistakes the governing legal standard and the evidentiary burden of establishing obviousness.**

124. Today, the X26, which embodies the inventions of claims 2 and 40 of the '295 patent, is the best selling ECD product in the world. It sells in greater volume and at a significantly higher price than TASER's M26. [Smith Decl. at ¶ 9 (Ex. 1); *see also* Smith 10/27/05 37 C.F.R. § 1.132 Decl. at ¶¶ 12-18 (Ex. 8)]

125. Substantial evidence exists that Stinger copied the X26 to create the S-200. *See* paragraphs 92-100, above.

126. The X26 satisfied a long-felt, but previously unmet need for a small, lightweight, efficient ECD. [Smith Decl. at ¶ 10 (Ex. 1)]

    **2. Stinger cannot rely on mere argument or conclusory statements by experts or uncorroborated testimony about prior art to establish obviousness or eliminate triable fact issues.**

127. Stinger's proposed patent law expert, Leonard Tachner, submitted the only following statement regarding the impact of the *KSR* decision should have on the effect of the Gowan patent (U.S. No. 5,471,362):

> In regard to the '295 patent, I am of the opinion that the statement of reasons for allowance issued by the Patent Office examiner would not hold up today after the 2007 KSR International decision of the U.S. Supreme Court. In that decision the Court said, in effect, that the prior art may be in a different field (i.e., spark plug in an engine) and not necessarily in the same field (i.e., stun gun type device). The Court said that "the analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inference and creative steps that a person of ordinary skill in the art would employ." The use of a first higher voltage to create an arc and a second lower voltage to cause current to flow over the same path, was known in the prior art as noted by the examiner in his citation of U.S. Patent No. 5,471,362 to Gowan. Based on the foregoing, it is my opinion that under the current law of patents, the asserted claims of the three Taser International patents would be considered obvious and thus invalid.

[Statement of Tachner, at p. 9 (Ex. A-2 to Decl. filed with Stinger's Motion (Doc. 157-2))]

128.    Regarding the M34000, Stinger's proposed patent law expert Mr. Tachner, in his Supplemental Statement, stated only that "I wish to further point out that each element of claims 2 and 4 of the '295 patent is found in the prior art Taser 34000 unit and in the prior art Taser Public Defender unit when operated."  [Supp. Statement of Tachner, at ¶ 8 (Ex. A-1 to Decl. filed with Stinger's Motion (Doc. 157-1))]

129.    Stinger's sole support regarding the purported design and operation of the alleged "Police Special" device is deposition testimony of Mr. McNulty, Stinger's counsel of record.  See paragraphs 5, 44, 46, 47, and 51, above.

**3.      Triable fact issues about the prior art must be resolved <u>before</u> the Court can make a final non-obviousness determination.**

**a.      Neither the Gowan patent nor the examiner's statements about it dictate a resolution of the disputed fact issues.**

130.    Claim 1 of the '295 patent recites "a first transformer for creating an arc and a second transformer with a lower output voltage to maintain current across the arc." ['295 pat. col. 20:2-4 (Ex. 5)]  Claim 2 of the '295 patent does not recite transformers at all.  [*Id.* col. 6-25 (claim 2) (Ex. 5)]  Neither does Claim 40 of the '295 patent.  [*Id.* col. 24:37-56 (claim 40) (Ex. 5)]

131.    TASER's expert Dr. Rodriguez explained that the Gowan patent (U.S. Patent No. 5,471,362) relates to igniter devices, not electronic control devices or stun guns.  [Rodriguez Rebuttal Report at ¶ 23 (Ex. 13)]

132.    The Gowan patent relates to a circuit to make a spark plug system work better in the presence of dirty fuel.  [Gowan pat. col. 1:5-14 (Ex. 26)]  The disclosed design allowed a standard spark plug to be used, rather than the special spark plug that was used with prior art systems.  [*Id.* col. 4:26-30 (Ex. 26)]  The sparks used with the Gowan circuits are designed for ignition and therefore last only a few microseconds.  [*See id.* col. 3:40-43 (6 microsecond pulse) (Ex. 26)]  According to Stinger's own documents, that is orders of magnitude less than the pulses used with stun guns, which are designed for incapacitation and thus need to last much longer—typically, a few hundred microseconds:

> Based on these biomedical shock sensitivity curves, a short pulse, say 20 microseconds, is only about 25% as effective as a 200 microsecond pulse at causing perceptible shock. Therefore, single, fast pulses are poor candidates for efficient voluntary muscle contraction. **And recognition of this fact is one of the keys to making a 'smarter' waveform for a stun gun.** It becomes clear that gun waveforms which generate a single, very-short electrical pulse will have to output massively larger energies to force this inherently slow process to take place. The T[ASER] M26 is a good example of this.

[SS-WP-11 at p. 2 (Ex. 12)]  Moreover, the circuits disclosed in Gowan are designed to plug into the electrical grid, whereas stun guns are designed to be portable and so use batteries.  [*See* Gowan pat. col. 1:25-26 ("[A] transformer 1 produces a 2000 RMS AC voltage with a normal 120 or 220 vac input.") (Ex. 26)]

**b.  Neither the Gowan patent nor the examiner's statements about it dictate a resolution of the disputed fact issues.**

133.  The '295 patent identifies the M26 as a commercial embodiment of the prior art circuit shown in Figure 1 of the patent. ['295 pat. col. 1:43-3:27, Fig. 1 (Ex. 5)]

134.  The M26 and M34000 have only one mode of operation to generate voltage sufficient to overcome an air gap and then deliver current to the target.  [Nerheim Decl. at ¶ 11 (Ex. 2)]

**c.  The purported Police Special Model is not properly before the court and is the subject of triable fact issues.**

135.  Mr. McNulty, the only source of information that Stinger has provided regarding the purported "Police Special" device conceded that the two capacitors in that device were connected in parallel.  [McNulty Depo. at pp. 159:5-21, 173:19-174:24 (Ex. 27)]

136.  Stinger's expert Mr. Tachner conceded that, when two capacitors are connected in parallel, they will behave as one bigger capacitor and discharge together.  [Tachner Depo. at pp. 65:23-66:21, 71:17-72:12 (Ex. 9); *see also* Nerheim Decl. at ¶ 23 (Ex. 2)]  He also conceded that a circuit using two parallel capacitors (as Stinger purports were used in the "Police Special") could be the type of single-mode prior art circuit shown in Figure 1 of the '295 patent.  [*Id.* at pp. 65:23-66:11; 116:14-117:5]

### 4. Substantial evidence in support of secondary considerations of non-obviousness raises a triable fact issue.

137.   Claims 2 and 40 of the '295 patent cover the core technology of TASER's X26 product.  [Nerheim Decl. at ¶¶ 17-18 (Ex. 2)]

138.   TASER has sold hundreds of thousands of X26 devices—far surpassing the volume of any other stun gun in history, and has been able to sell the X26 at almost double the price of the M26.  [Smith Decl. at ¶ 9 (Ex. 1); *see also* Smith 10/27/05 37 C.F.R. § 1.132 Decl. at ¶¶ 12-18 (Ex. 8)]

139.   Substantial evidence exists that Stinger copied the X26 to create the S-200. *See* paragraphs 92-100, above.

140.   The X26 satisfied a long-felt but unmet need for a reduction in size of ECDs deployed to law enforcement personnel.  [Smith Decl. at ¶ 10 (Ex. 1)]

### E. Stinger's S-200 ECDs Use the Dual-Mode Technology Invented by Max Nerheim, Not the Single-Mode Technology of the Prior Art.

141.   The S-200 includes two transformers and a capacitor bank comprising multiple capacitors.  [Tachner Depo. at pp. 65:8-11, 70:1-4 (Ex. 9)]

142.   It is possible to have a single-mode circuit using more than one capacitor and more than one transformer.  [Tachner Depo. at pp. 65:24-66:11, 70:18-71:3 (Ex. 9)] And it is also possible to have a dual-mode circuit using one, two, or three capacitors, or one, two, or three transformers.  [Nerheim Depo. at p. 115:10-21 (Ex. 4)]

143.   Dr. Rodriguez concluded that the S-200 operates with two distinct modes in satisfaction of all the limitations of both claims 2 and 40.  [Rodriguez Infringement Report at ¶¶ 11, 16, 17, 20-21 (Ex. 28)]

## II. STINGER IS NOT ENTITLED TO SUMMARY JUDGMENT THAT CLAIMS 1-4 OF THE '870 PATENT ARE EITHER INVALID OR NOT INFRINGED.

### A. '870 Claim 1.

#### 1. Stinger has not shown anticipation of '870 claim 1.

144.   The Kaufman patent (U.S. Patent No. 5,194,048) discloses neither a "digital memory device for storing battery capacity data indicating the amount of battery capacity

consumed or remaining" nor a "data interface for communicating between the battery system and the memory device to adjust the battery capacity data stored in the memory device." [Rodriguez Rebuttal Report at ¶¶ 27, 28 (Ex. 13)]

145.   Stinger's expert Mr. Tachner could not identify a memory device in the Kaufman patent.  [Tachner Depo. at p. 117:21-24 (Ex. 9)]

146.   The Kaufman patent expressly teaches that the disclosed "14 stage ripple carry counter" does not store or communicate any information relating to battery capacity: "[T]he above-described low battery indication circuit functions as a counter, and not as an actual evaluation of the batteries comprising the power source BTl . . . . [T]he 14 stage ripple carry counter U2, unaware of the quality of the replacement batteries, will by virtue of the reset input RST, start to count from a 'zero' count anytime the batteries are removed and replaced." ['048 pat. col. 5:53-63 (Ex. 18)]

### 2.   Stinger has not shown that '870 claim 1 is obvious.

147.   None of the patents that Stinger cites discloses the claimed "digital memory device for storing battery capacity data indicating the amount of battery capacity consumed or remaining" or the claimed "data interface for communicating between the battery system and the memory device to adjust the battery capacity data stored in the memory device." [Rodriguez Rebuttal Report at ¶¶ 27, 28 (Ex. 13)]

### 3.   Triable issues of fact preclude summary judgment that the S-200 does not infringe '870 claim 1.

148.   The S-200 includes each limitation recited in claim 1 of the '870 patent. [Rodriguez Infringement Report at ¶¶ 36-45 (Ex. 28)]

### B.   '870 Claim 2.

### 1.   Stinger has not shown that '870 claim 2 is anticipated.

149.   Stinger's sole evidence about the operation of the flashing light in the M34000 is a declaration from its CEO, Robert Gruder.  [Gruder Declaration (Ex. B to Decl. filed with Stinger's Motion (Doc. No. 157-2))]

150.    The M34000 operator's manual says only that the device included a flashing light to indicate battery health.  [Manual at pp. 2, 12 (Ex. D to Stinger's Statement of Facts (Doc. No. 156-3))]

151.    Stinger's expert Mr. Tachner was unable to identify a battery indicator on the "U34000" schematic provided by Stinger.  [Tachner Depo at p. 44:4-8 (Ex. 9)]

### 2.    Stinger has not shown that '870 claim 2 is obvious.

152.    Both Kaufman and United States Patent No. 4,541,191 to Morris were before the PTO during prosecution of the '870 patent.  ['870 pat. front page (references cited) (Ex. 6)]

153.    Neither Kaufman nor Morris, nor any of the other references in Stinger's Invalidity Chart disclosed the claimed "display for indicating to the user the amount of time remaining in each pulse sequence."  [Rodriguez Rebuttal Report at ¶ 32 (Ex. 13)]

### 3.    Triable issues of fact preclude summary judgment that the S-200 does not infringe '870 claim 2.

154.    Stinger's expert admitted that he did not examine the S-200 programming code. [Tachner Depo. at p. 81:5-19 (Ex. 9)]

155.    Dr. Rodriguez concluded, based on the S-200 software and schematics, that the S-200 includes each limitation of claim 2 of the '870 patent.  [Rodriguez Infringement Report at ¶¶ 46-51 (Ex. 28)]

156.    Stinger's training manual characterizes the device's display as a "four red lamp bar-graph display [that] indicates seconds trigger is pulled."    [Rodriguez Infringement Report at ¶ 50; Stinger Student Manual at p. 46 (Ex. 28)]

### C.    '870 Claim 3

### 1.    Stinger has not shown that claim 3 is anticipated.

### 2.    Stinger has not shown that claim 3 is obvious.

157.    Both Kaufman and Dunning (United States Patent No. 4,872,084) were before the PTO during prosecution of the '870 patent.  ['870 pat. front page (references cited) (Ex. 6)]

158.   Dunning does not disclose pre-timed pulses at all, and Kaufman teaches that its electrical output will always stop after a set 15 second period.  [Rodriguez Rebuttal Report at ¶ 37 (Ex. 13)]

**D.     '870 Claim 4**

    **1.     Stinger has not shown that claim 4 is anticipated.**

159.   Darrell (United States Patent No. 4,370,696) was before the PTO during prosecution of the '870 patent.  ['870 pat. front page (references cited) (Ex. 6)]

160.   Stinger's expert Mr. Tachner admitted that the circuit disclosed in Darrell would not operate to produce a positive voltage at one electrode and a negative voltage at the other (with respect to ground).  [Tachner Depo. at pp. 106:7-107:2 (Ex. 9)]

    **2.     Stinger has not shown that claim 4 is obvious.**

161.   Parker (United States Patent No. 5,892,646) relates to lamp power supplies, not to electronic control devices.  [Rodriguez Rebuttal Report at ¶ 40 (Ex. 13)]

    **3.     Triable issues of fact preclude summary judgment that the S-200 does not infringe '870 claim 4.**

162.   The accused versions of the S-200, which include a center-tapped output transformer, do not include a "bridge rectifier circuit" or "coupling diode bridge," as the bridge rectifier circuit was not added until late 2007 or early 2008, whereas the center-tapped output transformer was removed earlier.  [Saliga Depo. at pp. 90:20-91:17 (Ex. 11)]

163.   Stinger's expert Mr. Tachner admitted that the configuration of diodes used on the accused versions of the S-200 produce a positive voltage at one electrode and a negative voltage at the other.  [Tachner Depo. at p. 96:11-97:11 (Ex. 9); Saliga Depo. at pp. 90:4-91:4 (Ex. 11)]

164.   The oscilloscope tracing cited by Stinger was created using S-200 Serial No. S2474.  [Rodriguez Infringement Report at Ex. C (Ex 28)]

III.   **STINGER IS NOT ENTITLED TO SUMMARY JUDGMENT THAT THE ASSERTED CLAIMS OF THE '262 PATENT ARE INVALID OR NOT INFRINGED.**

A.   **Stinger Has Not Shown That Any Claim of the '262 Patent is Obvious.**

1.   **No independent claim is obvious.**

165.   The Morris patent (U.S. Patent No. 4,541,191), O'Dwyer patent (U.S. Patent No. 6,477,801), and Poole patent (U.S. Patent No. 6,237,461) were all before the PTO during prosecution of the '262 patent.  ['262 pat. front page (references cited) (Ex. 7)]

166.   Morris, O'Dwyer, and Poole do not disclose the microprocessor as required by claims 1, 9, and 13, nor do they disclose the "circuit" required by claim 6.  [Rodriguez Rebuttal Report at ¶¶ 43-47, 52-54, 57-59, 63-65 (Ex. 13)]

2.   **No dependent claim is obvious.**

B.   **Stinger Has Not Shown That the TASER X26 Anticipates Any Claim of the '262 Patent.**

167.   The '262 patent claims priority to an ancestor application filed on September 17, 1999.  ['262 patent front page (related U.S. application data) & col. 1:6-14 (Ex. 7)]

168.   Stinger concedes that the X26 was not introduced until May 2003.  See paragraph 38 above.

1.   **The PTO's two previous decisions regarding the '262 patent's priority date are entitled to great deference.**

169.   In March of 2006, the examiner of the '262 patent's parent application (No. 10/673,901) expressly found that application was entitled to the September 1999 priority date.  [Notice of Allowability dated March 7, 2006 at ¶ 5 (Ex. 20)]

170.   In December 2007, Stinger filed a request for *ex parte* reexamination of all claims of the '262 patent.  [Request for *Ex Parte* Reexamination (Ex. 21)]  The request was based on the same new matter argument that Stinger is now asserting.  [*Id.* at pp. 1-3 (Ex. 21)]  It asserted that, based on a 2005 priority date, all claims were anticipated by a publication describing the TASER M26.  [*Id.* at pp. 3-4 (Ex. 21)]

171.    The PTO rejected the request for reexamination and found that "all of the '262 claims are entitled to the domestic priority date of U.S. Application Serial No. 09/398,388, namely 9/17/1999, since all of these claim terms are fully supported in each of the parent applications of the '262 patent."  [Order Denying Request for Reexamination dated Apr. 30, 2008, at p. 8 (Ex. 22)]

          **2.**        **Triable facts preclude summary judgment of anticipation.**

**C.**      **Stinger Has Not Shown That the '262 Patent Fails to Satisfy the Best Mode and Enablement Requirements of 35 U.S.C. § 112.**

          **1.**        **Legal standards for enablement and best mode defenses.**

          **2.**        **Stinger has failed to provide clear and convincing evidence for either a best mode or an enablement defense.**

172.    The claims of the '262 patent do not require absolute date and time, a real time clock, or the use of Greenwich Mean Time.  ['262 pat. col. 7:35-10:7 (claims) (Ex. 7)]

**D.**      **Triable issues of fact preclude summary judgment that the S-200 does not infringe the asserted claims.**

173.    The Court construed the claims of the '262 patent in February 2009.  [Order dated Feb. 2, 2009 (Doc. No. 146)]

          **1.**        **Claims 1 and 13.**

174.    The Court ordered that "'track date and time' means the tracking of date and time in a program in a microprocessor through whatever means available to a person of skill in the art at the time of the invention."  [*Id.* at p. 25]  The Court further stated that "[t]he Court agrees with TASER's expert's opinion that 'tracking date and time means that you, through one way or another, have the ability to keep track of the date and the time.  And that could be done directly or indirectly."  [*Id.* at pp. 22-23]

          **2.**        **Claim 6.**

          **3.**        **Claim 9.**

175.    The parties agreed that the recited "means for recording the date and time of day" is a "Microprocessor and memory as described" at column 2, lines 38-42 and column

3, lines 38-45 of the '262 patent.  [Joint Report on Meet and Confer Following *Markman* Hearing dated May 27, 2008, at p. 2 (Doc. No. 93)]

176.   Based on his review of the S-200 documentation provided by Stinger, TASER's expert Dr. Rodriguez concluded that the microprocessor and memory in the S-200 meet the limitations of claim 9 of the '262 patent.  [Rodriguez Infringement Report at ¶¶ 97-102 (Ex. 28)]

177.   Stinger's expert Mr. Tachner admitted that the S-200 uses two transformers, coupled with a capacitor, just as is shown in Figure 2 of the '262 patent.  [Tachner Depo at pp. 110:12-111:13 (Ex. 9); *see* '262 pat. Fig. 2 (Ex. 7)]

### 4.   Stinger's Doctrine of Equivalents argument is invalid.

178.   Dr. Rodriguez showed how the S-200, without a separate computer, would infringe the '262 patent under the doctrine of equivalents if it does not literally infringe. [Rodriguez Infringement Report at ¶ 88 (Ex. 28)]

## IV.   THERE WAS NO INEQUITABLE CONDUCT.

### A.   The Applicable Legal Standard.

### B.   Stinger Has Failed to Show a Material Nondisclosure.

#### 1.   The Police Special Model is not properly before the Court, but would be immaterial and cumulative in any event.

179.   When two capacitors are connected in parallel, they form and function as a single capacitor, as even Stinger's expert admits.  [Tachner Depo. at pp. 65:23-66:21, 71:17-72:12 (Ex. 9); Nerheim Decl. at ¶ 23 (Ex. 2)]

#### 2.   The M26 was immaterial and cumulative.

180.   The '762 patent explains that Figure 1 of the patent is a block diagram of how the power supply in the M26 works, using the single mode blunt pulse form of operation that characterizes prior art.  ['762 pat. col. 1:48-52 (Ex. 25)]

181.   None of the claims in the '870 patent refer to the number of transformers a stun gun may have.  ['870 pat. col. 19:55-26:4 (claims) (Ex. 6)]

182.    The transformers in the M26 were connected in series, making them irrelevant to the subject matter of the '870 patent. [Nerheim Decl. at ¶¶ 24, 26, 30 (Ex. 2)]

183.    The Cover patent (U.S. Patent No. 3,803,463) was cited during the prosecution of the '870, '295, and '762 patents. ['870 pat. cover page (references cited) (Ex. 6); '295 pat. cover page (references cited) (Ex. 5); '762 pat. cover page (references cited) (Ex. 25)] So was the Kaufman patent (U.S. Patent No. 5,193,048) ['870 pat. cover page (references cited) (Ex. 6); '295 pat. cover page (references cited) (Ex. 5); '762 pat. cover page (references cited) (Ex. 25)]   Stinger's expert conceded that the circuits disclosed in those patents, which included two transformers connected in series, would operate like the prior art circuit shown in Figure 1 of the '295 patent (which is the same as Figure 1 of the '870 and '762 patents). [Tachner Depo. at pp. 115:3-120-14 (Ex. 9)]

184.    The M26 did not have a memory to store information about battery capacity or a data interface that communicates between such a memory and the battery.  In the M26, a battery indicator light simply blinks until the voltage declines to some threshold. The inventions described in the '870 patent use a new and different approach.  [Nerheim Decl. at ¶ 27 (Ex. 2)]

185.    Claim 1 of the '295 patent requires "a first high voltage transformer for creating an arc and a second transformer with a lower output voltage to maintain current across the arc to disable a subject." ['295 pat. col. 20:2-5 (claim 1) (Ex. 5)]

### 3.    The M34000 was immaterial and cumulative.

186.    The M34000 used fundamentally the same transformer configuration and battery circuit as the M26.  [Nerheim Decl. at ¶¶ 26, 27 (Ex. 2)]

### C.    Stinger Has Failed Establish a Specific Intent to Mislead.

#### 1.    Stinger has not shown that anyone _knew_ of the alleged materiality of the purportedly withheld prior art.

187.    Patrick Smith was not an inventor of the '762, '870, or '295 patents and had no substantive involvement in the prosecution of those patents.  [Smith Decl. at ¶ 4 (Ex. 1)]  His involvement was limited to signing an affidavit as TASER's CEO describing

TASER's business and giving an overview of its product line.  [*Id.* (Ex. 1); Smith 10/27/05 37 C.F.R. § 1.132 Decl. (Ex. 8)]

188.   Mr. Smith did not prepare claim language, correspond with the PTO examiner, or work on the evaluation of the application or the prior art. [Smith Decl. at ¶ 4 (Ex. 1)]  Mr. Smith had no knowledge or reason to know about any of the issues Stinger has raised between the patents and the allegedly undisclosed information.  [*Id.* at ¶¶ 4-6 (Ex. 1)]

189.   Mr. Nerheim knew nothing about the purported "Police Special."  [Nerheim Decl. at ¶ 25 (Ex. 2); Nerheim Depo. at p. 90:1-3 (Ex. 4)]  Nor did Mr. Nerheim have any reason to know of any connection or materiality between any of the patents and the transformers or battery lights of the M26 or M34000.  [Nerheim Decl. at ¶¶ 26-31 (Ex. 2)]

### 2.       Stinger Has Not Established an Intent to Deceive.

190.   There was no reason for anyone at TASER to think the items identified by Stinger were material to any of the TASER patent applications, as discussed above. [Nerheim Decl. at ¶¶ 21-31 (Ex. 2); Smith Decl. at ¶¶ 5-6 (Ex. 1)]

### D.       Stinger Has Failed to Demonstrate an Equitable Basis to Bar Enforcement of Any Asserted Patent.

## V.       TASER HAS MARKED ITS ECD PRODUCTS WITH THE NUMBERS OF THE '295, '870, AND '262 PATENTS.

191.   TASER promptly added markings on its products as each patent issued. [Smith Decl. at ¶ 8 (Ex. 1)]

192.   TASER has given Stinger samples of its products, showing the patent marking.  [Decl. (I) of Counsel at ¶ 28; photographs of M26 and X26 sent to Stinger (Exs. 23 & 24)]

Dated:  July 6, 2009

**PERKINS COIE BROWN & BAIN P.A.**

By:  s/ Aaron Matz
     Chad S. Campbell
     Aaron Matz
     2901 North Central Avenue, Suite 2000
     Phoenix, AZ  85012-2788

     Holly L. Gibeaut
     TASER International, Inc.
     17800 North 85th Street
     Scottsdale, AZ  85255-9603

Attorneys for Plaintiff TASER International, Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that on July 6, 2009, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Chad S. Campbell:       cscampbell@perkinscoie.com

Aaron Matz:             amatz@perkinscoie.com

Holly L. Gibeaut:       hgibeaut@taser.com

Attorneys for Plaintiff

        —and—

Ray K. Harris:          rharris@fclaw.com

James F. McNulty, Jr.   macslaw2000@yahoo.co.in

Attorneys for Defendant

By s/ Mary Wadsworth

16347655.2