Chad S. Campbell, Bar No. 012080
CSCampbell@perkinscoie.com
Aaron Matz, Bar No. 024108
AMatz@perkinscoie.com
PERKINS COIE BROWN & BAIN P.A.
2901 North Central Avenue, Suite 2000
Phoenix, AZ  85012-2788
Telephone: 602.351.8000
Facsimile: 602.648.7000

Holly L. Gibeaut, Bar No. 019786
hgibeaut@taser.com
TASER International, Inc.
17800 North 85th Street
Scottsdale, AZ  85255-9603
Telephone: 480.502.6265
Facsimile: 480.991.0791

Attorneys for Plaintiff
TASER International, Inc.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| TASER International, Inc., | No. CV07-0042-PHX-MHM |
| Plaintiff, | |
| v. | (Oral Argument Requested) |
| Stinger Systems, Inc., | |
| Defendant. | |

**TASER'S MOTION FOR PARTIAL SUMMARY JUDGMENT OF LITERAL INFRINGEMENT**

**AND**

**SUPPORTING MEMORANDUM**

**Table of Contents**

Motion .............................................................................................................................. 1

Memorandum ................................................................................................................... 1

    I. Introduction. .......................................................................................................... 1

    II. BACKGROUND. .................................................................................................. 3

        A. Handheld Electronic Control Devices. ........................................................ 3

        B. The Technology Claimed in TASER's '295 Patent. ...................................... 5

        C. Stinger's S-200 Handheld Electronic Control Device. .................................. 6

        D. Stinger's Motion for Summary Judgment. ..................................................... 8

    III. ARGUMENT. ....................................................................................................... 10

        A. Legal Standards for Summary Judgment. ...................................................... 10

        B. The S-200 Literally Infringes Claims 2 and 40 of the '295 Patent Because the S-200 Includes Each Limitation of Each Claim. ..................................... 10

            1. Stinger Has Conceded That the S-200 Includes Most of the Limitations of Claims 2 and 40 of the '295 Patent. ......................... 10

                a. "A[n] electronic disabling device for immobilizing a target" (claim 2); "a method for immobilizing the muscles of a target" (claim 40)....................................................................... 11

                b. "[Providing] first and second electrodes positionable to establish first and second contact points on the target" (claims 2 and 40). ........................................................................ 11

                c. "wherein a high impedance air gap may exist between at least one of the electrodes and the target" (claims 2 and 40). .... 12

                d. "a power supply for operating . . . to generate a first high voltage, short duration output across the first and second electrodes" (claim 2); "applying a first high voltage, short duration output across the first and second electrodes" (claim 40)........................................................................................ 12

                e. "to ionize the air within the air gap to thereby reduce the high impedance across the air gap to a lower impedance to enable current flow across the air gap at a lower voltage level" (claims 2 and 40). ........................................................................ 13

            2. No Reasonable Trier of Fact Could Find That the S-200 Lacks the Remaining Limitations of '295 Claims 2 and 40. ........................... 13

    IV. RELIEF REQUESTED. ........................................................................................ 15

**Table of Authorities**

**Cases:**

*CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d 1225 (Fed. Cir. 2005) .......................... 10

*Gemtron Corp. v. Saint-Gobain Corp.*, --- F.3d ----, 2009 WL 2137154 (Fed. Cir. Jul. 20, 2009) ..................................................................................................................3

*Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605 (1950) ........................ 10

*Hay & Forage Indus. v. New Holland N. Am., Inc.*, 25 F. Supp. 2d 1195 (D. Kan. 1998) ..................................................................................................................................3

*Kegel Co., Inc. v. AMF Bowling, Inc.*, 127 F.3d 1420 (Fed. Cir. 1997) ........................... 10

*Lisle Corp. v. A.J. Mfg. Co.*, 398 F.3d 1306 (Fed. Cir. 2005) ..........................................2, 3

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995)...............................2

*McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339 (Fed. Cir. 2001) ...................................3

*Mitutoyo Corp. v. Central Purchasing, LLC*, 499 F.3d 1284 (2007)............................... 10

*N. Telecom Ltd. v. Samsung Elecs. Co., Ltd.*, 215 F.3d 1281 (Fed. Cir. 2000) ................ 10

*Panduit Corp. v. Dennison Mfg. Co.*, 836 F.2d 1329 (Fed. Cir. 1987)............................. 10

*Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356 (Fed. Cir. 2008) ..................9

*Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*, 279 F.3d 1357 (Fed. Cir. 2002).......................................................................................................................... 15

**Statutes:**

Fed. R. Civ. P. 56............................................................................................................... 1

LRCiv. 56 ........................................................................................................................... 1

**Motion**

Pursuant to Fed. R. Civ. P. 56 and LRCiv. 56, TASER International, Inc. ("TASER") moves for partial summary judgment that Stinger Systems, Inc. ("Stinger") has literally infringed, and continues to literally infringe, claims 2 and 40 of United States Patent No. 6,999,295 (the "'295 patent") by making, using, selling, and offering to sell the S-200 handheld electronic control device. [TSOF 1][1] This motion is supported by TASER's separate statement of undisputed facts and the record materials cited in and accompanying the statement.[2]

**Memorandum**

I.   INTRODUCTION.

The '295 patent covers inventions that make it possible to shrink the size and weight of, and increase the efficiency of, power supplies in electronic control devices ("ECDs") capable of temporarily incapacitating a target. As a direct result of the inventions in the '295 patent, TASER has been able to supply hundreds of thousands of law enforcement officers in thousands of agencies worldwide with compact and lightweight, yet highly effective ECD products that have saved lives and enhanced public safety. That success in turn has led Stinger to copy TASER's inventive work into Stinger's S-200 ECD, which Stinger is attempting to sell in competition with TASER's products.

Stinger's decision to copy is particularly troubling because the '295 patent's claims do not cover all ECDs. Indeed, TASER continues to sell significant volumes of ECDs with designs that precede the '295 inventions and do not incorporate the power supply

---

[1] "TSOF" refers to TASER's Statement of Facts in support of this motion.

[2] Pursuant to L.R. Civ. 56.1(e), each assertion of fact in this Motion for Partial Summary Judgment is supported by a citation to a specific paragraph in the accompanying statement of facts. Many of the facts in this Motion merely provide background information, however, so the statement of facts distinguishes between "Material Facts" and "Other Background Facts." Although TASER does not believe that any of the "Other Background Facts" are in dispute, a disagreement about them cannot defeat summary judgment. The only facts necessary for granting this Motion are those identified as "Material Facts" in the statement of facts.

techniques disclosed and claimed in the patent. In other words, although Stinger had other options, it elected to copy the '295 inventions instead.

Under the Patent Act, the first step to arresting Stinger's unauthorized use of TASER's '295 inventions is to establish infringement—i.e., that the S-200 satisfies the language of claims 2 and 40 of the '295 patent, pursuant to the Court's construction of the disputed parts of the claim language. *Lisle Corp. v. A.J. Mfg. Co.*, 398 F.3d 1306, 1312 (Fed. Cir. 2005) (an infringement determination is a "two-step analysis": the court first construes the claims and then compares the "properly construed claims" to the accused device). Resolution of that issue on summary judgment is proper because (i) claim interpretation is a question of law for the Court, which the Court completed in its February 2, 2009 *Markman* Order [Dkt. 146]; and (ii) the summary judgment record confirms that Stinger has no genuine way to dispute that the S-200 satisfies the claim language as construed. *See Lisle Corp.*, 398 F.3d at 1314 (affirming summary judgment of infringement where there was no genuine issue of material fact that accused product met properly construed claim limitation); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-971 (Fed. Cir. 1995) ("[I]nterpretation and construction of patent claims, which define the scope of the patentee's rights under the patent, is a matter of law exclusively for the court.").

Stinger concedes that the S-200 is an "electronic disabling device" with two "electrodes positionable to establish first and second spaced apart contact points on the target wherein a high impedance air gap may exist between at least one of the electrodes and the target." It also concedes that the S-200 creates a high voltage that ionizes the air in the air gap, thereby lowering the impedance and allowing current to flow at a lower voltage. The undisputed record also establishes that:

- The S-200 has a power supply that operates in a first mode (a "flyback" mode) to generate a high voltage output that ionizes the air in the gap and lowers its impedance so that current can flow at a lower voltage; and

- The S-200 power supply then operates in a second mode (a non-fly-back, "direct-drive" mode) to generate a lower voltage output that delivers current to the target.

Because a reasonable trier of fact could not conclude that such operation lies outside the reach of claims 2 and 40, summary judgment of literal infringement should be entered.

Although the relief sought by this motion is narrow, TASER believes that granting summary judgment of infringement would greatly simplify the trial, if it does not lead to a resolution of the dispute altogether. Where, as here, the record supports it, courts frequently grant summary judgment motions of infringement, leaving for resolution at trial any invalidity defenses and damages. *See, e.g.*, *Gemtron Corp. v. Saint-Gobain Corp.*, --- F.3d ----, 2009 WL 2137154 (Fed. Cir. Jul. 20, 2009) (affirming summary judgment of infringement and jury verdict of validity); *Lisle Corp.*, 398 F.3d at 1306 (same); *McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339 (Fed. Cir. 2001) (affirming summary judgment of infringement and reinstating jury verdict of validity); *Hay & Forage Indus. v. New Holland N. Am., Inc.*, 25 F. Supp. 2d 1195 (D. Kan. 1998) (granting summary judgment of infringement and ordering trial on invalidity defenses).

## II.   BACKGROUND.

### A.   Handheld Electronic Control Devices.

Handheld ECDs[3] have been around since the 1970s. In the decades since then, they have become widely used by law enforcement officers as a less-lethal alternative to traditional firearms. [TSOF 8] Handheld ECDs, including the accused Stinger S-200 and TASER's M26 and X26 devices, share several basic features. They are battery-powered devices that use electrical current to temporarily immobilize and incapacitate a human or animal target that may be some distance (up to tens of feet) from the user. They do so by launching two small, barbed electrodes (sometimes called "darts" or "probes") that remain

---

[3] As used in this brief, the term "handheld ECDs" refers to handheld electronic control devices that propel wire-tethered electrodes toward a target. Examples of such devices include TASER's M26 and X26 devices and Stinger's S-200 device.

tethered to the device by thin insulated wires.  When those electrodes contact the target, they create a complete electrical circuit or loop that includes the ECD and the target.  That is, electrical current created in the ECD's power supply passes through the tether wires to the electrodes and, from there, through the target's body and back to the power supply in the ECD.  That flow of current causes the target to become incapacitated or immobilized.  [TSOF 9]

Because all handheld ECDs share these same basic features, they must all overcome a common obstacle:  When the device's electrodes strike a target, one or both of the electrodes may lodge in the target's clothing rather than directly in the target's skin, creating an air gap (or air gaps) in the circuit.[4]  [TSOF 10; Dkt. 146, at p. 2]  As the Court may recall from the *Markman* hearing, air in its natural state is a very poor conductor of electrical current.  [Dkt. 95, at pp. 17:2-9, 70:13-16; Dkt. 146, at p. 2]  That is, it has a very high electrical impedance.  [TSOF 11]  As a result, if such an ECD is to work reliably regardless of whether both of its probes are in solid contact with the target, it must be able to overcome that high impedance air gap so that it can deliver immobilizing current to the target.  [TSOF 12]

As was also discussed at the *Markman* hearing, one way to overcome that problem—and, in fact, the way that is used in all handheld ECDs—is to generate a very high voltage at the probes.  [Dkt. 95, at p. 94:2-8; Dkt. 146, at p. 3]  When the probe voltage becomes high enough, the air in the gap becomes ionized.  After ionization, the air in the gap changes from being a very poor conductor of electrical current to being a very good conductor—its impedance goes from high to low—and current begins to flow through the gap and into the target.  [TSOF 13; Dkt. 146, at pp. 2-3]

---

[4] In handheld ECDs, the problem of lodging in clothing arises from using lightweight electrodes designed to reduce blunt impact trauma (such as bruising) when the electrodes impact bare skin at close range.  Other types of ECDs, such as TASER's XREP projectile, have been designed with electrodes having sufficient mass to impact clothing, pierce the clothing, and lodge directly in the tissue of the target.

-4-

While current flows, the air in the gap remains ionized and its impedance remains low, even if the voltage at the probes drops to a much lower level. Thus, during the time that the air gap is ionized, it is no longer necessary (or even desirable) for the ECD's power supply to continue to generate and apply a very high voltage. Instead, during that time it is very beneficial for the ECD to efficiently generate current to incapacitate the target. [TSOF 14; Dkt. 146, at p. 3]

An analogy may be instructive here. Consider a 100-mile auto race with an unusual twist: At the beginning of the track, right at the starting line, there is a brick wall that each car must break through before it can speed around the rest of the track. A Formula One car would be the best for everything except the initial segment of the race. It is fast and efficient, but it would never make it through the wall at the starting line. It would take a bulldozer to do that. But a bulldozer is slow and heavy and is thus ill suited for the rest of the race. The ideal vehicle would be one that could transform itself to match both of the required conditions: A bulldozer mode of operation to smash through the wall, and then a Formula One racer mode of operation to complete the rest of the race as quickly and efficiently as possible. TASER's Max Nerheim, the inventor of the technology claimed in the '295 patent, was the first to recognize that a similar principle applies to handheld ECDs.[5]  [TSOF 15]

**B.   The Technology Claimed in TASER's '295 Patent.**

Before the '295 patent, handheld ECDs relied on a "bulldozer-only" approach. Their power supplies were designed to generate a very high voltage to overcome an air gap. Even after that air gap was ionized and current began to flow, however, their power

---

[5] There is also a different type of ECD (sometimes called a "contact stun device") that works by having the user press the electrodes directly against the target (which must be close to the user), rather than by launching wire-tethered electrodes toward the target. Moreover, many handheld ECDs, including the Stinger S-200 and TASER X26, can be used as contact stun devices by removing the ammunition cartridge or operating with a spent cartridge. As with a handheld ECD, the electrodes of a contact stun device may encounter clothing rather than bare skin, creating the same problem of overcoming air gaps. The solution claimed in the '295 patent applies to contact stun devices as well as to handheld ECDs.

1  supplies continued to operate in the same way, which was not very efficient at
2  incapacitating the target. [TSOF 16; Dkt. 146, at p. 3] As a result, those early ECDs were
3  bulky and heavy, and they required large battery packs. [TSOF 17; Dkt. 146, at p. 3]

4  Max Nerheim discovered a better way after much trial and error. While working
5  on the next-generation ECD at TASER during the early 2000's, Mr. Nerheim came up
6  with a solution that was both ingenious and elegant: A single power supply that operated
7  in two different modes. The first mode was optimized to create a very high voltage to
8  overcome any air gaps, and the second mode was optimized to deliver incapacitating
9  current to the target very efficiently. Returning to the analogy above, Mr. Nerheim's
10 invention was like designing a vehicle that can change itself from a bulldozer to a
11 Formula One car after it has broken through the wall. [TSOF 18]

12 Mr. Nerheim's dual-operating-mode power supply invention became the subject of
13 the '295 patent, and it is claimed in claims 2 and 40. It was also incorporated into
14 TASER's groundbreaking X26 device, allowing that device to be smaller, lighter, and far
15 more efficient than any ECD that had come before. [TSOF 19] Today, the X26 device is
16 the best-selling ECD product of all time, and it is considered the gold standard against
17 which all other ECDs are measured. [TSOF 20]

18 **C.   Stinger's S-200 Handheld Electronic Control Device.**

19 Stinger began work on the S-200 handheld ECD in 2006. [TSOF 21] Because
20 Stinger did not have in-house electronics expertise, it hired an outside electronics firm led
21 by Tom Saliga to create the circuit design for the S-200's power supply. [TSOF 22] Mr.
22 Saliga was immediately confronted with the same problem that had plagued the designers
23 of all earlier handheld ECDs, namely, how to create a device that was both compact and
24 effective. He confessed to Stinger's CEO, Robert Gruder, that "anybody can make a stun
25 gun if you want to make it the size of a coffee can," but that it would be a real "challenge"
26 to design a product that was both as compact and as effective as TASER's X26 device.
27 [TSOF 23]
28

1    In the course of designing the S-200, Mr. Saliga and his staff examined TASER's
2 patents, including the '295 patent. They also studied the X26 device itself, along with the
3 electrical transformers used in that device. [TSOF 24] Mr. Saliga even conducted a side-
4 by-side comparison of the S-200 waveform with the X26 waveform, informing Mr.
5 Gruder that "we're getting closer." [TSOF 25]

6    Just as Mr. Gruder had envisioned, the final S-200 product was virtually the same
7 size, weight, and shape as the TASER X26. [TSOF 26] Not surprisingly, it also used the
8 dual-mode power supply concept that Mr. Nerheim had invented several years earlier, and
9 that TASER had patented in the '295 patent. When the S-200 is used and an air gap exists
10 between one of the device's electrodes and the target, the S-200 power supply operates
11 first in a "flyback" mode that generates a very high voltage to ionize the air gap and
12 thereby lower its impedance. The S-200 power supply then operates in a second, lower-
13 voltage, "direct-drive" mode to flow current through the ionized air gap and into the
14 target. [TSOF 5-7]

15    In a technical white paper commissioned by Mr. Gruder, Mr. Saliga summarized
16 the S-200's dual-mode power supply by comparing it to a two-speed gear shift:

> **Separating the Men from The Boys:**
> Saying the Stinger is better because it has approximately
> 56,000 volts in an open circuit compared to Taser's 50,000 is
> really not the whole story. . . . What is needed is something
> akin to a two-speed gear shift automobile—one gear gets you
> going from a dead stop and the other does the fast moving.
> Guns which can "switch gears" is a big factor which separates
> the men from the boys in effectiveness. . . .
>
> **Guns With a Two-Speed Gear Shift:**
> The design of an effective stun gun electrical waveform
> requires that the fired darts manage to arc and spark through
> the target's outer clothes and then, once an ionized-air and
> highly conductive plasma arc is established, the gun must
> somehow automatically shift gears, so to speak, and drive
> home (to the target body) a much larger electrical current but
> with lower voltage to cause effective involuntary muscle
> contraction. Further, once the plasma arc has been
> established, then the wave shape and timing of the subsequent
> electrical waveform is important for "smart" muscle
> contraction. . . .

1  [TSOF 27]  Similarly, Stinger explained the S-200's dual-mode power supply to potential
2  investors using yet another analogy, that of a "dual personality":

> The Stinger S-200™ is a two-dart electronic immobilization device (EID). . . .
>
> . . . .
>
> Through the use of Quantum Flyback Technology or QFT™ the electrodes of the S-200 stun gun deliver high-voltage energy in a precisely controlled series of energy packets or "Quanta."  The electronics delivers these energy quanta from a so called "Flyback" transformer circuit.  Hence the name, Quantum Flyback Technology.
> When in use, each energy packet has a dual personality: if the gun's electrodes have not yet hit a target, the energy quantum 'flies back' to over 56,000 volts creating a commanding electrical spark – one which penetrates clothing easily.  Yet once the 'target' is contacted, the energy quantum delivers NMIW voltage and current very efficiently.
> Series of quantum pulses are delivered first as ionizing spark energy and then as a more immobilizing, lower-voltage, higher-current energy quanta once on target.

13  [TSOF 28]
14  In 2007, Mr. Saliga filed a patent application (serial no. 11/746,952), assigned to
15  Stinger, that Mr. Saliga concedes describes the "fundamental operation" of the S-200's
16  circuitry.  [TSOF 29]  That application (the "S-200 patent application"), which the PTO
17  published in late 2008, describes the S-200's dual-operating mode power supply as
18  follows: "[It] may be recognized as a flyback circuit that, when operated in pulsed mode,
19  provides two drastically different sorts of outputs depending on the impedance across the
20  output electrodes . . . ."  [TSOF 29-30]  TASER's expert Dr. Rodriguez examined several
21  S-200 devices, as well as the technical documents and source code describing those
22  devices, and prepared a report in which he concluded that the S-200 operates in two
23  modes just as described by Stinger and Mr. Saliga above.  [TSOF 31, 41]

### D.   Stinger's Motion for Summary Judgment.

25  Stinger has moved for summary judgment that the S-200 does not infringe claims 2
26  and 40 of the '295 patent.  [Dkt. 160, at p. 9]  Tellingly, its motion does not even attempt
27  to argue that the S-200 does not use a dual-mode power supply, or that the S-200 fails to
28  satisfy the limitations of either claim 2 or claim 40.  Rather, Stinger's non-infringement

-8-

defense collapses into to a single sentence: The S-200 "practices the prior art." [Dkt. 160, at p. 9]

Stinger's proposed expert Mr. Tachner, who admitted in his deposition that he did not understand how the S-200 power supply worked,[6] merely made the same unsupported assertion. [TSOF 32, 48] Compounding the confusion, Mr. Tachner also recited a list of circuit features that the S-200 allegedly lacks, even though claims 2 and 40, as construed by the Court, require none of those features. [TSOF 32-34; Dkt. 146, at pp. 8-18, 24] Mr. Tachner made no attempt to rebut Dr. Rodriguez's analysis and conclusion that the S-200 satisfies each of the limitations of claims 2 and 40. [TSOF 32]

As discussed in TASER's opposition to Stinger's motion for summary judgment, Stinger's assertion that the S-200 "practices the one capacitor/one transformer prior art" is factually incorrect. [Dkt. 160, at p. 9; Dkt. 181, at p. 18] Moreover, despite Stinger's representations to the Court that the S-200 is merely "practicing the prior art," its public and commercial statements tell a very different story:

> The Company has spent millions of dollars developing the S-200. We are very pleased of the fact that we now believe the S-200 is the most state of the art stun technology available in the world. . . .
> The weapon sold by Stinger Systems since September 2007 is radically different than any previous versions. . . .
>
> . . . .
>
> . . . The Company had great success in achieving its goals and has created, what it believes, is the most radical change to stun technology in years.
>
> . . . .
>
> Although Stinger Systems has spent millions of dollars developing what we believe to be the most state of the art EID

---

[6] For the past 35 years, Mr. Tachner has worked as a patent attorney, not as an electrical engineer. [Dkt. 162-1, at pp. 9-10] There are thus serious questions over whether he is even competent to give expert opinions regarding invalidity and infringement. *See Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1364-65 (Fed. Cir. 2008) (holding that testimony of patent law expert should have been excluded; "Allowing a patent law expert without any technical expertise to testify on the issues of infringement and validity amounts to nothing more than advocacy from the witness stand."). Nevertheless, for purposes of this motion, TASER will assume that Mr. Tachner's opinions regarding the structure and operation of the S-200 are admissible.

-9-

> product available, we are still always seeking improvements to provide the law enforcement community with the best tools available. After all, who would want an EID whose fundamental design hasn't changed in years? . . .

[TSOF 35]

**III.  ARGUMENT.**

**A.  Legal Standards for Summary Judgment.**

Courts grant summary judgment of infringement when there is no material dispute of fact that every claim limitation or its equivalent is found in the accused device. *See, e.g.*, *Mitutoyo Corp. v. Central Purchasing, LLC*, 499 F.3d 1284 (2007) (affirming summary judgment of infringement); *CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d 1225 (Fed. Cir. 2005) (same); *N. Telecom Ltd. v. Samsung Elecs. Co., Ltd.*, 215 F.3d 1281 (Fed. Cir. 2000) (same); *Kegel Co., Inc. v. AMF Bowling, Inc.*, 127 F.3d 1420 (Fed. Cir. 1997) (same). A party is liable for patent infringement even if it infringes only a single patent claim. *Panduit Corp. v. Dennison Mfg. Co.*, 836 F.2d 1329, 1330 n.1 (Fed. Cir. 1987). Where, as here, "accused matter falls clearly within the claim, infringement is made out and that is the end of it." *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 607 (1950).

**B.  The S-200 Literally Infringes Claims 2 and 40 of the '295 Patent Because the S-200 Includes Each Limitation of Each Claim.**

**1.  Stinger Has Conceded That the S-200 Includes Most of the Limitations of Claims 2 and 40 of the '295 Patent.**

Claim 2 of the '295 patent covers a handheld ECD that includes a dual-operating mode circuit, as described above. Claim 40 is similar, except that it covers a method of using such a circuit to immobilize a target. Stinger, in its own documents and in the testimony of Mr. Saliga, has conceded that the S-200 includes all but a few limitations of those claims. The conceded limitations, as described in the following paragraphs, are

common to handheld ECDs, including the "prior art" handheld ECD described in the '295 patent's written description and shown in Figure 1.[7]

### a. "A[n] electronic disabling device for immobilizing a target" (claim 2); "a method for immobilizing the muscles of a target" (claim 40).

Stinger concedes that the S-200 is an electronic disabling device[8] that immobilizes the muscles of a target. [TSOF 2] Its own documents describe the S-200 as "a two-dart electronic immobilization device (EID)." [TSOF 28] They also state that:

> This is how the Stinger system works. As all body functions are controlled by electrical impulse from the brain, additional electrical pulses can disrupt these messages causing an overload in the neuro muscular systems of the contact areas, thus causing immobilization or rapid fatigue without causing permanent or serious damage to those systems.

[TSOF 36] Further, the S-200 patent application describes the device using language remarkably similar to that of claims 2 and 40: "A preferred embodiment of the invention provides an electric disabling device configured as a handgun for immobilizing a human or animal target." [TSOF 37]

### b. "[Providing] first and second electrodes positionable to establish first and second contact points on the target" (claims 2 and 40).

Stinger concedes that the S-200 includes and provides the claimed electrodes. [TSOF 3] For example, Stinger's own documents state that:

> The Stinger S-200™ is a two-dart electronic immobilization device (EID). . . . Through the use of Quantum Flyback Technology or QFT™ the electrodes of the S-200 stun gun deliver high-voltage energy . . . . When in use, each energy packet has a dual personality: if the gun's electrodes have not yet hit a target, the energy quantum 'flies back' to over 56,000 volts . . . . Yet once the 'target' is contacted, the energy quantum delivers NMIW voltage and current very efficiently.

---

[7] Accordingly, Stinger's argument in its motion for summary judgment that the S-200 practices the prior art shown in Figure 1 of the '295 patent amounts to yet another concession that the S-200 necessarily includes the corresponding limitations of claims 2 and 40.

[8] Claim 2 recites an "electronic disabling device," which refers to and includes but is not limited to the handheld ECD discussed above.

-11-

[TSOF 28] Moreover, Stinger's S-200 patent application describes the device as including "at least two projectile electrodes for positioning at spaced apart contact points adjacent a target." [TSOF 38]

        c.    **"wherein a high impedance air gap may exist between at least one of the electrodes and the target" (claims 2 and 40).**

Stinger concedes that, when the S-200 is operated, a high impedance air gap may exist between at least one of the device's electrodes and the target. [TSOF 4] For example, Stinger's S-200 patent application states that "In one limiting case, one can consider the output electrodes 18 as being separated by a high impedance, such as an air gap. . . . For example, a human target's clothing may space either or both of the electrodes away from his or her body by several centimeters." At his deposition, Mr. Saliga confirmed that the S-200 operates in just that way. [TSOF 39]

        d.    **"a power supply for operating . . . to generate a first high voltage, short duration output across the first and second electrodes" (claim 2); "applying a first high voltage, short duration output across the first and second electrodes" (claim 40).**

Stinger concedes that the S-200 includes the claimed "power supply" and that, when operated, the S-200 generates and applies a high voltage, short-duration output across its electrodes. [TSOF 5] For example, the S-200 schematics provided with Mr. Tachner's expert report depict the device's "Quantum Flyback High Voltage Generator" circuit. [TSOF 40] According to Stinger's own S-200 documents, "if the gun's electrodes have not yet hit a target, the energy quantum 'flies back' to over 56,000 volts creating a commanding electrical spark—one which penetrates clothing easily." [TSOF 28] And Mr. Saliga confirmed at his deposition that the first high voltage output is of short duration: "[I]t's very quick, very quick, when it discharges that first spark." [TSOF 41]

          e.      **"to ionize the air within the air gap to thereby reduce the high impedance across the air gap to a lower impedance to enable current flow across the air gap at a lower voltage level" (claims 2 and 40).[9]**

Stinger concedes that the S-200 includes this limitation.[10] [TSOF 6] For example, its S-200 technical whitepaper states that:

> The design of an effective stun gun electrical waveform requires that the fired darts manage to arc and spark through the target's outer clothes and then, once an ionized-air and highly conductive plasma arc is established, the gun must somehow automatically shift gears, so to speak, and drive home (to the target body) a much larger electrical current but with lower voltage . . . .

[TSOF 27] Moreover, Stinger's S-200 patent application confirms that aspect of the S-200's operation:

> A high voltage output is required to ionize the air between the target's body and the electrode in order to establish effective electrical contact. Once an ionic air plasma or direct contact is established, a lower voltage can be used to send reasonable currents through the target . . . .

[TSOF 39]

### 2. No Reasonable Trier of Fact Could Find That the S-200 Lacks the Remaining Limitations of '295 Claims 2 and 40.

In light of the conceded limitations above, the only remaining issue is whether the S-200 includes a "dual operating mode" power supply that operates in a first mode, during a first time period, to generate and apply a high voltage to ionize the air in an air gap and then subsequently operates in a second, lower-voltage mode during a second time interval to maintain current flow through the target.[11] As explained below, the S-200 includes just

---

[9] The Court construed "to ionize the air within the air gap" to refer to the "formation of ions within the air gap as a result of the high voltage, short duration output across the first and second electrodes during the first mode/time period." [Dkt. 146, at p. 24]

[10] Stinger has also taken the position in its motion for summary judgment that the process of ionization in an air gap, along with the resulting reduction of impedance and flow of current at a lower voltage, is merely a law of nature. [Dkt. 160, at pp. 5-6] Accordingly, it cannot now dispute that the S-200 includes the corresponding limitation in claims 2 and 40.

[11] The Court ruled that "'to maintain the current flow' is self-explanatory, and refers to the maintenance of the current flow that is driven across the air gap by the low voltage output in the second mode/time period and is not limited to a continuous or

such a power supply. Just as claims 2 and 40 require, that power supply operates first in a high-voltage "flyback" mode to ionize any air gaps and then in a lower-voltage "direct-drive" mode to maintain current flow through the target to incapacitate the target. [TSOF 7]

Stinger's own documents repeatedly describe the S-200's power supply as using the dual operating mode invention recited in claims 2 and 40. [TSOF 42] In addition, the S-200's circuit designer, Mr. Saliga, confirmed that the device's power supply operates in just that manner. [TSOF 43] And Stinger has utterly failed to rebut Dr. Rodriguez's analysis and conclusion that the S-200 includes each limitation of claims 2 and 40, including the limitations relating to the use of dual operating modes.

As set forth in Dr. Rodriguez's infringement report, which is based on an examination of Stinger S-200 documents and source code, as well as measurements of the device's output, the S-200 power supply operates in two distinct modes. In the first mode, the power supply operates as a flyback circuit. In that mode, it is capable of producing very high voltages (i.e., much higher than the transformer primary voltage multiplied by the transformer turns ratio), as is necessary to ionize an air gap. Subsequently, once the air gap has been ionized and its impedance lowered, the power supply operates in a second distinct (non-flyback) mode that does not produce the high voltages produced by the first mode. That is, in the second mode, the output voltage is directly related to the transformer primary voltage by the transformer turns ratio. In addition, as shown in Dr. Rodriguez's report, the S-200 power supply maintains the current in the second time period associated with the second mode, as the impedance remains low throughout that time period. [TSOF 44] The description of the S-200 high voltage circuitry in Stinger's S-200 patent application, Mr. Saliga's other descriptions of that circuitry, and Stinger's own documents track Dr. Rodriguez's analysis exactly. [TSOF 27, 28, 45-47]

---

uninterrupted current flow to the extent that the current flow is able to maintain a state of low impedance throughout the second mode/time period." [Dkt. 146, at p. 24]

Stinger's proposed expert Mr. Tachner admitted in his deposition that he never examined the S-200's programming software and that he had "no idea" how the S-200 high voltage power supply works. [TSOF 48] In his rebuttal expert report, he did not even attempt to rebut Dr. Rodriguez's analysis or conclusions regarding the S-200. Instead, he merely stated that the "S-200 practices the one capacitor/ one transformer prior art described in FIG. 1 of the '295 patent." [TSOF 32] But that assertion is factually incorrect because, as set forth in TASER's opposition to Stinger's motion for summary judgment, the S-200 includes multiple capacitors and multiple transformers. [Dkt. 181, at p. 18] And it is also legally irrelevant, because the Federal Circuit has "made [it] unequivocally clear . . . that there is no 'practicing the prior art' defense to literal infringement." *Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*, 279 F.3d 1357, 1365-66 (Fed. Cir. 2002).

Mr. Tachner's only other point in rebuttal was that "the S-200 output is not formed by combining energy of two sources at two different voltages." [TSOF 32] But that is no rebuttal at all, because claims 2 and 40 of the '295 patent, as construed by the Court, do not require the combination of "energy of two sources at two different voltages." [TSOF 34; Dkt. 146, at pp. 8-18, 24]

In view of the overwhelming and unrebutted evidence that the S-200 includes the dual-operating-mode limitations of claims 2 and 40, Stinger cannot now plausibly assert that the S-200 lacks those limitations, nor could any reasonable trier of fact make such a finding.

**IV.   RELIEF REQUESTED.**

The Stinger handheld S-200 ECD includes each limitation of claims 2 and 40 of the '295 patent, as construed by the Court. Accordingly, TASER requests that the Court grant summary judgment that the Stinger S-200 handheld ECD has literally infringed, and continues to literally infringe, claims 2 and 40 of the '295 patent.

| | | |
|---|---|---|
| 1 | | |
| 2 | Dated: August 14, 2009 | **PERKINS COIE BROWN & BAIN P.A.** |
| 3 | | By:/s/ Aaron Matz |
| 4 | |     Chad S. Campbell<br>    Aaron Matz |
| 5 | | Holly L. Gibeaut |
| 6 | | TASER International, Inc.<br>17800 North 85th Street<br>Scottsdale, AZ  85255-9603 |
| 7 | | |
| 8 | | Attorneys for Plaintiff TASER<br>International, Inc. |

**CERTIFICATE OF SERVICE**

I hereby certify that on August 14, 2009, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Chad S. Campbell:   cscampbell@perkinscoie.com

Holly L. Gibeaut:   hgibeaut@taser.com

Attorneys for Plaintiff

—and—

Ray K. Harris:   rharris@fclaw.com

James F. McNulty, Jr.   macslaw2000@yahoo.co.in

Attorneys for Defendant

By /s/ Indy Fitzgerald

57518-0006/LEGAL16496510.3