Chad S. Campbell, Bar No. 012080
CSCampbell@perkinscoie.com
Aaron Matz, Bar No. 024108
AMatz@perkinscoie.com
PERKINS COIE BROWN & BAIN P.A.
2901 North Central Avenue, Suite 2000
Phoenix, AZ 85012-2788
Telephone: 602.351.8000
Facsimile: 602.648.7000

Holly L. Gibeaut, Bar No. 019786
hgibeaut@taser.com
TASER International, Inc.
17800 North 85th Street
Scottsdale, AZ 85255-9603
Telephone: 480.502.6265
Facsimile: 480.991.0791

Attorneys for Plaintiff
TASER International, Inc.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

TASER International, Inc.,

Plaintiff,

v.

Stinger Systems, Inc.,

Defendant.

No. CV07-0042-PHX-MHM

**TASER'S STATEMENT OF FACTS IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT OF LITERAL INFRINGEMENT**

Pursuant to L.R. Civ. 56.1(a), TASER International, Inc. ("TASER") submits the following statement in support of its concurrently-filed Motion for Partial Summary Judgment of Literal Infringement. Many of the facts in this statement are cited solely for the purpose of putting the motion in context and are not necessary for granting the motion. Accordingly, Part I of this statement sets forth the "Material Facts," and Part II sets forth "Other Background Facts," which are not necessary for resolution of the motion.

## PART I: MATERIAL FACTS

1. Stinger Systems, Inc. ("Stinger") has made, used, sold, and offered for sale the S-200 electronic control device in the United States. [*See, e.g.*, Stinger 2007 10-K at p. 1 ("Stinger Systems is engaged in the manufacture of electronic stun devices for the control of, and to provide temporary immobilization of, potentially dangerous persons. Stinger Systems produces a variety of control products including . . . the Stinger S-200 projectile stun device.") (Ex. 9); *id.* at p. 2 ("[T]he success of the Company rests solely on the success of the Stinger S-200 product line.") (Ex. 9)][1] It continues to do so. [*See, e.g.*, Stinger 1Q 2009 10-Q at p. 13 ("The Company's primary focus is the Stinger S-200 Electronic Immobilization Device (EID) and the Company's success is largely dependent upon the commercialization of this product." (Ex. 11); S-200 Specs. (Ex. 7)]

2. The S-200 is an electronic disabling device for immobilizing a target. When operated, the S-200 practices a method for immobilizing the muscles of a target. [Stinger 1Q 2009 10-Q at p. 13 (Ex. 11); Stinger Student Manual at pp. 9-10, 15 (Ex. 13); Stinger 2008 10-K at p. 2 (Ex. 10); Stinger 2007 10-K at p. 2 (Ex. 9); S-200 Specs. (Ex. 7); Saliga Depo. at pp. 92:25-93:4 (Ex. 4); SS-WP-11 at p. 1 (Ex. 19); S-200 Patent App. at Abstract, ¶¶ 8, 9, claim 1, pp. 1, 4 (Ex. 2); NIJ Study at p. 11 (Ex. 1); Rodriguez Infringement Report at ¶¶ 12, 24, 26, pp. 6, 12, 13 (Ex. 24)]

3. The S-200 includes first and second electrodes positionable to establish first and second contact points on the target. When operated, the S-200 provides first and second electrodes positionable to establish first and second contact points on the target. [Stinger Student Manual at p. 9 (Ex. 13); Stinger 2008 10-K at p. 4 (Ex. 10); Stinger 2007 10-K at p. 2 (Ex. 9); Saliga Depo. at p. 93:5-10 (Ex. 4); S-200 Patent App. at ¶ 9, p. 1 (Ex. 2); *id.* at claim 1, p. 4 (Ex. 2); Answer and Counterclaim, Dkt. 54 (Nov. 6, 2007) at ¶ 30, pp. 13-14 (Ex. 18); Rodriguez Infringement Report at ¶¶ 13, 27, pp. 7, 13 (Ex. 24)]

[1] As used in herein, and unless otherwise indicated, citations to "Ex. ____" refer to the exhibits attached to the counsel declarations filed concurrently with this Statement.

4. When the S-200 is operated, a high impedance air gap may exist between at least one of the electrodes and the target. [Stinger Student Manual at p. 9 (Ex. 13); Stinger 2008 10-K at p. 4 (Ex. 10); Stinger 2007 10-K at p. 2 (Ex. 9); S-200 Specs. (Ex. 7); Saliga Depo. at p. 98:13-21 (Ex. 4); SS-WP-11 at p. 1 (Ex. 19); *Always Improving* at p. 2 ("[T]he Company found some of the energy was lost when the electricity had to arc through air and therefore was not put forth into the subject.") (Ex. 8); S-200 Patent App. at Abstract, ¶¶ 33, 34, p. 3 (Ex. 2); Rodriguez Infringement Report at ¶¶ 14, 28, pp. 7, 13 (Ex. 24)]

5. The S-200 includes a power supply that, when operated, generates and applies a high-voltage, short duration output across the S-200's two electrodes. [Stinger Student Manual at p. 9 (Ex. 13); Stinger 2008 10-K at p. 4 (Ex. 10); Stinger 2007 10-K at p. 2 (Ex. 9); S-200 Specs. (Ex. 7); Saliga Depo. at p. 55:15-20 (Ex. 4); SS-WP-11 at p. 1 (Ex. 19); *Always Improving* at p. 2 (showing 56,000 volts "Peak Arcing Voltage") (Ex. 8); S-200 Schematic (Ex. 23); S-200 Patent App. at Abstract, ¶ 35, p. 3 (Ex. 2); Rodriguez Infringement Report at ¶¶ 15-17, 29, pp. 7-8, 13 (Ex. 24)]

6. When the S-200 is operated and an air gap exists between one of the device's electrodes and the target, the high voltage produced at the electrodes ionizes the air within the air gap, thereby reducing the high impedance to enable current flow across the air gap at a lower voltage level. [Stinger Student Manual at p. 9 (Ex. 13); Stinger 2008 10-K at p. 4 (Ex. 10); Stinger 2007 10-K at p. 2 (Ex. 9); Saliga Depo. at pp. 55:15-23, 68:25-69:4, 70:24-71:11 (Ex. 4); SS-WP-11 at p. 1 (Ex. 19); *Always Improving* at p. 2 (showing 56,000 volts "Peak Arcing Voltage") (Ex. 8); S-200 Patent App. at Abstract, ¶¶ 34, 36, p. 3 (Ex. 2); Rodriguez Infringement Report at ¶¶ 18, 19, 30, 31, pp. 9-10, 13 (Ex. 24)]

7. The S-200 includes a "dual operating mode" power supply. That power supply operates in a first mode to generate a first high voltage, short duration output across the device's electrodes during a first time interval. When the impedance in the air gap has been lowered to enable current flow across the air gap, the power supply operates

in a second mode that generates a second lower voltage across the electrodes during a second time interval to maintain the flow of current. That flow of current causes involuntary muscle contractions and thereby immobilizes the target. [Stinger Student Manual at p. 9 (Ex. 13); Stinger 2008 10-K at p. 4 (Ex. 10); Stinger 2007 10-K at p. 2 (Ex. 9); 9/10/07 email from Saliga to Belna (Ex. 25); Saliga Depo. at pp. 68:15-69:22, 70:11-72:17 (Ex. 4); SS-WP-11 at pp. 1-2 (Ex. 19); S-200 Patent App. at Abstract, ¶¶ 33-35, 39, pp. 3-4 (Ex. 2); Rodriguez Infringement Report at ¶¶ 12, 16-17, 20-24, 29, 32-34, pp. 6-13 (Ex. 24)]

**PART II: OTHER BACKGROUND FACTS**

8. Handheld Electronic Control Devices ("ECDs") have been around since the 1970s. [Smith Decl. at ¶ 7, p. 2 (Ex. 14); *see* '295 pat. col. 1:22-23 (Ex. 16)] They are now widely used by law enforcement officers as a less-lethal alternative to traditional firearms. [*See, e.g.*, NIJ Study at p. 12 ("Less-lethal technologies offer agencies the ability to reduce threats to the public good while causing the least amount of harm. CED systems appear to offer law enforcement agencies an ideal solution. Since the large scale deployment of CED systems on the market in the last ten years, many agencies have claimed that injuries to suspects and officers have been reduced as a result of their use.") (Ex. 1); S-200 Patent App. at ¶ 4, p. 1 ("Hand-held stun-guns are widely used by police officers to subdue uncooperative or potentially dangerous individuals . . . ." (Ex. 2)]

9. Handheld ECDs are battery-powered devices that use electrical current to temporarily immobilize and incapacitate a human or animal target some distance from the user. They do so by launching two small, barbed electrodes (sometimes called "probes" or "darts") that remain tethered to the ECD by thin insulated wires. When the electrodes contact the target, they create a complete electrical circuit from the ECD to the target. Electrical current created in the ECD's power supply passes through the tether wires to the probes and, from there, through the target's body and back to the power supply in the ECD. The flow of current causes the target to become incapacitated or immobilized.

[*E.g.*, NIJ Study at pp. 7, 13 (Ex. 1); ’295 pat. col. 1:32-42 (Ex. 16); ’262 pat. col. 1:34-42 (Ex. 17); Answer and Counterclaim, Dkt. 54 (Nov. 6, 2007) at ¶ 6, p. 8; *id.* at ¶ 30, pp. 13-14 (Ex. 18)]

10. When a handheld ECD’s electrodes strike a target, one or both of the electrodes may lodge in the target’s clothing rather than directly in the target’s skin, which creates an air gap (or air gaps) in the circuit. [*E.g.*, ’295 pat. col. 1:35-42, 2:19-27 (Ex. 16); S-200 Patent App. at ¶ 34, p. 3 (Ex. 2); SS-WP-11 at p. 1 (Ex. 19)]

11. Air in its natural state is a very poor conductor of electrical current. That is, it has a very high electrical impedance. [*E.g.*, *Markman* Tr., Dkt. 95 (June 10, 2008) at pp. 17:2-9, 70:13-16 (Ex. 20); ’295 pat. col. 1:37-42, col. 2:19-27 (Ex. 16); S-200 Patent App. at ¶ 33, p. 3 (Ex. 2)]

12. A handheld ECD must be able to overcome high impedance air gaps in order to immobilize targets reliably. [*E.g.*, ’295 pat. col. 2:19-27, 3:15-24 (Ex. 16); S-200 Patent App. at ¶ 5, p. 1 (Ex. 2); *see also* Gruder Depo. at. pp. 53:4-55:24 (Ex. 3)]

13. A handheld ECD can overcome air gaps by generating a very high voltage at the electrodes. When the electrode voltage becomes high enough, the air in the gap becomes ionized. When that happens, the air in the gap changes from being a very poor conductor of electrical current to being a very good conductor—its impedance goes from high to low—and current begins to flow through the gap and into the target. [*E.g.*, ’295 pat. col. 2:19-33, 3:15-24 (Ex. 16); S-200 Patent App. at ¶¶ 5, 12, 34, pp. 1-3 (Ex. 2); SS-WP-11 at p. 1 (Ex. 19); Saliga Depo. at. pp. 70:24-71:6 (Ex. 4); *Markman* Tr., Dkt. 95 (June 10, 2008) at p. 94:2-8 (Ex. 20)]

14. While current flows, the air in the gap remains ionized and its impedance remains low, even if the voltage at the probes drops to a much lower level. [*E.g.*, ’295 pat. col. 2:63-66 (Ex. 16); S-200 Patent App. at ¶¶ 5, 34, pp. 1, 3 (Ex. 2); SS-WP-11 at p. 1 (Ex. 19)] During that time, it beneficial for a handheld ECD to efficiently generate current to incapacitate the target. [*E.g.*, SS-WP-11 at p. 1(Ex. 19); *see* ’295 pat. col. 2:27-44 (Ex. 16)]

15. TASER's Max Nerheim is the inventor of the technology claimed in the '295 patent. ['295 pat. cover page (Ex. 16); Nerheim Decl. at ¶ 16, p. 4 (Ex. 15)]

16. Before the '295 patent, handheld ECDs used single-mode power supplies. Their power supplies would generate very high voltages to overcome air gaps, but even after those air gaps were overcome, their power supplies would continue to operate in the same way. ['295 pat. col. 3:15-27 (Ex. 16); *see also* Nerheim Decl. at ¶ 11, p. 2 (Ex. 15)]

17. Early handheld ECDs were bulky and heavy, and they required large battery packs. [Smith Decl. at ¶ 7, p. 2 (Ex. 14); *see* '295 pat. col. 2:50-58, 3:15-27 (Ex. 16); Nerheim Decl. at ¶ 16, p. 4 (Ex. 15)]

18. After much trial and error while working on the next-generation handheld ECD at TASER during the early 2000's, Max Nerheim invented the concept of using a single ECD power supply that operated in two different modes. The first mode was optimized to create a very high voltage to overcome any air gaps, and the second mode was optimized to deliver incapacitating current to the target very efficiently. [Nerheim Decl. at ¶¶ 16-19, pp. 4-6 (Ex. 15)]

19. Max Nerheim's dual-operating-mode power supply invention became the subject of the '295 patent, and it is claimed in claims 2 and 40. The invention was also incorporated into TASER's X26 device, allowing that device to be smaller, lighter, and far more efficient than any handheld ECD that had come before. [Nerheim Decl. at ¶¶ 16-19, pp. 4-6 (Ex. 15); '295 pat. col. 20:6-25 (claim 2), col. 24:37-56 (claim 40) (Ex. 16); *see id.* col. 9:28-43, col. 10:4-25 (Ex. 16)]

20. Today, the X26 is the best-selling ECD product of all time. [Smith Decl. at ¶ 9, p. 2 (Ex. 14)]

21. Stinger began work on the S-200 handheld ECD in 2006. [Saliga Depo. at p. 12:4-11 (Ex. 4); Gruder Depo. at p. 39:7-13 (Ex. 3)]

22. Stinger did not have in-house electronics expertise, so it hired EDA of Florida, led by Tom Saliga, to create the circuit design for the S-200's power supply. [Gruder Depo. at pp. 38:9-41:2 (Ex. 3); Saliga Depo. at pp. 5:23-6:2, 12:4-11 (Ex. 4)]

23. Tom Saliga told Stinger's CEO, Robert Gruder, that "anybody can make a stun gun if you want to make it the size of a coffee can," but that the "challenge" would be to make an ECD as small and effective as TASER's. [Gruder Depo. at pp. 87:24-88:9 (Ex. 3)]

24. In the course of designing the S-200, Tom Saliga and his staff examined TASER's patents, including the '295 patent. They also studied the X26 device itself, along with the electrical transformers used in that device. [Saliga Depo. at pp. 19:8-29:3, 81:19-82:7, 131:1-133:6 (Ex. 4); *see* Gruder Depo. at pp. 47:8-18, 82:8-83:21 (Ex. 3)]

25. Mr. Saliga also conducted a side-by-side comparison of the S-200 waveform with the X26 waveform, informing Mr. Gruder that "we're getting closer." [8/23/07 email from Saliga to Gruder (Ex. 26); *see also* Saliga Depo. at p. 20:9-11 (Ex. 4)]

26. The S-200 is approximately the same size, weight, and shape as the TASER X26. [*Compare* S-200 Specs. (Ex. 7) *with* X26 Specs. (Ex. 6); *see* NIJ Study at p. 16 ("[T]heir sizes are almost identical when a cartridge is placed on the TASER X26.") (Ex. 1)]

27. Robert Gruder commissioned Tom Saliga to write a white paper describing the S-200. [SS-WP-11 (Ex. 19); Saliga Depo. at pp. 214:15-215:16 (Ex. 4); Gruder Depo. at pp. 146:3-148:10, 196:16-197:8 (Ex. 3)] That paper states:

> **Separating the Men from The Boys:**
> Saying the Stinger is better because it has approximately 56,000 volts in an open circuit compared to Taser's 50,000 is really not the whole story. Yes, voltage is the "pushing" pressure, if you will, of electricity and generating more volts to push through clothes is a proper concept. However, Van De-Graff machines at museums (the contraption you put your hands on to make your hair stand straight up) are completely harmless yet generate up to a million volts in them. The difference is the amount and shape of the current passed through the body once contact is made. What is needed is something akin to a two-speed gear shift automobile—one gear gets you going from a dead stop and the other does the fast moving. Guns which can "switch gears" is a big factor which separates the men from the boys in effectiveness. But as will be described, there are other factors such as cardiac safety.
>
> **Guns With a Two-Speed Gear Shift:**

> The design of an effective stun gun electrical waveform requires that the fired darts manage to arc and spark through the target's outer clothes and then, once an ionized-air and highly conductive plasma arc is established, the gun must somehow automatically shift gears, so to speak, and drive home (to the target body) a much larger electrical current but with lower voltage to cause effective involuntary muscle contraction. Further, once the plasma arc has been established, then the wave shape and timing of the subsequent electrical waveform is important for "smart" muscle contraction. That is, maximum contraction with minimal likelihood of cardiac arrest or other adverse body effects.

[SS-WP-11 at p. 1(Ex. 19)]

28. Stinger's annual report (form 10-K) for fiscal year 2007, filed with the Securities and Exchange Commission on March 31, 2008, states as follows:

> The Stinger S-200™ is a two-dart electronic immobilization device (EID). Stinger surveyed many individuals from the law enforcement community to create, what it believes is, a state-of-the-art product that incorporated useful strategic features yet feels and looks like a tactical weapon.
>
> . . . .
>
> Through the use of Quantum Flyback Technology or QFT™ the electrodes of the S-200 stun gun deliver high-voltage energy in a precisely controlled series of energy packets or "Quanta." The electronics delivers these energy quanta from a so called "Flyback" transformer circuit. Hence the name, Quantum Flyback Technology.
>
> When in use, each energy packet has a dual personality: if the gun's electrodes have not yet hit a target, the energy quantum "flies back" to over 56,000 volts creating a commanding electrical spark – one which penetrates clothing easily. Yet once the "target" is contacted, the energy quantum delivers NMIW voltage and current very efficiently.
>
> Series of quantum pulses are delivered first as ionizing spark energy and then as a more immobilizing, lower-voltage, higher-current energy quanta once on target.

[Stinger 2007 10-K at p. 2 (Ex. 9)]

29. On May 10, 2007, Mr. Saliga filed for a patent application, serial no. 11/746,952 (the "S-200 patent application"), which the PTO published in late 2008 as pre-grant Publication No. US 2008/0278882 A1. [S-200 Patent App. cover page (Ex. 2)] The S-200 patent application is assigned to Stinger. [Stinger 2008 10-K at p. 4 (Ex. 10);

Abstract of Title (Ex. 12); Saliga Depo. at p. 87:23-88:1 (Ex. 4)] It describes the "fundamental operation" of the circuitry of the S-200. [Saliga Depo. at p. 90:7-19 (Ex. 4)]

30. The S-200 patent application describes the S-200 power supply as follows:

> The circuit schematically depicted in FIG. 2 and FIG. 4 may be recognized as a flyback circuit that, when operated in pulsed mode, provides two drastically different sorts of outputs depending on the impedance across the output electrodes 18, 19. In one limiting case, one can consider the output electrodes 18 as being separated by a high impedance, such as an air gap. In the other limiting case, a relatively low resistance, provided by tissue of a target 40, is connected between the two output electrodes.

[S-200 Patent App. at ¶ 33, p. 3 (Ex. 2)]

31. TASER's expert Dr. Rodriguez examined several S-200 devices, as well as the technical documents and source code describing those devices, and prepared a report in which he concluded that the S-200 power supply operates in two modes. [Rodriguez Infringement Report at ¶¶ 3, 11-12, 16-17, 20-21, 29, 32, pp. 1, 6-8, 10-11, 13, & Ex. B (Ex. 24)]

32. With regard to the S-200's infringement of claims 2 and 40 of the '295 patent, the rebuttal report of Stinger's proposed expert Leonard Tachner states only that: "In addition, the Stinger S-200 practices the one capacitor/ one transformer prior art described in FIG. 1 of the '295 patent and the S-200 output is not formed by combining energy of two sources at two different voltages." [Tachner Rebuttal Report at ¶ 8 (Ex. 22)]

33. With regard to the S-200's infringement of claims 2 and 40 of the '295 patent, Mr. Tachner's opening report states only that:

> No version of the S-200 comprises a second transformer for maintaining a current established across an arc created by a first high voltage transformer. No version of the S-200 comprises a second output voltage configuration to generate a second lower voltage output across first and second electrodes positionable to establish first and second spaced apart contact points on the target. No version of the S-200 comprises a low voltage output circuit coupled to the output terminal of a voltage conversion stage for generating a substantially increased DC output voltage. No version of the S-200

> comprises a second capacitor or any capacitor that connects to the output electrodes of a voltage multiplier.

[Tachner Opening Report at pp. 6-7 (Ex. 21)]

34. Claims 2 and 40 of the ’295 patent do not recite any of the following elements:

- “a second transformer for maintaining a current established across an arc created by a first high voltage transformer”;
- “a second output voltage configuration to generate a second lower voltage output across first and second electrodes positionable to establish first and second spaced apart contact points on the target”;
- “a low voltage output circuit coupled to the output terminal of a voltage conversion stage for generating a substantially increased DC output voltage”;
- “a second capacitor or any capacitor that connects to the output electrodes of a voltage multiplier”; or
- the generation or use of an output that “is formed by combining energy of two sources at two different voltages.”

[’295 pat. col. 20:6-25 (claim 2), 24:37-56 (claim 40) (Ex. 16)]

35. On its public website, stingersystems.com, Stinger states as follows:

> The Company has spent millions of dollars developing the S-200. We are very pleased of the fact that we now believe the S-200 is the most state of the art stun technology available in the world. Any comparisons of the S-200 prior to now would be meaningless, irrelevant and misleading.
>
> The weapon sold by Stinger Systems since September 2007 is radically different than any previous versions. . . .
>
> . . . .
>
> . . . The Company had great success in achieving its goals and has created, what it believes, is the most radical change to stun technology in years.
>
> . . . .

> Although Stinger Systems has spent millions of dollars developing what we believe to be the most state of the art EID product available, we are still always seeking improvements to provide the law enforcement community with the best tools available. After all, who would want an EID whose fundamental design hasn't changed in years? . . . .

[*Always Improving* at pp. 1-2 (Ex. 8)]

36. The *Stinger S-200 Basic Operator Certification Program Student Manual* states:

> This is how the Stinger system works. As all body functions are controlled by electrical impulse from the brain, additional electrical pulses can disrupt these messages causing an overload in the neuro muscular systems of the contact areas, thus causing immobilization or rapid fatigue without causing permanent or serious damage to those systems.

[Stinger Student Manual at p. 15 (Ex. 13)]

37. The S-200 patent application states: "A preferred embodiment of the invention provides an electric disabling device configured as a handgun for immobilizing a human or animal target." [S-200 Patent App. at ¶ 9, p. 1 (Ex. 2)]

38. The S-200 patent application states: "This gun, similar to other such devices, comprises at least two projectile electrodes for positioning at spaced apart contact points adjacent a target and a suitable propelling means, such as pressurized gas or a pyrotechnic charge, for propelling the projectile electrodes from the device towards the target." [S-200 Patent App. at ¶ 9, p. 1 (Ex. 2)] Claim 1 of the S-200 patent application recites "at least two electrodes positionable at spaced apart contact points adjacent the target." [*Id.* at p. 4 (claim 1) (Ex. 2)]

39. The S-200 patent application states:

> In one limiting case, one can consider the output electrodes 18 as being separated by a high impedance, such as an air gap. . . .
>
> . . . In an early stage of operation the output electrodes 18, 19 are often not in intimate physical contact with a target and the output transformer is essentially open circuited. For example, a human target's clothing may space either or both electrodes away from his or her body by several centimeters. A high voltage output is required to ionize the air between the target's body and the electrode in order to establish effective electrical

> contact. Once an ionic air plasma or direct contact is established, a lower voltage can be used to send reasonable currents through the target, which now appears as a resistive load 43 of approximately 1 kΩ. This situation is schematically depicted in FIG. 2 where the target 40 is depicted as comprising an initial gap, depicted as a target capacitance 41 that is commonly on the order of ten picofarads, a switch 42, and a 1 kΩ resistor 43 connected across the transformer output once air ionization has acted to render the gap conducting.

[*Id.* at ¶¶ 33, 34, p. 3 (Ex. 2)] At his deposition, Mr. Saliga confirmed that the S-200 operates as described above. [Saliga Depo. at p. 98:9-21 (Ex. 4)]

40. The S-200 schematics provided with Mr. Tachner's expert report depict the S-200's "Quantum Flyback High Voltage Generator" circuit. [S-200 Schematic (Ex. 23)]

41. At his deposition, Mr. Saliga, referring to the high voltage that the S-200 uses to create an arc, stated that "it's very quick, very quick, when it discharges that first spark." [Saliga Depo. at p. 55:15-20 (Ex. 4)]

42. Stinger's own documents describe the S-200 power supply as using the dual operating mode invention recited in claims 2 and 40 of the '295 patent. [*E.g.*, SS-WP-11 at p. 1 (Ex. 19); Stinger 2007 10-K, at at p. 2 (Ex. 9);

43. At his deposition, Tom Saliga confirmed that the S-200 power supply uses two operating modes as recited in claims 2 and 40 of the '295 patent. [Saliga Depo. at pp. 68:15-69:22, 70:11-72:17 (Ex. 4)]

44. Dr. Rodriguez's infringement report is based on an examination of Stinger S-200 documents and source code, as well as measurements of the S-200's output. [Rodriguez Infringement Report at ¶ 3, p. 1, & Ex. B (Ex. 24)] As set forth in the report, the S-200 power supply operates in two distinct modes. [*Id.* at ¶¶ 16-17, 20-21, pp. 7-11 (Ex. 24)] In the first mode, the power supply operates as a flyback circuit. [*Id.* at ¶¶ 16-17, pp. 7-9 (Ex. 24)] In that mode, it is capable of producing very high voltages (i.e., much higher than the transformer primary voltage multiplied by the transformer turns ratio). [*Id.* at ¶ 17, pp. 8-9 (Ex. 24)] Subsequently, once the air gap has been ionized and its impedance lowered, the S-200 power supply operates in a second distinct (non-

flyback) mode that does not produce the high voltages produced by the first mode. [*Id.* at ¶¶ 20-21, pp. 10-11 (Ex. 24)] That is, in the second mode, the output voltage is directly related to the transformer primary voltage by the transformer turns ratio. [*Id.* at ¶ 21, p. 11 (Ex. 24)] In addition, the S-200 power supply maintains the current in the second time period associated with the second mode, as the impedance remains low throughout that time period. [*Id.* at ¶¶ 22-23, pp. 11-12 (Ex. 24)]

45. The S-200 patent application describes a first, high-voltage mode of the S-200 power supply as follows:

> The circuit schematically depicted in FIG. 2 and FIG. 4 may be recognized as a flyback circuit that, when operated in pulsed mode, provides two drastically different sorts of outputs depending on the impedance across the output electrodes 18, 19. In one limiting case, one can consider the output electrodes 18 as being separated by a high impedance, such as an air gap. . . .
>
> . . .
>
> If the output of the step-up transformer is open-circuited and the controllable IGBT switch 32 is suddenly closed, current flows from the high voltage DC power supply 30 and the substantial charged capacitor 34. This current creates a magnetic field in the transformer inductance. If the controllable switch 32 is then abruptly opened, the magnetic field collapses and induces a large 'flyback' voltage spike, as is well known from Faraday's EMF Law, across the pairs of electrodes. In a particular preferred embodiment, using the circuit components described above, flyback voltage spikes of 55-65 kV were produced.

[S-200 Patent App. at ¶¶ 33, 35, p. 3 (Ex. 2)]

46. The S-200 patent application describes a second, lower-voltage mode of the S-200 power supply as follows:

> The circuit schematically depicted in FIG. 2 and FIG. 4 may be recognized as a flyback circuit that, when operated in pulsed mode, provides two drastically different sorts of outputs depending on the impedance across the output electrodes 18, 19. In one limiting case, one can consider the output electrodes 18 as being separated by a high impedance, such as an air gap. In the other limiting case, a relatively low resistance, provided by tissue of a target 40, is connected between the two output electrodes.
>
> . . .

> The flyback circuits of FIG. 2 and FIG. 4 behave considerably differently if a relative low impedance, such as the 100 ohms or so offered by a typical target 40, is connected across the electrodes 18, 19. In this case, closing the controllable switch 32 causes the full voltage of the capacitor bank 34 to be applied across the transformer's primary 36 which in turn causes a substantially higher voltage to be applied across the secondary, as determined by the turns-ratio. This voltage is then applied across the target resistance. In a particular preferred embodiment the combination of a 100V DC supply and a 55:1 step-up transformer generates a potential across the projectile electrodes of about 2 kV, where the balance of the nominal 5.5 kV is lost to parasitic resistance of the windings and electrode leads. . . .

[*Id.* at ¶¶ 33, 39, pp. 3-4 (Ex. 2)]

47. Mr. Saliga described the S-200 power supply as first operating as "a flyback spark coil to start an ionization trail," and then operating as a "direct-drive, power pulse-transformer." [Saliga Depo. at pp. 68:15-69:24, 70:11-72:17 (Ex. 4); 9/10/07 email from Saliga to Belna (Ex. 25)]

48. Mr. Tachner admitted in his deposition that he never examined the S-200's programming software. [Tachner Depo. at p. 80:4-14 (Ex. 5)] He also admitted that he had "no idea" how the S-200 high voltage power supply works. [*Id.* at p. 113:8-21 (Ex. 5)]

Dated: August 14, 2009

**PERKINS COIE BROWN & BAIN P.A.**

By: s/ Aaron Matz

Chad S. Campbell
Aaron Matz
2901 North Central Avenue, Suite 2000
Phoenix, AZ 85012-2788

Holly L. Gibeaut
TASER International, Inc.
17800 North 85th Street
Scottsdale, AZ 85255-9603

Attorneys for Plaintiff TASER International, Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that on August 14, 2009, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Chad S. Campbell: cscampbell@perkinscoie.com

Aaron Matz: amatz@perkinscoie.com

Holly L. Gibeaut: hgibeaut@taser.com

Attorneys for Plaintiff

—and—

Ray K. Harris: rharris@fclaw.com

James F. McNulty, Jr. macslaw2000@yahoo.co.in

Attorneys for Defendant

By s/ Indy Fitzgerald

57518-0006/LEGAL16578652.1