*TASER International, Inc. v. Stinger Systems, Inc.*
Case No. CV07-0042-PHX-MHM

**Index of Exhibits to
Declaration of Aaron Matz In Support of
TASER's Motion for Partial Summary Judgment
of Literal Infringement**

| Exhibit | Description |
|---|---|
| 1 | An accurate copy of *A Qualitative & Quantitative Analysis of Conducted Energy Devices: TASER X26 vs. Stinger S200: A Report to the National Institute of Justice*, dated March 5, 2008. |
| 2 | U.S. Patent Application No. 11/746,952 ("S-200 Patent Application"), published by the United States Patent and Trademark Office ("PTO") as Publication No. US 2008/027882 A1 on November 13, 2008. |
| 3 | An accurate copy of excerpts of the transcript of the deposition of Robert Gruder, taken on August 26, 2008. |
| 4 | An accurate copy of excerpts of the transcript of the deposition of Thomas V. Saliga, taken on August 27, 2008. |
| 5 | An accurate copy of excerpts of the transcript of the deposition of Leonard Tachner, taken on June 23, 2009. |
| 6 | An accurate copy of specification sheets for TASER's X26 device and associated cartridge. |
| 7 | An accurate copy of specifications for Stinger Systems, Inc.'s ("Stinger's") S-200 device. |
| 8 | An accurate copy of a webpage entitled *Always Improving to Create the Best EID*. |
| 9 | An accurate copy of Stinger's Form 10-K for fiscal year 2007. |
| 10 | An accurate copy of Stinger's Form 10-K for fiscal year 2008. |
| 11 | An accurate copy of Stinger's Form 10-Q for the quarter ending March 31, 2009. |
| 12 | An accurate copy of the Abstract of Title for the S-200 Patent Application. |
| 13 | An accurate copy of *The Stinger S-200 Basic Operator Certification Program Student Manual*. |
| 14 | An accurate copy of Declaration of Patrick W. Smith. |
| 15 | An accurate copy of Declaration of Magne H. Nerheim. |
| 16 | An accurate copy of United States Patent No. 6,999,295. |

*TASER International, Inc. v. Stinger Systems, Inc.*
Case No. CV07-0042-PHX-MHM

**Index of Exhibits to
Declaration of Aaron Matz In Support of
TASER's Motion for Partial Summary Judgment
of Literal Infringement**

| Exhibit | Description |
|---|---|
| 17 | An accurate copy of United States Patent No. 7,234,262. |
| 18 | An accurate copy of Stinger's Answer and Counterclaim, filed November 6, 2007. |
| 19 | An accurate copy of a paper entitled *Technical White Paper SS-WP-11: A Comparison of Stun Gun Waveforms for Safety and Effectiveness*, Stinger Systems, 2008. |
| 20 | An accurate copy of excerpts of the transcript of the *Markman* hearing conducted on May 7, 2008. |
| 21 | An accurate copy of the Statement of Leonard Tachner, dated April 17, 2009. |
| 22 | An accurate copy of the Supplemental Statement of Leonard Tachner, dated May 17, 2009. |
| 23 | An accurate copy of the S-200 Schematic attached as Exhibit F to the Statement of Leonard Tachner dated April 17, 2009. |
| 24 | An accurate copy of the *Report Concerning Infringement of U.S. Patent Nos. 6,999,295; 7,102,870; and 7,234,262* by Jeffrey Rodriguez, Ph.D., dated April 3, 2009.  FILED UNDER SEAL |
| 25 | An accurate copy of an email dated September 10, 2007.  FILED UNDER SEAL |

57518-0006/LEGAL16713733.1

# Exhibit 1



**U.S. Department of Justice**

Office of Justice Programs

Office of the General Counsel

_____

_Washington, D.C. 20531_

May 22, 2008

Mr. Aaron H. Matz
Perkins Cole Brown & Bain
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788

Re:    OJP FOIA No. 08-00144

Dear Mr. Matz:

This is an interim response to your Freedom of Information Act request for the following:

> All documents and communications received by the National Institute of Justice
> ("NIJ") in response to the NIJ's request for comments from TASER International,
> Inc. and Stinger Systems, Inc. regarding the draft final report _A Qualitative &_
> _Quantitative Analysis of Conducted Energy Weapons: TASER X26 vs. Stinger_
> _S200 by_ Charlie Mesloh, _et al._

Enclosed is a copy of a final report entitled "A Qualitative & Quantitative Analysis of Conducted
Energy Devices: TASER X26 vs. Stinger S200," including the comments. This report and the
comments, consisting of 117 pages, are appropriate for release in full and without excision. A
search is continuing for additional responsive documents and you will be notified of the result.

Sincerely,

_Dorothy A. Lee_

Dorothy A. Lee
Paralegal Specialist
Office of the General Counsel

Enclosure

The author(s) shown below used Federal funds provided by the U.S. Department of Justice and prepared the following final report:

| | |
|---|---|
| **Document Title:** | **A Qualitative & Quantitative Analysis of Conducted Energy Devices: TASER X26 vs. Stinger S200** |
| **Author:** | **Charlie Mesloh, Mark Henych, L. Frank Thompson, Ross Wolf** |
| **Document No.:** | **222769** |
| **Date Received:** | **May 2008** |
| **Award Number:** | **2005-IJ-CX-K049** |

This report has not been published by the U.S. Department of Justice. To provide better customer service, NCJRS has made this Federally-funded grant final report available electronically in addition to traditional paper copies.

Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

TSDOC004521



# A Qualitative & Quantitative Analysis of Conducted Energy Devices: TASER X26 vs. Stinger S200

A report to the National Institute of Justice

March 5, 2008

CHARLIE MESLOH, PhD
Associate Professor, Florida Gulf Coast University

MARK HENYCH, PhD
Senior Researcher, Weapons and Equipment Research Institute

L. FRANK THOMPSON, MBA
Researcher, Weapons and Equipment Research Institute

ROSS WOLF, EdD
Assistant Professor, University of Central Florida

The project was supported by Award No. 2005-IJ-CX-K049, by the National Institute of Justice, Office of Justice Programs, United States Department of Justice. The opinions, finding, and conclusions or recommendations expressed in this publication are those of the author and do not necessarily reflect the views of the Department of Justice.

TSDOC004522



# TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................... 1
TABLE OF TABLES .......................................................................................... 3
TABLE OF FIGURES......................................................................................... 4
DISCLAIMER ..................................................................................................... 5
ACKNOWLEDGEMENTS.................................................................................. 6
EXECUTIVE SUMMARY .................................................................................. 7
INTRODUCTION .............................................................................................. 10
   Research Problem........................................................................................... 11
   Implications for the law enforcement community ....................................... 12
LITERATURE REVIEW.................................................................................... 13
   TASER............................................................................................................ 13
   STINGER S200.............................................................................................. 16
RESEARCH DESIGN........................................................................................ 18
   Training Classes............................................................................................. 19
QUALITATIVE ANALYSIS.............................................................................. 20
   CED Application (Focus Group) .................................................................. 20
   Focus Group Testing Methodology.............................................................. 22
QUANTITATIVE ANALYSIS ........................................................................... 30
   Accuracy......................................................................................................... 30
   Accuracy Testing Methodology.................................................................... 33
   Target Description .......................................................................................... 33
   Data Collection.............................................................................................. 36
   Issues in Data Collection............................................................................... 37
   Analysis of Weapon Systems Malfunctions................................................. 40
   Accuracy Analysis ......................................................................................... 48
   Unequal Samples for Comparison ................................................................ 57
   Probe Spread.................................................................................................. 57
   Distance to Potential Miss ............................................................................ 60
   Projection of CED Probe Spread .................................................................. 64
   Other Variables Related to Functionality...................................................... 66
   Durability Testing .......................................................................................... 68
   Penetration Testing........................................................................................ 71
   Ergonomics Testing ....................................................................................... 75
   Video and Memory Storage .......................................................................... 80
   Touch Stun ..................................................................................................... 84
   Timing System ............................................................................................... 85
   Propellant Systems......................................................................................... 86
   Freeze Test ..................................................................................................... 87
   Heat/Humidity/Water Testing ...................................................................... 88
   Ignition Test................................................................................................... 89
APPENDIX 1  Graphical Representation of FPF Variables .............................. 92
APPENDIX 2  Malfunction Explanations .......................................................... 93
APPENDIX 3 ...................................................................................................... 95

TSDOC004523

Mesloh, Henych, Thompson, and Wolf   pg. 2

NIJ Requests for comments ................................................................................ 95
TASER International comments ....................................................................... 96
Stinger Systems comments ............................................................................. 98
REFERENCES.................................................................................................. 115

TSDOC004524



Mesloh, Henych, Thompson, and Wolf   pg. 3

# TABLE OF TABLES

Table 1: Weapon Malfunctions ................................................................................. 37
Table 2: Reliability of CED (Failure to Fire) ....................................................... 43
Table 3: Probe 1 (Hit or Miss) ............................................................................... 49
Table 4: Probe 2 (Hit or Miss) ............................................................................... 51
Table 5: Probe 1 & Probe 2; Distance from Point of Aim ................................. 54
Table 6: Probe Spread (Measured from Probe 1 to Probe 2) .......................... 59
Table 7: Distance to Probe 1 and Probe 2 Miss ................................................. 62
Table 8: Comparison of Projected Probe Spreads with Actual Scores ........ 65
Table 9: TASER and Stinger Probe Spread by Distance ................................... 66
Table 10: Probe Separated from Barb During Removal ................................... 68
Table 11: Tensile Strength of Probe Tethers ...................................................... 69

TSDOC004525



Mesloh, Henych, Thompson, and Wolf   pg. 4

## TABLE OF FIGURES

Figure 1: AFIDs (under alternate light source) .................................................. 15
Figure 2: TASER X26 and Stinger S200 ............................................................. 16
Figure 3: Test subject with Probes ..................................................................... 23
Figure 4: Embedded probes ................................................................................. 24
Figure 5: Alligator clips ...................................................................................... 25
Figure 6: Alligator clip placement ..................................................................... 26
Figure 7: Human subjects testing ...................................................................... 27
Figure 8: Drive stun testing ................................................................................ 28
Figure 9: Heart rate testing ................................................................................ 29
Figure 10: Accuracy Based on Probe Spread and Distance from Aim ........ 31
Figure 11: Distance to Nearest Miss .................................................................. 32
Figure 12: Three-Dimensional Target and Shooting Position ...................... 34
Figure 13: "Numb John" Target .......................................................................... 35
Figure 14: Stinger probe inconsistency ............................................................ 38
Figure 15: Stinger Shrapnel ................................................................................ 40
Figure 16: Stinger Cross-Bolt Safety ................................................................. 40
Figure 17: Stinger Possible Quality Control Mark ......................................... 42
Figure 18: TASER Probe Malfunction ............................................................... 44
Figure 19: Stinger Cartridge Explosion ............................................................ 48
Figure 20: Stinger wire entanglement ............................................................... 57
Figure 21: Probe Break ........................................................................................ 67
Figure 22: Broken Cartridges ............................................................................. 70
Figure 23: Blast door malfunction ..................................................................... 71
Figure 24: Ballistic clay ....................................................................................... 72
Figure 25: TASER Probe Penetration ................................................................ 72
Figure 26: Stinger Probe Penetration ................................................................ 73
Figure 27: Stinger Probe Penetration on Target Dummy .............................. 74
Figure 28: Stinger Cartridge Release ................................................................. 75
Figure 29: Stinger and TASER Safety Switches .............................................. 76
Figure 30: Examples of TASER and Stinger Holster Systems ...................... 78
Figure 31: TASER Cam ........................................................................................ 80
Figure 32: TASER Cam Data Download – Version 1 ...................................... 81
Figure 33: TASER Cam Data Download (By date and time) ......................... 82
Figure 34: TASER Cam Shots (Exterior and Interior) .................................... 83
Figure 35: Issues with TASER Cam and Auto-focus ...................................... 84
Figure 36: Stinger and TASER Displays ........................................................... 85
Figure 37: TASER battery status indicating 86% ............................................ 86
Figure 38: Normal and wet wire ........................................................................ 88
Figure 39: Chemical Agent Ignition Test ......................................................... 90
Figure 40: Lighter Impacted by Probe .............................................................. 91
APPENDIX 2 Figure 42: Malfunction Explanations ....................................... 93

TSDOC004526



## DISCLAIMER

While every effort has been made to ensure the accuracy of the information contained in this report, any errors of commission or omission are solely the responsibility of the research team. The research team shall not be liable for any damages or injury caused by errors, inaccuracies, omissions, or other defects in the content or any of the products tested, or any of the products referred. The researchers shall not be liable for any third-party claims or losses of any nature, including but not limited to, any claims or losses relating to any product referred to at any time in the content of this report. The researchers do not intend for references to corporations, products, or entities to be endorsements of such, and the researchers are not affiliated with, sponsored by, or endorsed by any consumer product in this report.

## MANUFACTURER COMMENTS

TASER® International Inc. and Stinger™ Systems were provided the opportunity to comment on the draft report. Their comments have been included in the appendix of this document.

Additional information about the companies and their products can be found at:

http://www.taser.com
http://www.stingersystems.com



Mesloh, Henych, Thompson, and Wolf   pg. 6

## ACKNOWLEDGEMENTS

Special appreciation is extended to the graduate research team at Florida Gulf Coast University, including:, Chris Berry, Komaal Collie, Chris Ford, Laura Gibson, and Brandon Wargo.

TSDOC004528



## EXECUTIVE SUMMARY

A Conductive Energy Device (CED) is a device designed to deploy electricity throughout the body of the target to temporarily cause loss of muscle control. TASER® International, the company best known today for producing CEDs, claims it provides an advanced non-lethal option for the use in law enforcement, private security and personal defense. However, recent competition by Stinger™ Systems, Inc. in the once limited field of CEDs has led many agencies to question the advantages and disadvantages of the competing products.

As a less-lethal weapon, a CED with projectile probes can be very effective. These devices can incapacitate a subject through the use of electrical shock, generally allowing the user enough time to apprehend a subject, or retreat from confrontation. It has been hypothesized that the voltage produced overwhelms the attacker's nervous system, forcing their muscles to contract, causing temporary incapacitation. However, reliability is a major concern when dealing with any type of weapon system. A significant problem for law enforcement agencies that are preparing to deploy CEDs into the field is that they are required to rely on factory data, specification sheets, and company marketing in order to make the critical decision as to which system to adopt. An independent study of this electronic weapons technology was necessary to determine each product's performance and operational safety.

TSDOC004529



Mesloh, Henych, Thompson, and Wolf   pg. 8

This report provides both a qualitative and quantitative analysis of the two weapon systems. The researchers tested both the TASER X26 and Stinger S200 weapon systems repeatedly, and documented variables including: distance to target, probe spread, probe distance to aim point, probe contact with target, and cartridge and weapon systems malfunctions. A qualitative review of the shocks received from both the TASER and Stinger weapons was conducted using fifteen volunteers. Using alligator clips to deliver the weapon's shock, the majority of people reported a much lower level of incapacitation when hit with the Stinger S200 in comparison to the TASER X26. In comparison, one individual that took a probe/barb hit claimed that the Stinger S200 was much stronger than the TASER X26 shock.

In a quantitative review of the weapon systems, this document shows the TASER X26 system to be much more reliable than its Stinger S200 counterpart, even after researchers received a replacement weapon and cartridges from Stinger due to a high incidence of malfunctions. An additional concern with the Stinger weapon system was that the Stinger S200 probes consistently broke free from their barbs in the target. The Stinger S200 system also had problems with tangled lead wire, and although the probe spread was smaller in the Stinger S200 (allowing for greater accuracy at greater distances than the TASER X26), the probes had a problem reaching the target. During testing it became clear that the lighter Stinger S200 probe penetrates deeply at close distances, but



quickly loses its ability to penetrate even a soft target over greater distances.

The TASER X26 weapon system also had problems. While probe spread is important in a projectile CED to insure electrical current is traveling through a large amount of muscle mass, the TASER missed the target a significant amount of times at 20 feet, even though the tether wire was 25 feet long, due to the probe's spread angle.

Both products were also tested for durability. The TASER X26 and the Stinger S200 had similar tensile strength in the tether wires leading from the weapon to the probes. In a separate test, a number of cartridges were dropped from a height of four feet to determine their survivability. None of the TASER cartridges broke during this test; however, fourteen out of the twenty Stinger cartridges broke upon impact with a carpeted floor.

TSDOC004531



## INTRODUCTION

Law enforcement agencies across the United States have adopted the TASER® as the Conducted Energy Device (CED) weapon of choice, and until recently it was the only commercially available stun-gun device for law enforcement agencies that worked by firing probes to conduct energy to a target. With the advent of Stinger™ Systems, Inc.'s Stinger S200 device, the CED marketplace now has two similar devices from which to choose. An initial review of Stinger revealed a lower purchase price than TASER, and features which may enhance accuracy and reduce liability claims.

As a result of public dollars, funds from the Department of Justice (DOJ) are being provided to local and state law enforcement agencies to purchase TASERs through community policing grants. Because of this new competition in the CED field, the DOJ has the obligation to examine other alternatives to ensure the maximum utility of the public monies being spent.

This report provides a framework which objectively and empirically examines the two CED devices so that the DOJ, and therefore law enforcement agencies that use these devices, are better informed about the devices' performance and safety attributes.

TSDOC004532



**Research Problem**

A CED is a device designed to deploy electricity through the body of the target to temporarily cause loss of muscle control. In the history of American law enforcement, there have been many devices that may fit this description, including "cattle prods," "stun guns," and many more. Over the past decade, however, the technology for these devices has become more user-friendly, allowing the application of electricity from the device from greater distances, with greater precision in the application of voltage.

The less lethal conductive energy device (CED) market has recently seen the introduction of a new handheld projectile stun gun in a field previously controlled by TASER International. The Stinger S200 has entered the law enforcement CED market, and is approximately the same size as the TASER X26. The Stinger S200, like the TASER X26, fires two probes and uses high voltage/low amperage electricity to disable a subject.

A significant problem for law enforcement agencies that are preparing to deploy CEDs into the field is that they are required to rely on factory data, specification sheets, and company marketing in order to make the critical decision as to which system to adopt. An independent study of this electronic weapons technology was necessary to determine the product's performance and operational safety.

TSDOC004533



## Implications for the law enforcement community

At the very heart of the debate on the use of less-lethal technology to maintain peace and law and order is the philosophical belief that doing unnecessary harm to another is wrong. Less-lethal technologies offer agencies the ability to reduce threats to the public good while causing the least amount of harm. CED systems appear to offer law enforcement agencies an ideal solution. Since the large-scale deployment of CED systems on the market in the last ten years, many agencies have claimed that injuries to suspects and officers have been reduced as a result of their use. In the case of the Orange County Sheriff's Office, there has been an estimated overall 80% reported reduction in injuries (Hopkins & Beary, 2003) since CEDs were deployed to patrol officers. This reduction clearly demonstrates that Conducted Energy Devices have greatly enhanced the ability of law enforcement officers to do their job, while at the same time offering the benefits of officer safety.

The TASER International device is the most widely accepted CED on the market by law enforcement agencies. Consequently, Stinger has entered the market and offers a similar CED device that is marketed as just as effective as and less expensive than the TASER brand device. The purpose of this study, therefore, is to objectively evaluate both the TASER International and Stinger weapon systems. This is accomplished by evaluating the performance, safety, and reliability of both products.

TSDOC004534



## LITERATURE REVIEW

### TASER

The TASER weapon (so named because of the creator's interest in
science fiction as the "Thomas A. Swift's Electric Rifle") administers an
electrical charge using direct current which causes muscular dysfunction
and temporary incapacitation of a suspect. Two darts are fired from the
pistol-like weapon and an electrical pulse of 50,000 volts is passed into
the subject's body (Laur, 2000). The darts fired from the TASER are
tethered by thin wires which can reach from 15 feet (civilian model) to 35
feet (law enforcement model).

Early studies indicated this weapon's effectiveness ranged from
50% - 85% (Donnelly, 2001). Because the TASER uses compressed
nitrogen for propulsion, TASER models are not classified as a firearm by
the Bureau of Alcohol, Tobacco, Firearms and Explosives (BATFE), and
only individual state statutes restrict ownership. TASER reports that they
will not sell their law enforcement models to civilians, as civilian models
that use cartridges with a shorter range (C2 model) are also available.
Nevertheless, this does not preclude a civilian from owning a law
enforcement model TASER if they are able to obtain one, and civilian
ownership may be restricted by specific state law.

The two primary TASER models are the older, larger M26 and the
newer, smaller X26 model; both models utilize a laser aiming system that
activates when the weapon is turned on. The M26 TASER has AA



Mesloh, Henych, Thompson, and Wolf   pg. 14

batteries in the weapon's grip and as the power runs down on the device, the electrical shock it provides is also weakened. The M26 is rechargeable through a port in the rear of the weapon that can also be used to download deployment data. This port is covered by a rubber plug which protects against moisture entering the weapon.

In comparison, the X26 uses a digital power magazine (DPM) which is inserted and removed from the X26's grip much like a pistol magazine. The DPM acts as both the software and power supply for the X26 and will functions for approximately two hundred shots before it should be replaced. As the battery wears down in the X26 model, the shocking power remains the same. Another addition to the X26 is that of a low powered flashlight. After the unit has been turned on, and the trigger pulled, the weapon operates on a five second cycle regardless of trigger position, and can only be turned off by engaging the safety of the weapon. Additionally, if the TASER X26 trigger is continually depressed, the weapon will continue to cycle uninterrupted. The TASER trigger can therefore be held down for continuous shock or released and pulled again.

TASER recently added the "TASER Cam" which replaced the DPM on the model X26. This audio/visual attachment recorded sound and video in a black & white mpeg4 format every time that the weapon was turned on.



## Figure 1: AFIDs (under alternate light source)



The TASER utilizes an Anti-Felon Identification (AFID) tracking system which incorporates serialized microdots, which correspond to cartridge number. This cartridge number can then be traced back to the law enforcement agency and the officer to which the cartridge was issued. When the TASER weapon is fired, twenty to thirty small brightly-colored paper tags are deployed. Despite their bright coloration, AFIDs may be difficult to locate in dark environments. Lounsbury and Thompson (2007) devised a method of locating these disks through the use of an alternate light source (450-480nm), which allows them to fluoresce and are viewable through orange filter glasses.

The cost of the TASER X26 starts at $799.95, while each cartridge is $22.97. The TASER Cam feature costs an additional $399.95. These prices are reflective of costs when purchased by a law enforcement agency, and may be more for individual sale.

TSDOC004537



## STINGER S200

Stinger System makes a number of electric weapons for corrections such as the "Band-It" and the "ICE Shield" which are primarily used for prisoner control and cell extractions. The company recently entered the CED market with their four projectile S400 system, which was quickly replaced by the two projectile S200 model. While it looks slightly larger than a TASER X26, their sizes are almost identical when a cartridge is placed on the TASER X26.

**Figure 2: TASER X26 and Stinger S200**



On the Stinger S200, the cartridge fits inside the weapon and is removed with an ambidextrous magazine release near the front of the gun. This spring-loaded action forces the cartridge out of the gun. The on/off switch on the Stinger S200 is a cross bolt design (similar to the Remington 870 shotgun safety-switch) and is located above the grip, on the frame of the weapon.

TSDOC004538

Case 2:07-cv-00042-JAT   Document 186-1   Filed 08/14/09   Page 23 of 190

The Stinger has a laser red dot sight that activates when the weapon is turned on. The weapon uses LED lights to provide information to the user, including battery life and a countdown for the length of time left on the weapon's burst of electricity. The electricity cycle on the Stinger S200 lasts for four seconds. The trigger is programmable and can be set to fire only when the trigger is depressed, in two second bursts, or automatically for four seconds.

The Stinger S200 is powered by lithium batteries that are stored in the weapon's grip. The electrical shock used is that of alternating current and the company suggests that this current allows for effective incapacitation even when the probes are close together; however due to fact that all literature on Stinger currently comes from the company itself, this has not been subject to outside review. Due to the fact that a small ballistic primer is used in the cartridge, the weapon is actually considered a firearm by the BATFE. This may limit the sale of the device to the public, based on firearm sale restrictions. Consequently, it may be illegal for the public to carry the Stinger device in some places where it would be legal to carry an alternative-firing device due to restrictions on the carrying of firearms.

The cost of the Stinger S200 is $699.00 and each cartridge is $20.00.

TSDOC004539



## RESEARCH DESIGN

This project consisted of three primary phases of testing. The first phase involved exposure testing on a number of willing participants who signed a liability waiver/release of information. Part two involved accuracy testing of the weapons to achieve probe spread. The third phase was comprised of destruction testing to assess if the weapons would experience problems in the field. Weapons and cartridges were subjected to extreme conditions over an extended period of time to identify weaknesses in design and performance.

In order to conduct this assessment, one member of the research team achieved "Instructor" level certifications from both TASER International and Stinger Systems. The rationale for achieving training beyond the typical end-user level provided to most law enforcement officers was to ensure that the research team had as much knowledge available to them as the companies would provide. This also enabled the research team the opportunity to assess the instructional methods of each company, as these may directly influence how their products are deployed. In addition, the manufacturers provided the instructor course attendees with their instructor materials, which contained additional information not readily available.



**Training Classes**

Stinger and TASER both offer an instructor course and an end-user certification course. The TASER end-user certification course is 4-6 hours in length and the Stinger end-user course is 6-8 hours in length when taken in person. The Stinger end-user certification course is also available online from the Stinger home page, and according to the manufacturer, this online course is available to any person or entity purchasing their product (see www.Stingersytems.com).

Differences were noted between the training provided for each of the weapon systems' instructor certification courses. TASER X26 training was carried out over 2 full 8-hour sessions. Material was presented in an organized fashion utilizing a combination of power point presentations, complete hard copy data and a Compact Disk containing train-the-trainer materials. The second day of the training allowed the participants direct clinical experience, employing knowledge gained from the first day's work. Scenarios included a wide range of common police scenarios with participants assuming multiple roles. Participants in the class were also able to receive deployments from the weapon system including being shot by the tethered probes. At the end of the training, students were evaluated on their absorption of the content presented through written examination.

Stinger training was scheduled to take 8 hours, but actually was completed in about five hours of instructions and demonstrations. The

TSDOC004541



session utilized handout material largely surrounding the design and electrical capabilities of the device, giving lots of information about how Conducted Energy Weapons work. Some of the material was found to be outdated and incomplete, and the instructor advised participants to ignore sections of the handout material where discrepancies were noted. Each class participant received five applications from the Stinger S200 with a combination of drive-stun shots and applications while the wires were attached to the person utilizing alligator clips. The participants fired live Stinger cartridges at a target, but no student was shot with the probes. There was no formal examination or participant evaluation in this training.

## QUALITATIVE ANALYSIS

### CED Application (Focus Group)

The first testing phase of the project was to apply each of the weapons on a willing pool of applicants after completing a training seminar on both CED systems. Initially, the research team thought to test the weapons on current law enforcement officers but the idea was quickly discarded due to biases that may have already been present in this group. In the Southwest Florida region, every law enforcement agency carries TASER brand weapon systems and thus their officers have been exposed to this CED and would likely already be unduly influenced by their department and the training they had previously received.

TSDOC004542



For the purpose of this study, fifteen criminal justice undergraduate students volunteered to participate, and received no credit or payment for their participation. None of the students had ever received an application from either weapon. The volunteer group consisted of male students but this session was not restricted in any way and female students were offered the same opportunity to participate. Despite this, no females volunteered to participate in the study. This testing followed the Florida Gulf Coast University Institutional Review Board (IRB) protocols regarding testing on human subjects.

The focus group testing was conducted at a local fire station due to the availability of Emergency Medical Technicians (EMTs). The students were given a training seminar by the certified TASER and Stinger Instructor/Researcher highlighting the use of CEDs in law enforcement, showing videos of their actual deployment, and were allowed to handle and "dry-fire" the weapons prior to experiencing an application of each CED.

All participants were offered numerous chances to withdraw from the testing, and one student chose to not participate after the instructional period was over. All students were ordered not to participate if they had recently consumed any alcohol or controlled substances. Additionally, student volunteers were also ordered to not participate in the "live-fire" portion of the seminar if they had ANY pre-existing health conditions, and one student self-excluded from the testing



Mesloh, Henych, Thompson, and Wolf   pg. 22

because of this caveat. All students who volunteered signed liability waivers and expressed a strong desire to be part of the study.

### Focus Group Testing Methodology

In order to maintain the anonymity for each CED and to avoid bias, the participants were not told which CED they were being shocked with and the actual CED was kept out of their sight. The researcher, who was certified as an instructor in both systems, administered an application from each CED at a distance of fifteen feet.

The TASER X26 has a five second run cycle while the Stinger S200 has a four second cycle. In order to minimize reporting and measurement bias, participants were not only blinded to the type of CED being used, but the CED was deployed for only 4 seconds per application regardless of the unit's ability or standard setting to deliver a longer application.

Each participant was held by student volunteers on each side, under the armpit, to keep the participant from falling to the ground. A research assistant ran a video camera, which was focused on the applicants in order to catch their reactions to each application. Additionally, pictures were taken of each subject's back after the application.

For the first test, one student volunteered to be shot with the probes from each CED. The participant, heavily-built and muscular, expressed a strong desire to feel the full effects of each CED and stated



Mesloh, Henych, Thompson, and Wolf   pg. 23

that he would refuse to participate in unless he was shot with the actual probes from each CED.

For the first application, a twenty-five foot TASER XP cartridge was shot into the subject's back from a TASER X26 from a distance of approximately ten feet. The probes impacted on his shoulder blade and directly above his waist. The subject's reaction included a tight clenching of the muscles, facial grimace, and clenched teeth. After four seconds, the CED was turned off and the probes were subsequently removed from the subject's back without incident.

**Figure 3: Test subject with Probes**



After a "cool down" period, the subject volunteer was next shot with a Stinger S200. When fired, the probes from the Stinger S200



impacted much closer together than the TASER X26 probes in the subject's back and the subject screamed and attempted to pull away from the restrainers, managing to twist out of the control of the two individuals holding him. Once the CED was turned off, the subject proclaimed that the effects of this CED (identified as the Stinger S200) were much stronger than that of the other CED

**Figure 4: Embedded probes**



At this point, however, the Stinger barbs could not be removed according to the instructions issued by Stinger. When proper removal procedure was followed, the barb became disconnected from the probe shaft. The probe removal method for both the TASER and the Stinger follow essentially the same protocol. Probes are removed by spreading the skin around the entry point to make it taut and then quickly jerking on the probe. Such an action leaves a small hole and a minute trace of blood, but little pain or chance of infection as the electricity has cauterized the entrance hole. The Stinger instructor course advocated



probe removal in the same fashion as the TASER instructor course. In this case, the barbs could not be removed by attendant EMS staff and the subject had to be transported to the local hospital for removal by a physician.

Due to an ethical concern about doing harm to the additional volunteer subjects involved in this testing, subsequent testing with all other subjects involved the use of alligator clips.

**Figure 5: Alligator clips**



Alligator clips were attached to clothing of the subjects. Each subject removed any excess clothing down to their baseline of clothing, (an undershirt or a t-shirt) before the probes were attached in order to ensure that there was a minimum amount of electricity lost in the transfer. Initially, one probe was attached to the shoulder area and the other to the lower back. However, it was found that this did not allow a

 

consistent flow of electricity and both probes were then attached to the shoulders for all of the trials involving data collection.   The alligator clips were used for both the TASER X26 and the Stinger S200 devices. This placement of the electricity near to, but not imbedded in, the skin simulates real-life police applications where probes land in clothing, but have not penetrated the skin.

**Figure 6: Alligator clip placement**



All other aspects of the testing protocols remained the same, i.e. not knowing the weapon, spotters to prevent injury from falls, and a video camera recording the CED application.  At the completion of each CED application, individual subjects briefly described on camera their feelings and opinion regarding the application of the CED to which they submitted.



Mesloh, Henych, Thompson, and Wolf   pg. 27

After each member of the group was shocked with each CED, and the CED used was randomly changed, they repeated the process with the second CED. In all cases of TASER deployment, the subjects were immediately incapacitated. However, the majority of people had little reaction when hit with the Stinger S200 while this CED was affixed to them via gator clips. In comparison, the individual who experienced a full probe deployment claimed that it was much stronger. However, this is one unique case out of the thirteen. An additional observation made by many of the participants was that the Singer appeared to have a much more localized effect. While many participants reported pain was very severe in a small area when the Stinger S200 was used, pain was felt in a wider distribution and was thus more tolerable with the TASER X26 device. This same effect was noted in the touch stun application (discussed later).

**Figure 7: Human subjects testing**



TSDOC004549



When asked to report their opinions on the difference felt between the two types of weapons (blind testing), participants stated about the Stinger:

1) "I didn't feel like doing anything but fall to the ground"

2) "It's a deep burn...that was awesome"

3) "That one [Stinger] hurts 10X more"...than the TASER (this was from the participant who took the probe hit from the Stinger).

Participants made the following observations about the TASER:

1) "By far, [TASER was] a lot more unpleasant than first weapon [Stinger]"

2) "I was highly motivated to have it stop"

3) "When I said turn it off, I meant it from the bottom of my soul"

4) "That one [TASER] sucks"...clarified to mean TASER was more painful and locks you up.

5) "That one [TASER] was way worse"

**Figure 8: Drive stun testing**



TSDOC004550


After all subjects had experienced both the TASER X26 and the Stinger S200 with alligator clips across their back, two subjects volunteered for additional drive stuns from each CED. Each of the two volunteering subjects sat in a chair and each CED was applied in a random fashion to their bare deltoid muscle. Emergency Medical Technicians (EMTs) monitored each subject's heart rate before and after each application of the CED; but did not leave the subjects connected to the EKG while the weapon was deployed. EMTs reported that each subject's heart rate was only slightly elevated both before and after the deployment of the weapon, and they surmised it was due to anxiety. Both subjects reported that a drive stun from the TASER was more incapacitating than one from the Stinger.

**Figure 9: Heart rate testing**





## QUANTITATIVE ANALYSIS

In this phase of the evaluation, the researchers utilized a series of variables determined to be the key variables associated with accuracy. The accuracy variable is considered by the researchers to be the most important variable in terms of functionality of the weapon. This variable was decomposed into several core measures.

The functionality of the TASER is, according to their literature, dependent on at least some distance between the probes and their point of impact and this allows current to flow from probe to probe and through body tissue (TASER X26 Operating Manual, 2006). The result is that the more tissue between the probes, the more the CED is able to incapacitate the subject. Stinger claims that their product has a lower probe spread but does not require much spread to be effective. Clearly, for any effect to take place, the probes in both CEDs need to make contact with the subject in question. Therefore, if one probe fails to make contact with the subject, the incapacitating effect of the electrical current is zero. To examine this concept the researchers developed a fixed firing platform methodology to examine the hit/miss rates of both systems and the actual accuracy of both probes in each firing event.

### Accuracy

To capture the true accuracy rates of the CEDs under evaluation, the "Probe Accuracy" variable was developed. This variable was

TSDOC004552



Mesloh, Henych, Thompson, and Wolf    pg. 31

calculated by measuring the distance of each probe where it hit the target to the point of aim (laser dot sight). This variable consists of several data points (one for each probe); "Distance from Probe 1 to point of aim," and also Distance from Probe 2 to point of aim." The total distance between the Probes was also measured. These data points are reflected in Figure 10.

**Figure 10: Accuracy Based on Probe Spread and Distance from Aim**



In addition to the simple measures of probe spread and distance from point of aim, additional data points were captured as "Distance to Miss." This variable is indicative of a measure of how close the probe came to missing the target. This variable was constructed in order to capture an additional dimension of accuracy and the likelihood of a failed

TSDOC004553

Mesloh, Henych, Thompson, and Wolf    pg. 32

deployment. This data point was measured from the point of impact of each probe to the closest point of a miss. This variable is reflected in the Figure 11.

**Figure 11: Distance to Nearest Miss**



In addition to these measures, the researchers coded an additional measure of accuracy. This measure was coded "Did the Probe Hit the Target". This was coded at a nominal level as a "Yes" or "No."

Lastly, an additional nominal variable was included in the accuracy testing. This variable was "Did the CED Fire"? During the firings of the CEDs malfunctions occurred mainly as failures to fire. This is described in more detail at the conclusion of the report. Obviously, the accuracy of

TSDOC004554


the weapon is affected by these failures to fire and was included in the accuracy analysis.

## Accuracy Testing Methodology

Both TASER and Stinger were fired at a target from a fixed platform at distances of 5, 10, 15, and 20-foot intervals. While the TASER is equipped with a lengthier probe tether, which according to TASER allows for shots up to a distance of 25 feet, the Stinger does not and only reaches 22 feet. In order to allow for an unbiased evaluation the two systems were fired at identical distance at which they were both in range of the target.

## Target Description

A full-sized plastic/rubber human target was purchased from Law Enforcement Targets, Inc. and is representative of the average human person. The target was clothed in a T-shirt and jeans.

The target remained stationary and the firing platform was moved to simulate firing distances. In the beginning, to maintain accuracy, each weapon was placed in a modified Ransom rest, but the research team soon found this method to be impractical as pressure on the sides of the weapon interfered with the deployment of the cartridges. The testing protocol was revised to use the certified TASER/Stinger instructor shooting each weapon from a rest. Before each shot was taken, the



Mesloh, Henych, Thompson, and Wolf   pg. 34

shooter dry-fired the weapon in order to ensure that no "trigger-flinch" was occurring. Trigger flinch is a "jerk" of the weapon associated with the anticipation of firing by the user.

**Figure 12: Three-Dimensional Target and Shooting Position**



At each predetermined distance, fifty shots from each weapon were fired at the target. Once the weapon had been discharged, the cartridge was removed from the weapon in order to ensure that the research team would not be accidentally shocked while recording measurements. The impact points of the probes were analyzed and their distance from the point of aim was recorded.

However, as the researchers discharged probes at the 3D plastic target, the Stinger probes were unable to penetrate clothing and in many cases would bounce off of the target. This was confirmed by reviewing digital video footage of the firings. Stinger probes were initially coded as

TSDOC004556



misses when they failed to penetrate the target and/or the clothing of the 3D plastic target and generated little data for analysis. As no data could be collected from these firings, the researchers opted for another target option. This secondary option consisted of the "Numb John XT®" target.

**Figure 13: "Numb John" Target**



The Numb John target is comprised of a softer compound and allowed for the Stinger and TASER probes to both penetrate and be fairly and equally measured. Even though we fired hundreds of projectiles into this target, we were unable to significantly damage it, making it the suitable method for collecting this type of projectile impact data. Since actual probe insertions were under represented for the Stinger device in



the first round of deployments, a change to numb John mannequin was carried out in order to be able to compare actual imbedded probe distances for both devices. This was done in order to capture representative data points from Stinger, which was under-represented in the first phase of testing. Further, it allows validation or retesting of summary findings as the methodology is simple to replicate.

### Data Collection

The data obtained from the firing of the CEDs was recorded into SPSS, the Statistical Package for the Social Sciences (Version 11) that allows for statistical analysis and the creation of data charts and other outputs.

To measure the data points captured from the probes point of impact, the researchers utilized a standardized measuring methodology consisting of a checklist of data points to be measured. The distances were measured and recorded directly into SPSS. While the data was collected and recorded a supplemental data sheet was maintained in Microsoft Word, where various idiosyncratic issues were recorded as they occurred. The particular issue captured at this time was easily identifiable to a particular distance and CED as it could be cross-referenced by its shot number.

TSDOC004558

 Mesloh, Henych, Thompson, and Wolf   pg. 37

### Issues in Data Collection

In the first phase of data collection, the Stinger system repeatedly malfunctioned and the cartridges failed to be discharged so as to strike the target. This prompted the researchers to immediately create a new variable "Cartridge Failed to Deploy." This data point was analyzed at the completion of the project and the following output was developed. The following table reflects the overall weapon "Cartridge Failed to Deploy" variable along with other variables that are discussed in this section.

### Table 1: Weapon Malfunctions

|              | FTD | DF | PB | WB | AD | CD | CI | SU | BP | CE |
|--------------|-----|----|----|----|----|----|----|----|----|----|
| Stinger:     | 39  | 12 | 2  | 12 | 0  | 5  | 2  | 1  | 0  | 1  |
| New Stinger: | 2   | 2  | 2  | 4  | 0  | 4  | 2  | 1  | 0  | 1  |
| TASER:       | 2   | 0  | 1  | 4  | 1  | 0  | 1  | 0  | 1  | 0  |

**Legend**
FTD = Failed to Deploy
DF = Delayed Fire
PB = Probe Bounced off Target
WB = Wire Broke
AD = Accidental Discharge
CD = Cartridge Dislodged
CI = Collateral Impacts/Shrapnel
SU = Shocked User (shooter shocked through weapon)
BP = Battery Problem
CE = Cartridge Exploded

With the exception of two cartridges that did not deploy properly, all of the TASER cartridges behaved as advertised and as expected. The probe spread was predictable and the weapon was consistent in its operation. The Stinger S200, however, exhibited little consistency.



Mesloh, Henych, Thompson, and Wolf   pg. 38

The probes from the Stinger, when they successfully fired, exhibited idiosyncratic flight behavior. At times, the Stinger S200 probes would land close together, while at other times they would be spread far apart, irrelevant of the distance from the weapon to the target. In addition to the erratic spread of the probes, the probes tended to fly in an untrue linear manner and did not penetrate the target as would often hit the target sideways. Evidence of this was when the barbs bounced off the target and flew back towards the researchers.

**Figure 14: Stinger probe inconsistency**



When the Stinger was fired at close distances, the probes became stuck in the target. As was the case with our initial volunteer tester, almost every barb broke off in the plastic of the dummy target. An additional observation, however, was the malfunction rate on the Stinger weapon, which was measured, for the initial equipment, at 47.35%. Many times the cartridge simply would not fire, despite the weapon running on a full four-second cycle. The trigger was depressed, the lights showed the

TSDOC004560



cycle time and the researchers could hear the electricity cycling in the weapon, but the cartridge would not ignite. The protocol for that occurrence was to carefully remove the cartridge from the weapon and turn it around so the contact points were switched and insert it into an alternate Stinger S200. The cartridge was then given a second chance to fire. If the cartridge did not fire the second time, it was held at waist level and ejected from the weapon. In most cases, the cartridge would break open upon hitting the ground.

After the researchers contacted Stinger about this issue, we received replacement weapons and cartridges. The performance of the Stinger products was much improved after new hardware was received, and the researchers decided to conduct separate analysis of the original Stinger equipment as well as the new Stinger weapons and cartridges. The failure to fire rate on the new Stinger cartridges dropped to only two out of eighty-four, or 2%.

An additional type of Stinger cartridge malfunction was observed when the weapon would be in the middle of its firing cycle and then the cartridge would deploy. The lag in deployment ranged from an instant deployment of the probes to the cartridge not deploying until the last second of the weapon's cycle.



**Figure 15: Stinger Shrapnel**



Further problems existed in that the Stinger cartridges would also discharge little pieces of plastic and metal that could best be described as "shrapnel". This was noted numerous times in testing as these items constantly struck the research team. These items were randomly dispersed and would sometimes fly out at nearly a 90-degree angle to the weapon, striking people next to the person deploying the Stinger S200.

**Figure 16: Stinger Cross-Bolt Safety**



**Analysis of Weapon Systems Malfunctions**

While those around the shooter experienced safety issues, the person deploying the weapon also had safety concerns with the Stinger



S200. When the cartridge did not deploy properly, the weapon would often lightly shock the shooter when they touched the cross-bolt safety. The length of this shock ranged for a brief "bite" of electricity to one tester receiving a three second shock during a demonstration of the weapon. Shocks occurred twice with the Stinger S200 system, once with the original cartridges, and once with the replacement cartridges.

### Failure to Fire Malfunction

This type of malfunction tends to erode both the officer's confidence in the weapon and any deterrent effect on the suspect. TASER cartridges failed to fire in only two cases, in comparison with Stinger's thirty-nine malfunctions with the original Stinger weapon. A visible trend in Stinger cartridge malfunctions emerged each time the weapon was tested. Failure-to-fire malfunctions appeared to cluster within specific boxes of cartridges, indicating a possible problem in quality control. Cartridges which were apparently reviewed by quality control were marked with permanent marker, while others did not have this mark. Most of the malfunctioning cartridges did not have this mark on them.

This variable, while coded as "Weapon Fired," is actually indicative of whether the CED' cartridge functioned and deployed appropriately. It must be stated that the CEDs always "fired" and a cycle of electricity either 4 or 5 seconds long discharged. However despite this, in many of

the Stinger test firing cases, the weapon fired, but the cartridge did not deploy.

**Figure 17: Stinger Possible Quality Control Mark**

The TASER CED fired 214 times out of the 216 times that it was utilized in the data collection. The Stinger CED during the initial phase of data collection, fired 161 times out of 200 times, this effectively calculates to a 19.5% failure to fire rate for Stinger. During this phase the TASER failed to fire 0.9% of the time. The new Stinger variable accounted for a newer batch of cartridges and these had a failure rate of 2.4%.

These failure rates were distributed across the distance intervals at which each CED was fired. Thus, when examining the other variables under review, readers should consider that an unequal number of firings are represented at each distance as a result of the failure to fire rates.



**Table 2: Reliability of CED (Failure to Fire)**

Count

| | | Weapon fired | | |
|---|---|---|---|---|
| | | No | Yes | Total |
| Weapon | TASER | 2 | 214 | 216 |
| | Stinger | 39 | 161 | 200 |
| | New Stinger | 2 | 82 | 84 |
| Total | | 43 | 457 | 500 |

### Delayed Fire

This malfunction occurs when the trigger is depressed, the weapon cycles, but the cartridge does not fire immediately. This malfunction was not observed in any of the TASER X26 tests, but sporadically was found in Stinger S200 tests. This occurred twelve times in the original supply of Stinger cartridges, but only twice in the replacement cartridges.

In some cases, the weapon cycled for three seconds before discharging the probes. In an actual deployment, the suspect would only receive a one second charge before it automatically shut down and would, in an actual field use of the device, likely require the officer to depress the trigger a second time.

### Probe Bounced Off Target

As stated previously in this report, there was a problem with probe penetration that was identified in the initial stages of testing. It was unclear if this was a problem with the probe performance or the thickness of the target dummy exterior. This issue was resolved with the

TSDOC004565



substitution of a different target dummy that both the Stinger and TASER CED probes were able to penetrate.  TASER probes bounced off the target in one case, while it occurred to Stinger probes twice in both the original and new cartridges.

**Figure 18: TASER Probe Malfunction**



### Probe Wire Broke

Although probe wires are often broken during confrontations with suspects, this study examined if probe wire broke during the initial firing of the weapon.  This malfunction was observed during this analysis for both weapon systems.  In four cases, TASER X26 cartridges malfunctioned and fired the probes but the wire failed to deploy and broke.  Shown in figure 18, the wire is clearly still spooled in the cartridge, while the probe is missing.  The Stinger S200's cartridges had three times as many malfunctions of this type (n = 12) in the original

TSDOC004566



supply of cartridges, while the new cartridges performed considerably better with only four wire breaks.

### Accidental Discharges

In this study, the researchers discharged over six hundred cartridges between the two CED weapon systems. Safety protocols were established prior to testing, which treated all CEDs as a firearm, regardless of being loaded. Despite these safety protocols, a single accidental discharge occurred with a TASER. The weapon had malfunctioned several times due to a DPM (battery) not seating properly. As a result, the weapon repeatedly went through its systems diagnostics routine.

The weapon was removed from its firing position and the battery was removed. However, the cartridge was left on the weapon. When a new DPM was inserted, the TASER instantly fired into the floor without the trigger being depressed. It was also found that the safety had been bumped to a halfway position between safe and fire. The cartridge was left in place and the DPM was removed and re-inserted a second time to duplicate the conditions and the weapon again discharged. Initially, it was thought that this was a malfunction or a freak occurrence. However, the TASER "Instructor Materials" clearly warns against replacing the DPM while the weapon is loaded, "Warning: Ensure that no live cartridges are loaded prior to running this drill" (p.114). Consequently, we viewed this



as an operator error but noteworthy in this report, as TASER's materials do not address this issue beyond this single sentence warning.

### Cartridge Dislodged

This type of malfunction occurred when the cartridge released itself from the weapon upon firing. In some cases, the cartridge would simply fall off, while in others it would be propelled downrange toward the target. This occurred five times with the original Stinger S200 cartridges and four times with the new Stinger S200cartridges. No malfunctions of this type were noted with TASER X26 cartridges.

### Collateral Impacts

This issue occurred when the weapon user was struck with some projectile after firing. As stated previously, Stinger cartridges produced a wide range of plastic and metal shrapnel that flew in all directions. It is believed that this shrapnel impacted the target and bounced back toward the shooter at relatively high speed. This did not occur with TASER cartridges, with the exception of a single TASER probe that separated from its wire tether bounced off the target and struck the shooter without puncturing the skin.



### Shocked User

In addition to the electric shock received from activating the safety while the Stinger is in a firing cycle, there were two events where the shooter was shocked through the grip during testing. Unlike a short, low intensity "bite", which occurs when officers briefly touch an area that is charged from a CED deployment, this shock was the equivalent of a drive stun and equally incapacitating. It is unclear why this occurs with the Stinger weapons, but it occurred with two different weapons that were from two different shipments. No problems of this type were noted with TASER weapons.

### Battery Problem

No battery problems were noted with any of the Stinger weapons. A single battery (DPM) failed to seat properly in the TASER X26, which caused it to repeatedly restart its diagnostic sequence. This DPM was replaced and no further problems were encountered.

### Cartridge Exploded

In two cases, the Stinger cartridge exploded when the weapon was fired. Beyond the shrapnel that was produced from the Stinger, these cartridges dislodged their entire firing mechanism. As shown in Figure 19, the center of the cartridge which houses the primers and probes shows considerable scoring from the blast. The center of the cartridge was propelled downrange (15 feet) and impacted the target. It is unclear what caused this malfunction.



Mesloh, Henych, Thompson, and Wolf    pg. 48

**Figure 19: Stinger Cartridge Explosion**

 

**Accuracy Analysis**

In examining the accuracy of the CEDs, the researchers have structured this section based upon the premise that if both probes make contact with a subject then the CED will deploy an incapacitating charge into the subject. This hit or miss approach guided the researchers to develop a macro approach to the question of "Did the CED deploy accurately enough to be effective?" Both CEDs were tested at intervals of 5 feet, 10 feet, 15 feet, and 20 feet.

Tables 2 and 3, Probe 1 and Probe 2 (Hit or Miss), reflect a simple analysis of whether the Probe(s) were accurate enough to make contact with the target at the various distances. In determining whether the TASER and Stinger would be effective, it becomes necessary for both probes to make contact with the target. In this research design, the point of impact of each probe was captured as "Did Probe 1 Hit", a "yes" indicates the probe made contact and stuck in the targets exterior



clothing or penetrated the dummy. The value of zero in Table 3 indicates no misses. A cartridge that failed to fire was coded as a miss for this performance measure.

**TASER:** Table 3 shows that TASER X26 Probe 1 was 100% accurate, at hitting the target up to 15 feet of distance. At 15 feet of distance, misses began to occur and TASER X26 Probe 1 missed 3 out of 54 times (5.6%). This miss-rate increases as distance increases and holds true at 20 feet of distance where Probe 1 missed 25 out of 57 times (78%). In an aggregate calculation, TASER's Probe 1 failed to hit the target in 28 out of 216 deployments for a failure rate of 13%. However this failure rate needs to be considered in light of the misses occurring almost exclusively at the 20-foot distance interval.

**Table 3: Probe 1 (Hit or Miss)**

Count

| Weapon | | | Distance to target | | | | Total |
|---|---|---|---|---|---|---|---|
| | | | 5 ft | 10 ft | 15 ft | 20 ft | |
| TASER | Did probe one hit? | No | 0 | 0 | 3 | 25 | 28 |
| | | Yes | 52 | 50 | 54 | 32 | 188 |
| | Total | | 52 | 50 | 57 | 57 | 216 |
| Stinger | Did probe one hit? | No | 10 | 14 | 9 | 15 | 48 |
| | | Yes | 40 | 36 | 41 | 35 | 152 |
| | Total | | 50 | 50 | 50 | 50 | 200 |
| New Stinger | Did probe one hit? | No | 2 | 1 | 3 | 5 | 11 |
| | | Yes | 27 | 26 | 19 | 1 | 73 |
| | Total | | 29 | 27 | 22 | 6 | 84 |

TSDOC004571


**Stinger:** Probe 1 was constantly less accurate than TASER X26 Probe 1. In this performance testing at 5-feet, Probe 1 missed 20% of the time. At 10-feet, Probe 1 missed 28% of the time, at 15-feet Probe 1 missed 18% of the time and at 20 feet Probe 1 missed 30% of the time. (Note: Some cartridges failed to fire/discharge at all). Overall, Stingers Probe 1 failed to fire or hit the target 48 out of 200 deployments/attempted deployments (24%). This failure rate is fairly evenly distributed across the various distance intervals.

**New Stinger:** In the newer "batch" of Stinger cartridges, supplied by Stinger, the performance rates were much improved. At 5-feet, 6.9% failed to deploy or missed (n = 29), at 10 feet 3.7% failed (n = 27), at 15 feet, 13.6% failed (n = 22) and at 20 feet, 13.1% failed (n = 11). Overall the performance of the new "batch" of Stinger cartridges was much improved over the original batch. This batch appeared to be of improved quality and reliability. Overall, this batch of cartridges had a failure rate of 13.3%, which was relatively evenly distributed, across the various distance intervals. However, these cartridges only represent 84 deployments and are a small number of any reliable extrapolations.

For either the TASER or Stinger CED to be effective, as mentioned earlier, it is important that both probes make contact with the subjects' clothing or their skin. This being the case, the researchers examined whether the second probe (Probe 2) made contact. As with the first probe, in some cases the Stinger and TASER cartridge failed to deploy



despite the weapon cycling through a 4 or 5 second shooting cycle. This failure to deploy is detailed more in this report in the section on cartridges and CED malfunctions.

**TASER:** At a 5-foot distance, TASER's X26 Probe 2 missed the target 2 out of 52 times (3.8%), at 10 feet there were no misses, at 15 feet 7 shots out of 57 were misses (12.3%), and at 20 feet, 46 deployments of Probe 2 were misses for a total of 80.7%. Overall, 55 out of 216 TASER X26 probes missed the target (predominant issue) for a missed/failure rate of 25.5%. As with Probe 1, the majority of the probe misses were at the longer distances, with the distance interval of 20 feet representing almost all of the TASER's X26 Probe 2 failures.

**Table 4: Probe 2 (Hit or Miss)**

Count

| Weapon | | | Distance to target | | | | Total |
|---|---|---|---|---|---|---|---|
| | | | 5 ft | 10 ft | 15 ft | 20 ft | |
| TASER | Did probe two hit? | No | 2 | 0 | 7 | 46 | 55 |
| | | Yes | 50 | 50 | 50 | 11 | 161 |
| | Total | | 52 | 50 | 57 | 57 | 216 |
| Stinger | Did probe two hit? | No | 16 | 17 | 12 | 18 | 63 |
| | | Yes | 34 | 33 | 38 | 32 | 137 |
| | Total | | 50 | 50 | 50 | 50 | 200 |
| New Stinger | Did probe two hit? | No | 3 | 2 | 3 | 4 | 12 |
| | | Yes | 26 | 25 | 19 | 2 | 72 |
| | Total | | 29 | 27 | 22 | 6 | 84 |

**Stinger:** At 5 feet, 16 out of 50 Stinger S200 Probes failed to hit or fire when deployed (32%), while at the 10 foot distance interval the


Stinger S200 Probes failed to hit or fire 17 times out of 50 shots (34%
failure rate). At the 15-foot range interval, 12 Probes out of 50 failed to
fire or hit the target (24%). Lastly, at 20 feet of distance 18 out of 50
cartridges failed to fire or hit the target for a 36% failure rate. Overall,
Stinger S200 failed to hit the target or deploy (predominantly failure to
deploy) for an overall failure rate of 31.5%. Stinger S200 Probe 2 failures
were relatively evenly distributed across the various distance intervals.

New Stinger: As mentioned earlier, because of the high failure
rates of the first batch of Stinger cartridges, new cartridges were
provided by Stinger. This batch, referred to as "new Stinger" in the data
code sheet, reflects the newer cartridges and allowed for comparison as
such. This batch of cartridges performed better and failure rates were
significantly reduced. At the 5 feet of distance interval, 3 out of 29 failed
(10.3%). At 10 feet, 2 Probes out of 27 failed to hit the target or failed to
fire (7.4%), at 15 feet 3 probes out of 22 failed to hit or fire (1.4%), and at
20 feet 4 out of 6 failed to hit or fire (66.7%).

Overall, the newer batch had 12 out of the 84 cartridges that
missed the target or failed to fire for an overall failure rate of 14.3%. A
caveat must be added here, that the N of this sample is much smaller
than the other groups (N=84). As with Stinger S200 Probe 1 and Probe 2,
this batch of probes also failed to hit the target or fire relatively
consistently at all distance intervals.



A review of Table 5 shows the distances of Probe 1 and Probe 2 from the point of aim (from the red dot site on each CED). The data reported here is the mean data (average of all the shots at the distance interval described) and the number of shots fired (represented by N).

### 5-Foot Distance Testing

**Taser:** At the 5-foot distance interval, TASER's X26 Probe 1 was a mean distance of 2.8 inches from the point of aim. The red dot sight is the point of aim reference point for these measures. The TASER X26 second Probe was an average of 7.0 inches from the point of aim. This probe (probe 2) is generally 7.0 inches lower (down) from the point of aim, as the TASER X26 cartridges fire the probe at an angle (stated as 8°) (X26 Instructor Materials, Taser International 2004).

This downward angle is important and is discussed later in this report where the researchers calculate regression lines for the probes and spread rates at the other distances. These means are based sample values of N= 52 for Probe 1 deployments and N-50 for Probe 2[1].

**Stinger:** At the 5-foot distance interval, Stingers S200 Probe 1 was a mean distance of 2.6 inches from the point of aim. The CED's standard red-dot sight is the point of aim reference point for these measures. The Stinger second probe was an average of 2.5 inches from the point of aim. This probe (probe 2) was generally 2.4 inches lower (down) from the

---

[1] Only 50 data points were captured here, compared to 52 for Probe 1 as in the two cases the Probes failed to hit the target or did not penetrate the clothing or target to allow for data point capture.

TSDOC004575


point of aim, as the Stinger S200 cartridge's fire the probe at an angle (stated as 5.5°) (Stinger Instructor Course Materials, 2006). This downward angle is important and is discussed later in this report where the researchers calculate regression lines for the probes and spread rates at the other distances.

New Stinger: As identified in the first round of testing, the Stinger S200 Cartridges failed to fire in much of the testing. As a result, the researchers contacted Stinger and requested additional cartridges to be delivered to compensate for the defective ones. This newer "batch" of cartridges was coded differently to allow for comparison with original shipment of cartridges. At the 5-foot distance, the new Stinger Probe 1 had 3.4 inches of deviation from POA and Probe 2 had 2.9 inches of distance from point of aim deviation.

### 10 Foot Distance Testing

TASER: At the 10-foot distance interval TASER Probe 1 landed a mean distance of 3.6 inches from POA and Probe 2 landed 15.5 inches from POA (n = 50 for both).

Stinger: The Stinger CED had a mean score of 3.5 inches for Probe 1 (n = 37) and 5.5 inches for Probe 2 (n = 34) at 10 feet of testing.

New Stinger: The new cartridges had relatively similar means scores; Probe 1 (n = 26, 5.6 inches) and Probe 2 (6.2 inches, n = 25).

**Table 5: Probe 1 & Probe 2; Distance from Point of Aim**

TSDOC004576

 Mesloh, Henych, Thompson, and Wolf    pg. 55

| Distance to target | Weapon | | | Distance from probe 1 to POA | Distance from probe 2 to POA |
|---|---|---|---|---|---|
| 5 ft | TASER | Mean | | 2.8279 | 6.9800 |
| | | N | | 52 | 50 |
| | | Std. Deviation | | .80241 | .50679 |
| | Stinger | Mean | | 2.5600 | 2.4074 |
| | | N | | 40 | 34 |
| | | Std. Deviation | | 1.02151 | 1.36942 |
| | New Stinger | Mean | | 3.4259 | 2.8662 |
| | | N | | 27 | 26 |
| | | Std. Deviation | | 1.12783 | 2.13691 |
| | Total | Mean | | 2.8735 | 4.5943 |
| | | N | | 119 | 110 |
| | | Std. Deviation | | 1.00374 | 2.55844 |
| 10 ft | TASER | Mean | | 3.5700 | 15.4890 |
| | | N | | 50 | 50 |
| | | Std. Deviation | | .84781 | .92219 |
| | Stinger | Mean | | 3.4743 | 5.4647 |
| | | N | | 37 | 34 |
| | | Std. Deviation | | 1.70190 | 1.86277 |
| | New Stinger | Mean | | 5.6019 | 6.1860 |
| | | N | | 26 | 25 |
| | | Std. Deviation | | 2.92221 | 2.95005 |
| | Total | Mean | | 4.0062 | 10.2284 |
| | | N | | 113 | 109 |
| | | Std. Deviation | | 1.98017 | 5.20756 |
| 15 ft | TASER | Mean | | 2.8944 | 25.0090 |
| | | N | | 54 | 50 |
| | | Std. Deviation | | 1.38219 | 1.43661 |
| | Stinger | Mean | | 5.3774 | 9.4581 |
| | | N | | 42 | 37 |
| | | Std. Deviation | | 2.77658 | 3.11235 |
| | New Stinger | Mean | | 5.2737 | 13.5421 |
| | | N | | 19 | 19 |
| | | Std. Deviation | | 2.53083 | 4.97531 |
| | Total | Mean | | 4.1943 | 17.5255 |
| | | N | | 115 | 106 |
| | | Std. Deviation | | 2.48644 | 7.81031 |
| 20 ft | TASER | Mean | | 4.2464 | 36.0186 |
| | | N | | 56 | 51 |
| | | Std. Deviation | | 1.97691 | 4.07637 |
| | Stinger | Mean | | 9.7865 | 16.2589 |
| | | N | | 37 | 35 |
| | | Std. Deviation | | 5.89776 | 4.39789 |
| | New Stinger | Mean | | | 24.8667 |
| | | N | | | 3 |
| | | Std. Deviation | | | 2.09841 |
| | Total | Mean | | 6.4505 | 27.8720 |
| | | N | | 93 | 89 |
| | | Std. Deviation | | 4.83530 | 10.46063 |

TSDOC004577


## 15 Foot Distance Testing

**TASER:** At the 15-foot distance interval TASER Probe 1 (N=54) landed a mean distance of 2.9 inches from POA and Probe 2 landed 25 inches from POA (n = 50).

**Stinger:** The Stinger CED had a mean score of 5.4 inches for Probe 1 (n = 42) and 9.5 inches for Probe 2 (n = 37) at 15 feet of testing.

**New Stinger:** The new cartridges had relatively similar means scores; Probe 1 (5.3 inches, n = 19) and Probe 2 (13.5 inches, n = 19).

## 20 Foot Distance Testing

**TASER:** At the 20-foot distance interval TASER Probe 1 (n = 56) landed a mean distance of 4.2 inches from POA and Probe 2 landed 36 inches from POA (n = 51).

**Stinger:** The Stinger CED had a mean score of 9.8 inches for Probe 1 (n = 37) and 16.3 inches for Probe 2 (n = 35) at 20 feet distance testing.

**New Stinger:** At 20 feet testing Probe 1 failed to hit the target. While these cartridges did in fact fire, the probes failed to hit the target as they were unable to fully deploy due to entanglements of the wire tethers. Probe 2 had a mean distance of 13.5 inches (n = 19). After numerous occurrences, we named this issue the "bungee effect", as the probes were snapped back as if on a bungee cord.

In comparing the number of cartridges fired for each CED, the researchers initially attempted to fire an equal number of shots at each

TSDOC004578



Mesloh, Henych, Thompson, and Wolf    pg. 57

distance interval for each CED. However in the first round of testing the Stinger malfunctioned and failed to fire so many times that an equal number of shots and data collection point became unfeasible. Thus, the researchers were forced to fire a disproportionate number of Stinger cartridges in order to balance the data for each CED in the various distance intervals. These malfunctions and failures to fire are examined in more detail in the section of Weapons Malfunctions.

**Figure 20: Stinger wire entanglement**



**Unequal Samples for Comparison**

**Probe Spread**

Another measure of relative accuracy and effectiveness of the CED is based upon whether both probes make contact with the subject. As such, the distance between Probe 1 and Probe 2 has been captured and reported in this table. This table reports the mean scores of the

TSDOC004579



distances between the probes and has been decomposed to reflect this "spread" at the various distance intervals.

### 5-Foot: Probe-Spread Testing

At the 5-foot distance interval, the TASER probe spread from Probe 1 to 2 was an average of 9.4 inches (n = 50). The Stinger has a smaller probe spread of 4.0 inches (n = 34). The New Stinger Cartridges were relatively similar to the original batch of Stinger cartridges and had a mean spread of 4.8 inches (n = 25).

### 10-Foot: Probe-Spread Testing

At the 10-foot distance interval the TASER probe spread from Probe 1 to 2 was an average of 18.5 inches (n = 50). The Stinger has a smaller probe spread of 7.5 inches (n = 34). The New Stinger Cartridges were relatively similar to the original batch of Stinger cartridges and had a mean spread of 10.2 inches (n = 25).

### 15-Foot: Probe-Spread Testing

At the 15-foot distance interval the TASER probe spread from Probe 1 to 2 was an average of 26 inches (n = 50). The Stinger has a smaller probe spread of 11.7 inches (n = 37). The New Stinger Cartridges had a mean probe spread of 14.5 inches (n = 17).

TSDOC004580



Mesloh, Henych, Thompson, and Wolf    pg. 59

### 20-Foot: Probe-Spread Testing

At the 20-foot distance interval the TASER probe spread from Probe 1 to 2 was an average of 35 inches (n = 50).  The Stinger has a smaller probe spread of 14.1 inches (n = 32).  The New Stinger Cartridges had a mean probe spread of 14.5 inches (n = 17).

**Table 6: Probe Spread (Measured from Probe 1 to Probe 2)**

Projectile spread

| Distance to target | Weapon | Mean | N | Std. Deviation |
|---|---|---|---|---|
| 5 ft | TASER | 9.4200 | 50 | .65745 |
| | Stinger | 4.0412 | 34 | 1.40710 |
| | New Stinger | 4.7620 | 25 | 1.60502 |
| | Total | 6.6739 | 109 | 2.80945 |
| 10 ft | TASER | 18.4540 | 50 | 1.45630 |
| | Stinger | 7.4588 | 34 | 2.32488 |
| | New Stinger | 10.2400 | 25 | 4.07469 |
| | Total | 13.1404 | 109 | 5.61110 |
| 15 ft | TASER | 25.9250 | 50 | 3.57206 |
| | Stinger | 11.6757 | 37 | 3.34445 |
| | New Stinger | 14.4588 | 17 | 3.78522 |
| | Total | 18.9813 | 104 | 7.62619 |
| 20 ft | TASER | 34.9240 | 50 | 4.59115 |
| | Stinger | 14.0797 | 32 | 4.96379 |
| | New Stinger | | | |
| | Total | 26.7896 | 82 | 11.26254 |
| Total | TASER | 22.1808 | 200 | 9.88373 |
| | Stinger | 9.2960 | 137 | 5.00412 |
| | New Stinger | 9.2664 | 67 | 5.04349 |
| | Total | 15.6697 | 404 | 10.12524 |

TSDOC004581



**Distance to Potential Miss**

Another important measure of relative accuracy of the CED under evaluation is a measure of how much distance the Probe 1 and Probe 2 had (described as leeway or accuracy error) before it would have missed the target. At issue here again, is the concept that both probes need to make contact with the subject in order for the TASER and/or Stinger CED to be effective

To collect this data point, as referenced in Figure 11, the researchers measured the closet or nearest distance from the probes point of impact to the nearest point where the probe/s would have failed to make contact with the target. In this testing the outer garments of the targets were coded as a hit largely as the literature from Stinger and TASER indicate electric arcs occur from their probes to the person thus still making them effective.

Table 7 reports the mean scores of Probe 1 and Probe 2 for the TASER, Stinger and the new Stinger cartridges. The mean scores are decomposed to the distance interval under evaluation.

### 5-Foot Distance Interval (Nearest Potential Miss)

**Taser:** At 5-feet of distance, the TASER's Probe 1 had a mean score of 7.1 inches (n = 52) of leeway before a miss would have occurred. Probe 2 averaged 7.2 inches (n = 50) of leeway until a miss. Two cases



occurred where Probe 2 missed the target and as such no data was captured.

**Stinger:** At 5-feet of distance, the Stinger Probe 1 averaged 7.2 inches of leeway (n = 40) and Probe 2 averaged 7.5 inches (n = 34) of leeway before its nearest potential miss.

**New Stinger:** The new Stinger cartridges Probe averaged a mean nearest miss score of 7.2 inches (n = 27) and Probe 2 averaged a nearest miss score of 9 inches (n = 26).

### 10-Foot Distance Interval (Nearest Potential Miss)

**Taser:** At 10-feet of distance, the TASER's Probe 1 had a mean score of 6.1 inches (n = 50) of leeway before a miss would have occurred. Probe 2 averaged 6.6 inches (n = 50) of leeway until a miss could have potentially occurred.

**Stinger:** At 10-feet of distance, the Stinger Probe 1 averaged 6.2 inches of leeway (n = 37) and Probe 2 averaged 6.2 inches (n = 34) of leeway before its nearest potential miss.

**New Stinger:** The new Stinger cartridges Probe averaged a mean nearest miss score of 5.5 inches (n = 26) and Probe 2 averaged a nearest miss score of 7.6 inches (n = 25).

TSDOC004583



Mesloh, Henych, Thompson, and Wolf   pg. 62

## Table 7: Distance to Probe 1 and Probe 2 Miss

| Distance to target | Weapon | | | Distance to miss probe 1 | Distance to miss probe 2 |
|---|---|---|---|---|---|
| 5 ft | TASER | Mean | | 7.0510 | 7.1720 |
| | | N | | 52 | 50 |
| | | Std. Deviation | | .89149 | 1.95334 |
| | Stinger | Mean | | 7.1813 | 7.4735 |
| | | N | | 40 | 34 |
| | | Std. Deviation | | 1.17417 | 1.94201 |
| | New Stinger | Mean | | 7.1296 | 9.0385 |
| | | N | | 27 | 26 |
| | | Std. Deviation | | 1.12858 | 1.17408 |
| | Total | Mean | | 7.1126 | 7.7064 |
| | | N | | 119 | 110 |
| | | Std. Deviation | | 1.04074 | 1.93504 |
| 10 ft | TASER | Mean | | 6.1310 | 6.5890 |
| | | N | | 50 | 50 |
| | | Std. Deviation | | 1.25095 | 2.14158 |
| | Stinger | Mean | | 6.1689 | 6.2000 |
| | | N | | 37 | 34 |
| | | Std. Deviation | | 2.05597 | 1.93332 |
| | New Stinger | Mean | | 5.5481 | 7.5540 |
| | | N | | 26 | 25 |
| | | Std. Deviation | | 2.25142 | 2.27119 |
| | Total | Mean | | 6.0093 | 6.6890 |
| | | N | | 113 | 109 |
| | | Std. Deviation | | 1.79977 | 2.14996 |
| 15 ft | TASER | Mean | | 6.4028 | 3.0520 |
| | | N | | 54 | 50 |
| | | Std. Deviation | | 1.91352 | 1.81538 |
| | Stinger | Mean | | 5.4805 | 6.0730 |
| | | N | | 41 | 37 |
| | | Std. Deviation | | 2.23668 | 2.22038 |
| | New Stinger | Mean | | 7.2316 | 6.0000 |
| | | N | | 19 | 19 |
| | | Std. Deviation | | 4.14287 | 2.36579 |
| | Total | Mean | | 6.2092 | 4.6349 |
| | | N | | 114 | 106 |
| | | Std. Deviation | | 2.57071 | 2.53906 |
| 20 ft | TASER | Mean | | 5.7672 | 1.3636 |
| | | N | | 32 | 11 |
| | | Std. Deviation | | 1.96155 | .99426 |
| | Stinger | Mean | | 5.0191 | 4.6385 |
| | | N | | 34 | 33 |
| | | Std. Deviation | | 2.81839 | 2.31242 |
| | New Stinger | Mean | | | 3.5167 |
| | | N | | | 3 |
| | | Std. Deviation | | | .92241 |
| | Total | Mean | | 5.3818 | 3.8004 |
| | | N | | 66 | 47 |
| | | Std. Deviation | | 2.45148 | 2.42915 |



### 15-Foot Distance Interval (Nearest Potential Miss)

**Taser:** At 15-feet of distance, the TASER's Probe 1 had a mean score of 6.4 inches (n = 54) of leeway before a miss would have occurred. Probe 2 averaged 3 inches (n = 50) of leeway until a miss could have potentially occurred.

**Stinger:** At 15-feet of distance, the Stinger Probe 1 averaged 5.5 inches of leeway (n = 41) and Probe 2 averaged 6.0 inches (n = 37) of leeway before its nearest potential miss.

**New Stinger:** The new Stinger cartridges Probe averaged a mean nearest miss score of 7.2 inches (n = 19) and Probe 2 averaged a nearest miss score of 6.0 inches (n = 19).

### 20-Foot Distance Interval (Nearest Potential Miss)

**Taser:** At 20-feet of distance, the TASER's Probe 1 had a mean score of 5.8 inches (n = 32) of leeway before a miss would have occurred. Probe 2 averaged 1.4 inches (n = 11) of leeway until a miss could have potentially occurred. As indicated earlier in this report, the accuracy of the TASER reduces dramatically at the 20-foot distance. This is reflected here in the near miss data, which shows the number of cases (N) as being relatively low. The missing cases are indicative of no data being collected because of misses.



**Stinger:** At 20-feet of distance, the Stinger Probe 1 averaged 5.0 inches of leeway (n = 34) and Probe 2 averaged 4.6 inches (N = 33) of leeway before its nearest potential miss.

**New Stinger:** The new Stinger cartridges Probe 1 failed to hit the target and Probe 2 averaged a nearest miss score of 3.5 inches (n = 3). The number of probes that hit in this case was extremely small. The researchers fired at least 20 cartridges in this testing scenario and only several made contact (at the cost of $20 per cartridge, the researchers ceased to continue to shoot at this distance due to cost considerations and poor performance leading to no data collection). This cost/data collection issue was also present in the initial testing phase wherein a large number of Stinger cartridge malfunctions/failure-to-fire occurred.


### Projection of CED Probe Spread

Based upon our analysis of individual weapon and cartridge performance, it was possible to create a projection of probe spread at any distance. A linear regression of probe spread and distance indicated a strong positive significant relationship for TASER (r=.983), Stinger (r=.807) and the new Stinger cartridges(r=.765).       .

Using the un-standardized beta coefficients in each model, the probe spread can be determined for each foot of distance between suspect and weapon. TASER was found to have a 1.77 inch spread for every foot of distance, in comparison with Stinger's .67in./ft. and the new



Mesloh, Henych, Thompson, and Wolf    pg. 65

Stinger cartridge's .98in. /ft. Using these values, probe spread can be predicted to the length of the TASER's conductive wire (as shown in below Table 11). After these predictions were established, we plotted a prediction line alongside the mean probe spread scores for each CED.

**Table 8: Comparison of Projected Probe Spreads with Actual Scores**

|  | TASER Projected | TASER Actual |
|---|---|---|
| Five feet | 8.85 in | 9.42 in |
| Ten feet | 17.70 in | 18.45 in |
| Fifteen feet | 26.55 in | 25.93 in |
| Twenty feet | 35.40 in | 34.92 in |
|  | Stinger Projected | Stinger Actual |
| Five feet | 3.35 in | 4.04 in |
| Ten feet | 6.70 in | 7.46 in |
| Fifteen feet | 10.05 in | 11.68 in |
| Twenty feet | 14.08 in | 14.07 in |
|  | New Stinger Projected | New Stinger Actual |
| Five feet | 4.90 in | 4.76 in |
| Ten feet | 9.80 in | 10.24 in |
| Fifteen feet | 14.70 in | 14.46 in |
| Twenty feet | 19.60 in | No data[2] |

The data from these projections is shown below in Table 11 for both weapons. It is then possible to determine with a high degree of accuracy the amount of projectile spread at a given distance. However, after fifteen feet, accuracy and performance of both weapons is significantly reduced.

---

[2] No data collected as new cartridges' probes failed to strike target at this distance.



## Table 9: TASER and Stinger Probe Spread by Distance

| Report | | | |
|---|---|---|---|
| Distance in feet | TASER spread | Stinger spread | New Stinger spread |
| 1.00 | 1.77 | .67 | .98 |
| 2.00 | 3.54 | 1.34 | 1.96 |
| 3.00 | 5.31 | 2.01 | 2.94 |
| 4.00 | 7.08 | 2.68 | 3.92 |
| 5.00 | 8.85 | 3.35 | 4.90 |
| 6.00 | 10.62 | 4.02 | 5.88 |
| 7.00 | 12.39 | 4.69 | 6.86 |
| 8.00 | 14.16 | 5.36 | 7.84 |
| 9.00 | 15.93 | 6.03 | 8.82 |
| 10.00 | 17.70 | 6.70 | 9.80 |
| 11.00 | 19.47 | 7.37 | 10.78 |
| 12.00 | 21.24 | 8.04 | 11.76 |
| 13.00 | 23.01 | 8.71 | 12.74 |
| 14.00 | 24.78 | 9.38 | 13.72 |
| 15.00 | 26.55 | 10.05 | 14.70 |
| 16.00 | 28.32 | 10.72 | 15.78 |
| 17.00 | 30.09 | 11.39 | 16.66 |
| 18.00 | 31.86 | 12.06 | 17.64 |
| 19.00 | 33.63 | 12.73 | 18.62 |
| 20.00 | 35.40 | 13.40 | 19.60 |
| 21.00 | 37.17 | 14.07 | 20.58 |
| 22.00 | 38.94 | 14.74 | 21.56 |
| 23.00 | 40.71 | 15.41 | 22.54 |
| 24.00 | 42.48 | 16.08 | 23.52 |
| 25.00 | 44.25 | 16.75 | 24.50 |

## Other Variables Related to Functionality

This section of the report examines the other variables under consideration to include, probe durability, CED reliability, CED durability, tensile strength of the cartridges' wire connections, tests of the elements (humidity, heat, cold and water) and several others.



Mesloh, Henych, Thompson, and Wolf   pg. 67

## Probe Broke During Removal

During testing, the researchers became aware of the number of probes that broke during removal from the testing subject and targets.

**Figure 21: Probe Break**



In addition to capturing images of this, the researchers developed a variable "Did Probe Break" which was used to capture whether the base of the probes separated from the barb which was fixed in the target. Of concern here is whether or not an officer would be able to process a subject into a correctional facility if they required the medical or surgical removal of a barb.

Table 10 reflects a code scheme that captured a probe break as one incident even if both probes broke off. Thus if one or both probes broke during removal the data is coded to be reflected as 1 break in the above table.

TSDOC004589



**Table 10: Probe Separated from Barb During Removal**

Count

| | | Weapon | | | |
|---|---|---|---|---|---|
| | | TASER | Stinger | New Stinger | Total |
| Did probe break? | No | 212 | 107 | 74 | 393 |
| | Yes | 1 | 52 | 4 | 57 |
| Total | | 213 | 159 | 78 | 450 |

During the testing a total of 450 data points were collected regarding the probes and whether they broke off from the barb during removal from the target.

**TASER:** One TASER probe broke off in the target requiring channel locks to be removed (0.4%).

**Stinger:** The Stinger probes frequently broke off in the target during testing and their removal. During this testing, 52 Probes out of 159 Stinger cartridges broke off in the testing target (32.8%). This occurred primarily at five and ten foot firing distances.

**New Stinger:** Out of the new cartridges, a relatively fewer number required extreme measures to remove and only 4 out of the 78, where data was captured, broke off and remained in the target (5%).

**Durability Testing**

Key to all law enforcement equipment is how well it will survive while in use. The majority of equipment carried on an officer's belt will



be subject to a great deal of daily abuse in their course of normal actions. If it cannot withstand the rigors of everyday use and carry, then the equipment is essentially useless as no officer will have faith in it.

### Tensile Strength Testing

If the wire on a CED cartridge is easily broken, then it is less likely that a subject will be effectively incapacitated by the shock. At this stage of testing, we chose twenty random cartridges from both TASER and Stinger and measured the tensile strength of the wires connecting the probes to the cartridge. For safety reasons, we used cartridges that had already been discharged as we did not want to open up a cartridge while the firing mechanism was intact.

To measure the number of foot-pounds necessary to break the wire, a trigger pull gauge was utilized as it records the maximum weight placed on it. The wire end with the probe attached was tied to the gauge, held by one tester, and another tester pulled on the cartridge, stretching out the wire and exerting increasing pressure. When the wire snapped, the number of pounds was recorded from the trigger pull gauge. On average, tether strength for both TASER and Stinger were similar. However, there was a great deal of variance within each brand.

**Table 11: Tensile Strength of Probe Tethers**

TSDOC004591



Tension strength

| Weapon | N | Mean | Median | Minimum | Maximum | Std. Deviation |
|--------|-----|---------|---------|---------|---------|----------------|
| TASER | 50 | 25.5760 | 26.1500 | 8.50 | 30.40 | 3.83127 |
| Stinger | 50 | 25.6460 | 25.1000 | 12.70 | 43.50 | 6.53553 |
| Total | 100 | 25.6110 | 25.9000 | 8.50 | 43.50 | 5.32985 |

## Durability Testing (Cartridge Drops)

During accuracy testing, we deliberately dropped a number of cartridges from a height of four feet to determine their survivability. None of the TASER cartridges broke during this test; however, fourteen out of the twenty Stinger cartridges broke upon impact with a carpeted floor. Additionally, a number of Stinger cartridges were broken while still in their shipping container. The blast doors fell off, releasing the wire tether.

**Figure 22: Broken Cartridges**



Stinger appeared to be addressing this issue by placing a small, clear piece of tape across the blast doors to prevent this type of



malfunction. However, at least one new malfunction was noted when the blast doors failed to separate when the weapon was fired.

**Figure 23: Blast door malfunction**



**Penetration Testing**

In an attempt to standardize a testing methodology for the penetration of the probes from each CED, a series of cartridges were fired at ballistic clay. Ballistic clay (specifically, Roma Plastelina #1) was utilized and the CEDS were fired into the clay at all of the distance intervals.

In order to capture this data, the researchers utilized the penetration data from Probe 1 from each CED as this was the most accurate based upon probe spread. Probe 1 also had the least amount of variation from point of aim. Probe 2 data was not captured as the creation of a wall of clay to address probe spread was not feasible. In order to measure the depth of the probe and barb penetration, the ballistic clay was cross-sectioned with a surgical saw and a digital image



was captured. A graph ruler was used to measure the distance of penetration.

**Figure 24: Ballistic clay**



TASER: At the 5-foot distance interval the TASER probe and barb penetrated completely past the base of the probe. The base of the probe penetrated approximately 7/16 of an inch.

**Figure 25: TASER Probe Penetration**



At the 10-foot distance interval the TASER barb penetrated fully and the base of the probe also penetrated the ballistic clay to about the same depth as probe base at the 5-foot distance interval.

TSDOC004594



Mesloh, Henych, Thompson, and Wolf   pg. 73

At 15 feet of firing, the TASER probe barb penetrated the clay completely. The probe base penetrated the clay to about 4/16 of an inch. This is consistent with a projectile that is losing some of kinetic energy.

At the 20 foot distance interval the TASER probe barb penetrated the clay completely and the probe base penetrated marginally to about 1/16 of an inch. This is no surprise as 20 feet of distance the probe will have lost more of its kinetic energy and is nearing the limit of its range.

**Stinger:** Stinger cartridges were fired at the various distance intervals. In order to obtain at least 10 data points at least 30 Stinger cartridges were fired (this was done to compensate for cartridge malfunctions). The Stinger probe penetration data was eventually based upon 10 captured observations. The Stinger probes at the 5-foot distance interval penetrated 3/16 of an inch past the base of the probe barb.

**Figure 26: Stinger Probe Penetration**



At the 10-foot distance interval the Stinger probes penetrated to the base of the probe and the barb was fully embedded in the clay.



At the 15-foot distance interval the Stinger probes barely penetrated the ballistic clay. The barb section of the probe did not pass the threshold of the surface of the clay, and if this were a subject, it is possible that the probes would not have penetrated the skin but may have penetrated an outer layer of clothing. This is illustrated in the below photograph where the top probe dangles from the shirt on the target.

At the 20-foot distance interval the Stinger probes were not tested as they failed to extend to this reach due to cartridge malfunctions[3].

While the use of clay to measure kinetic energy and penetration is not an exact measure, it does illustrate the changes in velocity over distance. It is clear that the light Stinger probe penetrates deeply at close distances, but quickly loses its ability to penetrate even a soft target.

**Figure 27: Stinger Probe Penetration on Target Dummy**



---

[3] In this test, the wire tethers were not allowing for full extension as they were becoming bundled and knotted.



## Ergonomics Testing

Both the Stinger S200 and TASER X26 are relatively similar in exterior design. The TASER X26 overall is slightly smaller than the Stinger and a person with larger hands may have some issues with handling. The Stinger S200 is longer initially, however when the TASER X26 is loaded with a cartridge, they are similar in length.

The cartridge release feature was scrutinized in both CEDs. The TASER X26 cartridge release consists of depressing a small button on each side of the cartridge. The Stinger cartridge release mechanism consists of an ambidextrous button release in the trigger guard housing, which allows for one handed cartridge removal.

**Figure 28: Stinger Cartridge Release**



Both the Stinger and the TASER are pistol-like and both have triggers set in a trigger guard. TASER's Safety/On/Off switch is much



Mesloh, Henych, Thompson, and Wolf   pg. 76

like the safety on a standard semi-automatic pistol, while the Stinger utilizes a cross bolt (similar to that of shotgun) safety switch for on and off operations.

TASER: On/Off switch was found to be a weakness in its design. Throughout testing, several TASER X26s were shipped back to TASER International in order for them to repair this switch, which when malfunctioning, would not allow the CED to activate. Communications with local law enforcement agencies confirmed that this is a well-documented problem and agencies are required to repeatedly return the TASER X26 to the manufacturer for repair. As a result, many agencies purchase extended warranties to cover the expenses of these repairs, which is approximately $150.

This is problematic as there is no sign of the weapon breaking down until it suddenly won't turn on. Consequently, it is important for officers to at least test their weapon prior to starting their shift, if not conducting an additional safety check during the shift.

**Figure 29: Stinger and TASER Safety Switches**



TSDOC004598


**Stinger:** The Stinger On/Off cross-bolt switch was also a weakness in the design of the Stinger S200. During testing, this switch was found to have a specific malfunction. Should the user make contact with the cross-bolt switch while the Stinger S200 is discharging a cycle of current, the user also receives a shock for the duration of the cycle. There is no consistency to when this occurs, so the researchers of this current study are unable to make specific suggestions for fixing the problem. However, if the user were to activate the cross bolt safety while the weapon is firing, this shock occurs much more frequently.

Both the Stinger and TASER use standard classic line of sight sighting (iron sights) as well as a red dot laser sight. The TASER red dot sight appears at 15-feet to have a finer, crisper red dot (when projected on a standard flat surface) while the Stinger has a slighter larger red dot image at the same distance. Additionally, the TASER X26 is equipped with a front tactical light, while the Stinger weapon system is not.

The ergonomics of the Stinger S200 and the TASER X26 are also highly contingent on the manner in which the CED is carried during standard duty shifts. Thus, the holster or retention system needs to be addressed. The researchers were able to locate a wide variety of holstering and carry systems for the TASER X26. This is presumed to be the case as TASER has penetrated the law enforcement market extensively. The result is numerous options of retention for various types of duty.

TSDOC004599



Mesloh, Henych, Thompson, and Wolf    pg. 78

## Figure 30: Examples of TASER and Stinger Holster Systems



The Stinger S200 appears to be offered standard with a single retention nylon based holster. This holster is included in the Stinger S200 standard package. Should Stinger penetrate the law enforcement market more extensively, then it is surmised that additional products will become available.

The researchers tested the TASER X26 and the S200 in the standard offered holster system as part of the ergonomics evaluation. The following issues were observed:

**TASER:** The TASER X26 ships with an exoskeleton plastic and nylon based holster system that retains the X26 though an insert-and-click-in-place mechanism that grips the X26 and secures it firmly. This holster system has a belt attachment clip which allows for the holster to be tightened onto any carry belt.

TSDOC004600


The exoskeleton holster poses an issue in that it secures the X26 in such a secure manner that makes it problematic to draw. Furthermore, when drawing from this holster system, the cartridge has the potential to be unintentionally stripped from the X26. It is additionally difficult to replace the weapon (one handed) back into this holster system. This action, facilitated more easily with two hands, is still challenging. Other TASER holsters examined, such as the Blade-Tech line did not present these problems and the wide range of carry options provided the ability to meet individualized needs.

**Stinger:** The S200 ships with a basic nylon single retention reversible holster system[4]. Although we were not able to identify any other holster systems designed specifically for the Stinger, it is likely that some will emerge as this weapon gains market share.

The basic nylon holster was identified as presenting an issue with the operations of the Stinger S200. The researchers found that when carrying the Stinger S200 in this standard holster the cross-bolt switch was easily accidentally depressed, thus activating the weapon. Given that the Stinger S200 does not have an automatic shut-off feature, this presents serious issues as the CED batteries would drain. Additionally, the CED when drawn from the holster would be in a live mode, perhaps with the user unaware, posing a safety hazard for accidental or unintended discharges.

---

[4] This holster is very similar to the brand of "Uncle Mike's".



## Figure 31: TASER Cam



**Video and Memory Storage**

The Stinger S200, at the time of testing, does not ship with audio or video recoding capability (the S400 appears to have this capability).

The TASER X26 allows for a digital camera attachment in the grip of the weapon with audio and video storage capability.

In addition to this storage capability, the TASER X26 camera and audio data is retrievable through download computer via USB adapter. This allows for the playback of an "incident". The camera activates and records when the TASER on/off switch is turned to the on position. The data is stored in a database format and allows for an agency to download the data which is unique to each TASER via serial number. The following images show this process and a screen shot of the video as it plays back for review.

The below image is a screen capture shot of the TASER Cam download software when it is initially loaded. This allows the user to

TSDOC004602

 Mesloh, Henych, Thompson, and Wolf   pg. 81

input data specific to the user of the TASER and is useful in tracking officers' uses of force.

**Figure 32: TASER Cam Data Download – Version 1**



Figure 32 represents the data screen as viewed by the software user and allows for the selection of video data based upon time interval or sequence. This screen also allows the administrator to view or even export selected video or generate a report from a selection of one or more data captures/incidents. The researchers utilized this function of the TASER X26 to test its functionality. This feature of the TASER was easy to use and generated reports (in a .pdf format) easily. In addition, the videos exported by this software were viewable by a number of commercial video software applications.

TSDOC004603



Mesloh, Henych, Thompson, and Wolf    pg. 82

## Figure 33: TASER Cam Data Download (By date and time)



The researchers utilized the TASER X26 standard camera and recorded video as seen in Figure 34. The video on the left was recorded during the day, as noted the clock was not set on the TASER correctly and it reads 22:01 hrs. This image was recorded during the late afternoon. The image on the right was also recorded during the day and reflects an interior (house) shot (as in the previous shot the clock time setting is also wrong). Noted in this image are the red-dot laser sight and the TASER X26's camera light which can be activated in this lower light environment.

TSDOC004604



Mesloh, Henych, Thompson, and Wolf    pg. 83

**Figure 34: TASER Cam Shots (Exterior and Interior)**



As with all digital cameras the TASER X26 digital camera is susceptible to the same problems of light, dark and position in relation to light source.  As with regular photography, the image may become blurred with speed and or distorted by sunlight or other light sources. Additionally, the TASER X26's camera mounts to the base of the pistol grip; in cases where a user has oversize hands, there is the potential to block the camera while filming.  In testing, the researchers found that if the camera is blocked while the TASER X26 is activated, the LED display flashes to warn the user.

The TASER X26 also stores audio data and audio recordings which begin when the TASER X26 is activated.  The researchers activated the TASER X26 and captured audio recordings and listened to them after the captured data was stored to computer via USB port.  This audio was exported with the video clips and is of reasonable audio quality.  The

TSDOC004605



audio captured was at the speaking voice level and the researchers did not experiment further with louder or lower or higher pitch sounds.

### Figure 35: Issues with TASER Cam and Auto-focus



**Touch Stun**

The Stinger S200 and the TASER X26 both have touch stun capability. Both CEDs require that a cartridge not be in place, or to be removed, when using this feature. The TASER S26 and Stinger S200 have an additional feature which allows the CED to discharge a stun in a contact mode, once the cartridge has already been fired. It must be added that in this case, the probes, and to what or whoever they are attached, may also be shocked.

TSDOC004606



Mesloh, Henych, Thompson, and Wolf   pg. 85

## Timing System

TASER: The TASER X26 normally cycles for 5 seconds. The user may interrupt the X26 cycle by engaging the on/off switch to the off position. The X26 LED displays a numerical countdown for the cycle, which is easily observable by the user. The X26 will fire continuously for 5-seconds with one application of the trigger.

**Figure 36: Stinger and TASER Displays**



Stinger: The S200 has a standard cycle of 4-seconds when the trigger is continuously depressed. At the end of this cycle, the trigger must be released and then reengaged to cause a 4-seond cycle. The trigger may be released at time during the cycle, which causes the Stinger to cease firing. This allows the user to select, up to 4 seconds, the length of charge a subject may be exposed to. The Stinger S200 LED display represents this cycle as a series of red dots that move from the left of the LED to the right. Each LED that subsequently lights represents 1 second.

TSDOC004607



The Stinger S200 LED display also shows it is activated by displaying a green LED light.

In comparing the two CEDS, the TASER LED readout also presents system diagnostic information at time of insertion of the DPM which includes warranty expiration date (in order of year month day), current date and time, current internal temperature in Celsius and software revision level.

**Figure 37: TASER battery status indicating 86%**



After the TASER is powered, the LED readout also represents other data when the X26 is activated to include, percentage of battery power remaining and at time of trigger depressing, the LED readout shows time remaining on the 5-second cycle.

**Propellant Systems**

The TASER X26 cartridge is powered by compressed nitrogen, which when ignited force the probes to accelerate from the cartridge towards the target.  The Stinger S200 cartridges are markedly different.

TSDOC004608



The Stinger S200 cartridges are fired by a primer which when activated through combustive pressure, forces the probes to deploy.

This method of causing the darts to deploy has significant legal implications for Stinger, as they are categorized by the BATFE as a firearm, and are viewed no differently than a regular firearm. Accordingly, anyone convicted for a felony, who has not had their rights restored, would be violating federal law if found with a Stinger S200 in their possession.

In addition, firearms manufacturers have recently won a case wherein their liability has been reduced. In this case the Stinger S200, being categorized as a firearm, may benefit from the legal benefits of such. It is unclear if this would have any effect on law enforcement agencies.

**Freeze Test**

Cartridges from both the TASER X26 and the Stinger S200 CED were placed in a controlled frigid environment of approximately 30°. The cartridges utilized for this portion of the testing were allowed to freeze for a period of 24hrs.

The cartridges from both the TASER X26 and Stinger S200 all fired and accuracy was consistent with previous results. The freeze test did



Mesloh, Henych, Thompson, and Wolf    pg. 88

not appear to affect the performance of the cartridges[5]. Weapons were not frozen as it has been clearly documented that cold will have an adverse affect on virtually every commercially available battery.

### Figure 38: Normal and wet wire



### Heat/Humidity/Water Testing

In this phase of testing, the cartridges (ten from TASER and ten from Stinger) were allowed to become exposed to the elements for seven days. The cartridges were exposed to an ambient temperature of about +95° Fahrenheit from 06/22/2007 until 06/29/2007. The cartridges were also exposed to several rain showers and the researchers also dowsed the cartridges with water. This dowsing was intended to simulate an excess of humidity. All the cartridges from the TASER X26 cartridges fired in this experiment, while three of the S200 cartridges failed to fire. Upon examination of the probe tether wires, it was clear

---

[5] In this case the CED's were not frozen and were fired with them being at the ambient room temperature of 78°.



that the moisture had affected their function. The tethers in these cases appeared, when handled, to have a more rigid feel and were not as flexible when compared with tethers that were not exposed. This crinkling or accordion effect may affect functioning as the tethers may have reduced velocity of the probes and the resultant penetration.

**Ignition Test**

There is some anecdotal evidence suggesting that certain chemical agents will ignite when exposed to a charge. The researcher conducted a simple experiment with the TASER X26 and Stinger S200 in order to determine whether this proposition would hold true. To test this hypothesis the researcher dosed a target with 1-second burst of Capstun, a commercially available chemical agent that has an alcohol-based carrier.

The target did not ignite when shot with the probes of TASER X26 and the Stinger S200 before the application of the chemical agent. However, when a contact shot was made with each CED to the chemical agent affected chest area of the target, both weapons ignited the target. When the residual chemical agent and the alcohol based carrier ignited, the flame appeared with a yellow consistency indicating low heat and a slow burn. The flame was allowed to burn for 15-seconds and was then extinguished. An examination of the targets affected area under the shirt revealed no burn indications. It is speculated that the shirt serves a wick like function and its absorption the chemical agent is what allowed the



ignition to take place. This issue relates to the chemical agent, much more than the CED. Any ignition source, including a lit cigarette, may create this effect depending on the chemical makeup of the agent. Consequently, awareness of the specific chemical agent brands using flammable carriers is the best preventive step.

**Figure 39: Chemical Agent Ignition Test**



### Additional flammability issues

Another anecdotal issue focused upon the explosion of a disposable lighter when struck by a CED probe. This concern was possibly created by an event which occurred in Daytona Beach, Florida. A suspect armed with a knife was shot by a TASER and a butane lighter was ignited by the probe strike (Local 6 News, 2006). Although the suspect



received only minor burns, concerns regarding future safety requirements were brought up by the news media.

We attempted to replicate this event under controlled conditions but were not able to do so. Although we were able to strike the lighter and vent the butane, no fire resulted. It is clear that if a flame source had been present, a small fireball would have resulted. However, this is a very unlikely event.

**Figure 40: Lighter Impacted by Probe**





Mesloh, Henych, Thompson, and Wolf   pg. 92

## APPENDIX 1, Figure 41 Graphical Representation of FPF Variables



**Legend**

A: Laser Dot Aim Point
B: Point of Contact for Probe 1
C: Point of Contact for Probe 2
D: Distance between Probes 1 and 2

E: Distance to miss (Probe 1)
F: Distance to miss (Probe 2)
G: Distance from Laser Dot to Probe 1
H: Distance from Laser Dot to Probe 2

TSDOC004614

 Mesloh, Henych, Thompson, and Wolf   pg. 93

## APPENDIX 2 Figure 41: Malfunction Explanations

| Case# | Malfunction |
|---|---|
| **Stinger S200** | |
| 2 | Cartridge Failed to Fire (FTF) after being subjected to freezing temperatures. |
| 9 | Weapon sounded odd when fired. Weapon popped opposed to bang – barb possibly missing from cartridge. |
| 19 | Probe bounced off target and landed 12 ft from target. |
| 45 | Weapon cycled for 1.5 seconds before cartridge deployed. |
| 47 | Weapon cycled for .5 seconds before cartridge deployed. |
| 52 | Cartridge misfired on first full cycle – exchanged test weapon and cartridge fired appropriately. |
| 85 | Weapon cycled for 1 second before cartridge deployed. Probe hit in arm. |
| 87 | Probe broke off of wire with a 2 inch piece of wire lead attached. Probe did not impact target. |
| 89 | Weapon cycled for full cycle without probes discharging. Cartridge was removed and placed in second Stinger weapon. The weapon cycled for 1.5 seconds before firing. |
| 95 | Probe landed 5 feet short of target with wire attached. |
| 96 | Probe landed 8 feet short of target with 1 inch of wire attached. Wire in cartridge is still wound tight. |
| 97 | Probe bounced off of target and landed 12 inches in front of target. |
| 127 | Probe broke from lead. Wire remained coiled inside cartridge. Probe landed 3 feet short of target. |
| 128 | Weapon cycled for 5 seconds without firing. Cartridge moved to second Stinger and fired after 1 second delay. |
| 131 | Cartridge deployed after a 3.5 second delay. Only one probe went downrange and missed the target. |
| 132 | Probes broke wire leads and only one probe traveled down range to the target. Probe two did not travel to the target. |
| 133 | FTF in the first test weapon. Only one probe deployed correctly, while the other failed to travel downrange. *The weapon also shocked the operator of the weapon. |
| 136 | Cartridge FTF in the first weapon. The cartridge functioned properly in the alternate weapon. |
| 176 | Weapon cycled for 3 seconds before discharging with loud popping noise. |
| 177 | FTF. |
| 179 | Barb retracted into probe. |
| 185 | Probe broke off of wire during firing. |
| 193 | Cartridge came loose and shifted forward upon firing. |
| 198 | One probe failed to reach target. |
| 206 | Blast door hit operator in face. |
| 207 | Blast door came back and hit tester. Probe #1 crept up and hit neck area of target. |
| 209 | FTF |
| 211 | FTF |
| 215 | Probe broke off upon discharge. Wire failed to uncoil and leave cartridge. |
| 218 | FTF |
| 220 | FTF |
| 221 | Cartridge dislodged upon firing |
| 222 | FTF |
| 227 | FTF |



| 229 | Weapon cycled for .5 seconds before firing.  Both probes made contact. |
| 231 | Weapon cycled for .5 seconds before firing. |
| 233 | Weapon cycled for 5 seconds without firing. Cartridge was removed and placed in second Stinger weapon. The weapon cycled for .5 seconds before firing. |
| 234 | Cartridge dislodged upon discharge. |
| 235 | Cartridge dislodged upon discharge. |
| 237 | Weapon cycled for .5 seconds before firing and cartridge dislodge upon discharge. |
| 238 | FTF |
| 239 | Cartridge dislodged upon discharge. |
| 241 | Weapon cycled for 1 second before discharging. |
| 243 | Probe #1 crept up to the neck area of the target |
| 246 | FTF |
| 251 | FTF |
| 252 | FTF |
| 255 | FTF |
| 256 | Weapon cycled for .5 seconds before firing. |
| 258 | Same as #256 |
| 266 | FTF |
| 268 | Probe #1 broke off from wire upon discharge. |
| 269 | FTF |
| 271 | FTF |

## *Stinger S200 (new cartridges)

| 293 | Probe #2 bounced off of target |
| 326 | Probe #2 bounced off of target |
| 328 | FTF |
| 361 | Neither probe made impact |
| 364 | Probe #1 made no impact |

## TASER X26

| 35 | Probe bounced off target fell 1ft back from target. |
| 42 | Probe #1 broke the wire lead before impacting target. Probe #2 missed target. |
| 37 | Probe#2 made contact with only 1 inch of lead wire attached. |
| 380 | FTF. Accidental discharge occurred when new battery was placed in weapon. No trigger pull occurred. Power switch was not completely set to the on position. Probe #1 stuck in carpet 6" from tester's foot. |
| 381 | Laser pointer faded in and out before becoming solid, once power switch was set to on. |
| 409 | Probe #2 broke off of wire upon discharge. Wire still coiled in cartridge. |
| 427 | Probe #1 broke off of wire upon discharge. Wire still coiled in cartridge. Probe #1 also bounced back and hit tester. |

TSDOC004616



**U.S. Department of Justice**

**Office of Justice Programs**

*National Institute of Justice*

95

---

*Washington, D.C. 20531*

January 28, 2008

Dear Sirs:

We are providing the draft final report: *A Qualitative & Quantitative Analysis of Conducted Weapons: TASER X26 vs. Stinger S200* for your review. This study by Florida Gulf Coast University's Weapon's & Equipment Research Institute was conducted as an impartial analysis that provides qualitative and quantitative data regarding these products. To maintain objectivity, we are offering both organizations the opportunity to review the study and provide comments accordingly.

Please take this opportunity to review the report and provide comments no later than February 04, 2008. We ask that your comments be factually based and address areas in the study that your literature can support (i.e. X26 or S200 specifications, operational and cost discrepancies), and limited to 5 pages. We will entertain including these comments in the report, upon receipt.

Operational Technologies Division
National Institute of Justice
810 7th Street NW
Washington, DC 20531-0001

TSDOC004617

96

# TASER

PROTECT LIFE

**TASER INTERNATIONAL, Inc.**
17800 N. 85th St. • Scottsdale, Arizona 85255-6311 • www.TASER.com
U.S. Phone: 1.800.978.2737 or 1.480.905.2000 • International Phone: +1.480.905.2000
U.S. Fax: 1.480.991.0791 • International Fax: +1.480.991.0791

Marc Caplan
Chief, Operational Technologies Division
National Institute of Justice
810 7th Street NW
Washington, DC 20531-0001

Dear Mr. Caplan;

In response to your undated letter addressed to Andrew Hines at TASER International, Inc. (TASER) which was received by TASER on January 30, 2008, following please find our comments to the January 25, 2008 NIJ report entitled "A Qualitative & Quantitative Analysis of Conducted Energy Weapons: TASER[®] X26 vs. Stinger S200", by Charlie Mesloh, Ph.D., Mark Henych, Ph.D., L. Frank Thomson, MBA, and Ross Wolf, EdD.

a.   In the section that describes TASER lower probe misses at 20' - the experiment does not accurately match field use because the Numb John target has his legs spread in an unnatural stance. In actual field-use applications, the human subject has his/her legs under the torso. At these longer distances, the lower TASER probe trajectory is designed to hit a target in the legs providing ample spread to cause NMI. The artificial stance of the dummy target left an open space where one's legs would normally be expected, and the probes projected through this open space consistently and accurately. However, the test set-up and interpretation that the lower TASER probes were missing the target draws a misleading conclusion as to the accuracy and repeatability of the TASER probe trajectory in real-life scenarios.

b.   Pg 73 - Safety weakness - the concern had been previously identified and has been remedied. The design and assembly process for the safety switch was modified to improve performance and eliminate potential inconsistencies in the weld of the parts. Since this modification has been implemented, the incidence of broken safety switches has fallen to a negligible number.

c.   Pg 76 - eXoskeleton.™ holster - the concern regarding the holster unintentionally stripping the cartridge had previously been identified and remedied. The release buttons on the cartridge used to protrude in a convex manner, allowing the holster to depress the release button under certain circumstances. The release buttons on the cartridge were inverted to a

TSDOC004618

**TASER**

97

──────────── PROTECT LIFE ────────────

concave indentation, thereby preventing mechanical interference with the holster that could inadvertently dislodge the cartridge, thereby eliminating this possibility.

Very truly yours,

Douglas Klint
Vice President and General Counsel

98



**DEDICATED TO THE SCIENCE OF OFFICER AND PUBLIC SAFETY®**

2701 N. Rocky Point Drive, Suite 1130
Tampa, FL 33607
813.281.1061
866.STUNSHOT
www.stingersystems.com

February 2, 2008

Mr. Marc Caplan
Mr. Davis Hart
National Institute of Justice
810 7th Street NW
Washington, DC 20531-0001

Dear Sirs:

Thank you for giving Stinger Systems an opportunity to comment on the DOJ analysis of the Stinger S-200 vs. the Taser X26.

The weapon you tested is no longer sold by Stinger Systems and therefore this comparison should be considered suitable, applicable, or current. In this letter I will provide comprehensive documentation that clearly illustrates that the gun you tested is a completely different weapon that the gun that is now being sold by Stinger. **The only thing that is similar between the current S-200 and the one tested is the name.**

Florida Gulf Coast University pressured Stinger Systems to provide it with a weapon when it fact, the gun was still in Alpha shipping state. The weapon they received was a first generation product that, in further market analysis, the Company quickly realized needed substantial revisions. The original design was ultimately scrapped and completely redone to what is now being offered by the company. **None of the aspects of the gun tested, except the basic look of the gun, remain.**

Distributing this document in my opinion be of no value and not a responsible action by the DOJ. The document would clearly provide a false representation to the law enforcement community what is genuinely available. Further, This report would provide Stinger's competitor with marketing material that would not be representative of a valid Stinger vs. Taser comparison. This action would genuinely be a disservice to those agencies and departments that seek accurate data regarding EID technologies.

Stinger Systems would welcome the opportunity to provide the DOJ with a "real" S-200 projectile stun gun. Additionally, because the output waveform is so radically different from the one you tested, Stinger Systems, is concerned that those who would read this report and would be lead to believe that information is correct about Stinger's current S-200 that they may decide to purchase a competitors product when the information is not current. Further, personnel from the University of Missouri completed additional medical testing this week and confirmed that the Taser X26 puts more amperage, voltage, and

TSDOC004620

energy at the chest than the Stinger S-200. This data is very important and could only be achieved with **Stinger's new wave form and not with the wave form that the DOJ tested**.

## ELECTRONICS:

The electronics in the S-200 the DOJ tested created the following data points:

| Waveform: | complex pulse series |
|---|---|
| Pulse Duration: | 300us and 400us |
| Trigger Activation: | programmable and manual up to 4 seconds |
| Peak Arcing Voltage | 63,000 volts |
| Peak Loaded Voltage | 1300 volts |
| Current | 5.0 mA average |
| Energy per pulse: | |
| At Main capacitors | 0.30 joule |
| Delivered into Load | 0.072 joules |
| Power Rating: | |
| At Main capacitors | 9.5 watts |
| Delivered into Load | 2.3 watts |

The electronics in the in the current S-200 create the following data points:

| Output Characteristics: | |
|---|---|
| Waveform: | complex pulse series |
| Pulse Duration: | 200 micro-sec |
| Trigger Activation: | programmable and manual up to 4 seconds |
| Peak Arcing Voltage | 56,000 volts |
| Peak Loaded Voltage | 1100 volts |
| DC Current | 2.3 mA average |
| Energy per pulse: | |
| At Main capacitors | 0.87 joule (available) |
| Delivered into Load | 0.043 joules |
| Power Rating: | |
| Delivered into Load | 0.94 watts |

Clearly, these tables characterize different products.

As one can see in Exhibit 1, the wave form is radically different than that of the wave form created in the current model, illustrated in Exhibit 2. Exhibit 3 and 4 are photographs of the compartmentalization of the old S-200 and the new S-200 respectively. As one can see, even the circuitry is laid out differently.

We tried to contact Florida Gulf Coast University to notify them that the gun they tested is not an representative product to test and offered to provide a new S-200 but we did not receive a returned call.

From an energy efficiency perspective in the gun the DOJ tested, much of the energy was found to be lost between the high voltage module and the dart probes. Therefore not as much energy that was actually created was put forth into the subject. Stinger's engineering team set out to redesign the circuit. The team knew the basic concept behind its waveform and how it effects physiology was valid but needed to ensure that the actually energy leaving the transformer could be conveyed to the subject. Among some of the radical new design efforts the engineering team created was to implement a rectifier bridge. Re-calibration of internal software, and additional electronics to compensate for the dart wires and ground capacitance was also taken into consideration. Exhibit 5 shows the new high voltage module which contains the rectifier bridge. Going back to Exhibit 3, one can clearly see that this bridge is not contained in the older model.

Moreover, the winding scheme, the design, and the fabrication of the output transformer are completely different from the S-200 used in testing. Output transformers are among the most critical components of a stun technology.

### Darts:

The darts used in the test, Exhibit 6, were unibody constructed and made outside of Stinger Systems. The barbs were inserted into a small hole in the dart and then swedged (crimped) in to keep it from being pulled out.

The Company this design had many issues, including the faults that were illustrated in the study.

The Company now uses a three piece dart for construction, Exhibit 7. During construction, a straight barb is passed though the forward component of the dart. Once through, the darts back end is flattened and then bent making it virtually impossible for the dart to be removed from the darts body.

Trajectories have changed drastically. After extensive analysis, several factors came into play when determining how to improve the flight patterns.

- First, as mentioned, the company changed the dart design and construction. All darts are now fabricated at Stinger Systems' manufacturing facilities and not a single aspect of the construction is made by a 3rd party.
- Second, the wire used in the DOJ tests we found to be unacceptable. The Company changed to a different wire vendor. The wire now being used has a different outside diameter and uses Dupont's Tefzel coating for insulation. This wire spools much differently which provides a smoother exit from the chambers. Therefore flight trajectory is more

reliable. Additionally, the new insulation provides for almost no possible shorting which could lead to mis-fires.

- Third, the cartridge's plastic housings themselves have been retooled and the exit paths, the construction, and the primer orientation have all been modified. These factors all assist in making a cleaner dart exit, which in turn, allows for a more reliable target attainment.

- Electrode placement in the gun, Exhibit 8. The electrodes of the gun have been moved from flush front of the gun (used in DOJ testing) to inside the gun and pointed downward. Ball springs are now used for electrode termination rather than rod aluminum. When a cartridge is now inserted into the gun, the cartridge is more secure because the electrodes now physically touch the cartridge where they hadn't in the past. Because they touch the cartridge, upon firing, the cartridge can no longer have as much play as it did in the model the DOJ tested. Moving a few thousandths of an inch we found could result in inconsistent firing patterns. Now that the cartridge is "locked" in place firing patterns are much more reliable.

**Ancillary:**

The Company has retooled every plastic injected mold that is used in the production of the S-200. The present S-200 is now more "tighter" and more rugged.

The Data Dock's program that is used for wireless downloading has been modified by reprogramming.

The actual vendors of electronics, plastic, and transformers have been changed.

Although Stinger Systems has spent millions of dollars developing what we believe to be the most state of the art EID product available, we are still a relative start up. With that being stated, we believe that to be a benefit because it allows the Company to continually improve its products and be very nimble. We therefore can adapt and improve very quickly to make the best product available. We believe we have a world class product and would very much like the DOJ to review a product that is now being sold by Stinger Systems and not one that has been retired.

Please contact me anytime at 813-281-1061 ext. 225.

Very truly yours,

Robert F. Gruder
President

102

# Exhibit 1
# DOJ Tested S-200
# Please note the energy RMS of only 14.4V and the length of the wave



TSDOC004624

103

# Exhibit 2
## Current S-200
### Please note the energy RMS of 26.5 and the length of the wave



TSDOC004625

104

## Exhibit 3
### DOJ Tested S-200 Electronics Package
**Please note there is no electronics board in the gun handle, the high voltage module arms extend to the end of the gun, there are no diodes in the high voltage module, there is a different output transformer and the trigger assembly is different**



TSDOC004626

105

# Exhibit 4
# Current S-200 Electronics Package
# Containing rectifier bridge in the high voltage module, a new trigger board assembly, and a logic board in the handle



TSDOC004627

106

# Exhibit 5
## Rectifier Bridge Exhibits







TSDOC004628

107

## Exhibit 6
## DOJ Tested Dart

## Exhibit 7
## Current Dart Configuration

**Crimped probe example before and after crimping to show flattened steel that can not be pulled from dart body**



TSDOC004629

108

## Exhibit 8
## DOJ Tested S-200 Electrode Placement

**Rod placed to bring electrode flush to end**

→



## Current S-200 Electrode Placement

**lectrodes inside ointed down to lock n cartridge**



TSDOC004630

Technical White Paper SS-WP-11
## A Comparison of Stun Gun Waveforms
Stinger Systems, 2008

**Introduction:**
In this paper, we wish provide a clearer understanding of how the Stinger Systems S200 stun gun's electrical output waveforms compare to that of Taser's M26 and X26 guns and, further, how they impact a target's nervous and muscular system. We wish to show that "more is not always better" but rather that a biologically "smarter" waveform can be better for what Stinger Systems believes are a safer and yet very effective muscular incapacitation gun.

**Separating the Men from The Boys:**
Saying the Stinger is better because it has approximately 56,000 volts in an open circuit compared to Taser's 50,000 is really not the whole story. Yes, voltage is the "pushing" pressure, if you will, of electricity and generating more volts to push through clothes is a proper concept. However, Van De-Graff machines at museums (the contraption you put your hands on to make your hair stand straight up) are completely harmless yet generate up to a million volts in them. The difference is the amount and shape of the current passed through the body once contact is made. What is needed is something akin to a two- speed gear shift automobile – one gear gets you going from a dead stop and the other does the fast moving. Guns which can 'switch gears' is a big factor which separates the men from the boys in effectiveness. But as will be described, there are other factors such as cardiac safety.

**Guns With a Two-Speed Gear Shift:**
The design of an effective stun gun electrical waveform requires that the fired darts manage to arc and spark through the target's outer clothes and then, once an ionized-air and highly conductive plasma arc is established, the gun must somehow automatically shift gears, so to speak, and drive home (to the target body) a much larger electrical current but with lower voltage to cause effective involuntary muscle contraction. Further, once the plasma arc has been established, then the wave shape and timing of the subsequent electrical waveform is important for "smart" muscle contraction. That is, maximum contraction with minimal likelihood of cardiac arrest or other adverse body effects.

**What Are We Trying To Do to the "Target"?**
First, let's just state the simple objective of what we want an effective stun gun to do: "Override the body's electrical signals to the muscles to achieve immobilization". But to get this electricity to penetrate to the body's surface from possibly non-contacting darts we need that aforementioned very high voltage initially to "spark" a good contact, but once that contact is made, we then need to push a lot more current through the low resistance of the flesh so it can 'find' and trigger the nerve fibers. Think of the body as a large salt bag with embedded electrical wiring called nerve fibers. Then envision a nerve

TSDOC004631

fiber as being like a string of pearls placed inside of a drinking straw inside this salt bag. This straw is filled with salt water and in its resting state has a positive electrical voltage with respect to the inside of each 'pearl'. This salt water is filled with sodium ions whereas the inside of each pearl is filled with potassium ions. This is similar to a battery.



When a strong current is passed through the "salt bag", then these sodium ions get "pushed" through the "pearls" or nerve cell membranes and the potassium ions get sucked out causing nerve cells to trigger. Once triggered, they in turn contract muscles in an involuntary manner. However, this current (and voltage) must last long enough for this chemical process to push and pull ions across the "pearl's" outer shell to actually cause a nerve to trigger. This ion transport process requires that the voltage and current pulse be applied in **one direction** for about one-fourth to one-half millisecond (250 to 500 microseconds). Shock sensitivity curves were compiled by C.F. Dalziel (Ref. 1) which suggest that sinusoidal pulses much shorter than 250 microseconds rapidly become less effective at causing electrical shock.

Based on these biomedical shock sensitivity curves, a short pulse, say, 20 microseconds, is only about 25% as effective as a 200 microsecond pulse at causing perceptible shock. Therefore, single, fast pulses are poor candidates for efficient involuntary muscle contraction. **And recognition of this fact is one of the keys to making a 'smarter' waveform for a stun gun.** It becomes clear that gun waveforms which generate a single, very-short electrical pulse will have to output massively larger energies to force this inherently slow process to take place. The Taser M26 is a good example of this.

**Relating Pulse Width and Polarity to Gun Performance:**

The M26 Gun's Waveforms:

Now, when you look at the huge electrical voltage and energy levels of the M26 as shown in **Figure 1**, you'd instinctively say, "Wow, that has so much energy, it's the best". Wrong. The M26 has a very narrow pulse waveform which, as suggested above, is less effective. To make matters worse, after a massive short positive pulse, the M26 immediately reverses polarity. This in turn partially reverses the ion transport process that was started by the preceding large pulse! So what you really get is heating and pain with relatively little efficiency of muscle contraction. That is why, we believe, the engineers at Taser came up with the X26 waveform.

The X26's Waveforms:

Looking at the X26's waveform in **Figure 2** (Direct Body Connection) or **Figure 3** (simulated Clothed Target), you can clearly see that it is quite different from the M26's waveform. This wave has an initial large but narrow spark voltage followed by a single uni-polar pulse. Taser's specification sheet states that the duration of this pulse is about

100 microseconds, but the majority of the energy is actually spent in about 80 microseconds. This is indeed a step in the right direction – namely first ionize any air gaps between the darts and the conductive target's "salt-bag" and then immediately use that highly conductive path to apply a lower-voltage, higher-current unipolar-pulse through the target's embedded nerve fibers to force a large migration of the sodium and potassium ions across the nerve cell membranes. However, because Taser guns incorporate older gas-tube and spark-gap technology, their design has no choice but to completely dump the available electrical energy (in a capacitor) in one quick pulse. It appears to Stinger Systems that Taser did attempt to stretch it out but could not readily achieve the ideal 250 microseconds to 500-microsecond pulse width goal, which nerve fibers are "looking for" to optimally trigger muscle contraction. Thus, in Stinger Systems' opinion, the X26 gun had to also output excessive energy to accomplish their goals but not as much as the M26 gun. Stinger Systems believes that this excess energy could more readily compromise a subject's stressed cardiac system in a confrontational scenario than a lower energy 'smarter' waveform.

### The S200: Towards a 'Smarter' Stun Waveform:
The novel *Quantum Flyback Technology*™ incorporated in the S-200 gun permits what Stinger Systems believes is a near optimal "designer" waveform to be created under microcomputer control. As shown in **Figures 4 and 5** for several target conditions, the wave consists of a series of relatively short, uni-polar pulses intentionally spread over a 200-microsecond interval. This gives more time for the ion transport to take place. By using a series of pulses, several benefits result. First, less total energy can be delivered over that interval while still optimally 'nudging along' the ion transport process with peak voltages in the 500v to 1000-volt range. Secondly, a series of short pulses is believed to be safer as described below.

### The Other Key for a "Smart Waveform": Cardiac Safety:
A subtle but important factor in the design of what Stinger Systems believes is a safer stun gun waveform is the depth of electrical current penetration. An ideal waveform would "somehow" not penetrate deeply into the body where the heart or other organs could be adversely impacted. If the waveform's shocking currents could somehow be confined to the body's exterior muscle tissue, then it would logically appear to possibly not only be safer but would also be more effective since the exterior skeletal muscles are the very ones we wish to incapacitate.

### High-frequency Pulses and the "Skin Effect":
An interesting phenomenon of high frequency electrical signals is that they tend to hug the surface of any conductor they travel through. (Ref. 2) If you once again inspect the waveforms of Figures 4 and 5, observe that the pulses have a narrow width – only about 15 microseconds. Such a fast pulse tends to not penetrate as deeply as a single long pulse. Note that these pulses are about 5 to 6 times shorter than the X26's pulse. So, this theory suggests that deep body penetration with the S-200 waveform may possibly be less. Note that any one pulse would unlikely cause a significant contraction. However, a series of them spread out over the important nerve ion-transport delay interval (0.2 to 0.5 msec.) is an entirely different matter … as test subjects will testify to.

TSDOC004633

**Conclusion:**
The design of a smart, non-brute-force stun-gun waveform is not trivial. The design factors of achieving a large target-connection spark followed by much higher current, bio-optimized waveforms at reduced voltages were challenging but have been solved, patent-applied-for and are now being produced in the S-200 Stun Gun. This *Quantum Flyback Technology*™ performs automatic electrical "gear-shifting" followed by near-optimum, less cardiac invasive, muscle-contracting electrical waveforms.

**Ref 1:** "Let-go current versus frequency curves", from C.F. Dalziel, "Electric Shock", *Advances in Biomedical Engineering*, edited by J.H.V. Brown and J.F.Dickson III, 1973, *3*, 223-248 (note: sinusoidal frequency to pulse width inference assumes that shock onset occurs during a one-half cycle period.)

**Ref 2:** "Noise reduction Techniques in Electronic Systems", by Henry W. Ott, Bell Laboratories, p144-147, John Wiley and Sons Publishers, 1976 ; (Electric current penetration is proportional to the square root of both frequency and the target's conductivity; so higher frequencies (smaller pulse widths) tend to penetrate less.)

**Figure 1:** The Taser M26 Stun Gun's Output Waveform
(Test Load has a 10:1 voltage reducer.)



**Figure 2:** Taser's X26 Stun Gun's Output Waveform: Direct Contact Load
(Test Load has a 10:1 voltage reducer.)



**Figure 3:** Taser's X26 Stun Gun's Output Waveform: Clothed Target Load
(Test Load has a 10:1 voltage reducer.)



TSDOC004635

**Figure 4:** The S-200's Output Voltage Waveform: Direct Contact
(Test Load has a 10:1 voltage reducer.)



**Figure 5:** The S-200 Output Voltage Waveform: Clothed Target Load
(Test Load has a 10:1 voltage reducer.)



Taser X26, Taser M26, and Taser are registered trademarks of Taser International, all rights reserved.

TSDOC004636



## REFERENCES

Donnelly, T. (2001). Less Lethal Technologies: Initial Prioritisation and Evaluation. Great Britain Home Office: London, UK.

Laur, D. (2004, November). Excited delirium and its correlation to sudden and unexpected death proximal to restraint: A review of the current and relevant medical literature. Canadian Police Research Center. Victoria: BC.

Lounsbury, D. & Thompson, F. (2007). "Locating TASER Anti-Felon Identification Disks", Journal of Forensic Identification, March/April, pp. 223 - 229.

S200 Instructor Course Materials (2006). Stinger Systems.

Taser International Inc. (2006). 2006 Annual Report. Retrieved July 18, 2007, from *http://ww3.ics.adp.com/streetlink_data/dirTASR/annual/HTML2/default.htm*

TASER X26 Operating Manual (2006) TASER International.

TASER International Instructor Materials: X26 & M26. (2004). TASER International

TSDOC004637

Exhibit 2

Case 2:07-cv-00042-JAT   Document 184   Filed 02/14/13   Page 123 of 190



US 20080278882A1

(19) **United States**

(12) **Patent Application Publication**     (10) Pub. No.: **US 2008/0278882 A1**

Saliga                                      (43) Pub. Date:     **Nov. 13, 2008**

(54) **ELECTRIC DISABLING DEVICE WITH CONTROLLED IMMOBILIZING PULSE WIDTHS**

(76) Inventor:     **Thomas V. Saliga**, Tampa, FL (US)

Correspondence Address:
**DAVID KIEWIT**
**5901 THIRD ST SOUTH**
**ST PETERSBURG, FL 33705 (US)**

(21) Appl. No.:     **11/746,952**

(22) Filed:     **May 10, 2007**

**Publication Classification**

(51) Int. Cl.
     *F41B 15/04*          (2006.01)
(52) U.S. Cl. ........................................ **361/232**; 320/166

(57)     **ABSTRACT**

A capacitive discharge stun-gun uses a flyback output circuit in which a semiconductor switch operates under control of a controller or suitable logic circuitry. The flyback circuit can deliver 50-65 kV pulses to a pair of electrodes in order to ionize air adjacent a target in order to initiate good electrical contact. When the electrodes are in good contact with the target, the flyback circuit delivers current at a lower voltage. In one mode of operation the stun-gun is controlled to initially deliver wider pulses optimized for causing air breakdown and to then deliver a series of shorter pulses in pulse groups optimized for causing involuntary muscle cramping.





FIG. 1

Case 2:07-cv-00042-JAT   Document 186-1   Filed 08/14/09   Page 125 of 190



FIG. 2

FIG 3a

FIG. 3b



FIG. 4



FIG 5a

FIG 5b



FIG. 6

US 2008/0278882 A1

Nov. 13, 2008

1

## ELECTRIC DISABLING DEVICE WITH CONTROLLED IMMOBILIZING PULSE WIDTHS

### BACKGROUND OF THE INVENTION

[0001]   1. Field of the Invention

[0002]   The invention generally relates to electric systems and devices that generate and accumulate charge for application to living beings. More specifically, the invention relates to electric disabling devices commonly referred to as stun-guns, stun-batons or the like for delivering an incapacitating, but less than lethal, sequence of electric shocks to a person.

[0003]   2. Background Information

[0004]   Hand-held stun-guns are widely used by police officers to subdue uncooperative or potentially dangerous individuals by subjecting them to electric current pulses inducing incapacitating muscle cramps. The jolt from a stun gun is intended to cause such severe cramping as to prohibit locomotion and to cause the victim to fall to the ground. Generally speaking, there are two limiting concerns in delivering an incapacitating electric shock. At one extreme, if too little energy is delivered to a targeted individual, he or she may not be incapacitated and may be able to persist in an attack on a police office. On the other hand, if extremely large electrical currents are delivered, the shock may be lethal, rather than merely incapacitating.

[0005]   Prior art stun guns operate by charging a capacitor to a relatively high voltage and then discharging the capacitor through the primary winding of a step-up transformer so as to produce a much higher voltage on electrodes propelled toward a target. If the electrodes are not in intimate contact with the target, voltages on the order of 50-60 kV need to be supplied to the electrodes to ionize the air between the electrodes and the target to establish a current path. Once contact has been established lower voltages, on the order of hundreds to a few thousand volts, are adequate for sending disabling current pulses through the target.

[0006]   In a typical prior art stun gun the capacitive discharge is controlled by a gas discharge tube. The capacitor is charged from a relatively high voltage power supply until the voltage across its terminals is high enough to trigger break-down in the gas discharge tube, and to cause the gas discharge tube to switch from its initial non-conducting to a highly conductive state in which the capacitor is electrically connected to the transformer. The capacitor then discharges through the primary winding of the transformer until its voltage falls below the minimum voltage at which the gas discharge tube will conduct. The gas discharge tube then switches to its original high resistance state and the cycle can be repeated. In this arrangement the pulse duration, repetition rate, output voltage, etc. are determined by component selection. That is, one can select gas discharge tubes with different turn-on and turn-off voltages, but once the turn-on voltage is attained, the device will conduct until the voltage falls below the turn-off level.

[0007]   Physiological studies of the effects of electrical impulses on nerves that control skeletal muscles indicate that a pulse needs to last longer than about 150 microseconds to be efficient at 'firing' the nerve tissue, which is critical for causing cramping or immobilization. Once stimulated, the nerve tissue requires four milliseconds or more to recover.

### BRIEF SUMMARY OF THE INVENTION

[0008]   It is an object of the invention to tailor the energy delivery sequence of a stun device, such as a stun gun, to more thoroughly incapacitate nerve tissue while delivering less total energy than is the case with prior art stun devices. In preferred embodiments this is provided by applying incapacitating pulses lasting between 150 and 300 microseconds. Further, because nerve tissue has a recovery period (depolarization and refractory period) of approximately 4 milliseconds, preferred embodiments of the invention deliver a plurality of energy pulse groups having an interval of about 4 milliseconds between pulse groups.

[0009]   A preferred embodiment of the invention provides an electric disabling device configured as a handgun for immobilizing a human or animal target. This gun, similar to other such devices, comprises at least two projectile electrodes for positioning at spaced apart contact points adjacent a target and a suitable propelling means, such as pressurized gas or a pyrotechnic charge, for propelling the projectile electrodes from the device towards the target. The preferred device also comprises a transformer having primary and secondary windings, a capacitor, and a DC power supply operable to charge the capacitor element. Each end of the secondary winding of the transformer is electrically connected to only one of the two electrodes The preferred embodiment also comprises a semiconductor switching device controllable by a control circuit to repeatedly switch between a conducting and a non-conducting state so as to cause pulses of current to flow from the capacitor through the primary winding of the transformer. In particular preferred embodiments, the semiconductor switching element is an insulated gate bipolar transistor (IGBT).

[0010]   In an initial preferred contact-establishing method of operating such an electric disabling device the capacitor is initially charged from the DC power supply to a predetermined maximum voltage and the semiconductor switching device is controlled by the controller to close for a discharge interval having a selected duration of more than 15 but less than 50 microseconds. This assumes that a step up transformer with a primary inductance of about 50 micro-henries is utilized. At the end of the selected discharge interval the switching element is opened and held open for a pause interval having a selected duration at least as long as the discharge interval and at most five times as long as the discharge interval. The discharge and pause steps are then repeated at least once and preferably between five and ten times until the capacitor is substantially fully discharged.

[0011]   In a second preferred immobilizing method of operating such an electric disabling device, the capacitor is charged from the DC power supply and the semiconductor switching device is controlled by the controller to close for a discharge interval having a duration of more than 5 but less than 20 microseconds. At the end of the discharge interval the switching element is opened and held open for a pause interval having a selected duration at least as long as the discharge interval and at most five times as long as the discharge interval. The number of such switching actions is adjusted to discharge the capacitor to approximately 40% of its maximum rated energy storage value and span a duration of approximately 200 microseconds. Then, during an idle period of substantially 4 millisec the capacitor is partially recharged to 50% or more of its rated capacity and then the above process is repeated until the capacitor is substantially fully

2

discharged. Thereafter, the capacitor is fully recharged and the process is repeated after a recharge delay between 50 and 100 milliseconds.

[0012] A particular preferred method of operating a disabling device of the invention comprises carrying out the first and second methods in sequence. That is, the controller controls the switching element to initially deliver high voltage pulses optimized to both fire the pyrotechnic charge and establish contact and to then deliver immobilizing pulses. If the projectile electrodes are not initially in intimate contact with the target, as is usually the case, the secondary of the transformer is essentially open-circuited so that pulsing the primary causes 'flyback' voltages in the secondary that can reach fifty to seventy kilovolts, which is known to be high enough to ionize the air between each projectile electrode and the target and to lead to intimate electrical contact. Once contact has been established to the target, the secondary of the transformer is no longer open-circuited and pulsing the primary results in lower voltage, higher current pulses in the secondary that can be controlled to have an optimal immobilizing duty cycle. In particular preferred embodiments, a 100 V DC power supply charges the capacitor, which is discharged through a 55:1 step-up transformer that outputs about a 2 kV pulse to the target, which is generally viewed as about a 1 kΩ load once contact has been established.

[0013] Although it is believed that the foregoing rather broad summary description may be of use to one who is skilled in the art and who wishes to learn how to practice the invention, it will be recognized that the foregoing recital is not intended to list all of the features and advantages. Those skilled in the art will appreciate that they may readily use both the underlying ideas and the specific embodiments disclosed in the following Detailed Description as a basis for designing other arrangements for carrying out the same purposes of the present invention, and that such equivalent constructions are within the spirit and scope of the invention in its broadest form. Moreover, it may be noted that different embodiments of the invention may provide various combinations of the recited features and advantages of the invention, and that less than all of the recited features and advantages may be provided by some embodiments.

BRIEF DESCRIPTION OF THE SEVERAL
VIEWS OF THE DRAWING

[0014] FIG. 1 is a largely schematic exploded block diagram of an electrical incapacitating device of the invention.

[0015] FIG. 2 is a schematic block diagram of a circuit for an electrical incapacitating device of the invention, wherein depiction of some of the power wiring has been omitted in the interest of clarity of presentation.

[0016] FIG. 3a is a schematic depiction of a train of pulses of output voltage of the circuit of FIG. 2 when an initial air gap is present between at least one electrode and a target.

[0017] FIG. 3b is a schematic depiction of a several pulses of output voltage as a function of time when both electrodes have contacted a target.

[0018] FIG. 4 is a schematic block diagram of a preferred circuit for a stun gun of the invention that can operate in the presence of substantial parasitic load capacitance.

[0019] FIG. 5a is a schematic depiction of a train of pulses of output voltage of the circuit of FIG. 4 when an initial air gap is present between at least one electrode and a target, but when no substantial parasitic load capacitance is present.

[0020] FIG. 5b is a schematic depiction of output voltage of the circuit of FIG. 4 when both an initial air gap and a substantial parasitic load capacitance are present.

[0021] FIG. 6 is a schematic depiction view of a data dock arrangement for transferring data between a non-volatile memory in a stun gun and an external computer.

DETAILED DESCRIPTION OF A PREFERRED
EMBODIMENT OF THE INVENTION

[0022] In studying this Detailed Description, the reader may be aided by noting definitions of certain words and phrases used throughout this patent document. Wherever those definitions are provided, those of ordinary skill in the art should understand that in many, if not most instances, such definitions apply to both preceding and following uses of such defined words and phrases. At the outset of this Description, one may note that the terms "include" and "comprise," as well as derivatives thereof, mean inclusion without limitation; the term "or," is inclusive, meaning and/or. Moreover, inasmuch as the preferred embodiment described herein involves controlled capacitive storage of electrical charge and subsequent discharge of it, it should be noted that the term 'capacitor' is sometimes used herein to denote either or both of a single physical component and various combinations of such components that can be viewed as being equivalent to a single capacitive component. In particular, a plurality of single capacitive components electrically connected in parallel so as to provide a total capacitance equal to the sum of the capacitances of the individual components will sometimes be herein referred to as a 'capacitor'.

[0023] Turning now to FIG. 1, one finds a schematic exploded view of a disabling device or stun-gun 10. As is conventional in the art, the stun device is powered by a removable and replaceable battery pack 12. In a particular preferred embodiment the battery pack comprises a plurality of lithium primary batteries such as the 123 size or the CR2 size inserted into the handle or butt of the stun-gun. After a safety-switch 13 is enabled to apply battery power, pulling the trigger 14 ignites a pyrotechnic charge 16 that fires dart-like projectile electrodes 18 from a replaceable cartridge 20. The projectile electrodes trail fine wires 22 behind them to keep them electrically connected to a power electronics portion 24 of the stun-gun. It may be noted that although the power electronics portion 24 of the gun 10 is depicted as a square block, this is an entirely schematic depiction selected for clarity of presentation. In reality, various elements of the power electronics portion of the weapon are tucked away in available nooks and crannies of the body of the weapon.

[0024] Moreover, although the initially preferred embodiment of the invention comprises a stun gun having both projectile 18 and fixed 19 electrodes, the reader will appreciate that the same inventive circuitry and operating methods can be employed for making other electrically incapacitating devices using only fixed electrodes 19 incorporated into batons, battle-shields, or restraint bracelets and belts, and that all such other uses shall be considered to be within the spirit and scope of the invention.

[0025] The power electronics portion 24 of the stun-gun is schematically depicted in FIG. 2, for an electrically incapacitating device comprising only fixed electrodes, and in FIG. 4 for a preferred stun gun having. In both cases the battery pack 12 powers a controller 28 and a high voltage DC-DC supply 30. When the device is triggered, the controller 28 controls the DC supply 30 and a controllable semiconductor switch 32 to

3

charge a capacitor or capacitor bank **34** and to send current pulses through the primary winding of a step-up transformer **36**, as will be described in greater detail hereinafter.

[0026] In a particular preferred embodiment, the power electronics portion of the stun gun is controlled by a micro-controller such as a Model 16F687 made by the Microchip Corporation. Those skilled in the control arts will recognize that although this arrangement is preferred, there are many other approaches that can be used to provide the necessary control features. These include, but are not limited to the use of other controllers as well as of hard-wired or custom programmed logic elements well known in the art.

[0027] The high voltage DC supply **30** is preferably any of many well-known step up, switching-type DC-DC power supplies circuits with a delivered power rating in the 10 watt to 20 watt range. When active, the preferred high voltage DC supply provides an output voltage of approximately 100 VDC.

[0028] Current from the high voltage DC supply **30** passes through a diode **26** to charge a capacitor **34**. Although one can consider using a single capacitor component for this function, a preferred embodiment of the invention uses a parallel pair of capacitors, each having a capacitance of fifty microfarads to achieve a total capacitance in the 90 μF to 108 μF range. The use of a plurality of paralleled components offers the advantages of reducing the maximum current that has to be delivered by any one of them, and of allowing the designer to more efficiently use the space available within the body of the weapon by packing smaller individual capacitors into spaces available within a body of a stun gun **10** or other incapacitating device.

[0029] A semiconductor switch **32**, which is preferably an insulated gate bipolar transistor (IGBT) Model IRG4PH50KDP supplied by the International Rectifier company, is controlled through a driver **29** by the controller **28** to discharge the capacitor **34** through the primary winding of the transformer **36**. Although this element is depicted in FIG. **2** as being physically connected between the transformer and negative rail, those skilled in the art will recognize that the semiconductor switch **32** can be located at other positions in the circuitry.

[0030] The preferred IGBT **32** can be controlled to generate pulses of a controllable width that can be as narrow as one microsecond. It can also be used to generate a long string of such pulses during the course of a single discharge of the capacitor **34**. It is noteworthy that this is a significant advantage over prior art stun-guns that employ a gas discharge tube to send a current pulse from a capacitor through the primary winding of a transformer. The prior art gas discharge tube operates in an 'all-or-nothing' mode and, once turned on, continues to conduct until the voltage on the capacitor falls below a predetermined voltage.

[0031] The preferred 55:1 ferrite core step-up transformer **36** is typically custom designed using well-known high-voltage transformer methods. In the preferred design, the primary inductance is 50 μH. It may be noted that the use of a controlled string of narrow pulses, when compared to the prior art approach of fully discharging the capacitor at each actuation, allows one to select a transformer with a smaller core size because core saturation is less of an issue. This use of a smaller transformer provides an additional benefit of reducing the overall size of the housing needed to contain it.

[0032] The transformer **36** may be designed to have either an ohmically floating secondary winding or may be center-tapped and have that center-tap **38** connected to the controller circuit's common rail. A practical advantage of the latter is that the voltage breakdown stresses may be reduced by a factor of two between the secondary wires **18** and primary common circuits. This significantly reduces insulation thickness requirements, permitting more compact design structures for the electronics output circuit module **24**.

[0033] The circuit schematically depicted in FIG. **2** and FIG. **4** may be recognized as a flyback circuit that, when operated in pulsed mode, provides two drastically different sorts of outputs depending on the impedance across the output electrodes **18**, **19**. In one limiting case, one can consider the output electrodes **18** as being separated by a high impedance, such as an air gap. In the other limiting case, a relatively low resistance, provided by tissue of a target **40**, is connected between the two output electrodes.

[0034] This accords well with the operational requirements of electrical incapacitating devices, such as a prisoner stun belt, baton, or other such devices. In an early stage of operation the output electrodes **18**,**19** are often not in intimate physical contact with a target and the output of the transformer is essentially open circuited. For example, a human target's clothing may space either or both of the electrodes away from his or her body by several centimeters. A high voltage output is required to ionize the air between the target's body and the electrode in order to establish effective electrical contact. Once an ionic air plasma or direct contact is established, a lower voltage can be used to send reasonable currents through the target, which now appears as a resistive load **43** of approximately 1 kΩ. This situation is schematically depicted in FIG. **2** where the target **40** is depicted as comprising an initial gap, depicted as a target capacitance **41** that is commonly on the order of ten picofarads, a switch **42**, and a 1 kΩ resistor **43** connected across the transformer output once air ionization has acted to render the gap conducting.

[0035] If the output of the step-up transformer is open-circuited and the controllable IGBT switch **32** is suddenly closed, current flows from the high voltage DC power supply **30** and the substantial charged capacitor **34**. This current creates a magnetic field in the transformer inductance. If the controllable switch **32** is then abruptly opened, the magnetic field collapses and induces a large 'flyback' voltage spike, as is well known from Faraday's EMF Law, across the pairs of electrodes. In a particular preferred embodiment, using the circuit components described above, flyback voltage spikes of 55-65 kV were produced.

[0036] In preferred embodiments, recognizing that it is likely that the output electrodes do not initially have good electrical contact with the target, the controller is programmed to open and close the switch in succession to generate a string of high voltage pulses as depicted in FIG. **3**a and FIG. **5**a. For the component values described above, each pulse had a peak value of 55-65 kV, as indicated by the $V_{ARC}$ line in those figures. A plurality of such pulses are created by repeatedly closing the controllable switch **32** for ten microseconds and then opening it for twenty to forty microseconds. The use of a string of high voltage pulses, rather than a single pulse, provides a higher probability that at least one of the pulses will result in air breakdown near the target with resulting good contact to the target. In a particular preferred embodiment, this "Max-Spark" high-spark energy waveform is generated for 0.1 to 0.25 seconds.

[0037] A further complication arises in the case of stun guns having projectile electrodes with trailing wires **22**. In

this case, a parasitic load capacitance **44** between either of the wires and earth ground **46** can absorb enough of the high voltage output pulses to prevent an arcing voltage from developing at the electrodes **18**. This can occur, for example, when one or both of the trailing wires lies on damp ground or pavement.

[0038]   In order to ensure that an arcing voltage is obtained in a stun gun application one can provide additional high voltage diodes **48** in the output circuit. In a particular preferred embodiment, depicted in FIG. **4**, three VMI Type X100FG miniature, fast recovery, 10 kV diodes are connected in each leg of the output circuit. This arrangement permits successive output pulses to repeatedly charge the load capacitance **44**, **46** until the designed 55 kV arc-over voltage is attained, as schematically depicted in FIG. **5***b*. Those skilled in the art will appreciate that more or fewer diodes may be used in each arm of the output circuit, depending on the availability of suitable components. In any such arrangement, of course, it is preferable to select the diodes so that the series string of diodes provides a breakdown voltage (e.g., 60 kV in the depicted case) that is greater than the targeted arc-over voltage (e.g., 55 kV).

[0039]   The flyback circuits of FIG. **2** and FIG. **4** behave considerably differently if a relative low impedance, such as the 1000 ohms or so offered by a typical target **40**, is connected across the electrodes **18**,**19**. In this case, closing the controllable switch **32** causes the full voltage of the capacitor bank **34** to be applied across the transformer's primary **36** which in turn causes a substantially higher voltage to be applied across the secondary, as determined by its turns-ratio. This voltage is then applied across the target resistance. In a particular preferred embodiment the combination of a 100 V DC supply and a 55:1 step-up transformer generates a potential across the projectile electrodes of about 2 kV, where the balance of the nominal 5.5 kV is lost to parasitic resistance of the windings and electrode leads. A pulse of this sort is depicted in FIG. **3***b*.

[0040]   In a preferred embodiment, during a time period in which a low impedance situation is believed to persist (e.g., after an initial high spark energy period of approximately 0.1 to 0.25 sec), the controller is programmed to open and close the switch **32** in rapid succession to generate a pulse group with a duration $T_1$ of about 350 microseconds, a pulse-group separation $T_2$ of 4 milliseconds, and a group repetition period of about 50 milliseconds, as generally depicted in FIGS. **3***a*, **5***a*, **5***b*. In a particular preferred embodiment, a first pulse group of five to fifteen pulses spans a period of 300 to 400 μsec. This is followed, after a pause of about 4 msec by a second group of five to fifteen pulses. The second group is followed by a somewhat longer delay of 50-100 msec to allow the capacitor to fully recharge, following which the first group/second group sequence is repeated.

[0041]   As noted above, this selection of pulse duration and pause duration is made to accord with physiological information on muscle control. Pulse durations of 150-500 microseconds are optimal for activating the nerves that control skeletal muscles and for causing involuntary cramping. A pulse-group repetition rate of 4 milliseconds assures that the cramping voltage is re-applied just as the effects of the previous pulse are dissipating. A pulse train of this sort is referred to as a "Nerv-Lok" waveform.

[0042]   In other embodiments of the stun device invention, to further enhance nerve and muscle incapacitation, a plurality (N) of pulse groups may be generated all with time interval

spacings of approximately 4 milliseconds. In these embodiments, the capacitor **34** would typically be exhausted by 1/N of its total energy capacity by a string of N pulse groups. Once exhausted, the capacitor would be recharged fully once again by the power supply **30**. In compact embodiments that seek to keep the total power requirements within the 10 watt to 20 watt range, it may be noted that the time interval for recharge would ordinarily take much longer than 4 milliseconds.

[0043]   Many operating modes can be offered in an electrical incapacitating device of the invention that provides controllable discharge pulses. A preferred embodiment of a stun-gun **10** provides manual, semi-automatic and fully automatic modes of operation that differ from each other in the weapon's response to a trigger pull. For example, in a 'full manual' operation the stun-gun operates at the Max-Spark rate for 0.2 sec and then outputs the "Nerv-LoK" waveform for up to four seconds, and for less time if the trigger is released during operation. In a semi-automatic operating mode the Max-Spark waveform is delivered for 0.2 seconds, followed by 0.8 seconds of the Nerv-Lok waveform, following which the weapon continues to put out the Nerv-Lok waveform as long as the trigger is held back for up to a maximum total elapsed operational time of four seconds. In a full-automatic operation the stun gun provides 0.2 seconds of Max-Spark, followed by 3.8 seconds of Nerv-Lok.

[0044]   Any one of the operational modes of a preferred stun-gun may be selected by having the gun's controller **28** communicate with another computer **50** running a local program that allows a user, usually a police department administrator, to select the desired operational mode, and store that mode selection in a non-volatile memory **52** that is associated with the controller **28** and that may also provide storage for trigger-usage history data.

[0045]   In a particular preferred embodiment the stun-gun controller **28** communicates with the external computer **50** by means of a wireless proximity coupling circuit. In this embodiment an inductor **54***a* in the gun **10** couples to another inductor **54***b* built into a docking station **56** connected to the external computer **50** when the wireless proximity coupling circuit is activated. The docking station, schematically depicted in double-dot phantom in FIG. **6**, is preferably configured to conveniently receive the gun in a standard position in which a permanent magnet **58**, built into the docking station, is close enough to a magnetic reed switch **60**, disposed within the gun, so as to close the switch **60** and place the controller **28** into a communication mode in which data are transmitted between the controller and the external computer.

[0046]   Although the present invention has been described with respect to several preferred embodiments, many modifications and alterations can be made without departing from the invention. Accordingly, it is intended that all such modifications and alterations be considered as within the spirit and scope of the invention as defined in the attached claims.

What is claimed is:

**1**) An electric disabling device for immobilizing a human or animal target, the device comprising:

at least two electrodes positionable at spaced apart contact points adjacent the target;

a transformer having primary and secondary windings, each of the two ends of the secondary winding respectively electrically connected to one of the two electrodes;

US 2008/0278882 A1

5

Nov. 13, 2008

a capacitor electrically connected to the primary winding of the transformer;

a DC power supply operable to charge the capacitor; and

a semiconductor switching device electrically connected to the primary winding and controllable by a control circuit to repeatedly switch between a conducting and a non-conducting state so as to cause a plurality of pulses of current to flow from the capacitor through the primary winding of the transformer during an interval of at least ten microseconds but not more than one millisecond.

**2**) The disabling device of claim **1** wherein the control circuit comprises a microcontroller.

**3**) The disabling device of claim **1** wherein the semiconductor switching device comprises an insulated gate bipolar transistor.

**4**) The disabling device of claim **1** wherein the secondary winding of the transformer is center tapped.

**5**) The disabling device of claim **1** wherein the control circuit comprises a microcontroller having non-volatile memory associated therewith, the disabling device further comprising a wireless proximity coupling circuit for transmitting data between the disabling device and an external computer.

**6**) The disabling device of claim **1** wherein each of the two ends of the secondary winding is respectively electrically connected to one of the two electrodes by means of a respective at least one high voltage diode.

**7**) A method of operating an electric disabling device, the method comprising the sequentially executed steps of:

a) charging a capacitor to a selected voltage from a DC power supply;

b) controlling a semiconductor switching element to at least partially discharge the capacitor through the primary winding of a transformer for a discharge interval having a selected duration of at least one microsecond;

c) controlling the switching element to open and to stay open for a pause interval having a selected duration at most five times as long as the discharge interval;

d) repeating steps b) and c) at least once.

**8**) The method of claim **7** wherein step (d) comprises repeating steps (b) and (c) at least five times.

**9**) The method of claim **7** further comprising a step (e) carried out subsequent to step (d) of:

(e) repeating steps (a) through (d).

**10**) The method of claim **7** further comprising steps carried out subsequent to step (d) of:

(e) charging the capacitor for a selected time interval; and

(f) repeating steps (b) through (d).

**11**) The method of claim **7** further comprising steps carried out subsequent to step (d) of:

(e) controlling the switching element to open and to stay open until substantially 4 milliseconds have elapsed from the time at which the switch was immediately previously closed;

(f) repeating steps (b) through (e) at least once.

**12**) A method of operating an electric disabling device, the method comprising the sequentially executed steps of

(a) charging a capacitor;

(b) closing a semiconductor switch for a first selected time interval less than a time required to fully discharge the capacitor;

(c) opening the switch for a second selected time interval, and

(d) repeating steps (b) and (c) at least once.

**13**) The method of claim **12** wherein the first selected time interval is at least one and not more than 50 microseconds.

**14**) The method of claim **12** wherein the second selected time interval is no more than five times the first selected time interval.

**15**) The method of claim **12** wherein the first selected time interval is at least one and not more than 50 microseconds, and wherein steps (b) and (c) are repeated often enough to generate a burst of pulses having a total duration of at least two hundred microseconds.

**16**) The method of claim **15** comprising a step sequentially carried out after step (d) of:

(e) holding the switch open for an interval of substantially four milliseconds and

(f) repeating steps (b) through (d).

**17**) The method of claim **12** wherein in step (d) steps (b) and (c) are repeated often enough to substantially fully discharge the capacitor, the method comprising additional steps, executed after step (d) of:

(e) holding the switch open for an interval selected to allow the capacitor to be charged to the selected voltage; and

(f) repeating steps (b) through (d).

**18**) The method of claim **12** comprising steps sequentially executed after step (d) of:

(e) holding the switch open for an interval of substantially four milliseconds and

(f) repeating steps (b) through (d).

\* \* \* \* \*

# Exhibit 3

C O N F I D E N T I A L                                    1

COPY

1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF ARIZONA
2

3          TASER International, Inc.,        ]
                                             ]
4               Plaintiff,                   ]
                                             ]
5          vs.                               ]      CASE NO.
                                             ]   CV07-0042-PHX-MHM
6          Stinger Systems, Inc.,            ]
                                             ]
7               Defendant.                   ]

8
                            **VIDEO TAPE**
9                **DEPOSITION OF ROBERT GRUDER**

10

11         DATE:           Tuesday, August 26, 2008

12         TIME:           8:58 a.m.  -  5:33 p.m.

13         PLACE:          Johnson & Associates
                           Court Reporters, Inc.
14                         620 East Twiggs Street
                           Suite 110
15                         Tampa, Florida  33602

16         PURSUANT TO:    Notice, upon oral examination

17         PURPOSE:        Of discovery, for use at trial
                           or for such other purposes as
18                         are permitted under Rule 45 of
                           the Federal Rules of Civil
19                         Procedure

20         REPORTED BY:    CATHY J. JOHNSON MESSINA, RMR, FPR
                           Registered Merit Reporter
21                         Florida Professional Reporter
                           Notary Public, State of Florida
22                         MEMBER:  NCRA, FCRA, STAR

23

24

25

*JOHNSON & ASSOCIATES COURT REPORTERS, INC.   (813) 223-4960*

1      A.    Sure.  My definition of "function" would be more

2   from the manufacturing ability and how to make the gun as

3   designed function per se; and that it would actually be able

4   to work as designed on paper and be able to be put into a

5   gun.  From a feature standpoint, I consider that marketing.

6      Q.    Is there any other aspect of the broad category of

7   design that we haven't covered?

8      A.    I can't think of anything.

9      Q.    Okay.  How did you become acquainted with Tom

10  Saliga?

11     A.    We had a predecessor gun called the S-400 and we

12  moved electronics down to a company down here in Orlando, down

13  here being Florida, in Orlando called Transpo and Transpo

14  really was -- I guess was going through a transition.

15          They ended up ultimately being bought, but their

16  quality, their attention to detail, was not to my

17  satisfaction.

18          There was an individual engineer there by the name

19  of Mike Richtarsic -- and, I'm sorry, I have no idea how to

20  spell his name --

21     Q.    Sure.

22     A.    -- was working at Transpo at the time and we

23  developed a little bit of a rapport.  Mike was subsequently

24  fired from Transpo during their transition.  I think they got

25  bought by a company in Philadelphia.  I really don't know.

1   And I had a dialogue with Mike saying do you think you could

2   find some good engineers in the area, we'd like to remain

3   local, we're coming up with a new concept of a new gun that

4   we're designing, and he came up with a list of design firms,

5   engineering design firms, and I interviewed Tom and I took a

6   liking to Tom and we engaged him.

7        Q.   Do you recall when you -- when you first engaged

8   Mr. Saliga?

9        A.   I am guessing approximately May of 2006, somewhere

10  around there.  Maybe in April.  I don't know.

11       Q.   What did you first ask Mr. Saliga to do?

12       A.   I don't recall specifically, but I asked him if he

13  could make a stun gun, I would imagine.

14       Q.   Back in the May and April of 2006 time frame, what

15  was the status of the S-200 device?

16       A.   We were designing -- we had tried to market the

17  S-400 gun.  The S-400 was a two-cartridge gun that was very

18  large, but it was a two-cartridge gun was what I inherited as

19  a prototype from the other company when we acquired it.

20            When we went out and tried to market that product,

21  we quickly realized that it was too large to be competitive to

22  TASER's products, so we decided that we needed -- the first

23  thing we -- the first thing we heard from all police

24  departments was that we like the concept of four darts, but we

25  need space on our duty belts.

So I decided to design a gun from the ground up with features that we heard from various departments that they'd like to incorporate.

And the S-400 did have value, because it did have some nice features that they said they would like to see in it, and so we started designing a brand new gun in January and February of '06.

Q. And you say you were designing a brand new gun. Were you designing electronic components for the gun?

A. No, strictly form function.

Q. Form function and feature?

A. Yes.

Q. Did you do mock-ups?

A. Yes. We made several mock-ups and we selected something very similar to them, the model that we're selling now.

Q. Did the mock-ups have electrical functionality?

A. No.

Q. When you interviewed and engaged Mr. Saliga in the April, May time frame in 2006, did you have an S-200 device that had electronic components in it?

A. No.

Q. Who designed the electronic components that are in the S-200 devices?

A. Tom's firm.

1       Q.   When did that work begin?

2       A.   Very soon after our initial dialogue.

3       Q.   And from that point until -- let me just ask.

4            When was the first point in time that you received

5  something back from Mr. Saliga that you would call, you know,

6  a first draft or an initial attempt at a design of the

7  electronic components?

8       A.   Are you talking about something that was

9  manufactured or something that was on the red board?

10      Q.   Let's start with the red board.

11      A.   It was sometime in the summer of 2006.

12      Q.   What was the next significant step in terms of

13  getting to having a functioning 200 device?

14      A.   There were -- there was significant steps everyday

15  in manufacturing and designing a new gun.  There was no

16  particular day where we had the hurrah.  We had changes weekly

17  on the gun, so I cannot give you a specific timeline of, wow,

18  this is it.

19      Q.   In terms of records for, you know, identifying what

20  happened when, what would be the best source of records to

21  look at?

22      A.   The company has none.  I believe Tom Saliga has some

23  versioning control.

24      Q.   Okay.

25           THE VIDEOGRAPHER:   Excuse me.  We need to change

1      A.     Physically?

2      Q.     Yes.

3      A.     I don't know.  That's a good question.  I don't

4    recall the first time.  It was inner memorial then.  I can't

5    recall.

6      Q.     Has Stinger Systems acquired an X-26 device?

7      A.     Yes.

8      Q.     When was the first time that an X-26 device

9    was acquired by Stinger?

10      A.     I can't recall.  I do remember having an X-26 and

11    showing it to Tom, but I don't recall the circumstance of how

12    that was acquired.  I don't know if it was on loan or if it

13    was purchased.

14      Q.     Do you recall when you first showed the X-26 device

15    that you're referring to to Tom?  That's Mr. Saliga, correct?

16      A.     Yes.  I would -- I do not know, but I could

17    speculate it was very soon after our -- our initial

18    introduction.

19      Q.     What makes you believe it was soon after your

20    initial introduction of Mr. Saliga?

21      A.     Because the requirement, as mentioned, that we heard

22    very loud and clear from the law enforcement community was

23    that duty belt space is the number one criteria on selecting a

24    stun gun, not so much the features or the price.

25            So we needed to measure the height of the TASER X-26

*C O N F I D E N T I A L*                                  53

1   different periods of the development?

2        A.   No.  We had no versioning.  We just made changes as

3   we needed to fit.

4        Q.   Are there some periods where you've had larger

5   amounts of change activity going on with respect to the design

6   than others?

7        A.   I would say there were two periods of time, and I

8   can't recall when one of them was.  When we first made the gun

9   there was a -- what we found out from feedback from the field,

10  there was a radiofrequency issue where under the right

11  frequency the gun could be inadvertently set off, and so we

12  had to make a change to the electronics, obviously.  I have no

13  idea when that was.  I just remember it was stop production,

14  we can't ship guns if they're going off by accident.

15        The second I would say very significant change where

16  we stopped production was last summer where the gun would work

17  well under load, except if it wasn't in an open circuit the

18  darts had to arc through air, the feedback would come back to

19  the gun and not have enough energy to be able to create --

20  ionize the air and create enough energy and take the

21  individual down.

22        We had -- and we were surprised by this, because

23  obviously during our human testing we would hook them up

24  directly and they would go down.  And then we find out about

25  some issues in the field where some individuals were -- were

C O N F I D E N T I A L                    54

1    shot and they did not go down, and we were complexed by it at

2    first.  First, we thought it was officer error, and then we

3    realized it could be a design issue.

4            We then -- not we.  We brought this -- I brought

5    this to the attention of Tom Saliga.  Tom created a rectifier

6    bridge of diodes that had fixed the problem, and that

7    basically was a very, very significant design change of the

8    gun.

9        Q.    You said that you stopped production in connection

10   with that second one?

11       A.    Yes.

12       Q.    For how long did you stop production?

13       A.    I don't recall.  It was -- it was sometime last

14   summer, but I can't recall the duration of that.

15       Q.    You mentioned a difference between when an

16   individual target was directly connected compared to an open

17   circuit kind of a circumstance.

18       A.    Um-hum.  (Indicating affirmatively.)

19       Q.    How physically were they directly connected in your

20   testing?

21       A.    Typically what we would do is we would either take

22   alligator clips and put them just on their shirt, or we would

23   just tape a probe to the body.  So it was -- it was, in my

24   estimation, within a sixteenth of an inch.

25       Q.    And what was the difference from the field

1  information you were getting back that caused this -- this

2  performance difference to arise; did you make any conclusions

3  about that?

4      A.    Well, as I mentioned, there was -- the gun was not

5  directing its energy forward, is my understanding, on the open

6  circuit enough to ionize the air.  It was reversing back

7  towards the gun, whereupon you wouldn't have enough energy

8  into the subject to bring them down.  You would just shock

9  them.

10     Q.    What I'm trying to get at with a very eloquent

11 question is the difference between the contact --

12     A.    Um-hum.  (Indicating affirmatively.)

13     Q.    -- you know, for the electrodes, in that

14 circumstance what your understanding of the difference was.

15         If you got direct contact in one case and you said

16 it was working just fine and the reports from the field were

17 coming back that it wasn't working in some circumstances, I'm

18 trying to get a handle on what the difference was compared to

19 the direct contact.

20     A.    The difference was, as I mentioned, was that

21 apparently there wasn't enough energy if they were wearing

22 heavy clothing and it had to arc and that it felt more

23 shocking than reaching deep into the tissue of the muscles to

24 be able to override the signals of the muscle.

25     Q.    When you say "thick clothing," what qualifies as

1    Q.    Did the meeting where you told him that you needed

2  the feature and you didn't want to infringe on any

3  patents take place before the prototype that was released in

4  November of 2006 was ready?

5    A.    I'm sure it did.

6    Q.    It took place before then?

7    A.    Yes.

8    Q.    What patents were you concerned about?

9    A.    We looked at -- I looked at them broadly in high

10  level and Tom looked at them in great detail.  All of TASER's

11  patents -- we want to go into the business and we know, from

12  my perspective, that TASER is a litigious company and we

13  wanted to avoid any litigation.

14        And so I just wanted to make sure that we had a

15  very, very clear path of not infringing on any patents and

16  that was -- that was probably the first and foremost thing

17  that we had to do.

18    Q.    Did Mr. Saliga report back to you on the

19  instructions not to infringe on any patents after this

20  meeting?

21    A.    Multiple times.

22    Q.    When you say "multiple times," you mean --

23    A.    Well, he would have -- he read TASER's patents and

24  obviously had concerns about how to design things properly.

25  And so I do recall specifically from the waveform that he had

*C O N F I D E N T I A L*                                        83

1    a eureka moment, because he called me on a Sunday night.

2          And he said, "I have got something and it's better

3    than TASER by a mile and it doesn't infringe on their patent."

4    And so we then talked with him the following week about that.

5          And we had discussed the TASER patents from the

6    waveform, the LED lights, and from the data collection, and we

7    wanted to make sure that there was no chance of violation of

8    the patent.

9          And, quite frankly, from a pride standpoint, we

10   really kind of thought TASER's technology was kind of

11   antiquated and we didn't -- we thought it was kind of -- why

12   would you make another Chevy Vega when you could make

13   something better?

14        Q.    This telephone conversation that you're

15   recollecting of Mr. Saliga where he had a eureka moment on the

16   waveform and said you had to do it without infringing on

17   TASER's patents, when did that take place approximately?

18        A.    I don't remember.

19        Q.    Would it have been before the prototype was ready in

20   November of 2006?

21        A.    Oh, sure.  Yes.

22        Q.    You also mentioned that there was a discussion about

23   patents related to a battery light, correct?

24        A.    No.  I said LED and data collection.

25        Q.    Okay.  Excuse me.  Let's take those one at a time.

1    circuitry and new switching technologies, Tom believed -- he

2    was first very challenged not to circumvent the TASER patent.

3    That's when he was very challenged by it, and that's when he

4    had his eureka moment.

5            And the funny thing, I guess he was laughing, why

6    part of it, I remember him coming back and telling me that

7    conversation, because the quantum flyback technology basically

8    originates back -- I think he said something like the 1940s

9    from an old television technology, something like that.

10           And he said now because of the way -- microcircuitry

11   and we can control the output of the flow of the energy, that

12   we're not going to need this.

13           And, forgive me, it's kind of a high-level overview,

14   but the way Tom described it was TASER's technology basically

15   just kind of holds all of this energy in a capacitator and

16   then just kind of dumps it out ineloquently, because it just

17   kind of holds what it can and then dumps it out.

18           And he said, and because of that, I think you refer

19   back to that old spike in that, in one of the earlier

20   exhibits, that you could actually just kind of -- kind of see

21   it kind of pushing the sides the balloon and all the air comes

22   out.  In this case it would be the energy, and then that

23   energy would dissipate very quickly.

24           And what Tom had said was the biggest challenge --

25   when we first met Tom, he said I can make you a stun gun just

1   as effective as TASER's quite easily, except I can't make it

2   that small.  The challenge was the size.  He said anybody can

3   make a stun gun if you want to make it the size of a coffee

4   can.

5            And the challenge that he had was to date the only

6   methodology to be able to create a stun gun with effective

7   takedown power in a package as small as TASER's was to do

8   it the TASER way; by having this large bank of capacitators to

9   just dump the energy.

10           And Tom -- and when Tom had his eureka moment, if

11  you will, he realized that that was really archaic,

12  ineloquent.

13           And whether or not we stumbled on it, whether or not

14  he's brilliant, or both, we were fortunate enough to realize

15  saying, Oh, my God, we've got something that cannot only take

16  people down, but it's better than TASER's, and why would he

17  possibly want to possibly infringe on this stuff.

18           And what he basically said was we can use this

19  flyback technology where the energy flies back to the

20  transformer and we can control it with -- he calls it an

21  IGBIT, which is some acronym for a microcomputer, but the

22  microcomputer can -- and IGBT is I-G-B-T -- I don't know what

23  that stands for, but he said that IGBT will then control the

24  outflow of the energy and in a -- and better yet, he can

25  program through software the ability to control those

1      Q.    -- from Mr. Saliga to you, correct?

2      A.    Yes.

3      Q.    And the subject line reads:  "Stun Gun White Paper

4   Corrected '26' Oversight"?

5      A.    Yes.

6      Q.    And there's a reference to the white paper number

7   SS-WP11-rev H?

8      A.    Yes.  Yes.

9      Q.    You're familiar with that white paper?

10     A.    Yes.

11     Q.    Is the draft -- the updated draft of this E-mail

12   attached behind it from pages 1825 through 1820?

13     A.    Yes.

14     Q.    Did you ask Mr. Saliga to prepare this white paper?

15     A.    Yes.

16     Q.    What was the purpose?

17     A.    People wanted to understand from a semi-technical

18   perspective our technology and the difference between our

19   technology and our competitors.

20     Q.    When you say your technology, you're referring to

21   the way that the S-200 is designed and operates --

22     A.    Yes.

23     Q.    -- compared to TASER's products?

24     A.    Yes.

25     Q.    It appears to me from an E-mail earlier in the chain

*C O N F I D E N T I A L*                    147

1    down on the bottom of the page that you ask Mr. Saliga to

2    change a typo that had appeared in an earlier version of the

3    draft from X-46 to --

4          A.    Yes.

5          Q.    -- to X-26?

6          A.    Yes.

7          Q.    And from M-46 to M-26?

8          A.    Yes.

9          Q.    And that was because that's what the paper was

10   supposed to be addressing, was the actual laser products?

11         A.    That would be correct.

12         Q.    All right.  How did this white paper get used?

13         A.    I'm not sure it was used extensively.  There was, if

14   I recall, some editing here.  There was some -- I guess some

15   marketing inaccuracies for fear of being used by TASER, which

16   I think were cleaned up.  I can't recall what they were

17   specifically, but I believe it was mostly for our

18   distributors.  We sent it to our distributors so that they

19   could understand our technology.  If anybody had requested a

20   white paper, gave it to our sales individuals.

21         Q.    So the white paper was prepared and then, in fact,

22   used to answer technical questions that people out in the

23   field might have from time to time?

24         A.    I don't know if they were technical -- potentially

25   technical questions or just why is your waveform different,

1    how does your gun work.

2        Q.    But the white paper was supposed to answer those

3    questions about the S-200, correct?

4        A.    I don't know if it did or didn't.  It was an -- at

5    least an attempt to.

6        Q.    Do you think it did a pretty good job?

7        A.    I think to some it did.  To some, I don't think they

8    wanted to read a paper that's very long.

9        Q.    You were satisfied with it?

10       A.    Yes.

11       Q.    In fact, you thought it was good?

12       A.    I thought it was adequate.

13       Q.    I want to direct you to the first page of the white

14   paper itself, which ends in the production number 1825.  Are

15   you on that page?

16       A.    Yes.

17       Q.    Under the introduction there is a heading that says

18   "*Separating the Men from the Boys.*"

19       A.    Yes.

20       Q.    "*Separating the Men from the Boys,*" I take to be a

21   reference to the fact of separating a stun gun device that

22   works well from those that don't?

23       A.    I never interpreted it as that.

24       Q.    And what is the reference to the "Men" and "Boys"?

25       A.    I kind of -- I always interpreted it as the advanced

CONFIDENTIAL                          196

1   dart where upon the fish hook -- working through the dart
2   body, we would not only swedge it in, we would flatten the
3   back end of it and then bend it so it would virtually make it
4   impossible to pull the hook out.   So the NIJ study was highly
5   misrepresentative.

6        Q.   There is a reference to the darts that's at the
7   beginning of the fourth paragraph down from that heading.  It
8   says, "Trajectors have changed drastically."  What trajectors
9   are you referring to?

10       A.   Of the flight patterns.  As it said there, of all of
11  the issues that I had mentioned previously of the components
12  that go into a dart, that the thing that police officers want
13  the most is consistency in flight patterns and trajectories, and
14  that we worked on modifying all of those internal components
15  to create a much more consistent dart trajectory.

16       Q.   I'd like you to turn, if you could, to the white
17  paper which is attached to your letter which got incorporated
18  into the NIJ study.

19       A.   Yeah.

20       Q.   It begins at 004631.  Did you ask Mr. Saliga to
21  prepare the white paper in connection with your plans to
22  respond to the DOJ -- or, excuse me, to the NIJ study?

23       A.   No.  As you saw in some previous E-mails, the
24  initial draft he sent me was in December of 2007, and I didn't
25  even know about the NIJ study until January.

*C O N F I D E N T I A L*                              197

1      Q.    So this white paper had been used by Stinger Systems

2   prior to your sending this letter?

3      A.    I don't know if it was used, because the gap in time

4   was fairly close, but was used thereafter, but it was created

5   before my knowledge of the NIJ report.

6      Q.    Did you make the decision to include it in your

7   letter?

8      A.    Yes.

9      Q.    When you sent the letter to the NIJ, did you have

10   the expectation that they would include your comments in their

11   report?

12      A.    No.  As a matter of fact, I had called Marc Caplan

13   and he and I had had some words and the -- and I was just

14   disgraced that the NIJ would -- the methodology that they

15   employed.

16          And I found out that Florida Gulfcoast University

17   was in a rush to do -- the original NIJ study was a grant to

18   compare the S-400, the old gun, and Charlie Meslow kept

19   calling me, and I said I will not give you that gun because

20   we're going to discontinue it.

21          He incessantly called me and wanted a gun.  And I

22   called Charlie and I said, "Charlie, we have the first

23   prototype available."  That was in November.

24          He came up in December with his grad student and

25   I -- as it turned out, he wanted it rush to get his grad

# Exhibit 4

C O N F I D E N T I A L                                        1

COPY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA


1

2

3      TASER International, Inc.,        ]
                                        ]
4           Plaintiff,                  ]
                                        ]
5      vs.                              ]    CASE NO.
                                        ]  CV07-0042-PHX-MHM
6      Stinger Systems, Inc.,           ]
                                        ]
7           Defendant.                  ]

8
                        **VIDEO TAPE**
9            **DEPOSITION OF THOMAS V. SALIGA**

10

11     DATE:          Wednesday, August 27, 2008

12     TIME:          9:00 a.m.  -  4:50 p.m.

13     PLACE:         Johnson & Associates
                      Court Reporters, Inc.
14                    620 East Twiggs Street
                      Suite 110
15                    Tampa, Florida  33602

16     PURSUANT TO:   Notice, upon oral examination

17     PURPOSE:       Of discovery, for use at trial
                      or for such other purposes as
18                    are permitted under Rule 45 of
                      the Federal Rules of Civil
19                    Procedure

20     REPORTED BY:   CATHY J. JOHNSON MESSINA, RMR, FPR
                      Registered Merit Reporter
21                    Florida Professional Reporter
                      Notary Public, State of Florida
22                    MEMBER:  NCRA, FCRA, STAR

23

24

25

CONFIDENTIAL                                    5

1          THE VIDEOGRAPHER:   This is the deposition of

2     Mr. Thomas Saliga in the case stylized TASER

3     International V Stinger Systems on August 27th at

4     9:00 o'clock a.m.

5          Will the parties please introduce themselves?

6          MR. MATZ:  Aaron Matz on behalf of Plaintiff.

7          MR. CAMPBELL:  I'm Chad Campbell also from the

8     same firm on behalf of Plaintiff TASER.

9          MR. HARRIS:  Ray Harris on behalf of Defendant

10    Stinger Systems, Inc., and if you'll have me, on behalf

11    of the witness, Tom Saliga.

12         THE VIDEOGRAPHER:  The time is 9:05 a.m., and we are

13    on the record.

14         THE COURT REPORTER:  Do you swear or affirm that

15    the testimony that you are about to give will be the

16    truth, the whole truth and nothing but the truth,

17    so help you God?

18         THE WITNESS:  Yes.

19                    DIRECT EXAMINATION
                  By Aaron Matz, Esquire
20

21    Q.    Morning.  Could you please state your name and

22    address for the record?

23    A.    Tom, or Thomas, Saliga; business address, 12918

24    Commodity Place, Tampa, Florida.

25    Q.    What is your present occupation?

*C O N F I D E N T I A L*                    6

1     A.    Owner and chief engineer of a company called

2   Electronic Design Associates.

3     Q.    You had your deposition previously taken in this

4   case; is that correct?

5     A.    Yes.

6     Q.    Do you recall when that was?

7     A.    Not exactly.  Earlier this year, whenever.  I don't

8   know.  There was something we did out in Phoenix and then

9   there was another deposition, I think, before that.  I don't

10  remember when, though.

11    Q.    Does May 2nd, 2008, sound about right?

12    A.    It sounds about right.

13    Q.    And do you recall at your previous deposition that

14  you and I went over some basic ground rules for how

15  depositions are conducted?

16    A.    I do recall we went over something, yes.

17    Q.    Do you feel comfortable with those rules?

18    A.    I don't recall what they all were right now.

19    Q.    Would you like a --

20    A.    Quick summary, sure.

21    Q.    Because the court reporter's going to be taking down

22  everything we say, it's important that we try not to talk over

23  one another.

24          So, please, try to let me finish my question before

25  you answer, and I'll try to let you finish your answer before

CONFIDENTIAL                                    12

1      Q.    In general terms, what is the S-200 gun?

2      A.    It's a stun gun which fires darts and is designed

3  for the intention of incapacitating some subject.

4      Q.    Do you recall when the relationship between EDA and

5  Stinger first began?

6      A.    It's been a couple of years now.  I don't know.

7  What is it, 2006?  Maybe -- I think they approached us in

8  something like late spring of 2006, as I best recall, and

9  indicated that they had a -- some existing stun gun and they

10  wanted to make a smaller version to better compete in the

11  marketplace.

12      Q.    Did they contact you directly?

13      A.    They -- they had like some outside technician-level

14  fellow -- I forget his name right off the top of my head --

15  that apparently contacted me first and then he, in turn, was

16  instrumental in bringing us together.

17      Q.    And after you were brought together by this tech

18  fellow, who was your primary contact at Stinger?

19      A.    Well, initially it was this tech fellow actually.

20  Then -- then as time went on, I would say Bob Gruder and the

21  tech fellow.  And then as further time went on, the tech

22  fellow kind of dropped out and it was probably Bob Gruder and

23  Wayne Thomas.

24      Q.    Do you know what Bob Gruder's position is at

25  Stinger?

1   recall specifically again when that would be.  Hopefully, much

2   of it would be in the engineering revision record that you

3   already have.

4        Q.   At this point in time, is that high voltage

5   transformer design finalized?

6        A.   I would say it's been finalized for pretty much the

7   past year.

8        Q.   So roughly summer to late summer of 2007 is when it

9   was finalized?

10       A.   Probably -- I would probably -- approximately say

11  yes.

12       Q.   Okay.  During the course of your design work on the

13  S-200 gun, did you ever examine any TASER product?

14       A.   Well, I think I mentioned this in your earlier

15  record, that it never occurred to me, to be honest, to even

16  look at TASER or any other patents in the marketplace.

17            In fact, after I came out with the quantum flyback

18  technology principle that summer of 2006, one of my engineers

19  said, "Oh, you know, I think I saw a patent on-line somewhere

20  that TASER has."

21            And I said, "Holy shit.  I didn't even think about

22  looking at the intellectual property record."

23            And so it was about a week after that that we --

24  that I asked my associate engineer to download whatever

25  patents he could get his hands on, and that's when I first

C O N F I D E N T I A L                    20

1   started looking at it to see what TASER actually had at that

2   point in time.

3           I reviewed it and I didn't see any fundamental

4   problem, because y'all had this dual mode thing and that's not

5   the way ours worked.

6           So anyway, after that there was a time where the gun

7   was brought to answer that directly to our facility.   It was

8   shipped to us by somebody somewhere.   It's not like -- it's

9   not like Bob Gruder dropped it off.   Somebody shipped it in

10  for an evaluation, so I just did an A-B comparison of the

11  TASER under our simulated load that we created versus ours.

12          Q.   Returning to your review of the TASER patents that

13  you had your associate get for you, do you have an approximate

14  date for when that occurred?

15          A.   It would have been later summer of 2006, I believe.

16          Q.   Do you recall whether your associate downloaded

17  patents only, or patents and published patent applications?

18          A.   No.   He would have only -- in fact, the only patent

19  I ever saw initially was one for -- I guess it was the dual

20  mode X-46.   I'm not aware of the others.   I felt like that

21  wasn't my job, I mean to research all that out.   I was never

22  asked to do that, quite frankly, and I was just doing it for

23  curiosity to make sure we didn't miss any major points.

24          Q.   The dual mode patent that you just described, do you

25  recall a patent number?

1    A.   Well, no, not right of the top of my head, but it's

2    whichever one basically describes that X-46.  And as I recall,

3    most all of the major claims, independent claims, talked about

4    a dual mode of operation.

5        Q.   Are you aware of a TASER product called the X-26?

6        A.   Yeah, I'm aware of it.

7        Q.   Do you know whether there is a difference between

8    the X-26 and the X-46 that you've been referring to?

9        A.   Yes, I am aware that there's a difference.  I don't

10   recall whether I saw it in the patent record or wherever, but

11   as I recall, the X-26 is just a big, ghastly, single-pulse,

12   very short, narrowed pulse instrument similar to the original

13   technology that Stinger had whereas the X-46 has this dual

14   mode thing.

15        So, yeah, as I recall, there is a substantive

16   difference in the underlying technology between the two

17   guns.

18        Q.   Have you ever heard of a TASER product called the

19   M-26?

20        A.   Well, maybe one is called the M-26 or X-26.  I don't

21   know.  That's the only two guns that I'm aware of that I ever

22   heard about, one of which is the X-46 -- actually I think it's

23   the X-46.  Is it X-26 or 46?

24        Q.   X-26 is the --

25        A.   I'm sorry.  I'm sorry.  I don't remember the stuff

C O N F I D E N T I A L                          22

1   because it's been quite awhile.  Anyway, I guess the X-26 is a

2   model and then an M --

3       Q.   M-26, which is the older product; and an X-26, which

4   is the newer TASER product?

5       A.   26, not 46?

6       Q.   Correct.

7       A.   I'm sorry.  I just didn't recall that correctly.

8   Yeah, but as I recall, a big difference was single-pulse, huge

9   pulse, versus stretched out pulse.

10      Q.   You mentioned that a TASER product was shipped in to

11  EDA?

12      A.   Um-hum.  (Indicating affirmatively.)

13      Q.   Do you recall when that was?

14      A.   I would -- best recollection I have is somewhere

15  around the spring of 2007, so about a year later.

16      Q.   But you don't know exactly where it came from?

17      A.   It was an Ohio address.  I didn't recognize who,

18  what, when, whenever.

19      Q.   When you received that TASER product, was it packed

20  in its original packaging?

21      A.   I remember a cardboard box and my technician taking

22  it out and putting it on the bench.  I'm not really sure, to

23  be honest.

24      Q.   Do you know whether that cardboard box had any

25  pictures on it?

1       A.   It was just a brown -- you know, standard, brown

2   shipping box.  That was all I really saw.  And then when I got

3   done testing it, I told them to ship it back, and I never

4   really got involved with it.

5       Q.   Do you know whether it was the newer TASER device

6   that is the X-26, or on the other hand the older TASER device

7   that is the M --

8       A.   It was the newer one.

9       Q.   Okay.  And can you describe the testing or

10   examination that you did with that product before you shipped

11   it back?

12       A.   Yeah.  Basically it was on the bench, electrical

13   testing with simulated loads.

14       Q.   And did you measure the output waveform with

15   an oscilloscope?

16       A.   Yes.

17       Q.   Did you take any other measurements?

18       A.   No.

19       Q.   Did you examine the gun's housing at all?

20       A.   Externally, yes.

21       Q.   Did you notice whether there were any patent numbers

22   marked on the gun's housing?

23       A.   To be honest, I didn't really pay attention to that.

24   We figured we already knew you had a patent on it, because I

25   had seen it before that point in time, so I didn't make a

1  point to study that.

2      Q.   Did you measure any other parameters of the gun; for

3  example, its size, its weight?

4      A.   I never thought to weigh it, to be honest.  So -- I

5  mean other than I took a picture of it side by side with the

6  Stinger System gun's outline, but I can't say I actually took

7  a micrometer to it and made measurements.

8      Q.   Did you examine the battery module at all?

9      A.   I did pull out the battery module.  There wasn't

10 much to see other than some module and some contacts on it.  I

11 didn't spend any time on it other than, okay, there is the

12 battery module.

13     Q.   And if I understand your testimony, you didn't

14 examine the internals of the gun at all?

15     A.   No, not -- did not take it apart.

16     Q.   Do you recall roughly when you shipped it back to

17 the Ohio address from where it came?

18     A.   I had it less than a week, so if that helps.

19     Q.   And is that the only time that you have ever

20 examined a TASER product?

21     A.   There was one more time I remember asking when we

22 were getting into these issues of specifications where I said,

23 well, I really didn't have enough data that I took on this

24 first pass, so I was able to get another one of those guns

25 later.  I don't recall if it was late -- it had to have been

1   probably late maybe fall or early winter of 2007.

2        Q.   You don't recall where you got that second gun?

3        A.   No.   That -- again, they ship it in.   I asked my

4   guys to set it up on the bench and I go out and do my

5   measurements and tell them to ship it back, so I don't know

6   where that came from.

7        Q.   Did you ask somebody to get you the gun?

8        A.   I asked Bob Gruder.   I said if I'm going to, you

9   know, get additional comparative measurements I need to get

10  ahold of a gun again because I didn't take enough data on the

11  first pass.

12       Q.   When you received that second gun, what sort of

13  examination did you do with it?

14       A.   Just an electrical test, not already -- you know,

15  just an electrical test.

16       Q.   You basically did the same type of testing that you

17  had done with the first gun?

18       A.   Yeah, except I was better equipped this time.   I had

19  a full recording oscilloscope that would directly compute

20  jewels of energy and so forth.

21       Q.   Did you send that second gun back at some point?

22       A.   Yeah.   Again, I only had it for a few number of

23  days, just long enough to make some measurements and told them

24  to ship it back.

25       Q.   And following -- when you shipped back that second

1   gun, have you ever looked or examined another TASER product

2   after that point?

3        A.    Not that I recall.  I only recall two instances

4   where I was making measurements, to be honest.  It's possible

5   there's -- I remember -- I don't remember if I had my hands on

6   an M-26 or not.  It's possible he brought one of those in one

7   day and I made some quick measurements.

8        Q.    Would that have been before or after you had

9   measured --

10       A.    This would have been in 2007 sometime, because I do

11  remember getting my hands on one, and I took it out to the lab

12  and made some like just very quick measurements and said,

13  "Holy cow, what a monstrous pulse," you know.

14       Q.    So you definitely did have an M-26 at some point?

15       A.    I did, yeah.  I didn't make real formal measurements

16  on it.  I just took a quick look at it, because it was being

17  just brought in and literally brought out again.

18       Q.    You didn't do any destructive testing on it?

19       A.    No.  No.

20       Q.    Did you examine the housing of the M-26?

21       A.    Not in any substantial way other than it was black

22  and bigger.  I didn't make any measurements because, at least

23  at the time it was my understanding, you know, that that's not

24  the competitive product that we're concerned with.

25       Q.    Did you look to see if there were any patent numbers

C O N F I D E N T I A L                                      27

1    marked on the housing?

2         A.    No, I didn't.

3         Q.    In the stack in front of you there, there should be

4    an Exhibit 11 that was previously marked.

5         A.    Okay.

6         Q.    Have you seen this document before?

7         A.    No, not that I recall.

8         Q.    Okay.  Could I have you turn, please, to Exhibit A

9    of Exhibit 11?

10        A.    Okay.  (Witness complying.)

11        Q.    Can you identify this document, Exhibit A?

12        A.    Well, it looks like the one that I referred to

13   earlier as being the X-26 related patent.  That's the one that

14   I really first looked at and told you I didn't look at

15   anything else for quite some time after that summer of 2006

16   incident.

17        Q.    This is United States Patent 6999295; is that

18   correct?

19        A.    Yes, sir.

20        Q.    Do you recall when you asked your associate to

21   search for TASER patents in the summer of 2006 what exactly

22   you told him to search for?

23        A.    Just, you know, find out what TASER has that would

24   be, you know, related to guns, and that was the one he brought

25   up to me.  I don't recall any others at the time at least that

C O N F I D E N T I A L                 28

1    were identified.

2          We were so darn busy doing so many other projects, I

3    just didn't have time to spend on this stuff, and he wasn't

4    paying me to review other people's patents, so I just scanned

5    it, frankly, and went on with life.

6          Q.   Do you know how your associate conducted his search

7    for TASER patents?

8          A.   He said he went to the United States Patent Office

9    website and did a search on TASER, I guess, and --

10         Q.   This is -- I'm sorry.  Go ahead.

11         A.   -- and this was the one patent that he presented to

12   me.

13         Q.   Do you recall the name of your associate who

14   conducted the search?

15         A.   Yeah.  His name is Jorge Campos.

16         Q.   Is he still currently employed by EDA?

17         A.   Yes.

18         Q.   And your understanding, if I've understood your

19   testimony correctly, is that he went to the U.S. PTO website

20   and he searched for issued United States patents assigned to

21   TASER; is that correct?

22         A.   Yes.

23         Q.   And the first time that you saw this document,

24   Exhibit A, was when Jorge Campos presented it to you in the

25   summer of 2006?

*C O N F I D E N T I A L*                    29

1        A.    Yeah.  As I recall, it was about a week after I had

2   done this quantum flyback technology presentation to

3   Mr. Gruder.

4        Q.    Would you turn, please, to Exhibit B to Exhibit 11?

5        A.    (Witness complying.)

6              MR. HARRIS:  It will be page 39 of 108 at the

7        bottom.

8   (Continuing)

9        A.    There's so many documents here.  This is all just

10  the patent right up here.  So you're saying there's an Exhibit

11  B here somewhere.  I see E.  Okay.  D -- is it a patent I'm

12  looking for or is it a --

13       Q.    Yes.

14       A.    Okay.  Let me tab this thing.

15       Q.    As Mr. Harris mentioned, if you look in the lower

16  right-hand corner there are some page numbers and it begins at

17  page 39 of 108.

18       A.    Oh, that's how it works.  Okay.  All right.  Thank

19  you.  Got it.

20       Q.    Have you seen this document before?

21       A.    Yes.  Yes, I have.

22       Q.    Can you identify this document?

23       A.    It's the patent 7,102,870.  It looks like it was

24  issued in September of 2006.

25       Q.    And it's assigned to TASER International,

1    Q.    Can I have you draw an arrow on the exhibit in front

2  of you and point to the portion on the oscilloscope trace that

3  you've just described?

4    A.    Well, why don't we just talk in terms of divisions?

5  If you look at the oscilloscope trace, you'll see there's ten

6  divisions sort of roughly one centimeter or less apart.

7    Q.    Okay.

8    A.    So the third division is when the first arc takes

9  place for both the TASER as well as the QFT gun.  I tried to

10  put them in alignment for the purposes of this display.

11    Q.    At the point that those two air gaps arc over, can

12  you tell what the voltage is on the QFT-2 waveform?

13    A.    No.  It's just a wave above a thousand volts.

14  That's as high as I could measure at that point.

15    Q.    Based on your personal knowledge, do you have an

16  opinion as to how high that voltage would be?

17    A.    Whatever it takes to arc over the air gap, probably

18  three, four thousand volts, maybe five, maybe a little higher,

19  but it's very quick, very quick, when it discharges that first

20  spark.

21    Q.    And then referring to the subsequent four pulses

22  that are shown there, are those at a lower voltage?

23    A.    Yes.

24    Q.    Is the X-26 waveform that's shown on this

25  oscilloscope trace -- do you know when that was captured?

1  and Dave Philbrook, dated September 10th, 2007?

2      A.    Yes.

3      Q.    Do you recognize that as an E-mail that you sent?

4      A.    Yes.

5      Q.    Who is John Belna?

6      A.    He would be the engineer of the manufacturer of the

7  high voltage transformer.

8      Q.    Do you recall the name of that manufacturer?

9      A.    I should, but I don't right now.  They're over in

10  Deland, Florida.  I don't recall.

11          MR. HARRIS:  Does the name REF Technology --

12          THE WITNESS:  Thank you.

13  (Continuing)

14      A.    Okay.

15      Q.    Okay.  I'd like to direct you to the second

16  paragraph of that E-mail which begins:

17          "John, in the 'new' gun's operation, T2 operates

18      first as a flyback spark coil to start an ionization

19      trail (typically with three short pulses of 115 vdc) and

20      then it drives current to the 'load' once this conducting

21      trail is established."

22          Do you see that.

23      A.    Um-hum. (Indicating affirmatively.)

24      Q.    What did you mean to describe in that sentence?

25      A.    Basically the way a flyback system works.  The first

C O N F I D E N T I A L                                      69

1    few pulses typically may have to generate a very high voltage

2    to establish a load conductance path to the target and then

3    once the air is ionized then it continues to, you know, supply

4    energy through direct primary drive of the transformer.

5         Q.   Referring to your answer there, when you said "low

6    conductance," did you mean low impedence?

7         A.   Yeah.

8         Q.   And looking back at the sentence that we just

9    discussed, as of September 10th, 2007, the date this E-mail

10   was sent, did that sentence accurately characterize the

11   operation of the S-200?

12        A.   Well, from the standpoint of the guy having to

13   design a transformer, I would say it's representative, yes.

14        Q.   Is there some sense in which it was not

15   representative?

16        A.   Well, I didn't -- I didn't detail him with, you

17   know, the pulse rates and necessarily how far apart each of

18   the pulses were spaced and so forth.  I didn't think he needed

19   to know that.

20        Q.   Accepting that you left out some of the detail of

21   the operation, is there anything inaccurate about that

22   sentence with respect to the operation of the S-200?

23        A.   Well, as far as it goes, as far as what's stated, I

24   think it's reasonably technically accurate.

25        Q.   Is there any way you can make it more accurate?

C O N F I D E N T I A L                    70

1     A.    Oh, well, yeah, that and all the other details we
2  had here.
3     Q.    In the first part of that sentence you refer to the
4  "new gun's operation."  Do you see that?
5     A.    Yes.
6     Q.    What did you mean by the "new gun"?
7     A.    Well, we keep having revisions, which you have a
8  complete history of, okay, and we changed the terms ratio and
9  I think the insulation thickness of the bobbin, as I think was
10  disclosed earlier.
11     Q.    Okay.  In moving ahead just a bit in that sentence,
12  it says:
13         "T2 operates first as a flyback spark coil to start
14     an ionization trail."
15         Is T2 the output transformer of the S-200?
16     A.    Yes.
17     Q.    What is a flyback spark coil?
18     A.    The same thing that's in your car since 1910 when
19  they first started having spark coils in cars.  It's basically
20  a transformer flyback.
21     Q.    Is flyback -- is that a term of art?
22     A.    Um-hum.  (Indicating affirmatively.)  Yeah.  It's
23  been around at least before I was a kid.
24     Q.    And what is an ionization trail that's started by
25  that flyback spark coil?

1    A.    Well, it's the one that we had a lot of discussion

2  on.  It's a previous thing out in Phoenix.  That's where the

3  voltage gets high enough between a -- across an air gap to

4  begin a crescendo of ionization and break down so you

5  establish a lower impedence or a lower conductance path

6  between the two conductors and an air gap.

7    Q.    Just to clarify your answer, is it a lower impedence

8  path or a lower conductance path?

9    A.    The more general term is impedence since it refers

10 to resistance capacitance and than conductance, but let's just

11 call it impedence, if you prefer.

12   Q.    Okay.  And reading further in that same sentence:

13       "After T2 operates in that first mode as a flyback

14     spark coil, then after that it drives current to the load

15     once this conducting trail is established."

16       Correct?

17   A.    Yes.

18   Q.    And then the next sentence says:

19       "T2 thereafter operates as a direct-drive, power

20     pulse-transformer dumping pulse energy into a nominal

21     650 ohm load."

22       What is a direct-drive power pulse-transformer?

23   A.    It's just -- it's just not operating necessarily --

24 it's not having to kick the voltage up so it just -- as you

25 continue to pulse the primary, the energy is substantially

C O N F I D E N T I A L                    72

1    delivered while you're pulsing the primary, and, hence, it's

2    directly driving the load.

3         Q.    In-between those two modes of operation there,

4    flyback spark coil which starts the ionization trail and

5    direct-drive power pulse-transformer, which dumps pulse energy

6    into the nominal load, those are two distinct operations of

7    the T2 transformer; is that correct?

8         A.    Well, it's just a classic flyback circuit.  You

9    know, you drive energy into the primary and the output does

10   whatever it's got to do to, you know, conduct a conductive

11   path.  It's still the same transformer.  It's still the same

12   pulses driving the primary.

13        Q.    Is it fair to say it's operating in two different

14   modes?

15        A.    It's fair to say that the way the load current --

16   the load voltage is created by that flyback circuit that it

17   has two different personalities.

18        Q.    "Personality" the same as mode?

19        A.    Not really.

20        Q.    What's the difference?

21        A.    Well, if you have a mode, at least in my art, okay,

22   a mode refers to that you have like a separate circuit or a

23   separate -- in other words, you've purposefully created a

24   circuit, for example, or a software behavior that switches

25   from first one way of operating to a completely different way

C O N F I D E N T I A L                        81

1   to Stinger Systems?

2       A.    Yes.

3       Q.    Could I have you turn to the second page of the

4   document of the tech memo, I should say of the page which ends

5   423?

6       A.    (Witness complying.)   Yes.

7       Q.    Toward the top of the page there there's a paragraph

8   that says:

9           *"The following guns were tested."*

10          And then it lists:

11          *"An S-400 (two guns); lab versions of S-200*

12      *operating with the three waveforms and two battery*

13      *voltages; and a TASER X-26 gun."*

14          Do you see that?

15      A.    Yes.

16      Q.    In preparing this tech memo, did you do lab tests on

17  various guns described there?

18      A.    Yes.

19      Q.    And you testified a little bit earlier that during

20  the course of developing the S-200 you received and had access

21  to at different times two TASER X-26 guns; is that correct?

22      A.    Well, I've always only had one at a time, if, that's

23  what you meant.   There were two different times that I recall

24  having received one for evaluation for a brief period of time.

25      Q.    Okay.   And the TASER X-26 gun referred to here, do

C O N F I D E N T I A L                82

1   you know whether it's the earlier of the two or the later of

2   the two?

3       A.    I'm -- wait a minute.  Of which gun?

4       Q.    Let me try again.

5             You had access at different times to two different

6   TASER X-26 devices; is that correct?

7       A.    Yes, that's what I recall.

8       Q.    Okay.  At the top of the page ending 423 on

9   Exhibit 28 in front of you there is a reference to a TASER

10  X-26 gun.

11            And my question is:  Do you know which of the two

12  X-26 guns that you had access to that that refers to?

13      A.    Probably would have been the first time.

14      Q.    Okay.  Beneath that paragraph we were just

15  discussing is a table headed "Measured Results."  Is that

16  correct?

17      A.    Yes.

18      Q.    Were those results in that table obtained by

19  measuring the outputs of the guns listed in the table?

20      A.    Yes, but with whatever equipment I was able to

21  garner at the time.

22      Q.    And referring to the row of the table that

23  corresponds with the TASER X-26, there are a couple of

24  measured parameters there:  "Net DC mA of 2.1 mA, and rep rate

25  of 18 pps."  Do you see that?

1      A.    Just as a wild guess, six maybe.

2      Q.    Do you have an idea of the period of time over which

3  he filed those?

4      A.    I think I first started using them in '92, 1993, so

5  it's been awhile.

6      Q.    Is he based here in Florida?

7      A.    Yes.

8      Q.    And still on the first page ending 586 the filing

9  date of this application, according to this page, is May 10th,

10  2007; is that correct?

11      A.    Yes.

12      Q.    Did you draft any of the written portion of this

13  patent application?

14      A.    As best I recall, I gave Dave a set of diagrams and

15  a good verbal description, and I think he pretty much

16  generated all the words.  And then I, you know, went through

17  and edited it later.

18      Q.    Did you give it a final review before

19  Mr. Kiewit filed it with the patent office?

20      A.    I'm sure I would have, yes.

21      Q.    And did you make any changes as part of that review?

22      A.    Probably.

23      Q.    Do you know whether this application has been issued

24  as a United States patent?

25      A.    I have no idea.  I signed it over to Stinger

C O N F I D E N T I A L                                    88

1   Systems, and that's the last I know of it.

2       Q.   All right.  Could I have you turn to the last page

3   of the document which ends 623?

4       A.   (Witness complying.)

5       Q.   Are you there?

6       A.   Yes, sir.

7       Q.   Is this the Assignment to Stinger Systems that you

8   just referred to?

9       A.   It looks like it, yes.

10      Q.   Is it customary for you in your work at EDA to

11  assign inventions that you come up with to clients of EDA's?

12      A.   Sometimes yes; sometimes no.

13      Q.   Does it just depend on the client?

14      A.   Yeah, and how much the novelty of it was done by

15  myself without any funding on their part.

16      Q.   Referring to this Application, how much of the

17  novelty of it would you say was done by you?

18      A.   Pretty near a hundred percent.

19      Q.   Turning back to that last page there, 623, the third

20  paragraph down begins:

21          *"Now, therefore, for and in consideration of one*

22          *dollar and an option to purchase up to 50,000 shares of*

23          *stock of Stinger Systems, Inc., at a cost of eighty*

24          *cents,"* et cetera, et cetera.

25              Do you see that?

C O N F I D E N T I A L                    90

1     A.    Yes.

2     Q.    Was that your signature below it there?

3     A.    Yes.

4     Q.    As you sit here today, are you familiar with the

5  inventions that are disclosed in this Application?

6     A.    Well, reasonably so.

7     Q.    Does this Application accurately represent or

8  disclose any aspect of the S-200 stun gun?

9     A.    Yes.

10    Q.    Which aspect or aspects does it disclose?

11    A.    The fundamental operation.

12    Q.    And does it relate to a specific version of the

13 S-200 stun gun, or does it relate generally to the S-200 stun

14 gun?

15    A.    I would -- well, let's put it this way:  There is a

16 figure four that represented a version or a particular

17 schematic of a gun that existed I would say in late 2006,

18 early 2007.  There's been a few changes since then, but it's

19 still substantially the same.

20    Q.    Can you describe what those changes are in reference

21 to figure four?

22    A.    Yeah.  The primary change is at -- the diode network

23 was changed somewhat.

24    Q.    How was it --

25    A.    It's referred to as item 48.

1   have built with the center-tap?

2       A.   I have no idea.  All I know is we supplied them some

3   prototype and some documentation and said, you know, because

4   we were going through -- there were problems, continuing

5   problems, with potting and transformer insulation and so

6   forth.

7            So I would have been surprised if they built very

8   many, let's put it that way, because they were going out for

9   evaluation.  It wasn't a mature product yet.

10      Q.   Okay.  But based on your personal knowledge, you

11  don't know how many?

12      A.   No, I have no idea.  You know, they're over in Largo

13  somewhere and I live in Tampa and we never visit each other

14  other than when they come to see us.

15      Q.   Okay.  Could I have you turn to the page ending 591?

16      A.   (Witness complying.)  Okay.

17      Q.   And referring to the lower of the two paragraphs

18  that are there, that -- paragraph seven, could you take a

19  moment and quickly read through that paragraph, please?

20      A.   Okay.  (Witness complying.)

21      Q.   Does that paragraph accurately describe the S-200?

22      A.   Well, it certainly -- you know, I don't know if it's

23  a hundred percent complete, but it certainly describes it,

24  yes.

25      Q.   Just to break it down and be a little bit more

*C O N F I D E N T I A L*                              93

1    specific, starting from the start of that paragraph, is the

2    S-200 an electric disabling device for immobilizing a human

3    target?

4         A.    That's its intention.

5         Q.    And does it have at least two projectile electrodes?

6         A.    Yes.

7         Q.    And are they positioned at spaced apart contact

8    points adjacent a target?

9         A.    The intention, yes, is to have them positioned apart

10   on some target.

11        Q.    And read down a little bit further in that

12   paragraph.  Does the S-200 have a transformer with primary and

13   secondary windings?

14        A.    Yes.

15        Q.    Does it have a capacitor?

16        A.    Or a capacitor bank, yes.

17        Q.    Is the capacitor bank electrically the same as a

18   capacitor?

19        A.    It can be modeled electrically as a single

20   capacitor.

21        Q.    Okay.  And then continuing in that paragraph, does

22   the S-200 have a DC power supply operable to charge the

23   capacitor element?

24        A.    Yes.

25        Q.    And what in the S-200 does that DC power supply

*C O N F I D E N T I A L*                                      98

1      A.    Stinger Systems, yeah, based upon reports that came

2   back, yeah, from their testing.  I know they were like firing

3   into a ladder over in the Largo facility, amongst other

4   things.

5      Q.    Okay.  Continuing down that page, I'd like to refer

6   you to paragraph 31.

7      A.    Yes, sir.

8      Q.    And it says:

9          *"The circuit depicted in figure 2 and 4 may be*

10         *recognized as a flyback circuit that when operated in*

11         *pulsed mode provides drastically two different sorts of*

12         *outputs depending on the impedance across the output*

13         *electrodes 18, 19.  In one limiting case, one can*

14         *consider the output electrodes 18 as being separated by a*

15         *high impedance, such as an air gap.  In the other*

16         *limiting case, relatively low resistance, provided by*

17         *tissue of a target 40, is connected between the two*

18         *output electrodes."*

19         Does that paragraph accurately characterize the

20         operation of the S-200?

21     A.    To the extent that it's described therein, yes.

22     Q.    Is there anything inaccurate about that paragraph?

23     A.    Well, I mean it -- I could add a lot more detail,

24   but it's adequate.

25     Q.    Okay.  And I'd like you to continue on to paragraph

*C O N F I D E N T I A L*                    131

1      Q.    Okay.  I'd like to have you now turn, flip quite a

2   ways through this stack to the document ending 1686, please.

3      A.    (Witness complying.)  Okay.

4      Q.    Can you tell me what this document is?

5      A.    Well, let's see.  This is back in the early

6   prototype days.  We were having -- yeah, this basically

7   identifies, the best of my knowledge, the transformers that

8   were being considered at the time, the high voltage

9   transformers.

10      Q.    And this is revision F of this document; is that

11   correct?

12      A.    Yes.

13      Q.    And it was created on June 14, 2006, correct?

14      A.    Well, apparently there were earlier versions started

15   in May of which this was the only one that was published.

16      Q.    This particular version, version F --

17      A.    Yes.

18      Q.    -- was it created on June 14, 2006?

19      A.    Well, the last updates to it for release were done

20   on the 14th.  I don't know if it was created on the 14th.

21      Q.    Okay.  And over in the column initials it says,

22   "TS."  Do you see that?

23      A.    Yes.

24      Q.    Is that you?

25      A.    Yes.

C O N F I D E N T I A L                    132

1        Q.    Now, referring to the upper right-hand portion of

2   this diagram, zones D3 and D4, there's a dimension drawing of

3   what appears to be a transformer.  Do you see that?

4        A.    Yes.

5        Q.    And zone D2 is an area that appears to describe that

6   transformer.  It says, "TASER."  Do you say you see that?

7        A.    Yes.

8        Q.    What does that dimension drawings in zoning D3 and

9   34 represent?

10       A.    Our best estimates of the internal transformers of

11  some module that was provided to us that we could site

12  through.  It was an adopted module of the translucent, you

13  know, potting.  So we just kind of have to get an estimate for

14  what the sizes were and the devices used in that instrument.

15       Q.    Who provided that module to you?

16       A.    Someone at Stinger Systems.  I would assume either

17  Wayne Thomas or Bob Gruder.

18       Q.    And when the module was provided to you, what did

19  the person who provided it to you tell you about it?

20       A.    Basically some words to the effect, Well, look,

21  these guys did it, why can't you.

22             Well, he didn't say why can't you.  This is the size

23  we need to get to, so we're studying transformers.

24       Q.    Referring to that dimension drawings in zones D3 and

25  D4, do you know which TASER product the module that you cited

1   down to create that drawing came from?

2       A.   I guess I should have specified it.  The only one

3   that I had any awareness of at this time was -- I don't even

4   know if they called it the X-26.  It was just a module that

5   was handed to me that said here's what they did.  I assumed by

6   hindsight it was the X-26, but I don't know that for a fact.

7       Q.   And they didn't tell you whether it was?

8       A.   Well, if they did, I don't recall them telling me.

9       Q.   Okay.

10      A.   I have no idea where they got the guts for the

11  module at.

12      Q.   Okay.  I'd like to have you flip back now to the

13  page ending 1305.

14      A.   (Witness complying.)  Okay.

15      Q.   Can you tell me what this document is?

16      A.   It's a schematic as existed in the area of February

17  of 2007 of the microcomputer sub system of the S-200 gun.

18      Q.   And this is revision 02a, final changes made

19  February 20th, 2007; is that correct?

20      A.   Yes.

21      Q.   And are those your initials corresponding to

22  revisions to 02a?

23      A.   Yes.

24      Q.   Okay.  Referring to zone C2 of the document, there's

25  a component there labeled U3. Do you see that?

1       A.     (Witness complying.) Okay.

2       Q.     And I'd like to have you turn to -- actually before

3    we do that, I'd just like to hand you what's been marked as

4    Exhibit 35.

5            Are those the calculations that you just performed

6    before we went off the record?

7       A.     Yes.

8       Q.     Okay.  Turning back to Exhibit 10, could I have you

9    turn to the page that ends in 1824?

10      A.     (Witness complying.)  Okay.

11      Q.     And referring to the full letter E-mail there,

12   there's an E-mail from EDA chief engineer to Bob Gruder,

13   drafted January 26th, 2008; is that correct?

14      A.     Yes.

15      Q.     And the subject line for that E-mail is, *"Stun gun*

16   *white paper - finished ? (SS-WP11-rev G),"* correct?

17      A.     Yes.

18      Q.     And the body of that E-mail states:

19            *"Attached is my shot (or is it stun) at completion*

20          *of the waveforms white paper.  However, figure four has a*

21          *scanner glitch (vertical line at end of pulse sequence)*

22          *which you should probably correct with a new scan."*

23            Do you see that?

24      A.     Yes.

25      Q.     Did you write that E-mail?

1       A.    Yes.

2       Q.    And if you'll turn over to the following page which

3    ends in 1825, is that the white paper that is referred to in

4    the E-mail on the page ending 1824?

5       A.    Yes.

6       Q.    You are the author of this white paper; is that

7    correct?

8       A.    Yes.

9       Q.    And you prepared this white paper at the request of

10   Mr. Gruder; is that correct?

11      A.    Yes.

12      Q.    And the purpose of preparing this white paper was to

13   explain the waveform used in the new S-200 gun; is that

14   correct?

15      A.    I would assume, yes.  Let me see.  I see the new

16   waveforms in here, yes.

17      Q.    Okay.  Referring to -- I'd like to refer you to the

18   first page of the white paper which ends with 1825.  There's a

19   paragraph there headed, *"Separating the Men From the Boys."*

20   Do you see that?

21      A.    Yes.

22      Q.    And toward the end of that paragraph it states?

23            *"What is needed is something akin to a two-speed*

24      *gear shift automobile - one gear gets you going from a*

25      *dead stop and the other does the fast moving.  Guns which*

Exhibit 5

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


TASER International, Inc.,      )
                               )
                Plaintiff,     )
                               )
        v.                     )   No. CV07-0042-PHX-MHM
                               )
Stinger Systems, Inc.,         )
                               )
                Defendant.     )
_____)



VIDEOTAPED DEPOSITION OF LEONARD TACHNER

Phoenix, Arizona
June 23, 2009
8:56 a.m.



Prepared by:
Janet Hauck, RPR
Arizona Certified
Reporter Number 50522

Prepared for:
The Court


(Original)

9a25fd72-b707-4655-9398-434ad2947cda

Taser International, Inc. v. Stinger Systems, Inc.
Videotaped Deposition of Leonard Tachner - 6/23/2009

Page 80

1    that I'm referring to here, we went through a rather

2    thorough description of the operation of the system,

3    what it keeps track of, how it operates and so forth.

4        Q.    In that same passage that I just read from it

5    refers to programs for the S-200 device.  Do you

6    understand the S-200 device to include a microprocessor?

7        A.    Yes.

8        Q.    And does that microprocessor run software?

9        A.    Yes.

10       Q.    Did you examine any of that software that

11   runs on the S-200 microprocessor?

12       A.    No.  I didn't examine it in terms of a

13   listing or anything like that.  I just talked to

14   Mr. Saliga about it.

15       Q.    Okay.  And following that it refers to

16   product and training literature and media therefore.

17   Did you review the S-200 product and training

18   literature?

19       A.    Well, I reviewed the schematics that we sent

20   you with my statement, and I looked at other schematics

21   that were also sent to me that I didn't really rely on,

22   but I looked at them and they -- they were a little

23   more lower level schematics.  And I discussed with

24   Mr. Saliga various things that were said in the

25   literature.

9a25fd72-b707-4655-9398-434ad2947cda

Taser International, Inc. v. Stinger Systems, Inc.
Videotaped Deposition of Leonard Tachner - 6/23/2009

Page 114

1    I don't remember the details of the conversation.  It

2    didn't seem to be a particularly important point at the

3    time.

4         Q.    Okay.  Do you recall anything that he told

5    you about it?

6         A.    He made some analogies to other energy

7    storage devices that I guess he felt would explain it,

8    but I don't remember the analogy or much about the

9    reasoning behind it at this time.

10        Q.    Okay.  I'd like to have you turn back to the

11   other binder, the smaller binder.  It should be

12   Exhibit 56.

13        A.    Yes.

14        Q.    And if you could turn to the first patent in

15   there which is behind tab 1, that should be U.S. Patent

16   Number 3,803,463 to John H. Cover.  Do you see that?

17        A.    Yes, I do.

18        Q.    Have you looked at this patent before?

19        A.    Yes.

20        Q.    In what context did you look at it?

21        A.    Oh, I don't remember.  I've seen this patent

22   probably 100 times over the years in various -- for

23   various reasons.  I mean this was considered one of the

24   underlying basic patents in the Taser art.  So I looked

25   at it probably as a representative of -- probably as a

9a25fd72-b707-4655-9398-434ad2947cda