*TASER International, Inc. v. Stinger Systems, Inc.*
Case No. CV07-0042-PHX-MHM

**Index of Exhibits to
Declaration of Aaron Matz In Support of
TASER's Motion for Partial Summary Judgment
of Literal Infringement**

| Exhibit | Description |
|---------|-------------|
| 1 | An accurate copy of *A Qualitative & Quantitative Analysis of Conducted Energy Devices: TASER X26 vs. Stinger S200: A Report to the National Institute of Justice*, dated March 5, 2008. |
| 2 | U.S. Patent Application No. 11/746,952 ("S-200 Patent Application"), published by the United States Patent and Trademark Office ("PTO") as Publication No. US 2008/027882 A1 on November 13, 2008. |
| 3 | An accurate copy of excerpts of the transcript of the deposition of Robert Gruder, taken on August 26, 2008. |
| 4 | An accurate copy of excerpts of the transcript of the deposition of Thomas V. Saliga, taken on August 27, 2008. |
| 5 | An accurate copy of excerpts of the transcript of the deposition of Leonard Tachner, taken on June 23, 2009. |
| 6 | An accurate copy of specification sheets for TASER's X26 device and associated cartridge. |
| 7 | An accurate copy of specifications for Stinger Systems, Inc.'s ("Stinger's") S-200 device. |
| 8 | An accurate copy of a webpage entitled *Always Improving to Create the Best EID*. |
| 9 | An accurate copy of Stinger's Form 10-K for fiscal year 2007. |
| 10 | An accurate copy of Stinger's Form 10-K for fiscal year 2008. |
| 11 | An accurate copy of Stinger's Form 10-Q for the quarter ending March 31, 2009. |
| 12 | An accurate copy of the Abstract of Title for the S-200 Patent Application. |
| 13 | An accurate copy of *The Stinger S-200 Basic Operator Certification Program Student Manual*. |
| 14 | An accurate copy of Declaration of Patrick W. Smith. |
| 15 | An accurate copy of Declaration of Magne H. Nerheim. |
| 16 | An accurate copy of United States Patent No. 6,999,295. |

*TASER International, Inc. v. Stinger Systems, Inc.*
Case No. CV07-0042-PHX-MHM

**Index of Exhibits to
Declaration of Aaron Matz In Support of
TASER's Motion for Partial Summary Judgment
of Literal Infringement**

| Exhibit | Description |
|---|---|
| 17 | An accurate copy of United States Patent No. 7,234,262. |
| 18 | An accurate copy of Stinger's Answer and Counterclaim, filed November 6, 2007. |
| 19 | An accurate copy of a paper entitled *Technical White Paper SS-WP-11: A Comparison of Stun Gun Waveforms for Safety and Effectiveness*, Stinger Systems, 2008. |
| 20 | An accurate copy of excerpts of the transcript of the *Markman* hearing conducted on May 7, 2008. |
| 21 | An accurate copy of the Statement of Leonard Tachner, dated April 17, 2009. |
| 22 | An accurate copy of the Supplemental Statement of Leonard Tachner, dated May 17, 2009. |
| 23 | An accurate copy of the S-200 Schematic attached as Exhibit F to the Statement of Leonard Tachner dated April 17, 2009. |
| 24 | An accurate copy of the *Report Concerning Infringement of U.S. Patent Nos. 6,999,295; 7,102,870; and 7,234,262* by Jeffrey Rodriguez, Ph.D., dated April 3, 2009.  FILED UNDER SEAL |
| 25 | An accurate copy of an email dated September 10, 2007.  FILED UNDER SEAL |

57518-0006/LEGAL16713733.1

# Exhibit 11

10-Q 1 g19122e10vq.htm FORM 10-Q

Table of Contents

## United States Securities and Exchange Commission
### Washington, D.C. 20549

# Form 10-Q

☑     **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

    **For the quarterly period ended March 31, 2009**

☐     **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

    **For the transition period from _____ to _____**

### Commission File Number 000-51822

# STINGER SYSTEMS, INC.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **NEVADA** | **30-0296398** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |
| **5505 Johns Road, Suite 702** | |
| **Tampa, Florida** | **33634** |
| (Address of principal executive offices) | (Zip Code) |

**(813) 281-1061**
(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). ☐ Yes ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definition of "large accelerated filer", "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐     Accelerated filer ☐     Non-accelerated filer ☐     Smaller reporting Company ☑

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☑

All amounts set forth in this Quarterly Report Form 10-Q have been adjusted to reflect a 1-for 5 reverse stock split completed on January 17, 2009. There were 4,001,832 shares outstanding of the issuer's common stock, par value $0.001 per share, as of May 15, 2009.

**STINGER SYSTEMS, INC.**
**QUARTERLY REPORT ON FORM 10-Q**
**FOR THE THREE MONTHS ENDED MARCH 31, 2009**
**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| **PART I — FINANCIAL INFORMATION** |  | 3 |
| ITEM 1. | Financial Statements (unaudited) | 3 |
|  | Consolidated Balance Sheets as of March 31, 2009 (unaudited) and December 31, 2008 (audited) | 3 |
|  | Consolidated Statements of Operations for the three months ended March 31, 2009 (unaudited) and March 31, 2008 (unaudited) | 5 |
|  | Consolidated Statements of Cash Flows for the three months ended March 31, 2009 (unaudited) and March 31, 2008 (unaudited) | 6 |
|  | Notes to Consolidated Financial Statements (unaudited) | 8 |
| ITEM 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 13 |
| ITEM 3. | Quantitative and Qualitative Disclosures about Market Risk | 16 |
| ITEM 4. | Controls and Procedures | 17 |
| **PART II — OTHER INFORMATION** |  | 18 |
| ITEM 1. | Legal Proceedings | 18 |
| ITEM 1A. | Risk Factors | 19 |
| ITEM 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 23 |
| ITEM 3. | Defaults Upon Senior Securities | 23 |
| ITEM 4. | Submission of Matters to a Vote of Security Holders | 23 |
| ITEM 5. | Other Information | 23 |
| ITEM 6. | Exhibits | 24 |
| SIGNATURES |  | 25 |
| INDEX TO EXHIBITS |  | 26 |

EX-31.1
EX-31.2
EX-32.1
EX-32.2

Table of Contents

## PART I — FINANCIAL INFORMATION

### ITEM 1.  Financial Statements

**STINGER SYSTEMS, INC.**
**CONSOLIDATED BALANCE SHEETS**
**ASSETS**

|  | March 31, 2009 (Unaudited) | December 31, 2008 |
|---|---|---|
| **CURRENT ASSETS** | | |
| Cash | $    25,261 | $   699,934 |
| Accounts Receivable, net of $1,800 allowance for uncollectible accounts in 2009 and 2008 | 119,298 | 75,200 |
| Inventories, at cost | 248,795 | 238,757 |
| Prepaid Expenses and Other Current Assets | 220,910 | 254,898 |
| TOTAL CURRENT ASSETS | 614,264 | 1,268,789 |
| **EQUIPMENT AND FURNITURE** | | |
| Equipment and Furniture, net of accumulated depreciation of $266,522 and $229,767 in 2009 and 2008, respectively | 305,764 | 231,706 |
| **OTHER ASSETS** | | |
| Prepaid Interest, Long Term Asset | 203,892 | 257,373 |
| Intangible Assets, net of accumulated amortization of $1,622,672 and $1,527,222 in 2009 and 2008, respectively | 1,049,947 | 1,145,398 |
| Other Assets | 35,898 | 35,898 |
| TOTAL OTHER ASSETS | 1,289,737 | 1,438,669 |
| TOTAL ASSETS | $2,209,765 | $ 2,939,164 |

See accompanying notes.
(Continued)

3

Table of Contents

## STINGER SYSTEMS, INC.
## CONSOLIDATED BALANCE SHEETS
## LIABILITIES AND STOCKHOLDERS' (DEFICIT) EQUITY

|  | March 31, 2009 (Unaudited) | December 31, 2008 |
|---|---|---|
| **CURRENT LIABILITIES** |  |  |
| Accounts Payable | $ 643,710 | $ 417,425 |
| Accrued Liabilities | 382,164 | 254,638 |
| Capital Lease Obligation, current portion | 24,090 | 23,571 |
| Note Payable-Related Parties | 31,250 | 31,250 |
| TOTAL CURRENT LIABILITIES | 1,081,214 | 726,884 |
| Capital Lease Obligation, long-term portion | 46,072 | 52,293 |
| Note Payable-Convertible, net of debt discount of $5,235,319 and $5,340,001 for 2009 and 2008, respectively | 2,655,881 | 2,551,199 |
| Derivative Liability Associated with Convertible Note and Warrants | 7,837,074 | 7,377,771 |
| TOTAL LIABILITIES | 11,620,241 | 10,708,147 |
| **COMMITMENTS AND CONTINGENCIES** | — | — |
| **STOCKHOLDERS' (DEFICIT) EQUITY** |  |  |
| Preferred Stock, $0.001 Par Value, 1,000,000 Shares Authorized, None Issued | — | — |
| Common Stock, $0.001 Par Value, 50,000,000 Shares Authorized, 4,001,832 and 4,001,832 Shares Issued and Outstanding at March 31, 2009 and December 31, 2008, respectively | 4,002 | 4,002 |
| Additional Paid-In Capital | 47,259,019 | 47,259,019 |
| Retained Deficit | (56,673,497) | (55,032,004) |
| TOTAL STOCKHOLDERS' (DEFICIT) EQUITY | (9,410,476) | (7,768,983) |
| TOTAL LIABILITIES AND STOCKHOLDERS' (DEFICIT) EQUITY | $ 2,209,765 | $ 2,939,164 |

See accompanying notes.

4

Table of Contents

**STINGER SYSTEMS, INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(UNAUDITED)**

|  | Three Months Ended March 31, | |
|  | 2009 | 2008 |
|---|---|---|
| **REVENUES** | | |
| Sales | $ 273,009 | $ 182,557 |
| Cost of Product Sold | 299,325 | 191,916 |
| GROSS (LOSS) MARGIN | (26,316) | (9,359) |
| **SELLING EXPENSES** | 74,920 | 156,955 |
| **GENERAL AND ADMINISTRATIVE EXPENSES** | | |
| Employee Salaries | 250,933 | 287,921 |
| Other | 325,422 | 1,983,237 |
| Depreciation and Amortization | 132,206 | 120,817 |
| Research and Development | 84,763 | 70,096 |
| TOTAL GENERAL AND ADMINISTRATIVE EXPENSES | 793,324 | 2,462,071 |
| LOSS FROM OPERATIONS | (894,560) | (2,628,385) |
| INTEREST INCOME | 5,402 | 2,624 |
| INTEREST EXPENSE | (293,032) | (190,688) |
| DERIVATIVE LIABILITY EXPENSE | (459,303) | (3,410,000) |
| LOSS BEFORE INCOME TAXES | (1,641,493) | (6,226,449) |
| **PROVISION FOR INCOME TAXES** | — | — |
| NET LOSS | $(1,641,493) | $(6,226,449) |
| **BASIC AND DILUTED LOSS PER COMMON SHARE** | $ (0.41) | $ (1.65) |
| **WEIGHTED AVERAGE NUMBER OF COMMON SHARES** | | |
| Basic and Diluted | 4,001,832 | 3,768,707 |

See accompanying notes.

5

Table of Contents

## STINGER SYSTEMS, INC.
## CONSOLIDATED STATEMENTS OF CASH FLOWS
### (UNAUDITED)

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2009 | 2008 |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Net Loss | $(1,641,493) | $(6,226,449) |
| Adjustments to Reconcile Net Loss to Net Cash Used in Operating Activities: | | |
| Depreciation and Amortization | 132,206 | 120,817 |
| Stock Option Expense | — | 1,606,317 |
| Amortization of Discount on Notes Payable-Convertible | 104,682 | 191,015 |
| Derivative Liability Associated with Convertible Note and Warrants | 459,303 | 3,410,000 |
| Changes in Operating Assets and Liabilities Accounts Receivable | (44,098) | (40,658) |
| Inventory | (10,038) | (58,926) |
| Prepaid Expenses | 87,469 | 3,718 |
| Accounts Payable | 226,285 | 81,772 |
| Accrued Liabilities | 127,526 | (30,101) |
| NET CASH USED IN OPERATING ACTIVITIES | (558,158) | (942,495) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Purchase of Equipment | (110,813) | (7,473) |
| NET CASH USED IN INVESTING ACTIVITIES | (110,813) | (7,473) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Payments on Capital Lease Obligation | (5,702) | (6,942) |
| Proceeds from the Issuance of Convertible Notes Payable, Net of $117,500 Issuance Costs and $641,775 prepaid interest | — | 1,390,725 |
| NET CASH PROVIDED BY (USED IN) FINANCING ACTIVITIES | (5,702) | 1,383,783 |
| **NET DECREASE IN CASH** | (674,673) | 433,815 |
| **CASH BALANCE, BEGINNING OF PERIOD** | 699,934 | 345,293 |
| **CASH BALANCE, END OF PERIOD** | $ 25,261 | $ 779,108 |

(Continued)

6

Table of Contents

### STINGER SYSTEMS, INC.
### CONSOLIDATED STATEMENTS OF CASH FLOWS
### (UNAUDITED)

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2009 | 2008 |
| **NON-CASH INVESTING AND FINANCING ACTIVITIES** | | |
| Additional Paid in Capital from Termination of Registration Rights on Debt | — | 3,130,000 |
| Reduction of Derivative Liability due to Termination of Registration Rights on Debt | — | (3,130,000) |
| Additional Paid in Capital, Issued in Connection with Financing from Stock | — | 1,059,480 |
| Common Stock Issued for Debt Discount | — | 270 |
| Debt Discount from Issuance of Common Stock | — | (1,059,750) |
| Prepaid Interest from Convertible Note | — | (641,775) |
| Debt Discount from Fees Retained | — | (422,450) |
| Convertible Note | — | 1,064,225 |
| Conversion of Notes Payable to Common Stock | — | (320,000) |
| Common Stock Issued for Notes Payable Conversion | — | 210 |
| Additional Paid in Capital from Conversion of Notes Payable | — | 319,790 |
| Debt Discount on Notes Payable | — | (3,595,300) |
| Additional Paid in Capital, Issued in connection of Notes Payable | — | 3,595,300 |
| Deferred Debt Discount | — | — |
| Common stock | — | — |
| Paid-in-capital | — | — |
| | $     — | $     — |

| | | |
| --- | --- | --- |
| **SUPPLEMENTAL CASH FLOW DISCLOSURES** | | |
| Cash Paid During the Year For: | | |
| Interest | $   1,618 | $   330,646 |
| Taxes | $     — | $     — |

See accompanying notes.

7

Table of Contents

## STINGER SYSTEMS, INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### (UNAUDITED)

### NOTE 1: BASIS OF PRESENTATION

### ACCOUNTING POLICIES

The accompanying unaudited consolidated financial statements for Stinger Systems, Inc. (the "Company") have been prepared in accordance with generally accepted accounting principles for interim financial information and with the instructions to Form 10-Q and Regulation S-X. Accordingly, they do not include all of the information and footnotes required by United States generally accepted accounting principles for complete consolidated financial statements. In the opinion of management, all adjustments considered necessary for a fair presentation have been included. All such adjustments are of a normal and recurring nature. These financial statements should be read in conjunction with the audited financial statements as of December 31, 2008. Operating results as of March 31, 2009 are not necessarily indicative of the results that may be expected for the year ended December 31, 2009.

Management of the Company has determined that the Company's operations are comprised of one reportable segment as that term is defined by SFAS No. 131 *"Disclosures About Enterprise and Related Information"*, therefore, no separate segment disclosures have been included in the accompanying notes to the financial statements.

All amounts set forth in this Quarterly Report on Form 10-Q have been adjusted to reflect a 1-for 5 reverse stock split completed on January 17, 2009.

### Embedded Derivatives

The conversion feature of the convertible notes payable and warrants issued by the Company in August 2007, February 2008 and September 2009 was accounted for as an embedded derivative and was valued on the transaction date using the Black-Scholes pricing model. At the end of each quarterly reporting date, the value of the derivatives are evaluated and adjusted to current fair value. At March 31, 2009, the Company's derivative valuation liability totaled $7,837,074.

In conjunction with the February 29, 2008 offering, the registration rights were removed from the amended August 2007 Note. This eliminated the embedded derivative pertaining to the Warrant issued in conjunction with the August 2007 offering. The table below illustrates the effect of the removal of registration rights.

| | |
|---|---|
| Embedded Derivative Liability, December 31, 2007 | $ 3,660,000 |
| Adjustment of Liability due to amended August 2007 Note | (3,130,000) |
| Embedded Derivative Liability Expense, December 31, 2008 | 6,847,771 |
| Embedded Derivative Liability Expense, March 31, 2009 | 459,303 |
| Ending Balance, December 31, 2008 | $ 7,837,074 |

### Reclassifications

Certain reclassifications have been made to the 2008 consolidated financial statements in order to conform to the 2009 presentation.

### Loss per Share

Basic loss per share is determined based on the weighted average number of common shares outstanding during each period. Diluted loss per share is the same as basic loss per share because all common share equivalents are excluded from the calculation, because their effect is anti-dilutive. The weighted average number of shares of common stock outstanding for the three month period ended March 31, 2009 and March 31, 2008 was 4,001,832 and 3,768,707, respectively. Options and warrants to purchase 11,662,486 and 3,768,707 shares of common stock were outstanding at March 31, 2009 and March 31, 2008, respectively, and were excluded from the computation of diluted earnings per share as the effect of these options and warrants would have been anti-dilutive.

8

Table of Contents

## NOTE 2: USE OF ESTIMATES

The preparation of the financial statements in conformity with United States generally accepted accounting principles requires management to make estimates and assumptions that affect reported amounts in the consolidated financial statements. Therefore, actual results could differ materially from those estimates used in the preparation of these financial statements.

## NOTE 3: REVENUE RECOGNITION

The Company recognizes revenue when delivery of the product has occurred or services have been rendered, title has been transferred, the price is fixed and collectability is reasonably assured. We warrant our products against manufacturing defects for a period of one year. As of March 31, 2009, we had no significant warranty claims on products sold. Once reasonable estimates of returns of sales of our new stun gun are obtainable, we expect to make an accrual for warranty claims based on our sales.

## NOTE 4: INVENTORIES

Inventories are stated at the lower of average cost or market. Inventories consisted of the following at March 31, 2009 and December 31, 2008:

|  | March 31, 2009 | December 31, 2008 |
|---|---|---|
|  | (Unaudited) |  |
| Raw Materials and Work-In Progress | $ 206,265 | $ 203,595 |
| Finished Goods | 42,530 | 35,161 |
|  | $ 248,795 | $ 238,757 |

## NOTE 5: STOCK BASED COMPENSATION

Effective January 1, 2006, the Company adopted Statement of Financial Accounting Standards No. 123 (revised 2004), "*Share-Based Payment*" (SFAS 123(R)) which requires the measurement and recognition of compensation expense for all stock-based awards made to employees and directors, including stock option grants, based on estimated fair values. SFAS 123(R) supersedes previous accounting under Accounting Principles Board Opinion No. 25, "*Accounting for Stock Issued to Employees*" (APB 25), for periods beginning in fiscal year 2006.

SFAS 123(R) requires companies to estimate the fair value of stock-based awards on the date of grant using an option-pricing model. The value of the portion of the award that is ultimately expected to vest is recognized as expense over the requisite service periods in our Consolidated Statements of Operations. The Company adopted SFAS 123(R) using the modified prospective transition method which requires the application of the accounting standard starting on January 1, 2006, without restatement of prior years. Stock options were granted at an exercise price equal to the Company's stock price at the date of grant.

Prior to the adoption of SFAS 123(R), the Company accounted for stock-based awards to employees and directors using the intrinsic value method in accordance with APB 25 as allowed under Statement of Financial Accounting Standards No. 123, "*Accounting for Stock-Based Compensation*" (SFAS 123). Under the intrinsic value based method, stock-based compensation expense for employee stock options was recognized in the Company's Consolidated Financial Statements as the difference in the exercise price of the option and the Company's stock price at the date of grant.

9

Table of Contents

The Company has selected the Black-Scholes option-pricing model as the most appropriate method for determining the estimated fair value for stock-based awards. As of March 31, 2009, the Company's outstanding stock options have vested and therefore the Company has not recognized a stock option expense for the current quarter.

The fair value of the stock-based awards was estimated using the Black-Scholes model with the following weighted average assumptions:

|  | Three Months Ended March 31, | |
|  | 2009 | 2008 |
| --- | --- | --- |
| Estimated fair value | $ 0.70 | $ 0.70 |
| Expected life (years) | 1.15 | 1.15 |
| Risk free interest rate | 1.54% | 1.54% |
| Volatility | 132.05% | 140.93% |
| Dividend yield | — | — |

## NOTE 6: GENERAL AND ADMINISTRATIVE EXPENSES, OTHER

General and Administrative Expenses — Other includes the following:

|  | Three Months Ended March 31, | |
|  | 2009 | 2008 |
| --- | --- | --- |
| Legal and Professional Fees | $186,995 | $ 158,086 |
| Stock Option Expense | — | 1,606,317 |
| Rent and Utilities | 52,045 | 43,073 |
| Other | 85,285 | 116,592 |
|  | $325,422 | $1,977,237 |

## NOTE 7: CAPITAL LEASE OBLIGATIONS

In January 2007, the Company entered into a capital lease for a tool room mill machine in which the Company pays $631 per month for a term of four years, with the initial lease term ending on December 2010. The lease agreement contains a bargain purchase option after the initial term of the lease, at which time the Company may purchase the leased equipment for $101.

In September 2007, the Company entered into a capital lease for a tool room mill machine in which the Company pays $824 per month for a term of four years, with the initial lease term ending on August 2011. The lease agreement contains a bargain purchase option after the initial term of the lease, at which time the Company may purchase the leased equipment for $101.

In September 2007, the Company entered into a capital lease for a tool room mill machine in which the Company pays $1,111 per month for a term of five years, with the initial lease term ending August 2012. The lease agreement contains a bargain purchase option after the initial term of the lease, at which time the Company may purchase the leased equipment for $101.

## NOTE 8: NOTES PAYABLE — CONVERTIBLE

On September 12, 2008, the Company closed a private placement transaction (the "September 2008 Offering") with an institutional investor pursuant to which the Company issued and sold to the institutional investor a senior secured convertible note (the "September 2008 Note") in an aggregate principal amount of $3,000,000 and a warrant to purchase 2,586,207 shares of the Company's common stock (the "September 2008 Warrant"). At March 31, 2009, the September 2008 Note is convertible into 6,417,112 shares of the Company's common stock at a price of $0.4675 per share. Under the terms of the September 2008 Note, the Company, at its option, may pay any portion of the interest then due in cash or may elect to issue shares of the Company's common stock. The September 2008 Warrant is exercisable immediately at a price of $1.45 per share.

10

**Table of Contents**

Neither the shares to be issued upon conversion of the September 2008 Note nor upon exercise of the September 2008 Warrant have been registered under the Securities Act of 1933(the "Securities Act"), as amended, and may not be offered or sold in the United States in the absence of an effective registration statement or exemption from the registration requirements. Midtown Partners & Co., LLC ("Midtown") acted as placement agent for the September 2008 Offering. The Company paid Midtown a cash fee equal to $67,500 and issued to Midtown a warrant to purchase 372,414 shares of the Company's common stock at a price of $1.45 per share. The September 2008 Note and the September 2008 Warrant were offered and sold to an "accredited investor" (as defined in section 501(a) of Regulation D) pursuant to an exemption from the registration requirements under Section 4(2) of the Securities Act.

On February 29, 2008, the Company closed a private placement transaction (the "February 2008 Offering") with an institutional investor pursuant to which the Company issued and sold to that institutional investor a senior secured convertible note (the "February 2008 Note") in the aggregate principal amount of $2,150,000 and a warrant to purchase 3,296,377 shares of the Company's common stock at $1.45 per share (the "February 2008 Warrant"). The Company also issued to that institutional investor 250,000 shares of the Company's Common stock valued at $981,250. The conversion rate of the February 2008 Note, the number of shares under the February 2008 Warrant and the February 2008 Warrant exercise price have been reset due to the anti-dilution provisions of the February 2008 Note. At March 31, 2009, the February 2008 Note is convertible into 4,598,930 shares of the Company's common stock at a price of $0.4675 per share. Under the terms of the February 2008 Note, the Company, may pay any portion of the interest then due in cash or may elect to issue shares of the Company's common stock. The February 2008 Warrant, consisting of 3,296,377 shares of stock at March 31, 2009, is exercisable immediately at a price of $1.45 per share. In connection with the February 2008 Offering, the Company amended a security agreement entered into in August 2007 in connection with a prior offering and amended and restated the senior secured convertible note issued in such offering. Neither the shares to be issued upon conversion of the February 2008 Note nor upon exercise of the February 2008 Warrant nor the shares issued in connection therewith have been registered under the Securities Act and may not be offered or sold in the United States in the absence of an effective registration statement or exemption from the registration requirements. Midtown acted as placement agent for the February 2008 Offering. The Company paid Midtown a cash fee equal to $67,500 and issued to Midtown 20,000 shares of Common stock and a warrant to purchase 95,520 shares of the Company's common stock. The February 2008 Note, the February 2008 Warrant and the Shares were offered and sold to an "accredited investor" (as defined in section 501(a) of Regulation D) pursuant to an exemption from the registration requirements under Section 4(2) of the Securities Act.

On August 3, 2007, the Company completed a private placement transaction with an institutional investor pursuant to which the Company issued and sold to that institutional investor a senior secured convertible note (the "August 2007 Note") in the aggregate principal amount of $3,000,000 and a warrant to purchase 2,586,207 shares of the Company's common stock at $1.45 per share (the "August 2007 Warrant"). During 2008, $320,000 of the August 2007 Note was converted into 210,412 shares of common stock, and $61,200 of interest was capitalized leaving a balance at March 31, 2009 of $2,741,200. The conversion rate of the August 2007 Note, the number of shares under the August 2007 Warrant and the August 2007 Warrant price have been reset due to anti-dilution provisions of the notes. At March 31, 2009 the August 2007 Note is convertible into 5,863,529 shares of the Company's common stock at a price of $0.4675 per share. Under the terms of the August 2007 Note, the Company, at its option, may pay any portion of the interest then due in cash or may elect to issue the investor shares of the Company's common stock. The August 2007 Warrant, consisting of 2,586,207 shares at March 31, 2009, is exercisable immediately at a price of $1.45 per share. The Company granted the investor certain registration rights with respect to the shares to be issued upon conversion of the August 2007 Note and upon exercise of the August 2007 Warrant. Neither the shares to be issued upon conversion of the August 2007 Note nor upon exercise of the August 2007 Warrant have been registered under the Securities Act of 1933 and may not be offered or sold in the United States in the absence of an effective registration statement or exemption from the registration requirements. The August 2007 Note and the August 2007 Warrant were offered and sold to an "accredited investor" (as defined in section 501(a) of Regulation D) pursuant to an exemption from the registration requirements under Section 4(2) of the Securities Act. Midtown acted as placement agent for the offering. The Company paid Midtown a cash fee of $270,000 and issued Midtown a warrant to purchase 170,293 shares of the Company's common stock at an exercise price of $3.17 per share.

All of the Company's assets have been pledged as collateral for all of the notes described above.

The warrants and the conversion features of the August 2007 Note, the September 2008 Note and February 2009 Note were reviewed for possible embedded derivatives. The warrants and conversion features of the August 2007 Note, the September 2008 Note and February 2009 Notes were deemed to have embedded derivative features and were accounted for as such. At the end of each quarterly reporting date, the value of the derivatives are evaluated and adjusted to current fair value. At March 31, 2009, the Company's derivative valuation liability totaled $7,837,074.

11

Table of Contents

## NOTE 9: LIQUIDITY AND CAPITAL RESOURCES

The process of developing and commercializing the Company's products requires significant research and development, engineering, testing, significant marketing and sales efforts, and manufacturing capabilities. Stinger Systems views the development of the S-200 as an ongoing process and has spent several years developing the S-200 AT model ECD to be more mature, both in respect to the ECD's overall technology and creating an efficient manufacturing processes. Because only one other significant vendor makes ECD's, the processes and best manufacturing practices could not be sourced by traditional hiring practices. The Company has incurred substantial costs to develop a sophisticated and documented methodology to completely understand every known detail related to manufacturing the ECD. Stinger Systems believes that its knowledge of manufacturing and methods of creating efficiencies for the ECD has greatly matured. The Company believes that it is at a point in which the S-200 AT can be manufactured readily and reliably at considerably less costs than in the past.

In an effort to try to maintain excellent customer relations, the Company has replaced many older model S-200's with newer, next generation models. The result of this is reflected poorly on the Company's gross and net margins. However, the Company believes that these efforts have created excellent relationships and references that provide the Company the ability to become competitive in the projectile ECD marketplace. Further, the Company believes that its new production efficiencies will allow the cost of goods sold to be greatly reduced, therefore allowing the Company to be more competitive on pricing, provide improved margins, or both. These activities, together with the Company's general and administrative expenses, require significant investments and are expected to continue to result in operating losses for the foreseeable future while the Company introduces its Stinger product line to the marketplace.

To date, revenues recognized from its current products have not been sufficient for the Company to achieve or sustain profitability. The Company believes it is unlikely that its existing cash resources will be sufficient to fund its operations at its planned levels of research, development, sales, and marketing activities. Thus, execution of its current strategies will require it to raise additional capital through debt or equity transactions in order to finance its operations in the future. The Company believes that additional financing may be available to it, but there can be no guarantee that financing will be available on acceptable terms or at all. If adequate funds are not available, the Company may be required to delay, reduce the scope of or eliminate its research and development programs, reduce its commercialization efforts, or effect changes to its facilities or personnel, and its ability to operate as a going concern may be adversely impacted.

Table of Contents

## ITEM 2.  MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

The following discussion and analysis of the Company's financial condition and results of operations should be read together with the financial statements and related notes appearing in Item 1 of this Part I and the financial statements and notes thereto and the Management's Discussion and Analysis of Financial Condition and Results of Operations contained in the Company's Annual Report on Form 10-K filed with the Securities and Exchange Commission (the "SEC").

### Forward-Looking Statements

The following discussion and analysis of the financial condition and results of operations should be read in conjunction with the consolidated financial statements, related notes, and other detailed information included elsewhere in this Quarterly Report on Form 10-Q for the quarter ended March 31, 2009 (this "Form 10-Q"). This Form 10-Q contains certain forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. Forward-looking statements are statements other than historical information or statements of current condition. We generally identify forward-looking statements by the use of terms such as "believe", "intend", "expect", "may", "should", "plan", "project", "contemplate", "anticipate" or other similar statements. Examples of forward looking statements in this Quarterly Report on Form 10-Q include, but are not limited to statements concerning: (a) the timely development and acceptance of new products, (b) sources of supply and concentration of customers, (c) acceptance in the marketplace, establishment and expansion of our distribution channels, (d) endorsement of opinion leaders in the law enforcement community, (e) implementation risks of manufacturing automation, (f) risks associated with rapid technology change, (g) impact of media publicity, (h) dependence upon sole or limited source suppliers, (i) existing or potential lawsuits, (j) risks of governmental regulations and (k) dependence upon key employees, (l) availability of financing, and other factors detailed in the Company's filings with the SEC. These factors should not be considered exhaustive. We undertake no obligation to release publicly the results of any future revisions we may make to forward-looking statements to reflect events or circumstances after the date hereof or to reflect the occurrence of unanticipated events. We caution you not to put undue reliance on these forward-looking statements. These forward-looking statements relate to our plans, objectives and expectations for future operations. In light of the risks and uncertainties inherent in all such projected operational matters, the inclusion of forward-looking statements in this Form 10-Q should not be regarded as a representation by us or any other person that our objectives or plans will be achieved or that any of our operating expectations will be realized. Our actual financial results realized could differ materially from the statements made herein, depending in particular upon the risks and uncertainties described in our filings with the SEC.

### Executive Summary

Stinger Systems is in the business of producing and marketing less-lethal electronic restraint products to law enforcement, correctional facilities, professional security and military sectors. The Company's products include the Ice-Shield electronic immobilization riot shield and the Bandit / REACT system, an electronic immobilizing restraint. The Company's primary focus is the Stinger S-200 Electronic Immobilization Device (EID) and the Company's success is largely dependent upon the commercialization of this product.

The Company plans to use third parties to manufacture some components for its products. Except for ongoing purchase orders, the Company is under no contractual obligation with these parties. Because the Stinger projectile stun gun is classified as a firearm and subject to various regulations of the U.S. Bureau of Alcohol, Tobacco, and Firearms (ATF), the Company ships all products from its production and manufacturing facility and maintains proper records. While the Company hopes to manufacture the Stinger and its components in the United States, there can be no assurances that it will continue to do so. The Company believes that electronics are easily sourced throughout the world and the Company will continually seek best pricing and highest quality components for its products. The Company expects to continue handling the shipment of its products.

The Company's success will be dependent upon its ability to attract high quality distributors to market its products. To date, the Company has been able to attract distributors and manufacturer's representative groups with a solid track record for selling firearms to the law enforcement, correctional, and/or military community. The Company is unable to provide forecasts as to the number of Stingers it anticipates selling.

13

Table of Contents

At the present time, the Company does not generate sufficient revenues from its operations to pay its operating costs. Management believes that the Company will need additional outside sources of funding in the future to continue the production and promotion of its products.

Stinger Systems views the development of the S-200 as an ongoing process and has spent several years developing the S-200 AT model ECD to be more mature both in respect to the ECD's overall technology but also in best understanding efficient manufacturing processes. Because only one other significant vendor makes ECD's, the processes and best manufacturing practices could not be sourced by traditional hiring practices. The Company has incurred substantial costs to develop a sophisticated and documented methodology to completely understand every known detail related to manufacturing the ECD. Stinger Systems now believes that its knowledge of manufacturing and methods of creating efficiencies has greatly matured. The Company strives to and now believes that it is at a point in which the S-200 AT can be manufactured readily and reliably at considerably less costs than in the past.

In an effort to try to maintain excellent customer relations, the Company has replaced many older model S-200's with newer, next generation models. The result of this is reflected poorly on the Company's gross and net margins. However, the Company believes that these efforts have created excellent relationships and references that provide the Company the ability to become competitive in the projectile ECD marketplace. Further, the Company now believes that these new production efficiencies will allow the cost of goods sold to be greatly reduced, therefore allowing the Company to be more competitive on pricing, provide improved margins, or both.

## Results of Operations

*Revenues.* Revenue increased $90,452, or 50%, to $273,009 for the three months ended March 31, 2009 compared to $182,557 for the three months ended March 31, 2008. The increase from 2007 to 2008 was due to the Company's new sales model and ability to receive and fill orders during 2009.

*Cost of Goods Sold.* Cost of Goods Sold increased $107,409 or 56% to $299,325 for the three months ended March 31, 2009 compared to $191,916 for the three months ended March 31, 2008. The increase for the three months ended March 31, 2009 was due to increased production, and in an effort to maintain excellent customer relations, the Company's replacement of many older model S-200's with the next generation S-200 AT model. The cost of production for the periods ended March 31, 2009 and March 31, 2008, includes manufacturing costs such as materials, labor and identifiable overhead related to finished goods and components.

*Gross Margin.* Gross margin decreased $16,956 to $(26,316) for the three months ended March 31, 2009 compared to $(9,359) for the three months ended March 31, 2008. The decrease in gross margin was principally due to an increase in the costs of goods sold related to the Company's replacement of many older model S-200's with the next generation S-200 AT model, partially mitigated by an increase in revenue.

*Selling Expenses.* Selling expenses decreased $82,035 to $74,920 for the three months ended March 31, 2009 compared to $156,955 for the three months ended March 31, 2008. The decrease for the three months ended March 31, 2009 was due to the restructuring of our marketing department and other related efforts to promote current products and the branding of the Stinger name.

*General and Administrative Expenses.* General and Administrative (G&A) expenses decreased $1,668,746 or 68% to $793,324 for the three months ended March 31, 2009 compared to $2,462,070 for the three months ended March 31, 2008. The decrease in G&A expenses for the three months ended March 31, 2009 as compared to the three months ended March 31, 2008 is primarily due to the decrease of stock option expense and insurance expense. Additionally, other operating expenses for the three months ended March 31, 2009, include legal and professional fees of $186,995, rent and utilities expense of $52,045, stock option expense in the amount of $0, insurance expense of $1,097, and other costs in the amount of $85,285, compared to legal and professional fees of $158,086, rent and utilities expense of $43,073 stock option expense in the amount of $1,606,317, and other costs in the amount of $116,592 for the three months ended March 31, 2008.

*Research and Development Expenses.* Research and Development (R&D) expenses increased $14,667 or 21% to $84,763 for the three months ended March 31, 2009, compared to $70,096 for the three months ended March 31, 2008. The Company's increase in R&D expense is due to the costs associated with future generations of our projectile stun guns.

*Interest Income.* Interest income increased $2,778 to $5,402 for the three months ended March 31, 2009, compared to $2,624 for the three months ended March 31, 2008. The increase for the three months ended March 31, 2009 to 2008 was due to an increase in working capital and higher cash balances as a result of the September 2008 offering.

*Interest Expense.* Interest expense increased $102,344 to $293,032 for the three months ended March 31, 2009, compared to $190,688 for the three months ended March 31, 2008. The increase for the three months ended March 31, 2008 to 2009 was due to financing received in February and September 2008.

*Derivative Liability.* Derivative liability expense decreased $2,950,697 to $459,303 for the three months ended March 31, 2009, compared to $3,044,028 for the three months ended March 31, 2008. The increase for the three months ended March 31, 2008 to 2009 was due to financing received on February 29, 2008 and September 12, 2008.

*Net Loss.* Net loss decreased by $4,589,956 to $(1,641,493) or $(0.41) per common share for the three months ended March 31, 2009 compared to a net loss of $(6,226,449) or $(1.65) per common share for the three months ended March 31, 2008. The increase in the net loss was due primarily to the derivative liability expense associated with accounting for financing received during the third quarter of

2007 and during 2008.

14

Table of Contents

## Liquidity and Capital Resources

The process of developing and commercializing the Company's products requires significant research and development, engineering, testing, significant marketing and sales efforts, and manufacturing capabilities. These activities, together with the Company's general and administrative expenses, require significant investments and are expected to continue to result in operating losses for the foreseeable future while the Company introduces its Stinger product line to the marketplace. To date, revenues recognized from its current products have not been sufficient for the Company to achieve or sustain profitability. The Company believes it is unlikely that its existing cash resources will be sufficient to fund its operations for 2009 at its planned levels of research, development, sales, and marketing activities. Thus, execution of its current strategies will require it to raise additional capital through debt or equity transactions in order to finance its operations through 2009. Given the severe contraction in the credit market, the Company is not certain that additional financing will be available to it, or that financing will be available on acceptable terms. If adequate funds are not available, the Company may be required to delay, reduce the scope of or eliminate its research and development programs, reduce its commercialization efforts, or effect changes to its facilities or personnel, and its ability to operate as a going concern may be adversely impacted.

Stinger Systems views the development of the S-200 as an ongoing process and has spent several years developing the S-200 AT model ECD to be more mature, both in respect to the ECD's overall technology and creating an efficient manufacturing process. Because only one other significant vendor makes ECD's, the processes and best manufacturing practices could not be sourced by traditional hiring practices. The Company has incurred substantial costs to develop a sophisticated and documented methodology to completely understand every known detail related to manufacturing the ECD. Stinger Systems believes that its knowledge of manufacturing and methods of creating efficiencies for the ECO matured. The Company believes that it is at a point in which the S-200 AT can be manufactured readily and reliably at considerably less costs than in the past.

In an effort to try to maintain excellent customer relations, the Company has replaced many older model S-200's with newer, next generation models. The result of this is reflected poorly on the Company's gross and net margins. However, the Company believes that these efforts have created excellent relationships and references that provide the Company the ability to become competitive in the projectile ECD marketplace. Further, the Company believes that its new production efficiencies will allow the cost of goods sold to be greatly reduced, therefore allowing the Company to be more competitive on pricing, provide improved margins, or both.

At March 31, 2009, we had working capital of $(466,951), including a cash balance of $25,261. This represents a decrease in working capital of $1,011,834 from working capital of $544,833 at March 31, 2008 and a cash balance of $779,108. This decrease in working capital is principally due to a decrease in cash. Operating activities for the three months ended March 31, 2009 and the three months ended March 31, 2008 used cash of $558,158 and $942,495, respectively. The decrease in the negative cash flow from operating activities during the three months ended March 31, 2009, as compared to 2008 was primarily due to the decrease in our loss for the period and general timing of obligations.

The long-term continuation of the Company's business plans is dependent upon generation of sufficient revenues from its products to offset expenses. In the event that the Company does not generate sufficient revenues, it will be required to obtain additional funding through public or private financing, if available, and/or reduce certain discretionary spending. Management believes certain operating costs could be reduced if working capital decreases significantly and additional funding is not available. Failure to generate sufficient revenues, raise additional capital and/or reduce certain discretionary spending could have a material adverse effect on the Company's current operations and its ability to achieve its intended long-term business objectives.

## Critical Accounting Policies

We have identified the following policies as critical to our business operations and the understanding of our results of operations. The preparation of these financial statements require us to make estimates and assumptions that effect the reported amount of assets and liabilities, disclosure of contingent assets and liabilities at the date of our financial statements, and the reported amounts of revenue and expenses during the reporting period. There can be no assurance that actual results will not differ from those estimates. The effect of these policies on our business operations is discussed below where such policies affect our reported and expected financial results.

Revenue Recognition. Our revenue recognition policy is significant because our revenue is a key component of our results of operations. We recognize revenue when delivery of the product has occurred or services have been rendered, title has been transferred, the price is fixed and collectability is reasonably assured. Sales of goods are final, with no right of return.

Warranty Costs. We warrant our products against manufacturing defects for a period of one year. As of March 31, 2009, we have had no significant warranty claims on products sold. Once sales of our new stun gun commence, we expect to make an accrual for warranty claims based on our sales.

Intangible Assets. We have substantial intangible assets. Our estimate of the remaining useful life of these assets and the amortization of these assets will affect our gain from operations. Since we do not have a method of quantifying the estimated number of units that may be sold, we have elected to amortize these intangibles over a seven year period beginning in the first quarter of 2005.

Common Stock Issued for Goods and Services. We have issued our common stock for intangible assets and services received or to be received. The values assigned to such stock issuances effects the amount of recorded assets and the amount of recorded expenses. For stock issued before November 12, 2004, (the Company's common stock began to be traded in the Pink Sheets on November 12, 2004) we assigned a value of $0.36 to $0.40 per share which approximates the cash received per share for shares sold on September 24, 2004. For

shares issued after November 12, 2004 we assigned the closing value quoted on the OTC Bulletin Board or on the Pink Sheets as the amount of the recorded asset or expenditure. From May 2005 until November 2005, we incurred $145,000 per month of liquidated damages as part of the registration rights agreement from the December 2004 financing.

15

Table of Contents

Purchase Accounting. Our purchase accounting policy is to record any acquisitions in accordance with current accounting pronouncements and allocate the purchase price to the net assets. We evaluate the fair market values of tangible and intangible assets based on current market conditions, and financial and economic factors. Intangible assets are valued using several cash flow projection models and financial models to establish a baseline for their respective valuations. We valued our acquisition of the stun gun technology based on the competitive advantage the technology provides. These competitive advantages are analyzed in relation to the current market and may include valuation techniques, such as the cost to develop the technology, the cost of designing around the claims of the patent or technology, comparable transactions of like-kind patents or technology, and discounted cash flows of future incremental profits that may be generated. We valued our intangible assets, including our stun gun technology, utilizing the aforementioned techniques. We valued our stun gun technology by comparing current competitor's revenue and assumed a 10% market penetration of this revenue. We also assumed a factor for the increase in the general use of this stun gun technology, the estimated economic life of this current technology of approximately seven years, and the anticipated profit margins that we believed was achievable. Our policy is to expense in-process research and development costs at acquisition.

Stock Options. We have a stock option plan under which options to purchase shares of our common stock may be granted to employees, consultants and directors at a price no less than the fair market value on the date of grant. Effective January 1, 2006, the Company adopted Statement of Financial Accounting Standards No. 123 (revised 2004), "Share-Based Payment" (SFAS 123(R)) which requires the measurement and recognition of compensation expense for all stock-based awards made to employees and directors, including stock option grants, based on estimated fair values. SFAS 123(R) supersedes previous accounting under Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" (APB 25), for periods beginning in fiscal year 2006.

SFAS 123(R) requires companies to estimate the fair value of stock-based awards on the date of grant using an option-pricing model. The value of the portion of the award that is ultimately expected to vest is recognized as expense over the requisite service periods in our Consolidated Statements of Operations. The Company adopted SFAS 123(R) using the modified prospective transition method that requires the application of the accounting standard starting on January 1, 2006, without restatement of prior years. Stock options were granted at an exercise price equal to the Company's stock price at the date of grant.

Prior to the adoption of SFAS 123(R), the Company accounted for stock-based awards to employees and directors using the intrinsic value method in accordance with APB 25 as allowed under Statement of Financial Accounting Standards No. 123, "Accounting for Stock-Based Compensation" (SFAS 123). Under the intrinsic value based method, stock-based compensation expense for employee stock options was recognized in the Company's Consolidated Financial Statements as the difference in the exercise price of the option and the Company's stock price at the date of grant.

Embedded Derivatives. Certain features of the convertible notes payable were accounted for as embedded derivatives and were valued on the transaction date using the Black-Scholes pricing model. At the end of each quarterly reporting date, the value of the derivatives are evaluated and adjusted to current fair value. At March 31, 2009, the Company's derivative valuation liability totaled $7,387,074.

Limited Trading Market. On February 22, 2006, our common stock began trading on the OTC Bulletin Board. An investment in a security quoted on the OTC Bulletin Board is speculative and involves a high degree of risk. Many OTC Bulletin Board securities are relatively illiquid, or "thinly traded," which tends to increase price volatility. Illiquid securities are often difficult for investors to buy or sell without dramatically affecting the quoted price. In some cases, the liquidation of a position in a OTC Bulletin Board security may not be possible within a reasonable period of time. Reliable information regarding issuers of OTC Bulletin Board securities, their prospects, or the risks associated with the business of any particular issuer or an investment in the issuer's securities may not be available. As a result, it may be difficult to properly value an investment in a OTC Bulletin Board security. Prior to February 23, 2006, our stock has been quoted on the Pink Sheets which presented similar risks related to the liquidity of the market for our shares.

## ITEM 3.  Quantitative and Qualitative Disclosures About Market Risk.

Our exposure to market risk is currently confined to our cash and cash equivalents and restricted cash. We currently do not hedge interest rate exposure. We have not used derivative financial instruments for speculation or trading purposes. Because of the short-term maturities of our cash, cash equivalents and marketable securities, we do not believe that an increase in market rates would have any significant impact on the realized value of our investments, but may increase the interest expense associated with any future debt.

16

Table of Contents

Our most liquid assets are cash and cash equivalents. Because of their liquidity, these assets are not directly affected by inflation. We also believe that we have intangible assets in the value of our intellectual property. In accordance with generally accepted accounting principles, we have not capitalized the value of this intellectual property on our balance sheet. Due to the nature of this intellectual property, we believe that these intangible assets are not affected by inflation. Because we intend to retain and continue to use our equipment, furniture and fixtures and leasehold improvements, we believe that the incremental inflation related to replacement costs of such items will not materially affect our operations. However, the rate of inflation affects our expenses, such as those for employee compensation and contract services, which could increase our level of expenses and the rate at which we use our resources.

## ITEM 4.  Controls and Procedures

### Evaluation of Disclosure Controls and Procedures

Our management, including our principal executive and principal financial officers, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) or 15d-15(e) of the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report. Our disclosure controls and procedures are designed to provide reasonable assurance that the information required to be disclosed in this report has been appropriately recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, and that such information is accumulated and communicated to our management, including our principal executive and principal financial officers, to allow timely decisions regarding disclosures. Based on that evaluation, our principal executive and principal financial officer has concluded that our disclosure controls and procedures are effective at the reasonable assurance level.

### Changes in Internal Controls Over Financial Reporting

Our management, including our principal executive and principal financial officer, has evaluated any changes in our internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) that occurred during the period covered by this report and have concluded that there was no change that occurred during the period covered by this report that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

17

Table of Contents

## PART II — OTHER INFORMATION

### ITEM 1.  Legal Proceedings

The Company is a party in Case Number 3:04CV620K styled Taser International, Inc. v. Stinger Systems, Inc. and Robert F. Gruder, pending in the United States District Court for the Western District of North Carolina. In the suit, Taser asserts a claim for false advertising under 15 U.S.C. Section 1125(a) and seeks injunctive relief, monetary damages in an unspecified amount, trebling of damages, attorneys fees and destruction of certain advertising material. Based upon a review of the pleading, it is Stinger's management's opinion that Taser's claims center around the allegation that the Stinger stun gun does not exist and therefore Stinger's statements about its existence and capabilities are false and misleading and inasmuch as Stinger has demonstrated its Stinger stun gun on several occasions. It is Stinger's management's opinion that Stinger will prevail in the lawsuit. Stinger has moved to dismiss Taser's claims, responded to the allegations and counter sued Taser for defamation. It is seeking monetary damages, punitive damages and attorney fees.

On August 4, 2008, John Ward filed an eight-count complaint against Dennis Kaufman, Frances J. Reimer, the Company, John Doe 1 and John Doe 2 based, essentially, on a loan agreement entered into in 1992, whereby Mr. Ward loaned $30,000 to Stun Tech, Inc. Mr. Ward seeks payment of a promissory note which was the security for the loan, from all the defendants, and punitive damages against Dennis Kaufman and Frances Reimer. The Company is a defendant to the breach of contract, unjust enrichment and constructive trust counts of the complaint. Mr. Ward alleges liability against the Company based on a successor liability theory, claiming that the Company is the successor entity of Electronic Defense Technology LLC and, ultimately, of Stun Tech, Inc., the obligor of the promissory note. Mr. Ward alleges damages in the amount of $232,630 from the Company, comprising the principal of the note and interest from 1992. On September 18, 2008, the Company filed its answer and affirmative defenses. Discovery is on-going. The deposition of the Company's corporate representative is scheduled for April 23, 2009, after which, the Company may move for summary judgment based on its affirmative defenses. This case is set for trial for July 20-24, 2009.

On December 30, 2007 the Company entered into an employment agreement with Ronald Bellistri to become an officer of the Company. Mr. Bellistri contract was structured for three years and one million stock option shares. Mr. Bellistri employment was terminated with the Company in August of 2008. In May of 2009, the Company and Mr. Bellistri reached a settlement for $50,000 payable over one year and Mr. Bellistri termination has forfeited his options.

On January 9, 2007, Taser International, Inc. filed a complaint against Stinger Systems, Inc. that alleges patent infringement, false advertising, and patent false marking in its case, Taser International, Inc. v. Stinger Systems, Inc., in United States District Court for the District of Arizona, Case CV-07-0042-PHX-DGC. Discovery in this case closed on October 17, 2008, but Taser is seeking to reopen discovery. The Markman hearing has concluded, and the Court ruled on claims constructions for US patents 7,234,262, 6,999 295 and 7,102, 870 on February 2, 2009. Parties bearing the burden of proof must serve expert disclosures by April 3, 2009 (60 days after the Markman ruling). Rebuttal expert disclosures are due by May 3, 2009 (90 days after the Markman ruling). Expert depositions must be completed by June 17, 2009 (135 days after the Markman ruling). Dispositive Motions must be filed by August 1, 2009 (190 days after the Markman ruling). Upon resolution of all dispositive motions, the Court will set a pretrial status hearing to set the dates for the Pretrial Order, Motions in Limine, the Pretrial Conference and a firm Trial date. The Court's full Rule 16 Scheduling Order order dated May 2, 2007 is available on line at PACER, the official web site of the U.S. Courts. All dates are subject to modification. The case is also seeking an unspecified amount of punitive damages. Absent modification or other unexpected event, the Company will incur no legal fees for its defense in this case as the Company's attorney has agreed upon entry of appearance to act as its attorney in the case without fee. An adverse outcome in this action may have a material adverse effect on our business and results of operations.

18

Table of Contents

## ITEM 1A. RISK FACTORS

*Investing in our common stock involves a high degree of risk. You should carefully consider the risks and uncertainties described below in addition to the other information contained in this annual report. If any of the following risks actually occur, our business, financial condition or operating results could be harmed. In that case, the trading price of our common stock could decline and investors may lose part or all of your investment. In the opinion of management, the risks discussed below represent the material risks known to the company. Additional risks and uncertainties not currently known to us or that we currently deem immaterial may also impair our business operations and adversely affect the market price of our common stock.*

### We have a history of operating losses and anticipate future operating losses until such time as we can generate additional sales.

Since beginning operations in September 2004, we have sustained substantial operating losses. At the present time, we do not generate sufficient revenues to support our operating expenses. We expect to have ongoing costs associated with the process of developing and commercializing the Company's products, including significant research and development, engineering, testing, significant marketing and sales efforts, and manufacturing capabilities. These activities, together with the Company's general and administrative expenses, require significant investments and are expected to continue to result in operating losses for the foreseeable future while the Company introduces its Stinger product line to the marketplace. If adequate funds are not available to fund these activities, the Company may be required to delay, reduce the scope of or eliminate its research and development programs, reduce its commercialization efforts, or effect changes to its facilities or personnel, and its ability to operate as a going concern may be adversely impacted.

### If we do not obtain additional funding as needed, we may be unable to fund our engineering, marketing and production activities and to adequately pursue our business plan.

Our business plan requires significant ongoing expenditures for product engineering, testing and marketing of our products. It is likely that we will need additional outside funding sources in the future to continue the production and the promotion of our products. If we are not successful in obtaining additional funding for operations, if and when needed, we may have to discontinue some or all of our business activities and our stockholders might lose all of their investment.

### Our failure to properly design the Stinger projectile stun gun would have a material adverse effect on our operations.

We will be devoting our capital and management efforts to the design, production and marketing of the Stinger S-200 EID. There is no assurance that our current design will meet our targeted specifications and tolerances, or that we will be able to manufacture the Stinger EID on a timely basis at a competitive price. Failure to timely resolve any design or production issues will delay the continued production of the Stinger EID. Failure to introduce the Stinger EID on a timely basis would have a material adverse effect on us and investors could lose their entire investment.

### If we fail to convince the market place that we have competitive products, we will not be commercially successful.

Even if we are successful in designing products competitive to those of our competitors, it will be necessary for us to educate and convince the market place of that competitiveness. If we are unable to do so, we will not be able to achieve the market penetration necessary to become commercially successful and our investors may lose their investments.

19

Table of Contents

*If third party manufacturers do not perform in a commercially reasonable manner, we may not be successful.*

We rely primarily on third parties to manufacture our products. We do not have long-term supply contracts with these third party manufacturers and instead work on an order-by-order basis. By not having long-term supply contracts, we run the risk that our current suppliers will opt to discontinue their relationship with us thereby interrupting the flow of products and significantly limiting our ability to operate our business. If alternative third party manufacturers could not be located in a timely manner, we would go out of business and investors would lose their entire investment. We own all of the rights, drawings, and intellectual property regarding schematics of the electronics of our products. Circuit board manufacturing and transformer winding companies are a common business throughout the world. We continually are examining alternative sourcing and may have multiple suppliers providing transformers and circuit boards when economies of scale merit such sourcing. We do not anticipate any business interruption if any of our suppliers could no longer supply or work with us on our terms.

*Our primary competitor, Taser International Inc., has an established name in the marketplace with both distributors and the end-users of stun products.*

Taser International, Inc. is the dominant player in our industry. Taser has been able to successfully launch its products, and penetrate the marketplace. While we hope to design a product that is competitive with those offered by Taser, there is no assurance that we will be able to do so or that we will be able to successfully market such products if we are successful in designing them. Unless we are able to persuade distributors or manufacturer's representatives and end-users of the competitiveness of our products, we will be unable to generate sufficient sales of our products to become viable. Further, Taser already has contracts with a number of distributors and end-users, who may be unwilling or unable to distribute or purchase our products, respectively.

*Negative publicity about less-than-lethal stun weapons may negatively impact sales of our products.*

There have been a number of negative articles about the use and abuse of less-than-lethal weapons by law enforcement and correctional officers. There have also been accusations that stun guns have caused the deaths of subjects who have been stunned. The safety of such less-than-lethal weapons has become a matter of some controversy and continued negative publicity about the use of less-than-lethal stun devices may negatively impact the sale of our products.

*The sale and use of our products may result in claims against us.*

As noted above, the use of stun weapons has been associated with injuries, some serious and permanent, including death. While we are attempting to design the Stinger projectile stun gun to diminish the risk of injury, there can be no assurance that injuries will not occur from the use of the product. Such injuries could result in claims against us. Although we intend to maintain liability insurance for our products, there can be no assurance that the coverage limits of our insurance policies will be adequate. Claims brought against us, whether fully covered by insurance or not, will likely have a material adverse effect upon us.

*We have been sued by Taser International, Inc. which could result in a judgment against us that could negatively impact our operations.*

On January 9, 2007, Taser International, Inc. filed a complaint against Stinger Systems, Inc. that alleges patent infringement, false advertising, and patent false marking in its case, Taser International, Inc. v. Stinger Systems, Inc., in United States District Court for the District of Arizona, Case CV-07-0042-PHX-DGC. Discovery in this case closed on October 17, 2008, but Taser is seeking to reopen discovery. The Markman hearing has concluded, and the Court ruled on claims constructions for US patents 7,234,262, 6,999 295 and 7,102, 870 on February 2, 2009. Parties bearing the burden of proof must serve expert disclosures by April 3, 2009 (60 days after the Markman ruling). Rebuttal expert disclosures are due by May 3, 2009 (90 days after the Markman ruling). Expert depositions must be completed by June 17, 2009 (135 days after the Markman ruling). Dispositive Motions must be filed by August 1, 2009 (190 days after the Markman ruling). Upon resolution of all dispositive motions, the Court will set a pretrial status hearing to set the dates for the Pretrial Order, Motions in Limine, the Pretrial Conference and a firm Trial date. The Court's full Rule 16 Scheduling Order order dated May 2, 2007 is available on line at PACER, the official web site of the U.S. Courts. All dates are subject to modification. The case is also seeking an unspecified amount of punitive damages. Absent modification or other unexpected event, the Company will incur no legal fees for its defense in this case as the Company's attorney has agreed upon entry of appearance to act as its attorney in the case without fee. An adverse outcome in this action may have a material adverse effect on our business and results of operations.

20

Table of Contents

*Claims by others that our products infringed their patents or other intellectual property rights could adversely affect our financial condition.*

Any claim of patent or other proprietary right infringement brought against us would be time consuming to defend and would likely result in costly litigation, diverting the time and attention of our management. Moreover, an adverse determination in a judicial or administrative proceeding could prevent us from developing, manufacturing and/or selling some of our products, which could harm our business, financial condition and operating results. Claims against our patents may cost us significant expenses to defend and if our patents are not upheld, we may not be able to continue operations and investors may lose their entire investment.

*We may not be able to protect our patent rights, trademarks, and other proprietary rights.*

We believe that our patent rights, trademarks, and other proprietary rights are important to our success and our competitive position. While we have patents and licenses with respect to certain of our products, there is no assurance that they are adequate to protect our proprietary rights. Accordingly, we plan to devote substantial resources to the establishment and maintenance of these rights. However, the actions taken by us may be inadequate to prevent others from infringing upon our rights which could compromise any competitive position we may develop in the marketplace.

*Law enforcement, correction and military operations are government agencies which are subject to budgetary constraints, which may inhibit sales.*

Government agencies are generally subject to budgets which limit the amount of money that they can spend on weapons procurement. It may be that although a government agency is interested in acquiring our products, it will be unable to purchase our products because of budgetary constraints. Further, the lead time for an agency acquiring new weapons and receiving approval to acquire them may delay sales to such agencies. Any such delay will have an adverse effect upon our revenues.

*There exist some state, local and international regulations and/or prohibitions on less-than-lethal weapon systems which will make it more difficult or impossible to market our products in those jurisdictions thereby limiting potential revenues.*

Some states prohibit the sale of less-than-lethal weapon systems. Additional negative publicity with respect to less-than-lethal weapon systems may cause other jurisdictions to ban or restrict the sale of our products. Internationally, there are some countries which restrict and/or prohibit the sale of less-than-lethal weapon systems. Further, the export of our less-than-lethal weapon systems is regulated. Export licenses must be obtained from the Department of Commerce for all shipments to foreign countries. To the extent that states, local governments or other countries impose restrictions or prohibitions on the sale and use of our products or to the extent we are unable to obtain export licenses for the sales of our weapons to international customers, our sales could be materially adversely impacted.

*If we cannot retain or hire qualified personnel, our programs could be delayed.*

Our business is a technical and highly specialized area of the firearms industry. We are dependent on the principal members of the management and technical staff. The loss of key employees could disrupt our research and development and product promotion activities. We believe that our future success will depend in large part upon our ability to attract and retain highly skilled, scientific and managerial personnel. We face intense competition for these kinds of personnel from other companies and organizations. We might not be successful in hiring or retaining the personnel needed for our company to be successful.

21

Table of Contents

***Because our common stock is quoted only on the OTC Bulletin Board and the Pink Sheets, your ability to sell your shares in the secondary trading market may be limited.***

Our common stock is traded only on the OTC Bulletin Board and the Pink Sheets. Consequently, the liquidity of our common stock is impaired, not only in the number of shares that are bought and sold, but also through delays in the timing of transactions, and coverage by security analysts and the news media, if any, of our company. As a result, prices for shares of our common stock may be different than might otherwise prevail if our common stock was quoted or traded on a national securities exchange such as the New York Stock Exchange, NASDAQ or the American Stock Exchange.

***Our stock price has been volatile and your investment in our common stock could suffer a decline in value.***

Our common stock is quoted for trading only on the OTC Bulletin Board and the Pink Sheets. The market price of our common stock may fluctuate significantly in response to a number of factors, some of which are beyond our control. These factors include:

- sales of the Stinger projectile stun gun;
- announcements of technological innovations or new products by us or our competitors;
- government regulatory action affecting our products or our competitors' products;
- developments or disputes concerning patent or proprietary rights;
- actual or anticipated fluctuations in our operating results;
- changes in our financial estimates by securities analysts;
- broad market fluctuations; and
- economic conditions in the United States.

During 2008, the split-adjusted closing sales price of our stock has ranged from $0.55 to $7.60. Our stock closed on March 31, 2009 at $0.50 per share. All amounts set forth in this Form 10-Q have been adjusted to reflect a 1-for-5 reverse stock split affected on January 17, 2009.

***Trading of our stock may be restricted by the SEC's penny stock regulations, which may limit a stockholder's ability to buy and sell our stock.***

The SEC has adopted regulations which generally define "penny stock" to be any equity security that has a market price (as defined) less than $5.00 per share or an exercise price of less than $5.00 per share, subject to certain exceptions. Our securities are covered by the penny stock rules, which impose additional sales practice requirements on broker-dealers who sell to persons other than established customers and "accredited investors". The term "accredited investor" refers generally to institutions with assets in excess of $5,000,000 or individuals with a net worth in excess of $1,000,000 or annual income exceeding $200,000 or $300,000 jointly with their spouse. The penny stock rules require a broker-dealer, prior to a transaction in a penny stock not otherwise exempt from the rules, to deliver a standardized risk disclosure document in a form prepared by the SEC which provides information about penny stocks and the nature and level of risks in the penny stock market. The broker-dealer also must provide the customer with current bid and offer quotations for the penny stock, the compensation of the broker-dealer and its salesperson in the transaction and monthly account statements showing the market value of each penny stock held in the customer's account. The bid and offer quotations, and the broker-dealer and salesperson compensation information, must be given to the customer orally or in writing prior to effecting the transaction and must be given to the customer in writing before or with the customer's confirmation. In addition, the penny stock rules require that prior to a transaction in a penny stock not otherwise exempt from these rules, the broker-dealer must make a special written determination that the penny stock is a suitable investment for the purchaser and receive the purchaser's written agreement to the transaction. These disclosure requirements may have the effect of reducing the level of trading activity in the secondary market for the stock that is subject to these penny stock rules. Consequently, these penny stock rules may affect the ability of broker-dealers to trade our securities. We believe that the penny stock rules discourage investor interest in and limit the marketability of our common stock.

***FINRA sales practice requirements may also limit a stockholder's ability to buy and sell our stock.***

In addition to the penny stock rules described above, the FINRA (Financial Industry Regulatory Authority) has adopted rules that require that in recommending an investment to a customer, a broker-dealer must have reasonable grounds for believing that the investment is suitable for that customer. Prior to recommending speculative low priced securities to their non-institutional customers, broker-dealers must make reasonable efforts to obtain information about the customer's financial status, tax status, investment objectives and other information. Under interpretations of these rules, the FINRA believes that there is a high probability that speculative low priced securities will not be suitable for at least some customers. The FINRA requirements make it more difficult for broker-dealers to recommend that their customers buy our common stock, which may limit your ability to buy and sell our stock and have an adverse effect on the market for its shares.

22

Table of Contents

***Sales of a substantial number of shares of our common stock in the public market could lower our stock price and impair our ability to raise funds in stock offerings and impair the ability of stockholders to receive a return on their investment in Stinger Systems.***

Future sales of a substantial number of shares of our common stock in the public market, or the perception that such sales could occur, could adversely affect the prevailing market price of our common stock and could make it more difficult for us to raise additional capital through the sale of equity securities and reduce the chances of persons who have invested in us of receiving a return on their investment. In addition, substantially all of the outstanding shares of our common stock are freely tradable or eligible for sale under Rule 144, subject to certain conditions of that rule.

***Exercise of outstanding options, warrants and convertible securities will dilute existing shareholders and could decrease the market price of our common stock.***

All amounts set forth in this Quarterly Report Form 10-Q have been adjusted to reflect a 1-for 5 reverse stock split affected on January 17, 2009. As of March 31, 2009, we had 4,001,832 shares issued and outstanding, 28,542,057 shares of common stock that could be issued upon the exercise of options, warrants, grants and convertible securities, of which 1,244,900 shares could be issued pursuant to the exercise of options outstanding under the Stinger Systems, Inc. Employee Stock Option & Stock Bonus Plan. There can be no guarantee that any or all of the warrants, grants, options or convertible securities will be exercised or converted. To the extent these underlying shares are ultimately issued, there will be further dilution to investors. The existence or exercise of the outstanding options, grants, warrants or convertible notes may adversely affect the market price of our common stock and the terms under which we could obtain additional equity capital.

***We likely will issue additional equity securities which will dilute your share ownership.***

We likely will issue additional equity securities through the exercise of options, grants, convertible notes, or warrants that are outstanding or may be outstanding, and possibly to raise capital. These additional issuances will dilute your share ownership.

***Any short selling of our stock could depress the stock's price and have a negative impact on the investments in us by our stockholders.***

Downward pressure on our stock price could result from the occurrence of any of the risk factors set forth herein as well as from other factors that relate generally to stocks that trade in the securities markets. Downward pressure on our stock could result in short sales of stock that could further depress the price. The further depression of the stock price could then encourage additional short selling with the end result being a downward spiral of our stock price. If short selling of our stock should commence in the market, the net effect could be an overall drop in share price thereby having a negative effect on any person owning shares of our stock.

***We do not intend to pay any cash dividends on our common stock in the foreseeable future and, therefore, any return on your investment in our common stock must come from increases in the fair market value and trading price of our common stock.***

We have never paid a cash dividend on our common stock. We do not intend to pay cash dividends on our common stock in the foreseeable future and, therefore, any return on your investment in our common stock must come from increases in the fair market value and trading price of our common stock.

**ITEM 2.  Unregistered Sales of Equity Securities and Use of Proceeds. Not applicable.**

**ITEM 3.  Defaults Upon Senior Securities. Not applicable.**

**ITEM 4.  Submission of Matters to a Vote of Security Holders. Not applicable.**

**ITEM 5.  Other Information. Not applicable.**

23

**Table of Contents**

## ITEM 6. EXHIBITS

| Exhibit No. | Description |
|---|---|
| 31.1 | Section 302 Certification of the Principal Executive Officer pursuant to Rule 13a-14(a) under the Securities Exchange Act of 1934. |
| 31.2 | Section 302 Certification of the Principal Financial Officer pursuant to Rule 13a-14(a) under the Securities Exchange Act of 1934. |
| 32.1 | Section 906 Certification of the Principal Executive Officer pursuant to U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2 | Section 906 Certification of the Principal Financial Officer pursuant to U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |

24

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

STINGER SYSTEMS, INC.
(Registrant)

Date: May 15, 2009

/s/ Robert F. Gruder
Robert F. Gruder
President
(Principal Executive Officer)


Date: May 15, 2009

/s/ Brian S. Gannon
Brian S. Gannon
Financial Controller
(Principal Financial Officer)

25

**Table of Contents**

### Index to Exhibits

| Exhibit No. | Description |
| --- | --- |
| 31.1 | Section 302 Certification of the Principal Executive Officer pursuant to Rule 13a-14(a) under the Securities Exchange Act of 1934. |
| 31.2 | Section 302 Certification of the Principal Financial Officer pursuant to Rule 13a-14(a) under the Securities Exchange Act of 1934. |
| 32.1 | Section 906 Certification of the Principal Executive Officer pursuant to U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2 | Section 906 Certification of the Principal Financial Officer pursuant to U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |

26

EX-31.1 2 g19122exv31w1.htm EX-31.1

Exhibit 31.1

### CERTIFICATION PURSUANT TO
### RULE 13a-14(a) UNDER THE
### SECURITIES EXCHANGE ACT OF 1934

I, Robert F. Gruder, Principal Executive Officer, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of Stinger Systems, Inc., for the period ended March 31, 2009;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 15, 2009

/s/ Robert F. Gruder
Robert F. Gruder
Principal Executive Officer

EX-31.2 3 g19122exv31w2.htm EX-31.2

**Exhibit 31.2**

### CERTIFICATION PURSUANT TO
### RULE 13a-14(a) UNDER THE
### SECURITIES EXCHANGE ACT OF 1934

I, Brian S. Gannon, Principal Financial Officer, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of Stinger Systems, Inc., for the period ended March 31, 2009;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 15, 2009

/s/ Brian S. Gannon
Brian S. Gannon
Principal Financial Officer

EX-32.1 4 g19122exv32w1.htm EX-32.1

**EXHIBIT 32.1**

### CERTIFICATION PURSUANT TO
### 18 U.S.C. SECTION 1350
### AS ADOPTED PURSUANT TO
### SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Quarterly Report of Stinger Systems, Inc. (the "Company") on Form 10-Q for the period ending March 31, 2009 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Robert F. Gruder, Principal Executive Officer of the Company, certify pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1)   The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)   The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ Robert F. Gruder
Robert F. Gruder
Principal Executive Officer

Date: May 15, 2009

EX-32.2 5 g19122exv32w2.htm EX-32.2

**EXHIBIT 32.2**

### CERTIFICATION PURSUANT TO
### 18 U.S.C. SECTION 1350
### AS ADOPTED PURSUANT TO
### SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Quarterly Report of Stinger Systems, Inc. (the "Company") on Form 10-Q for the period ending March 31, 2009 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Brian S. Gannon, Principal Financial Officer of the Company, certify pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1)  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ Brian S. Gannon
Brian S. Gannon
Principal Financial Officer

Date: May 15, 2009

Exhibit 12

Case 2:07-cv-00042-JAT    Document 186-3    Filed 08/14/09   Page 39 of 106

 **United States Patent and Trademark Office**

Home|Site Index|Search|Guides|Contacts|eBusiness|eBiz alerts|News|Help



**Assignments on the Web** > Patent Query

# Patent Assignment Abstract of Title
## NOTE:Results display only for issued patents and published applications. For pending or abandoned applications please consult USPTO staff.

**Total Assignments: 3**

| | | |
|---|---|---|
| **Patent #:** NONE | **Issue Dt:** | **Application #:** 11746952 | **Filing Dt:** 05/10/2007 |

**Publication #:** 20080278882    **Pub Dt:** 11/13/2008

**Inventor:** Thomas V. Saliga

**Title:** Electric Disabling Device with Controlled Immobilizing Pulse Widths

**Assignment: 1**

**Reel/Frame:** 019358/0170          **Recorded:** 05/30/2007                              **Pages:** 2

**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignor:** SALIGA, THOMAS V., MR.                          **Exec Dt:** 04/17/2007

**Assignee:** STINGER SYSTEMS, INC.
2701 NORTH ROCKY POINT DRIVE, SUITE 1130
TAMPA, FLORIDA 33607

**Correspondent:** LEONARD TACHNER, A PROFESSIONAL LAW CORP
17961 SKY PARK CIRCLE, SUITE 38-E
IRVINE, CA 92614

**Assignment: 2**

**Reel/Frame:** 019754/0160          **Recorded:** 08/28/2007                              **Pages:** 7

**Conveyance:** ASSIGNMENT FOR SECURITY

**Assignor:** STINGER SYSTEMS, INC.                          **Exec Dt:** 08/03/2007

**Assignee:** CASTLERIGG MASTER INVESTMENTS LTD., AS COLLATERAL AGENT
C/O SANDELL ASSET MANAGEMENT, 40 WEST 57TH STREET
26TH FLOOR
NEW YORK, NEW YORK 10019

**Correspondent:** WATT WANAPHA
919 THIRD AVENUE
19TH FLOOR
NEW YORK, NY 10022

**Assignment: 3**

**Reel/Frame:** 021531/0151          **Recorded:** 09/16/2008                              **Pages:** 5

**Conveyance:** SECURITY AGREEMENT

**Assignor:** STINGER SYSTEMS, INC.                          **Exec Dt:** 09/12/2008

**Assignee:** DEBT OPPORTUNITY FUND, LLLP
20711 STERLINGTON DRIVE
LAND O'LAKES, FLORIDA 34638

**Correspondent:** RANDY K. STERNS
1801 N. HIGHLAND AVENUE
TAMPA, FL 33602

Search Results as of: 08/10/2009 07:39 PM
If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350.
Web interface last modified: October 18, 2008 v.2.0.2

| .HOME | INDEX| SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT |

# Exhibit 13

# THE STINGER S-200™

## Basic Operator Certification Program
### Student Manual



**WWW.STINGERSYSTEMS.COM**
**1.866.STUNSHOT (788-6746)**

STINGER000805

# BASIC 8-HOUR TRAINING MANUAL

This is the Basic 8-Hour Certification Course Training Manual for the Stinger S-200.

It is a comprehensive, BASIC presentation for the individual who will be using the device in the field.

This manual is to be used only in conjunction with the Basic Certification Program and ONLY by authorized Stinger Systems, Inc. instructors.

The data found within the manual is based on extensive research and actual combat situations. It represents over 20 years of organization and is made available as a result of the numerous requests from Criminal Justice agencies across the country for a standardized certification program.

    Students should be advised to:
        1. Maintain these manuals with updates
        2. Read the manual from cover to cover

By reading the manual through, the student will have learned almost everything that he/she possibly can. The only additional learning process will be the expertise developed by actual field application.

**NOTE:** *This manual is a legal document.*

STINGER000806

 # MANUAL FORWARD

The following program of instruction will provide the student with a fundamental understanding of the Stinger Systems Hand Held Stun Device. This program is to be conducted by a Stinger Systems certified instructor.

Students should consult with their department prior to the deployment of any use of force alternative. Questions relative to this training program or the Stinger device should be directed to:

**Stinger Systems Training Division**
**2701 North Rocky Point Drive, Suite 1130**
**Tampa, Fl. 33607**

**Phone: (800) 345-7886**
**Fax: (813) 288-9148**

Instructor Name: _____

Date of Instruction: _____

Location of Training: _____

© Stinger Systems, Inc. Unauthorized reproduction of this material is strictly forbidden without the written consent of Stinger Systems, Inc.

STINGER000807

# STINGER BASIC TRAINING PROGRAM

## Introduction

Stinger is a non-lethal electronic immobilization product designed for short-term non-lethal incapacitation of an individual during law enforcement/correctional operations.

As with any product utilized during use of force altercations (even hands-on physical contact), although designed to be non-lethal, the device has a potential of inflicting injury and even a remote aspect of lethality. Care must be exercised during any type of use of force encounters to minimize injuries and/or death.

Stinger Systems, Inc. is pleased to introduce the Stinger stun device to promote officer and subject safety by minimizing physical contact and the time spent during physical encounters.

## Training and Performance Objectives

- Officer injury reduction.
- Reduction of liability law suits against officers and municipalities.
- Reduction of liability claims against the misuse or improper use of EIDs.
- Understanding what bodily contact with various EID's will accomplish - duration and application areas.
- Understanding force - meeting force with force, excessive force, required force, deadly force, and range of force.
- Awareness of vicarious and civil liabilities.
- Demonstration of basic field defensive tactics in EID use.
- Learn basic laws and principles of electricity
- Be able to define "Use of Force", "Reasonable Force" and explain the "Force Continuum"
- Learn proper technique to document a "Use of Force" incident involving the Stinger
- Demonstrate the ability to manipulate, operate and maintain the Stinger EID
- Participate in "Live Fire" deployment of the Stinger

It is important to learn the principles of how the Stinger system works as well as how to determine if its use in a particular situation is appropriate and applicable.

After the completion of this course, the student should have a better understanding of the dynamics behind the Stinger and its operation, as well as having a enough information in regards to use of force to properly, effectively, and justifiably use this device in a real world setting.

Also as part of the course, you will learn how to properly report and document Stinger deployments for later use in the field.

STINGER SERIES S-200 | 3

STINGER000808



## INITIAL COURSE REGISTRATION FORM

Applicant Name _____
                        LAST NAME                                    FIRST NAME                          MI

Social Security Number: _____   Date of Birth: _____
                                                                                              MM/DD/YY

Mailing Address: _____
                        NUMBER AND STREET                          CITY/TOWN                    STATE        ZIP

Telephone: Residence: _____   Business: _____   Fax: _____

May STINGER contact you via e-mail with training and device information updates?   ☐ Yes   ☐ No

E-Mail Address: _____

Agency: _____   Officer Rank: _____

Agency Address: _____
                        NUMBER AND STREET                          CITY/TOWN                    STATE        ZIP

Course Requested (Check each that apply)

   ☐   STINGER System Basic Course

   ☐   STINGER System Instructor Course (Prerequisite: Basic Course)

   ☐   STINGER System Senior Instructor Course (Prerequisite: Instructor Course)

For the Instructor and Senior Instructor courses, have you completed the required prerequisite courses?

☐ Yes   Course Name: _____   Date Completed: _____

       Course Name: _____   Date Completed: _____

☐ No   If no, this application cannot be processed until the proper prerequisite training has been com-
      pleted, and documentation of stated training has been provided by the student.

I, the undersigned, certify that all information contained on this application is true and correct to the best of
my knowledge, and I have not omitted any pertinent information. I understand that any misrepresentation,
falsification or omission of pertinent information may be cause for denial of certification and possible expul-
sion from requested and/or all training classes conducted by STINGER Systems, Inc.

Applicants Signature: _____   Date: _____

━━━━━━━━━━━━━━━━━━━ INSTRUCTOR USE ONLY ━━━━━━━━━━━━━━━━━━━

Payment Received:   ☐ Yes   ☐ No   Instructor Cert. #: _____

Application Approved:   ☐ Yes   ☐ No   If No, Reason(s): _____

**White: Student**     **Yellow: Instructor**

**STINGER000809**

YOU ARE IN POSSESSION OF A WEAPON CLASSIFIED BY
BATF AS A FIREARM, PURSUANT TO RULE 80-20 OF THE
GCA OF 1968.

HANDLE AND TREAT THIS WEAPON AS
YOU WOULD ANY FIREARM.

* ALWAYS POINT DOWN UNLESS READY TO USE

* TREAT IT AS LOADED AT ALL TIMES

* KEEP FINGER AWAY FROM TRIGGER UNTIL READY TO FIRE

**NOTICE**

The information provided herein is intended to familiarize the user with basic product operations. It is NOT designed, nor intended, to substitute for certified product training by an authorized instructor.

STINGER000810



# TABLE OF CONTENTS

**1. Stinger Systems Products**     **8**

**2. About the Stinger Series S-200**     **9**
Commentary for Prospective Users ............................................................. 9
Disclaimer .................................................................................................. 9
Smart Stun Technology ............................................................................. 10
How the S-200 Operates ........................................................................... 10
Advantages of the Stinger EID ................................................................. 10
Unique Feature of the S-200 ASM (Auto-Sleep Mode) ............................ 10

**3. Stinger Systems' Position**     **11**

**4. Electronic Information**     **12**
Common Electrical Terms ......................................................................... 12
Basic Principles of Electricity ................................................................... 12
Ohms Law ................................................................................................. 12
Facts ......................................................................................................... 13
Voltage and Amperage ............................................................................. 13
Neuromuscular Keying ............................................................................. 13

**5. General Effects of the Stinger**     **15**

**6. Body Application Information**     **16**
Body Application Points ........................................................................... 16
Areas to Avoid When Possible and Practical Training Directive ............... 16
Areas to Avoid When Possible/Restrictions/Contact Stun Mode (CSM) ... 17
Preferred Application Areas and Effects ................................................... 19
Areas to Avoid in the Contact Mode ........................................................ 19
Application Marks/Signature/Evidence .................................................... 20
Variables that Determine Effectiveness .................................................... 20
Post Deployment Care .............................................................................. 21

**7. Use of Force & Force Continuum**     **22**
Use of Force Tactics ................................................................................. 23
Use of Force/Policies & Tactics ............................................................... 24

STINGER000811

Authority for Force ............................................................................... 24
Understanding Force ............................................................................. 24
Types of Force - Alternative Force Implementation ......................... 25
A Force Continuum ............................................................................... 26
Force Continuum Scale ........................................................................ 27
Transfer of Force .................................................................................. 28
ACLU Policy #207 ................................................................................. 29

## 8. Stinger Tactical Deployment &
## Practical Aspects Device Capabilities                           **30**
Mode 1 - Contact .................................................................................. 30
Mode 2 - Distance ................................................................................ 30
Distance Firing vs. Contact Mode ...................................................... 31

## 9. Liability Aspects & Court Review                               **33**
Documentation of Deployment ............................................................ 33
Testifying in Court ................................................................................ 33
Areas of Civil Liberties ........................................................................ 33
Caldwell v. Moore ................................................................................. 34
Haynes v. Marshall ............................................................................... 34
Considerations Regarding In-Custody and Sudden Deaths ............ 35

## 10. Battery Information                                           **37**
General .................................................................................................. 37
Lithium Battery Power Source Applicable to the Stinger ................. 37
Training Information .............................................................................. 38
Tips ........................................................................................................ 38
Stinger Power Source & Battery Specifications ................................ 38
Unique Feature of the S-200 ASM (Auto-Sleep Mode) ..................... 38

## 11. Wearing the Stinger/Size Requirements                        **40**

## 12. Hands On - Practical Exercises                                **41**
Hands On - Basic Techniques .............................................................. 41
Hands On - Tactical Training Session ................................................. 41
Practical Exercise ................................................................................ 43

## Appendix A - Features of the Stinger S-200                       **44**

## Appendix B - Specifications of the Stinger S-200                 **45**

## Appendix C - Abbreviations & Definitions                         **48**
Abbreviations ........................................................................................ 48
Definitions ............................................................................................. 48
Common Electrical Terms ..................................................................... 49

STINGER000812

# STINGER SYSTEMS PRODUCTS



**BAND-IT™**
An electronic wrap used in the transport of dangerous criminals – can be triggered by motion or remotely.



**ICE SHIELD™**
An electrified riot shield used in hostile crowd control situations.



**STINGER S-200™**
A handheld, projectile stun gun utilizing quantum flyback nervelok technology



**ULTRON® II (Discontinued Dec. 2006)**
A handheld, contact stun gun used widely by police and corrections officers around the country.

STINGER000813

# ABOUT THE STINGER SERIES S-200

The S-200 is spearheading new technology promising greater, safe knock-down power than existing technology. The device electrodes deliver high-voltage energy in a precisely controlled series of energy packets or "Quanta". The electronics delivers these energy quanta from a so-called "Flyback" transformer circuit, hence the term Quantum Flyback Technology ("QFT").

When in use, each energy packet has a dual personality: if the device electrodes have not yet hit a target, the energy quantum "flies back" to over 50,000 volts creating a commanding electrical spark – one which penetrates clothing easily. Yet once the "target" is contacted, the energy quantum delivers NMI voltage and current very effectively.

Series of quantum pulses are delivered first as ionizing spark energy and then as a more immobilizing, lower-voltage, higher current energy quanta once on target.

A novel feature of QFT is the ability to tailor the energy delivery sequence to more thoroughly incapacitate nerve tissue with less total energy being delivered. To more effectively lock-up muscle tissue, the applied incapacitating pulse energy should last between 50 microseconds and 250 microseconds. QFT adjusts its energy delivery width to 180 microseconds. Further, nerve tissue has a recovery period (depolarization and refractory period) of approximately 4,000 microseconds. By emitting yet a second quantum energy burst that period of time later, the muscles become hopelessly overloaded and fatigued very quickly – yet with less total pulse energy than a conventional stun gun. This Nervelok™ quanta delivery profile for the QFT stun system offers the user the following benefits: reliability, effectiveness and product longevity!

## Commentary for Prospective Users

While electronic immobilization technology has been available for use by the criminal justice system since 1973, Stinger Systems has added greater functionality and industry-leading documentation capability with its Stinger series projectile/contact stun guns. Non-lethal by intended design, the Stingers utilize modern technology. The Stingers are designed to provide law enforcement, professional security, and military personnel with a viable alternative to brute and deadly force options. When used properly, the Stingers can significantly reduce officer and subject injuries.

## Disclaimer

The Stinger technology is not without limitations and risks.

STINGER000814

**Smart Stun Technology**

The S-200 uses proven pulse waveform technology ("PWT") based on known safe levels of electrical values. High voltage and low amperage provide a capacitor discharge system designed to temporarily immobilize an aggressive individual with minimal recovery time. PWT is designed to affect the neuro-muscular system by interrupting and disrupting the electrical impulses to and from the brain. Consequently, electrical impulses throughout the human body become confused and ultimately "shut down" temporarily.

**How the S-200 Operates**

- Primarily the S-200 operates on high voltage, low amperage electrical frequency.
- Modern engineering has developed Quantum/Nervelok technology exclusive to the S-200.

**Advantages of the Stinger EID**

- Can be utilized by all officers regardless of size or strength
- Minimal training time is required
- No specific skills are required
- Stinger easily integrates with all defensive tactics programs
- Can be used for both defense and control
- Reduces officer and offender injury rates
- Reduces excessive force complaints

Size, strength or fitness does not affect your ability to effectively use the Stinger. Four to six hours of training is all that is required to become a Stinger operator.

The Stinger can be used for the only two reasons force would be used: for Defense or Control.

The less physical contact spent with an offender reduces officer and offender injury rates.

The less physical contact spent with an offender also lessens the number of excessive force complaints because of the reduction of permanent injuries to offenders. Officers must, however, use common sense in selecting to utilize any alternative to control a situation.

**Unique Feature of the S-200 ASM (Auto-Sleep Mode)**

*See page 38 for more information.*

**STINGER000815**

# ▇3 STINGER SYSTEMS' POSITION

Stinger Systems Inc. designs its products to be intended for non-lethal use. However, unknown factors such as substance abuse, pre-existing, non-obvious medical conditions or abnormal levels of stress potentially could result in a more serious injury or possibly lethality.

## Definition: Non-Lethal

U.S. Department of Defense policy defines non-lethal weapons as "weapon systems that are explicitly designed and primarily employed so as to incapacitate personnel or material, while minimizing fatalities, permanent injury to personnel, and undesired damage to property and the environment..."

It is important to note that Department of Defense policy does not require or expect non-lethal weapons are intended to significantly reduce the probability of such fatalities or injuries as compared with traditional military weapons which achieve their effects through the physical destruction of targets.

*-Joint Concept for Non-lethal Weapons*
*United States Marine Corps*

STINGER000816



# ELECTRICAL INFORMATION

## Common Electrical Terms

**Voltage:** The measure of electromotive force in the system

**Amperage:** The measure of current flow per unit time

**Ohm:** Unit used to measure resistance to the conduction of electricity

The flow of electricity in relation to passing through an object is specifically described in terms of *Voltage, Amperage,* and *Ohms,* each of which play a role in the passage and effect of electricity on the human body.

In the next few sections, you will learn more about each of these and how they apply to the Stinger and its effects on the human body.

## Basic Principles of Electricity

- Electricity takes the path of least resistance
- There is a direct correlation between amperage and voltage (Ohms Law)
- Amperage or current is the number one factor in human fatalities
- Pulsed electricity at pre-determined intervals is non-lethal
- Ohms Law cannot be altered

These are basic principles of electricity and are always a constant by laws of physics. Electricity always works on what is called a circuit principle, in which electrical current needs a complete circular path or circuit to and from the source of power to be of any effect. When a partial circuit comes in contact with a conductive material, the electrical current from one part of the circuit travels through the least resistant part of the conductor to the opposite part of the circuit, thus completing the circle.

The main principle to remember is that high amperage in electricity is what causes death in humans, not the voltage.

## Ohms Law

$I = E/R$

I – Current through the body

E – Voltage across the body

R – Resistance of the body

STINGER000817

Imagine water flowing down a river (voltage or E), as the water flows down the river and it encounters some large boulders it has to flow around the boulders (resistance or R), therefore reducing the current going down the river (through the body or I).

Also imagine a car traveling down a road at 80 m.p.h., the car encounters a series of cones arranged in a pattern. The car has to slow down to maneuver through the cones. The car is the voltage and the cones are the resistance. When the current encounters the resistance it decreases the current through the body.

## Facts

- Resistance is measured in Ohms
- 1,000 Ohms stimulates human body resistance (skin)
- Immobilization does not occur at voltages less than 6,000
- Stinger has a minimum of 7,000 to 8,000 volts in the body

The adult human body is capable of generating almost 2,000 Ohms in optimal conditions and immobilization or muscular interference does not occur at voltages less than 6,000. Electronic stun devices must be rated to put out a high voltage output with lowered amperage to have the desired effect without causing permanent damage or possible death to the subject.

## Voltage and Amperage
**Example:** one unit of flow (amperes) occurs with one unit of force (volts) divided by one unit of resistance (ohms).

Joules = watt second

Current flow, or amperes, is the most important single factor in human electrocution. By direct measurement and information derived from animal studies, the following approximations as to various effects of current flow in humans for 60-hertz alternating currents are generally accepted:

    0.001 amps - barely perceptible tingle
    0.016 " - "let go" current
    0.020 " - muscular paralyses
    0.100 " - ventricular fibrillation
    2.000 " - ventricular standstills
    20,000 " - common household fuse blows

## Neuromuscular Keying
The generated pulses project a frequency into the neuromuscular system of a subject and *Temporarily* interrupt *Voluntary* muscle control

Pulsed electricity relates to the method in which the electrical shock is introduced. As opposed to a direct current shock where the voltage and amperage remains constant over a period of time, a pulse delivers a set voltage and amperage of the greatest strength upon initial contact, and then diminishes to a lower rate immediately. It only effects voluntary muscle groups and the effect is temporary.

STINGER000818

Pulse duration time is approximately 10 microseconds

Pulse voltage ratio is approximately 32 pgps (pulse groups per second)

Pulse voltage is 7,000 to 8,000 volts in subject

The offender will be receiving approximately 32 pgps for each second the Stinger is deployed. The actual voltage received by the offender will be approximately 8,000 volts under a 1k Ohm load. The electrical current of these pulses will cause the muscular systems that lie in the path of least resistance to experience a signal overload, eventually causing them to contract and relax violently, wearing them out, thus causing temporary immobilization.

*The S-200 electrical specifications are as follows:*

| | |
|---|---|
| Pulse Rate: | 32 pulse groups per second |
| Pulse Duration: | 300us to 400us |
| Peak Arc Volts: | 63KV |
| Peak Loaded Voltage: | 1300v |
| DC Curr Avg: | 5.0mA |
| Energy at Main Capacitor: | 0.60J |

STINGER000819



## TRAINING DIRECTIVE #101-S-106

### Length of Contact
In the event the use of a Stinger™ is required in an effort to control a resisting or uncontrollable individual, it is recommended to be applied up to two (2) sequential 4-second applications or only until resistance has been terminated - up to the 8 seconds and pursuant to respective agency policies and/or guidelines. Furthermore, it is suggested that officers will not unneccesarily or unreasonably endanger themselves or a third party to be in compliance with stated guidelines.

### Course of Action
When a device is applied in the contact or firing mode to a combative/resisting individual, if there are NO noticeable results after (2) 4-second applications, Stinger Systems recommends in most circumstances that it be holstered and a secondary plan of control implemented. Should the device have a noticeable effect at any given time during the applications, Stinger Systems recommends it be discontinued after compliance is attained, but not exceeding 8 seconds (two 4-second applications).

Chances are that if the device does not work within the 8 second window, it is highly unlikely it will work at all. From the standpoint of over-use, or intentional abuse, extended duration of more than (2) 4-second sequential applications is discouraged.

When and where possible, during an application of a Stinger™, follow-up physical contact controls should be initiated as quickly and as safely as possible. Use of the Stinger™ is intended to reduce the time an officer spends in a physical confrontation but it may NOT avoid a physical altercation. Officers must be prepared to use alternative methods commensurate with use of force policy and also realize physical contact is not ALWAYS inevitable and may not be avoidable. Thus, physical contact control techniques may be reality and must rely on an officer's abilities.

Providing the Stinger™ has an effect upon an individual, immediate follow-up control should be initiated. However, after (2) intentional 4-second applications, if there are no noticeable results to a subject, Stinger Systems recommends there should be a 2-3 second officer discretional pause and a third 4-second application applied. Ultimate failure to work at a third stage deployment will require a transition to a different method/ alternative application of force either equal to intended electrical immobilization or greater than, depending on respective agency policy.

Field experience with this technology for over 30 years indicates one of three results taking place. Consult with certified training instructors to learn more regarding these phases.

**NOTE:** *During an effective application of a device either during contact or distance firing modes, it is highly likely that if the officer gives an individual orders, failure to comply will be evident. This is a typical response because the individual hears the audible orders but the body is not capable of responding. Accordingly, officers misinterpret this as "failure to comply" and will administer subsequent applications. This is incorrect and must be avoided.*

*An officer must ALWAYS be prepared to transition to a different force alternative if an applied option does not work.*

**I have read this page and fully understand its meaning.**

_____          _____
          SIGNATURE                                  DATE


_____          _____
          PRINT NAME                              INSTRUCTOR

**White: Student     Yellow: Instructor**

**STINGER000820**

# GENERAL EFFECTS OF THE STINGER

- .5 seconds – Startles subject
- 1 - 2 seconds – Causes a release action and minor muscle contractions
- 2 - 4 seconds – Causes a stunning action and knocks offender down
- 4 – 6 seconds – Temporary, short-term non-lethal incapacitation state causes a loss of balance, loss of voluntary muscle control, confusion and disorientation

**NOTE:** *The effects are not the same on everyone.*

A 2-4 second application should be sufficient to gain compliance with most offenders under normal circumstances. Be aware that some individuals, especially on certain types of drugs such as PCP, may not react immediately or at all to the application of an electronic stun device. Others may require a longer pulse discharge, however, you must be cautious not to send too long of an application into a subject as it could raise the likelihood of injury.

The Stinger utilizes high tech quality electronic components that precisely blend *Pulsed Electricity, High Voltage* and *Low Amperage* that mimic and override the body's individual electrical system and will achieve takedown capabilities while not causing damage or injury to the human body.

This is how the Stinger system works. As all body functions are controlled by electrical impulse from the brain, additional electrical pulses can disrupt these messages causing an overload in the neuro muscular systems of the contact areas, thus causing immobilization or rapid fatigue without causing permanent or serious damage to those systems.

STINGER000821

# ◆6 BODY APPLICATION INFORMATION

## Body Application Points

- Attempt to achieve application on nerve or muscle areas
- Bone and fat act as insulators and should be avoided when possible

Since muscles and nerves are controlled by electrical impulses from the brain, the key to proper utilization of the EID is to disrupt and/or confuse these areas by adding more electrical signals that the areas are accustomed too, which leads to the desired effect of immobility and loss of muscular function to react and resist.

Fat cells and Bone, which is a less porous material, do not rely on electrical impulse for function control and therefore striking the skeletal system or fatty tissue area with an electrical shock is very ineffective.

## Areas to Avoid When Possible and Practical Training Directive

Environmental

- Presence of Gases
- Atmosphere

Persons

- Body
- Conditional

Presence of flammable gases such as propane or even fumed gasoline could ignite an airburst fire when an electrical spark is introduced. If there is indication that a flammable gas is present, utilize alternate force options.

Be aware of effects of water, humidity, etc in regards to electricity and the human body especially in regards to the reduction of body resistance to electricity. Also, use extreme caution when using the device on an individual in proximity to a fall hazard such as a building rooftop, etc as a fall may seriously injure or kill the suspect or pose danger to the officers involved.

Body size and weight as well as physical condition also play key roles in the effectiveness of the Stinger. Be aware that electricity has different effects on different people as well.

STINGER000822

## Areas to Avoid When Possible/Restrictions/Contact Stun Mode (CSM)

The following is a list of environmental and individual conditions where the stun device should NOT be used, applied, or areas to be avoided in the Contact mode. However, points of application cannot be selected in the firing mode.

I. Environmental

    A. Gases

        1. _____    2. _____

        3. _____

    B. Atmosphere

        1. _____    2. _____

        3. _____

        Rule of thumb:

        _____

        _____

II. Persons

    A. Body

        1. _____    2. _____

        3. _____    4. _____

        5. _____

    B. Conditional

        1. _____    2. _____

        3. _____    4. _____

        5. _____    6. _____

        7. _____    8. _____

                          a. _____

                          b. _____

Name: _____    Date: _____

STINGER000823



## BODY APPLICATION CHART

1. PRIMARY STRIKE        2. SECONDARY STRIKE

STUDENT NAME                          DATE

White: Student        Yellow: Instructor

STINGER000824

## Preferred Application Areas and Effects

**Shoulders (deltoids) and upper back:** Primary loss of upper arm strength and mobility, disorientation, then loss of grip strength and balance

**Stomach Area:** Disorientation, loss of balance, weakness and loss of appendage control

**Lower Back:** Loss of balance, weakness, loss of appendage control

**Legs *(thighs and calves)*:** Loss of balance, weakness

**Arms *(upper and lower)*:** Loss of strength, loss of grip strength, weakness, grip release

Application to large muscle groups will produce more of a desired effect and are generally easier targets to aim for. Target the back (upper and lower), the abdominal area, shoulders and thigh area of the legs.

When the Stinger has been applied to a combative or resisting offender and there are no noticeable results after two, four second cycles, holster the device and transfer to an alternate force option.

If two, four second applications are not effective, the need to transition to another force alternative should be attempted. An agency's use-of-force policy will usually dictate what option(s) may be available to use, depending on environment, location, availability of back-up, seriousness of offenses and an officers' physical abilities. Officers must be familiar with their agencies respective use-of-force policies.

## Areas to Avoid in the Contact Mode

**Top of neck:** Too close to the brain stem.

**Throat:** Directed pressure in the CONTACT mode could "crush" the windpipe.

**Female breasts:** The breast is a gland and susceptible to damage. Application of a stun device to the breast area would raise concerns at a later time if the inability to function as a milk producing gland became apparent. It would also be susceptible to producing significant marks because of the sensitive type of glandular tissue.

**Head:** The head has a wealth of nerve endings in it and an individual could be rendered unconscious from an application from an electrical stun device directly to the head. Also the eyes are very sensitive and susceptible to serious damage or loss of sight from a puncture wound.

**Base of Sternum *(Xyphoid Process)*:** May cause a contraction of the diaphragm and effect breathing.

**The Groin:** An application to the groin could be viewed as torture or a sadistic act, and should be avoided.

STINGER000825

## Application Marks/Signature/Evidence

Application of an EID to body tissue (even through clothing) will leave marks. In the past, these marks have been referred to as burns, friction abrasions or friction marks. Further evaluation of this fact has revealed that the marks are indicative of a simple medical phenomenon know as the Lewis Triple Response. The marks should be referred to as "SIGNATURE" marks. This reference pertains only to the products described in this manual as other devices lack tested and documented output characteristics. These other devices, due to electronic irregular proportions and inadequate monitoring systems, could be capable of producing burns.

An application of an EID, as described herein, to the human body for more than 1/8 of a second (both contact probes must touch the subject), will leave the appearance of two or four marks on the skin. These marks could be evidentiary in nature. Applications through clothes will usually leave marks. The thickness and composition of the fabric will determine the ultimate effect from the device.

A thermal electrical burn occurs only if the temperature of the skin is sufficiently raised for a long enough period of time to cause tissue damage. Therefore, whether or not burns will be generated is dependent on several factors:

1. Amperage - Current flow
2. Voltage - Force in the system
3. Time Duration - Length of contact time with tissue
4. Area of Contact - (Volume) will the energized source and the ground

Such are the characteristics of the Stinger; low amperage and pulsed electrical output. Application for a sustained time period will not cause electrical burns. The evidentiary marks left as a result of an application(s) are actually signature marks or evidence. Darts fired directly into skin will leave small puncture marks which may cause bleeding.

## Variables that Determine Effectiveness

**Duration:** length of application

**Frequency:** how many times the offender is stunned and how much time between each application.

**Location:** location on the body of the application is applied to.

**Condition of Offender:** Variables that may diminish the effect of the Stinger on certain individuals.

- Mental State
- Body weight
- Drugs
- Demeanor

STINGER000826

## Post Deployment Care

Medical Assistance
- Incapacitated Subject

Dart Removal
- Small Puncture Marks

After deployment of the Stinger hand held stun device, the potential exists that the subject could be injured or face serious and even life threatening injuries. The officer should always pursue medical evaluation of a subject that has been affected by an EID.

Darts removed from body tissue should be treated as bio hazard material and properly handled. All darts should be retained as evidence if actually used to immobilize an individual.

STINGER000827

# USE OF FORCE & FORCE CONTINUUM

A review of the definitions of **FORCE** are herein described.

Force means an aggressive act committed by any person, which does not amount to an assault and is necessary to accomplish your objective.

Lawful Force means an aggressive act committed by any peace officer in the performance of his official duties when it is necessary to accomplish any of the following:

- When necessary to preserve peace
- Prevent the commission of offenses or prevent suicide of self-inflicted injury
- When making lawful arrests and searches or preventing escapes from custody
- When in self-defense or defense of another against unlawful violence to his person or property
- When preventing or interrupting an intrusion on or interference with the lawful possession of property.

Necessary Force means the minimum amount of lawful force sufficient to achieve a legitimate law enforcement objective.

Deadly Force means force that is intended or know by the act or to cause or, in the manner of its use or intended use, is capable of causing serious bodily injury or death.

Custody means:

- Under arrest by a peace officer; or
- Under restraint by a public servant pursuant to an order of a court.

Escape means unauthorized departure from custody or failure to return to custody following temporary leave for specific purpose or limited period, but does not include a violation of conditions of parole or probation.

There are three basic restrictions that apply in the use of force. They are:

- Must be reasonable
- Must be justified
- Must be necessary

The Use of Force is a decision-making process. It would be useful to have a guide outlining parameters available in making the decision to use or to not use force, as well as how much force to use, but there is not black and white delineation.

STINGER000828

Remember on thing while making this decision. The Fourth Amendment states that:

> "all persons shall be free from unreasonable searches and seizures..."

and the courts have said that the use of force as it applies to an arrest is a seizure and therefore the amount of and type of force used must be reasonable.

Also remember that as a law enforcement officer you are not getting paid to fight. Nor do you have to stand toe-to-toe with someone and use the same level of force or type of force that they are using... you can legally escalate to that level of force that is just above the level of force that is being used to resist your attempts to gain control. Because generally you cannot gain control when you use equal force, but you must believe your actions are reasonable.

The point is, when the decision is made to use force, it must be used quickly effectively and dynamically. GAIN CONTROL, thus preventing more force from being used as counter measures.

There are no magic bullets, no ultimate panacea when it comes to using technology to implement force regarding effectiveness and safety. And arrest situation can spiral out of control, thus it becomes a match of strength only fueled by the intention of an individual not to get arrested. Officers must not only use the appropriate amount of force, but only that force necessary to overcome resistance. Respective agency policies will guide officers in where, when and how much force should be used. Officers must select the proper alternative to fulfill the need of force while not exceeding given parameters.

## Use of Force Tactics

The BUT for argument... Failure to assess alternatives; too hasty a response?

Officer are placed in situations where a weapon must be used in defense of him, fellow officers or citizens. It is at this point an officer must make a decision to de-escalate, avoid confrontation or use lethal force in split second timing.

It is always second-guessing if an officer should have kept distance or if he could have maintained distance in a secure position until additional manpower arrived. The officer MUST make that decision which ultimately determines the course of ever changing events.

There are several points here to be made:
- Officer training
- Officer judgement
- Available alternatives

Alternatives, which include hands-on physical control, must all be evaluated at the moment of confrontation and/or resistance. Although non-lethal force may be intended, death or serious injury may still occur because of human factors: misapplication, miscalculation, and excessive strength. Conversely, this can work against an officer and even be the cause of using more force.

While it is sound judgement to wait for assistance and superior odds when possible, many response situations (traffic stops, etc.) require immediate and direct action be taken.

STINGER000829

The levels of force available to an officer become even more effective with the levels of force available when electronic waveform technology is used.

## Use of Force/Policies & Tactics

Every law enforcement and correctional agency maintains established Use of Force Policies. While some of these policies are similar, others are entirely different. It is not Stinger Systems' responsibility to dictate where/when a Stinger may be deployed, but how it is deployed.

Unique as it is, the Stinger has levels of force built in from display mode to deployment in contact or dart firing modes (dart firing is a greater degree of force because it is body invasive and could cause serious injury). The following pagers will serve for informational purposes and not intended to dictate policy. They are suggestive in nature.

Basic and Advanced officer training includes recognizing individuals under the influence of drugs. Upon responding and observing such an individual, whether or not there is an intended Stinger deployment, EMT/Paramedics should be immediately contacted and deployed to the scene. An individual in such condition (cocaine induced Excited Delirium, cocaine abuse, etc.) is at a heightened critical state requiring immediate medical attention. Even if an electrical force alternative is NOT deployed, a sudden death syndrome incident may be experienced. Proactive planning is always better than reactive.

## Authority for Force

Departmental policy may dictate who can use force and when. Sworn and non-sworn officers.

State Law usually dictates who has the powers of arrest and grants them the statutory authority to use force to effect an arrest.

Federal Law gives federal officers the authority to use force. Case Law from federal courts also dictate laws and policies relating to the use of force.

## Understanding Force

NIJ Definitions of Force
- Non-Lethal Force
- Less than Lethal Force

EID's and the Use of Force
- Device is deployed with the intend of resolving a conflict without the loss of life or serious bodily injury
- The potential for the loss of life is possible

Officers must evaluate and determine what force is reasonable for a given situation using these criteria and be prepared to justify their actions in written reports as well as possibly in court. When assessing a situation, be sure to use no more force than reasonably necessary to gain compliance, and upon choosing a method to use, prepare a back up, just in case.

STINGER000830

Gaining compliance with the proper level of applied force for a situation is paramount in officer and subject safety. Ensure that the policies and regulations regarding use of force for your department or agency is followed at all times, whether using the Stinger, or any other control device or method.

## Types of Force - Alternative Force Implementation

1. Show of Force
    a. (1) Mere presence
    b. (2) Uniform authority
    c. (3)Bodylanguage

2. Verbalization
    a. (4) Ability to verbally communicate
    b. (5) Direct commands
    c. (6) Intimidation

3. Physical Contact (weaponless)
    a. (7) Come-along techniques
    b. (8) Joint restraints
    c. (9) Pressure point control
    d. (10) Punching
    e. (11) Physical power restraint
    f. (12) Pain compliance

4. Electronic Restraints
    a. (13) Optional Compliance
    b. (14) Repelling/grip breaking
    c. (15) Stunning
    d. (16) Complete, short term, non-lethal incapacitation (follow-up contact control)

5. Physical Contact (weapons) Category #1: Close contact
    a. (17) Kubaton
    b. (18) Chemical mace
    c. (19) Black jacks/saps

6. Physical Contact (weapons) Category #2: Extended contact
    a. (20) Impact weapons
    b. Batons/PR-24
    c. Expandable devices
    d. (21) Flashlights

7. Lethal Force
    a. (22) Firearms
    b. (23) Hi-Powered weapons

STINGER000831

**A Force Continuum**



This particular Use of Force continuum model shows you that you are not locked into a step by step process of the escalation or de-escalation of force when you are in a given situation.

Using this force continuum imagine that you have been dispatched to a call involving a man with a handgun. When you arrive on the scene the subject is waving the gun wildly and telling officers to get back. There are also civilians in the area who could be in immediate danger. At this time you are authorized to use Deadly Force if necessary to protect your life and the lives of others. You point your firearm at the subject and he throws down the gun. You give him commands to get on the ground which he initially refuses to do. The subject eventually complies and officers approach the subject in an attempt to handcuff him. When initial contact is made with the subject he begins to fight with officers and a struggle ensues. You deploy your Stinger in the contact stun mode, the subject ceases to resist, and is taken into custody without further incident. During this given situation you have escalated to deadly force and de-escalated to less lethal force. You have also used your mere presence and verbal commands as use of force options during this confrontation.

STINGER000832

## Force Continuum Scale



**Suspect:** Cooperative, but in close range with officer

**Officer:** Presence, body language, verbalization

**Suspect:** Cooperative, but must be given directions

**Officer:** Presence, body language, verbalization

**Suspect:** Not controlled by verbal direction / Passive resistance

**Officer:** Presence, body language, verbalization, intimidation, weaponless control

**Suspect:** Active resistance / Defensive status

**Officer:** Presence, body language, verbalization, intimidation, weaponless control. Chemicals, ERD

**Suspect:** Active resistance / Offensive status (no weapon)

**Officer:** Presence, body language, verbalization, intimidation, weaponless control. Chemicals, ERD, impact weapons

**Suspect:** Aggressive, posing harm to others (no weapon)

**Officer:** Presence, body language, verbalization, intimidation, weaponless control. Chemicals, ERD, impact weapons

**Suspect:** Place life in jeopardy

**Officer:** Presence, body language, verbalization, intimidation, weaponless control. Chemicals, ERD, impact weapons, firearms

**NOTE:** A handcuffed subject may be either passive and cooperative or resisting and offensive.

Presence
Verbalization
Physical Contact / Weaponless Control
Electronic Restraints
Chemicals
Impact Weapons
Lethal Weapons

**Use of Force**
**Alternative Enforcement Action**

STINGER000833

**ESCALATION**



**DE-ESCALATION**

**Transfer of Force**

Most officers know when it is appropriate to escalate the use of force but it is equally important to know when it is appropriate to de-escalate. In many cases, it may be possible to de-escalate a situation through verbal command or mere presence, which is desirable as the risk to both officer and subject diminishes. Seeing as this is not always the case, the scale here can fluctuate rapidly given potentially volatile situations. Be prepared for anything.

STINGER000834

## ACLU Policy #207

A police officer may not use a degree of physical force - which is greater than that for which there are reasonable grounds to believe are necessary to stop an ongoing crime, effect a lawful arrest, prevent an escape from custody or defend himself/herself or a third person from what s/he believes to be imminent danger. Use of deadly physical force by a police office is permissible only when s/he reasonably believes there is an imminent use of deadly physical force against himself/herself or a third person.

"Deadly physical force" refers to any physical force, not just firearms, which under the circumstances in which it is used is readily capable of causing death or other serious physical injury.

"Police training must include instruction on the techniques involving a gradually escalating degree of force for stopping ongoing crimes, effecting arrests, preventing escape from custody, and defending both the police officer and third persons from physical harm. Police officers must be trained in the use of alternatives to firearms and other non-deadly techniques, and must be required to use those techniques before they may resort to deadly physical force, unless immediate resort to deadly physical force reasonably appears necessary to prevent the use of imminent use of deadly physical force against the officer or a third person". (Board Minutes, June 12- 13, 1982)

*Current policy language of the American Civil Liberties Union as established by the National ACLU Board of Directors, and set forth in the official ACLU Policy Guide.*



360 South Third Street, Suite 150
Columbus. Ohio 43215
(614) 228-8951

STINGER000835

# ▪8 STINGER TACTICAL DEPLOYMENT & PRACTICAL ASPECTS DEVICE CAPABILITIES

The Stinger has 2 modes of operation. *Contact* and *Distance*. Within these modes are additional levels of less-than-lethal force.

**Mode 1 - *Contact*** (Without cartridges in or cartridges already discharged) A unique feature of the S-200 permits the unit to be carried while loaded. However, if required, the cartridge can be quickly ejected with the trigger finger.

### 1. Display (Optional Compliance)
An audible and visible display of electricity is usually enough to back someone down. It demonstrates more force than possessed by a suspect/subject. It serves as a deterrent.

### 2. Repelling
Momentary contact of 1-2 seconds will push away or keep an attacker at a distance. It is also capable of inducing a release action.

### 3. Stunning
Actual momentary immobilization by means of 2-4 seconds (1 cycle) will "surprise" or stun an individual.

### 4. Sustained Contact
A prolonged application of 4-8 seconds (2 applications) will place an individual in non-lethal short-term incapacitation, thereby permitting follow-up control.

**Mode 2 - *Distance*** (Standoff)
Use of the Stinger is relatively simple: grip, sight picture, sight alignment, trigger squeeze, objectives of use.

### 5. Firing/Repelling
Once fired, momentary contacts will keep an attacker at a distance. It is also capable of inducing release actions.

### 6. Firing/Momentary Stun/Momentary multiple bursts from the Stinger
Actual momentary immobilization (attention getter, but could be prone to aggravation)

STINGER000836

**7. Firing/Sustained Stun/Maintaining contact with the trigger**
A prolonged application of 2-4 second cycles will place an individual in non-lethal short-term incapacitation, thereby permitting follow-up control.

The Stinger is not designed to be a quick draw impromptu weapon although it may have to be deployed quickly by one officer. It is a specialty device designed to be used where and when lethal force is not required - where there is a high risk of serious physical resistance difficult to overcome. Anytime an officer must get physical to overcome resistance, there is a potential of both officer and violator/aggressor to get injured. Is this force not enough or is it too much? Many arrests, due to circumstances, are like trying to put an octopus in a coke bottle. If properly used (time and place), the Stinger is intended to prevent additional and greater force from being used because it potentially could terminate the confrontation. All physical encounters are fluid and rapidly unfolding.

There are two distinct uses of the Stinger:

**Spontaneous**
One-on-one/officer against violator where a situation quickly requires deployment to contain and control hostile activity.

**Standoff**
Where a violator is contained and time permits responding officers to respond as a team. One or two officers serve as Stinger operators or stands by with lethal force in the event the situation escalates to deadly threat or encounter. The other team officers become the control personnel where they will handcuff and secure the subject.

By far, the standoff scenario is the safer of the two because it allows for planning, whereas the spontaneous situation is more dangerous because of a lack of available manpower. The team response concept should be practiced with two, three or four officers facilitating efficient control tactics. One-on-one tactical deployment should also be practiced as an officer survival factor.

The Stinger is designed to subdue an individual by means of short-term non-deadly incapacitation, but follow-up physical contact is inevitable. Furthermore, it is always a possibility that even after the Stinger is applied, it may not have an effect, requiring physical force being used.

## Distance Firing vs. Contact Mode
It is a well-known fact that most law enforcement encounters take place within arms reach (WAR). When resistance is incurred within hands-on proximity, the contact mode (CM) should be used when and where possible. Firing the device at such close range serves little purpose from the standpoint of lack of dart separation, although most agencies prefer the weapon to be carried with cartridges loaded. The point here is that even when the cartridges are not locked in, the Stinger is still loaded with high voltage of non-lethal electronic waveform pulse technology available in the contact mode. Placement of the device on the body is often times selective whereas the firing mode is prone to injury from the aspect of darts penetrating the skin and/or impacting an eye, breast or groin area.

STINGER000837

The contact mode reflects an extension of an officer's arm loaded with immobilization power. The firing mode promotes distance but reflects possible injury from dart penetration. All of these factors must be assessed during confrontation. The point is that an officer goes hands-on 100% of the time during a physical arrest. Use of the contact or firing mode becomes a reasonable and conscious decision.

STINGER000838

# LIABILITY ASPECT & COURT REVIEW

## Documentation of Deployment

- Written report by officers involved
- Facts involving the incident
- Criminal charges
- Injury/Non-injury
- Secondary injuries
- Photographs
- All officers involved should file a written report.

Be clear and concise when explaining the facts of the incident, making sure to cover the totality of the situation and steps taken to the point of force being applied. This will show that attempts to de-escalate the situation failed, and that the force applied for a particular incident was justified.

Reporting of all injuries whether primary or secondary will help to exonerate officers from liability charges after the fact in the case of subject injuries, and help substantiate the force applied in a situation in the case of officer injuries. Take photographs if there are visible secondary injuries and if available, make the Tru-Vu™ recordings available for evidentiary review. Take photos only after the wound has been cleaned, safety first.

## Testifying in Court

- Wear a small badge, don't be a macho cop.
- Be prepared, prepare clear, concise reports and testify directly from your report. Deviation in story told to report may lessen your credibility. Be sure to explain in full detail the situation as it happened.
- Put the jury in your shoes. Look directly and relate your story to them, if you were in fear tell them. You want the jury to completely understand why force was applied, the reasoning for it, and what justified its use on the level that the force was used.

## Areas of Civil Liabilities

- Excessive force violations
- Technology not being implemented
- Technology not being provided to officers
- Liability factors can be diminished through proper training and implementation of agency policies and procedures

STINGER000839

Use of the Stinger will reduce excessive force violations and complaints.

Department may be sued by the subject or subjects family if the technology is available but not made available to officers therefore forcing the officer to resort to another force option which may cause severe injury or death to an offender.

Department may be sued by the officer or officer's family if the technology is available but not made available to an officer therefore causing the officer to be injured due to less lethal weapon not being available to them.

### Caldwell v. Moore
*US 6th Circuit Court of Appeals, 1992*

The court affirmed "It is not unreasonable for the jail officials to conclude that the use of a stun gun is less dangerous for all involved than hand to hand confrontation."

Further there was no deliberate indifference as plaintiff did not suffer a serious deprivation because his injuries were not serious enough to require immediate medical attention.

Allegations were brought against correctional officers who had utilized the contact stun device to subdue an inmate. The inmate claimed that his 8th amendment rights against cruel and unusual punishment had been violated with the use of this device.

Upon reviewing of the evidence in this case, the court decided that electric stun devices when used properly and in justified circumstances were not violating the 8th Amendment, and would only be doing so if used improperly as a device of torture.

This case basically states that the use of an EID is not cruel and unusual punishment and does not violate the 8th amendment.

### Haynes v. Marshall
*US 6th Circuit Court of Appeals, 1989*

The court affirmed where allegations of excessive force are concerned, it must be determined if the force was applied "maliciously for the purpose of causing harm".

Allegations were brought against correctional officers who had to forcefully remove and subdue an inmate who had not taken prescribed anti-psychotic medication. The inmate during the removal had acted violently towards the responding correctional officers who placed him in a "strip cell" where he later died due to injuries suffered in the struggle. It was alleged that the inmate was beaten to death by the officers who violated his 8th amendment rights against cruel and unusual punishment.

It was determined by the court that the officers had acted appropriately in dealing with the circumstances presented. The court detailed that in order for a use of force incident to be violating the 8th Amendment, the force had to be applied "maliciously and for the purpose of causing harm" to the subject.

STINGER000840

## Considerations Regarding In-Custody and Sudden Deaths

Subduing and controlling violent and aggressive subjects during law enforcement encounters has been an ongoing endeavor of the Criminal Justice System.

Defensive tactics utilizing physical hands-on contact methods has always been primary use of force to control violent behavior (resisting arrest, assaults, etc.). It is during such activities that officers and suspects alike get injured. Often times a greater degree of force must be used to counter the aggressive nature of would be violators.

To assist officers in these use of force situations, a myriad of alternative tools have been invented. All have been implemented with one though in mind - to minimize time an officer must spend in a confrontation thereby reducing the chance of a greater amount or degree of force.

Unfortunately, a great portion of today's violators is on drugs, mentally ill, intoxicated or a combination of the three. Not only does this place innocent bystanders and enforcement personnel at great risk, but it also places the individual at significant risk from unknown personal undetected medical problems.

Extended fighting and struggling with officers after a foot pursuit places an abnormal strain on the heart. The combination of adrenalin rushes followed by adrenalin dumps and use of alcohol and/or drugs combine to form a potential of a lethal outcome. That outcome may happen even if no tools or alternatives were used. Now if an officer uses OC Spray or electronic immobilization technology as an assisting tool and the encounter results in a fatality, the death will be blamed on the tool, not everything that happened prior to using it. Even being unable to catch a breath after a severe struggle can result in death. It is human nature to blame an outside stimulus, not the individual who resist arrest and has willfully ingested unknown quantities of drugs and/or alcohol.

Indeed incidents involving sudden death while in police custody is an increasing phenomenon largely due to the increased use of illicit drugs. Determination of cause of death is often problematic, regardless of the causative rendered conclusions. Most deaths follow violent struggles with law enforcement officers and create potential for significant legal ramifications. Often times little pathological evidence is gather as the result of autopsies. The truth of the matter is that technological alternative (stun guns) are a benefits because they are actually intended to (and do) reduce the time spent in a physical altercation thereby reducing strain and stress on the body - even possibly preventing heart attacks in borderline situations.

Moreover, there is a lack of (or difficulty) interpreting pathological evidence. The cause of death may be misattributed to police action. Importance must be placed on the evaluation of the history, circumstances surrounding death and the fatal environment.

Research suggest that four or more conditions may account for the majority of custody-related deaths: positional asphyxia, cocaine abuse and alcohol intoxication, excited delirium, and neuroleptic malignant syndrome. The point is that an individual may have died anyway without the use of a stun device or OC Spray. After all, it is easy to blame the car not the driver. I guess it is very simple: Don't fight back, don't resist arrest - you probably will not die from that arrest incident.

STINGER000841

*Positional Asphyxia*

This occurs when the body position interferes with breathing resulting in asphyxia. Usually maximally restrained individuals placed in a prone position. Unless seated upright after restrained, may become quiet and active. Breathing becomes strained and subsequently breathing stops. Further susceptibility can be experience due to alcohol/drug intoxication.

*Cocaine Abuse and Toxicity, Alcohol Intoxication*

Cocaine is a agent that stimulates both the central nervous and cardiovascular systems. Pharmacologically cocaine constricts the blood vessels, elevates heart rate, raises blood pressure and body temperature and ultimately affects the nervous system. These effects alone have produced legal anatomic catastrophes in individuals without underlying pre-existing anatomic disease. Cocaine has also been know to cause death in cardiovascular incidents where there is no abnormality (ref: Mittleman & Wetlie 1987). These effects can substantially compromise an already diseased heart and potentially culminate in death. Or course, the quantity and quality of drugs will impact the result. Add alcohol and it substantially increases the risk of sudden death when mixed with cocaine. Cardio toxic effects of alcohol potentates the cardio toxic effects of cocaine, thus increasing the risk of overdose death.

*Cocaine Induced Excited Delirium*

Excited delirium is an acute mental disorder characterized by disorientation, impaired thinking, hallucinations and illusions. Behavior is consistent, purposeless and often violent. It can also be part of bipolar disease (manic depressant), schizophrenia and/or acute drug intoxication such as cocaine, PCP and amphetamines. Although treatable in onset, it is considered a medical emergency. Cocaine-induced excited delirium fatalities ten to occur in a stereotypical manner with individuals exhibiting similar behavior. Intense paranoia followed by violent and/or bizarre behavior: running, screaming, stripping off clothing. Subjects appear psychotic, exhilarant, great strength and have diminished threshold of pain. Sudden death occurs either during or immediately after a struggle. Autopsy findings are generally non-specific, revealing only injuries sustained from the struggle with officers.

*Neuroleptic Malignant Syndrome*

Characteristics are similar to excited delirium but generally occur in psychiatric patients who are taking anti-psychotic medication. Physical exhaustion, dehydration and organic brain disease are predisposing factors. Individuals who are not being treated with medications can be diagnosed as acute exhaustive mania. This could also relate to a cardiac event due to stress. Psychological stress can indeed induce fatal heart events, however autopsy finding are generally negative, seldom revealing a pathological cause of death.

Once again, add the elements of alcohol, a struggle with officers, and respiratory problems - all are additional factors, which may not be detected but significant contributing factors to a fatal outcome.

If using technological alternatives - electronic stun technology, OC Sprays, rubber bullets, etc. - the obvious blame of death or cause of fatalities will be focused upon that specific tool when in essence, that tool averted longer drawn out confrontations.

STINGER000842



## BASIC CERTIFICATION - STINGER SYSTEM ACKNOWLEDGMENT

I, _____, an officer with the _____
Agency, in the city of _____, in the state of _____, do hereby
acknowledge receiving training in the use of the Stinger System and agree to use the System pursuant to the
guidelines and policies as set forth by my agency.

Furthermore, I fully understand that I could be held criminally and civilly liable should I intentionally and without
provocation activate the described product without just cause, or with the intention of causing torture, while it
is being worn by a designated individual.

I further understand that this is a device for purposes of control and will maintain my best efforts to preserve
the peace and prevent a crime from being committed in my presence.

_____          _____
NAME                                     WITNESS

_____          _____
DATE                                     INSTRUCTOR NAME

_____

### CHECK AND SIGN EITHER #1 OR #2 - NOT BOTH

☐   1. I HAVE READ MY AGENCY'S POLICIES PERTAINING TO GUIDELINES OF USE FOR THE
       STINGER SYSTEM AND UNDERSTAND SAME.

_____          _____
SIGNATURE                                DATE

☐   2. I HAVE NOT YET READ MY AGENCY'S POLICIES PERTAINING TO THE STINGER SYSTEM
       BUT WILL DO SO PRIOR TO MY USING THE SYSTEM.

_____          _____
SIGNATURE                                DATE

White: Student      Yellow: Instructor

**STINGER000843**

# ■ BATTERY
# 10 INFORMATION

With focus on battery maintenance as an essential factor for device operational efficiency, the power source becomes a key to unit acceptance. The power source is the "heart" of the device.

Batteries have limitations regarding maintenance and actual uses per charge. Each unit is restricted by its own battery limitations. The Stinger was engineered around a consumer buyable and replaceable lithium battery power source. This designated power source offers ultimate performance while remaining readily available and makes the device "user friendly".

Working with lithium batteries, a more than adequate power source has been developed to power several different stun devices. The significance of this development reflects a virtually maintenance-free power source good for many activation prior to replacement. Lithium batteries, known for their prolonged shelf life, have been used in emergency medical equipment as back-up power sources and in cameras because of extended power output capabilities.

Use only the designated battery in respective devices.

⚠ **CAUTION:** *A low battery will not properly cycle the respective device and could virtually "energize" the individual it is used upon. Thus, it is crucial to maintain proper battery levels. Units should not be needlessly or carelessly played with.*

### General
Various EIDs have different requirements in the way of individualized power sources. There have different types of batteries due to the demands of the respective units.

| Power Source | Effective Operating Time | Battery Stock# |
|---|---|---|
| Four 3-volt Lithium | Approximately 200 firings | Duracell® CR-2 |

Available directly from SSI and world wide availability off-the-shelf.

Do NOT use alkaline batteries or any other battery not listed above.

Temperature range for batteries: -40° F to 167° F

### Lithium Battery Power Source Applicable to the Stinger
Inherent characteristics of lithium batteries portray an extremely long shelf life with significant power retention. Voltage demand draws minimal power while offering peak

STINGER SERIES S-200 | 37

**STINGER000844**

performance. Circuit design and electronic components found in the Stinger permit the designated lithium batteries to operate the respective devices for up to 200 firings prior to replacement.

The 3-volt lithium battery cell (Duracell®) has a shelf life of 5 years, prior to deterioration of operational capabilities, to properly cycle the unit. Although the battery cannot be recharged, for most practical correctional, law enforcement or military applications the battery(s) should be sufficient for 12 months of service.

## Training Information

The specified lithium battery has extended operational power to cycle the unit. Therefore, any combination of seconds for applications, up to the indicated amount of available power because there is no degradation on a daily basis.

SSI recommends replacing lithium batteries every 12 months or when the LED indicates, whichever occurs first. Closely monitoring daily uses of the device and documenting such activities could indicate more frequent replacement as could humid environmental conditions. Care must be taken not to exceed the upper limits of allocated power.

⚠ CAUTION: *Temperature variables, such as extreme heat or cold, will automatically discharge any battery to unknown proportions. Care should be taken not to store or leave a unit in a vehicle for prolonged periods of time as the battery(s) will discharge.*

*Lithium batteries CANNOT be recharged. Discard properly after useful life.*

## Tips

- Store extra batteries at room temperature
- Do not attempt to charge a lithium battery
- Use only the specified battery(s) for respective units
- Replace batteries every 12 months or when indicated by system

## Stinger Power Source & Battery Specifications

The power source of the Stinger was designed focusing on three (3) important factors:

- Performance
- Cost Effectiveness
- Availability

⚠ CAUTION: *Do not attempt to charge or discharge a lithium battery. Do not use anything other than specified battery.*

## Unique Feature of the S-200 ASM (Auto Sleep Mode)

The S-200 is equipped with a very unique feature to prevent the battery from draining in the event the unit is inadvertently left in the *"ON"* position. If the user forgets to turn the unit *"OFF"* or if it is unintentionally left in the *"ON"* position, it will ONLY remain on

STINGER000845

for 4 minutes, than automatically convert to a "sleep mode". If it has not been used for four minutes it will remain *"ON"* but asleep instantly ready for use only without the use of the laser.

**Operation Status**

If left on, after 4 minutes the unit goes to sleep. The LED will blink approximately 2 times per second to alert the user that the S-200 is live and *NOT* off. It is not necessary to turn the unit off and than back on if the lights are blinking. It may be immediately fired *(aim and shoot)* however, the manual site will have to be used because the laser will not be functioning. After it is fired, the S-200 will "wake up" and the laser and LED will function and normally operate. If the sleep mode is detected and use of the unit is not immediately required simply turn the unit *"OFF"*.

Please note that this is a safety feature of the device to minimize battery rundown and the unit should be turned off after each intended use and verified at the end of the shift.

STINGER000846

# ◼◼ WEARING THE STINGER/
# ◼◼ SIZE REQUIREMENTS

### Duty Belt
Because of the size of the Stinger, many officers are concerned about wearability. The S-200 is compact and may be worn very comfortably by officers regardless of size.

The Stinger is designed for proven assistance or power enhancement; therefore it should be worn and used weak side (weak hand) or cross-draw. Always leave the weapon hand (strong hand) free for immediate action, especially for handgun use.

Holster design permits the device to be worn on the duty-belt for regular belt placement. Duty-belt size may necessitate sacrificing some equipment however SSI makes no suggestions as to what an officer should delete from the belt.

### Size
The size of the Stinger is a key issue to psychological deterrence as well as functional use.

The obvious appearance of the device alerts adversaries to an officer's possession of some type of distinctive but unknown weapon. It gives the user a "psychological" advantage as many individuals do not want to resist if they are aware that enforcement action involves using a weapon. The ominous appearance of the Stinger, especially with the electricity crashing from probe to probe, provides an officer with the tactical edge. And for those who choose to ignore the visible recognition when the Stinger is pressed into service, it gives a textbook performance.

Although not 100% effective on everyone, actual combat field testing shows increased takedown capability for shorter applications and longer lasting results affecting more individuals than ever before, including subjects intoxicated or under the influence of drugs.

STINGER000847

# HANDS ON - PRACTICAL EXERCISES

**12**

## Hands On - Basic Techniques

Basic applications should be demonstrated for the students. They should physically practice the techniques in an effort to demonstrate a minimal level of proficiency.

1. Grasp/Grip

2. Floating Arm Technique

3. Balance

4. Bear Hug (approach from rear)

5. Frontal approach left (or right) arm swing Lock arm/pull suspect in/apply device

6. Frontal approach right (or left) arm swing - Force arm around in applicable direction, grab around throat/pull back/apply device to lower back or kidney area.

7. Front Choke - two hands on throat (against officer) - Apply device to upper chest area by shoulder - left hand to right shoulder or right hand to left shoulder.

8. Arm-bar Choke against officer from rear - Press device against suspect's upper forearm to cause a near immediate release, then drop down with arm and apply the device to the lower torso or leg area of the suspect behind you.

9. Vehicle extraction: DWUI or resistant suspect - hands on wheel - Apply device to back of hand or upper forearm to break grip/lock of the exposed arm back and pull suspect toward you applying device to underarm area. Extract and handcuff.

**NOTE:** *This training session is not intended to replace the use of defensive tactics. This program cannot make anyone a defensive tactics instructor, but it will offer a foundational approach to the use of electronic immobilization devices.*

## Hands On - Tactical Training Session

This section is directed toward actual application of the device to a suspect/subject.

1. Proper grip - make sure the device is held in the appropriate hand (strong hand/weak hand) as per Instructor explanation. Maintain a firm, tight grasp while maintaining contact of the first joint of the index (left or right) finger with the activator switch.

STINGER000848

2. When finished with the device, place it in the corresponding holster. Never throw it on the ground after an application to affect an arrest, as it may be necessary to re-apply it a second time. Keep the device in its holster. Repeatedly dropping the device could damage it.

3. Upon application, maintain contact for as long as possible, up to, and a short time after, resistance has noticeably been terminated. A short application could result in the necessity of a second or third to achieve the desired results. If no results are apparent after eight (8) seconds of constant application, conventional or secondary methods of control should be employed. It is difficult to maintain contact in struggling situations, but failure to do so could result in non-effective uses.

4. Any attempt to subdue or restrain an individual by means of an EID should be in conjunction with "HOLDING" onto that individual. By firmly grabbing the individual, contact with the ground will be minimized and sustained device application will be maximized. Pull the suspect into you while pushing against him/her with the device.

**NOTE:** *Training in this area is suggested on an ongoing basis and can be designed to lengthen a given program. Repetitive training in tactical applications will generally increase device effectiveness.*

5. In contact mode do not "thrust" the unit. Most confrontations are by general rule, a wrestling or grappling type of situation. Where distance is apparent, the stun device should be employed in the firing mode. Nor should it be used against a handgun or knife. Maintain arm flexibility when applying the device as the body will tend to jump back during combat use. If an arm is in a full thrust position and body weight is not properly shifted, the device will break contact with the point of application.

6. Most effective applications are primarily by two officers: (1) as an "interference" officer and (2) as the applicator or "control" officer. However, successful applications by one officer are the basic attribute of the device. Elements of surprise, effectiveness and technique knowledge will provide the officer with a tactical advantage.

7. A loud crackling noise will indicate non-contact. A good, solid contact will be indicated by a muffled noise. Be cognizant of the fact that a sustained application will promote an individual to possibly scream and swear. These actions usually result in an officer removing the device too quickly. MAINTAIN CONTACT to effectively break resistance.

8. The overall dimensions of the unit (7.8 L x 2.5 W x 1.68), permit it to be easily grasped. Research has indicated the smaller the unit, the more chance of dropping it during a confrontation.

STiNGER000849

## Practical Exercise

- Identify nomenclature
- Manipulate Stinger controls
- Demonstrate use of laser aiming device
- Demonstrate contact stun
- Demonstrate trigger pull activation
- Exposure to dart tape application
- Perform two deployments for qualification
- Practical Scenarios

These practical exercises will help develop familiarity with the STINGER HANDHELD PROJECTILE STUN GUN. Please make sure that you have a firm understanding of how the device is set up, how it operates, and its limitations. Once familiarization is complete, you will be run through a series of practical scenarios utilizing the Stinger as a force option.

STINGER000850

# APPENDIX



# FEATURES OF THE STINGER S-200



# FEATURES

| | | |
|---|---|---|
| [1] Safety Mechanism On/Off Switch | [5] LED Display | [9] Manual Site |
| [2] Battery Compartment | [6] 4-Second Light Indicator Counter | [10] Side Illumination |
| [3] Cartridge Ejection System (CES) | [7] Laser Site | [11] Trigger |
| [4] Recessed Cartridge Bay | [8] Battery Strength Indicator Light | [12] Electrodes for Contact Stun Mode |

STINGER000851



# SPECIFICATIONS OF THE STINGER S-200

The S-200 is a new proprietary waveform utilizing the latest electronic technologies. Unlike, other stun technologies, the S-200 specifications do not compare on an apples to apples basis because many factors of the waveform make it not truly useful to compare. For example, competitors use pulses per second while Stinger believes using pulse groups per second is a much more effective waveform to incapacitate muscles. The S-200 utilizes up to 63k volts in the open circuit which allows for better "pushing" power through clothes, yet drops significantly when under load (hits a human). Also, while the S-200 DC (direct current) mA's is higher than competitors, the S-200 puts *significantly* less AC (alternate current) into the subject than our competitor. AC has been known to burn tissue. We have strived to focus on impact on the body while trying to reduce unnecessary currents to the body.

| | |
|---|---|
| Pulse Rate: | 32 pulse groups per second |
| Pulse Duration: | 300us to 400us |
| Peak Arc Volts: | 63KV |
| Peak Loaded Voltage: | 1300v |
| DC Curr Avg: | 5.0mA |
| Energy at Main Capacitor: | 0.60J |

Dart Included Angle: 5.5°
Spread Rate: 0.1228 in/in

| DISTANCE | SPREAD |
|---|---|
| 5 Feet | 5.777" |
| 10 Feet | 11.555" |
| 15 Feet | 17.332" |
| 20 Feet | 23.109" |

7.50"
2.25"  2.5"
7.875"
1.6875"
1.75"
1.375"
1.25"
0.990

STINGER000852

## 1.1 Mechanical/Visual/Operational

**1a) Housing:** high impact polymer

**1b) Overall Dimensions:** 7.6 inches long by 3.9 inches tall *(not including sights)* and 1.7 inches at widest point.

**1c) Weight** *(with batteries)***:** 0.8 pound; (13 oz)

**1d) Display Lamp Operation:** Rear Display with two bar-graph-style displays. Upper row is Firing-Progress lamps and lower row is Battery-State lamps.

   * **Progress Lamps:** four red lamp bar-graph display; indicates seconds trigger is pulled

   * **Battery bar-graph display:** indicates lithium battery voltage. It is measured before and after a firing sequence. Lamp indicators have the following approximate volt-meter calibration:

      * Green = "good"; Vbat > 10V

      * Yellow = "weak" ; Vbat > 8.0V but < 10V

      * Red = "nearly exhausted"; Vbat < 8.0V; gun will not fire but laser still works if possible

**1e) Safe-Switch Operation:** slide type switch with contrasting yellow color; Pushed-far left is OFF *(only internal clock runs)* and pushed far right turns gun ON and is ready for firing *(unless placed in Data-Dock).*

**1f) Hot Standby Mode:** If the gun is left ON for greater than 4 minutes (+-15 sec) without the Trigger being pulled, then, to conserve battery power, all lamps and the laser illumination change from a continuous ON to a flashing mode of about 2.5 flashes per second. None-the-less, the gun's Trigger may pulled at any time and the gun will fire without delay. The lamps will thereafter illuminate continuously for another four minutes and the process will repeat. This reduced power mode will increase standby battery life by over five times.

**1g) Programmable Gun Operation:** There are three trigger operational modes which can be selected by a data download from your PC using the S-100 Data-Dock and S-200 Console software. These operational modes behave as follows:

   If the gun is ON and not in a Data Dock, then after the trigger is pulled, firing operation will continue for a minimum and maximum firing time as follows:

   * **Manual** *(factory default)***:** 0.1 second to 4 seconds

   * **Semi-Automatic:** 1.0 second to 4 seconds

   * **Automatic:** 4 seconds only

## 2.0 Environmental

   * **Foreign Matter and Water Ingress rating:** IP43 (per IEC 529)

   * **Temperature Range:**
     **Storage:** -20° C to 48° C; **Operating:** -5° C to 45° C

   * **Humidity:** 10% RH to 95% RH, non-condensing

   * **Altitude:** sea level to 10,000 ft.

## 3.0 Power

Powered by four replaceable photo-flash style, lithium batteries; type CR123
   * **Battery Life:** over 300 firings of four seconds each (Tamb > 15C)

STINGER000853

## 4.0 Laser
**Wavelength:** 635 nm; < 1mW, Spot Diameter: < 6mm at 5 meters distance
Laser is enabled anytime the Safe-Switch is On. *(It is not enabled by the automatic Power-On feature when placed into the Data Dock station.)*

## 5.0 Output Characteristics
**5a) Waveform:** Complex neuro-stimulation optimized pulsatile waveform *(NerveLok™, patent applied for)*

**5b) Pulse Rate:** 30 pgps typical *(pgps = pulse groups per second)*

**5c) Pulse Group's Duration:** 300 microseconds first group; 400 microseconds second group

**5d) Peak Open-Circuit arcing voltage:** 63,000 volts

**5e) Peak Loaded voltage *(1100 ohms)*:** 1300 V

**5f) Current:** 5 mADC *(average DC current in pulse groups)*

**5g) Energy per Pulse:**
    **At Main capacitor bank:** 600 milli-joules
    **Delivered to load:** 72 milli-joules per pulse group

**5h) Power Rating:**
    **At Main capacitor bank:** 9.5 watts nominal
    **Delivered into load *(1100 ohms)*:** 2.3 watts

**5i) Maximum Firing Time (before requiring a trigger release):** 4 seconds nominal (+- 0.4 sec)

## 6.0 Data Logging Specifications
**6a) Data Logged:** After the Safe switch is enabled *(and the gun is not in a Data Dock)*, each trigger pull causes the following data to be logged into an internal memory. The user need not initialize the clock for proper logging.

* Time and date *(1 sec. steps)*
* Duration of trigger pull *(0.1 sec. steps)*
* Loaded Battery Voltage *(0.056 V steps)*

**6b) Logging capacity:** 1300 records before over-write of oldest data

**6c) Minimum Clock Run Time with Battery Removed:** 10 hours

**6d) Clock Rollover Period:** 30 years min.

**6e) Identification Memory Storage:**

* **User identity field:** up to 64 characters
* **Manufacturer's identify field:** up to 32 characters

## 7.0 Test and Status Features
The gun's internal microcomputer has several built-in features under command control by the PC console software via the Data Dock which permit testing and status checks.

**7a) Status Request:** This command will data upload gun serial number, software revision number, current battery voltage, capacitor bank voltage, clock seconds value, and Trigger mode presently stored. This command also slowly discharges the capacitor bank to permit capacitor bank testing in concert with the next command.

STINGER000854



# ABBREVIATIONS & DEFINITIONS

## Abbreviations

**CCC** - Close Contact Confrontation

**EID** - Electronic Immobilization Device, Stun Device, "Stun Gun"

**EPT** - Electronic Pulse Technology

**ERD** - Electronic Restraint Device, Stun Device, "Stun Gun"

**NMIW** - NeuroMuscular Incapacitation Waveform

**QFT** - Quantum Flyback Technology


## Definitions

**Amperage** - the strength of amperage established current expressed in

**Ampere** - a unit of electric current in the meter-kilogram-second system

**ASM** - Auto-Sleep Mode

**Battery** - a device for generating an electrical current by chemical reaction; a source of continual power

**Electricity** - current used or regarded as a source of power or derived from a defined source of power

**Electronic Pulse Technology** - a high voltage, low amperage discharge system combining electricity with frequency. Often referred to as a non-linear muscle relaxer as used for nerve or muscle stimulation within the medical profession

**Event** - each occurrence where a device is used from start to finish

**Joules** - the International System unit of energy equal to work done when a current of one amperage is passed through resistance of one ohms for one second. A measurement of one watt second

**Non-Lethal** - not likely to cause death

**Ohms** - a unit of electrical resistance equal to that of a conductor in which a current of one ampere is produced by a potential of one volt across its terminal; a unit of measure

**Resistance** - the opposition to electrical current characteristics of a medium, substance or circuit element

STINGER000855

**Signature -** the evidentiary marks left by the application of an electrical stun device

**Watt -** a unit of power in the International System equal to one joule per second

## Common Electrical Terms

**Voltage:** The measure of electromotive force in the system

**Amperage:** The measure of current flow per unit time

**Ohm:** Unit used to measure resistance to the conduction of electricity

The flow of electricity in relation to passing through an object is specifically described in terms of *Voltage*, *Amperage*, and *Ohms*, each of which play a role in the passage and effect of electricity on the human body.

STINGER000856



# CLASS OVERVIEW, REVIEW & ACKNOWLEDGEMENT

1. Review and understand agency policy/procedures and protocol regarding respective product use.

2. Never use an immobilization device to attempt to gain information from an individual by threatening.

3. Never use an immobilization device to intentionally inflict torture, abuse, self-gratification and/or punishment.

4. Be aware of the areas on the human body and gender restrictions where an EID should not be applied.

5. Be aware of the maintenance aspects of the respective EID.

6. Know where and how an EID may be used in and during USE OF FORCE incidents and the relationship between the need for force and the actual force applied.

7. Be aware that this technology does not affect everyone the same way.

8. Be aware that this is a device designed for immobilization and control and NOT as an offensive weapon.

9. Be aware that an EID is an alternative and must be used at the proper moment.

10. Know your own limitations with an EID.

I fully acknowledge receiving training in the above mentioned areas and understand my responsibilities when using an ELECTRONIC IMMOBILIZATION DEVICE.

_____          _____
              NAME                                            AGENCY

_____          _____
     INSTRUCTOR (PRINT NAME)                              DATE

White: Student    Yellow: Instructor

STINGER000857



# INSTRUCTOR REFERENCE GUIDE STUDENT PERFORMANCE OBJECTIVES PRACTICAL EXAMINATION FOR USE OF ELECTRONIC STUN DEVICE

Student Name: _____ Date: _____

Agency: _____ Class Location: _____

## NOTE: #1-19 ARE <u>MANDATORY</u> FOR CERTIFICATION, #20 & 21 ARE OPTIONAL

|  |  | ACCEPTABLE | UNACCEPTABLE |
|---|---|---|---|
| 1. | VERBALIZATION | _____ | _____ |
| **CONTACT MODE (no cartridges)** | | | |
| 2. | WORKING SAFETY ON/OFF SWITCH | _____ | _____ |
| 3. | DISPLAY (AIMING) | _____ | _____ |
| 4. | OPTIONAL COMPLIANCE MODE | _____ | _____ |
| 5. | TARGET AREAS | _____ | _____ |
| 6. | VEHICLE EXTRACTION | _____ | _____ |
| 7. | SEARCHING | _____ | _____ |
| 8. | GRIP RELEASE | _____ | _____ |
| 9. | MAINTAINING CONTACT | _____ | _____ |
| 10. | ARM LOCK/UPPER CHEST APPLICATION | _____ | _____ |
| **FIRING MODE** | | | |
| 11. | LOADING CARTRIDGES | _____ | _____ |
| 12. | MANUAL UNLOADING | _____ | _____ |
| 13. | CARTRIDGE EJECTION | _____ | _____ |
| 14. | TRANSITION TO CONTACT MODE | _____ | _____ |
| 15. | FIRING FROM 5 FEET | hit _____ | miss _____ |
| 16. | FIRING FROM 18 FEET | hit _____ | miss _____ |

**APPLICATIONS  (unloaded device/contact mode)**

| 17. | SELF APPLICATION TO THIGH | YES ☐  NO ☐ |
|---|---|---|
| 18. | INSTRUCTOR APPLICATION TO UPPER CHEST | YES ☐  NO ☐ |
| 19. | INSTRUCTOR APPLICATION TO RADIAL NERVE | YES ☐  NO ☐ |
| 20. | FULL TAKE DOWN **(OPTIONAL)** CONTACT MODE | YES ☐  NO ☐ |
| 21. | FULL TAKE DOWN - Alligator Clips **(OPTIONAL)** | YES ☐  NO ☐ |

STUDENT SIGNATURE: _____

I certify that the above named individual has demonstrated his/her ability to properly utilize a Stinger S-200™ stun device according to SSI Training Guidelines and SPOs.

_____                    _____
INSTRUCTOR SIGNATURE                                  DATE

**White: Student        Yellow: Instructor**

**STINGER000858**

# Exhibit 14

This exhibit can be found in the Clerk's file at Docket No. 175-2, pages 4 through 6.

A full copy is included with the Court's copy and with a copy separately served on counsel for Stinger Systems, Inc.

# Exhibit 15

This exhibit can be found in the Clerk's file at Docket No. 175-3, pages 2 through 9.


A full copy is included with the Court's copy and with a copy separately served on counsel for Stinger Systems, Inc.

# Exhibit 16

This exhibit can be found in the Clerk's file at Docket No. 175-6, pages 2 through 36.

A full copy is included with the Court's copy and with a copy separately served on counsel for Stinger Systems, Inc.

# Exhibit 17

This exhibit can be found in the Clerk's file at Docket No. 175-8, pages 2 through 16.

A full copy is included with the Court's copy and with a copy separately served on counsel for Stinger Systems, Inc.

# Exhibit 18

This exhibit can be found in the Clerk's file at
Docket No. Docket No. 54.


A full copy is included with the Court's copy and
with a copy separately served on counsel for Stinger
Systems, Inc.

# Exhibit 19

This exhibit can be found in the Clerk's file at
Docket No. 175-13, pages 2 through 8.

A full copy is included with the Court's copy and
with a copy separately served on counsel for Stinger
Systems, Inc.

# Exhibit 20

This exhibit can be found in the Clerk's file at
Docket No. 95, pages 17, 70, 94

A full copy is included with the Court's copy and
with a copy separately served on counsel for Stinger
Systems, Inc.

# Exhibit 21

This exhibit can be found in the Clerk's file at Docket No. 162-1, pages 9 through 17.

A full copy is included with the Court's copy and with a copy separately served on counsel for Stinger Systems, Inc.

# Exhibit 22

This exhibit can be found in the Clerk's file at Docket No. 162-1, pages 2 through 7.

A full copy is included with the Court's copy and with a copy separately served on counsel for Stinger Systems, Inc.

# Exhibit 23

This exhibit can be found in the Clerk's file at Docket No. 162-1, pages 29 through 30.


A full copy is included with the Court's copy and with a copy separately served on counsel for Stinger Systems, Inc.

# Exhibit 24

This exhibit can be found in the Clerk's file at
Docket No. 180 (filed under seal).


A full copy is included with the Court's copy and
with a copy separately served on counsel for Stinger
Systems, Inc.

# Exhibit 25

This exhibit can be found in the Clerk's file at Docket No. 180, page 129 (filed under seal).

A full copy is included with the Court's copy and with a copy separately served on counsel for Stinger Systems, Inc.