Chad S. Campbell, Bar No. 012080
CSCampbell@perkinscoie.com
Aaron Matz, Bar No. 024108
AMatz@perkinscoie.com
PERKINS COIE BROWN & BAIN P.A.
2901 North Central Avenue, Suite 2000
Phoenix, AZ 85012-2788
Telephone: 602.351.8000
Facsimile: 602.648.7000

Holly L. Gibeaut, Bar No. 019786
hgibeaut@taser.com
TASER International, Inc.
17800 North 85th Street
Scottsdale, AZ 85255-9603
Telephone: 480.502.6265
Facsimile: 480.991.0791

Attorneys for Plaintiff
TASER International, Inc.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| TASER International, Inc.,<br>Plaintiff,<br>v.<br>Stinger Systems, Inc.,<br>Defendant. | No. CV07-0042-PHX-MHM<br><br>(Oral Argument Requested) |

**REPLY IN SUPPORT OF TASER'S MOTION FOR PARTIAL SUMMARY JUDGMENT OF LITERAL INFRINGEMENT**

# Table of Contents

Page

Table of Contents ..... i

Table of Authorities ..... ii

Preliminary Statement ..... 1

Discussion ..... 2

I. The Record Before the Court Justifies Partial Summary Judgment that Stinger Has Literally Infringed Claims 2 and 40 of the '295 Patent ..... 2

A. TASER Is Entitled to Summary Judgment as to Both Claim 2 and Claim 40. ..... 2

B. There Is No Triable Dispute that the S-200 Satisfies Each Limitation of Claim 2 and Claim 40. ..... 3

1. Stinger has conceded nearly all the material facts. ..... 3

2. Stinger has failed to demonstrate a triable dispute that the S-200 has a power supply that operates in two modes as required by claims 2 and 40 of the '295 patent. ..... 4

II. Stinger's Invalidity Arguments Are Incorrect, But Also Beside the Point. ..... 7

A. The Court Can Grant Summary Judgment of Infringement Without Reaching Issues of Validity. ..... 7

B. Claims 2 and 40 of the '295 Patent Are Valid. ..... 8

1. Stinger grossly distorts the facts and law regarding secondary considerations of nonobviousness. ..... 8

2. Stinger has failed to show that any of the alleged prior art anticipate claims 2 and 40. ..... 10

3. Stinger has failed to provide clear and convincing evidence that claims 2 and 40 are not enabled. ..... 10

Conclusion ..... 11

# Table of Authorities

**Cases** **Page**

*Akamai Techs., Inc. v. Cable & Wireless Internet Servs., Inc.*, 344 F.3d 1186 (Fed. Cir. 2003) .......... 9

*AquaTex Indus., Inc. v. Techniche Solutions*, 419 F.3d 1374 (Fed. Cir. 2005) .......... 3

*Cole v. Kimberly-Clark Corp.*, 102 F.3d 524 (Fed. Cir. 1996) .......... 3

*DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293 (Fed. Cir. 2006) .......... 3

*Gemtron Corp. v. Saint-Gobain Corp.*, 572 F.3d 1371 (Fed. Cir. Jul. 20, 2009) .......... 8

*Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605 (1950) .......... 3

*Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470 (1974) .......... 9

*Lisle Corp. v. A.J. Mfg. Co.*, 398 F.3d 1306 (Fed. Cir. 2005) .......... 8

*McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339 (Fed. Cir. 2001) .......... 8

*Medtronic, Inc. v. Cardiac Pacemakers, Inc.*, 721 F.2d 1563 (Fed. Cir. 1983) .......... 8

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358 (Fed. Cir. 2008) .......... 8

*Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211 (Fed. Cir. 1995) .......... 2

*Pandrol USA, LP v. Airboss Ry. Prods., Inc.*, 320 F.3d 1354 (Fed. Cir. 2003) .......... 7

*Süd-Chemie, Inc. v. Multisorb Techs., Inc.*, 554 F.3d 1001 (Fed. Cir. 2009) .......... 8

*Vandenberg v. Dairy Equip. Co.*, 740 F.2d 1560 (Fed. Cir. 1984) .......... 9

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17 (1997) .......... 3

**Other Authorities**

35 U.S.C. § 271(a) .......... 3

35 U.S.C. § 271(b) .......... 3

35 U.S.C. § 28 .......... 7

**Preliminary Statement**

Most of Stinger's Opposition addresses patent invalidity defenses rather than the narrow infringement issue raised by TASER's motion.[1] Stinger's assertion that invalidity must be decided before infringement can be assessed conflicts with settled authority in which federal courts have resolved infringement by summary judgment first, leaving invalidity defenses for resolution at trial. Regarding the issue actually raised in TASER's motion—whether the Stinger S-200 satisfies each limitation of claims 2 and 40 of the '295 patent—Stinger has nothing of substance to say.

Stinger has conceded (by failing to contest) six of the seven material facts underlying TASER's motion. The lone remaining fact—whether Stinger's S-200 satisfies the dual-operating mode limitations of claims 2 and 40 of the '295 patent—is not genuinely disputed. As set forth in TASER's motion, and below, the agreed design and operating characteristics of the S-200 satisfy those limitations. That fact is established beyond genuine dispute by Stinger's statements to its customers, to the Securities and Exchange Commission and the investing public, and in the contemporaneous writings of the S-200 designer including design records and formal filings with the United States Patent and Trademark Office. The S-200's use of a dual mode power supply is further confirmed by Dr. Rodriguez's analysis, which pinpoints a high voltage flyback mode and a distinct lower voltage non-flyback mode. Although Stinger continues to submit improper, untimely (and previously undisclosed) expert reports, those tardy submissions do not challenge the accuracy of Dr. Rodriguez's analysis of the design and operation of the S-200 power supply.

Having no facts or evidence to dispute the dual operating modes of the S-200 power supply, Stinger submits *ipse dixit* assertions that the S-200 has only one mode. But

---

[1] TASER objects to Stinger's transparent attempt to use the page limit of its opposition to submit, in effect, a second reply in support of Stinger's motion for summary judgment.

lawyer argument is not evidence, and unsupported and conclusory pronouncements do not establish triable issues of fact where none actually exist.

As noted at page 3 of TASER's motion, the relief TASER seeks is narrow. Because there is no triable issue that the S-200 satisfies each limitation of claims 2 and 40 of the '295 patent, partial summary judgment of infringement should be granted, leaving for trial the issues of damages and Stinger's validity and related defenses.

## Discussion

### I. THE RECORD BEFORE THE COURT JUSTIFIES PARTIAL SUMMARY JUDGMENT THAT STINGER HAS LITERALLY INFRINGED CLAIMS 2 AND 40 OF THE '295 PATENT.

#### A. TASER Is Entitled to Summary Judgment as to Both Claim 2 and Claim 40.

Stinger argues (at p. 4) that it "cannot be liable for literal infringement under the method claim" (i.e., claim 40) because "Stinger does not practice the method as required for direct infringement" and TASER purportedly "did not sue for inducing infringement." That argument mistakes both the law and the procedural posture of the case.

First, the argument has no possible application to claim 2 of the '295 patent, which covers an ECD apparatus and not a method of using such an apparatus. As a result, the argument (even if correct, and it is not) would be insufficient to preclude partial summary judgment of infringement of the '295 patent in any event. *See Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1220 (Fed. Cir. 1995) ("A patent is infringed if any claim is infringed . . . for each claim is a separate statement of the patented invention." (internal citations omitted)).

Second, Stinger's assertion that TASER did not sue for inducing infringement is wrong as reflected expressly in the Second Amended Complaint at paragraph 35. [Dkt. 51] Stinger is liable for inducing infringement of method claim 40 because Stinger knew of the '295 patent while continuing actively to encourage its customers to use the S-200 device for its intended purpose—namely, to temporarily immobilize a target. Given that (i) Stinger does not and cannot dispute that its actual and prospective customers have in

fact used the S-200 device in circumstances where an air gap exists between one of the electrodes and the target, and (ii) the S-200 is designed to use the method of claim 40 when operated in that circumstance, Stinger is liable for inducing infringement under 35 U.S.C. § 271(b). *See DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1304 (Fed. Cir. 2006) (inducement arises where party knows of patent, and encourages customers to use product in infringing manner); *AquaTex Indus., Inc. v. Techniche Solutions*, 419 F.3d 1374, 1379 (Fed. Cir. 2005) ("[A] party may still be liable for inducement or contributory infringement of a method claim if it sells infringing devices to customers who use them in a way that directly infringes the method claim.").[2]

### B. There Is No Triable Dispute that the S-200 Satisfies Each Limitation of Claim 2 and Claim 40.

#### 1. Stinger has conceded nearly all the material facts.

Under LRCiv 56.1(b), Stinger was required to "expressly controvert[]" and demonstrate with adequate record support a genuine dispute for each material fact that it does not concede. For Facts 1 through 6 of TASER's Statement of Facts, Stinger has effectively conceded each one. [*Compare* TSOF 1-6 *with* SSOF 1-6][3] As explained in the motion (at pp. 10-13), those facts establish that the S-200 satisfies nearly all the limitations of claims 2 and 40.

---

2 Stinger has confused the concept of "literal infringement" with the concept of "direct infringement." "Literal infringement" refers to whether the accused device satisfies the literal language of an asserted claim. *See Cole v. Kimberly-Clark Corp.*, 102 F.3d 524, 532 (Fed. Cir. 1996). It contrasts with infringement under the "doctrine of equivalents," under which infringement can be found where an accused device has no more than an insubstantial difference from the language of a claim. *See generally Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39-40 (1997); *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 607-609 (1950). "Direct infringement" refers to whether a party itself has practiced a claim, 35 U.S.C. § 271(a), in contrast to inducing someone else to practice the claim, *id.* § 271(b), or contributing to such infringement by another, *id.* § 271(c).

3 "TSOF" refers to TASER's Statement of Facts in Support of Its Motion for Partial Summary Judgment of Literal Infringement (Dkt. 185). "SSOF" refers to Stinger's Statement of Facts in Opposition to TASER's Statement of Facts in Support of Its Motion for Partial Summary Judgment of Issue of Literal Infringement (Dkt. 193).

**2. Stinger has failed to demonstrate a triable dispute that the S-200 has a power supply that operates in two modes as required by claims 2 and 40 of the '295 patent.**

Stinger's only stated basis for avoiding summary judgment of infringement is its unsupported argument that "[t]he S-200 does not have a 'dual operating mode' power supply." [SSOF 7] As set forth in detail at pages 13-15 of TASER's motion, and in the corresponding paragraphs in TASER's Statement of Facts, the overwhelming evidence demonstrates that the S-200 uses a power supply that operates in two distinct modes. As a result, the unsupported contrary arguments in Stinger's Opposition papers fail to create a triable issue regarding that fact.

Stinger first argues (at pp. 4-5) that the S-200 is not a dual-mode device because it does not "generate" or "apply" a second lower voltage output. According to Stinger, "[t]here is no evidence of record that the S-200 power supply <u>generates</u> a second lower voltage."

That assertion is flatly false, a fact that is most easily seen in the S-200 designer's own patent application (which undisputedly describes the operation of the S-200). [TSOF 29] In discussing the first (high voltage or "flyback") mode of operation, the application describes how the S-200 circuit operates to generate or produce a very high voltage: "[T]he magnetic field collapses and induces a large 'flyback' voltage spike, as is well known from Faraday's EMF law, across the pairs of electrodes. In a particular preferred embodiment, using the circuit components described above, flyback voltage spikes of 55-65 kV were produced." [TSOF 45] Then, in discussing the second (lower voltage) mode, the application describes how the S-200 circuit operates in an entirely different manner to "generate" or "apply" a lower voltage output:

> In this case, closing the controllable switch 32 causes the full voltage of the capacitor bank 34 to be applied across the transformer's primary 36 which in turn causes a substantially higher voltage to be applied across the secondary, as determined by the turns-ratio. This voltage is then applied across the target resistance. In a particular preferred embodiment the combination of a 100V DC supply and a 55:1 step-up transformer generates a potential across the projectile electrodes of about 2kV, where the balance of the nominal 5.5

> kV is lost to parasitic resistance of the windings and electrode leads. . . .

[TSOF 46] Even if the voltage drop caused by the "parasitic resistance" described above is ignored, this second mode "generates" only 5.5 kV (i.e., 5,500 volts), roughly one-tenth of the 55-65 kV (i.e., 55,000 to 65,000 volts) generated by the first mode.

In addition to that description of the S-200's dual-mode circuit, Dr. Rodriguez showed, through a detailed analysis of the S-200 design documentation, that the S-200 circuitry operates in two separate modes, one of which generates a high voltage and one of which generates a lower voltage, just as described in the S-200 patent application. [TSOF 44] Stinger's proposed expert Mr. Tachner has never disputed or shown any flaw in Dr. Rodriguez's analysis, not even in the two new declarations submitted with Stinger's Opposition.

Stinger also states (at p. 4) that "one cannot tell from an output waveform alone how the internal circuits of a stun gun are designed." While that is certainly true, and while it dramatically undermines Stinger's invalidity arguments (as described below and at p. 7 of TASER's Motion), it cannot create a triable issue of fact regarding the S-200's use of a dual-mode circuit. The reason is simple: The evidence showing that the S-200 uses the claimed dual-mode circuit includes far more than simply the S-200 output waveform. Instead, it includes Stinger's and the S-200 designer's own descriptions of the S-200's dual-mode circuit, as well as the analysis by Dr. Rodriguez, who (although he did examine the S-200 output waveform) based his conclusions on a detailed analysis of the S-200 circuitry and source code. [TSOF 7, 27-31, 42-47] Contrary to Stinger's assertion (at p. 7), TASER has never argued that "the Stinger waveform," by itself, "establishe[s] a dual mode."

In addition, Stinger's apparent argument that the S-200 circuits are identical to prior art ECD circuits, so that the change in output voltages is merely a consequence of Ohm's law, fails to withstand even the most casual scrutiny. [Opp. at pp. 6, 9; 8/17/09 Tachner Decl. (Dkt. 192-1) at ¶ 3] According to Stinger, the S-200 "is the culmination of

years of research and development"; is "designed to not behave like[] older discharge stun technologies"; and uses "revolutionary stun technology [that m]akes much more sense[] than using the older 'dump and hope it works without too much power in the subject' technologies." [Ex. 1][4] Moreover, the S-200's designer felt his dual-mode circuit was novel enough to warrant a patent application, which, as discussed above, clearly describes two separate modes of operation.[5] And on top of that, Stinger "has spent millions of dollars developing the S-200 . . . and has created, what it believes, is the most radical change to stun technology in years." [TSOF 35] Yet now, despite its own statements, despite the S-200 patent application, and despite those millions of dollars spent, Stinger asks the Court to believe that its "revolutionary" S-200 device is essentially identical to decades-old stun gun circuits. The argument is completely undercut by the fact that Stinger has not and cannot identify a single prior art stun device that uses a flyback mode to produce a first high voltage output and then a non-flyback mode to produce a lower voltage output that is applied to the target.

In the same vein, Stinger argues that its own description of the S-200 as "shift[ing] gears" from a high-voltage mode to a low-voltage mode "is quite innocuous when in the proper context," because it is "simply an acknowledgement of Ohm's law." [Opp. at p. 6] That argument is pure chutzpah. Here is the context: The discussion of "shifting gears" from the first mode to the second mode first appears in a passage called "Separating the Men from The Boys." [TSOF 27] That passage states: "Guns which can 'switch gears' is [sic] a big factor which separates the men from the boys in effectiveness." [*Id.*] If that passage merely referred to the effect of Ohm's law (which applies to all stun guns), then all stun guns would be able to "switch gears," and there would be no need to separate the "men" (dual-mode devices) from the "boys" (older, single-mode devices). [*Id.*]

---

[4] As used herein, citations to "Ex. __" refer to the exhibits attached to the counsel declaration filed concurrently with this Reply.

[5] The patent office has rejected all pending claims of the application as obvious in view of the '295 patent, the '262 patent, and one other recent patent. [Ex. 2]

Finally, Stinger apparently argues (at p. 8) that the S-200 does not use the claimed dual-mode circuit because it does not include "any . . . circuitry whatsoever [that] causes the device to switch from a first high voltage shock mode to a second lower voltage shock mode." That assertion amounts to a straw man argument because claims 2 and 40 do not require a physical switch that causes the output circuit to switch from the first, high-voltage mode of operation to the second, lower-voltage mode of operation. Moreover, to the extent that Stinger means to suggest that the S-200 does not infringe because it does not include *any* circuitry that causes the device to transition from the first mode of operation to the second, the argument is unsupported by any facts and contradicted by all of the evidence in the record. It is undisputed that the S-200 includes circuitry, and, as discussed above, that circuitry operates in the two claimed modes. It follows that the S-200 circuitry causes the device to transition from the first mode to the second.

## II. STINGER'S INVALIDITY ARGUMENTS ARE INCORRECT, BUT ALSO BESIDE THE POINT.

### A. The Court Can Grant Summary Judgment of Infringement Without Reaching Issues of Validity.

Consistent with its theme of re-arguing invalidity—because it cannot avoid infringement—Stinger represents to the Court (at p. 2) that "[a]nticipation and obviousness analyses are matters of law that are preliminary to patentability of an invention . . . and, therefore, establishing an infringement and are not simply defenses as proposed by T[ASER]." That assertion is wrong, as the Patent Act itself makes clear. *See* 35 U.S.C. § 282 ("The following shall be defenses in any action involving the validity or infringement of a patent and shall be pleaded: . . . (2) Invalidity of the patent or any claim in suit . . . .").

The Federal Circuit has thus held that "Supreme Court precedent and our cases make clear that patent infringement and patent validity are treated as separate issues." *Pandrol USA, LP v. Airboss Ry. Prods., Inc.*, 320 F.3d 1354, 1364 (Fed. Cir. 2003); *see also id.* at 1365 ("Though an invalid claim cannot give rise to liability for infringement, whether it is infringed is an entirely separate question capable of determination without

regard to its validity." (quotation marks omitted) (quoting *Medtronic, Inc. v. Cardiac Pacemakers, Inc.*, 721 F.2d 1563, 1583 (Fed. Cir. 1983))). Accordingly, courts routinely grant summary judgment of infringement without first disposing of issues of invalidity. *See, e.g.*, *Gemtron Corp. v. Saint-Gobain Corp.*, 572 F.3d 1371 (Fed. Cir. Jul. 20, 2009) (affirming summary judgment of infringement and jury verdict of validity); *Lisle Corp. v. A.J. Mfg. Co.*, 398 F.3d 1306 (Fed. Cir. 2005) (same); *McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339 (Fed. Cir. 2001) (affirming summary judgment of infringement and reinstating jury verdict of validity).

**B. Claims 2 and 40 of the '295 Patent Are Valid.**

**1. Stinger grossly distorts the facts and law regarding secondary considerations of nonobviousness.**

Stinger is correct that secondary considerations of nonobviousness are not relevant to the present motion, which concerns infringement only. [Opp. at p. 2] Nevertheless, because Stinger raised the issue in its Opposition, and more importantly, because of the extent to which Stinger has distorted the facts and law, TASER submits the following to correct the record.

First, Stinger states (at p. 3) that "T[A]SER has not annually sold in the U.S. market a significantly greater number of its new X26 model T[ASER]s . . . than its earlier M26 model [TASER]." As noted at page 18 of TASER's opposition to Stinger's motion for summary judgment of invalidity, the enormous commercial success of the X26 provides compelling evidence that '295 patent claims 2 and 40, which cover the core technology used in the X26, were not obvious. *See Süd-Chemie, Inc. v. Multisorb Techs., Inc.*, 554 F.3d 1001, 1008 (Fed. Cir. 2009) ("As we have repeatedly emphasized, evidence relating to secondary considerations 'constitutes independent evidence of nonobviousness' and can be quite instructive in the obviousness inquiry." (quoting *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1365 (Fed. Cir. 2008))). Stinger invites the Court to examine TASER's SEC filings, but given what those filings show, it is not surprising that Stinger chose to omit the actual numbers. The table below shows the

yearly sales figures for the X26 and the older-technology M26, beginning in 2002 (the year before the X26 was introduced) and ending in 2008 (the last year for which a form 10-K is available), with the numbers in the table representing thousands of dollars in sales:

| | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|
| X26 | --- | $8,066 | $46,083 | $31,313 | $45,241 | $61,638 | $51,733 |
| M26 | $8,494 | $15,412 | $3,929 | $2,635 | $2,578 | $2,412 | $3,422 |

[Exs. 3-9] TASER respectfully submits that these numbers demonstrate beyond question that the X26 (which incorporates the ’295 inventions) has eclipsed the success of the M26 (which does not incorporate the ’295 inventions) by more than an order of magnitude.

Second, Stinger asserts (at p. 3) that TASER’s discussion of Stinger’s deliberate copying of the X26 device “are most inappropriate.” That is incorrect as a matter of law. Even assuming that Stinger is correct that “[t]he review of competitor’s products” and reverse engineering are “a normal part of the product development process,” Stinger’s copying of the X26 is a powerful indication of the nonobviousness of claims 2 and 40. *See Akamai Techs., Inc. v. Cable & Wireless Internet Servs., Inc.*, 344 F.3d 1186, 1196 (Fed. Cir. 2003) (“This evidence of copying is relevant to an obviousness determination.”); *Vandenberg v. Dairy Equip. Co.*, 740 F.2d 1560, 1567 (Fed. Cir. 1984) (“The copying of an invention may constitute evidence that the invention was not an obvious one. . . . This would be particularly true where the copyist had itself attempted for a substantial length of time to design a similar device, and had failed.” (internal citation omitted)).[6]

[6] Indeed, even if it were true, as Stinger seems to suggest, that the S-200 had been designed completely “from scratch,” without copying, or even referring to, TASER’s X26 device or patents, that would not excuse Stinger’s infringement. *See Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 478 (1974) (“[Patent] protection goes not only to copying the subject matter . . . but also to independent creation.”).

**2.  Stinger has failed to show that any of the alleged prior art anticipate claims 2 and 40.**

Stinger apparently argues once again that various prior art devices, including the M34000 and M26, anticipate claims 2 and 40 because their "oscilloscope tracings show . . . electrical shocks that drop in voltage once an ionized path is established." [Opp. at p. 6]  But it also agrees with TASER (at page 4) that "one cannot tell from an output waveform alone how the internal circuits of a stun gun are designed."  In contrast to TASER's analysis of the S-200, Stinger's arguments regarding the alleged prior art devices are based entirely on the output waveform alone; Stinger has presented no evidence whatsoever that the circuitry of any prior art device included the two distinct operating modes required by claims 2 and 40.  That falls far short of the clear and convincing evidence required to establish anticipation.  In any event, its assertions that the damped sinusoid waveforms of the prior art M34000 and M26 devices are identical to the waveforms of the X26 and S-200 are patently ridiculous.  [*Compare* Ex. 11 (purportedly showing the damped sinusoid waveform of the M34000) and Ex. 12, Fig. 1 (showing damped sinusoid waveform of the M26) *with id.* Figs. 2-5 (showing waveforms of X26 and S-200)]

Stinger's discussion of the Rhoads patent (at p. 10) is also fatally flawed.  Far from showing a first mode that provides the claimed "high voltage," the only other mode described in Rhoads is a "quiescent" mode, in which the circuit produces no voltage at all but simply consumes minimal power until it makes contact with a target.  *See* Rhoads abstract.

**3.  Stinger has failed to provide clear and convincing evidence that claims 2 and 40 are not enabled.**

Stinger argues (at p. 12) that claims 2 and 40 are not enabled, apparently because the patent does not disclose how to perform AM radio modulation, but rather shows only how to perform FM radio modulation.  But as Stinger concedes, AM and FM relate to radio broadcasting. [Opp. at p. 12]  The '295 patent need not enable what it does not claim, and the inventions described in the '295 patent, along with the patent's claims,

have nothing whatsoever to do with AM, FM, or any other form of radio modulation. [*See* Ex. 10 at ¶ 9]

**Conclusion**

The Stinger S-200 includes each limitation of claims 2 and 40 of the ’295 patent and therefore literally infringes those claims. Accordingly, TASER requests that the Court grant partial summary judgment that the Stinger S-200 has literally infringed, and continues to literally infringe, claims 2 and 40 of the ’295 patent.

Dated: October 5, 2009

**PERKINS COIE BROWN & BAIN P.A.**

By: /s/ Aaron Matz
Chad S. Campbell
Aaron Matz

Holly L. Gibeaut
TASER International, Inc.
17800 North 85th Street
Scottsdale, AZ 85255-9603

Attorneys for Plaintiff TASER International, Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that on October 5, 2009, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Chad S. Campbell: cscampbell@perkinscoie.com

Holly L. Gibeaut: hgibeaut@taser.com

Attorneys for Plaintiff

—and—

Ray K. Harris: rharris@fclaw.com

James F. McNulty, Jr. macslaw2000@yahoo.co.in

Attorneys for Defendant

By /s/ Aaron Matz

17074879.1