**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| TASER INTERNATIONAL, INC., | ) | No. 07-042-PHX-MHM |
| | ) | |
| Plaintiff, | ) | **ORDER** |
| | ) | |
| vs. | ) | |
| | ) | |
| STINGER SYSTEMS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

Currently before the Court is Defendant Stinger Systems, Inc.'s ("Stinger") Motion for Summary Judgment of Patent Invalidity or Noninfringement, (Dkt. #160), and Plaintiff TASER International, Inc.'s ("TASER") Motion for Partial Summary Judgment of Literal Infringement. (Dkt. #184). Having considered all the evidence and heard oral argument on March 23, 2010, the Court issues the following Order:

**I.    Background**

   **A.    Procedural History**

   On January 5, 2007, TASER filed an action against Stinger alleging infringement of U.S. Patent 7,145,762 (filed Feb. 11, 2003) ("the '762 patent") under 35 U.S.C. § 271, false advertising under 15 U.S.C. § 1051 *et seq.*, and false marketing under 35 U.S.C. § 292. (Dkt. #1).  TASER amended its complaint on July 9, 2007 to add infringement claims for two additional patents, U.S. Patent 6,999,295 (filed Feb. 5, 2005) ("the '295 patent") and U.S. Patent 7,102,870 (filed May 29, 2003) ("the '870 patent").  (Dkt. #32).  Thereafter, on

October 10, 2007, TASER filed a second amended complaint in which TASER dropped all claims related to the '762 patent and added claims pertaining to a fourth patent, U.S. Patent 7,234,262 (Dec. 2, 2005) ("the '262 patent").

On November 6, 2007, Stinger filed an Answer to TASER's second amended complaint and counterclaim for false advertising under 15 U.S.C. § 1125(a) to TASER's second amended complaint. (Dkt. #54). Stinger asserts a number of affirmative defenses, including statute of limitations, laches, waiver, estoppel, unclean hands, patent misuse, and inequitable conduct. (Dkt. #54, pp. 4-5).

On May 7, 2008, the Court held a hearing in accordance with Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996), to construe disputed claims of the '262, '295, and '870 patents. This Court issued its Markman Order construing the disputed claims on February 2, 2009. (Dkt. #146). In that Order, the Court construed disputed claim language as follows: for the '295 patent (1) "to ionize the air within the air gap" refers to the formation of ions within the air gap as a result of the high voltage, short duration output across the first and second electrodes during the first mode/time period; and (2) "to maintain the current flow" is self-explanatory, and refers to the maintenance of the current flow that is driven across the air gap by the low voltage output in the second mode/time period and is not limited to a continuous or uninterrupted current flow to the extent that the current flow is able to maintain a state of low impedance throughout the second mode/time period; for the 870 patent a "grounded user of the weapon" refers to a user coupled to a common reference conductor in the weapon; and for the '262 patent (1) "track date and time" means the tracking of date and time, in a program, in a microprocessor, through whatever means available to a person of skill in the art at the time of the invention; (2) "period of time" means the predefined period recited in Claim 9. (Id.).

On, May 18, 2009, Stinger filed a Motion for Summary judgment of Patent Invalidity or Noninfringement. (Dkt. #160). On August 14, 2009 TASER filed its Motion for Partial

1  Summary Judgment of Literal Infringement.  (Dkt. #184).  The Court held oral argument on

2  these motions on March 23, 2010.

3  **B.**   **General Description of the Technology**

4  TASER and Stinger develop, manufacture, and sell electronic control devices

5  ("ECD"), commonly known as "stun guns," which are used to temporarily incapacitate a

6  single person from a distance.  While ECDs are intended to be non-lethal, they are somewhat

7  similar to pistols: handheld devices that are activated by a trigger mechanism.  Once

8  activated, two dart electrodes, each of which are tethered to a wire connected to the internal

9  circuitry of the weapon, are ejected out of the end of the weapon.  The darts are intended to

10  establish contact points with a living target, enabling a power supply circuit in the weapon

11  to deliver current through the electrodes and the target in order to cause involuntary muscle

12  contractions and temporarily immobilize the target.

13  At issue in this case are three of TASER's patents that relate to technology for

14  reducing the size and weight of ECDs while increasing their efficiency, effectiveness, and

15  traceability in deployment.  TASER's '295 patent is entitled "Dual Operating Mode

16  Electronic Disabling Device for Generating a Time-Sequenced, Shaped Voltage Output

17  Waveform."  As the title suggests, the '295 patent claims a dual operating mode designed to

18  addresses the challenge of establishing electrical contact with a target and efficiently deliver

19  electric current flow to temporarily immobilize the target.  In addition, the '870 patent is

20  entitled "Systems and Methods for Managing Battery Power in an Electronic Disabling

21  Device."  Likewise, as the title suggests, the '870 patent claims systems and methods for

22  managing battery power.  The two patents share a common specification.

23  Apparently, an ECD's darts may often lodge in a target's clothing, which results in

24  an air gap between the electrodes and the target, preventing the electrodes from establishing

25  direct contact with the target's skin.  The air gap impedes the flow of electricity due to the

26  high impedance of air, which is generally defined as the absence of charged particles, or the

27  ratio of the voltage of the electrical potential between two points and the current passing

28  - 3 -

1  there. High impedance exists when there is a large voltage potential and only a small amount

2  of current; low impedance is the opposite.  The application of voltage across an air gap,

3  which can be administered by the functioning of ECD capacitors and transformers,

4  accelerates the available electrons in the air and causes them to pick up speed and crash into

5  each other, thus freeing additional electrons and creating ions.  This process is known as

6  ionization, which breaks down high impedance and enables a smaller voltage application

7  over a larger current flow.  Once voltage is removed, the air gradually returns to its original

8  state and high impedance returns.  In addition, during the process of ionization, electrons can

9  recombine with ions to recreate stable molecules, and in doing so they release energy by

10  emitting photons, the particles responsible for light energy.  In some instances, the

11  recombination process results in the creation of visible electrical arcs.

12      Importantly, the common specification of the '295 and '870 patents reveal that

13  although conventional ECDs were designed to have the capability of causing voltage

14  breakdown across a very high impedance air gap by administering a fifty to sixty thousand

15  volt output, once the air gap has been ionized and the impedance reduced to a low level, the

16  stun guns continued to operate in the same mode, resulting in a high power, high voltage stun

17  gun circuit operating relatively inefficiently and yielding low electro-muscular efficiency

18  with high battery power requirements.  To overcome this inefficiency, the '295 patent

19  provides for the operation of an ECD in a second mode.  Once the air gap is ionized and the

20  air impedance is reduced to a low level, current is able to flow across the air gap at a lower

21  voltage level.  At that point, a  second lower voltage, longer duration output is generated to

22  maintain an immobilizing current flow through the target.  In addition, the '870 patent makes

23  additional claims for, among other things, safety enhancements with respect to the operation

24  of ECDs.

25      Finally, the '262 patent is entitled "Electrical Weapon Having Controller for Timed

26  Current Through Target and Date/Time Recording."  As the title suggests, the patent claims

27  an apparatus that includes a microprocessor programmed to track date and time, to initiate

28

- 4 -

1    and maintain an electrical current for a period, and to record tracked date and time for each

2    initiation of the current.

3        C.    **The Claims at Issue**

4            The independent claims currently at issue are as follows[1]:

5                1.    **The '295 Patent.**

6                    **Claim 2:**

7        A dual operating mode electronic disabling device for immobilizing a target

8    comprising:

9            a. first and second electrodes positionable to establish first and second spaced apart

10           contact points on the target wherein a high impedance air gap may exist between at

11           least one of the electrodes and the target; and

12           b. a power supply for operating in a first mode to generate a first high voltage, short

13           duration output across the first and second electrodes during a first time interval to

14           ionize the air within the air gap to thereby reduce the high impedance across the air

15           gap to a lower impedance to enable current flow across the air gap at a lower voltage

16           level and for subsequently operating in a second mode to generate a second lower

17           voltage output across the first and second electrodes during a second time interval to

18           maintain the current flow across the first and second electrodes and between the first

19           and second contact points on the target to enable the current flow through the target

20           to cause involuntary muscle contractions to thereby immobilize the target.

21                   **Claim 40**

22       A method for immobilizing the muscles of a target, comprising the steps of:

23

24

25

26   _____

27       [1]There are also dependent claims at issue regarding the '262 patent.  For ease of
     reference, however, only the independent claims are expressly quoted herein.

28                                    - 5 -

a. providing first and second electrodes positionable to establish first and second spaced apart contact points on the target wherein a high impedance air gap may exist between al least one of the electrodes and the target;

b. applying a first high voltage, short duration output across the first and second electrodes during a first time interval to ionize the air within the air gap to thereby reduce the high impedance across the air gap to a lower impedance to enable current to flow across the air gap at a lower voltage level; and

c. subsequently applying a second lower voltage output across the first and second electrodes during a second time interval to maintain the current flow across the first and second electrodes and between the first and second contact points on the target to enable the current flow through the target to cause involuntary muscle contractions to thereby immobilize the target.

### 2.    The '870 Patent

#### Claim 1

An electronic disabling device for imobilzing a target comprising:

a. first and second electrodes positionable to establish first and second spaced apart contact points on the target;

b. high voltage power supply for generating an output voltage delivered in a series of electrical pulses to the target;

c. a battery system including: (I) a battery; (ii)  a digital memory device for storing battery capacity data indicating the amount of battery capacity consumed or remaining; (iii) a data interface for communicating between the battery system and the memory device to adjust the battery capacity data stored in the memory device; and

d. a display for indicating to a user the battery capacity.

#### Claim 2

An electronic disabling device for immobilizing a target comprising:

a. first and second electrodes positionable to establish first and second spaced apart contact points on the target;

b. a high voltage power supply for generating an output voltage delivered in a pre-timed series of electrical pulses to the target; and

c. a display for indicating to the user the amount of time remaining in each pulse sequence.

### Claim 3

An electronic disabling device for immobilizing a target comprising:

a. first and second electrodes positionable to establish first and second spaced apart contact points on the target;

b. a high voltage of  power supply for generating an output voltage delivered in a pre-timed series of electrical pulses to the target;

c. a trigger mechanism to initiate the pre-timed series of electrical pulse; and

d. a mechanism for allowing the user to extend the duration of the pre-timed series of electrical pulses.

### Claim 4

An electronic disabling device for immobilizing target comprising:

a. first and second electrodes positionable to establish first and second spaced apart contact points on the target; and

b. a high voltage power supply for generating an output voltage delivered across the first and second contact points on the target to generate a positive voltage potential at one electrode and a negative voltage potential at the other electrode, thereby increasing the total voltage drop across a target while deceasing the maximum voltage potential between either electrode and a grounded user of the weapon.

3.      **The '262 Patent**

**Claim 1**

A dart weapon for interfering with locomotion by a human being or animal target, the weapon for use with each of a plurality of replaceable cartridges, each cartridge having at least one wire-tethered dart and a propellant that propels the dart, the weapon comprising:

a receiver that receives a particular cartridge of the plurality of cartridges;

a power supply coupled to the receiver for conducting a high voltage pulsed current from the power supply through the wire-tethered dart of the particular cartridge;

a microprocessor programmed

(1) to track date and time,

(2) to activate via the power supply the propellant of the particular cartridge,

(3) to maintain for a period the current from the power supply, and

(4) to record tracked date and time in accordance with activation of the propellant of the particular cartridge and in accordance with respective activation of each other cartridge of the plurality received by the receiver, wherein the current through the target interferes with use by the target of the skeletal muscles of the target during the period

**Claim 6**

A dart weapon for interfering with use by a human being or animal target of skeletal muscles of the target, the weapon operative with a provided cartridge, the device comprising:

a trigger that provides a first signal responsive to operation of the trigger; and

a circuit, comprising a memory, that

(1) keeps track of current time of day,

(2) keeps track of current date,

(3) receives the first signal to determine a first time, and

(4) responds to the first signal by recording current date and current time of day in the memory by applying power to a signal generator, by keeping track of a period of time from the first time, and by disabling the signal generator upon lapse of the period, wherein;

1    the signal generator activates the cartridge to propel a wire-tethered dart of the
2    cartridge toward the target: and

3    a current from the signal generator via the wire-tethered dart and through the target
4    interferes with use by the target of the skeletal muscles of the target during the period.

5                    **Claim 9**

6    A dart weapon for interfering with locomotion by a human being or animal target, the
7    apparatus comprising:

8    means for providing a high voltage pulsed current through the target via a provided
9    wire-tethered dart launched from the weapon;

10   means for recording date and time of day for each occasion that the weapon was
11   operated to provide the current; and

12   means for discontinuing provision of the current in accordance with lapse of a
13   predefined period.

14                   **Claim 13**

15   An apparatus for causing involuntary contractions of skeletal muscles of a human or
16   animal target, the apparatus comprising:

17   a circuit having a microprocessor that is

18        (1) programed to track date and time,

19        (2) programmed to initiate a high voltage pulsed current from the circuit, and

20        (3) programmed to record tracked date and time in accordance with each

21        initiation of the current, wherein the current launches a provided wire-tethered

22        dart toward the target to conduct the current through the target and when

23        passing through the target, causes involuntary contractions of skeletal muscles

24        of the target.

25   **II.    Standard of Review**

26   A motion for summary judgment may be granted only if the evidence shows "that
27   there is no genuine issue as to any material fact and that the moving party is entitled to

28

1  judgment as a matter of law." FED. R. CIV. P. 56(c).  To defeat the motion, the non-moving

2  party must show that there are genuine factual issues "that properly can be resolved only by

3  a finder of fact because they may reasonably be resolved in favor of either party." Anderson

4  v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  The party opposing summary judgment

5  "may not rest upon the mere allegations or denials of [the party's] pleadings, but ... must set

6  forth specific facts showing that there is a genuine issue for trial." Rule 56(e).  See

7  Matsushita Elec. Indus. Co., v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  The

8  evidence must be viewed in the light most favorable to the nonmoving party. Devereaux v.

9  Abbey, 263 F.3d 1070, 1074 (9th Cir. 2001) (en banc).

10  **III.     STINGER'S Motion for Summary Judgment**

11       In its summary judgment motion, Stinger has set forth numerous grounds upon which

12  relief should be granted.  It argues that the various claims of the '295, '262, and '870 patents

13  are invalid, either as anticipated, obvious, or both.  Stinger also alleges inequitable conduct

14  as to the '762, '295, and '870 patents.  Finally, as to almost all of the patent claims at issues,

15  Stinger denies that the S-200 infringes.  The Court will consider Stinger's invalidity

16  arguments before moving onto the question of infringement.

17       **1.     Anticipation**

18            **A.     Legal Standard**

19       A party seeking to establish that patent claims are invalid must overcome statutory

20  presumption of validity set forth in 35 U.S.C. § 282 by clear and convincing evidence.

21  Impax Labs., Inc. v. Aventis Pharms., Inc., 545 F.3d 1312, 1314 (Fed. Cir. 2008).  This

22  presumption of validity exists at every stage of the litigation.  Cannon Comp. Sys., Inc. v.

23  Nu-Kote Int'l, Inc., 134 F.3d 1985, 1088 (Fed. Cir. 1998), and "is never annihilated,

24  destroyed or even weakened regardless of what facts are of record." ACS Hosp. Sys., Inc.

25  v. Montefiore Hosp., 732 F.2d 1472, 1574-75 (Fed. Cir. 1984). Where the Patent and

26  Trademark Office ("PTO") considered the prior art that is the basis of the validity challenge

27  during patent prosecution, a defendant's burden concerning proof of invalidity is particularly

28                                              - 10 -

1  heavy. Id.; Glaxo Group Ltd. v. Apotex, Inc., 376 F.3d 1339, 1348 (Fed. Cir. 2004) ("This

2  burden is 'especially difficult' when, as is the present case, the infringer attempts to rely on

3  prior art that was before the patent examiner during prosecution.").

4      "A patent is invalid for anticipation if a single prior art reference discloses each and

5  every limitation of the claimed invention." Schering Corp. v. Geneva Pharm., 339 F.3d

6  1373, 1377 (Fed Cir. 2003). "[A] prior art reference may anticipate without disclosing a

7  feature of the claimed invention if that missing characteristic is necessarily present, or

8  inherent, in the single anticipating reference." Id. Additionally, such disclosure must be

9  "enabling." SmithKline v. Beecham Corp v. Apotex Corp., 403 F.3d 1331, 1432 (Fed. Cir.

10 2005). In other words, it must allow a person of ordinary skill in the art to practice or make

11 the invention without resort to undue experimentation. Impax Labs., 545 F.3d at 1314. The

12 enabling component of the anticipation test "presents a question of law based upon

13 underlying factual findings." Id. at 1315. On the whole, however, anticipation is a question

14 of fact. SmithKline, 403 F.3d at 1343. Where there are no "genuine factual disputes

15 underlying the anticipation inquiry, the issue is ripe for judgment as a matter of law." Id.

16          **B.      The '295 Patent**

17              **i.      Claims 2 & 40**

18      For the purposes of its motion, Stinger groups claims 2 and 40 of the '295 patent

19 together, making two arguments: (1) two prior art ECDs—the U34000 Air Taser ("U34000")

20 and the Taser Public Defender ("TPD") embody every element of claims 2 and 40; and (2)

21 TASER's X26 ECD anticipates claims 2 and 40 because the PTO wrongly granted the '295

22 patent a priority date of 2003.

23              **a.      The U34000 and TPD**

24      The U34000 and TPD are prior art ECDs. The Parties do not dispute that the U34000

25 and TPD were sold in the United States before 1995 and 1976 respectively, well before the

26 2003 priority date of the '295 patent. (Defendant's Statement of Facts ("DSOF") ¶1) In its

27 papers, Stinger argues, that when operated, these two prior art ECDs embody every element

28                                      - 11 -

of claims 2 and 40, an assertion that TASER denies.   The Parties disagreement, however, is narrow, focusing only on one element of claims 2 and 40; the so-called dual operating mode, which teaches a power supply for operating in a first mode to generate a high voltage output, then in a second mode to generate a second lower voltage output.

In support of its argument, Stinger relies primarily on the conclusions of its expert, Mr. Tachner.   Having analyzed the wave forms of the U34000 and TPD with an oscilloscope, Mr. Tachner found they each demonstrated a damped sinusoid wave form, then concluded that such a wave form demonstrates the utilization of a dual operating mode.  (Id. ¶2).  TASER contests Mr. Tachner's conclusions, citing this Court to the Rebuttal Report of its expert, Dr. Rodriguez, who found that a damped sinusoid wave is not indicative of a dual operating mode, as ECDs known to operate in only one mode also produce damped sinusoid waves. (Plaintiff's Statement of Facts ("PSOF") ¶2).  For instance, TASER cites to evidence showing that the prior art TASER M26 ECD, which operates in only one mode, outputs a damped sinusoid wave.  (Id.  ¶109).  Additionally, TASER has cited to evidence showing that the M34000 utilizes the same single mode blunt-pulse approach as the M26, and points out that the M26 is not alleged to have anticipated claims 2 and 40.   Given the dispute over the significance of a damped sinusoid wave form, whether or not the U34000 and TPD operate in two modes is a material fact about which there is clearly a dispute, precluding a finding of anticipation.

### b.    The priority date argument

Next, Stinger argues that claims 2 and 40 are anticipated by TASER's X26 ECG[2] ("X26") because TASER is not entitled to the 2003 priority date currently enjoyed by its '295 patent.   Pursuant to 35 U.S.C. § 120, an application for a patent based on a previously disclosed invention "shall have the same effect, as to such invention, as though filed on the

---

[2]The TASER X26 ECG is the product that embodies the technological innovations represented by the patents at issue in this case.

date of the prior application" when certain conditions are met.  These conditions are as follows:

> (1) the invention claimed in the application must have been properly disclosed in a prior-filed application; (2) the application must have been filed by inventor(s) named on the prior-filed application; (3) the application must have been "filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application"; and (4) the application must contain or be amended to contain a specific reference to the prior-filed application.

Tafas v. Doll,  559 F.3d 1345, 1361 (Fed. Cir. 2009) (quoting 35 U.S.C. § 120).

As a preliminary matter, it is undisputed that TASER began selling the X26 in or about May, 2003, and that the '295 patent is a continuation of an application U.S. Patent 10/447,447 (filed May 29, 2003)  (PSOF ¶112).  Accordingly, absent a showing by Stinger that the '295 patent is not a continuation of the '447 patent, the X26 cannot have anticipated the '295 patent.  35 U.S.C.  § 102(b) (stating that a person shall be entitled to a patent unless the invention was described, in use, or on sale "one year prior to the date of the application for patent in the United States.").

The Court must determine, then, whether Stinger has proven that the '295 patent application did not satisfy the four-part test set forth in Tafas.  The answer to that question is clearly, no.  TASER has introduced evidence showing that the '295 patent satisfies all four elements of that test, including the written description requirement, which only requires that the disclosure statement convey "with reasonable clarity to those skilled in the art that, as of the filing date sought, [the inventor] was in possession of the invention."  Revolution Eyewear, Inc. v. Aspex Eyewear, Inc., 563 F.3d 1358, 1366 (Fed. Cir. 2009); (PSOF ¶114–17).  Stinger, on the other hand, does not explain how the '295 Patent fails to satisfy the Tafas test—i.e. meet the requirements of 35 U.S.C. § 120—let alone explain how it does not satisfy the written description element.  Instead, Stinger argues that the prosecution of the '762 patent somehow deems the '295 patent unworthy of continuation.  Although it is somewhat unclear, Stinger appears to contend that the '762 patent disclosed the invention

1   taught in the '295 patent and, as a result, the '295 patent cannot be a continuation of the '447

2   patent. Stinger, however, has cited no authority for its proposition that the file history of a

3   different patent application can cancel an otherwise valid continuation application. This

4   Court, as a result, will not grant summary judgment.

5            **c.**      **The Rhoads Patent**

6         In its reply brief, Stinger's anticipation argument relies heavily on the prior art patent,

7   Rhoads, U.S. Patent No. 4,120,305 (filed Sept. 10, 1976) ("Rhoads"). In its initial motion,

8   however, Stinger's only mentions Rhoads twice. One reference to Rhoads is found in the

9   section of its brief arguing that claims 2 and 40 of the '295 patent a law of nature. The other

10  reference is located under the heading "Stinger Practices the Prior Art." Both citations make

11  reference to Figure 3A of Rhoads, but neither explains its meaning or content. Additionally,

12  neither reference is supported by citation to Stinger's statement of facts. In fact, Rhoads is

13  not cited in the statement of facts at all.   By failing to adequately explain its reliance on

14  Rhoads or cite to it in its statement of facts, Stinger has denied TASER an opportunity to

15  properly respond to the more specific anticipation arguments made in its reply brief.   See

16  Eberle v. City of Anaheim, 901 F.2d 814, 818 (9th Cir. 1990) (noting that legal arguments

17  raised for the first time in the reply brief are deemed waived). While Stinger's behavior may

18  fall short of waiver, the Court finds it would be inequitable to rely on Rhoads to invalidate

19  TASER's '295 patent, as doing so would entail relying on arguments to which TASER did

20  not have a proper opportunity to respond[3]. See United States v. Romm, 455 F.3d 990, 997

21  (noting that even if the argument has merit, this Court cannot appropriately consider it, since

22  Plaintiffs did not have the opportunity to respond.).

23           **C.**      **The '870 Patent**

24

---

25      [3]At oral argument, Stinger explained that it relied so heavily on Rhoads in its reply

26  brief because it was merely responding to arguments concerning Rhoads raised in TASER's
    response. The Court is not persuaded by this line of reasoning, as it does not appear that

27  TASER mentioned Rhoads even one time in its response.

28

1

### i.    Claim 1

2    Stinger's anticipation argument concerning claim 1 of the '870 patent is predicated

3    on the prior art patent Kaufman, U.S. Patent No. 5,193,048 (filed April 27, 1990)

4    ("Kaufman").  Kaufman patents an "electronic [stun-gun] device designed to incapacitate a

5    person by means of a non-lethal electric shock."  Stinger contends that Kauffman discloses

6    every limitation of claim 1 of the '870 patent.  Claim 1 teaches (1) two separate electrodes

7    that allow for two contact points on the target; (2) a high voltage power supply capable of

8    delivering a series of electrical pulses to the target, a battery system including a battery; (3)

9    a digital memory device for storing battery capacity data indicating the amount of battery

10    capacity consumed or remaining, and a data interface that allows the battery system and the

11    digital memory device to communicate; (4) and a display for indicating to the battery

12    capacity.  TASER does not appear to dispute that Kaufman embodies the first. second, and

13    fourth elements of claim 1.  Instead, TASER's responds to Stinger's accusation of

14    anticipation by arguing that the third element of claim 1—the digital memory and data

15    interface—is not found in Kaufman.  (PSOF ¶144).

16    As an initial matter, the PTO considered Kaufman when making its determination

17    concerning TASER's '870 patent application.  Accordingly, Stinger bares a even heavier

18    burden than would otherwise apply in an anticipation challenge.   Impax Labs., 545 F.3d at

19    1314.  In support of its position that the Kaufman patent satisfies claim 1's "digital memory"

20    and "data" limitation, Stinger points to Kaufman's utilization of a "14 stage ripple carry

21    counter."  In explaining the significance of the 14 stage ripple carry counter, however,

22    Stinger merely quotes Kaufman, which states that "anytime the power switch SW1 [of the

23    weapon taught in Kaufman] is held closed, the 14 state ripple carry counter U2 continues to

24    increment its count stored therein."  TASER counters by noting that its expert concluded that

25    the 14 stage ripple carry counter is not, in fact, a digital memory device.  TASER also argues

26    that the  14 stage ripple carry counter does not track battery capacity (PSOF ¶144).  Instead,

27    it  functions as more of a timer, keeping track of how long a battery has been in use and

28

triggering a low battery light indicator after the battery has been used for a certain amount of time. (Id. ¶146). When a new battery is inserted, the 14 stage ripple carry counter is "unaware of the quality of the replacement battery" and will begin counting time again from zero, regardless of how much charge is in the replacement battery. (Id.). Accordingly, TASER argues, that the invention taught in Kauffman only monitors the time a battery has been used, not its capacity

In light of the Parties disagreement concerning the function of the 14 stage ripple carry counter, summary judgment is inappropriate. There is very clearly a disputed issue of fact concerning whether Kaufman teaches "a digital memory device for storing battery capacity data indicating the amount of battery capacity consumed or remaining, and a data interface that allows the battery system and the digital memory device to communicate." The Court finds, therefore, that Stinger has not met its heavy burden and its motion is denied.

### ii.    Claim 2

As with claim 1 of the '870 patent, the Parties only disagree about one element of the patent claim at issue; the element of claim 2 that teaches "a display for indicating to the user the amount of time remaining in each pulse sequence." Stinger's argument is predicated on a prior art device, the U34000, but only indirectly, and can only be understood by reference to TASER's allegation of infringement against Stinger. TASER alleges that the S-200 infringes claim 2 of the '870 patent because it utilizes a display consisting of four light emitting diodes ("LEDs"), which light or energize sequentially as 25% increments of the pulse charge are consumed. TASER asserts that because each of the S-200's LEDs activate at approximately one second intervals, users are able to measure the time remaining in each pulse sequence. Stinger argues that if the S-200 infringes claim 2, which it denies, then the U34000 must also infringe because it's battery indicator display can be similarly used to calculate the time remaining in a given pulse sequence. And, if the U34000 infringes, then TASER's patent is anticipated because the U34000 was in public use prior to 1995, well before the 2003 date of the '870 patent.

1    Whatever the merit of Stinger's argument concerning the U34000, this Court cannot
2    accept it to invalidate TASER's patent.   Essentially, Stinger argues that TASER's patent
3    should be invalidated because the U34000 and the S-200 each allow a user to employ the
4    same method to deduce the time remaining in a given pulse sequence; counting light pulses.
5    To prevail on its argument, then, Stinger must necessarily introduce evidence of how the
6    U34000's battery light indicator operates when the U34000 is fired.  Only then can the Court
7    determine if  a user can deduce the time remaining in the pulse sequence when operating the
8    U34000.  Stinger has provided this Court evidence of the U3400's operation in the form of
9    a declaration of a single witness, Stinger's CEO, Robert Gruder.  (DSOF ¶22–23).  This
10   uncorroborated interested-witness testimony is insufficient to invalidate a patent.  Finnigan
11   Corp. v. Int'l Trade Comm'n, 180 F.3d 1354, 1369 (Fed Cir. 1999) ("[C]orroboration is
12   required of any witness whose testimony alone is asserted to invalidate a patent, regardless
13   of his or her level of interest.").  Accordingly, Stinger's motion concerning anticipation as
14   to claim 2 of the 870' patent is denied.

15                                iii.    Claim 4

16        In support of its anticipation argument concerning claim 4 of the '870 patent, Stinger
17   draws this Court's attention to the Darrell, U.S. Patent No. 4,370,696(filed May 26, 1981)
18   ("Darrell"). Once again, the Parties arguments center around the existence or non-existence
19   of a single claim element in the prior art.  In this instance, the Parties disagreement focus on
20   whether claim 4's element of "a high voltage power supply for generating an output voltage
21   delivered across the first and second contact points on the target to generate a positive
22   voltage potential at one electrode and a negative voltage potential at the other electrode," is
23   taught in Darrell.  Stinger, pointing to the Supplemental Statement of its expert, Mr. Tachner,
24   argues that the circuit disclosed in Darrell will produce a positive potential at one electrode
25   and a negative potential at the other, every other half cycle.  (DSOF  ¶27).

26        The PTO considered Darrell when making its determination concerning TASER's
27   '870 patent application.  (PSOF ¶159).  Accordingly, Stinger bares a even heavier burden

28                                            - 17 -

1    than would otherwise apply in an anticipation challenge.   Impax Labs., 545 F.3d at 1314.

2    It has not met that burden.  In opposition to Stinger's motion, TASER also relies on Stinger's

3    expert, Mr. Tachner, pointing to deposition testimony in which Mr. Tachner admitted

4    Darrell's transistor switch, which connects the transformer center tap to the positive battery

5    terminal, may be open during the half cycle relied upon by Stinger, preventing a positive

6    voltage from appearing at one electrode and a negative voltage at the other, with respect to

7    the ground.  (PSOF ¶160).  In light of the contradictory nature of Mr. Tachner's testimony

8    and the heavy presumption in favor of validity, summary judgment cannot be granted.  The

9    Court finds there is a genuine issue of material of fact concerning whether or not the

10   contested element of claim 4 is present in Darrell.

11                        **D.    The '262 Patent**

12           As with the '295 patent, Stinger asserts that TASER's '262 patent is not entitled to

13   its 1999 priority date and, therefore, is anticipated by TASER's own X26 ECD.  (See DSOF

14   ¶39).   Specifically, Stinger claims that the invention claimed in the '262 patent was not

15   disclosed until a December 12, 2005 amendment to the September 17, 1999, application.

16   (DSOF ¶37).    As TASER rightly points out, Stinger's argument, then, is that the

17   amendments made to the 1999 application by the 2005 amendment constitute previously

18   undisclosed "new matter."  See, e.g., Pfizer, Inc. v. Teva Pharm. USA, Inc., 518 F.3d 1353,

19   1362 (Fed. Cir. 2008) (noting that as a general rule "new matter is not entitled to the priority

20   date of the original application.").  "Whether particular technological information is 'new

21   matter' depends on the facts of the case: the nature of the disclosure, the state of the art, and

22   the nature of the added matter."  Brooktree Corp. v. Advanced Micro Devices, Inc., 977 F.2d

23   1555, 1575 (Fed. Cir. 1992).  Additionally, "in the context of a validity challenge based on

24   new matter, the fact that the [PTO] has allowed an amendment without objection is entitled

25   to an especially weighty presumption of correctness in a subsequent validity challenge based

26   on the alleged introduction of new matter."  Commonwealth Scientific and Indus. Research

27   Org. v. Buffalo Tech. (USA), Inc.,  542 F.3d 1363, 1380 (Fed. Cir. 2008).

28

1    The 262 patent appears to warrant a heavy presumption of validity.  TASER has cited

2  this Court to the Notice of Allowability, dated March 7, 2006, in which the patent examiner

3  concluded the 2005 application was entitled to a September 1999 priority date. (PSOF ¶169).

4  In attempting to satisfy its very heavy burden,  Stinger argues that the 2005 amendment is

5  new matter because it includes, for the first time, references to a "circuit," "signal generator,"

6  "disabling the signal generator," apparatus that "keeps track of current time of day, keeps

7  track of current date," or "keeping track of a period of time."    (See DSOF ¶39).  TASER

8  concedes that the 1999 application does not contain these exact phrases, but argues instead

9  that Stinger cannot invalidate its patent merely by pointing out that certain terms and phrases

10  do not appear verbatim in the 1999 application.  TASER's position is accurate, "as the prior

11  application need not describe the claimed subject matter in exactly the same terms as used

12  in the claims; it must simply indicate to persons skilled in the art that as of the earlier date

13  the applicant had invented what is now claimed."  Eiselstein v. Frank, 52 F.3d 1035, 1039

14  (Fed. Cir. 1995).  Accordingly, the Court must consider what was disclosed in the 1999

15  patent application.

16    It appears that the 1999 application discloses an ECD controlled by a microprocessor

17  that, among other things,  "retains a record of the date and time the weapon was fired."

18  TASER argues that '262 merely claims a method to accomplish this task.  Stinger makes

19  much of the fact that the '262 patent does not detail the specific operation of the

20  microprocessor, such as how the microprocessor is programmed to keep track of date and

21  time.  Stinger has not put forth evidence, however, explaining how this lack of information

22  does not disclose to a person reasonably skilled in the art what TASER had invented.  On the

23  contrary, in another part of its brief, Stinger cites to the Declaration of Rodriguez, in which

24  Dr. Rodriguez stated that "[o]ne of ordinary skill in the art would know there are many ways

25  to track date and time" and explained many viable methods to accomplish that task (DSOF

26  ¶40).  Accordingly, the Court finds that Stinger has not overcome the presumption of validity

27  to which the '262 patent is entitled, and a material issue of fact exists concerning whether the

28

1    disclosures made in the 2005 application are new matter and not, therefore, entitled to the

2    1999 priority date.

3        **2.    Obviousness**

4

5            **A.    Legal Standard**

6            As this Court has already explained, a party seeking to establish that patent claims are

7    invalid must overcome statutory presumption of validity set forth in 35 U.S.C. § 282 by clear

8    and convincing evidence.   Impax Labs., Inc. v. Aventis Pharms., Inc., 545 F.3d 1312, 1314

9    (Fed. Cir. 2008).  This presumption of validity exists at every stage of the litigation.  Cannon

10   Computer Sys., Inc. v. Nu-Kote Int'l, Inc., 134 F.3d 1985, 1088 (Fed. Cir. 1998), and "is

11   never annihilated, destroyed or even weakened regardless of what facts are of record." ACS

12   Hosp. Sys., Inc. v. Montefiore Hosp., 732 F.2d 1472, 1574-75 (Fed. Cir. 1984). Where the

13   Patent and Trademark Office ("PTO") considered the prior art that is the basis of the validity

14   challenge during patent prosecution, defendant's burden to prove invalidity is particularly

15   heavy.  Glaxo Group Ltd. v. Apotex, Inc., 376 F.3d 1339, 1348 (Fed. Cir. 2004) ("This

16   burden is 'especially difficult' when, as is the present case, the infringer attempts to rely on

17   prior art that was before the patent examiner during prosecution.").

18           A patent claim is invalid for obviousness if the invention recited in the claim would

19   have been obvious to a person of ordinary skill in the field of the invention at the time it was

20   made. Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,  381 F.3d 1111, 1116

21   (Fed Cir. 2004).  In this case, the Parties have agreed that a person of ordinary skill in the art

22   is a university educated electronics engineer with a bachelor's degree in electronic

23   engineering.  To determine obviousness, the Court must examine: (1) the scope and content

24   of the prior art; (2) the differences between the prior art and the claims at issue; (3) the level

25   of ordinary skill in the pertinent art; and (4) the objective evidence of nonobviousness.  Iron

26   Grip Barbell Co., Inc. v. USA Sports, Inc., 392 F.3d 1317, 1320 (Fed Cir. 2004) (citing

27   Graham v. John Deere Co., 383 U.S. 1 (1966)).  Obviousness is a question of law predicated

28

on underlying facts.  McGinley v. Franklin Sports, Inc., 262 F.3d 1339, 1349 (Fed. Cir. 2001).  And, as with anticipation, a defendant must show invalidity due to obviousness by clear and convincing evidence.  Id.  Ultimately, where "the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent in light of these factors, summary judgment is appropriate."   KSR International. Co. v. Teleflex Inc., 550 U.S. 398, 427 (2007)

In its papers, Stinger argues that the Supreme Court's decision in KSR radically altered the obviousness standard.  This Court, however, disagrees.  Contrary to Stinger's assertions, the KSR Court did not overturn the Federal Circuit's teaching, suggestion, or motivation ("TSM") test, "under which a patent claim is only proved obvious if the prior art, the problem's nature, or the knowledge of a person having ordinary skill in the art reveals some motivation or suggestion to combine the prior art teachings."  Id. at 407.  To the contrary, the Court specifically noted that "[t]here is no necessary inconsistency between the [TSM] test and the Graham analysis."  Id. at 419.  Instead, it merely held that the TSM test should not be rigidly applied; instead courts should utilize a more "expansive and flexible approach." Id. at 415. Accordingly,  "[i]n determining whether the subject matter of a patent claim is obvious, neither the particular motivation nor the avowed purpose of the patentee controls. What matters is the objective reach of the claim." Id. at 419.  Additionally, KSR, did not, however, alter courts' duty to consider secondary factors which mitigate against a finding of obviousness.  These include: (1) the commercial success of a product due to the merits of the claimed invention; (2) a long felt need for the solution provided by the claimed invention; (3) unsuccessful attempts by others to find the solution provided by the claimed invention; (4) copying of the claimed invention by others; (5) unexpected and superior results from the claimed invention; (6) acceptance by others of the claimed invention as shown by praise from others in the field or from the licensing of the claimed invention; (7) other evidence tending to show nonobviousness; (8) independent invention of the claimed invention by others before or at about the same time as the named inventor thought of it; and

1   (9) other evidence tending to show obviousness.  Id. at 406 (citing Graham, 383 U.S. at 17-
2   18).

3          Predicated on its beliefs concerning the transformative nature of KSR, Stinger argues
4   this Court should not apply the presumption of validity to TASER's patents, as the PTO
5   awarded TASER's patents under the pre-KSR standard for obviousness.  This argument,
6   however, is not supported by KSR.  As part of its analysis the Supreme Court specifically
7   noted that it did not doubt the Federal Circuit, in many case, had conducted the obviousness
8   inquiry pursuant to the standard it articulated in KSR  Id. at 419 ("In the years since the
9   Court of Customs and Patent Appeals set forth the essence of the TSM test, the Court of
10  Appeals no doubt has applied the test in accord with these principles in many cases.").
11  Likewise, this Court does not doubt that patent examiners have likewise conducted many of
12  their patent examinations in accord with KSR.  Accordingly, it does not accept Stinger's
13  position, that in light of KSR, this Court must not give TASER's patents the statutory
14  presumption of validity to which they are otherwise entitled.  In so doing, this Court notes
15  that its holding comports with the majority of other district courts that have addressed this
16  question.  See, e.g., Church & Dwight Co., Inc. v. Abbott Labs., 2008 WL 2566193, at *6
17  (D.N.J., June 24, 2008) ("KSR does not appear to have altered the statutory presumption of
18  validity."); Power Integrations, Inc. v. Fairchild Semiconductor Int'l, 2007 WL 2893391, at
19  *1 (D. Del. Sept. 20, 2007) (concluding that KSR "does not alter the statutory presumption
20  of validity").

21              **B.    The 295' Patent**

22                  **i.    Claims 2 & 40**

23         Stinger makes three arguments concerning the obviousness of claims 2 and 40 of
24  TASER's '295 patent: (1) claims 2 and 40 impermissibly patent a law of nature; (2) claims
25  2 and 40 are obvious in light of the prior art patent Gowan, U.S. Patent No. 5,471,362 (filed
26  February 26, 1993) ("Gowan");  and (3) the prior art Taser Public Defender ECD uses a two
27  capacitor.

28                              - 22 -

1

**a.      TASER has not patented a law of nature.**

2      Stinger argues that claims 2 and 40 of the '295 patent should be invalidated because

3  they patent a law of nature.[4]  The Court agrees with Stinger that patent protection does not

4  extend to "laws of nature, natural phenomena, and abstract ideas." Diamond v. Diehr, 450

5  U.S. 175, 185 (1981).  Stinger, however, presents an incomplete picture of the law, failing

6  to recognize that "an *application* of a law of nature or mathematical formula to a known

7  structure or process may well be deserving of patent protection."  Id. at 187 (emphasis in

8  original). The question this Court must answer is whether Claims 2 and 40 impermissibly

9  patent a law of nature, as opposed to permissibly patenting a process that applies a law of

10 nature.  Stinger argues the former, TASER the latter.

11     In support of its argument, Stinger points out that TASER's expert admitted that in

12 prior art ECDs—i.e. ECD's employing a single operating mode—ionization of the air gap

13 will naturally cause the voltage output to decrease, while, at the same time, causing an

14 increase in the output of current, and that this phenomenon is a law of nature.  (DSOF ¶3).

15 According to Stinger, this testimony proves that TASER has patented a law of nature,

16 arguing that the natural drop in voltage and commensurate increase in current flow after

17 ionization of the air gap is, in essence, the second operating mode found in claims 2 and 40.

18 TASER, on the other hand, denies that claims 2 and 40 patent a law of nature, explaining that

19 the '295 patent acknowledges how single mode ECD's operate, and that claims 2 and 40

20 teach a process—the dual-operating mode—that utilizes this law of nature.

21     TASER's description of the dual operating mode comports with its description of

22 claims 2 and 40 as having patented a process, not a law of nature.  The alleged novelty of

23 the dual-operating mode patented by claims 2 and 40 is that it allows production of an ECD

24 that uses far less battery power than is used in single-operating mode ECDs.  As TASER

25 ─────────────

26     [4]The Court agrees with TASER that Stinger's law of nature argument is not properly
   considered under an obviousness analysis.  It will consider the argument in this section of the
27 Order for organizational purposes.

28

1    explained in the '295 patent application , after ionization of the air gap, a single-mode ECD

2    must "continue operating in the same mode while delivering current flow or charge across

3    the skin of a now very low impedance target. The resulting high power, high voltage stun gun

4    circuit operates relatively inefficiently yielding low electro-muscular efficiency and with

5    high battery power requirements."  U.S. Patent 6,999,295 (filed Feb. 5, 2005).  To address

6    this problem, claims 2 and 40 teach the use of a power supply which operates in a second

7    mode to generate a more efficient low voltage, high current  output.  (See PSOF ¶89–91).

8    Because the second-mode's voltage output is not merely the result of the law of nature

9    described by Dr. Rodriguez, TASER denies it has patented a law of nature.  Instead, TASER

10   argues it has patented a process that takes advantage of that law of nature to send high

11   amounts of current over the ionized air-gap using very little voltage.

12       In determining whether the moving party has met its burden, the Court views the

13   evidence in the light most favorable to the nonmovant.  Allen v. City of Los Angeles, 66 F.3d

14   1052, 1056 (9th Cir. 1995).  If the ECD patented by claims 2 and 40 operates as TASER has

15   described, than a reasonable juror could conclude that TASER has patented a process, not

16   a law of nature.   Accordingly, summary judgement on this issue is denied.

17                    **b.      Gowan does not render claims 2 and 40 obvious**

18       Stinger argues that the dual operating mode taught by claims 2 and 40 apply well

19   understood electrical principles and, as a result, are obvious in light of the Gowan, U.S.

20   Patent No. 5,471,362 (filed February 26, 1993) ("Gowan").  TASER, on the other hand,

21   maintains that the dual-operating mode was not obvious in light of Gowan.  At the outset, the

22   Court notes that the patent examiner considered Gowan when evaluating TASER's

23   application for the '295 patent.  As this Court has already explained, KSR did not alter the

24   presumption of validity or burden that a party challenging a patent must carry.  Accordingly,

25   Stinger bares a particularly heavy burden to demonstrate claims 2 and 40's invalidity.  Glaxo

26   Group Ltd. v. Apotex, Inc.,  376 F.3d 1339, 1348 (Fed. Cir. 2004).  In its motion, Stinger has

27   not attacked the substance of the patent examiner's reasons for allowance, other than to

28                                              - 24 -

1  suggest it is wrong in light of <u>KSR</u>.  Because Stinger does not argue that the examiner's

2  decision was incorrect under the pre-<u>KSR</u> standard, this Court need only determine whether

3  Stinger has proven by clear and convincing evidence that <u>KSR</u> dictates a different conclusion

4  than the one reached by the patent examiner.

5      In considering TASER's patent application, "Gowan . . . teaches an arc generating

6  circuit that has a first transformer 1 to create an arc and a second transformer 21 with a

7  different output voltage to flow current across the arc." (DSOF, ¶4).  In deciding that claims

8  2 and 40 were not obvious, the patent examiner distinguished Gowan, stating:

9      The teachings of Gowan differ from the claims by not using the current flow
       across the arc to disable a subject (person or other living being).  The arc in the
10     Gowan teaching is used to fire a spark plug in an automotive internal
       combustion engine.  The prior art record in this application (which includes
11     Gowan) fails to teach or fairly suggest the use of a stun gun type device that
       uses a second transformer with a lower output voltage to flow current across
12     an arc to disable a subject.

13  (<u>Id</u>). Because the patent examiner distinguished Gowan from claims 2 and 40 by noting the

14  dissimilarity between the arts, Stinger's argument for obviousness based on <u>KSR</u> is

15  presumably grounded in <u>KSR's</u> teaching that "if a technique has been used to improve one

16  device, and a person of ordinary skill in the art would recognize that it would improve similar

17  devices in the same way, using the technique is obvious."  550 U.S. at 417.

18      TASER does not appear to dispute that claims 2 and 40 use the same or, at least, a

19  similar technique to the one utilized in Gowan.  <u>KSR</u> suggests, however, that the mere fact

20  a technique exists in the prior art does not render any subsequent use of that technique

21  obvious.  Instead, <u>KSR</u> teaches that the prior art device that employed the technique and the

22  device currently utilizing the technique must be "similar devices." <u>Id.</u>   In awarding claims

23  2 and 40 of the '295 patent, the examiner noted that "an arc . . . used to fire a spark plug for

24  an automotive engine . . . is <u>highly unrelated</u> to the stun gun art." (emphasis added).

25  Additionally, TASER's expert, Dr. Rodriguez, has testified to other major differences in

26  design, operation, and purpose between Gowan. (<u>See</u> PSOF ¶131–32). Because Stinger has

27  relied solely on <u>KSR</u> as a reason to contravene the patent examiner's findings concerning

28                                                 - 25 -

Gowan with respect to claims 2 and 40, and <u>KSR</u> does not appear to mandate a finding of obviousness in this situation, the Court cannot conclude that Stinger has met its very heavy burden.  Whether there is sufficient similarity between the Gowan device and the ECD claimed in the '295 patent will be for a jury to decide.

          **c.**    **Police Model Taser does not render claims 2 and 40 obvious**

Stinger also contends that an ECD called the Police Model Taser ("PMT"), which was manufactured by Tasertron, Inc. prior to its purchase by TASER in 2003, renders the '295 patent obvious.  According to Stinger, the PMT employed two capacitors in parallel to discharge an arching shock, with one capacitor discharging after the other, the later of the two at a lower energy level and voltage than the first.  (DSOF ¶ 5).  Stinger appears, then, to argue the PMT's two capacitor system makes obvious the dual-mode operating system taught in the '295 patent.

As an initial matter, Stinger's claims concerning the workings of the PMT are supported by the uncorroborated declaration of Stinger's lawyer, Mr. McNulty.  (<u>See</u> <u>Id.</u>).  Uncorroborated testimony is insufficient to invalidate a patent.  <u>Finnigan Corp. v. Int'l Trade Comm'n</u>, 180 F.3d 1354, 1369 (Fed Cir. 1999) ("[C]orroboration is required of any witness whose testimony alone is asserted to invalidate a patent, regardless of his or her level of interest.").   Additionally, TASER has produced evidence contradicting Stinger's characterization of the prior art PMT's operation.  TASER cites to the deposition of Stinger's expert,  Mr. Tachner, who testified that when two capacitors are connected in parallel, they do not operate separately, but work in tandem as a single larger capacitor, discharging simultaneously.  (PSOF ¶ 136).  In his deposition,  Mr. Tachner also admitted that a circuit using two parallel capacitors could be identical to the prior art circuit shown in Figure 1 of the '295 patent.  (<u>Id.</u>).  In light of the lack of corroboration, the presumption of validity, and the dispute concerning the workings of a parallel circuit—i.e. the scope of the prior art

1  PMT—this Court finds that Stinger has not demonstrated obviousness by clear and
2  convincing evidence.

3              **C.**      **The '870 Patent**

4                    **i.**      **Claim 1**

5        Claim 1 of the '870 patent teaches (1) two separate electrodes that allow for two
6  contact points on the target; (2) a high voltage power supply capable of delivering a series
7  of electrical pulses to the target, a battery system including a battery; (3) a digital memory
8  device for storing battery capacity data indicating the amount of battery capacity consumed
9  or remaining, and a data interface that allows the battery system and the digital memory
10 device to communicate; (4) and a display for indicating the battery capacity.  In arguing that
11 Claim 1 is obvious, Stinger cites this Court to four prior art patents (Kaufman; Poole, U.S.
12 Patent No. 6,237,461 (filed May 28, 1999); Harthcock, U.S. Patent No. 5,303,495 (filed Dec.
13 9, 1992); and Horne, 5,005,307 (filed Dec. 29, 1989)) and two prior art devices (the M26 and
14 the U34000).  (DSOF ¶15).  Stinger asserts that all elements of claim 1 are present in the
15 prior art devices, except the digital memory device and data interface.  As for the fourth
16 element of claim 1—a display for indicating battery capacity—Stinger notes that it accepted
17 TASER's construction that "a display with any indication of battery capacity is sufficient,"
18 then directs the Court to Kaufman and Poole, each of which teach a low-battery indicator
19 light.  (Id.).  Finally, Stinger cites to Harthcock and Horne, as teaching the use of a
20 microprocessor to control a firearm, which, presumably, covers claim 1's digital memory
21 device and data interface limitation.

22       Stinger has set forth prior-art patents and devices that are relevant to an obviousness
23 inquiry.  What it has not done, however, is explain to this Court why this prior art render's
24 claim 1 obvious.  In the section of its brief pertaining to the alleged obviousness of claim
25 1—which weighs in at a mere seven sentences—Stinger makes only one argumentative
26 statement: "The use of the microprocessor's memory instead of a separate circuit to monitor
27 the battery is obvious."  Given that it must overcome the presumption of validity and prove

28

1   obviousness by clear and convincing evidence, Stinger's lack of application of facts to law

2   is puzzling.  As the Supreme Court has explained, "a patent composed of several elements

3   is not proved obvious merely by demonstrating that each of its elements was, independently,

4   known in the prior art."  KSR, 550 U.S. at 418.  Rather, the question is really whether "a

5   person of ordinary skill can implement a predictable variation."  Id. at 417.  Stinger clearly

6   believes a college educated engineer could have implemented claim 1, but does not bother

7   to explain why, let alone support its claim with expert testimony or other evidence.[5]   In

8   essence, Stinger merely asserts that its obviousness claim is obvious.  In so doing, Stinger

9   has not met its burden, and this Court will not invalidate claim 1.

10                            **ii.    Claim 3**

11          Stinger's obviousness argument as to claim 3 of the '870 patent focuses on a single

12   limitation of that claim; "a mechanism for allowing the user to extend the duration of the

13   pre-timed series of electrical pulses."[6]  The parties do no dispute that the "mechanism" is a

14   trigger.   Stinger contends that the use of a trigger in this manner is obvious, citing the

15   deposition admission by claim 3's inventor, Mr. Nerheim, that both prior art automatic

16   weapons and the prior art M26 ECD will continue to fire if their trigger is held down.

17   (DSOF ¶26).  Similarly, Stinger cites to Kaufman and Dunning, U.S. Patent No. 4,872,084

18   (filed Sept. 6, 1988). Kaufman teaches an activator switch used for firing an ECD that when

19

20          [5]Indeed, the Court notes that Stinger only explained the type of knowledge and skill

21   it believes a college educated engineer possesses in its reply brief.  By completely neglecting
     this important step in its motion, Stinger deprived TASER of a chance to respond and has

22   failed to adequately guide this Court's consideration of the issue, making it difficult to grant

23   summary judgment.

24          [6]The Court understands that "the determination of obviousness is made with respect

25   to the subject matter as a whole, not separate pieces of the claim."  Sanofi-Synthelabo v.
     Apotex, Inc., 550 F.3d 1075, 1086 (Fed. Cir. 2008).  The disputed element, however, fairly

26   captures the whole of claim 3's subject matter as the other parts of the claim merely teach

27   essential elements of the ECD device to which the purported invention, the trigger
     mechanism for extending a pre-timed series of electrical pulses, is attached.

28
                                    - 28 -

1   "pressed continually for 15 seconds . . .automatically disable [the ECD] for a predetermined

2   time," while Dunning teaches an ECD that fires as long as its trigger switch is operated.

3   (DSOF ¶26).

4            In response, TASER notes that both Kaufman and Dunning were before the patent

5   examiner.  TASER also argues that Kaufman teaches away from the concept of using a

6   trigger to extend a devices' output, as the ECD taught in Kaufman  stops firing after 15

7   seconds, no matter how long its activator switch is held.  See McGinley v. Franklin Sports,

8   Inc.  262 F.3d 1339, 1354 (Fed Cir. 2001)("[R]eferences that teach away cannot serve to

9   create a prima facie case of obviousness.").   TASER, however, primarily combats Stinger's

10  allegation of obviousness by distinguishing the prior art devices and weapons relied upon by

11  Stinger, arguing that their firing output continues as long as the trigger is held down, not for

12  a pre-defined period of time.   In other words, TASER argues that no one had ever before

13  used a trigger to extend a pre-timed series of electrical pulses. This fact, however, is not

14  determinative under KSR.

15           As this Court has already explained, "if a technique has been used to improve one

16  device, and a person of ordinary skill in the art would recognize that it would improve similar

17  devices in the same way, using the technique is obvious unless its actual application is

18  beyond his or her skill."  KSR, 550 U.S. at 417.  There is no question that an ECD that fires

19  a pre-timed series of pulses is similar art to an ECD that fires non-pre-timed pulses.

20  Additionally, TASER does not dispute that the M26 and the device taught in Dunning both

21  use triggers to extend their firing duration.  Accordingly, Stinger's evidence shows that a

22  trigger is a well known option for extending the firing duration of ECDs.  The question, then

23  becomes, would a reasonably skilled engineer have recognized that a trigger could be used

24  to extend a pre-timed series of electrical pulses? Without relying on Kaufman, which teaches

25  away from using extending a pre-timed series of electrical pulses with a trigger, this Court

26  answers this question in the affirmative.

27

28

1    "When there is a design need or market pressure to solve a problem and there are a

2    finite number of identified, predictable solutions, a person of ordinary skill has good reason

3    to pursue the known options within his or her technical grasp." Id. at 421.  The use of a

4    trigger to extend the firing duration of an ECD was clearly a known option at the time of

5    claim 3's invention.  Given this fact, the Court finds that applying the same technique to an

6    ECD using pre-timed electrical pulses appears to be a predictable solution that a reasonably

7    skilled college educated engineer would have had good reason to pursue.   Accordingly, the

8    Court finds that Stinger has met its heavy burden, overcoming the presumption of validity,

9    and summary judgment should be granted as to the invalidity of claim 3 of the '870 patent.

10   The Court will not consider secondary factors that might  mitigate against a finding of

11   obviousness, as TASER has not argued that they are applicable concerning claim 3.

12                              iii.    Claim 4

13         Stinger argues that it was obvious to combine the transformer configuration taught in

14   claim 4 of the '870 patent with an ECD.  In pertinent part, Claim 4 recites:

15         a high voltage power supply for generating an output voltage delivered across
           the first and second contact points on the target to generate a positive voltage
16         potential at one electrode and a negative voltage potential at the other electrode
           thereby increasing the total voltage drop across a target while deceasing the
17         maximum voltage potential between either electrode and a grounded user of
18         the weapon
19   In support of its argument, Stinger cites this Court to the Parker, U.S. Patent 5,892,646 (filed

20   May 5, 1995) ("Parker").  Parker teaches the use of transformers with grounded secondary

21   wire center taps ("GSWCT") in gas-discharge display lamps (i.e. neon signs), the purpose

22   of which is to reduce the severity of shock to users of electronic devices that contact the

23   ground and a lead of the secondary transformer.  (DSOF ¶31).  Stinger claims that the ECD

24   described in claim 4 utilizes the transformer with grounded secondary wire center taps found

25   in Parker, installs it in the same fashion, and uses it for the same purpose.  TASER does not

26   appear to contest Stinger's factual contentions concerning Parker and its relationship to claim

27

28                                    - 30 -

4.  In lieu of challenging the factual underpinnings of Stinger's obviousness argument, TASER asserts legal defenses, arguing that only analogous prior art is relevant to a question of obviousness and that claim 4 cannot be invalidated as obvious without engaging in impermissible hindsight-based analysis.

The Federal Circuit has held that non-analogous art has no bearing on an obviousness claim.  See Jurgens v. McKasy, 927 F.2d 1552, 1559 (Fed. Cir. 1991) ("And if we presume that the Dacian windsock is not analogous art, it has no bearing on the obviousness of the patent claim.").  As this Court has already explained, KSR does not appear to have completely destroyed this principle.  Instead, it appears to have expanded the range of prior art that is relevant to an obviousness inquiry, substituting the word analogous for similar. KSR, 550 U.S. at 417 ( "[I]f a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious." (emphasis added)).  KSR also points out, however, that "[w]hen there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp."  Id. at 421.  It stands to reason, then, that identified and predictable solutions are those which have been employed in similar or analogous arts.  Were it otherwise, a reasonably skilled  inventor  would be responsible for techniques and invention  he would have no reason about which to know.  Courts, in turn, would be forced to engage in the type of hind-sight based analysis which KSR confirmed is forbidden when evaluating obviousness. Id.  ("A factfinder should be aware, of course, of the distortion caused by hindsight bias and must be cautious of arguments reliant upon ex post reasoning.").

The question, then, is whether Parker and the claim 4 can be said to practice similar arts or are similar devices.   If the answer is yes, then claim 4 is likely invalid as obvious. Id. at 421 (noting that "if [pursuing known options] leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense.").  On the one

1  hand, neon signs and stun guns are very different devices.  On the other hand, both are within

2  the more general art of electronics and might therefore be considered similar under <u>KSR</u>.

3  Given this ambiguity, the Court finds that there is a material issue of fact concerning whether

4  Parker is sufficiently similar to claim 4 and, therefore, applicable to an obviousness analysis.

5  Therefore, summary judgment on this claim is no appropriate.

6                  **D.      The '262 Patent**

7                      **i.      Independent claims 1,6,9, and 13**

8          In its brief Stinger makes a generalized attack on independent claims 1,6,9, and 13 of

9  the '262 patent, arguing these claims are obvious because all of their individual claim

10  elements are found in the prior art and are well known applications of microprocessor

11  technoloy.  In other words, Stinger claims that it was obvious to combine a dart weapon with

12  technology taught in three prior art patents—Morris, U.S. Patent No. 4,541,191 (filed April

13  6, 1984); O'Dwyer, U.S. Patent No. 6,477,801(filed Dec. 03, 1999); and Poole., (DSOF

14  ¶32)— because doing so was nothing more than combining familiar elements using known

15  methods.  <u>See</u> <u>KSR</u>, 550 U.S. at 416.  ("The combination of familiar elements according to

16  known methods is likely to be obvious when it does no more than yield predictable results.").

17          As an initial matter, all three of the prior art patents relied on by Stinger were before

18  the patent examiner when it considered the '262 patent.  Stinger, therefore, again enjoys an

19  especially heavy burden in proving invalidity.  <u>Glaxo Group Ltd. v. Apotex, Inc.</u>, 376 F.3d

20  1339, 1348 (Fed. Cir. 2004) ("This burden is 'especially difficult' when, as is the present

21  case, the infringer attempts to rely on prior art that was before the patent examiner during

22  prosecution.").  Once again, Stinger has not attempted to explain why the patent examiner's

23  decision to allow the claim it challenges was incorrect.  Instead, it relies exclusively on the

24  Supreme Court's decision in <u>KSR</u>, seemingly believing that it so changed the applicable

25  patent law that invalidation is mandatory.  As this Court has already explained, Stinger's

26  reading of the <u>KSR</u> decision is over broad and tends to exaggerate <u>KSR's</u> impact on the

27  obviousness standard.

28

1        Having said that, Stinger contends that all four independent claims are obvious

2  because [1]all elements are present in the prior art and [2] are well known applications of

3  microprocessor technology.   As to the former claim, assuming, without deciding, that it is

4  true, the fact that all elements of claims 1,6,9, and 13 are present in the prior art is not

5  determinative.   KSR, 550 U.S. at 418 ("[A] patent composed of several elements is not

6  proved obvious merely by demonstrating that each of its elements was, independently,

7  known in the prior art.").  Regarding the latter claim, Stinger has not supported its assertion

8  that all elements of the independent claims are well known applications of microprocessor

9  technology with any evidence directed towards specific claim elements.  Additionally, this

10  assertion seems to run contrary to Stinger's own suggestion that accommodating prior art

11  mechanical devices to electronics would be reasonably obvious to a college educated

12  engineer.  See Leapfrog Enters., Inc. v. Fisher-Price, Inc., 485 F.3d 1157, 1161 (Fed Cir.

13  2007) ("Accommodating a prior art mechanical device that accomplishes that goal to modern

14  electronics would have been reasonably obvious to one of ordinary skill in designing

15  children's learning devices.").  Either claims 1,6,9,13 apply well know applications of

16  microprocessor technology, or they merely accommodated prior mechanical inventions to

17  an electrical device.   This ambiguity concerning the nature of the independent claims does

18  not weigh in Stinger's favor and is indicative of the lack of clarity and over generalized

19  nature of Stinger's assertions throughout its motion.

20        Stinger also asserts that the independent claims of the '262 patent are common sense

21  inventions in light of the prior art its identified.  Mere common sense inventions are obvious.

22  Leapfrog Enters., Inc. v. Fisher-Price, Inc., 485 F.3d 1157, 1161 (Fed Cir. 2007) ("[T]he

23  common sense of those skilled in the art demonstrates why some combinations would have

24  been obvious where others would not." (citing KSR, 550 U.S. 416 ("The combination of

25  familiar elements according to known methods is likely to be obvious when it does no more

26  than yield predictable results."))).  To determine if the combination of the prior art identified

27  by Stinger was obvious, the Court must first examine that art, which the Court notes, Stinger

28

1   has barely explained. Morris teaches a weapon capable of recording the time it is fired, as

2   well as measuring the elapsed time of the firing sequence. (See DSOF ¶32). Similarly,

3   O'Dwyer teaches a security device which may be installed on weapons so that the weapon

4   can only be activated by the use of a code. More pertinent to the instant case, the device

5   taught in O'Dwyer contains a memory which can record the time, place, date, and direction

6   of a firing of the weapon. (Id.) Finally, Poole teaches a non-lethal personal defense device

7   that can be equipped with a wireless communication system capable of transmitting date and

8   time to a monitoring station. (Id.)   Of these devices, only Poole involves the use of a

9   microprocessor, but the microprocessor does not appear to be used to either track or store

10  information pertaining to date and time. Additionally, Stinger notes that dart weapons were

11  known in the prior art; TASER does not dispute this claim.

12          Generally speaking, the Court agrees with Stinger that the prior art in questions

13  teaches similar inventions to the ones found in claims 1,6,9,and 13; methods for tracking

14  when and where a weapon is fired. What distinguishes TASER's claims from the prior art,

15  however, appears to be the manner in which date and time are tracked; namely, the use of a

16  microprocessor and a circuit. The question, then, is whether it was obvious to combine the

17  date-tracking prior art with the use of a microprocessor or circuit.   There is clearly

18  disagreement between the parties concerning the answer to this question.   The burden,

19  however, is on Stinger to explain why the patented invention is invalid and it simply has not

20  done so. Stinger has not stated in its papers, let alone cited this Court to expert testimony or

21  other evidence, why the specific inventions set forth in claims 1,6,9, and 13 should have been

22  obvious to a person of reasonable skill. Nor has it explained the scope of the prior art in any

23  sort of detail, such that this Court might more accurately compare it to the challenged claims.

24  Accordingly, this Court is left without guidance concerning whether or not the challenged

25  claims would be obvious to a college educated engineer. In light of the deficiencies in

26  Stinger's papers, this Court will not overturn the decision of the only expert that considered

27  the contested claims in light of prior art; the patent examiner.   Having so decided, the Court

28

1   need not consider Stinger's arguments regarding the dependent claims of the '262 patent.

2   See In re Fine,  837 F.2d 1071, 1076 (Fed. Cir. 1988) ("Dependent claims are nonobvious

3   under section 103 if the independent claims from which they depend are nonobvious.").

4       **3.**    **Non-Infringement**

5       In addition to their invalidity arguments, Stinger also argues that its S-200 ECD does

6   not infringe many of the claims upon which TASER has rested its lawsuit.  Specifically,

7   Stinger asks this Court to grant summary judgment on claims 1, 2, and 4 of the '870 patent and

8   claims 1, 6, 9, and 13 of the '262 patent.[7]  Infringement  is a question of fact.  Kemo Sales,

9   Inc. v. Control Papers Co., Inc., 208 F.3d 1352, 1359-60 (Fed. Cir. 2000).   "Literal

10  infringement requires that each and every claim limitation be present in the accused product."

11  Abraxis Bioscience, Inc. v. Mayne Pharma (USA) Inc., 467 F.3d 1370, 1378 (Fed Cir. 2006).

12  Similarly,  "[i]n order to literally infringe a method claim, the accused device must literally

13  meet each and every one of the claim limitations."  Desper Products, Inc. v. QSound Labs,

14  Inc., 157 F.3d 1325, 1337 (Fed. Cir. 1998).  In considering Stinger's request, the Court

15  applies same legal standard it does to all motions for summary judgement. CollegeNet, Inc.

16  v. ApplyYourself, Inc.,  418 F.3d 1225, 1230 (Fed. Cir. 2005).   "Summary judgment is

17  appropriate if, drawing all factual inferences in favor of the non-movant, there is no genuine

18  issue of material fact and the movant is entitled to judgment as a matter of law." Combined

19  Sys., Inc. v. Def. Tech. Corp., 350 F.3d 1207, 1209 (Fed. Cir.2003). Accordingly, Stinger

20  must demonstrate the absence of a disputed issue of material fact as to the non-presence in

21  the S-200 of at least one element in any of the patent claims of which TASER has alleged

22  infringement.

23

24       [7]Stinger  argues that the S-200 does not infringe the '295 patent because it merely
     practices the prior art.  The Court need not consider this argument, however, as practicing
25  the prior art is not a defense to literal infringement.  Tate Access Floors, Inc. v. Interface
     Architectural Res., Inc., 279 F.3d 1357, 1366 (Fed Cir. 2002) ("This court [has] made
26  unequivocally clear . . .  that there is no practicing the prior art defense to literal
27  infringement.").

28                        - 35 -

1

2

### A.     The '870 Patent

#### i.     Claim 1

Claim 1 of the '870 patent teaches (1) two separate electrodes that allow for two contact points on the target; (2) a high voltage power supply capable of delivering a series of electrical pulses to the target, a battery system including a battery; (3) a digital memory device for storing battery capacity data indicating the amount of battery capacity consumed or remaining, and a data interface that allows the battery system and the digital memory device to communicate; (4) and a display for indicating the battery capacity. Stinger argues that the S-200 does not literally infringe claim 1 because it lacks a "display for indicating to a user the battery capacity." TASER counters that Stinger agreed during the <u>Markman</u> phase of this lawsuit that "a display with any indication of battery capacity is sufficient" to satisfy the display limitation. This citation would be determinative were Stinger disputing that the S-200 lacks a display which gives users information about battery health; it is not. Stinger instead claims that the battery display on its ECD indicates momentary battery voltage, which it distinguishes from battery capacity.

In support of its position, Stinger cites the Court to the Deposition of Robert Gruder, who testified that the S-200 does not store battery capacity, but relies instead on a voltage reading. (DSOF ¶14). It also draws the Court attention to the Statement of its expert, Mr. Tachner, who asserts that the S-200's monitors battery status using an "integration technique" in a fashion similar to the prior art described in the '870 patent. (<u>Id.</u>) Finally, Stinger references the deposition testimony of Saliga, in which he describes the battery status display on the S-200 as corresponding to levels of battery voltage. (<u>Id.</u>) TASER, on the other hand, cites to the Dr. Rodriguez expert report in support its contention that the S-200 both measures and displays battery capacity data. (PSOF ¶148). In the cited section of the report, however, Dr. Rodriguez describes the S-200 as measuring battery capacity by measuring remaining battery voltage.

27

28

1    Accordingly, it is clear that S-200 display battery voltage.  It is less clear whether the

2    phrase battery capacity encompasses a measure of battery life based on voltage.   In

3    concluding that the S-200 infringes claim 1 of the '870 patent, Dr. Rodriguez's report clearly

4    treats "battery capacity" as encompassing a measure of battery voltage.  On the other, hand,

5    Gruder seems to distinguish between a measure of capacity and a measure of voltage,

6    asserting: "[W]e do not store battery capacity in our gun.  We just take a voltage reading to

7    indicate that."   (DSOF ¶14).   Still, a reasonable juror could plausibly understand Gruder's

8    statement as drawing an equivalence between battery capacity and battery voltage, as it

9    suggests that the S-200 measuring voltage is equivalent to measuring battery capacity, a

10   finding which would comport with Dr. Rodriguez's expert report.  And, at oral argument,

11   Stinger's counsel seemed to concede that battery voltage is a method by which to measure

12   battery capacity.  In light of this ambiguity, the Court concludes that there is a disputed issue

13   of material fact concerning whether the S-200's display measures battery capacity which

14   must be decided at trial.

15       Additionally, Stinger appears to argue the S-200 does not infringe because its display

16   is not connected to a memory system which stores battery capacity data.  In other words,

17   Stinger argues that the words "battery capacity" found in the "display" element must be read

18   as referring to the battery capacity stored in the "memory" and "data interface" element.

19   First, the Court notes that Stinger agreed to TASER's  construction of  "a display with any

20   indication of battery capacity is sufficient."  Yet, Stinger now appears to be extending this

21   construction to read "a display with any indication of battery capacity stored in the memory

22   described in the third claim ."   The Court cannot, however, consider Stinger's proposed

23   construction.  At this stage in the proceedings the Court's task is to determine if any element,

24   as construed during the claim construction phase, is not present in the S-200.  See

25   TechSearch, L.L.C. v. Intel Corp., 286 F.3d 1360, 1371 (Fed. Cir. 2002) ("To establish literal

26   infringement, all elements of the claim, as correctly construed, must be present in the accused

27   system.").  Because the Court has already determined that a disputed issue of material fact

28

1    exists as to the S-200's infringement of the "display" element as defined by the Parties agreed

2    upon construction, there is nothing else left to decide.    Having so decided, the Court notes

3    that even if it were to accept Stinger's construction, Stinger's motion does not cite to any

4    evidence supporting its assertion that the S-200's battery display is not connected to its

5    memory.

6                                    **ii.    Claim 2**

7            Stinger argues that summary judgment is appropriate as to claim 2 of the '870 patent

8    because the S-200 does not contain the claim element: "a display for indicating to the user

9    the amount of time remaining in each pulse sequence." Instead, Stinger asserts that the S-200

10   utilizes four LED lamps which light in sequence as 25% increments of the pulse charge are

11   consumed during operation of the ECD. (DSOF ¶21).  In other words, the LED display on

12   the S-200 indicates the amount of charge delivered to the target, not the time remaining in

13   the pulse sequence.  TASER, on the other hand, cites to Dr. Rodriguez's expert report, which

14   concludes that the four LED lights represent one second each of the S-200's four second

15   pulse sequence and, therefore, indicate the amount of time remaining in the pulse sequence.

16   TASER also cites to the S-200's training manual, which describes the LED Lights as

17   measuring time remaining in the pulse sequence.  (PSOF ¶155)

18           In support of its position, Stinger points to Mr. Tachner's expert statement, in which

19   he explains that the discharge rate of the S-200 is not fixed, but varies depending on a

20   number of factors, including "internal body resistance, possible skin resistance, and/or

21   atmospheric impedance." (DSOF ¶ 14).  Stinger also directs this Court to Dr. Rodriguez's

22   expert report, noting Dr. Rodriguez concludes that the pulse sequence of the S-200 is

23   "approximately" four seconds, that there are several steps of the firing loop (i.e. the entire

24   pulse sequence), and the duration of each step  is only "approximately fixed."  (Id.).  Based

25   on Dr. Rodriguez's description of the S-200 pulse sequence as being variable in time, Stinger

26   contends that the LED display does not actually track time remaining in the pulse sequence.

27   It reasons that because different quarters of the sequence vary in time, even if only slightly,

28                                        - 38 -

the LCD light display cannot be used to measure time, just the percentage of the firing sequence completed.

Stinger's characterization of the S-200, however, is disputed by the S-200's training manual, which characterizes the device's display as a "four red lamp bar-graph display [that] indicates seconds [sic] trigger is pulled." (PSOF ¶156). At oral argument, Stinger stated that the training manual is incorrect. Still, the court finds that a reasonable juror might conclude such an explanation is self-serving, giving it little weight. In sum, given the stated purpose of the LED display and the differing conclusions that parties draw from the Rodriguez Report, this Court cannot conclude as a matter of law that the S-200 does not, in fact, indicate to a user the amount of time remaining in the pulse sequence. While it may be true that the LED display only offers an approximation of the time remaining, the Court finds that a reasonable juror could include that the display does give an indication of the amount of time remaining, even if that indication is not exact down to the microsecond.

### iii.    Claim 4

Stinger's non-infringement argument focuses on claim 4's element requiring "a high voltage power supply for generating an output voltage delivered across the first and second contact points on the target to generate a positive voltage potential at one electrode and a negative voltage potential at the other electrode." Stinger claims that the S-200 does not produce the required negative voltage at one electrode and positive voltage at the other. TASER disputes this claim.

Before beginning its analysis, the Court notes that only certain early version of the S-200 are accused of infringing claim 4, and both Parties concede that those versions utilize center-tapped transformers. In its papers, Stinger also concedes that the center-tapped transformers in the accused version of the S-200 produced a positive voltage at one winding and a negative voltage at the other. (DSOF ¶27)    In support of its non-infringement argument, however, Stinger points to evidence showing that the center-tapped transformer windings are not connected directly to the electrodes, but coupled to them through rectifying

1    diodes.  In its motion, however, Stinger does not explain to the Court the significance of the

2    rectifying diodes; it merely notes their presence.  Instead, Stinger argues only that Dr.

3    Rodriguez's expert report concluded that the S-200 utilizes a bridge rectifier circuit, which

4    reverses any negative polarity for the transistor windings, causing polarity at the electrodes

5    to remain positive.  (Id. ¶30). In support of its position, Stinger also points to Exhibit C of

6    the Rodriguez Report, which demonstrates output wave form tracings from an S-200 showing

7    only positive polarity flowing from the S-200's electrodes.  (Id.).

8         TASER responds by noting that the accused versions of the S-200 did not utilize

9    bridge rectifier or coupling diode bridge.  (PSOF ¶162).  Additionally, TASER claims that

10   Exhibit C is irrelevant, because (1) the data was procured using a newer version of the S-200

11   which is not alleged of infringing claim 4, and (2) the data only shows polarity between two

12   electrodes without any reference to a primary weapon ground, which is significant because

13   claim 4's reference to negative and positive voltages refers to the relationship between an

14   electrode and the ground.  (Id. ¶164).  Finally, TASER also argues that in his deposition, Mr.

15   Tachner admitted that the configuration of the diodes used in the accused verison of the S-

16   200 produced a positive voltage at one electrode and a negative voltage at the other. (Id.

17   ¶163).

18        In its reply, Stinger did not challenge or deny TASER's assertions concerning the

19   relevance of exhibit C or the non-presence of a bridge rectifier circuit in the accused S-200

20   ECDs.  Instead, it pivots, electing to emphasize the role of previously unexplained rectifying

21   diodes, arguing that a center-tapped transformer was never installed in an S-200 without

22   rectifying diodes and that the use of rectifying diodes would necessarily generate only

23   positive voltage potential at the electrons.  In making this argument, Stinger cites the Court

24   to the Declaration of Saliga which it attached only as part of its reply brief.  By changing its

25   argument and relying on new evidence, Stinger has deprived TASER of an opportunity to

26   properly respond. Accordingly, the Court will not consider Stinger's arguments concerning

27   the significance of the rectifier diodes.  See Eberle v. City of Anaheim, 901 F.2d 814, 818

28                                           - 40 -

1   (9th Cir. 1990) (noting that legal arguments raised for the first time in the reply brief are

2   deemed waived).  Having so decided, this Court cannot find that Stinger has met its burden

3   of establishing the absence of a genuine issue of material fact concerning claim 4.  Celotex

4   Corp. v. Catrett, 477 U.S. 317, 323 (1986) (holding that the  moving party bears the initial

5   burden of establishing the absence of any genuine issue of material fact). TASER completely

6   refuted Stinger's original argument, leaving a disputed issue of material fact concerning the

7   polarity of the electrodes on the accused version of the Stinger S-200.

8                      **B.     The '262 Patent**

9                           **i.     Claims 1 and 13**

10          In pertinent parts, claims 1 and 13 of the '262 patent both teach a dart weapon

11   comprising a microprocessor programmed to track date and time of the dart weapon's firing.

12   Based on the Court's construction of "track date and time," Stinger argues that the S-200's

13   microprocessor is not programmed to track date and time.  In its Markman order, this Court

14   construed "track date and time" to mean "the tracking of date and time in a program in a

15   microprocessor through whatever means available to a person of skill in the art at the time

16   of the invention." (Dkt. #146, p. 25).   In reaching its conclusion, this Court also noted that

17   it agreed with TASER's expert that "tracking date and time means that you, through one way

18   or another, have the ability to keep track of the date of the time.  And that could be done

19   directly or indirectly." (Id. at 22–23). Finally, the Markman order also stated, that "the

20   process necessary to 'track date and time' must be internal to the microprocessor."  (Id. at

21   23).

22           Stinger admits that the S-200's microprocessor utilizes a seconds counter, which

23   tracks how many seconds the S-200 has been activated, and that this data can be used to

24   derive date and time, but only by using a separate external computer containing a separate

25   tracking program. (DSOF ¶41). Stinger asserts it is entitled to summary judgement because

26   the S-200's microprocessor is not itself programmed to derive a date and time. In other

27   words, Stinger argues that claims 1 and 13 require the microprocessor to operate like a clock

28                                    - 41 -

1   or calendar, i.e. contain a calendar program or program for tracking to a specific date or day.

2   (Id.).  TASER's disputes this characterization, noting that the claim construction states that

3   date and time can be tracked utilizing "whatever means available to a person of skill in the

4   art at the time of the invention." (Dkt. #146, p. 25).  It also emphasizes this Court's Markman

5   Order finding that time and date could be tracked directly or indirectly.  (Id. at 22–23).

6         It is clear that data from the S-200's microprocessor can be utilized to determine the

7   date and time of its activation.  By arguing "track date and time" means that the

8   microprocessor must utilize "a calendar or program for tracking a specific date or time of a

9   specific day," Stinger appears to disregard the Court decision not to place any such limitation

10   on its construction of "track date and time".  In the Markman Order the Court explained that

11   "[a]lthough there are many ways to track date and time in a microprocessor-based circuit, one

12   of which is to independently track current absolute date and time . . . there is nothing in the

13   claims or specification of the '262 patent that lead the Court to impose limitations on the

14   disputed phrase."  (Dkt. #146, p. 22).  Stinger has not explained how its current argument

15   concerning "specific" date and time is different than the "absolute" date and time

16   construction already rejected by this Court.  (Id.) ("[The Court finds no reason to adopt

17   Stinger's proposed construction and impose the limitations "absolute" or "current" on the

18   phrase "track date and time," as used in Claims 1 and 13.")).  At a bare minimum, then, there

19   is a disputed issue of material fact concerning whether the S-200 tracks date and time.[8]

20

21         [8]At oral argument, Stinger, for the first time, drew the Court's attention to the PTO's
22   examination of the '262 patent.  (Dkt. #175, exb. 22). Stinger argued that this document
     makes clear that "tracks date and time" should have been more narrowly constructed to
23   require that the microprocessor track date and time as, for lack of a better phrase, date and
     time, not as a form of data—like seconds counter data—that can later be converted to date
24   and time through external means.

25         First, the Court notes that this argument is extremely untimely.  Second,, the Court
     does not agree with Stinger's analysis of the patent examiner's report.  In the passage in
26   question, the patent examiner stated that "[o]ne having ordinary skill in the art, or even a
     layperson with no skill in the art, would have interpreted the concept of recording date and
27   time as presented in the '770 and '412 Patents as recording a "current" date and time. Any

28                                              - 42 -

1    Additionally, the Parties clearly disagree whether the S-200's date tracking capability,

2    assuming one exists, is a process that is internal to the microprocessor.  Stinger believes that

3    it is not, arguing that the necessity of using external means to determine date and time

4    necessarily precludes a finding that the process is purely internal to the microprocessor.

5    Conversely, TASER responds that because all the data necessary to track date and time is

6    contained in the microprocessor, the process is purely internal, even if external means are

7    necessary to interpret the information.  The Court finds that both explanations are plausible,

8    and a reasonable juror could reach either conclusion.   Accordingly, Stinger has not

9    demonstrated the absence of material issues of fact as to claims 1 and 13.

10                          **ii.      Claim 6**

11    Claims 6 teaches a circuit, comprising of a memory, that keeps track of the current

12    time of day and current date, and "record[s] current date and current time of day" when the

13    dart weapon is operated.  Claims 6' reference to the tracking of date and time varies from that

14    found in claims 1 and 13 by use of the modifier "current."  In its brief, Stinger resorts, once

15    again, to the Merriam Webster dictionary to interpret claim language.  After considering the

16    meaning and usage of the words "current," "day," "keep," "specify," and "track," Stinger

17    explains that keep track of current time and date means "maintain a record of a specified day

18    or date.  It then concludes that S-200 does not preform that function.  In support of its

19    position, Stinger cites only to evidence explaining the S-200's use of a seconds timer, which

20

21

_____

22    other interpretation would yield an irrelevant recording as the resultant stored values would

23    not have any relative reference point for comparison."   Stinger's argument confuses the
      emphasis of the examiner statement, which is focused on the word "current."  He is merely

24    saying that "track date and time" necessarily means "current" date and time, otherwise there
      would be no  reference point from which to convert the stored "values"—the data — to date

25    and time  Accordingly, the patent examiner was not saying that the tracked date and time data

26    needed to be in a specific form, merely that it must be pegged to current date and time as a
      reference point, otherwise it would be useless.  The Court, therefore, does not find Stinger's

27    argument persuasive.

28

1    activates upon the activation of the weapon, and  from which date and time can only be

2    determined by reference to an external source.  (DSOF ¶41).

3          The evidence to which Stinger cites does not specifically address whether the S-200,

4    in any manner, keeps track of <u>current</u> day and time prior to its activation by a user.  One

5    might be able to infer from the evidence Stinger adduced that time and date are only tracked

6    after the S-200 is activated.   Stinger has not, however, cited to any evidence specifically

7    drawing such a conclusion.  And, a reasonable juror might infer that the S-200 must track

8    current date and time in some form or fashion, or else it would have no way to track date and

9    time after activation.  Accordingly, to the extent Stinger argues that the S-200 does not track

10   current date and time prior to its activation, it has not met its burden.

11         The Court turns next to the claim limitation that teaches an ECD which "record[s]

12   current date and current time of day" after its activation.  Stinger does not dispute that the S-

13   200 records data which can be used, by means of an external computer, to ascertain the date

14   and time the weapon it fired.  Accordingly, there does appear to be a dispute concerning the

15   "records" part of the claim limitation.  In discussing claims 1 and 13, the Court has already

16   stated that there is a disputed issue of material fact concerning whether the S-200 records

17   date and time upon its activation by a user.  In its motion, Stinger has not explained how the

18   word "current" alters the meaning of "track date and time," other than to offer a definition—

19   "maintain a record of a specified day or date,"— that seems to rehash its argument

20   concerning the meaning of "tracks date and time" made in service of its non-infringement

21   arguments concerning claims 1 and 13; arguments this Court already found insufficient.

22   Accordingly, Stinger has not met its burden and this Court will not grant Stinger summary

23   judgment as to claim 6 on non-infringement grounds.

24                              **iii.    Claim 9**

25         Claim 9 teaches a "means for recording date and time of day for each occasion that

26   the weapon was operated to provide the current."  The Parties agree that the "means" in

27   question are a  microprocessor and memory, and there is no dispute that the S-200 contains

28                                   - 44 -

a microprocessor and memory for maintaining a record of operation.  Stinger argues the S-200 does not infringe because the "means" do not include a second computer and program, something both  parties agree is necessary to convert the data recorded by the S-200 into date and time.  The question, then, is whether the necessity of utilizing an external computer and program to convert the S-200's data into date and time format means that the S-200 does not have the necessary means for recording the date and time described in claim 9.

This Court finds that Stinger's argument is nothing more than a variation on the other arguments it has made concerning the meaning of track date and time.  This Court has already concluded that Stinger has not sufficiently shown that the S-200 does not on its own track date and time through the use of a process internal to the microprocessor.  In so doing, the Court found that there is also a disputed issue of material fact concerning whether data in non-date-and-time format constitutes the tracking of date and time.  Assuming, without deciding that it does, a juror could reasonably conclude that the microprocessor and memory are the means for tracking date and time, even though an external computer and program are necessary to convert that data into a recognizable form.

Additionally, Stinger also argues that it should prevail because the parties have agreed, which TASER does not dispute, that the means for providing a high pulse current requires two transformers.  (DSOF  ¶43).  In support of this claim, Stinger cites to the Statement of Tachner, in which  Mr. Tachner asserts that the S-200 uses only one transformer. (Id.).  TASER contests  Mr. Tachner's conclusion, citing to Mr. Tachner's deposition, in which he appears to testify that the S-200 uses two transformers.  (PSOF ¶177).  The Court will not attempt to resolve the discrepancy between  Mr. Tachner's statement and his deposition; the jury will.  The Court, therefore, finds there is a disputed issue of material fact concerning whether or not the S-200 satisfies the disputed limitations of claim 9.

### iv.    Doctrine of Equivalents

- 45 -

1    Having determined that Stinger has not met its burden concerning literal infringement

2    as to any of TASER's patent claims, the Court need not consider Stinger's arguments

3    concerning infringement via the doctrine of equivalents. See Cybor Corp. v. FAS Techs.,

4    Inc., 138 F.3d 1448, 1460 (Fed Cir. 1998)("An accused device that does not literally infringe

5    a claim may still infringe under the doctrine of equivalents if each limitation of the claim is

6    met in the accused device either literally or equivalently.").

7    **4.    Enablement Defense**

8    Stinger argues that the '262 is invalid because it is not enabled.  Section 112 of the

9    patent code requires that a patent specification:

10   "shall contain a written description of the invention, and of the manner and
     process of making and using it, in such full, clear, concise, and exact terms as
11   to enable any person skilled in the art to which it pertains, or with which it is
     most nearly connected, to make and use the same, and shall set forth the best
12   mode contemplated by the inventor of carrying out his invention."

13   35 U.S.C. § 112.  "In order to enable the claims of a patent pursuant to § 112, the patent

14   specification must teach those of ordinary skill in the art how to make and use the full scope

15   of the claimed invention without undue experimentation."  Liquid Dynamics Corp. v.

16   Vaughan Co., Inc.  449 F.3d 1209, 1224 (Fed. Cir. 2006) (internal quotations omitted).

17   "Some experimentation is permissible although it cannot be unduly excessive."  Id.

18   Invalidity predicated on enablement is a question of law supported by questions of fact and

19   must be proven by clear and convincing evidence.  N. Telecom, Inc. v. Datapoint Corp., 908

20   F.2d 931 (Fed. Cir. 1990).  Finally, "the grant of the patent by the PTO carries with it the

21   presumption of validity including compliance with § 112."  Id.

22   According to Stinger, the '262 patent does not enable the disclosed invention because

23   it fails to disclose any mode that would enable another inventor to carry out an invention that

24   tracks date and time.  More specifically, Stinger claims '262 disclosure is invalid because it

25   does not cite to an internal clock or any other means of "keeping" or "tracking" time.  In

26   support of these assertions, Stinger points to the testimony of Dr. Rodriguez, who stated:

27

28                                        - 46 -

> One of ordinary skill in the art would know that there are many ways to track date and time. Examples include, but are not limited to, a real time clock, a counter, a timer circuit, or even a circuit using capacitive relays. Date and time may be measured and tracked as absolute quantities or, alternatively, they may be measured and tracked relative to a reference date and time. In addition, the date and time can be determined from a running count of seconds instead of tracking date and time separately or independently from one another.

(DSOF ¶40). Stinger then goes on to cite Dr. Rodriguez's admission that "the '262 patent never mentions using 'absolute' date and time, never mentions a 'real time clock,' and never discusses the use of a specific time system such as GMT." (Id.).

TASER does not dispute any of the testimony on which Stinger relies. Instead it asserts a contrary interpretation, arguing Dr. Rodriguez's statement that "[o]ne of ordinary skill in the art would know that there are many ways to track date and time" proves that an inventor of ordinary skill could implement the invention of '262 without undue experimentation. In other words, Stinger claims that because '262 does not require the use of absolute date and time, but merely any method to track date and time, Dr. Rodriguez's testimony actually weighs towards a finding of enablement. Viewing the facts in the light most favorable to TASER, as it must, the Court finds that a reasonable juror could reach the same conclusion as TASER. Accordingly, summary judgment on enablement is denied.

### 5. Best Mode Defense

Stinger also argues that TASER did not disclose the required best mode of the '262 patent. A patent specification must layout the best mode known to the inventor for the implementation of the claimed invention. High Concrete Structures, Inc. v. New Enter. Stone And Lime Co ., Inc., 377 F.3d 1379, 1382 (Fed. Cir. 2004). "Invalidation for failure to set forth the best mode requires (1) the inventor knew of a better mode than was disclosed, and (2) the inventor concealed that better mode." Id. The Court agrees with TASER that Stinger has not provided sufficient evidence demonstrating that Patrick Smith, the inventor of the '262 patent, either knew of or concealed a better mode than the one disclosed on the '262 patent. Stinger's entire best mode defense motion is predicated on a single reference to a different TASER patent application, U.S. Patent No. 09/398,388 (filed Sep. 17, 1999),

- 47 -

1  which it alleges also uses an internal clock.  Stinger has not, however asserted that Patrick

2  Smith knew of this patent or concealed the allegedly better mode contained therein.

3  Accordingly, summary judgment is denied.

4        **6.**    **Inequitable Conduct**.

5             **A.**    **Legal Standard**

6        Stated generally, patent applicants and their patent attorneys have a duty of candor,

7  good faith and honesty in their dealings with the PTO. 37 C.F.R. § 1.56(a) (1989). The duty

8  of candor, good faith and honesty includes the duty to submit truthful information and the

9  duty to disclose to the PTO information known to the patent applicants or their attorneys

10  which is material to the examination of the patent application. <u>Elk Corp. of Dallas v. GAF</u>

11  <u>Bldg. Materials Corp.</u>, 168 F.3d 28, 30 (Fed. Cir. 1999); 37 C.F.R. § 1.56(a) (1989). The duty

12  of candor extends throughout the patent's entire prosecution history. <u>Fox Indus. v. Structural</u>

13  <u>Preservation Sys., Inc.</u>, 922 F.2d 801, 803 (Fed. Cir. 1991). Breach of the duty of candor,

14  good faith and honesty may constitute inequitable conduct. Id. If it is established that a patent

15  applicant engaged in inequitable conduct before the PTO, the entire patent application so

16  procured is rendered unenforceable. <u>Kingsdown Med. Consultants, Ltd. v. Hollister Inc.</u>, 863

17  F.2d 867, 877 (Fed. Cir. 1988).

18        "To prove that a patent is unenforceable due to inequitable conduct, the [] infringer

19  must provide clear and convincing evidence of (1) affirmative misrepresentations of a

20  material fact, failure to disclose material information, or submission of false material

21  information, and (2) and intent to deceive." <u>Impax Labs., Inc. v. Aventis Pharms., Inc.</u>, 468

22  F.3d 1366, 1374 (Fed. Cir. 2006).  Information  is deemed material if there is a substantial

23  likelihood that a reasonable examiner would have considered the material important in

24  deciding whether to issue the application as a patent. <u>See</u> <u>Elk Corp.</u>, 168 F.3d at 31; 37

25  C.F.R. § 1.56(a). Accordingly, a reference does not have to be prior art to be material

26  information that must be disclosed to the PTO. See 37 C.F.R. § 1.56(a) (1989). "The

27  [information] need only be within a reasonable examiner's realm of consideration." <u>Merck</u>

28                                     - 48 -

& Co., Inc. v. Danbury Pharmacal, Inc., 873 F.2d 1418, 1421 (Fed. Cir. 1989).  "An otherwise material reference need not be disclosed if it is merely cumulative of or less material than other references already disclosed." Elk Corp., 168 F.3d at 31.

While "[m]ateriality does not presume intent, which is a separate and essential component of inequitable conduct," Allen Eng'g Corp. v. Bartell Indus., Inc., 299 F.3d 1336, 1352 (Fed. Cir. 2002) (internal quotes and citation omitted), the materiality of a reference may lead to an inference of intent. Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., 394 F.3d 1348 (Fed. Cir. 2005) ("in the absence of a credible explanation, intent to deceive is generally inferred from the facts and circumstances surrounding a knowing failure to disclose material information").  Intent to deceive is rarely established by direct evidence, and therefore, may be inferred from the facts and circumstances surrounding the applicant's overall conduct. Molins PLC v. Textron, Inc., 48 F.3d 1172, 1180 (Fed. Cir. 1995) (intent to deceive is most often proven "by a showing of acts, the most natural consequence of which are presumably intended by the actor").  For example, "intent may be inferred where a patent applicant knew, or should have known, that withheld information would be material to the PTO's consideration of the patent application." Critikon, Inc. v. Becton Dickinson Vascular Access, Inc., 120 F.3d 1253, 1256 (Fed. Cir. 1997).

 "Intent to deceive, however, cannot be 'inferred solely from the fact that information was not disclosed;' there must be a factual basis for a finding of deceptive intent." Purdue Pharma L.P. v. Endo Pharms., 438 F.3d 1123, 1133-34 (Fed. Cir .2006). Moreover, if the failure to disclose or misrepresentation occurred due to "[s]imple negligence, oversight, or an erroneous judgment made in good faith," the intent element is not satisfied. Specialty Composites v. Cabot Corp., 845 F.2d 981, 982 (Fed. Cir. 1988).  A finding of "gross negligence," likewise, "does not itself justify an inference of intent to deceive." Kingsdown, 863 F.2d at 876. However, a patent applicant cannot "cultivate ignorance, or disregard numerous warnings that material information or prior art may exist, merely to avoid actual knowledge of that information or prior art." FMC Corp. v. Hennessy Indus., Inc., 836 F.2d

1    521, 526 n.6 (Fed. Cir. 1987). In determining whether the applicant's overall conduct

2    evidences an intent to deceive the PTO, the Federal Circuit has emphasized that "the

3    involved conduct, viewed in light of all the evidence, including evidence indicative of good

4    faith, must indicate sufficient culpability to require a finding of intent to deceive." Paragon

5    Podiatry Lab, Inc. v. KLM Labs, Inc., 984 F.2d 1182, 1189 (Fed. Cir. 1993) (internal

6    quotations and citation omitted).

7         Once materiality and intent have been established, the Court must conduct a balancing

8    test to determine "whether the scales tilt to a conclusion that 'inequitable conduct' occurred."

9    Critikon, 120 F.3d at 1256. Generally, "when the misrepresentation or withheld information

10   is highly material, a lesser quantum of proof is needed to establish the requisite intent, … In

11   contrast, the less material the information, the greater proof must be." Purdue Pharma

12   L.P., 438 F.3d at 1128-29 (internal citations omitted). Ultimately, the question of whether

13   inequitable conduct occurred is equitable in nature. The court must make the "equitable

14   judgment concerning whether the applicant's conduct is so culpable that the patent should not

15   be enforced." Life Techns., Inc. v. Clontech Labs., Inc., 224 F.3d 1320, 1324 (Fed. Cir.

16   2000). During this step of the analysis, the court determines "whether the material

17   misrepresentations or omissions in question are sufficiently serious in light of the evidence

18   of intent to deceive, under all the circumstances, to warrant the severe sanction of holding

19   the patent unenforceable." Hoffmann-La Roche, Inc. v. Promega Corp., 323 F.3d 1354, 1372

20   (Fed. Cir. 2003).

21            **B.    Discussion**

22        Stinger's arguments concerning inequitable conduct are directed towards two of

23   TASER's patents: '870 and '295.  As part of its efforts to invalidate these patents, Stinger

24   also attacks TASER's '762 patent—which is not asserted in this case—because it claims

25   priority to the same patent application as the '870 and '295 patents, arguing that inequitable

26   conduct with respect to one patent in a family can infect related applications.  See Nilssen

27   v. Osram Sylvania, Inc., 504 F.3d 1223, 1230 (Fed. Cir. 2007) ("[I]nequitable conduct with

28

respect to one or more patents in a family can infect related applications.").   The Court will consider the materiality of the alleged inequitable conduct before moving on to intent, if necessary.

### i.    The '762 Patent

In its '762 patent application, TASER claimed that it had solved a problem not addressed in the prior art: "switching capacitors without interrupting ionization in the air gap." (DSOF ¶6). Stinger claims that TASER acted inequitably when it failed to disclose two prior art devices: the Police Special Model ("PSM")[9] and M26.  As for the M26, Stinger does not explain the materiality of TASER's failure to disclose, noting only that TASER did not initially disclose the M26, but did so in a subsequent Response to Office Action, which the PTO received a month before the '762 patent was allowed.  (Id.  ¶45).  Given that the M26 was in the PTO's possession prior to its notification of allowance, the Court cannot find that Stinger has shown substantial likelihood of materiality.

As for the PSM, Stinger begins by stating that the patent examiner allowed '762 because a "second capacitant . . .discharges to provide energy for the current through the established arc."  (Id.  ¶6). Stinger also notes that in its response to the PTO's allowance, TASER acknowledged that "the output signal of the present invention is formed by combining the energy from two sources at different voltages."  (Id.).  From this foundation, Stinger alleges TASER's failure to disclose the PSM was material because the PSM utilized two capacitors in parallel to discharge an arching shock with one of the capacitors operating at a lower voltage.

TASER responds that Stinger's focus on the number of capacitors is misguided, arguing the more pertinent question is the manner in which those capacitors operate.  In support of this argument, TASER notes that Stinger has conceded, as was already discussed

---

[9]Although Stinger refers to it as the Police Special Model Taser in this section of its briefing, it appears to the Court and to TASER that the PSM is the same ECD Stinger has previously referred to as the Police Model Taser.

1    in this order, that the PSM capacitors are coupled, causing them to function as a single

2    capacitor.  (PSOF ¶47, 179).    It then points out that the '762 patent claims non-coupled,

3    individually configured capacitors, each with their own energy-releasing switch.  (See PSOF

4    ¶183).    This distinction is enough to preclude summary judgement on materiality in this

5    case, as a reasonable juror could conclude that single capacitor prior art, of which the PSM

6    may be viewed as a functional equivalent, is simply not relevant to a patent application

7    claiming two individual capacitors.  Accordingly, Stinger has not shown there is a substantial

8    likelihood that a reasonable examiner would have considered the PSM important in deciding

9    whether to issue the application as a patent.

10                            **ii.    The '870 Patent**

11                Stinger argues that in its application for the '870 patent, TASER claimed to have

12   invented a dual-transformer system—with the first transformer creating an arc, and the

13   second producing a lower voltage to flow current in the arc—but failed to disclose that this

14   invention could be implemented with a single transformer.  (DSOF ¶49).  This statement is

15   correct; inventor Magne H. Nerheim, admitted in his deposition that the invention claimed

16   in '870 could be implemented with one transformer.  (Id.).  Stinger, however, has neither

17   explained the significance of this admission regarding materiality, nor has it specifically

18   identified the prior art or other reference TASER failed to produce, except for one reference

19   to the PSM.  Instead, it only has noted that the claim of the '870 patent relating to dual

20   transformers was later withdrawn because it was duplicative of a claim in the '295 patent;

21   an assertion TASER does not deny.  (DSOF ¶50–51).  Stinger cannot expect this Court to

22   find a material non-disclosure without even explaining what material reference was omitted

23   and why it was important.  As to the non-disclosure of the PSM, the Court can only assume

24   Stinger brings it up for the same reasons it did concerning the '762 patent; reasons this Court

25   has already deemed insufficient.

26                Stinger's second argument is directed  towards the patent's claimed battery indicator

27   display.  Stinger argues that both the M26 and U34000 should have been disclosed, as they

28                                      - 52 -

1    each embodied a battery indicator display.  (DSOF ¶52).  TASER responds by noting that

2    the claim in '870 is "very different" then the battery light indicators found on the M26 and

3    U34000, pointing to evidence showing the M26 and U34000 utilize single lights to indicate

4    when the batteries are low.  (PSOF ¶186–84).  Conversely, the '870 patent claimed a digital

5    memory to store battery capacity information and an interface that allowed this information

6    to be digitally displayed.  Viewing the facts in the light most favorable to TASER, as it must,

7    the difference between these types of battery displays is enough to preclude summary

8    judgement.  The Court need not merely rest on that, however, as TASER also notes that the

9    '870 patent disclosed Kaufman, which taught a battery light indicator similar to the ones

10   found on the M26 and U34000.  (DSOF ¶15).   In light of Kaufman, it is possible that a jury

11   could conclude that the addition of the M26 and U34000 patents would have been

12   cumulative, and therefore not material omissions.  See Larson Mfg. Co. of S.D., Inc. v.

13   Aluminart Prods. Ltd., 559 F.3d 1317, 1327 (Fed Cir. 2009) ("[A] withheld otherwise

14   material reference is not material if it is merely cumulative to, or less relevant than,

15   information already considered by the examiner.").

16                          **iii.    The '295 Patent**

17          Finally, Stinger alleges material non-disclosures of the U34000 and M26 during the

18   prosecution of the '295 patent.  Stinger argues that these disclosures were material because

19   the '295 patent teaches a two transformer system to create ionization within an air gap and

20   allow current to flow at a lower voltage level, and the U34000 and M26 utilize two

21   transformers to achieve the same effect.  TASER's response is two-fold.  It first notes that

22   the M26's transformers are connected in a series, whereas the transformers in the '295 patent

23   are not, rendering the M26 irrelevant to the TPO's examination.  (PSOF ¶182).  Secondly,

24   TASER asserts that including the M26 would have been cumulative, as other prior art

25   reference before the patent examiner utilized the same circuit configuration.  As to the latter

26   point, the record shows that TASER disclosed both Cover, U.S. Patent No. 3,803,463 (filed

27   July, 10, 1972), and Kaufman during the prosecution of the '295 patent, and that Stinger's

28                                      - 53 -

1   expert, Mr. Tachner, admits that Cover and Kaufman include two transformers connected in
2   a series, as does Figure 1 of the '295 patent application  (PSOF ¶183).  Based on this
3   evidence of cumulativeness, this Court cannot find that Stinger has met its burden.  See
4   Larson Mfg. Co. of S.D., 559 F.3d at 1327.

5        Having determined that summary judgment is not appropriate as to materiality, this
6   Court need not consider intent.  Stinger's motion for summary judgement concerning
7   inequitable conduct is denied.

8        **7.    Damages**

9        Stinger argues that TASER is not eligible to begin recovering damages on the '295,
10  '870, and '262 patents until the day Stinger received actual notice of the alleged
11  infringement, i.e. the day TASER amended its complaint to include the aforementioned
12  patent claims.  This argument is only correct, however, if TASER failed to properly label its
13  ECD products with the word "patent" or "pat." and the applicable patent numbers.  See 35
14  U.S.C. §287(a) (noting that actual notice is only required in the event of a party's failure to
15  mark properly mark their products).  Stinger has not put forth evidence showing that TASER
16  failed to properly mark its products.  TASER, on the other hand, has cited to evidence
17  showing that it  promptly added markings to its products as each patent issued.  (DSOF
18  ¶191–92).  Accordingly, the Court will not at this time limit the period of recovery for
19  damages caused by Stinger's alleged infringement.

20  **IV.    TASER's MOTION FOR PARTIAL SUMMARY JUDGEMENT**

21       TASER has moved for partial summary judgement as to literal infringement on claims
22  2 and 40 of the '295 patent.

23       **A.    Legal Standard**

24       The Court once again notes that infringement  is a question of fact.  Kemo Sales, Inc.
25  v. Control Papers Co., Inc., 208 F.3d 1352, 1359-60 (Fed. Cir. 2000).   "Literal infringement
26  requires that each and every claim limitation be present in the accused product."  Abraxis
27  Bioscience, Inc. v. Mayne Pharma (USA) Inc., 467 F.3d 1370, 1378 (Fed Cir. 2006).  "In

28                                    - 54 -

order to literally infringe a method claim, the accused device must literally meet each and every one of the claim limitations." Desper Prods., Inc. v. QSound Labs, Inc., 157 F.3d 1325, 1337 (Fed. Cir. 1998). "Summary judgment is appropriate if, drawing all factual inferences in favor of the non-movant, there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Combined Sys., Inc. v. Def. Tech. Corp., 350 F.3d 1207, 1209 (Fed. Cir. 2003). Accordingly, TASER must demonstrate the absence of a disputed issue of material fact concerning its allegation that the S-200 satisfies all of claims 2 and 40's limitations.

Before beginning its analysis, the Court notes Stinger's argument that claim 40 is a method claim, TASER did not sue for inducing infringement, and, therefore, Stinger is precluded from being held liable for infringing claim 40. Stinger's assertion, however, is factually incorrect. TASER's second amended complaint at ¶35 includes a charge of inducing infringement. (Dkt. #51). A party is liable for inducing infringement on a method claim "if it sells infringing devices to customers who use them in a way that directly infringes the method claim." AquaTex Indus., Inc. v. Techniche Solutions, 419 F.3d 1374, 1380 (Fed Cir. 2005). A finding of inducement is dependent on a finding of direct infringement. Joy Techs., Inc. v. Flakt, Inc., 6 F.3d 770, 774 (Fed. Cir. 1993) ("Liability for either active inducement of infringement or for contributory infringement is dependent upon the existence of direct infringement."). In this case, there is no question that Stinger sold the S-200 to customers who, if this Court finds direct infringement, would necessarily have used the S-200 in an infringing matter. Accordingly, a finding of direct infringement as to claim 40 is sufficient to prove inducement.

**B.    Discussion**

At the outset, the Court notes that the scope of the Parties dispute concerning this motion is really quite narrow. Stinger, in its statement of facts and responsive brief, concedes that the S-200 embodies every elements of claim 2 and 40, with one exception; it disputes that the S-200 utilizes a dual-mode power supply. (DSOF ¶1–6 (stating that the S-

1   200 is made and sold in the United states, is an ECD, includes first and second positionable

2   electrodes, in operation may encounter a high impedance air gap, exhibits high or low

3   voltage depending on the impedance of the circuit, and when the air gap is ionized the

4   voltage in the circuit is reduced)).  Stinger maintains that the S-200 does not infringe because

5   it operates in only one mode.  Returning to the language of the claims themselves, claim 2,

6   in pertinent part, teaches "a power supply for operating in a first mode to generate a first high

7   voltage . . .  to ionize the air within the air gap to thereby reduce the high impedance across

8   the air gap to a lower impedance to enable current flow across the air gap at a lower voltage

9   level and for subsequently operating in a second mode to generate a second lower voltage

10  output across the first and second electrodes."  Likewise, Claim 40 teaches a method of "a

11  first high voltage, short duration output across the first and second electrodes during a first

12  time interval to ionize the air within the air gap," followed by a subsequent "second lower

13  voltage output across the first and second electrodes during a second time interval to

14  maintain the current flow across the first and second electrodes." The sole issue in the instant

15  motion, then, is whether TASER has proven the absence of a genuine issue of material fact

16  concerning its allegation that the S-200's utilizes a  dual-mode power supply.

17         In their papers, the Parties appear to agree that the word "mode" refers to a distinct

18  manner of circuit operation.  At oral argument, however, Stinger's counsel suggested that

19  manner of circuit operation is irrelevant, asserting that claims 2 and 40 require only a first

20  high voltage output, followed by a low voltage output.  He then went on to argue that the

21  majority of prior art  stun guns operate in this manner—a high initial voltage, followed by

22  a low voltage output—so the S-200 does nothing more than practice the prior art and claims

23  2 and 40 are obvious or anticipated.   There is, however,  no practicing the prior art defense

24  to infringement.  Tate Access Floors, Inc. v. Interface Architectural Res., Inc., 279 F.3d

25  1357, 1366 (Fed Cir. 2002) ("This court [has] made unequivocally clear . . . that there is no

26  practicing the prior art defense to literal infringement.").  Additionally, the Federal Circuit

27  has made it perfectly clear that "that patent infringement and patent validity are treated as

28                                              - 56 -

1    separate issues." Pandrol USA, LP v. Airboss Ry. Prods., Inc., 320 F.3d 1354, 1365 (Fed

2    Cir. 2003); see id. ("Though an invalid claim cannot give rise to liability for infringement,

3    whether it is infringed is an entirely separate question capable of determination without

4    regard to its validity." (Quoting Medtronic, Inc. v. Cardiac Pacemakers, Inc., 721 F.2d 1563,

5    1583 (Fed. Cir. 1983))).  Courts routinely enter summary judgment concerning infringement,

6    saving questions of validity for trial. See e.g., Gemtron Corp. v. Saint-Gobain Corp., 572

7    F.3d 1371 (Fed. Cir. 2009).  Accordingly, this Court may not consider Stinger's invalidity

8    or practicing the prior art arguments when deciding TASER's instant motion.

9          More importantly, Stinger's position is not supported by the '295 patent itself. First,

10   contrary  to Stinger's assertions, the '295 patent does not merely teach the output of  high

11   voltage followed by a low voltage.  Instead, it very explicitly references a power supply

12   capable of operating in two distinct modes, the first *generating* a high voltage output and the

13   second *generating* a lower voltage output.  Furthermore, the patented  modes of operation

14   do not merely describe the rapid voltage drop phenomenon present in single-mode ECDs,

15   whereby voltage drops significantly after the ionization of an air gap.  As explained in the

16   patent itself, even after that  voltage drop, a single-mode "stun gun, which has by necessity

17   been designed to have the capability of ionizing an air gap, must now continue operating in

18   the same mode while delivering current flow or charge across the skin of a now very low

19   impedance target. The resulting high power, high voltage stun gun circuit operates relatively

20   inefficiently  yielding  low  electro-muscular  efficiency  and  with  high  battery  power

21   requirements." U.S. Patent 6,999,295 (filed Feb. 5, 2005).  The claimed invention is not

22   merely a low voltage output, but a distinct manner of circuit operation which generates the

23   low voltage output  more efficiently, thereby alleviating the inefficiencies present during the

24   low voltage output phase of single-mode guns.

25         Stinger does not dispute that it uses a first power-supply mode to generate a voltage

26   sufficient to ionize an air gap.  Consequently, Court must determine whether the S-200

27   utilizes a second mode of circuit operation that generates the low-voltage output it produces

28

1   after ionization an air gap. TASER argues that it does.  In support of this position, TASER

2   relies on a number of different pieces of evidence.  First, it cites to Dr. Rodriguez's expert

3   report.  In his report, Dr. Rodriguez concludes that the S-200's operates in two modes, a first

4   high voltage output mode which generates a voltage sufficient to ionize an air-gap, and a

5   second mode which generates a lower voltage to maintain the flow of current across the

6   ionized gap.  (PSOF ¶44).  Dr. Rodriguez' conclusion is supported by his analysis of the S-

7   200's circuitry, which he explains operates differently in each of the two modes he identified.

8   In the first, high-voltage mode:

9         the S-200's capacitor bank is charged up to approximately 115V. Next, the
          S-200's microprocessor causes a signal called pQFSW1 to transition from 0
10        to 1. That, in turn, causes the S-200's IGBT switch to turn on. When the IGBT
          switch turns on, the charge stored on the capacitor bank begins to flow through
11        the primary of the S-200 output transformer, T2.  During that time, the T2
          secondary voltage reaches several thousand volts (with positive polarity), but
12        not a high enough voltage to ionize the air gap. Next, after approximately 9
          microseconds, the S-200's microprocessor causes the pQFSW1 signal to
13        transition from 1 to 0, which switches the IGBT off. When the IGBT switches
          off, the current in the primary of T2 rapidly decreases, which induces a voltage
14        on the secondary that is high enough to ionize the air gap. That voltage is not
          limited to the voltage on the capacitor bank times the transformer turns ratio.
15        This allows the secondary voltage to exceed the primary voltage times the
          turns ratio.
16
17  (PSOF ¶44) (internal citations omitted)).  Dr. Rodriguez' report then identifies a second

    mode which is utilized to flow current at a low voltage through an ionized air gap:
18
19        After the air gap has been ionized and is in a low impedance state, the
          microprocessor continues to toggle signal pQFSW1, which switches the IGBT
20        on and off. Each time the IGBT switches on, current flows from the capacitor
          bank through the primary of T2, causing a corresponding current and voltage
21        to appear on the secondary. The voltage on the secondary is directly related
          to the voltage on the primary by the turns ratio of the transformer. Each time
22        the IGBT switches off, it induces a negative voltage on the secondary, but,
          because there is now a conducting load in the circuit (and because the
23        capacitor bank has partially discharged), the induced negative voltage is not
          as large as it was in the first mode.
24  (Id.).

25        TASER also cites the Court to Stinger's patent application for the S-200.  In that

26  application, Stinger described the circuitry of the S-200, noting that it "may be recognized

27  as a flyback circuit that, when operated in pulsed mode, provides two drastically different

28                                         - 58 -

1   sets of output depending on the impedance across the output." (PSOF ¶45). TASER argues

2   that the patent applications's description of how these "drastically different sets of outputs"

3   operate indicates the existence of two distinct modes of circuit operation, the second of which

4   generates a significantly lower output voltage than the first. (PSOF ¶45–46). Finally,

5   TASER cites to the deposition testimony of the inventor of the S-200, Mr. Saliga, where Mr.

6   Saliga describes the S-200's transformer as operating in two modes; first as a flyback spark

7   coil, and then, after ionization occurs, as a direct-drive power pulse transformer. In that same

8   testimony, Mr. Saliga also articulates the difference between the flyback spark coil and

9   direct-drive operations, noting that in its direct-drive capacity, the transformer is "not having

10  to kick the voltage up."

11          In addition to its scientific evidence, TASER draws the Court's attention to Stinger's

12  own descriptions of the S-200. In a technical white paper prepared by Mr. Saliga, the S-200

13  is described as operating like a "two-speed gear shift automobile—one gear gets you going

14  from a dead stop and the other does the fast moving. Guns which can "switch gears" is a big

15  factor which separates the men from the boys in effectiveness." (PSOF ¶27). That same

16  white paper goes on to state:

17          The design of an effective stun gun electrical waveform requires that the fired
            darts manage to arc and spark through the target's outer clothes and then, once
18          an ionized-air and highly conductive plasma arc is established, the gun must
            somehow automatically shift gears, so to speak, and drive home (to the target
19          body) a much larger electrical current but with lower voltage to cause effective
            involuntary muscle contraction.
20
    (Id.). Similarly, in a presentation to potential investors Stinger explained:
21
            Through the use of Quantum Flyback Technology or QFT™ the electrodes of
22          the S-200 stun gun deliver high-voltage energy in a precisely controlled series
            of energy packets or "Quanta". The electronics delivers these energy quanta
23          from a so called "Flyback" transformer circuit. Hence the name, Quantum
            Flyback Technology.
24
            When in use, each energy packet has a dual personality: if the gun's electrodes
25          have not yet hit a target, the energy quantum "flies back" to over 56,000 volts
            creating a commanding electrical spark - one which penetrates clothing easily.
26          Yet once the "target" is contacted, the energy quantum delivers NMIW voltage
            and current very efficiently.
27

28                                              - 59 -

1  Series of quantum pulses are delivered first as ionizing spark energy and then
2  as a more immobilizing, lower-voltage, higher-current energy quanta once on
   target.

3  (PSOF ¶28).  Finally, TASER has introduced evidence showing that Stinger's website

4  describes the S-200 as "the most state of the art stun technology available in the world,"

5  "radically different than any previous versions," and having achieved the "most radical

6  change to stun gun technology in years." (Id.)  TASER argues that Stinger's various public

7  proclamations, especially the claims of having invented a radically new ECD, undercut

8  Stinger's assertion that the S-200 merely practices the prior-art, i.e. operates in one-mode as

9  a blunt pulse weapon.

10      Based on the foregoing evidence, this Court concludes that TASER has met its initial

11  burden of establishing the absence of any genuine issue of material fact.  See Celotex Corp.

12  v. Catrett, 477 U.S. 317, 323 (1986) (holding that the moving party bears the initial burden

13  of establishing the absence of any genuine issue of material fact; the moving party must

14  present the basis for its summary judgment motion and identify those portions of the record

15  that it believes demonstrate the absence of a genuine issue of material fact). The key question

16  becomes, then, whether Stinger has raised a disputed issue of material fact.  This Court finds

17  that it has not.

18      In its response, Stinger makes arguments directed towards the claims of invalidity

19  contained in its summary judgment motion.[10]   As a result, Stinger spends very little of its

20  seventeen-page response actually contesting the infringement arguments and evidence raised

21  in TASER's motion.  It argues only that there is no evidence in the record that the S-200's

22  circuit generates a second lower voltage and that the S-200's low-voltage output is caused

23

24  _____

25  [10]The Court acknowledges TASER's concern that Stinger has attempted to use the
    instant motion to buttress the arguments it made concerning invalidity in its summary
26  judgment motion.  The Court has not considered those arguments in deciding Stinger's
    motions, and will not consider them in the instant motion, except to the extent they concern
27  literal infringement.

28                                    - 60 -

1    by external factors, namely the level of impedance.  In support of the latter assertion, Stinger

2    cites exclusively to the testimony of TASER's expert, Dr. Rodriguez, in which Dr. Rodriguez

3    admitted that the S-200 exhibits high voltage or low voltage depending on the impedance of

4    the circuit.  (DSOF ¶7).  Based on this admission alone, Stinger summarily concludes that,

5    "a reasonable trier of fact could conclude that the S-200 is constantly generating a single

6    mode first high voltage output that is being externally reduced by passage through a load or

7    loads in the circuit."  (Dkt. #192, p.4).  Additionally, Stinger relies on Ohm's law to explain

8    away statements in its literature that appear to suggest the S-200 utilizes dual modes.  Ohm's

9    law is a well known scientific law, which teaches that  voltage drop relates to an increase in

10   current flow.  Based on Ohm's law, Stinger describes the boasts made in its advertisements

11   as mere tautologies.  In other words, Stinger was using mere puffery to describe the normal

12   operation of an electrical circuit or single- mode ECD.

13        The testimony of Dr. Rodriguez on which Stinger  relies, is not enough to raise a

14   disputed issue of material fact concerning a second operating mode.  Dr. Rodriguez's

15   testimony  explains what *triggers* the S-200 's drop in voltage; lack of impedance in the air

16   gap.  It does not, however, explain what actually *causes* that drop in voltage.  In single-mode

17   ECDs, the ionization of the air gap is the sole cause of the ECD's decease in output voltage.

18   The '295 patent, however, teaches a system whereby the ionization of the air gap triggers the

19   circuit to generate the lower voltage.  In other words, the difference between the prior art and

20   the '295 patent is not the triggering event, but how the ECD reacts to that event.  Thus, the

21   mere fact that Dr. Rodriguez has identified impedance, or lack thereof, as triggering the S-

22   200's lower voltage output  is not determinative, as it does not explain what is actually

23   responsible for the lower voltage output; natural forces or the circuit operation.

24        Additionally, Stinger's claims that there is no evidence of dual-modes of operation

25   is clearly not true.  Dr. Rodriguez' expert report clearly identifies two distinct modes of

26   circuit operation, the second of which produces a lower voltage than the first.  The report

27   explains how in the first mode the S-200's output voltage is quite large  and  not limited to

28

the voltage on the capacitor bank times the transformer turns ratio, whereas in the second mode the output voltage is drastically smaller, directly related to output on the primary by the transformer turns ratio. Additionally, Dr. Rodriguez' conclusions are supported by the deposition testimony of Mr. Saliga, who not only describes two modes of operation—flyback and direct drive—but distinguishes them by noting that in the direct-drive mode, the transformer does not have to "kick-up" the voltage. Mr. Saliga's testimony directly refutes Stinger's claims that the voltage output of the S-200 depends entirely on external factors, as the transformer would not have to "kick-up" the voltage were that the case.

If by "no evidence" Stinger meant to imply that TASER's evidence does not support the conclusions TASER draws, Stinger has failed to explain why that is the case. Other than the Rodriguez' testimony, which does not directly address the determinative question of fact, Stinger has failed to cite to evidence in the record disputing TASER's evidence. Specifically, Stinger has not directed the Court to evidence contradicting or explaining the Rodriguez report's description of the operation of the S-200's circuit, the deposition testimony of Mr. Saliga, or the S-200's patent application. Accordingly, Stinger's blanket denial that the S-200 operates in two modes amounts merely to unsupported opposition to TASER's factually supported allegations. Such a response is insufficient to prevent the entry of summary judgment. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989) (stating that conclusory allegations, unsupported by factual material, are insufficient to defeat a motion for summary judgment.). And, if such evidence is in the record, it is Stinger's job, not this Court's, to bring it to light.

In light of the uncontroverted scientific evidence put forth by TASER, this Court need not even discuss Stinger's public statements concerning the S-200 in order to find that no reasonable juror could conclude that the S-200 does not operate in two modes. In so doing, the Court acknowledges Stinger's argument that the S-200 only has one transformer and, therefore, cannot utilize a dual operating mode. The amount of transformers, however, is besides the point as neither Claim 2 nor Claim 40's teach a particular number of transformers.

1   Accordingly, TASER has demonstrated that the S-200 embodies every element of claims 2

2   and 40  and summary judgement concerning infringement of '295 patent is warranted.

3         **Accordingly,**

4         **IT IS HEREBY ORDERED** denying in part and granting in part Stinger's Motion

5   for Summary Judgment of Patent Invalidity or Noninfringement. (Dkt. #160).  Summary

6   judgment is **GRANTED** as to claim 3 of the '870 patent, finding it invalid as obvious.

7   Summary judgment is **DENIED** as to the rest of the grounds for relief set forth in Stinger's

8   motion.

9         **IT IS FURTHER ORDERED** granting TASER's Motion for Partial Summary

10  Judgment of Literal Infringement.  (Dkt. #184).

11        **IT IS FURTHER ORDERED** denying as moot Stinger's request for consolidated

12  oral argument.  A consolidated oral argument was held on March 23, 2010. (Dkt. #194).

13        **IT IS FURTHER ORDERED** denying TASER's Motion for Leave to File

14  Supplemental Counsel Declaration in Support of TASER's Reply in Support of its Motion

15  for Partial Summary Judgment of Literal Infringement.  (Dkt. #197).

16        **IT IS FURTHER ORDERED** denying TASER's Motion for Leave to File Surreply

17  or in the Alternative to Strike Stinger Systems, Inc.'s Improper and Oversized Reply in

18  Support of Motion for Summary Judgment. (Dkt. #199).

19        **IT IS FURTHER ORDERED** setting this matter for Status Hearing on April 19,

20  2010 at 4:30 p.m.

21        DATED this 31st day of March, 2010.

22

23

24  _____

            Mary H. Murguia

25             United States District Judge

26

27

28             - 63 -