*TASER International, Inc. v. Stinger Systems, Inc.*
Case No. CV07-0042-PHX-MHM

**Index of Exhibits to**
**Declaration of Counsel In Support of TASER's Motion For Contempt And**
**Application For Order To Show Cause**

| Exhibit No. | Description |
|:---:|:---|
| 1 | An accurate copy of a Verified Return of Service, demonstrating that Robert F. Gruder was personally served with a copy of this Court's Final Injunction on September 28, 2010. |
| 2 | An accurate copy of an Affidavit of Service, demonstrating that Karbon Arms, Inc. was personally served with a copy of this Court's Final Injunction on September 28, 2010. |
| 3 | An accurate copy of an excerpt from the deposition of Thomas V. Saliga, taken in this action on August 27, 2008. |
| 4 | An accurate copy of the Petition Commencing Assignment for Benefit of Creditors, filed on July 20, 2010 with the Circuit Court of the Thirteenth Judicial Circuit for Hillsborough County Florida, Civil Division, obtained from the court file in that action. |
| 5 | An accurate copy of an Order of the Court in *TASER Int'l v. Stinger Sys. Inc, James F. McNulty and Robert Gruder*, No. 2:09-CV-00289-KJD-PAL (D. Nev.), Docket No. 150, filed October 7, 2010, and obtained from the court file in that action. |
| 6 | An accurate copy of an email from Robert F. ("Bob") Gruder to Stefan Stein and John Anthony, dated July 26, 2010, and other emails in the same email string, that was produced by Stinger Systems, Inc. ("Stinger") and Robert Gruder in *TASER Int'l v. Stinger Sys. Inc, James F. McNulty and Robert Gruder*, No. 2:09-CV-00289-KJD-PAL (D. Nev.). |
| 7 | An accurate copy of an email from Bob Gruder to P. Sterling Kerr, dated July 7, 2010, that was produced by Stinger and Robert Gruder in *TASER Int'l v. Stinger Sys. Inc, James F. McNulty and Robert Gruder*, No. 2:09-CV-00289-KJD-PAL (D. Nev.). |
| 8 | An accurate copy of an email from Shad Stastney to Bob Gruder, dated July 7, 2010, and other emails in the same email string, that was produced by Stinger and Robert Gruder in *TASER Int'l v. Stinger Sys. Inc, James F. McNulty and Robert Gruder*, No. 2:09-CV-00289-KJD-PAL (D. Nev.). |
| 9 | An accurate copy of an email from Bob Gruder to Matthew Pliskin, dated July 8, 2010, and other emails in the same email string, that was produced by Stinger and Robert Gruder in *TASER Int'l v. Stinger Sys. Inc, James F. McNulty and Robert Gruder*, No. 2:09-CV-00289-KJD-PAL (D. Nev.). |

*TASER International, Inc. v. Stinger Systems, Inc.*
Case No. CV07-0042-PHX-MHM

**Index of Exhibits to**
**Declaration of Counsel In Support of TASER's Motion For Contempt And**
**Application For Order To Show Cause**

| Exhibit No. | Description |
|:---:|:---|
| 10 | An accurate copy of an email from Bob Gruder to James McNulty, dated July 22, 2010, and other emails in the same email string, that was produced by Stinger and Robert Gruder in *TASER Int'l v. Stinger Sys. Inc, James F. McNulty and Robert Gruder*, No. 2:09-CV-00289-KJD-PAL (D. Nev.). |
| 11 | An accurate copy of the Certificate of Incorporation for Karbon Arms, Inc., filed August 2, 2010 and obtained from the files of the State of Delaware, Secretary of State, Division of Corporations. |
| 12 | An accurate copy of an email from Bob Gruder to Stefan V. Stein and John Anthony, dated August 11, 2010, and other emails in the same email string, that was produced by Stinger and Robert Gruder in *TASER Int'l v. Stinger Sys. Inc, James F. McNulty and Robert Gruder*, No. 2:09-CV-00289-KJD-PAL (D. Nev.). |
| 13 | An accurate copy of a Notice of and Motion to Authorize the Sale of Assets, to Establish Bidding and Sale Procedures, and Notice of Hearing on Any Timely Filed Objections, filed on August 13, 2010 in the matter *In re: Assignment for the Benefit of Creditors of Stinger Systems, Inc., Assignor, to Larry S. Hyman, Assignee*, Case No. 10-014854, then pending in the Circuit Court of the Thirteenth Judicial Circuit for Hillsborough County Florida, Civil Division. |
| 14 | An accurate copy of an email from Vann McCollough to Bob Gruder, dated August 18, 2010, and other emails in the same email string, that was produced by Stinger and Robert Gruder in *TASER Int'l v. Stinger Sys. Inc, James F. McNulty and Robert Gruder*, No. 2:09-CV-00289-KJD-PAL (D. Nev.). |
| 15 | An accurate copy of an email from Bob Gruder to James McNulty, dated August 23, 2010, and other emails in the same email string, that was produced by Stinger and Robert Gruder in *TASER Int'l v. Stinger Sys. Inc, James F. McNulty and Robert Gruder*, No. 2:09-CV-00289-KJD-PAL (D. Nev.). |
| 16 | An accurate copy of the decision of the United States Patent and Trademark Office regarding a reexamination of U.S. Patent No. 6,999,295, received by TASER International, Inc. on or about May 2, 2011. |
| 17 | An accurate copy of an Application by Foreign Corporation for Authorization to Transact Business in Florida, and related filings, filed September 14, 2010 with the Florida Division of Corporations and obtained from the files of that Division. |

*TASER International, Inc. v. Stinger Systems, Inc.*
Case No. CV07-0042-PHX-MHM

**Index of Exhibits to**
**Declaration of Counsel In Support of TASER's Motion For Contempt And**
**Application For Order To Show Cause**

| Exhibit No. | Description |
|---|---|
| 18 | An accurate copy of a Amended Order on Notice of and Motion to Authorize the Sale of Assets, to Establish Bidding and Sale Procedures, and Notice of Hearing on Any Timely Filed Objections, filed on or about September 15, 2010 in the matter *In re: Assignment for the Benefit of Creditors of Stinger Systems, Inc., Assignor, to Larry S. Hyman, Assignee*, Case No. 10-014854, then pending in the Circuit Court of the Thirteenth Judicial Circuit for Hillsborough County Florida, Civil Division. |
| 19 | Accurate copies of a State of Delaware Certificate of Conversion from a Corporation to a Limited Liability Company converting Karbon Arms, Inc. to Karbon Arms, LLC, and a State of Delaware Limited Liability Company Certificate of Formation for Karbon Arms, LLC, both filed February 23, 2011, and both obtained from the files of the State of Delaware, Secretary of State, Division of Corporations. |
| 20 | An accurate copy of an email from George DiScioscia to Jerry Kovar, dated September 28, 2010. |
| 21 | An accurate copy of an excerpt from the deposition of Robert Gruder, taken in this action on August 26, 2008. |
| 22 | Photographs taken of the Stinger S-200 and Karbon MPID devices that accurately depict the devices. |
| 23 | Photographs taken of certain printed wiring boards obtained from a Karbon MPID, serial no. S7033, when it was partially disassembled.  The photographs accurately depict those printed wiring boards and the electronic components attached to those printed wiring boards. |
| 24 | An accurate copy of an email from George DiScioscia to Allen L. Edington, dated February 25, 2011. |
| 25 | An accurate copy of a page from the Karbon Arms website, http://www.karbonarms.com, obtained on May 27, 2011. |
| 26 | An accurate copy of U.S. Patent No. 7,778,005 (Aug. 17, 2010). |
| 27 | An accurate copy of the *Basic Operator Certification Program Student Manual* for the Stinger Systems S-200, bearing Bates Nos. STINGER000805-58. |
| 28 | An accurate copy of the *Owners Manual & Operating Instructions* for the Stinger Systems S-200, bearing Bates Nos. STINGER000025-38. |
| 29 | An accurate copy of *Basic Operator Certification Program Student Manual* for the Karbon MPID. |

*TASER International, Inc. v. Stinger Systems, Inc.*
Case No. CV07-0042-PHX-MHM

**Index of Exhibits to**
**Declaration of Counsel In Support of TASER's Motion For Contempt And**
**Application For Order To Show Cause**

| Exhibit No. | Description |
|:---:|:---|
| 30 | An accurate copy of the *Owners Manual & Operating Instructions* for the Karbon MPID. |

57518-0006/LEGAL21254739.1

# Exhibit 21

CONFIDENTIAL          1

1       IN THE UNITED STATES DISTRICT COURT

        FOR THE DISTRICT OF ARIZONA

2

3       TASER International, Inc.,   ]

                           ]

4           Plaintiff,         ]

                           ]

5       vs.              ]   CASE NO.

                       ] CV07-0042-PHX-MHM

6       Stinger Systems, Inc.,     ]

                           ]

7           Defendant.          ]

8

                    VIDEO TAPE

9           DEPOSITION OF ROBERT GRUDER

10

11      DATE:      Tuesday, August 26, 2008

12      TIME:      8:58 a.m. - 5:33 p.m.

13      PLACE:     Johnson & Associates

                   Court Reporters, Inc.

14                 620 East Twiggs Street

                   Suite 110

15                 Tampa, Florida  33602

16      PURSUANT TO:  Notice, upon oral examination

17      PURPOSE:     Of discovery, for use at trial

                   or for such other purposes as

18                 are permitted under Rule 45 of

                   the Federal Rules of Civil

19                 Procedure

20      REPORTED BY:  CATHY J. JOHNSON MESSINA, RMR, FPR

                   Registered Merit Reporter

21                 Florida Professional Reporter

                   Notary Public, State of Florida

22                 MEMBER:  NCRA, FCRA, STAR

23

24

25

        JOHNSON & ASSOCIATES COURT REPORTERS, INC.  (813) 223-4960

Gruder, Robert 8/26/2008 8:58:00 AM

1    invested by Castlerigg and they got a convertible instrument.

2    That's what I'm understanding so far.

3         And what I -- what I'm asking now is, is there

4    anything else to the investment deal that we're missing

5    besides those pieces?

6    A.   No.

7    Q.   So they do not receive any actual stock in

8    connection with their investment?

9    A.   At the time of closing, no.

10   Q.   Have they converted any of the convertible

11   instrument?

12   A.   Very small amount last January.

13   Q.   That would be January of 2008?

14   A.   That's correct.

15   Q.   Do you know about how much?

16   A.   I could give you an approximation.

17   Q.   Okay.

18   A.   Maybe $100,000 worth.  Maybe $115,000 worth.

19   Q.   If I've captured your testimony so far correctly

20   today, you are the largest holder of issued shares of the

21   company?

22   A.   To my knowledge, yes.

23   Q.   Who's number two?

24   A.   Yates Exley.

25   Q.   Do you know how many shares he owns?

JOHNSON & ASSOCIATES COURT REPORTERS, INC.  (813) 223-4960

1   now. I'm trying to get my -- the dates right in my head.

2   September '06 to about February, March of '07.

3       Q.   Were the pages or the investment of that amount over

4   that period of time put in in a regular way, or did they come

5   just whatever was needed?

6       A.   As-needed.

7       Q.   Did you take notes back for the company for the

8   investment?

9       A.   Yes.

10      Q.   Did you receive stock for the investment?

11      A.   The notes were subsequently converted to stock in

12  August of '08 -- August of '07. I'm sorry.

13      Q.   What is your -- what is your present title?

14      A.   President and chairman.

15      Q.   Can you identify for me the names of the other

16  current officers of Stinger Systems?

17      A.   The only other current officer is Ron

18  Bellistri, CEO.

19      Q.   No other present officers of the company?

20      A.   That's correct.

21      Q.   I'd like to get a sense for the management structure

22  in terms of how the operational management flows.

23           Could you describe your role compared to

24  Mr. Bellistri's role and let us know how the division of

25  management breaks down between the two of you?

JOHNSON & ASSOCIATES COURT REPORTERS, INC. (813) 223-4960

Gruder, Robert 8/26/2008 8:58:00 AM

1      A.   I would say I do everything and Ron is more of a

2   figurehead.

3      Q.   What would you describe the reason for having Ron as

4   the CEO?

5      A.   To -- I would say Ron was put in a CEO last January

6   when the SEC said they were going to be investigating Stinger

7   Systems.  I thought it best that I would take a back seat

8   publicly.

9      Q.   Are you able to tell us whether or not he will

10   continue in that role as CEO?

11      A.   I don't think that's relevant.

12      Q.   Are there plans to replace him?

13      A.   I don't think that's relevant.

14      Q.   Whether or not you think it's relevant, I'd like you

15   to go ahead and answer the question.

16      A.   I can't comment on that.  I have no comment.

17      Q.   Is he presently an officer?

18      A.   Yes, he is.

19      Q.   Who are the directors of the company today?

20      A.   Myself, Yates Exley, Wells Van Pelt, Andrew Helene,

21   and Bo Dietl.

22      Q.   Are any of the directors other than yourself

23   involved in management functions?

24      A.   Can you say what that means?  I mean board of

25   directors has a responsibility of management of the company.

1    STATE OF FLORIDA          )

2    COUNTY OF HILLSBOROUGH      )

3             I, CATHY J. JOHNSON MESSINA, Registered Merit

4    Reporter, Florida Professional Reporter and Notary Public,

5    State of Florida, do hereby certify that I was authorized to

6    and did stenographically report the video tape deposition of

7    ROBERT GRUDER; that a review of the transcript WAS requested;

8    and that the foregoing transcript, pages 1 through 248, is a

9    true record of my stenographic notes.

10            I FURTHER CERTIFY that I am not a relative,

11   employee, or attorney, or counsel of any of the parties, nor

12   am I a relative or employee of any of the parties' attorney or

13   counsel connected with the action, nor am I financially

14   interested in the action.

15

16            DATED this 6th day of September, 2008, at

17   Tampa, Hillsborough County, Florida.

18

19

20            _____

21            CATHY J. JOHNSON MESSINA, RMR, FPR

              Registered Merit Reporter

22            Florida Professional Reporter

23

24

              TRANSCRIPT ORDERED: 8-26-08

25

     JOHNSON & ASSOCIATES COURT REPORTERS, INC.  (813) 223-4960

Taser v. Stinger                     None                          Page  248

# Exhibit 22









# Exhibit 23

**Karbon MPID Microprocessor Printed Wiring Board**
**Stinger Systems Part No. 400-5527**
**Component Side**



**Karbon MPID Microprocessor Printed Wiring Board**
**Stinger Systems Part No. 400-5527 (With Shield Part No. 400-5529)**
**Back Side**



**Karbon MPID T1 Transformer Printed Wiring Board**
**Stinger Systems Part No. 400-5528**
**Component Side**



# Exhibit 24

**From:** George DiScioscia [mailto:GeorgeD@karbonarms.com]
**Sent:** Friday, February 25, 2011 8:08 AM
**To:** Edington, Allen L.
**Cc:** Brian Caffee
**Subject:** Karbon Arms

Officer Eddington,

I am taking the liberty of enclosing a copy of the patent that was granted for the MPID technology. As you can see, the patent examiner actually references Taser's patents and viewed the MPID technology as unique.  As you know, patents don't come easily and this patent was applied for several years ago.  Additionally, I know that you were concerned about the Taser patent litigation against Stinger.  Taser sued Stinger on claims 2 and 40 of their "295" patent. This patent was for Taser's "shaped pulse" technology.  Karbon believed that much of this technology already resided in a previous patent which is now expired and petitioned the Patent office to review Taser's patent and claims.   As believed, the Patent Office agreed and has rejected those claims in Taser's patents. Therefore, Taser presently no longer has the ability to sue under claims 2 and 40 of that patent and therefore also cannot claim they own the rights to a dual mode stun technology that was in the previous Rhodes patent.

Jorge "George" DiScioscia
Regional Sales Director



**5505 Johns Rd Suite 702**
**Tampa, Fl 33634**
**866-788-6746 ext 234**
**727-657-5671**
**813-288-9148 fax**
**Georged@karbonarms.com**
**WWW.Karbonarms.com**

# Exhibit 25

Advanced Technology - Karbon Community Forum

DISTRIBUTORS   CONTACT US

**Products     About Us     Training     Request Evaluation Unit     Technology**

**Advanced Technology**

**Constant Current Generator**
While voltage determines how much "pushing" power is generated, current is responsible for immobilizing humans and can ultimately be dangerous. The Karbon MPID utilizes a constant current generator, reducing the risks of unnecessary spikes in current while giving the user superior immobilization power.

**Pulse Groups Per Second**
The Karbon MPID incorporates "Pulse Groups Per Second" rather than traditional "PulsessPer Second." By spreading a wider waveform, comprised of a series of micro pulses over a longer period of time, the muscles contract longer.

**Single Mode Generation**
The Karbon MPID generates a single-pulse type from a single circuit. This pulse "type" must both ionize any existing air gap between the darts and target as well as perform the muscular contraction function. The single mode circuit in the Karbon MPID creates a sequence of smaller but longer lasting pulses. Using patented Quantum Flyback Technology (US Patent 7,778,005, Aug. 2010), the Karbon MPID outputs, very closely together in time (e.g. 10 microseconds typically), a series of pulses all from the same single-mode circuit.

A closely packed group of pulses can be very effective because the first one or two pulses of a pulse group will ionize the air gap and then subsequent pulses can focus their energy on muscle contraction.

For comparison, the Taser x26 brand works on a dual-mode circuit. When the X26's trigger is pulled, a first circuit creates a high voltage pulse to try and establish an ionized "highly conductive" air path between the darts and target. The first high voltage discharge is quickly followed by a second lower-voltage, because the design would then assume it has ionized the air to conduct consistently, which then effects muscular contraction.*

The Karbon MPID is a smart EID. A program is installed on a computer chip that "tells" the gun how to fire its waveform rather than dumping electricity via a loaded capacitor bank only. Karbon believes that having software control the waveform is a much smart approach than the "brut-force" high voltage blast to get to the body then lower the voltage. The obvious question is "what if you don't need that initial high voltage blast?" Karbon hopes this innovative technology will give law enforcement agencies the confidence to be

Advanced Technology - Karbon Community Forum

able to fire their EIDs with confidence to immobilize suspects.

*Based on Karbon Arms research. Taser and Taser X 26 are registered trademarks of Taser International, Inc.

PRODUCTS   ABOUT US   TRAINING   REQUEST EVALUATION UNIT   TECHNOLOGY   DISTRIBUTORS   CONTACT US

©2010 KARBON ARMS, ALL RIGHTS RESERVED.

5/27/2011

# Exhibit 26

US007778005B2

(12) **United States Patent**

Saliga

(10) **Patent No.:** **US 7,778,005 B2**

(45) **Date of Patent:** **Aug. 17, 2010**

(54) **ELECTRIC DISABLING DEVICE WITH CONTROLLED IMMOBILIZING PULSE WIDTHS**

(76) Inventor: **Thomas V Saliga**, Electronic Design Associates, 12918 Commodity Pl., Tampa, FL (US) 33636

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 232 days.

(21) Appl. No.: **11/746,952**

(22) Filed: **May 10, 2007**

(65) **Prior Publication Data**

US 2008/0278882 A1     Nov. 13, 2008

(51) **Int. Cl.**
*F41B 15/04* (2006.01)

(52) **U.S. Cl.** ..................................................... **361/232**

(58) **Field of Classification Search** ................. 361/232, 361/230; 102/501, 502; 42/1.08
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,654,867 | A | 8/1997 | Murray |
| 5,960,207 | A * | 9/1999 | Brown ........................ 713/300 |
| 6,636,412 | B2 | 10/2003 | Smith |

| | | | | |
|---|---|---|---|---|
| 6,999,295 | B2 * | 2/2006 | Watkins et al. .............. | 361/232 |
| 7,102,870 | B2 * | 9/2006 | Nerheim ...................... | 361/232 |
| 7,110,897 | B2 * | 9/2006 | Nadig et al. .................. | 702/66 |
| 7,145,762 | B2 | 12/2006 | Nerheim | |
| 7,218,501 | B1 * | 5/2007 | Keely ........................... | 361/232 |
| 7,237,352 | B2 * | 7/2007 | Keely et al. .................. | 42/1.08 |
| 2006/0256498 | A1 * | 11/2006 | Smith et al. ................. | 361/232 |
| 2006/0292528 | A1 * | 12/2006 | Keely et al. .................. | 434/11 |
| 2007/0081292 | A1 * | 4/2007 | Brundula et al. ........... | 361/232 |
| 2007/0097592 | A1 * | 5/2007 | Smith .......................... | 361/232 |
| 2008/0130192 | A1 * | 6/2008 | Nerheim ...................... | 361/232 |

* cited by examiner

*Primary Examiner*—Jared J Fureman
*Assistant Examiner*—Angela Brooks
(74) *Attorney, Agent, or Firm*—David Kiewit

(57) **ABSTRACT**

A capacitive discharge stun-gun uses a flyback output circuit in which a semiconductor switch operates under control of a controller or suitable logic circuitry. The flyback circuit can deliver 50-65 kV pulses to a pair of electrodes in order to ionize air adjacent a target in order to initiate good electrical contact. When the electrodes are in good contact with the target, the flyback circuit delivers current at a lower voltage. In one mode of operation the stun-gun is controlled to initially deliver wider pulses optimized for causing air breakdown and to then deliver a series of shorter pulses in pulse groups optimized for causing involuntary muscle cramping.

**5 Claims, 4 Drawing Sheets**





FIG. 1



FIG. 2

FIG 3a

FIG. 3b



FIG. 4



FIG 5a

FIG 5b



FIG. 6

US 7,778,005 B2

1

# ELECTRIC DISABLING DEVICE WITH CONTROLLED IMMOBILIZING PULSE WIDTHS

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The invention generally relates to electric systems and devices that generate and accumulate charge for application to living beings. More specifically, the invention relates to electric disabling devices commonly referred to as stun-guns, stun-batons or the like for delivering an incapacitating, but less than lethal, sequence of electric shocks to a person.

### 2. Background Information

Hand-held stun-guns are widely used by police officers to subdue uncooperative or potentially dangerous individuals by subjecting them to electric current pulses inducing incapacitating muscle cramps. The jolt from a stun gun is intended to cause such severe cramping as to prohibit locomotion and to cause the victim to fall to the ground. Generally speaking, there are two limiting concerns in delivering an incapacitating electric shock. At one extreme, if too little energy is delivered to a targeted individual, he or she may not be incapacitated and may be able to persist in an attack on a police office. On the other hand, if extremely large electrical currents are delivered, the shock may be lethal, rather than merely incapacitating.

Prior art stun guns operate by charging a capacitor to a relatively high voltage and then discharging the capacitor through the primary winding of a step-up transformer so as to produce a much higher voltage on electrodes propelled toward a target. If the electrodes are not in intimate contact with the target, voltages on the order of 50-60 kV need to be supplied to the electrodes to ionize the air between the electrodes and the target to establish a current path. Once contact has been established lower voltages, on the order of hundreds to a few thousand volts, are adequate for sending disabling current pulses through the body.

In a typical prior art stun gun the capacitive discharge is controlled by a gas discharge tube. The capacitor is charged from a relatively high voltage power supply until the voltage across its terminals is high enough to trigger breakdown in the gas discharge tube, and to cause the gas discharge tube to switch from its initial non-conducting state to a highly conductive state in which the capacitor is electrically connected to the transformer. The capacitor then discharges through the primary winding of the transformer until its voltage falls below the minimum voltage at which the gas discharge tube will conduct. The gas discharge tube then switches to its original high resistance state and the cycle can be repeated. In this arrangement the pulse duration, repetition rate, output voltage, etc. are determined by component selection. That is, one can select gas discharge tubes with different turn-on and turn-off voltages, but once the turn-on voltage is attained, the device will conduct until the voltage falls below the turn-off level.

Physiological studies of the effects of electrical impulses on nerves that control skeletal muscles indicate that a pulse needs to last longer than about 150 microseconds to be efficient at 'firing' the nerve tissue, which is critical for causing cramping or immobilization. Once stimulated, the nerve tissue requires four milliseconds or more to recover.

## BRIEF SUMMARY OF THE INVENTION

It is an object of the invention to tailor the energy delivery sequence of a stun device, such as a stun gun, to more thor-

2

oughly incapacitate nerve tissue while delivering less total energy than is the case with prior art stun devices. In preferred embodiments this is provided by applying incapacitating pulses lasting between 150 and 300 microseconds. Further, because nerve tissue has a recovery period (depolarization and refractory period) of approximately 4 milliseconds, preferred embodiments of the invention deliver a plurality of energy pulse groups having an interval of about 4 milliseconds between pulse groups.

A preferred embodiment of the invention provides an electric disabling device configured as a handgun for immobilizing a human or animal target. This gun, similar to other such devices, comprises at least two projectile electrodes for positioning at spaced apart contact points adjacent a target and a suitable propelling means, such as pressurized gas or a pyrotechnic charge, for propelling the projectile electrodes from the device towards the target. The preferred device also comprises a transformer having primary and secondary windings, a capacitor, and a DC power supply operable to charge the capacitor element. Each end of the secondary winding of the transformer is electrically connected to only one of the two electrodes. The preferred embodiment also comprises a semiconductor switching device controllable by a control circuit to repeatedly switch between a conducting and a non-conducting state so as to cause pulses of current to flow from the capacitor through the primary winding of the transformer. In particular preferred embodiments, the semiconductor switching element is an insulated gate bipolar transistor (IGBT).

In an initial preferred contact-establishing method of operating such an electric disabling device the capacitor is initially charged from the DC power supply to a predetermined maximum voltage and the semiconductor switching device is controlled by the controller to close for a discharge interval having a selected duration of more than 15 but less than 50 microseconds. This assumes that a step up transformer with a primary inductance of about 50 micro-henries is utilized. At the end of the selected discharge interval the switching element is opened and held open for a pause interval having a selected duration at least as long as the discharge interval and at most five times as long as the discharge interval. The discharge and pause steps are then repeated at least once and preferably between five and ten times until the capacitor is substantially fully discharged.

In a second preferred immobilizing method of operating such an electric disabling device, the capacitor is charged from the DC power supply and the semiconductor switching device is controlled by the controller to close for a discharge interval having a duration of more than 5 but less than 20 microseconds. At the end of the discharge interval the switching element is opened and held open for a pause interval having a selected duration at least as long as the discharge interval and at most five times as long as the discharge interval. The number of such switching actions is adjusted to discharge the capacitor to approximately 40% of its maximum rated energy storage value and span a duration of approximately 200 microseconds. Then, during an idle period of substantially 4 millisec the capacitor is partially recharged to 50% or more of its rated capacity and then the above process is repeated until the capacitor is substantially fully discharged. Thereafter, the capacitor is fully recharged and the process is repeated after a recharge delay between 50 and 100 milliseconds.

A particular preferred method of operating a disabling device of the invention comprises carrying out the first and second methods in sequence. That is, the controller controls the switching element to initially deliver high voltage pulses optimized to both fire the pyrotechnic charge and establish

**3**

contact and to then deliver immobilizing pulses. If the projectile electrodes are not initially in intimate contact with the target, as is usually the case, the secondary of the transformer is essentially open-circuited so that pulsing the primary causes 'flyback' voltage in the secondary that can reach fifty to seventy kilovolts, which is known to be high enough to ionize the air between each projectile electrode and the target and to lead to intimate electrical contact. Once contact has been established to the target, the secondary of the transformer is no longer open-circuited and pulsing the primary results in lower voltage, higher current pulses in the secondary that can be controlled to have an optimal immobilizing duty cycle. In particular preferred embodiments, a 100 V DC power supply charges the capacitor, which is discharged through a 55:1 step-up transformer that outputs about a 2 kV pulse to the target, which is generally viewed as about a 1 kΩ load once contact has been established.

Although it is believed that the foregoing rather broad summary description may be of use to one who is skilled in the art and who wishes to learn how to practice the invention, it will be recognized that the foregoing recital is not intended to list all of the features and advantages. Those skilled in the art will appreciate that they may readily use both the underlying ideas and the specific embodiments disclosed in the following Detailed Description as a basis for designing other arrangements for carrying out the same purposes of the present invention and that such equivalent constructions are within the spirit and scope of the invention in its broadest form. Moreover, it may be noted that different embodiments of the invention may provide various combinations of the recited features and advantages of the invention, and that less than all of the recited features and advantages may be provided by some embodiments.

BRIEF DESCRIPTION OF THE SEVERAL
VIEWS OF THE DRAWING

FIG. **1** is a largely schematic exploded block diagram of an electrical incapacitating device of the invention.

FIG. **2** is a schematic block diagram of a circuit for an electrical incapacitating device of the invention, wherein depiction of some of the power wiring has been omitted in the interest of clarity of presentation.

FIG. **3**a is a schematic depiction of a train of pulses of output voltage of the circuit of FIG. **2** when an initial air gap is present between at least one electrode and a target.

FIG. **3**b is a schematic depiction of a several pulses of output voltage as a function of time when both electrodes have contacted a target.

FIG. **4** is a schematic block diagram of a preferred circuit for a stun gun of the invention that can operate in the presence of substantial parasitic load capacitance.

FIG. **5**a is a schematic depiction of a train of pulses of output voltage of the circuit of FIG. **4** when an initial air gap is present between at least one electrode and a target, but when no substantial parasitic load capacitance is present.

FIG. **5**b is a schematic depiction of output voltage of the circuit of FIG. **4** when both an initial air gap and a substantial parasitic load capacitance are present.

FIG. **6** is a schematic depiction view of a data dock arrangement for transferring data between a non-volatile memory in a stun gun and an external computer.

DETAILED DESCRIPTION OF A PREFERRED
EMBODIMENT OF THE INVENTION

In studying this Detailed Description, the reader may be aided by noting definitions of certain words and phrases used

**4**

throughout this patent document. Wherever those definitions are provided, those of ordinary skill in the art should understand that in many, if not most instances, such definitions apply to both preceding and following uses of such defined words and phrases. At the outset of this Description, one may note that the terms "include" and "comprise," as well as derivatives thereof, mean inclusion without limitation; the term "or," is inclusive, meaning and/or. Moreover, inasmuch as the preferred embodiment described herein involves controlled capacitive storage of electrical charge and subsequent discharge of it, it should be noted that the term 'capacitor' is sometimes used herein to denote either or both of a single physical component and various combinations of such components that can be viewed as being equivalent to a single capacitive component. In particular, a plurality of single capacitive components electrically connected in parallel so as to provide a total capacitance equal to the sum of the capacitances of the individual components will sometimes be herein referred to as a 'capacitor'.

Turning now to FIG. **1**, one finds a schematic exploded view of a disabling device or stun-gun **10**. As is conventional in the art, the stun device is powered by a removable and replaceable battery pack **12**. In a particular preferred embodiment the battery pack comprises a plurality of lithium primary batteries such as the 123 size or the CR2 size inserted into the handle or butt of the stun-gun. After a safety-switch **13** is enabled to apply battery power, pulling the trigger **14** ignites a pyrotechnic charge **16** that fires dart-like projectile electrodes **18** from a replaceable cartridge **20**. The projectile electrodes trail fine wires **22** behind them to keep them electrically connected to a power electronics portion **24** of the stun-gun. It may be noted that although the power electronics portion **24** of the gun **10** is depicted as a square block, this is an entirely schematic depiction selected for clarity of presentation. In reality, various elements of the power electronics portion of the weapon are tucked away in available nooks and crannies of the body of the weapon.

Moreover, although the initially preferred embodiment of the invention comprises a stun gun having both projectile **18** and fixed **19** electrodes, the reader will appreciate that the same inventive circuitry and operating methods can be employed for making other electrically incapacitating devices using only fixed electrodes **19** incorporated into batons, battle-shields, or restraint bracelets and belts, and that all such other uses shall be considered to be within the spirit and scope of the invention.

The power electronics portion **24** of the stun-gun is schematically depicted in FIG. **2**, for an electrically incapacitating device comprising only fixed electrodes, and in FIG. **4** for a preferred stun gun. In both cases the battery pack **12** powers a controller **28** and a high voltage DC-DC supply **30**. When the device is triggered, the controller **28** controls the DC supply **30** and a controllable semiconductor switch **32** to charge a capacitor or capacitor bank **34** and to send current pulses through the primary winding of a step-up transformer **36**, as will be described in greater detail hereinafter.

In a particular preferred embodiment, the power electronics portion of the stun gun is controlled by a microcontroller such as a Model 16F687 made by the Microchip Corporation. Those skilled in the control arts will recognize that although this arrangement is preferred, there are many other approaches that can be used to provide the necessary control features. These include, but are not limited to the use of other controllers as well as of hard-wired or custom programmed logic elements well known in the art.

The high voltage DC supply **30** is preferably any of many well-known step up, switching-type DC-DC power supplies

5

circuits with a delivered power rating in the 10 watt to 20 watt range. When active, the preferred high voltage DC supply provides an output voltage of approximately 100 VDC.

Current from the high voltage DC supply 30 passes through a diode 26 to charge a capacitor 34. Although one can consider using a single capacitor component for this function, a preferred embodiment of the invention uses a parallel pair of capacitors, each having a capacitance of fifty microfarads to achieve a total capacitance in the 90 μF to 108 μF range. The use of a plurality of paralleled components offers the advantages of reducing the maximum current that has to be delivered by any one of them, and of allowing the designer to more efficiently use the space available within the body of the weapon by packing smaller individual capacitors into spaces available within a body of a stun gun 10 or other incapacitating device.

A semiconductor switch 32, which is preferably an insulated gate bipolar transistor (IGBT) Model IRG4PH50KDP supplied by the International Rectifier company, is controlled through a driver 29 by the controller 28 to discharge the capacitor 34 through the primary winding of the transformer 36. Although this element is depicted in FIG. 2 as being physically connected between the transformer and negative rail, those skilled in the art will recognize that the semiconductor switch 32 can be located at other positions in the circuitry.

The preferred IGBT 32 can be controlled to generate pulses of a controllable width that can be as narrow as one microsecond. It can also be used to generate a long string of such pulses during the course of a single discharge of the capacitor 34. It is noteworthy that this is a significant advantage over prior art stun-guns that employ a gas discharge tube to send a current pulse from a capacitor through the primary winding of a transformer. The prior art gas discharge tube operates in an 'all-or-nothing' mode and, once turned on, continues to conduct until the voltage on the capacitor falls below a predetermined voltage.

The preferred 55:1 ferrite core step-up transformer 36 is typically custom designed using well-known high-voltage transformer methods. In the preferred design, the primary inductance is 50 μH. It may be noted that the use of a controlled string of narrow pulses, when compared to the prior art approach of fully discharging the capacitor at each actuation, allows one to select a transformer with a smaller core size because core saturation is less of an issue. This use of a smaller transformer provides an additional benefit of reducing the overall size of the housing needed to contain it.

The transformer 36 may be designed to have either an ohmically floating secondary winding or may be center-tapped and have that center-tap 38 connected to the controller circuit's common rail. A practical advantage of the latter is that the voltage breakdown stresses may be reduced by a factor of two between the secondary wires 18 and primary common circuits. This significantly reduces insulation thickness requirements, permitting more compact design structures for the electronics output circuit module 24.

The circuit schematically depicted in FIG. 2 and FIG. 4 may be recognized as a flyback circuit that, when operated in pulsed mode, provides two drastically different sorts of outputs depending on the impedance across the output electrodes 18, 19. In one limiting case, one can consider the output electrodes 18 as being separated by a high impedance, such as an air gap. In the other limiting case, a relatively low resistance, provided by tissue of a target 40, is connected between the two output electrodes.

This accords well with the operational requirements of electrical incapacitating devices, such as a prisoner stun belt,

6

baton, or other such devices. In an early stage of operation the output electrodes 18,19 are often not in intimate physical contact with a target and the output of the transformer is essentially open circuited. For example, a human target's clothing may space either or both of the electrodes away from his or her body by several centimeters. A high voltage output is required to ionize the air between the target's body and the electrode in order to establish effective electrical contact. Once an ionic air plasma or direct contact is established, a lower voltage can be used to send reasonable currents through the target, which now appears as a resistive load 43 of approximately 1 kΩ. This situation is schematically depicted in FIG. 2 where the target 40 is depicted as comprising an initial gap, depicted as a target capacitance 41 that is commonly on the order of ten picofarads, a switch 42, and a 1 kΩ resistor 43 connected across the transformer output once air ionization has acted to render the gap conducting.

If the output of the step-up transformer is open-circuited and the controllable IGBT switch 32 is suddenly closed, current flows from the high voltage DC power supply 30 and the substantial substantially charged capacitor 34. This current creates a magnetic field in the transformer inductance. If the controllable switch 32 is then abruptly opened, the magnetic field collapses and induces a large 'flyback' voltage spike, as is well known from Faraday's EMF Law, across the pairs of electrodes. In a particular preferred embodiment, using the circuit components described above, flyback voltage spikes of 55-65 kV were produced.

In preferred embodiments, recognizing that it is likely that the output electrodes do not initially have good electrical contact with the target, the controller is programmed to open and close the switch in succession to generate a string of high voltage pulses as depicted in FIG. 3a and FIG. 5a. For the component values described above, each pulse had a peak value of 55-65 kV, as indicated by the $V_{ARC}$ line in those figures. A plurality of such pulses is created by repeatedly closing the controllable switch 32 for ten microseconds and then opening it for twenty to forty microseconds. The use of a string of high voltage pulses, rather than a single pulse, provides a higher probability that at least one of the pulses will result in air breakdown near the target with resulting good contact to the target. In a particular preferred embodiment, this "Max-Spark" high-spark energy waveform is generated for 0.1 to 0.25 seconds.

A further complication arises in the case of stun guns having projectile electrodes with trailing wires 22. In this case, a parasitic load capacitance 44 between either of the wires and earth ground 46 can absorb enough of the high voltage output pulses to prevent an arcing voltage from developing at the electrodes 18. This can occur, for example, when one or both of the trailing wires lies on damp ground or pavement.

In order to ensure that an arcing voltage is obtained in a stun gun application one can provide additional high voltage diodes 48 in the output circuit. In a particular preferred embodiment, depicted in FIG. 4, three VMI Type X100FG miniature, fast recovery, 10kV diodes are connected in each leg of the output circuit. This arrangement permits successive output pulses to repeatedly charge the load capacitance 44, 46 until the designed 55 kV arc-over voltage is attained, as schematically depicted in FIG. 5b. Those skilled in the art will appreciate that more or fewer diodes may be used in each arm leg of the output circuit, depending on the availability of suitable components. In any such arrangement, of course, it is preferable to select the diodes so that the series string of

diodes provides a breakdown voltage (e.g., 60 kV in the depicted case) that is greater than the targeted arc-over voltage (e.g., 55 kV).

The flyback circuits of FIG. 2 and FIG. 4 behave considerably differently if a relative low impedance, such as the 1000 ohms or so offered by a typical target 40, is connected across the electrodes 18,19. In this case, closing the controllable switch 32 causes the full voltage of the capacitor bank 34 to be applied across the transformer's primary 36 which in turn causes a substantially higher voltage to be applied across the secondary, as determined by its turns-ratio. This voltage is then applied across the target resistance. In a particular preferred embodiment the combination of a 100 V DC supply and a 55:1 step-up transformer generates a potential across the projectile electrodes of about 2 kV, where the balance of the nominal 5.5 kV is lost to parasitic resistance of the windings and electrode leads. A pulse of this sort is depicted in FIG. 3b.

In a preferred embodiment, during a time period in which a low impedance situation is believed to persist (e.g., after an initial high spark energy period of approximately 0.1 to 0.25 sec), the controller is programmed to open and close the switch 32 in rapid succession to generate a pulse group with a duration $T_1$ of about 350 microseconds, a pulse-group separation $T_2$ of 4 milliseconds, and a group repetition period of about 50 milliseconds, as generally depicted in FIGS. 3a, 5a, 5b. In a particular preferred embodiment, a first pulse group of five to fifteen pulses spans a period of 300 to 400 μsec. This is followed, after a pause of about 4 msec by a second group of five to fifteen pulses. The second group is followed by a somewhat longer delay of 50-100 msec to allow the capacitor to fully recharge, following which the first group/second group sequence is repeated.

As noted above, this selection of pulse duration and pause duration is made to accord with physiological information on muscle control. Pulse durations of 150-500 microseconds are optimal for activating the nerves that control skeletal muscles and for causing involuntary cramping. A pulse-group repetition rate of 4 milliseconds assures that the cramping voltage is re-applied just as the effects of the previous pulse are dissipating. A pulse train of this sort is referred to as a "Nerv-Lok" waveform.

In other embodiments of the stun device invention, to further enhance nerve and muscle incapacitation, a plurality (N) of pulse groups may be generated all with time interval spacings of approximately 4 milliseconds. In these embodiments, the capacitor 34 would typically be exhausted by 1/N of its total energy capacity by a string of N pulse groups. Once exhausted, the capacitor would be recharged fully once again by the power supply 30. In compact embodiments that seek to keep the total power requirements within the 10 watt to 20 watt range, it may be noted that the time interval for recharge would ordinarily take much longer than 4 milliseconds.

Many operating modes can be offered in an electrical incapacitating device of the invention that provides controllable discharge pulses. A preferred embodiment of a stun-gun 10 provides manual, semi-automatic and fully automatic modes of operation that differ from each other in the weapon's response to a trigger pull. For example, in a 'full manual' operation the stun-gun operates at the Max-Spark rate for 0.2 sec and then outputs the "Nerv-LoK" waveform for up to four seconds, and for less time if the trigger is released during operation. In a semi-automatic operating mode the Max-Spark waveform is delivered for 0.2 seconds, followed by 0.8 seconds of the Nerv-Lok waveform, following which the weapon continues to put out the Nerv-Lok waveform as long as the trigger is held back for up to a maximum total elapsed

operational time of four seconds. In a full-automatic operation the stun gun provides 0.2 seconds of Max-Spark, followed by 3.8 seconds of Nerv-Lok.

Any one of the operational modes of a preferred stun-gun may be selected by having the gun's controller 28 communicate with another computer 50 running a special program that allows a user, usually a police department administrator, to select the desired operational mode, and store that mode selection in a non-volatile memory 52 that is associated with the controller 28 and that may also provide storage for trigger-usage history data.

In a particular preferred embodiment the stun-gun controller 28 communicates with the external computer 50 by means of a wireless proximity coupling circuit. In this embodiment an inductor 54a in the gun 10 couples to another inductor 54b built into a docking station 56 connected to the external computer 50 when the wireless proximity coupling circuit is activated. The docking station, schematically depicted in double-dot phantom in FIG. 6, is preferably configured to conveniently receive the gun in a standard position in which a permanent magnet 58, built into the docking station, is close enough to a magnetic reed switch 60, disposed within the gun, so as to close the switch 60 and place the controller 28 into a communication mode in which data are transmitted between the controller and the external computer.

Although the present invention has been described with respect to several preferred embodiments, many modifications and alterations can be made without departing from the invention. Accordingly, it is intended that all such modifications and alterations be considered as within the spirit and scope of the invention as defined in the attached claims.

What is claimed is:

1. An electric disabling device for immobilizing a human or animal target, the device comprising:
    at least two electrodes positionable at spaced apart contact points adjacent the target;
    a transformer having a primary winding and a secondary winding;
    a capacitor electrically connected to the primary winding of the transformer;
    a DC power supply operable to charge the capacitor; and
    a semiconductor switch directly electrically connected to the primary winding, and controllable by a control circuit to repeatedly switch between a conducting state and a non-conducting state so as to cause a plurality of pulses of current to flow from the capacitor through the primary winding of the transformer during an interval of at least ten microseconds but not more than one millisecond; and
    an output circuit comprising two legs connectable through the target, each leg respectively connected between one of the two ends of the secondary winding of the transformer and a respective one of the electrodes, each leg comprising a plurality of series-connected high voltage diodes, the two legs, when connected through the target, having a breakdown voltage in excess of a selected arc-over voltage.

2. The disabling device of claim 1 wherein the semiconductor switch comprises an insulated gate bipolar transistor.

3. The disabling device of claim 1 wherein the selected arc-over voltage is at least 55 kV.

4. An electric disabling device for immobilizing a human or animal target, the device comprising:
    at least two electrodes positionable at spaced apart points adjacent the target;
    a transformer having a primary winding and a secondary winding;

US 7,778,005 B2

**9**

a capacitor electrically connected to the primary winding of the transformer;

a DC power supply operable to charge the capacitor; and

an insulated gate bipolar transistor switch directly electrically connected to the primary winding, and controllable by a control circuit to repeatedly switch between a conducting and a non-conducting state so as to cause a plurality of pulses of current to flow from the capacitor through the primary winding of the transformer;

**10**

wherein the two ends of the secondary winding are electrically connectable through the target by a series string of high voltage diodes, the series string characterized by a breakdown voltage in excess of a selected arc-over voltage.

**5**. The disabling device of claim **4** wherein the selected arc-over voltage is 55 kV.

* * * * *

# Exhibit 27

# THE STINGER
# S-200™

## Basic Operator
## Certification Program
### Student Manual



WWW.STINGERSYSTEMS.COM
1.866.STUNSHOT (788-6746)

STINGER000805

# BASIC 8-HOUR TRAINING MANUAL

This is the Basic 8-Hour Certification Course Training Manual for the Stinger S-200.

It is a comprehensive, BASIC presentation for the individual who will be using the device in the field.

This manual is to be used only in conjunction with the Basic Certification Program and ONLY by authorized Stinger Systems, Inc. instructors.

The data found within the manual is based on extensive research and actual combat situations. It represents over 20 years of organization and is made available as a result of the numerous requests from Criminal Justice agencies across the country for a standardized certification program.

Students should be advised to:
1. Maintain these manuals with updates
2. Read the manual from cover to cover

By reading the manual through, the student will have learned almost everything that he/she possibly can. The only additional learning process will be the expertise developed by actual field application.

**NOTE:** *This manual is a legal document.*

STINGER000806

 # MANUAL FORWARD

The following program of instruction will provide the student with a fundamental understanding of the Stinger Systems Hand Held Stun Device. This program is to be conducted by a Stinger Systems certified instructor.

Students should consult with their department prior to the deployment of any use of force alternative. Questions relative to this training program or the Stinger device should be directed to:

**Stinger Systems Training Division**
**2701 North Rocky Point Drive, Suite 1130**
**Tampa, Fl. 33607**

**Phone: (800) 345-7886**
**Fax: (813) 288-9148**

Instructor Name: _____

Date of Instruction: _____

Location of Training: _____

© Stinger Systems, Inc. Unauthorized reproduction of this material is strictly forbidden without the written consent of Stinger Systems, Inc.

STINGER000807

# STINGER BASIC TRAINING PROGRAM

## Introduction

Stinger is a non-lethal electronic immobilization product designed for short-term non-lethal incapacitation of an individual during law enforcement/correctional operations.

As with any product utilized during use of force altercations (even hands-on physical contact), although designed to be non-lethal, the device has a potential of inflicting injury and even a remote aspect of lethality. Care must be exercised during any type of use of force encounters to minimize injuries and/or death.

Stinger Systems, Inc. is pleased to introduce the Stinger stun device to promote officer and subject safety by minimizing physical contact and the time spent during physical encounters.

## Training and Performance Objectives

- Officer injury reduction.
- Reduction of liability law suits against officers and municipalities.
- Reduction of liability claims against the misuse or improper use of EIDs.
- Understanding what bodily contact with various EID's will accomplish - duration and application areas.
- Understanding force - meeting force with force, excessive force, required force, deadly force, and range of force.
- Awareness of vicarious and civil liabilities.
- Demonstration of basic field defensive tactics in EID use.
- Learn basic laws and principles of electricity
- Be able to define "Use of Force", "Reasonable Force" and explain the "Force Continuum"
- Learn proper technique to document a "Use of Force" incident involving the Stinger
- Demonstrate the ability to manipulate, operate and maintain the Stinger EID
- Participate in "Live Fire" deployment of the Stinger

It is important to learn the principles of how the Stinger system works as well as how to determine if its use in a particular situation is appropriate and applicable.

After the completion of this course, the student should have a better understanding of the dynamics behind the Stinger and its operation, as well as having a enough information in regards to use of force to properly, effectively, and justifiably use this device in a real world setting.

Also as part of the course, you will learn how to properly report and document Stinger deployments for later use in the field.

STINGER000808



# INITIAL COURSE REGISTRATION FORM

Applicant Name _____
LAST NAME          FIRST NAME       MI

Social Security Number: _____ Date of Birth: _____
MM/DD/YY

Mailing Address: _____
NUMBER AND STREET    CITY/TOWN    STATE    ZIP

Telephone: Residence: _____ Business: _____ Fax: _____

May STINGER contact you via e-mail with training and device information updates?   ☐ Yes   ☐ No

E-Mail Address: _____

Agency: _____ Officer Rank: _____

Agency Address: _____
NUMBER AND STREET    CITY/TOWN    STATE    ZIP

Course Requested (Check each that apply)

   ☐   STINGER System Basic Course

   ☐   STINGER System Instructor Course (Prerequisite: Basic Course)

   ☐   STINGER System Senior Instructor Course (Prerequisite: Instructor Course)

For the Instructor and Senior Instructor courses, have you completed the required prerequisite courses?

☐ Yes   Course Name: _____ Date Completed: _____

       Course Name: _____ Date Completed: _____

☐ No   If no, this application cannot be processed until the proper prerequisite training has been completed, and documentation of stated training has been provided by the student.

I, the undersigned, certify that all information contained on this application is true and correct to the best of my knowledge, and I have not omitted any pertinent information. I understand that any misrepresentation, falsification or omission of pertinent information may be cause for denial of certification and possible expulsion from requested and/or all training classes conducted by STINGER Systems, Inc.

Applicants Signature: _____ Date: _____

━━━━━━━━━━━━━━━━━━━━━━ INSTRUCTOR USE ONLY ━━━━━━━━━━━━━━━━━━━━━━

Payment Received:   ☐ Yes   ☐ No   Instructor Cert. #: _____

Application Approved:   ☐ Yes   ☐ No   If No, Reason(s): _____

_____

White: Student       Yellow: Instructor

STINGER000809

YOU ARE IN POSSESSION OF A WEAPON CLASSIFIED BY
BATF AS A FIREARM, PURSUANT TO RULE 80-20 OF THE
GCA OF 1968.

HANDLE AND TREAT THIS WEAPON AS
YOU WOULD ANY FIREARM.

* ALWAYS POINT DOWN UNLESS READY TO USE

* TREAT IT AS LOADED AT ALL TIMES

* KEEP FINGER AWAY FROM TRIGGER UNTIL READY TO FIRE

## NOTICE

The information provided herein is intended to familiarize the user with basic product operations. It is NOT designed, nor intended, to substitute for
certified product training by an authorized instructor.

STINGER000810



# TABLE OF CONTENTS

## 1. Stinger Systems Products                                    8

## 2. About the Stinger Series S-200                              9
Commentary for Prospective Users ........................................ 9
Disclaimer ......................................................................... 9
Smart Stun Technology ....................................................... 10
How the S-200 Operates ...................................................... 10
Advantages of the Stinger EID .............................................. 10
Unique Feature of the S-200 ASM (Auto-Sleep Mode) ............... 10

## 3. Stinger Systems' Position                                   11

## 4. Electronic Information                                      12
Common Electrical Terms ..................................................... 12
Basic Principles of Electricity ............................................... 12
Ohms Law ......................................................................... 12
Facts ................................................................................ 13
Voltage and Amperage ........................................................ 13
Neuromuscular Keying ........................................................ 13

## 5. General Effects of the Stinger                              15

## 6. Body Application Information                                 16
Body Application Points ....................................................... 16
Areas to Avoid When Possible and Practical Training Directive ..... 16
Areas to Avoid When Possible/Restrictions/Contact Stun Mode (CSM) ... 17
Preferred Application Areas and Effects .................................. 19
Areas to Avoid in the Contact Mode ...................................... 19
Application Marks/Signature/Evidence ................................... 20
Variables that Determine Effectiveness .................................. 20
Post Deployment Care ......................................................... 21

## 7. Use of Force & Force Continuum                              22
Use of Force Tactics ........................................................... 23
Use of Force/Policies & Tactics ............................................. 24

STINGER000811

Authority for Force ................................................................................................ 24
Understanding Force ............................................................................................. 24
Types of Force - Alternative Force Implementation ........................................ 25
A Force Continuum ............................................................................................... 26
Force Continuum Scale ........................................................................................ 27
Transfer of Force .................................................................................................. 28
ACLU Policy #207 ................................................................................................. 29

**8. Stinger Tactical Deployment &**
**Practical Aspects Device Capabilities**                                              **30**
Mode 1 - Contact .................................................................................................. 30
Mode 2 - Distance ................................................................................................ 30
Distance Firing vs. Contact Mode ..................................................................... 31

**9. Liability Aspects & Court Review**                                               **33**
Documentation of Deployment ........................................................................... 33
Testifying in Court ............................................................................................... 33
Areas of Civil Liberties ....................................................................................... 33
Caldwell v. Moore ................................................................................................. 34
Haynes v. Marshall ............................................................................................... 34
Considerations Regarding In-Custody and Sudden Deaths ......................... 35

**10. Battery Information**                                                           **37**
General ................................................................................................................... 37
Lithium Battery Power Source Applicable to the Stinger ............................. 37
Training Information ............................................................................................. 38
Tips ......................................................................................................................... 38
Stinger Power Source & Battery Specifications ............................................. 38
Unique Feature of the S-200 ASM (Auto-Sleep Mode) .................................. 38

**11. Wearing the Stinger/Size Requirements**                                         **40**

**12. Hands On - Practical Exercises**                                                **41**
Hands On - Basic Techniques ............................................................................ 41
Hands On - Tactical Training Session ................................................................ 41
Practical Exercise ................................................................................................ 43

**Appendix A - Features of the Stinger S-200**                                        **44**

**Appendix B - Specifications of the Stinger S-200**                                  **45**

**Appendix C - Abbreviations & Definitions**                                          **48**
Abbreviations ........................................................................................................ 48
Definitions ............................................................................................................. 48
Common Electrical Terms ................................................................................... 49

STINGER000812

# STINGER SYSTEMS PRODUCTS



**BAND-IT™**
An electronic wrap used in the transport of dangerous criminals – can be triggered by motion or remotely.



**ICE SHIELD™**
An electrified riot shield used in hostile crowd control situations.



**STINGER S-200™**
A handheld, projectile stun gun utilizing quantum flyback nervelok technology



**ULTRON® II (Discontinued Dec. 2006)**
A handheld, contact stun gun used widely by police and corrections officers around the country.

STINGER000813

# 2 ABOUT THE STINGER SERIES S-200

The S-200 is spearheading new technology promising greater, safe knock-down power than existing technology. The device electrodes deliver high-voltage energy in a precisely controlled series of energy packets or "Quanta". The electronics delivers these energy quanta from a so-called "Flyback" transformer circuit, hence the term Quantum Flyback Technology ("QFT").

When in use, each energy packet has a dual personality: if the device electrodes have not yet hit a target, the energy quantum "flies back" to over 50,000 volts creating a commanding electrical spark – one which penetrates clothing easily. Yet once the "target" is contacted, the energy quantum delivers NMI voltage and current very effectively.

Series of quantum pulses are delivered first as ionizing spark energy and then as a more immobilizing, lower-voltage, higher current energy quanta once on target.

A novel feature of QFT is the ability to tailor the energy delivery sequence to more thoroughly incapacitate nerve tissue with less total energy being delivered. To more effectively lock-up muscle tissue, the applied incapacitating pulse energy should last between 50 microseconds and 250 microseconds. QFT adjusts its energy delivery width to 180 microseconds. Further, nerve tissue has a recovery period (depolarization and refractory period) of approximately 4,000 microseconds. By emitting yet a second quantum energy burst that period of time later, the muscles become hopelessly overloaded and fatigued very quickly – yet with less total pulse energy than a conventional stun gun. This Nervelok™ quanta delivery profile for the QFT stun system offers the user the following benefits: reliability, effectiveness and product longevity!

## Commentary for Prospective Users

While electronic immobilization technology has been available for use by the criminal justice system since 1973, Stinger Systems has added greater functionality and industry-leading documentation capability with its Stinger series projectile/contact stun guns. Non-lethal by intended design, the Stingers utilize modern technology. The Stingers are designed to provide law enforcement, professional security, and military personnel with a viable alternative to brute and deadly force options. When used properly, the Stingers can significantly reduce officer and subject injuries.

## Disclaimer

The Stinger technology is not without limitations and risks.

STINGER000814

## Smart Stun Technology

The S-200 uses proven pulse waveform technology ("PWT") based on known safe levels of electrical values. High voltage and low amperage provide a capacitor discharge system designed to temporarily immobilize an aggressive individual with minimal recovery time. PWT is designed to affect the neuro-muscular system by interrupting and disrupting the electrical impulses to and from the brain. Consequently, electrical impulses throughout the human body become confused and ultimately "shut down" temporarily.

## How the S-200 Operates

- Primarily the S-200 operates on high voltage, low amperage electrical frequency.
- Modern engineering has developed Quantum/Nervelok technology exclusive to the S-200.

## Advantages of the Stinger EID

- Can be utilized by all officers regardless of size or strength
- Minimal training time is required
- No specific skills are required
- Stinger easily integrates with all defensive tactics programs
- Can be used for both defense and control
- Reduces officer and offender injury rates
- Reduces excessive force complaints

Size, strength or fitness does not affect your ability to effectively use the Stinger. Four to six hours of training is all that is required to become a Stinger operator.

The Stinger can be used for the only two reasons force would be used: for Defense or Control.

The less physical contact spent with an offender reduces officer and offender injury rates.

The less physical contact spent with an offender also lessens the number of excessive force complaints because of the reduction of permanent injuries to offenders. Officers must, however, use common sense in selecting to utilize any alternative to control a situation.

## Unique Feature of the S-200 ASM (Auto-Sleep Mode)

*See page 38 for more information.*

STINGER000815

# STINGER SYSTEMS' **3** POSITION

Stinger Systems Inc. designs its products to be intended for non-lethal use. However, unknown factors such as substance abuse, pre-existing, non-obvious medical conditions or abnormal levels of stress potentially could result in a more serious injury or possibly lethality.

### Definition: Non-Lethal

U.S. Department of Defense policy defines non-lethal weapons as "weapon systems that are explicitly designed and primarily employed so as to incapacitate personnel or material, while minimizing fatalities, permanent injury to personnel, and undesired damage to property and the environment..."

It is important to note that Department of Defense policy does not require or expect non-lethal weapons are intended to significantly reduce the probability of such fatalities or injuries as compared with traditional military weapons which achieve their effects through the physical destruction of targets.

*-Joint Concept for Non-lethal Weapons*
*United States Marine Corps*

STINGER000816



# ELECTRICAL INFORMATION

## Common Electrical Terms

**Voltage:** The measure of electromotive force in the system

**Amperage:** The measure of current flow per unit time

**Ohm:** Unit used to measure resistance to the conduction of electricity

The flow of electricity in relation to passing through an object is specifically described in terms of *Voltage, Amperage,* and *Ohms,* each of which play a role in the passage and effect of electricity on the human body.

In the next few sections, you will learn more about each of these and how they apply to the Stinger and its effects on the human body.

## Basic Principles of Electricity

• Electricity takes the path of least resistance

• There is a direct correlation between amperage and voltage (Ohms Law)

• Amperage or current is the number one factor in human fatalities

• Pulsed electricity at pre-determined intervals is non-lethal

• Ohms Law cannot be altered

These are basic principles of electricity and are always a constant by laws of physics. Electricity always works on what is called a circuit principle, in which electrical current needs a complete circular path or circuit to and from the source of power to be of any effect. When a partial circuit comes in contact with a conductive material, the electrical current from one part of the circuit travels through the least resistant part of the conductor to the opposite part of the circuit, thus completing the circle.

The main principle to remember is that high amperage in electricity is what causes death in humans, not the voltage.

## Ohms Law

$I = E/R$

I – Current through the body

E – Voltage across the body

R – Resistance of the body

STINGER000817

Imagine water flowing down a river (voltage or E), as the water flows down the river and it encounters some large boulders it has to flow around the boulders (resistance or R), therefore reducing the current going down the river (through the body or I).

Also imagine a car traveling down a road at 80 m.p.h., the car encounters a series of cones arranged in a pattern. The car has to slow down to maneuver through the cones. The car is the voltage and the cones are the resistance. When the current encounters the resistance it decreases the current through the body.

## Facts

- Resistance is measured in Ohms
- 1,000 Ohms stimulates human body resistance (skin)
- Immobilization does not occur at voltages less than 6,000
- Stinger has a minimum of 7,000 to 8,000 volts in the body

The adult human body is capable of generating almost 2,000 Ohms in optimal conditions and immobilization or muscular interference does not occur at voltages less than 6,000. Electronic stun devices must be rated to put out a high voltage output with lowered amperage to have the desired effect without causing permanent damage or possible death to the subject.

## Voltage and Amperage

**Example:** one unit of flow (amperes) occurs with one unit of force (volts) divided by one unit of resistance (ohms).

Joules = watt second

Current flow, or amperes, is the most important single factor in human electrocution. By direct measurement and information derived from animal studies, the following approximations as to various effects of current flow in humans for 60-hertz alternating currents are generally accepted:

0.001 amps - barely perceptible tingle
0.016 " - "let go" current
0.020 " - muscular paralyses
0.100 " - ventricular fibrillation
2.000 " - ventricular standstills
20,000 " - common household fuse blows

## Neuromuscular Keying

The generated pulses project a frequency into the neuromuscular system of a subject and *Temporarily* interrupt *Voluntary* muscle control

Pulsed electricity relates to the method in which the electrical shock is introduced. As opposed to a direct current shock where the voltage and amperage remains constant over a period of time, a pulse delivers a set voltage and amperage of the greatest strength upon initial contact, and then diminishes to a lower rate immediately. It only effects voluntary muscle groups and the effect is temporary.

STINGER000818

Pulse duration time is approximately 10 microseconds

Pulse voltage ratio is approximately 32 pgps (pulse groups per second)

Pulse voltage is 7,000 to 8,000 volts in subject

The offender will be receiving approximately 32 pgps for each second the Stinger is deployed. The actual voltage received by the offender will be approximately 8,000 volts under a 1k Ohm load. The electrical current of these pulses will cause the muscular systems that lie in the path of least resistance to experience a signal overload, eventually causing them to contract and relax violently, wearing them out, thus causing temporary immobilization.

*The S-200 electrical specifications are as follows:*

| | |
|---|---|
| Pulse Rate: | 32 pulse groups per second |
| Pulse Duration: | 300us to 400us |
| Peak Arc Volts: | 63KV |
| Peak Loaded Voltage: | 1300v |
| DC Curr Avg: | 5.0mA |
| Energy at Main Capacitor: | 0.60J |

STINGER000819



## TRAINING DIRECTIVE #101-S-106

### Length of Contact

In the event the use of a Stinger™ is required in an effort to control a resisting or uncontrollable individual, it is recommended to be applied up to two (2) sequential 4-second applications or only until resistance has been terminated - up to the 8 seconds and pursuant to respective agency policies and/or guidelines. Furthermore, it is suggested that officers will not unneccesarily or unreasonably endanger themselves or a third party to be in compliance with stated guidelines.

### Course of Action

When a device is applied in the contact or firing mode to a combative/resisting individual, if there are NO noticeable results after (2) 4-second applications, Stinger Systems recommends in most circumstances that it be holstered and a secondary plan of control implemented. Should the device have a noticeable effect at any given time during the applications, Stinger Systems recommends it be discontinued after compliance is attained, but not exceeding 8 seconds (two 4-second applications).

Chances are that if the device does not work within the 8 second window, it is highly unlikely it will work at all. From the standpoint of over-use, or intentional abuse, extended duration of more than (2) 4-second sequential applications is discouraged.

When and where possible, during an application of a Stinger™, follow-up physical contact controls should be initiated as quickly and as safely as possible. Use of the Stinger™ is intended to reduce the time an officer spends in a physical confrontation but it may NOT avoid a physical altercation. Officers must be prepared to use alternative methods commensurate with use of force policy and also realize physical contact is not ALWAYS inevitable and may not be avoidable. Thus, physical contact control techniques may be reality and must rely on an officer's abilities.

Providing the Stinger™ has an effect upon an individual, immediate follow-up control should be initiated. However, after (2) intentional 4-second applications, if there are no noticeable results to a subject, Stinger Systems recommends there should be a 2-3 second officer discretional pause and a third 4-second application applied. Ultimate failure to work at a third stage deployment will require a transition to a different method/ alternative application of force either equal to intended electrical immobilization or greater than, depending on respective agency policy.

Field experience with this technology for over 30 years indicates one of three results taking place. Consult with certified training instructors to learn more regarding these phases.

**NOTE:** *During an effective application of a device either during contact or distance firing modes, it is highly likely that if the officer gives an individual orders, failure to comply will be evident. This is a typical response because the individual hears the audible orders but the body is not capable of responding. Accordingly, officers misinterpret this as "failure to comply" and will administer subsequent applications. This is incorrect and must be avoided.*

*An officer must ALWAYS be prepared to transition to a different force alternative if an applied option does not work.*

**I have read this page and fully understand its meaning.**

_____          _____
          SIGNATURE                                    DATE

_____          _____
          PRINT NAME                                INSTRUCTOR

                    **White: Student**      **Yellow: Instructor**

**STINGER000820**

# GENERAL EFFECTS OF THE STINGER

- .5 seconds – Startles subject
- 1 - 2 seconds – Causes a release action and minor muscle contractions
- 2 - 4 seconds – Causes a stunning action and knocks offender down
- 4 – 6 seconds – Temporary, short-term non-lethal incapacitation state causes a loss of balance, loss of voluntary muscle control, confusion and disorientation

**NOTE:** *The effects are not the same on everyone.*

A 2-4 second application should be sufficient to gain compliance with most offenders under normal circumstances. Be aware that some individuals, especially on certain types of drugs such as PCP, may not react immediately or at all to the application of an electronic stun device. Others may require a longer pulse discharge, however, you must be cautious not to send too long of an application into a subject as it could raise the likelihood of injury.

The Stinger utilizes high tech quality electronic components that precisely blend *Pulsed Electricity, High Voltage* and *Low Amperage* that mimic and override the body's individual electrical system and will achieve takedown capabilities while not causing damage or injury to the human body.

This is how the Stinger system works. As all body functions are controlled by electrical impulse from the brain, additional electrical pulses can disrupt these messages causing an overload in the neuro muscular systems of the contact areas, thus causing immobilization or rapid fatigue without causing permanent or serious damage to those systems.

STINGER000821

# ⑥ BODY APPLICATION INFORMATION

## Body Application Points
- Attempt to achieve application on nerve or muscle areas
- Bone and fat act as insulators and should be avoided when possible

Since muscles and nerves are controlled by electrical impulses from the brain, the key to proper utilization of the EID is to disrupt and/or confuse these areas by adding more electrical signals that the areas are accustomed too, which leads to the desired effect of immobility and loss of muscular function to react and resist.

Fat cells and Bone, which is a less porous material, do not rely on electrical impulse for function control and therefore striking the skeletal system or fatty tissue area with an electrical shock is very ineffective.

## Areas to Avoid When Possible and Practical Training Directive
Environmental
- Presence of Gases
- Atmosphere

Persons
- Body
- Conditional

Presence of flammable gases such as propane or even fumed gasoline could ignite an airburst fire when an electrical spark is introduced. If there is indication that a flammable gas is present, utilize alternate force options.

Be aware of effects of water, humidity, etc in regards to electricity and the human body especially in regards to the reduction of body resistance to electricity. Also, use extreme caution when using the device on an individual in proximity to a fall hazard such as a building rooftop, etc as a fall may seriously injure or kill the suspect or pose danger to the officers involved.

Body size and weight as well as physical condition also play key roles in the effectiveness of the Stinger. Be aware that electricity has different effects on different people as well.

STINGER000822

## Areas to Avoid When Possible/Restrictions/Contact Stun Mode (CSM)

The following is a list of environmental and individual conditions where the stun device should NOT be used, applied, or areas to be avoided in the Contact mode. However, points of application cannot be selected in the firing mode.

I. Environmental

    A. Gases

        1. _____    2. _____

        3. _____

    B. Atmosphere

        1. _____    2. _____

        3. _____

        Rule of thumb:

        _____

        _____

II. Persons

    A. Body

        1. _____    2. _____

        3. _____    4. _____

        5. _____

    B. Conditional

        1. _____    2. _____

        3. _____    4. _____

        5. _____    6. _____

        7. _____    8. _____

                               a. _____

                               b. _____

Name: _____     Date: _____

STINGER000823



# BODY APPLICATION CHART



1. PRIMARY STRIKE        2. SECONDARY STRIKE

_____        _____
STUDENT NAME                          DATE

White: Student        Yellow: Instructor

STINGER000824

## Preferred Application Areas and Effects

**Shoulders (deltoids) and upper back:** Primary loss of upper arm strength and mobility, disorientation, then loss of grip strength and balance

**Stomach Area:** Disorientation, loss of balance, weakness and loss of appendage control

**Lower Back:** Loss of balance, weakness, loss of appendage control

**Legs** *(thighs and calves)***:** Loss of balance, weakness

**Arms** *(upper and lower)***:** Loss of strength, loss of grip strength, weakness, grip release

Application to large muscle groups will produce more of a desired effect and are generally easier targets to aim for. Target the back (upper and lower), the abdominal area, shoulders and thigh area of the legs.

When the Stinger has been applied to a combative or resisting offender and there are no noticeable results after two, four second cycles, holster the device and transfer to an alternate force option.

If two, four second applications are not effective, the need to transition to another force alternative should be attempted. An agency's use-of-force policy will usually dictate what option(s) may be available to use, depending on environment, location, availability of back-up, seriousness of offenses and an officers' physical abilities. Officers must be familiar with their agencies respective use-of-force policies.

## Areas to Avoid in the Contact Mode

**Top of neck:** Too close to the brain stem.

**Throat:** Directed pressure in the CONTACT mode could "crush" the windpipe.

**Female breasts:** The breast is a gland and susceptible to damage. Application of a stun device to the breast area would raise concerns at a later time if the inability to function as a milk producing gland became apparent. It would also be susceptible to producing significant marks because of the sensitive type of glandular tissue.

**Head:** The head has a wealth of nerve endings in it and an individual could be rendered unconscious from an application from an electrical stun device directly to the head. Also the eyes are very sensitive and susceptible to serious damage or loss of sight from a puncture wound.

**Base of Sternum** *(Xyphoid Process)***:** May cause a contraction of the diaphragm and effect breathing.

**The Groin:** An application to the groin could be viewed as torture or a sadistic act, and should be avoided.

**STINGER000825**

## Application Marks/Signature/Evidence

Application of an EID to body tissue (even through clothing) will leave marks. In the past, these marks have been referred to as burns, friction abrasions or friction marks. Further evaluation of this fact has revealed that the marks are indicative of a simple medical phenomenon know as the Lewis Triple Response. The marks should be referred to as "SIGNATURE" marks. This reference pertains only to the products described in this manual as other devices lack tested and documented output characteristics. These other devices, due to electronic irregular proportions and inadequate monitoring systems, could be capable of producing burns.

An application of an EID, as described herein, to the human body for more than 1/8 of a second (both contact probes must touch the subject), will leave the appearance of two or four marks on the skin. These marks could be evidentiary in nature. Applications through clothes will usually leave marks. The thickness and composition of the fabric will determine the ultimate effect from the device.

A thermal electrical burn occurs only if the temperature of the skin is sufficiently raised for a long enough period of time to cause tissue damage. Therefore, whether or not burns will be generated is dependent on several factors:

1. Amperage - Current flow
2. Voltage - Force in the system
3. Time Duration - Length of contact time with tissue
4. Area of Contact - (Volume) will the energized source and the ground

Such are the characteristics of the Stinger; low amperage and pulsed electrical output. Application for a sustained time period will not cause electrical burns. The evidentiary marks left as a result of an application(s) are actually signature marks or evidence. Darts fired directly into skin will leave small puncture marks which may cause bleeding.

## Variables that Determine Effectiveness

**Duration:** length of application

**Frequency:** how many times the offender is stunned and how much time between each application.

**Location:** location on the body of the application is applied to.

**Condition of Offender:** Variables that may diminish the effect of the Stinger on certain individuals.
- Mental State
- Body weight
- Drugs
- Demeanor

STINGER000826

## Post Deployment Care

Medical Assistance

  • Incapacitated Subject

Dart Removal

  • Small Puncture Marks

After deployment of the Stinger hand held stun device, the potential exists that the subject could be injured or face serious and even life threatening injuries. The officer should always pursue medical evaluation of a subject that has been affected by an EID.

Darts removed from body tissue should be treated as bio hazard material and properly handled. All darts should be retained as evidence if actually used to immobilize an individual.

STINGER000827

# 7 USE OF FORCE & FORCE CONTINUUM

A review of the definitions of *FORCE* are herein described.

Force means an aggressive act committed by any person, which does not amount to an assault and is necessary to accomplish your objective.

Lawful Force means an aggressive act committed by any peace officer in the performance of his official duties when it is necessary to accomplish any of the following:

- When necessary to preserve peace
- Prevent the commission of offenses or prevent suicide of self-inflicted injury
- When making lawful arrests and searches or preventing escapes from custody
- When in self-defense or defense of another against unlawful violence to his person or property
- When preventing or interrupting an intrusion on or interference with the lawful possession of property.

Necessary Force means the minimum amount of lawful force sufficient to achieve a legitimate law enforcement objective.

Deadly Force means force that is intended or know by the act or to cause or, in the manner of its use or intended use, is capable of causing serious bodily injury or death.

Custody means:

- Under arrest by a peace officer; or
- Under restraint by a public servant pursuant to an order of a court.

Escape means unauthorized departure from custody or failure to return to custody following temporary leave for specific purpose or limited period, but does not include a violation of conditions of parole or probation.

There are three basic restrictions that apply in the use of force. They are:

- Must be reasonable
- Must be justified
- Must be necessary

The Use of Force is a decision-making process. It would be useful to have a guide outlining parameters available in making the decision to use or to not use force, as well as how much force to use, but there is not black and white delineation.

STINGER000828

Remember on thing while making this decision. The Fourth Amendment states that:

> "all persons shall be free from unreasonable searches and seizures..."

and the courts have said that the use of force as it applies to an arrest is a seizure and therefore the amount of and type of force used must be reasonable.

Also remember that as a law enforcement officer you are not getting paid to fight. Nor do you have to stand toe-to-toe with someone and use the same level of force or type of force that they are using... you can legally escalate to that level of force that is just above the level of force that is being used to resist your attempts to gain control. Because generally you cannot gain control when you use equal force, but you must believe your actions are reasonable.

The point is, when the decision is made to use force, it must be used quickly effectively and dynamically. GAIN CONTROL, thus preventing more force from being used as counter measures.

There are no magic bullets, no ultimate panacea when it comes to using technology to implement force regarding effectiveness and safety. And arrest situation can spiral out of control, thus it becomes a match of strength only fueled by the intention of an individual not to get arrested. Officers must not only use the appropriate amount of force, but only that force necessary to overcome resistance. Respective agency policies will guide officers in where, when and how much force should be used. Officers must select the proper alternative to fulfill the need of force while not exceeding given parameters.

## Use of Force Tactics

The BUT for argument... Failure to assess alternatives; too hasty a response?

Officer are placed in situations where a weapon must be used in defense of him, fellow officers or citizens. It is at this point an officer must make a decision to de-escalate, avoid confrontation or use lethal force in split second timing.

It is always second-guessing if an officer should have kept distance or if he could have maintained distance in a secure position until additional manpower arrived. The officer MUST make that decision which ultimately determines the course of ever changing events.

There are several points here to be made:
- Officer training
- Officer judgement
- Available alternatives

Alternatives, which include hands-on physical control, must all be evaluated at the moment of confrontation and/or resistance. Although non-lethal force may be intended, death or serious injury may still occur because of human factors: misapplication, miscalculation, and excessive strength. Conversely, this can work against an officer and even be the cause of using more force.

While it is sound judgement to wait for assistance and superior odds when possible, many response situations (traffic stops, etc.) require immediate and direct action be taken.

STINGER000829

The levels of force available to an officer become even more effective with the levels of force available when electronic waveform technology is used.

## Use of Force/Policies & Tactics

Every law enforcement and correctional agency maintains established Use of Force Policies. While some of these policies are similar, others are entirely different. It is not Stinger Systems' responsibility to dictate where/when a Stinger may be deployed, but how it is deployed.

Unique as it is, the Stinger has levels of force built in from display mode to deployment in contact or dart firing modes (dart firing is a greater degree of force because it is body invasive and could cause serious injury). The following pagers will serve for informational purposes and not intended to dictate policy. They are suggestive in nature.

Basic and Advanced officer training includes recognizing individuals under the influence of drugs. Upon responding and observing such an individual, whether or not there is an intended Stinger deployment, EMT/Paramedics should be immediately contacted and deployed to the scene. An individual in such condition (cocaine induced Excited Delirium, cocaine abuse, etc.) is at a heightened critical state requiring immediate medical attention. Even if an electrical force alternative is NOT deployed, a sudden death syndrome incident may be experienced. Proactive planning is always better than reactive.

## Authority for Force

Departmental policy may dictate who can use force and when. Sworn and non-sworn officers.

State Law usually dictates who has the powers of arrest and grants them the statutory authority to use force to effect an arrest.

Federal Law gives federal officers the authority to use force. Case Law from federal courts also dictate laws and policies relating to the use of force.

## Understanding Force

NIJ Definitions of Force

- Non-Lethal Force
- Less than Lethal Force

EID's and the Use of Force

- Device is deployed with the intend of resolving a conflict without the loss of life or serious bodily injury
- The potential for the loss of life is possible

Officers must evaluate and determine what force is reasonable for a given situation using these criteria and be prepared to justify their actions in written reports as well as possibly in court. When assessing a situation, be sure to use no more force than reasonably necessary to gain compliance, and upon choosing a method to use, prepare a back up, just in case.

STINGER000830

Gaining compliance with the proper level of applied force for a situation is paramount in officer and subject safety. Ensure that the policies and regulations regarding use of force for your department or agency is followed at all times, whether using the Stinger, or any other control device or method.

## Types of Force - Alternative Force Implementation

1. Show of Force
   - a. (1) Mere presence
   - b. (2) Uniform authority
   - c. (3)Bodylanguage

2. Verbalization
   - a. (4) Ability to verbally communicate
   - b. (5) Direct commands
   - c. (6) Intimidation

3. Physical Contact (weaponless)
   - a. (7) Come-along techniques
   - b. (8) Joint restraints
   - c. (9) Pressure point control
   - d. (10) Punching
   - e. (11) Physical power restraint
   - f. (12) Pain compliance

4. Electronic Restraints
   - a. (13) Optional Compliance
   - b. (14) Repelling/grip breaking
   - c. (15) Stunning
   - d. (16) Complete, short term, non-lethal incapacitation (follow-up contact control)

5. Physical Contact (weapons) Category #1: Close contact
   - a. (17) Kubaton
   - b. (18) Chemical mace
   - c. (19) Black jacks/saps

6. Physical Contact (weapons) Category #2: Extended contact
   - a. (20) Impact weapons
   - b. Batons/PR-24
   - c. Expandable devices
   - d. (21) Flashlights

7. Lethal Force
   - a. (22) Firearms
   - b. (23) Hi-Powered weapons

STINGER000831

**A Force Continuum**



This particular Use of Force continuum model shows you that you are not locked into a step by step process of the escalation or de-escalation of force when you are in a given situation.

Using this force continuum imagine that you have been dispatched to a call involving a man with a handgun. When you arrive on the scene the subject is waving the gun wildly and telling officers to get back. There are also civilians in the area who could be in immediate danger. At this time you are authorized to use Deadly Force if necessary to protect your life and the lives of others. You point your firearm at the subject and he throws down the gun. You give him commands to get on the ground which he initially refuses to do. The subject eventually complies and officers approach the subject in an attempt to handcuff him. When initial contact is made with the subject he begins to fight with officers and a struggle ensues. You deploy your Stinger in the contact stun mode, the subject ceases to resist, and is taken into custody without further incident. During this given situation you have escalated to deadly force and de-escalated to less lethal force. You have also used your mere presence and verbal commands as use of force options during this confrontation.

STINGER000832

**Force Continuum Scale**



**Suspect:** Cooperative, but in close range with officer

**Officer:** Presence, body language, verbalization

**Suspect:** Cooperative, but must be given directions

**Officer:** Presence, body language, verbalization

**Suspect:** Not controlled by verbal direction / Passive resistance

**Officer:** Presence, body language, verbalization, intimidation, weaponless control

**Suspect:** Active resistance / Defensive status

**Officer:** Presence, body language, verbalization, intimidation, weaponless control. Chemicals, ERD

**Suspect:** Active resistance / Offensive status (no weapon)

**Officer:** Presence, body language, verbalization, intimidation, weaponless control. Chemicals, ERD, impact weapons

**Suspect:** Aggressive, posing harm to others (no weapon)

**Officer:** Presence, body language, verbalization, intimidation, weaponless control. Chemicals, ERD, impact weapons

**Suspect:** Place life in jeopardy

**Officer:** Presence, body language, verbalization, intimidation, weaponless control. Chemicals, ERD, impact weapons, firearms

Presence
Verbalization
Physical Contact / Weaponless Control
Electronic Restraints
Chemicals
Impact Weapons
Lethal Weapons

**NOTE:** A handcuffed subject may be either passive and cooperative or resisting and offensive.

**Use of Force
Alternative Enforcement Action**

STINGER000833

# ESCALATION



# DE-ESCALATION

**Transfer of Force**

Most officers know when it is appropriate to escalate the use of force but it is equally important to know when it is appropriate to de-escalate. In many cases, it may be possible to de-escalate a situation through verbal command or mere presence, which is desirable as the risk to both officer and subject diminishes. Seeing as this is not always the case, the scale here can fluctuate rapidly given potentially volatile situations. Be prepared for anything.

STINGER000834

## ACLU Policy #207

A police officer may not use a degree of physical force - which is greater than that for which there are reasonable grounds to believe are necessary to stop an ongoing crime, effect a lawful arrest, prevent an escape from custody or defend himself/herself or a third person from what s/he believes to be imminent danger. Use of deadly physical force by a police office is permissible only when s/he reasonably believes there is an imminent use of deadly physical force against himself/herself or a third person.

"Deadly physical force" refers to any physical force, not just firearms, which under the circumstances in which it is used is readily capable of causing death or other serious physical injury.

"Police training must include instruction on the techniques involving a gradually escalating degree of force for stopping ongoing crimes, effecting arrests, preventing escape from custody, and defending both the police officer and third persons from physical harm. Police officers must be trained in the use of alternatives to firearms and other non-deadly techniques, and must be required to use those techniques before they may resort to deadly physical force, unless immediate resort to deadly physical force reasonably appears necessary to prevent the use of imminent use of deadly physical force against the officer or a third person". (Board Minutes, June 12- 13, 1982)

*Current policy language of the American Civil Liberties Union as established by the National ACLU Board of Directors, and set forth in the official ACLU Policy Guide.*



360 South Third Street, Suite 150
Columbus. Ohio 43215
(614) 228-8951

STINGER000835

# STINGER TACTICAL DEPLOYMENT & PRACTICAL ASPECTS DEVICE CAPABILITIES

The Stinger has 2 modes of operation. *Contact* and *Distance*. Within these modes are additional levels of less-than-lethal force.

**Mode 1 - *Contact*** (Without cartridges in or cartridges already discharged) A unique feature of the S-200 permits the unit to be carried while loaded. However, if required, the cartridge can be quickly ejected with the trigger finger.

### 1. Display (Optional Compliance)
An audible and visible display of electricity is usually enough to back someone down. It demonstrates more force than possessed by a suspect/subject. It serves as a deterrent.

### 2. Repelling
Momentary contact of 1-2 seconds will push away or keep an attacker at a distance. It is also capable of inducing a release action.

### 3. Stunning
Actual momentary immobilization by means of 2-4 seconds (1 cycle) will "surprise" or stun an individual.

### 4. Sustained Contact
A prolonged application of 4-8 seconds (2 applications) will place an individual in non-lethal short-term incapacitation, thereby permitting follow-up control.

**Mode 2 - *Distance*** (Standoff)
Use of the Stinger is relatively simple: grip, sight picture, sight alignment, trigger squeeze, objectives of use.

### 5. Firing/Repelling
Once fired, momentary contacts will keep an attacker at a distance. It is also capable of inducing release actions.

### 6. Firing/Momentary Stun/Momentary multiple bursts from the Stinger
Actual momentary immobilization (attention getter, but could be prone to aggravation)

**STINGER000836**

### 7. Firing/Sustained Stun/Maintaining contact with the trigger

A prolonged application of 2-4 second cycles will place an individual in non-lethal short-term incapacitation, thereby permitting follow-up control.

The Stinger is not designed to be a quick draw impromptu weapon although it may have to be deployed quickly by one officer. It is a specialty device designed to be used where and when lethal force is not required - where there is a high risk of serious physical resistance difficult to overcome. Anytime an officer must get physical to overcome resistance, there is a potential of both officer and violator/aggressor to get injured. Is this force not enough or is it too much? Many arrests, due to circumstances, are like trying to put an octopus in a coke bottle. If properly used (time and place), the Stinger is intended to prevent additional and greater force from being used because it potentially could terminate the confrontation. All physical encounters are fluid and rapidly unfolding.

There are two distinct uses of the Stinger:

**Spontaneous**
One-on-one/officer against violator where a situation quickly requires deployment to contain and control hostile activity.

**Standoff**
Where a violator is contained and time permits responding officers to respond as a team. One or two officers serve as Stinger operators or stands by with lethal force in the event the situation escalates to deadly threat or encounter. The other team officers become the control personnel where they will handcuff and secure the subject.

By far, the standoff scenario is the safer of the two because it allows for planning, whereas the spontaneous situation is more dangerous because of a lack of available manpower. The team response concept should be practiced with two, three or four officers facilitating efficient control tactics. One-on-one tactical deployment should also be practiced as an officer survival factor.

The Stinger is designed to subdue an individual by means of short-term non-deadly incapacitation, but follow-up physical contact is inevitable. Furthermore, it is always a possibility that even after the Stinger is applied, it may not have an effect, requiring physical force being used.

## Distance Firing vs. Contact Mode

It is a well-known fact that most law enforcement encounters take place within arms reach (WAR). When resistance is incurred within hands-on proximity, the contact mode (CM) should be used when and where possible. Firing the device at such close range serves little purpose from the standpoint of lack of dart separation, although most agencies prefer the weapon to be carried with cartridges loaded. The point here is that even when the cartridges are not locked in, the Stinger is still loaded with high voltage of non-lethal electronic waveform pulse technology available in the contact mode. Placement of the device on the body is often times selective whereas the firing mode is prone to injury from the aspect of darts penetrating the skin and/or impacting an eye, breast or groin area.

STINGER000837

The contact mode reflects an extension of an officer's arm loaded with immobilization power. The firing mode promotes distance but reflects possible injury from dart penetration. All of these factors must be assessed during confrontation. The point is that an officer goes hands-on 100% of the time during a physical arrest. Use of the contact or firing mode becomes a reasonable and conscious decision.

STINGER000838

# LIABILITY ASPECT & COURT REVIEW

## Documentation of Deployment

- Written report by officers involved
- Facts involving the incident
- Criminal charges
- Injury/Non-injury
- Secondary injuries
- Photographs
- All officers involved should file a written report.

Be clear and concise when explaining the facts of the incident, making sure to cover the totality of the situation and steps taken to the point of force being applied. This will show that attempts to de-escalate the situation failed, and that the force applied for a particular incident was justified.

Reporting of all injuries whether primary or secondary will help to exonerate officers from liability charges after the fact in the case of subject injuries, and help substantiate the force applied in a situation in the case of officer injuries. Take photographs if there are visible secondary injuries and if available, make the Tru-Vu™ recordings available for evidentiary review. Take photos only after the wound has been cleaned, safety first.

## Testifying in Court

- Wear a small badge, don't be a macho cop.
- Be prepared, prepare clear, concise reports and testify directly from your report. Deviation in story told to report may lessen your credibility. Be sure to explain in full detail the situation as it happened.
- Put the jury in your shoes. Look directly and relate your story to them, if you were in fear tell them. You want the jury to completely understand why force was applied, the reasoning for it, and what justified its use on the level that the force was used.

## Areas of Civil Liabilities

- Excessive force violations
- Technology not being implemented
- Technology not being provided to officers
- Liability factors can be diminished through proper training and implementation of agency policies and procedures

STINGER000839

Use of the Stinger will reduce excessive force violations and complaints.

Department may be sued by the subject or subjects family if the technology is available but not made available to officers therefore forcing the officer to resort to another force option which may cause severe injury or death to an offender.

Department may be sued by the officer or officer's family if the technology is available but not made available to an officer therefore causing the officer to be injured due to less lethal weapon not being available to them.

## Caldwell v. Moore
*US 6th Circuit Court of Appeals, 1992*

The court affirmed "It is not unreasonable for the jail officials to conclude that the use of a stun gun is less dangerous for all involved than hand to hand confrontation."

Further there was no deliberate indifference as plaintiff did not suffer a serious deprivation because his injuries were not serious enough to require immediate medical attention.

Allegations were brought against correctional officers who had utilized the contact stun device to subdue an inmate. The inmate claimed that his 8th amendment rights against cruel and unusual punishment had been violated with the use of this device.

Upon reviewing of the evidence in this case, the court decided that electric stun devices when used properly and in justified circumstances were not violating the 8th Amendment, and would only be doing so if used improperly as a device of torture.

This case basically states that the use of an EID is not cruel and unusual punishment and does not violate the 8th amendment.

## Haynes v. Marshall
*US 6th Circuit Court of Appeals, 1989*

The court affirmed where allegations of excessive force are concerned, it must be determined if the force was applied "maliciously for the purpose of causing harm".

Allegations were brought against correctional officers who had to forcefully remove and subdue an inmate who had not taken prescribed anti-psychotic medication. The inmate during the removal had acted violently towards the responding correctional officers who placed him in a "strip cell" where he later died due to injuries suffered in the struggle. It was alleged that the inmate was beaten to death by the officers who violated his 8th amendment rights against cruel and unusual punishment.

It was determined by the court that the officers had acted appropriately in dealing with the circumstances presented. The court detailed that in order for a use of force incident to be violating the 8th Amendment, the force had to be applied "maliciously and for the purpose of causing harm" to the subject.

**STINGER000840**

## Considerations Regarding In-Custody and Sudden Deaths

Subduing and controlling violent and aggressive subjects during law enforcement encounters has been an ongoing endeavor of the Criminal Justice System.

Defensive tactics utilizing physical hands-on contact methods has always been primary use of force to control violent behavior (resisting arrest, assaults, etc.). It is during such activities that officers and suspects alike get injured. Often times a greater degree of force must be used to counter the aggressive nature of would be violators.

To assist officers in these use of force situations, a myriad of alternative tools have been invented. All have been implemented with one though in mind - to minimize time an officer must spend in a confrontation thereby reducing the chance of a greater amount or degree of force.

Unfortunately, a great portion of today's violators is on drugs, mentally ill, intoxicated or a combination of the three. Not only does this place innocent bystanders and enforcement personnel at great risk, but it also places the individual at significant risk from unknown personal undetected medical problems.

Extended fighting and struggling with officers after a foot pursuit places an abnormal strain on the heart. The combination of adrenalin rushes followed by adrenalin dumps and use of alcohol and/or drugs combine to form a potential of a lethal outcome. That outcome may happen even if no tools or alternatives were used. Now if an officer uses OC Spray or electronic immobilization technology as an assisting tool and the encounter results in a fatality, the death will be blamed on the tool, not everything that happened prior to using it. Even being unable to catch a breath after a severe struggle can result in death. It is human nature to blame an outside stimulus, not the individual who resist arrest and has willfully ingested unknown quantities of drugs and/or alcohol.

Indeed incidents involving sudden death while in police custody is an increasing phenomenon largely due to the increased use of illicit drugs. Determination of cause of death is often problematic, regardless of the causative rendered conclusions. Most deaths follow violent struggles with law enforcement officers and create potential for significant legal ramifications. Often times little pathological evidence is gather as the result of autopsies. The truth of the matter is that technological alternative (stun guns) are a benefits because they are actually intended to (and do) reduce the time spent in a physical altercation thereby reducing strain and stress on the body - even possibly preventing heart attacks in borderline situations.

Moreover, there is a lack of (or difficulty) interpreting pathological evidence. The cause of death may be misattributed to police action. Importance must be placed on the evaluation of the history, circumstances surrounding death and the fatal environment.

Research suggest that four or more conditions may account for the majority of custody-related deaths: positional asphyxia, cocaine abuse and alcohol intoxication, excited delirium, and neuroleptic malignant syndrome. The point is that an individual may have died anyway without the use of a stun device or OC Spray. After all, it is easy to blame the car not the driver. I guess it is very simple: Don't fight back, don't resist arrest - you probably will not die from that arrest incident.

STINGER000841

### Positional Asphyxia

This occurs when the body position interferes with breathing resulting in asphyxia. Usually maximally restrained individuals placed in a prone position. Unless seated upright after restrained, may become quiet and active. Breathing becomes strained and subsequently breathing stops. Further susceptibility can be experience due to alcohol/drug intoxication.

### Cocaine Abuse and Toxicity, Alcohol Intoxication

Cocaine is a agent that stimulates both the central nervous and cardiovascular systems. Pharmacologically cocaine constricts the blood vessels, elevates heart rate, raises blood pressure and body temperature and ultimately affects the nervous system. These effects alone have produced legal anatomic catastrophes in individuals without underlying pre-existing anatomic disease. Cocaine has also been know to cause death in cardiovascular incidents where there is no abnormality (ref: Mittleman & Wetlie 1987). These effects can substantially compromise an already diseased heart and potentially culminate in death. Or course, the quantity and quality of drugs will impact the result. Add alcohol and it substantially increases the risk of sudden death when mixed with cocaine. Cardio toxic effects of alcohol potentates the cardio toxic effects of cocaine, thus increasing the risk of overdose death.

### Cocaine Induced Excited Delirium

Excited delirium is an acute mental disorder characterized by disorientation, impaired thinking, hallucinations and illusions. Behavior is consistent, purposeless and often violent. It can also be part of bipolar disease (manic depressant), schizophrenia and/or acute drug intoxication such as cocaine, PCP and amphetamines. Although treatable in onset, it is considered a medical emergency. Cocaine-induced excited delirium fatalities ten to occur in a stereotypical manner with individuals exhibiting similar behavior. Intense paranoia followed by violent and/or bizarre behavior: running, screaming, stripping off clothing. Subjects appear psychotic, exhilarant, great strength and have diminished threshold of pain. Sudden death occurs either during or immediately after a struggle. Autopsy findings are generally non-specific, revealing only injuries sustained from the struggle with officers.

### Neuroleptic Malignant Syndrome

Characteristics are similar to excited delirium but generally occur in psychiatric patients who are taking anti-psychotic medication. Physical exhaustion, dehydration and organic brain disease are predisposing factors. Individuals who are not being treated with medications can be diagnosed as acute exhaustive mania. This could also relate to a cardiac event due to stress. Psychological stress can indeed induce fatal heart events, however autopsy finding are generally negative, seldom revealing a pathological cause of death.

Once again, add the elements of alcohol, a struggle with officers, and respiratory problems - all are additional factors, which may not be detected but significant contributing factors to a fatal outcome.

If using technological alternatives - electronic stun technology, OC Sprays, rubber bullets, etc. - the obvious blame of death or cause of fatalities will be focused upon that specific tool when in essence, that tool averted longer drawn out confrontations.

STINGER000842



# BASIC CERTIFICATION - STINGER SYSTEM ACKNOWLEDGMENT

I, _____, an officer with the _____
Agency, in the city of _____, in the state of _____, do hereby
acknowledge receiving training in the use of the Stinger System and agree to use the System pursuant to the
guidelines and policies as set forth by my agency.

Furthermore, I fully understand that I could be held criminally and civilly liable should I intentionally and without
provocation activate the described product without just cause, or with the intention of causing torture, while it
is being worn by a designated individual.

I further understand that this is a device for purposes of control and will maintain my best efforts to preserve
the peace and prevent a crime from being committed in my presence.

_____          _____
                NAME                                        WITNESS

_____          _____
                DATE                                    INSTRUCTOR NAME

_____


**CHECK AND SIGN EITHER #1 OR #2 - <u>NOT</u> BOTH**

☐  1. I HAVE READ MY AGENCY'S POLICIES PERTAINING TO GUIDELINES OF USE FOR THE
    **STINGER** SYSTEM AND UNDERSTAND SAME.

_____          _____
            SIGNATURE                                      DATE


☐  2. I HAVE NOT YET READ MY AGENCY'S POLICIES PERTAINING TO THE **STINGER** SYSTEM
    BUT WILL DO SO <u>PRIOR</u> TO MY USING THE SYSTEM.

_____          _____
            SIGNATURE                                      DATE


**White: Student      Yellow: Instructor**

**STINGER000843**

# ▉ BATTERY
# 10 INFORMATION

With focus on battery maintenance as an essential factor for device operational efficiency, the power source becomes a key to unit acceptance. The power source is the "heart" of the device.

Batteries have limitations regarding maintenance and actual uses per charge. Each unit is restricted by its own battery limitations. The Stinger was engineered around a consumer buyable and replaceable lithium battery power source. This designated power source offers ultimate performance while remaining readily available and makes the device "user friendly".

Working with lithium batteries, a more than adequate power source has been developed to power several different stun devices. The significance of this development reflects a virtually maintenance-free power source good for many activation prior to replacement. Lithium batteries, known for their prolonged shelf life, have been used in emergency medical equipment as back-up power sources and in cameras because of extended power output capabilities.

Use only the designated battery in respective devices.

⚠ **CAUTION:** *A low battery will not properly cycle the respective device and could virtually "energize" the individual it is used upon. Thus, it is crucial to maintain proper battery levels. Units should not be needlessly or carelessly played with.*

## General
Various EIDs have different requirements in the way of individualized power sources. There have different types of batteries due to the demands of the respective units.

| Power Source | Effective Operating Time | Battery Stock# |
|---|---|---|
| Four 3-volt Lithium | Approximately 200 firings | Duracell® CR-2 |

Available directly from SSI and world wide availability off-the-shelf.

Do NOT use alkaline batteries or any other battery not listed above.

Temperature range for batteries: -40° F to 167° F

## Lithium Battery Power Source Applicable to the Stinger
Inherent characteristics of lithium batteries portray an extremely long shelf life with significant power retention. Voltage demand draws minimal power while offering peak

STINGER000844

performance. Circuit design and electronic components found in the Stinger permit the designated lithium batteries to operate the respective devices for up to 200 firings prior to replacement.

The 3-volt lithium battery cell (Duracell®) has a shelf life of 5 years, prior to deterioration of operational capabilities, to properly cycle the unit. Although the battery cannot be recharged, for most practical correctional, law enforcement or military applications the battery(s) should be sufficient for 12 months of service.

## Training Information

The specified lithium battery has extended operational power to cycle the unit. Therefore, any combination of seconds for applications, up to the indicated amount of available power because there is no degradation on a daily basis.

SSI recommends replacing lithium batteries every 12 months or when the LED indicates, whichever occurs first. Closely monitoring daily uses of the device and documenting such activities could indicate more frequent replacement as could humid environmental conditions. Care must be taken not to exceed the upper limits of allocated power.

⚠ **CAUTION:** *Temperature variables, such as extreme heat or cold, will automatically discharge any battery to unknown proportions. Care should be taken not to store or leave a unit in a vehicle for prolonged periods of time as the battery(s) will discharge.*

*Lithium batteries **CANNOT** be recharged. Discard properly after useful life.*

## Tips

- Store extra batteries at room temperature
- Do not attempt to charge a lithium battery
- Use only the specified battery(s) for respective units
- Replace batteries every 12 months or when indicated by system

## Stinger Power Source & Battery Specifications

The power source of the Stinger was designed focusing on three (3) important factors:

- Performance
- Cost Effectiveness
- Availability

⚠ **CAUTION:** *Do not attempt to charge or discharge a lithium battery. Do not use anything other than specified battery.*

## Unique Feature of the S-200 ASM (Auto Sleep Mode)

The S-200 is equipped with a very unique feature to prevent the battery from draining in the event the unit is inadvertently left in the "ON" position. If the user forgets to turn the unit "OFF" or if it is unintentionally left in the "ON" position, it will ONLY remain on

STINGER000845

for 4 minutes, than automatically convert to a "sleep mode". If it has not been used for four minutes it will remain *"ON"* but asleep instantly ready for use only without the use of the laser.

### Operation Status

If left on, after 4 minutes the unit goes to sleep. The LED will blink approximately 2 times per second to alert the user that the S-200 is live and *NOT* off.  It is not necessary to turn the unit off and than back on if the lights are blinking. It may be immediately fired *(aim and shoot)* however, the manual site will have to be used because the laser will not be functioning. After it is fired, the S-200 will "wake up" and the laser and LED will function and normally operate. If the sleep mode is detected  and use of the unit is not immediately required simply turn the unit *"OFF"*.

Please note that this is a safety feature of the device to minimize battery rundown and the unit should be turned off after each intended use and verified at the end of the shift.

STINGER000846

# ⬛1 WEARING THE STINGER/ SIZE REQUIREMENTS

### Duty Belt

Because of the size of the Stinger, many officers are concerned about wearability. The S-200 is compact and may be worn very comfortably by officers regardless of size.

The Stinger is designed for proven assistance or power enhancement; therefore it should be worn and used weak side (weak hand) or cross-draw. Always leave the weapon hand (strong hand) free for immediate action, especially for handgun use.

Holster design permits the device to be worn on the duty-belt for regular belt placement. Duty-belt size may necessitate sacrificing some equipment however SSI makes no suggestions as to what an officer should delete from the belt.

### Size

The size of the Stinger is a key issue to psychological deterrence as well as functional use.

The obvious appearance of the device alerts adversaries to an officer's possession of some type of distinctive but unknown weapon. It gives the user a "psychological" advantage as many individuals do not want to resist if they are aware that enforcement action involves using a weapon. The ominous appearance of the Stinger, especially with the electricity crashing from probe to probe, provides an officer with the tactical edge. And for those who choose to ignore the visible recognition when the Stinger is pressed into service, it gives a textbook performance.

Although not 100% effective on everyone, actual combat field testing shows increased takedown capability for shorter applications and longer lasting results affecting more individuals than ever before, including subjects intoxicated or under the influence of drugs.

STINGER000847

# HANDS ON - PRACTICAL EXERCISES

## Hands On - Basic Techniques

Basic applications should be demonstrated for the students. They should physically practice the techniques in an effort to demonstrate a minimal level of proficiency.

1. Grasp/Grip

2. Floating Arm Technique

3. Balance

4. Bear Hug (approach from rear)

5. Frontal approach left (or right) arm swing Lock arm/pull suspect in/apply device

6. Frontal approach right (or left) arm swing - Force arm around in applicable direction, grab around throat/pull back/apply device to lower back or kidney area.

7. Front Choke - two hands on throat (against officer) - Apply device to upper chest area by shoulder - left hand to right shoulder or right hand to left shoulder.

8. Arm-bar Choke against officer from rear - Press device against suspect's upper forearm to cause a near immediate release, then drop down with arm and apply the device to the lower torso or leg area of the suspect behind you.

9. Vehicle extraction: DWUI or resistant suspect - hands on wheel - Apply device to back of hand or upper forearm to break grip/lock of the exposed arm back and pull suspect toward you applying device to underarm area. Extract and handcuff.

**NOTE:** *This training session is not intended to replace the use of defensive tactics. This program cannot make anyone a defensive tactics instructor, but it will offer a foundational approach to the use of electronic immobilization devices.*

## Hands On - Tactical Training Session

This section is directed toward actual application of the device to a suspect/subject.

1. Proper grip - make sure the device is held in the appropriate hand (strong hand/weak hand) as per Instructor explanation. Maintain a firm, tight grasp while maintaining contact of the first joint of the index (left or right) finger with the activator switch.

STINGER000848

2. When finished with the device, place it in the corresponding holster. Never throw it on the ground after an application to affect an arrest, as it may be necessary to re-apply it a second time. Keep the device in its holster. Repeatedly dropping the device could damage it.

3. Upon application, maintain contact for as long as possible, up to, and a short time after, resistance has noticeably been terminated. A short application could result in the necessity of a second or third to achieve the desired results. If no results are apparent after eight (8) seconds of constant application, conventional or secondary methods of control should be employed. It is difficult to maintain contact in struggling situations, but failure to do so could result in non-effective uses.

4. Any attempt to subdue or restrain an individual by means of an EID should be in conjunction with "HOLDING" onto that individual. By firmly grabbing the individual, contact with the ground will be minimized and sustained device application will be maximized. Pull the suspect into you while pushing against him/her with the device.

NOTE: *Training in this area is suggested on an ongoing basis and can be designed to lengthen a given program. Repetitive training in tactical applications will generally increase device effectiveness.*

5. In contact mode do not "thrust" the unit. Most confrontations are by general rule, a wrestling or grappling type of situation. Where distance is apparent, the stun device should be employed in the firing mode. Nor should it be used against a handgun or knife. Maintain arm flexibility when applying the device as the body will tend to jump back during combat use. If an arm is in a full thrust position and body weight is not properly shifted, the device will break contact with the point of application.

6. Most effective applications are primarily by two officers: (1) as an "interference" officer and (2) as the applicator or "control" officer. However, successful applications by one officer are the basic attribute of the device. Elements of surprise, effectiveness and technique knowledge will provide the officer with a tactical advantage.

7. A loud crackling noise will indicate non-contact. A good, solid contact will be indicated by a muffled noise. Be cognizant of the fact that a sustained application will promote an individual to possibly scream and swear. These actions usually result in an officer removing the device too quickly. MAINTAIN CONTACT to effectively break resistance.

8. The overall dimensions of the unit (7.8 L x 2.5 W x 1.68), permit it to be easily grasped. Research has indicated the smaller the unit, the more chance of dropping it during a confrontation.

STINGER000849

## Practical Exercise

- Identify nomenclature
- Manipulate Stinger controls
- Demonstrate use of laser aiming device
- Demonstrate contact stun
- Demonstrate trigger pull activation
- Exposure to dart tape application
- Perform two deployments for qualification
- Practical Scenarios

These practical exercises will help develop familiarity with the STINGER HANDHELD PROJECTILE STUN GUN. Please make sure that you have a firm understanding of how the device is set up, how it operates, and its limitations. Once familiarization is complete, you will be run through a series of practical scenarios utilizing the Stinger as a force option.

STINGER000850



# FEATURES OF THE STINGER S-200



## FEATURES

| | | |
|---|---|---|
| [1] Safety Mechanism On/Off Switch | [5] LED Display | [9] Manual Site |
| [2] Battery Compartment | [6] 4-Second Light Indicator Counter | [10] Side Illumination |
| [3] Cartridge Ejection System (CES) | [7] Laser Site | [11] Trigger |
| [4] Recessed Cartridge Bay | [8] Battery Strength Indicator Light | [12] Electrodes for Contact Stun Mode |

STINGER000851



# SPECIFICATIONS OF THE STINGER S-200

The S-200 is a new proprietary waveform utilizing the latest electronic technologies. Unlike, other stun technologies, the S-200 specifications do not compare on an apples to apples basis because many factors of the waveform make it not truly useful to compare. For example, competitors use pulses per second while Stinger believes using pulse groups per second is a much more effective waveform to incapacitate muscles. The S-200 utilizes up to 63k volts in the open circuit which allows for better "pushing" power through clothes, yet drops significantly when under load (hits a human). Also, while the S-200 DC (direct current) mA's is higher than competitors, the S-200 puts *significantly* less AC (alternate current) into the subject than our competitor. AC has been known to burn tissue. We have strived to focus on impact on the body while trying to reduce unnecessary currents to the body.



| Pulse Rate: | 32 pulse groups per second |
|---|---|
| Pulse Duration: | 300us to 400us |
| Peak Arc Volts: | 63KV |
| Peak Loaded Voltage: | 1300v |
| DC Curr Avg: | 5.0mA |
| Energy at Main Capacitor: | 0.60J |

Dart Included Angle: 5.5°
Spread Rate: 0.1228 in/in

| DISTANCE | SPREAD |
|---|---|
| 5 Feet | 5.777" |
| 10 Feet | 11.555" |
| 15 Feet | 17.332" |
| 20 Feet | 23.109" |

STINGER000852

## 1.1 Mechanical/Visual/Operational

**1a) Housing:** high impact polymer

**1b) Overall Dimensions:** 7.6 inches long by 3.9 inches tall *(not including sights)* and 1.7 inches at widest point.

**1c) Weight** *(with batteries)*: 0.8 pound; (13 oz)

**1d) Display Lamp Operation:** Rear Display with two bar-graph-style displays. Upper row is Firing-Progress lamps and lower row is Battery-State lamps.

* **Progress Lamps:** four red lamp bar-graph display; indicates seconds trigger is pulled

* **Battery bar-graph display:** indicates lithium battery voltage. It is measured before and after a firing sequence. Lamp indicators have the following approximate volt-meter calibration:

  * Green = "good"; Vbat > 10V

  * Yellow = "weak" ; Vbat > 8.0V but < 10V

  * Red = "nearly exhausted"; Vbat < 8.0V; gun will not fire but laser still works if possible

**1e) Safe-Switch Operation:** slide type switch with contrasting yellow color; Pushed-far left is OFF *(only internal clock runs)* and pushed far right turns gun ON and is ready for firing *(unless placed in Data-Dock)*.

**1f) Hot Standby Mode:** If the gun is left ON for greater than 4 minutes (+-15 sec) without the Trigger being pulled, then, to conserve battery power, all lamps and the laser illumination change from a continuous ON to a flashing mode of about 2.5 flashes per second. None-the-less, the gun's Trigger may pulled at any time and the gun will fire without delay. The lamps will thereafter illuminate continuously for another four minutes and the process will repeat. This reduced power mode will increase standby battery life by over five times.

**1g) Programmable Gun Operation:** There are three trigger operational modes which can be selected by a data download from your PC using the S-100 Data-Dock and S-200 Console software. These operational modes behave as follows:

If the gun is ON and not in a Data Dock, then after the trigger is pulled, firing operation will continue for a minimum and maximum firing time as follows:

* **Manual** *(factory default)*: 0.1 second to 4 seconds

* **Semi-Automatic:** 1.0 second to 4 seconds

* **Automatic:** 4 seconds only


## 2.0 Environmental

* **Foreign Matter and Water Ingress rating:** IP43 (per IEC 529)

* **Temperature Range:**
  **Storage:** -20° C to 48° C; **Operating:** -5° C to 45° C

* **Humidity:** 10% RH to 95% RH, non-condensing

* **Altitude:** sea level to 10,000 ft.


## 3.0 Power

Powered by four replaceable photo-flash style, lithium batteries; type CR123
 * **Battery Life:** over 300 firings of four seconds each (Tamb > 15C)

STINGER000853

## 4.0 Laser

**Wavelength:** 635 nm; < 1mW, Spot Diameter: < 6mm at 5 meters distance
Laser is enabled anytime the Safe-Switch is On. *(It is not enabled by the automatic Power-On feature when placed into the Data Dock station.)*

## 5.0 Output Characteristics

**5a) Waveform:** Complex neuro-stimulation optimized pulsatile waveform *(NerveLok™, patent applied for)*

**5b) Pulse Rate:** 30 pgps typical *(pgps = pulse groups per second)*

**5c) Pulse Group's Duration:** 300 microseconds first group; 400 microseconds second group

**5d) Peak Open-Circuit arcing voltage:** 63,000 volts

**5e) Peak Loaded voltage *(1100 ohms)*:** 1300 V

**5f) Current:** 5 mADC *(average DC current in pulse groups)*

**5g) Energy per Pulse:**
  At Main capacitor bank: 600 milli-joules
  Delivered to load: 72 milli-joules per pulse group

**5h) Power Rating:**
  At Main capacitor bank: 9.5 watts nominal
  Delivered into load *(1100 ohms)*: 2.3 watts

**5i) Maximum Firing Time (before requiring a trigger release):** 4 seconds nominal (+- 0.4 sec)

## 6.0 Data Logging Specifications

**6a) Data Logged:** After the Safe switch is enabled *(and the gun is not in a Data Dock)*, each trigger pull causes the following data to be logged into an internal memory. The user need not initialize the clock for proper logging.

  * Time and date *(1 sec. steps)*

  * Duration of trigger pull *(0.1 sec. steps)*

  * Loaded Battery Voltage *(0.056 V steps)*

**6b) Logging capacity:** 1300 records before over-write of oldest data

**6c) Minimum Clock Run Time with Battery Removed:** 10 hours

**6d) Clock Rollover Period:** 30 years min.

**6e) Identification Memory Storage:**

  * **User identity field:** up to 64 characters

  * **Manufacturer's identify field:** up to 32 characters

## 7.0 Test and Status Features

The gun's internal microcomputer has several built-in features under command control by the PC console software via the Data Dock which permit testing and status checks.

**7a) Status Request:** This command will data upload gun serial number, software revision number, current battery voltage, capacitor bank voltage, clock seconds value, and Trigger mode presently stored. This command also slowly discharges the capacitor bank to permit capacitor bank testing in concert with the next command.

STINGER000854



# ABBREVIATIONS & DEFINITIONS

## Abbreviations

**CCC -** Close Contact Confrontation

**EID -** Electronic Immobilization Device, Stun Device, "Stun Gun"

**EPT -** Electronic Pulse Technology

**ERD -** Electronic Restraint Device, Stun Device, "Stun Gun"

**NMIW -** NeuroMuscular Incapacitation Waveform

**QFT -** Quantum Flyback Technology

## Definitions

**Amperage -** the strength of amperage established current expressed in

**Ampere -** a unit of electric current in the meter-kilogram-second system

**ASM -** Auto-Sleep Mode

**Battery -** a device for generating an electrical current by chemical reaction; a source of continual power

**Electricity -** current used or regarded as a source of power or derived from a defined source of power

**Electronic Pulse Technology -** a high voltage, low amperage discharge system combining electricity with frequency. Often referred to as a non-linear muscle relaxer as used for nerve or muscle stimulation within the medical profession

**Event -** each occurrence where a device is used from start to finish

**Joules -** the International System unit of energy equal to work done when a current of one amperage is passed through resistance of one ohms for one second. A measurement of one watt second

**Non-Lethal -** not likely to cause death

**Ohms -** a unit of electrical resistance equal to that of a conductor in which a current of one ampere is produced by a potential of one volt across its terminal; a unit of measure

**Resistance -** the opposition to electrical current characteristics of a medium, substance or circuit element

STINGER000855

**Signature -** the evidentiary marks left by the application of an electrical stun device

**Watt -** a unit of power in the International System equal to one joule per second

## Common Electrical Terms

**Voltage:** The measure of electromotive force in the system

**Amperage:** The measure of current flow per unit time

**Ohm:** Unit used to measure resistance to the conduction of electricity

The flow of electricity in relation to passing through an object is specifically described in terms of *Voltage*, *Amperage*, and *Ohms*, each of which play a role in the passage and effect of electricity on the human body.

STINGER000856



## CLASS OVERVIEW, REVIEW & ACKNOWLEDGEMENT

1. Review and understand agency policy/procedures and protocol regarding respective product use.

2. Never use an immobilization device to attempt to gain information from an individual by threatening.

3. Never use an immobilization device to intentionally inflict torture, abuse, self-gratification and/or punishment.

4. Be aware of the areas on the human body and gender restrictions where an EID should not be applied.

5. Be aware of the maintenance aspects of the respective EID.

6. Know where and how an EID may be used in and during USE OF FORCE incidents and the relationship between the need for force and the actual force applied.

7. Be aware that this technology does not affect everyone the same way.

8. Be aware that this is a device designed for immobilization and control and NOT as an offensive weapon.

9. Be aware that an EID is an alternative and must be used at the proper moment.

10. Know your own limitations with an EID.

I fully acknowledge receiving training in the above mentioned areas and understand my responsibilities when using an ELECTRONIC IMMOBILIZATION DEVICE.

| | |
|---|---|
| NAME | AGENCY |

| | |
|---|---|
| INSTRUCTOR (PRINT NAME) | DATE |



# INSTRUCTOR REFERENCE GUIDE STUDENT PERFORMANCE OBJECTIVES PRACTICAL EXAMINATION FOR USE OF ELECTRONIC STUN DEVICE

Student Name: _____ Date: _____

Agency: _____ Class Location: _____

## NOTE: #1-19 ARE <u>MANDATORY</u> FOR CERTIFICATION, #20 & 21 ARE OPTIONAL

| | | ACCEPTABLE | UNACCEPTABLE |
|---|---|---|---|
| 1. | VERBALIZATION | _____ | _____ |
| **CONTACT MODE (no cartridges)** | | | |
| 2. | WORKING SAFETY ON/OFF SWITCH | _____ | _____ |
| 3. | DISPLAY (AIMING) | _____ | _____ |
| 4. | OPTIONAL COMPLIANCE MODE | _____ | _____ |
| 5. | TARGET AREAS | _____ | _____ |
| 6. | VEHICLE EXTRACTION | _____ | _____ |
| 7. | SEARCHING | _____ | _____ |
| 8. | GRIP RELEASE | _____ | _____ |
| 9. | MAINTAINING CONTACT | _____ | _____ |
| 10. | ARM LOCK/UPPER CHEST APPLICATION | _____ | _____ |
| **FIRING MODE** | | | |
| 11. | LOADING CARTRIDGES | _____ | _____ |
| 12. | MANUAL UNLOADING | _____ | _____ |
| 13. | CARTRIDGE EJECTION | _____ | _____ |
| 14. | TRANSITION TO CONTACT MODE | _____ | _____ |
| 15. | FIRING FROM 5 FEET | hit _____ | miss _____ |
| 16. | FIRING FROM 18 FEET | hit _____ | miss _____ |
| **APPLICATIONS (unloaded device/contact mode)** | | | |
| 17. | SELF APPLICATION TO THIGH | YES ☐ | NO ☐ |
| 18. | INSTRUCTOR APPLICATION TO UPPER CHEST | YES ☐ | NO ☐ |
| 19. | INSTRUCTOR APPLICATION TO RADIAL NERVE | YES ☐ | NO ☐ |
| 20. | FULL TAKE DOWN **(OPTIONAL)** CONTACT MODE | YES ☐ | NO ☐ |
| 21. | FULL TAKE DOWN - Alligator Clips **(OPTIONAL)** | YES ☐ | NO ☐ |

STUDENT SIGNATURE: _____

I certify that the above named individual has demonstrated his/her ability to properly utilize a Stinger S-200™ stun device according to SSI Training Guidelines and SPOs.

_____          _____
INSTRUCTOR SIGNATURE                                    DATE

**White: Student        Yellow: Instructor**

STINGER000858