*TASER International, Inc. v. Stinger Systems, Inc.*
Case No. CV07-0042-PHX-MHM

**Index of Exhibits to**
**Declaration of Counsel In Support of TASER's Motion For Contempt And**
**Application For Order To Show Cause**

| Exhibit No. | Description |
|:---:|:---|
| 1 | An accurate copy of a Verified Return of Service, demonstrating that Robert F. Gruder was personally served with a copy of this Court's Final Injunction on September 28, 2010. |
| 2 | An accurate copy of an Affidavit of Service, demonstrating that Karbon Arms, Inc. was personally served with a copy of this Court's Final Injunction on September 28, 2010. |
| 3 | An accurate copy of an excerpt from the deposition of Thomas V. Saliga, taken in this action on August 27, 2008. |
| 4 | An accurate copy of the Petition Commencing Assignment for Benefit of Creditors, filed on July 20, 2010 with the Circuit Court of the Thirteenth Judicial Circuit for Hillsborough County Florida, Civil Division, obtained from the court file in that action. |
| 5 | An accurate copy of an Order of the Court in *TASER Int'l v. Stinger Sys. Inc, James F. McNulty and Robert Gruder*, No. 2:09-CV-00289-KJD-PAL (D. Nev.), Docket No. 150, filed October 7, 2010, and obtained from the court file in that action. |
| 6 | An accurate copy of an email from Robert F. ("Bob") Gruder to Stefan Stein and John Anthony, dated July 26, 2010, and other emails in the same email string, that was produced by Stinger Systems, Inc. ("Stinger") and Robert Gruder in *TASER Int'l v. Stinger Sys. Inc, James F. McNulty and Robert Gruder*, No. 2:09-CV-00289-KJD-PAL (D. Nev.). |
| 7 | An accurate copy of an email from Bob Gruder to P. Sterling Kerr, dated July 7, 2010, that was produced by Stinger and Robert Gruder in *TASER Int'l v. Stinger Sys. Inc, James F. McNulty and Robert Gruder*, No. 2:09-CV-00289-KJD-PAL (D. Nev.). |
| 8 | An accurate copy of an email from Shad Stastney to Bob Gruder, dated July 7, 2010, and other emails in the same email string, that was produced by Stinger and Robert Gruder in *TASER Int'l v. Stinger Sys. Inc, James F. McNulty and Robert Gruder*, No. 2:09-CV-00289-KJD-PAL (D. Nev.). |
| 9 | An accurate copy of an email from Bob Gruder to Matthew Pliskin, dated July 8, 2010, and other emails in the same email string, that was produced by Stinger and Robert Gruder in *TASER Int'l v. Stinger Sys. Inc, James F. McNulty and Robert Gruder*, No. 2:09-CV-00289-KJD-PAL (D. Nev.). |

*TASER International, Inc. v. Stinger Systems, Inc.*
Case No. CV07-0042-PHX-MHM

**Index of Exhibits to**
**Declaration of Counsel In Support of TASER's Motion For Contempt And**
**Application For Order To Show Cause**

| Exhibit No. | Description |
|---|---|
| 10 | An accurate copy of an email from Bob Gruder to James McNulty, dated July 22, 2010, and other emails in the same email string, that was produced by Stinger and Robert Gruder in *TASER Int'l v. Stinger Sys. Inc, James F. McNulty and Robert Gruder*, No. 2:09-CV-00289-KJD-PAL (D. Nev.). |
| 11 | An accurate copy of the Certificate of Incorporation for Karbon Arms, Inc., filed August 2, 2010 and obtained from the files of the State of Delaware, Secretary of State, Division of Corporations. |
| 12 | An accurate copy of an email from Bob Gruder to Stefan V. Stein and John Anthony, dated August 11, 2010, and other emails in the same email string, that was produced by Stinger and Robert Gruder in *TASER Int'l v. Stinger Sys. Inc, James F. McNulty and Robert Gruder*, No. 2:09-CV-00289-KJD-PAL (D. Nev.). |
| 13 | An accurate copy of a Notice of and Motion to Authorize the Sale of Assets, to Establish Bidding and Sale Procedures, and Notice of Hearing on Any Timely Filed Objections, filed on August 13, 2010 in the matter *In re: Assignment for the Benefit of Creditors of Stinger Systems, Inc., Assignor, to Larry S. Hyman, Assignee*, Case No. 10-014854, then pending in the Circuit Court of the Thirteenth Judicial Circuit for Hillsborough County Florida, Civil Division. |
| 14 | An accurate copy of an email from Vann McCollough to Bob Gruder, dated August 18, 2010, and other emails in the same email string, that was produced by Stinger and Robert Gruder in *TASER Int'l v. Stinger Sys. Inc, James F. McNulty and Robert Gruder*, No. 2:09-CV-00289-KJD-PAL (D. Nev.). |
| 15 | An accurate copy of an email from Bob Gruder to James McNulty, dated August 23, 2010, and other emails in the same email string, that was produced by Stinger and Robert Gruder in *TASER Int'l v. Stinger Sys. Inc, James F. McNulty and Robert Gruder*, No. 2:09-CV-00289-KJD-PAL (D. Nev.). |
| 16 | An accurate copy of the decision of the United States Patent and Trademark Office regarding a reexamination of U.S. Patent No. 6,999,295, received by TASER International, Inc. on or about May 2, 2011. |
| 17 | An accurate copy of an Application by Foreign Corporation for Authorization to Transact Business in Florida, and related filings, filed September 14, 2010 with the Florida Division of Corporations and obtained from the files of that Division. |

*TASER International, Inc. v. Stinger Systems, Inc.*
Case No. CV07-0042-PHX-MHM

**Index of Exhibits to**
**Declaration of Counsel In Support of TASER's Motion For Contempt And**
**Application For Order To Show Cause**

| Exhibit No. | Description |
|:---:|:---|
| 18 | An accurate copy of a Amended Order on Notice of and Motion to Authorize the Sale of Assets, to Establish Bidding and Sale Procedures, and Notice of Hearing on Any Timely Filed Objections, filed on or about September 15, 2010 in the matter *In re: Assignment for the Benefit of Creditors of Stinger Systems, Inc., Assignor, to Larry S. Hyman, Assignee*, Case No. 10-014854, then pending in the Circuit Court of the Thirteenth Judicial Circuit for Hillsborough County Florida, Civil Division. |
| 19 | Accurate copies of a State of Delaware Certificate of Conversion from a Corporation to a Limited Liability Company converting Karbon Arms, Inc. to Karbon Arms, LLC, and a State of Delaware Limited Liability Company Certificate of Formation for Karbon Arms, LLC, both filed February 23, 2011, and both obtained from the files of the State of Delaware, Secretary of State, Division of Corporations. |
| 20 | An accurate copy of an email from George DiScioscia to Jerry Kovar, dated September 28, 2010. |
| 21 | An accurate copy of an excerpt from the deposition of Robert Gruder, taken in this action on August 26, 2008. |
| 22 | Photographs taken of the Stinger S-200 and Karbon MPID devices that accurately depict the devices. |
| 23 | Photographs taken of certain printed wiring boards obtained from a Karbon MPID, serial no. S7033, when it was partially disassembled.  The photographs accurately depict those printed wiring boards and the electronic components attached to those printed wiring boards. |
| 24 | An accurate copy of an email from George DiScioscia to Allen L. Edington, dated February 25, 2011. |
| 25 | An accurate copy of a page from the Karbon Arms website, http://www.karbonarms.com, obtained on May 27, 2011. |
| 26 | An accurate copy of U.S. Patent No. 7,778,005 (Aug. 17, 2010). |
| 27 | An accurate copy of the *Basic Operator Certification Program Student Manual* for the Stinger Systems S-200, bearing Bates Nos. STINGER000805-58. |
| 28 | An accurate copy of the *Owners Manual & Operating Instructions* for the Stinger Systems S-200, bearing Bates Nos. STINGER000025-38. |
| 29 | An accurate copy of *Basic Operator Certification Program Student Manual* for the Karbon MPID. |

*TASER International, Inc. v. Stinger Systems, Inc.*
Case No. CV07-0042-PHX-MHM

**Index of Exhibits to**
**Declaration of Counsel In Support of TASER's Motion For Contempt And**
**Application For Order To Show Cause**

| Exhibit No. | Description |
|---|---|
| 30 | An accurate copy of the *Owners Manual & Operating Instructions* for the Karbon MPID. |

57518-0006/LEGAL21254739.1

# Exhibit 28



Single Shot Ballistic Firing Non-lethal
Electronic Immobilization Device

Model S-200 Compact Series

**OWNERS MANUAL
&
OPERATING INSTRUCTIONS**

Stinger Systems, Inc.
U.S.A.

⚠ **CAUTION:** *Read and understand completely prior to operating this device*
***NOT** to be used in lieu of certified training*

STINGER000025

YOU ARE IN POSSESSION OF A WEAPON
CLASSIFIED BY BATF AS A FIREARM,
PURSUANT TO RULE 80-20 OF THE GCA
OF 1968.

HANDLE AND TREAT THIS WEAPON AS
YOU WOULD ANY FIREARM.

* ALWAYS POINT DOWN UNLESS READY TO USE

* TREAT IT AS LOADED AT ALL TIMES

* KEEP FINGER AWAY FROM TRIGGER UNTIL READY TO FIRE

## NOTICE

The information provided herein is intended to familiarize the user with basic product operations. It is NOT
designed, nor intended, to substitute for certified product training by an authorized instructor.

STINGER000026





**S-200**
**FEATURES**

[1] Safety Mechanism

[2] Battery Compartment

[3] Cartridge Ejection System (CES)

[4] Recessed Cartridge Bay

[5] LED Display

[6] 4-Second Lights

[7] Laser Site

[8] Battery Indicator Light

[9] Manual Site

[10] Side Illumination

[11] Trigger

[12] Electrodes for Contact Stun Mode

STINGER000027



# TABLE OF CONTENTS

Introduction ................................................................................. 5

Exactly What is Quantum™ Technology ................................................... 6

Commentary for Prospective Users ........................................................ 6

Disclaimer ................................................................................... 6

Cleaning and Maintenance of the S-200 Compact ........................................ 6

Product Description .......................................................................... 7

Smart Stun Technology ..................................................................... 7

Power Source - User Friendly .............................................................. 7

On/Off Safety Switch ....................................................................... 8

LED Display ................................................................................. 8

Accountability/Data/Recording ............................................................ 8

Cartridge Description ....................................................................... 8

Loading and Unloading Cartridges ......................................................... 9

Loading/Unloading Tips ..................................................................... 9

Sighting & Laser Application ............................................................... 9

Firing the S-200 ............................................................................. 9

Practice Firing/Range/Target Acquisition ................................................ 10

Areas of Non-Use ........................................................................... 10

Removing Darts ............................................................................. 11

Contact Stun Mode (CSM) ................................................................. 11

Troubleshooting Device Failures ........................................................... 11

Manufacturing Statement ................................................................... 12

Unit Registration/Warranty Validation .................................................... 14

STINGER000028

## INTRODUCTION

Stinger Systems, Inc. ("Stinger Systems") is pleased to present the Stinger S-200 which is a unique, technologically advanced electronic "Smart" stun gun employing numerous features and advanced takedown power.

*1. Powerful, 2. Compact, 3. Concealable, 4. Affordable, and 5. Unique Features.*

1. **Advanced Technology:** QUANTUM™ FLYBACK TECHNOLOGY (QFT). Stinger Systems engineering has developed a superb method of takedown capabilities utilizing less amperage than conventional stun technologies while enhancing neuromuscular impact power. The user does not "see" Quantum Technology but the receiver certainly experiences it! The electrical pulse width and rate are self adjusting which permits use of a smaller high voltage transformer and more controlled discharge of energy stored in the capacitor bank. The resulting neuromuscular incapacitation voltage waveform (NMIW) produces superior neuronal cramping for better effectiveness and efficiency.

2. **Compact:** Size is important. Today's officers are required to carry an array of equipment for a variety of confrontational situations. The S-200 is small enough to be worn on a duty belt yet large enough to maintain a grip for effective aiming or contact application.

3. **Concealable:** Sleek and slim, the S-200 may be worn on outerwear duty gear or concealed under jackets or shirts for non-obviousness accessibility/plain clothes operations.

4. **Affordable:** MSR is $699. Cartridges are $20 each. The S-200 utilizes off-the-shelf batteries which are lower cost for on demand and extreme product operations. This is less taxing on agency budgets while affording more officers to have "non-lethal" options available for suspect control.

5. **Unique Features**

   a. CARTRIDGE EJECTION SYSTEM ("CES") is a patent pending technology unique to the S-200. The ambidextrous push button ejector is located forward of the trigger guard. By simply pushing the eject button, the cartridge is easily and quickly ejected with ONLY one hand. This permits the S-200 to be quickly reloaded or emptied for "contact" use. In addition, the user's hand is not in front of a potentially live weapon.

   b. DATA DOWNLOAD AND CAPTURE is accomplished by radio frequency ("RF") leaving the unit sealed without a data port point of entry. This is one less place for water to enter potentially reducing the possibly of shorting the unit.

   c. CONCEALED CARTRIDGE - A recessed bay houses the cartridge preventing it from dislodging in the holster, snapping off or dislodging during actual shooting encounters.

   d. DART SEPARATION - A "tight" pattern is experienced by providing a 5.5 degree dart separation angle. At 5 feet to target there is a dart separation of approximately 6.5" and at 20 feet a separation of approximately 23" achieving excellent target acquisition. The dart cartridge is also reversible: it can be loaded upside down.

   e. SAFETY MECHANISM - The safety is a "bolt thru" push on/off mechanism when activated in an immediate boot up function; no time delay.

   f. AUTO-SLEEP MODE (ASM) - If the unit is left on for more than 4 minutes without any use, it automatically goes into a "sleep mode" to prevent draining the battery.

5

STINGER000029

## EXACTLY WHAT IS QUANTUM™ TECHNOLOGY?

The S-200 is spearheading new technology promising greater, safe knock-down power than existing technology. The device electrodes deliver high-voltage energy in a precisely controlled series of energy packets or "Quanta". The electronics delivers these energy quanta from a so-called "Flyback" transformer circuit, hence the term Quantum Flyback Technology ("QFT").

When in use, each energy packet has a dual personality: if the device electrodes have not yet hit a target, the energy quantum "flies back" to over 50,000 volts creating a commanding electrical spark – one which penetrates clothing easily. Yet once the "target" is contacted, the energy quantum delivers NMI voltage and current very effectively.

Series of quantum pulses are delivered first as ionizing spark energy and then as a more immobilizing, lower-voltage, higher current energy quanta once on target.

A novel feature of QFT is the ability to tailor the energy delivery sequence to more thoroughly incapacitate nerve tissue with less total energy being delivered. To more effectively lock-up muscle tissue, the applied incapacitating pulse energy should last between 50 microseconds and 180 microseconds. QFT adjusts its energy delivery width to 180 microseconds. Further, nerve tissue has a recovery period (depolarization and refractory period) of approximately 4,000 microseconds. By emitting yet a second quantum energy burst that period of time later, the muscles become hopelessly overloaded and fatigued very quickly – yet with less total pulse energy than a conventional stun gun. This **Nervelok™** quanta delivery profile for the QFT stun system offers the user the following benefits: reliability, effectiveness and product longevity!

## COMMENTARY FOR PROSPECTIVE USERS

While electronic immobilization technology has been available for use by the criminal justice system since 1973, Stinger Systems has added greater functionality and industry-leading documentation capability with its Stinger series projectile/contact stun guns. Non-lethal by intended design, the Stinger utilizes modern technology. The S-200 is designed to provide law enforcement, corrections, professional security, and military personnel with a viable alternative to brute and deadly force options. When used properly, the Stingers can significantly reduce officer and subject injuries.

The following pages will explain basic operating function and features of the Stinger S-200.

## DISCLAIMER

The Stinger technology is not without limitations and risks. It may not be instantly effective on subjects and while intended to be non-lethal, it may cause serious injury or even death in extreme circumstances. Accordingly, CARE MUST ALWAYS BE EXCERCISED in the use of this product. Like all stun device products, the risk of injury to a subject can be increased by their use of drugs, pre-existing medical conditions as well as elevated metabolic rates and stress brought on by the confrontation itself. Risk of injury is also greatly increased by the overuse of this product. Stinger Systems, Inc. strongly recommends that after two stun cycles (See description below) an alternative means of subduing a subject be employed.

## CLEANING AND MAINTENANCE OF THE S-200 COMPACT

The Stinger shell is comprised of a polycarbonate plastic, which has very little chemical resistance. Accordingly, the Stinger should be cleaned with a damp cloth with a small amount of mild detergent, if needed. The product should not be exposed to solvents or gun cleaners of any kind as serious damage could result. The Stinger is an electronic device and should not be placed underwater at any time as personal injury and damage to the product could result.

**KEEP THE UNIT DRY and free from moisture.** Water is a conductor of electricity. If the unit becomes wet, the user could experience a slight shock and the possibility of shorting out the unit. While the unit can be used in the rain, if it is submerged or drenched with water, it should be toweled off, batteries removed, cartridge removed and left to air-dry for at least 24 hours.

6

STINGER000030

## PRODUCT DESCRIPTION

The S-200 is a single cartridge, two dart projectile/contact stun gun designed to provide an alternative method of immobilizing and subduing potentially dangerous and violent individuals in situations in which the use of deadly force is not warranted. The S-200 provides an effective operating range of up to 22 feet, up to the reactionary gap, providing the user time to respond to the incident thereby increasing safety for both the user and target alike.

The effective operating range of a projectile stun gun is determined by two principal features: the distance that the darts travel and the spread of the darts. Maintaining an optimal spread between the darts is important to the effectiveness of the system. If the negative and positive darts are too close together, an insufficient area of the subject's body will be affected. The S-200 maintains an effective yet tight spread throughout its range by ample disbursement of the darts.



Dart Included Angle, 5.5°
Spread Rate: 0.1228 in/in

| DISTANCE | SPREAD |
|----------|--------|
| 5 Feet | 5.777" |
| 10 Feet | 11.555" |
| 15 Feet | 17.332" |
| 20 Feet | 23.109" |

## SMART STUN TECHNOLOGY

The S-200 uses proven pulse waveform technology ("PWT") based on known safe levels of electrical values. High voltage and low amperage provide a capacitor discharge system designed to temporarily immobilize an aggressive individual with minimal recovery time. PWT is designed to affect the neuro-muscular system by interrupting and disrupting the electrical impulses to and from the brain. Consequently, electrical impulses throughout the human body become confused and ultimately "shut down" temporarily.

## POWER SOURCE - USER FRIENDLY

The S-200 is powered by four (4) CR-2 lithium power cells. Available off-the-shelf or directly from Stinger Systems, these batteries maintain excellent shelf life, on demand use and should provide more than 100 cycles prior to replacement.



To install the batteries in the unit, simply press the tab release button in the middle of the base plate while squeezing the tabs on both sides to unsnap the base plate on the bottom of the grip and insert the 4 batteries. Snap the base plate back on snugly but do NOT over tighten. For best performance Stinger Systems Inc. recommends **DURA-CELL®** CR-2 batteries. Other brands may impact overall efficiency and ultimate effectiveness of the device. **Make certain to place the batteries in the correct position as damage could result from improper installation.**

7

STINGER000031



**TIPS:**

• Store extra batteries at room temperature

• Do not attempt to charge a lithium battery

• Use only the specified battery(s) for respective units

• Replace batteries every 12 months OR when indicated by system

• Battery indicator lights: Green-good battery, Yellow-recommend replacing, Red-must replace

⚠ **CAUTION:** *Temperature variables, such as extreme heat or cold, will discharge ANY battery. Lithium batteries CANNOT be recharged. Discard properly after useful life.*



## ON/OFF SAFETY SWITCH

The S-200 is shipped ready to use. First insert the batteries. To operate the S-200, deactivate the safety switch that is located on the side of the device in a push-through bolt slide. When the switch is fully pushed to the left, the S-200 is in the on or "safe" position. Sliding the switch through to the right turns the unit on and it is ready to fire. A green dot, indicating a good battery, in the LED display indicates the unit is on. When the unit is turned on, the sight laser and the LED display are both activated.

## LED DISPLAY

The S-200 has four (4) LED lights illuminated at the same time and extinguished with each second of use up to four (4) seconds. All of this information is retained in memory each time the S-200 is fired. The display turns on and off automatically with the safety switch.

## ACCOUNTABILITY/DATA/RECORDING

Each S-200 has a unique data download system to display basic information including date, time, length of stun and number of cycles. The unit will record up to 1,000 firings by placing the unit in the cradle. The data is accessible through Windows 2000, XP or ME.

## CARTRIDGE DESCRIPTION

SIZE:    1.75" L x 1.375" H x 1.25" W
COLOR:   Yellow
WEIGHT:  .64 oz. or .025kg

8

**STINGER000032**



Each cartridge contains 44 feet (22 feet per dart) of insulated wire. On the end of each wire is a small barbed dart affixed to an aluminum shaft to which the wire is connected. When the trigger is pulled, an electrical charge ignites a primer, which ejects and propels the darts from the cartridge. The darts have a muzzle velocity of approximately 170 feet per second.

Two small panels on the front of the cartridge hold the wires and darts securely. Upon firing, these "blast-doors" are blown free from the front of the cartridge. When the cartridge is fired, there is a report similiar to that of a .22 caliber round. After every 10 firings, the cartridge bays should be cleaned with a cotton swab dipped in alcohol to keep the bays free from powder residue.

If a blast door falls off a live cartridge, DO NOT attempt to glue it back. The cartridge should be disposed of properly and treated as would any other form of live ammunition.

## LOADING AND UNLOADING CARTRIDGES

The S-200 has a recessed ammunition-firing bay to prevent the cartridge from being knocked off or damaged. When possible do not attempt to load the S-200 unless the safety lever is enabled. To load, insert the cartridge into firing bay and press securely into place. When lodged correctly the cartridge should snap into place. To unload and remove cartridge, simply squeeze the side of the cartridge or use the ejector button. The spring inside the firing bay will help push the cartridge out. **Do not place your hand directly in front of the door.**

## LOADING/UNLOADING TIPS

- Unless in an actual combat situation, when loading or unloading an S-200, verify the safety is in the "on" position for maximum safety.
- When loading or unloading, always point the S-200 toward the ground.
- Never have a finger on the trigger when loading or unloading.

## SIGHTING & LASER APPLICATION

The S-200 has a built-in laser optic located below the cartridge bay. The laser serves as sight as well as a psychological deterrent possibly pre-empting actual firing of the device. Never aim the S-200 at a subject's face. Serious injury could result if a dart lodges in an eye and the laser could cause damage to the eye even if the weapon is not fired.

- Never look directly into or towards the laser
- Always point the S-200 away from your body
- Assume the S-200 is loaded until checked by you

## FIRING THE S-200 – TPA: Trigger Pull Activation

**1. Officer control:** The officer has total control on each application up to 4 seconds. He may let-off on the trigger at any given time up to four seconds thereby discontinuing the activation, or maintaining trigger pull at which time the unit will time-out at 4 seconds of discharge. The trigger switch activates the unit and provides the user with

9

STINGER000033

total control of the stun cycle. When the unit is fired, constant contact with the trigger sends an electrical shock to the target for up to 4 seconds; a full stun cycle. After 4 seconds the unit disengages and can only be re-engaged by releasing and pulling the trigger again starting another 4-second cycle. Letting up on the trigger at any time will terminate the cycle. Stinger Systems strongly recommends that shock cycles be terminated as soon as the subject submits and Stinger Systems recommends only two shock cycles be used on a subject due to the possibility of increased of risk of injury. After two full shock cycles, other means of subduing the subject are required. The aforementioned is also applicable to the CSM (Contact Stun Mode).

**2. Semi-Auto bursts:** Trigger pull and constant contact with the trigger will automatically time-out after two seconds. The officer will than have to re-engage the trigger for subsequent activations.

**3. Auto Cycle:** Officer pulls the trigger and immediately releases it, the unit will still continue to operate up to four seconds. The only way to interrupt this cycle in the middle of a four second operation is to engage the safety bolt to turn the unit "off".

These various modes of operation are ALL programable by the agency by means of placing the unit in the download cradle and following directions. Units shipped from the factory are ALL in position 1: Officer Control.

**NOTE:** *Units used by an agency should ALL be in the same mode from the aspect of continuity, standardization and training, for liability reasons, keeping in mind that the programmable mode, 1, 2, or 3 will be a function in the CONTACT STUN MODE as well as the firing mode.*

## PRACTICE FIRING/RANGE/TARGET ACQUISITION
Required materials: polypropylene or foil target/tape/cardboard

**NOTE:** *Special targets are available from Stinger Systems, Inc.*

1. Select a safe location within a 22 foot range. Place the target on a cardboard backing to prevent damage and reduce the chance of darts bouncing off. Placing a target directly over a hard surface may cause the darts to bounce off the target and could damage the underlying surface.

2. Stinger Systems recommends measuring off firing positions at 15 feet and 21 feet. Load, disengage safety, aim laser, pull and hold down the trigger. The S-200 will go through a full stun cycle. Repeat at different distances to familiarize yourself with the dart patterns.

3. Always hold the S-200 level when firing. *NEVER* tilt the unit sideways as this will cause the darts to spread horizontally rather than vertically.

## AREAS OF NON-USE
Do not use or activate the device in the contact or firing mode within the proximity of flammable gases or other flammable substances. Doing so could cause an explosion. Also note that some self-defense sprays contain flammable components such as alcohol, therefore Stinger should not be used on subjects that have recently been sprayed.

To lower the risk of injury, Stinger Systems, strongly recommends that you *DO NOT SHOOT* individuals that are under 80 pounds, elderly, pregnant, or wheel chair bound. Do not fire the unit if an individual is in or near a swimming pool, a lake or an ocean as the subject may drown. Do not fire the unit at a subject who is on a building top, roof, or cliff because falling from such a dangerous height could harm the subject.

10

STINGER000034

**REMOVING DARTS – pursuant to agency policies and procedures**

The darts are designed to lodge in clothing and conduct a stun through the clothing into the subject. A barb at the end of the dart helps the darts to embed and makes it difficult for the subject to remove. Accordingly, care should be taken in removing the darts as they could cause damage to clothing. It is possible that the darts could lodge in the skin of the subject. If this occurs simply cut the wire and have the dart removed by trained professional. If medical attention is not available, firmly pinch the area around the dart and quickly pull the dart out. If the dart is lodged in a sensitive area, the eyes, neck etc., cut the wire and seek medical attention immediately. Do not twist darts when removing them as this could result in injury and / or discomfort.

**NOTE/WARNING:** *It is possible when firing the Stinger, with the subject facing you, that a dart could penetrate an eye. If this happens, IMMEDIATELY discontinue stun cycle and seek immediate medical attention.*

**CONTACT STUN MODE (CSM)**

The S-200 may be used as a contact stun device. Before operating in contact stun mode be certain that the S-200 is not loaded with live cartridges. To operate, press the S-200 firmly against the subject and depress the trigger. For the S-200 to be effective in the contact mode, constant, firm pressure must be applied. Bare skin is a preferable contact point to clothing as the stun may not penetrate heavy outerwear such as winter jackets.

 

**NOTE/WARNING:** *If the Stinger is already loaded the CSM cannot be used because the cartridge(s) will fire first. The CSM feature may be used with an expended cartridge still in the device, but care should be taken as a stun will also be passed down the wire to the darts.*

**TROUBLESHOOTING DEVICE FAILURES**

Should the device fail to work or does not achieve the desired results, the reason should be determined. The following is a guideline in determining the issue at hand:

    1. Gun Fails to Power Up:
        - Battery is discharged
        - Safety is engaged
        - Unit malfunction

    2. Gun Fails to Fire after Powering Up:
        - Cartridges are not properly installed
        - Contacts are dirty
        - Cartridge is faulty
        - Unit malfunction

    3. Stun Shock Fails to Subdue Subject:
        - No connection
        - Thickness of clothes prevents transfer of stun shock
        - Too short of duration of application
        - Recipient condition affected by drugs, stress, mental condition
        - Unit malfunction

STINGER000035

## MANUFACTURING STATEMENT

Stinger System's products are manufactured in the United States at manufacturing plants that are ISO 9000 compliant. The S-200 is specifically engineered to provide reliable use in field conditions and each gun is individually tested prior to shipping to insure it functions within design tolerances. Accordingly, Stinger Systems warrants its products for a period of one year from the date of purchase.

### Limited One Year Warranty

Stinger Systems warrants that Stinger Systems Stinger brand projectile stun weapons are free from defects in workmanship and materials for a period of one (1) year from the date of first activation. Stinger Systems agrees to repair or replace such defective products which, under normal use as defined in the written instructions that accompany the product at time of purchase, fail to function provided that the disclosed defect is determined by Stinger Systems to be Stinger Systems's fault. After one (1) year, Stinger Systems offers time and material repair services that vary according to the nature of the problem.

Customer has the responsibility to return the defective product to Stinger Systems via prepaid postage and provide written information as to the nature of the defect. If damage during the first year is determined by Stinger Systems to be caused by other than a defect in material or workmanship, Stinger Systems will charge for time and material repair services that vary according to the nature of the problem.

### Warranty Terms and Procedure

Stinger Systems's sole responsibility under either warranty shall be to either repair or replace, at Stinger Systems's sole option, any damaged product and return it via prepaid postage. This warranty is the only warranty and may not be changed or enlarged by any agent, distributor, dealer or other person.

To register a claim, file a claim notice on **www.stingersystems.com** and mail the defective parts, postage prepaid together with a printout of the claim notice to the address provided on the website. If you do not have internet access, please call **(813) 281-1061** and ask for Customer Service.  Please be prepared to provide a serial number, purchase date and a description of the problem.

### Warranty Exclusions

STINGER SYSTEM'S WARRANTY AS STATED ABOVE IS THE EXCLUSIVE WARRANTY WITH RESPECT TO THIS PRODUCT. STINGER SYSTEMS DISCLAIMS ANY AND ALL OTHER WARRANTIES, WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF MERCHANTABILITY, DESIGN OR FITNESS FOR A PARTICULAR PURPOSE OR ARISING FROM A COURSE OF DEALING, USAGE OR TRADE PRACTICE, OR ANY WARRANTY AGAINST PATENT INFRINGEMENT. IF THE EXCLUSION OF IMPLIED WARRANTIES IS PROHIBITED BY STATE LAW, THEN ANY APPLICABLE IMPLIED WARRANTIES SHALL BE LIMITED TO THE DURATION OF THE EXPRESS WARRANTY DESCRIBED ABOVE AND OTHER PROVISIONS CONTAINED HEREIN.

THE EXPRESS WARRANTY STATED ABOVE SHALL BE VOID AND STINGER SYSTEMS SHALL NOT BE RESPONSIBLE FOR ANY LOSS, DAMAGE OR FOR ANY OTHER LIABILITIES ARISING FROM ALTERATIONS, ADDITIONS, ADJUSTMENTS OR REPAIRS WHICH ARE MADE TO THE PRODUCT BY OTHER THAN AUTHORIZED REPRESENTATIVES OF STINGER SYSTEMS.

### Release and Limitation of Remedies

PURCHASER AGREES TO ASSUME ALL RISKS OF LOSS AND AGREES TO RELEASE STINGER SYSTEMS FROM ANY AND ALL LIABILITY FOR ANY DAMAGES AND BODILY INJURY WHICH MAY RESULT FROM THE DEPLOYMENT, USE OR MISUSE OF THE PRODUCT BY THE PURCHASER OR ANY OTHER PERSON. STINGER SYSTEMS IS NOT LIABILE FOR THE FAILURE OF THE PRODUCT TO PERFORM AND STINGER SYSTEMS IS NOT LIABLE FOR ANY CLAIMS MADE BY A THIRD PARTY OR BY PURCHASER FOR OR ON BEHALF OF A THIRD PARTY. STINGER SYSTEM'S CUMULATIVE LIABILITY TO ANY PARTY FOR ANY LOSS OR DAMAGES RESULTING FROM ANY CLAIMS, DEMANDS, OR ACTIONS ARISING OUT OF OR RELATING TO THIS PRODUCT SHALL NOT EXCEED THE PURCHASE PRICE PAID TO STINGER SYSTEMS FOR THE

STINGER000036

PRODUCT.  IN NO EVENT WILL STINGER SYSTEMS BE LIABLE FOR ANY SPECIAL, INDIRECT, INCIDEN-
TAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES, HOWEVER CAUSED, WHETHER FOR BREACH OF
WARRANTY, NEGLIGENCE, STRICT LIABILITY OR OTHERWISE, EVEN IF STINGER SYSTEMS HAS BEEN
ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR IF SUCH DAMAGE COULD HAVE BEEN REASON-
ABLY FORESEEN, AND NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE OF ANY EXCLU-
SIVE REMEDY PROVIDED HEREIN. SOME STATES DO NOT ALLOW FOR THE LIMITATION OR EXCLUSION
OF LIABILITY FOR INCIDENTAL OR CONSEQUENTIAL.

13

STINGER000037

**UNIT REGISTRATION/WARRANTY VALIDATION**

Individual or Agency remove from manual and send to:

**Stinger Systems, Inc.**
**Attn: Product Warranty Registration**
**2701 North Rocky Pointe Drive, Suite 1130**
**Tampa, Florida 33607**

Name: _____

Agency: _____

Street Address: _____
(No P.O. Box Addresses)

City: _____   State: _____   Zip: _____

Phone: _____   Email: _____

Unit Serial #: _____   Date Unit Returned: ____/____/____

Agency or Individual Purchase: _____

Dealer Name: _____

**Training Information:**

_____ I have been trained pursuant to Stinger certification program
_____ I have not been trained
_____ I plan to obtain certified training
_____ I have read the directions thoroughly and understand they DO NOT replace certified training

_____
Signature

**All purchases must be validated!!**

14

STINGER000038

Exhibit 29

# KARBON ARMS

## KARBON MPID™
### (Multi-Purpose Immobilization Device)

## KARBON MPID-C™
### (Corrections Model)

## Basic Operator Certification Program
### Student Manual



WWW.KARBONARMS.COM
1.866.STUNSHOT (788-6746)



**The Definition of Strength**

## Legal Services and Support

We are frequently asked "what type of assistance and support does Karbon Arms, Inc. provide and agency/officer in the event of litigation?" The risk of any litigation exists during the use of force.

Electronic Immobilization Devices are not new to the market. Tens of thousands of applications have occurred with the various types of stun devices in the marketplace. Karbon Arms recognizes that risks of litigation exist but definitive proof of a relationship of injury or death by the use of an EID has not been proven in many court cases.

The number of litigation cases against EID manufacturers has actually decreased over the years. However, in the event of litigation, the Karbon Arms believes that the Karbon MPID technology may allow additional support for a department's case. Since the Karbon MPID is the only EID that actually manages the energy output, the exact amount of energy emitted from the EID is known rather than speculated. Therefore, that data can be made available to expert witnesses whom can use that data to definitively comment on the impact of that energy to the body. No other EID vendor can provide such vital information.

There are many components and variables involving any situation of litigation. Thus, it is our premise that we will offer and assist any agency that has used any Karbon Arms products and been sued over the use of these products. Should technology and / or training become material issues of litigation, when Karbon Arms protocols have been followed, Karbon Arms will do the utmost to be of assistance to those agencies. While Karbon Arms, Inc. cannot be held responsible for the intentional misuse or abuse of its products, should the agency request Karbon Arms assistance, we will provide limited support for those agencies requesting assistance.

Accordingly, Karbon Arms, Inc. believes strongly in defending its products and customers. In the event of litigation, Karbon Arms, Inc. will make available a full range of assistances to any agency that requests such support. Agency support includes but is not limited to:

1. Expert witnesses can be made available regarding Karbon Arms products, including but not limited to use of force, training and product engineering including electrical theory and application, and;

2. Testimony, documents and assistance from medical experts including medical reviews, published papers, and specific medical studies, and;

3. Deposition review, case preparation and general consultation

Karbon Arms, Inc. has continued to support our existing customer base for extensive use of our varied product line. Client base includes the US Marshals Service; US Federal Bureau of Prisons ,(US Dept of Justice) countless county agencies; numerous state departments of correction and a rapid growing list of municipal law enforcement agencies.

The bottom line is that Karbon Arms realizes that any lawsuit is an assault on the industry as well as the agency. Therefore, Karbon Arms, Inc will support any agency to its utmost abilities.

Sincerely,

Robert F. Gruder
President

# BASIC 8-HOUR
# TRAINING MANUAL

This is the Basic 8-Hour Certification Course Training Manual for the Karbon MPID and Karbon MPID-C.

It is a comprehensive, BASIC presentation for the individual who will be using the device in the field.

This manual is to be used only in conjunction with the Basic Certification Program and ONLY by authorized Karbon Arms, Inc. instructors.

The data found within the manual is based on extensive research and actual combat situations. It represents over 25 years of organization and is made available as a result of the numerous requests from Criminal Justice agencies across the country for a standardized certification program.

> Students should be advised to:
>   1. Maintain these manuals with updates
>   2. Read the manual from cover to cover

By reading the manual through, the student will have learned almost everything that he/she possibly can. The only additional learning process will be the expertise developed by actual field application.

This Basic Certification Manual is also to be used for basic operator RECERTIFICATION purposes by those agencies opting to use the KARBON ARMS RECERT process for the end-line user.  Certain pages are marked with an "R" at the bottom of the page above the page number. These pages as well as agency actual use reports should be reviewed in full each 12 month period along with each officer firing at least one cartridge for recertification process.  This entire process should take approximately 2-3 hours to complete. It could be worked in with firearms or DT annual recertification.

There is a RECERTIFICATION form in the Instructor Notebook which should be copied, filled out by each officer and kept on file by the agency to document the recertification process.

There is NO recertification suggested for the Corrections Contact Model.

**NOTE:** *This manual is a legal document.*



# MANUAL
# FORWARD

The following program of instruction will provide the student with a fundamental understanding of the Karbon Arms Hand Held Stun Device. This program is to be conducted by a Karbon Arms certified instructor.

Students should consult with their department prior to the deployment of any use of force alternative. Questions relative to this training program or the Karbon device should be directed to:

**Karbon Arms, Inc. Training Division**
**5505 Johns Road, Suite 702**
**Tampa, Fl. 33634**
**Phone: (800) 345-7886**
**Fax: (813) 288-9148**

Instructor Name: _____

Date of Instruction: _____

Location of Training: _____

<u>NOTE</u>:  The information in this manual addresses the Karbon MPID Firing Device and the Karbon MPID-C Corrections Model (contact capability ONLY).  Please specify training module:  Firing and Contact, or CONTACT ONLY.

©Karbon Arms, Inc. unauthorized reproduction of this material is strictly forbidden without the written consent of Karbon Arms, Inc.

Revised 10/10

# KARBON BASIC TRAINING PROGRAM

## Introduction

The Karbon MPID is a less-lethal electronic immobilization product designed for short-term less-lethal incapacitation of an individual during law enforcement/correctional operations.

As with any product utilized during use of force altercations (even hands-on physical contact), although designed to be less-lethal, the device has a potential of inflicting injury and even a remote aspect of lethality. Care must be exercised during any type of use of force encounters to minimize injuries and/or death.

Karbon Arms, Inc. is pleased to introduce the Karbon MPID stun device to promote officer and subject safety by minimizing physical contact and the time spent during physical encounters.

## Training and Performance Objectives

- Officer injury reduction.

- Reduction of liability law suits against officers and municipalities.

- Reduction of liability claims against the misuse or improper use of EIDs.

- Understanding what bodily contact with various EID's will accomplish - duration and application areas.

- Understanding force - meeting force with force, excessive force, required force, deadly force, and range of force.

- Awareness of vicarious and civil liabilities.

- Demonstration of basic field defensive tactics in EID use.

- Learn basic laws and principles of electricity

- Be able to define "Use of Force", "Reasonable Force" and explain the "Force Continuum"

- Learn proper technique to document a "Use of Force" incident involving the Karbon

- Demonstrate the ability to manipulate, operate and maintain the Karbon EID

- Participate in "Live Fire" deployment of the Karbon

It is important to learn the principles of how the Karbon MPID works as well as how to determine if its use in a particular situation is appropriate and applicable.

After the completion of this course, the student should have a better understanding of the dynamics behind the Karbon MPID and its operation, as well as having a enough information in regards to use of force to properly, effectively, and justifiably use this device in a real world setting.

Also as part of the course, you will learn how to properly report and document Karbon MPID deployments for later use in the field.



## INITIAL COURSE REGISTRATION FORM

Applicant Name _____
LAST NAME                          FIRST NAME                          MI

Mailing Address: _____
NUMBER AND STREET              CITY/TOWN                STATE      ZIP

Telephone: Residence: _____   Business: _____   Fax: _____

May KARBON contact you via e-mail with training and device information updates?   ☐ Yes   ☐ No

E-Mail Address: _____

Agency: _____   Officer Rank: _____

Agency Address: _____
NUMBER AND STREET              CITY/TOWN                STATE      ZIP

Course Requested (Check each that apply)

    ☐ KARBON ARMS Basic Course    ☐ KARBON ARMS MPID-C  Contact Corrections Model

    ☐ KARBON ARMS Instructor Course (Prerequisite: Basic Course)

    ☐ KARBON ARMS Senior Instructor Course (Prerequisite: Instructor Course)

For the Instructor and Senior Instructor courses, have you completed the required prerequisite courses?

☐ Yes   Course Name: _____   Date Completed: _____

      Course Name: _____   Date Completed: _____

☐ No   If no, this application cannot be processed until the proper prerequisite training has been completed, and documentation of stated training has been provided by the student.

I, the undersigned, certify that all information contained on this application is true and correct to the best of my knowledge, and I have not omitted any pertinent information. I understand that any misrepresentation, falsification or omission of pertinent information may be cause for denial of certification and possible expulsion from requested and/or all training classes conducted by KARBON ARMS, INC.

Applicants Signature: _____   Date: _____

━━━━━━━━━━━━━━━━━━━ **INSTRUCTOR USE ONLY** ━━━━━━━━━━━━━━━━━━━

Payment Received:   ☐ Yes   ☐ No   Instructor Cert. #: _____

Application Approved:   ☐ Yes   ☐ No   If No, Reason(s): _____

_____

_____

White: Student      Yellow: Instructor

## YOU ARE IN POSSESSION OF A WEAPON CLASSIFIED BY BATF AS A FIREARM, PURSUANT TO RULE 80-20 OF THE GCA OF 1968.

## HANDLE AND TREAT THIS WEAPON AS YOU WOULD ANY FIREARM.

* ALWAYS POINT DOWN UNLESS READY TO USE

* TREAT IT AS LOADED AT ALL TIMES

* KEEP FINGER AWAY FROM TRIGGER UNTIL READY TO FIRE

### NOTICE

NOTE:  The Corrections Model (Karbon MPID-C) is PLUGGED to prevent chambering of a dart firing cartridge.  Therefore, it has no classification by BATF as a firearm.

The information provided herein is intended to familiarize the user with basic product operations. It is NOT designed, nor intended, to substitute for certified product training by an authorized instructor.



# 1. Karbon Arms Products                                                                 8

# 2. About the Karbon MPID™                                                               9
Commentary for Prospective Users ...................................................................................9
Disclaimer ..........................................................................................................................9
Smart Stun Technology.....................................................................................................10
How the Karbon MPID Operates.......................................................................................10
Advantages of the Karbon MPID .....................................................................................10

# 3. Karbon Arms' Position                                                               11

# 4. Electronic Information                                                               12
Common Electrical Terms ..................................................................................................12
Basic Principles of Electricity...........................................................................................12
Ohms Law...........................................................................................................................12
Facts ...................................................................................................................................13
Voltage and Amperage ......................................................................................................13
Neuromuscular Keying ......................................................................................................13

# 5. General Effects of the Karbon                                                       15

# 6. Body Application Information                                                         16
Body Application Points.....................................................................................................16
Areas to Avoid When Possible and Practical Training Directive.....................................16
Areas to Avoid When Possible/Restrictions/Contact Stun Mode (CSM)...........................17
Preferred Application Areas and Effects ..........................................................................19
Areas to Avoid in the Contact Mode ................................................................................19
Application Marks/Signature/Evidence.............................................................................20
Variables that Determine Effectiveness............................................................................20
Post Deployment Care .......................................................................................................21

# 7. Use of Force & Force Continuum                                                      22
Use of Force Tactics ..........................................................................................................23
Use of Force/Policies & Tactics .......................................................................................24

Authority for Force ...........................................................................................................24
Understanding Force ........................................................................................................24
Types of Force - Alternative Force Implementation.......................................................25
A Force Continuum...........................................................................................................26
Force Continuum Scale.....................................................................................................27
Transfer of Force...............................................................................................................28
ACLU Policy #207 ...........................................................................................................29

## 8. Karbon Tactical Deployment &
## Practical Aspects Device Capabilities                          30
Mode 1 – Contact..............................................................................................................30
Mode 2 – Distance ...........................................................................................................30
Distance Firing vs. Contact Mode ...................................................................................31

## 9. Liability Aspects & Court Review                            33
Documentation of Deployment.........................................................................................33
Testifying in Court............................................................................................................33
Areas of Civil Liberties....................................................................................................33
Caldwell v. Moore ............................................................................................................34
Haynes v. Marshall ...........................................................................................................34
Considerations Regarding In-Custody and Sudden Deaths ............................................35

## 10. Battery Information                                        37
General..............................................................................................................................37
Lithium Battery Power Source Applicable to the Karbon ...............................................37
Training Information .........................................................................................................38
Tips ...................................................................................................................................38
Karbon Power Source & Battery Specifications...............................................................38
Data Dock .........................................................................................................................38
Optional Tru-Vu™ Camera ..............................................................................................38
Laser Site ..........................................................................................................................39

## 11. Wearing the Karbon/Size Requirements                      40

## 12. Hands On - Practical Exercises                             41
Hands On - Basic Techniques............................................................................................41
Hands On - Tactical Training Session ..............................................................................41
Practical Exercise..............................................................................................................43

## Appendix A - Features of the Karbon MPID                      44

## Appendix B - Specifications of the Karbon MPID               45

## Appendix C - Abbreviations & Definitions                      46
Abbreviations ...................................................................................................................46
Definitions........................................................................................................................46
Common Electrical Terms ................................................................................................47



# KARBON ARMS PRODUCTS



**KARBON MPID**
A Handheld, Projectile EID
utilizing pulse group technology

**Karbon ICE-Shield**
An electrified riot shield used in
hostile crowd control or inmate
control situations





**Karbon Band-IT**
An electronic wrap used in the
transport of dangerous criminals
- can be triggered by motion or
  remotely



# ABOUT THE
# KARBON MPID

The KARBON MPID is spearheading new technology promising greater, hopefully safer knock-down power than existing technology. The device electrodes deliver high-voltage energy in a precisely controlled series of energy packets.

When in use, each energy packet has a dual personality: if the device electrodes have not yet hit a target, the energy "flies back" to over 50,000 volts creating a commanding electrical spark - one which penetrates clothing easily. Yet once the "target" is contacted, the energy delivers NMI voltage and current very effectively.

Karbon engineers believe that a more effective approach to immobilizing muscles is to expose the muscles to electricity for more than 150 micro seconds, which scientific studies have suggested is the least amount of time for an effective lock up. The Karbon MPID does not shoot in traditional "pulses per second" rather it fires in a series of mini or micro pulses. About 7 micro pulses that make up a single "pulse". This allows for a lower current per pulse but longer duration immobilizing current to the muscles (about 250 micro seconds!)

Scientific studies show that the higher frequency content of micro-pulse currents tend to stay closer to the body's surface—locking up skeletal muscles while possibly avoiding deep penetration to the internal organs

## Commentary for Prospective Users

While electronic immobilization technology has been available for use by the criminal justice system since 1973, Karbon Arms has added greater functionality and industry leading documentation capability with its Karbon MPID projectile and contact stun guns.  Less-lethal by intended design, the Karbons utilize modern technology. The Karbons are designed to provide law enforcement, professional security, and military personnel with a viable alternative to brute and deadly force options. When used properly, the Karbons can significantly reduce officer and subject injuries.

## Disclaimer

The Karbon technology is not without limitations and risks.

## Smart Stun Technology

The Karbon MPID uses proven pulse waveform technology ("PWT") based on published safe levels of electrical values. High voltage and low amperage provide a capacitor discharge system designed to temporarily immobilize an aggressive individual with minimal recovery time. PWT is designed to affect the neuro-muscular system by interrupting and disrupting the electrical impulses to and from the brain. Consequently, electrical impulses throughout the human body become confused and ultimately "shut down" temporarily.

## How the Karbon MPID Operates

- Primarily the Karbon MPID operates on high voltage, low amperage electrical frequency.

## Advantages of the Karbon MPID

- Can be utilized by all officers regardless of size or strength
- Minimal training time is required
- No specific skills are required
- Karbon easily integrates with all defensive tactics programs
- Can be used for both defense and control
- Reduces officer and offender injury rates
- Reduces excessive force complaints

Size, strength or fitness does not affect your ability to effectively use the Karbon. Four to six hours of training is all that is required to become a Karbon operator.

The Karbon can be used for the only two reasons force would be used: for Defense or Control. The less physical contact spent with an offender reduces officer and offender injury rates. The less physical contact spent with an offender also lessens the number of excessive force complaints because of the reduction of permanent injuries to offenders. Officers must, however, use common sense in selecting to utilize any alternative to control a situation.

# KARBON ARMS POSITION

**Karbon Arms Inc. designs its products to be intended for less lethal use.** However, unknown factors such as substance abuse, pre-existing, non-obvious medical conditions or abnormal levels of stress potentially could result in a more serious injury or possibly lethality.

### Definition: Non-Lethal

U.S. Department of Defense policy defines non-lethal weapons as "weapon systems that are explicitly designed and primarily employed so as to incapacitate personnel or material, while minimizing fatalities, permanent injury to personnel, and undesired damage to property and the environment..."

It is important to note that Department of Defense policy does not require or expect nonlethal weapons are intended to significantly reduce the probability of such fatalities or injuries as compared with traditional military weapons which achieve their effects through the physical destruction of targets.

*-Joint Concept for Non-lethal Weapons*
*United States Marine Corps*

**R**



# ELECTRICAL INFORMATION

## Common Electrical Terms

**Voltage:** The measure of electromotive force between two conductors

**Amperage:** The measure of current flow

**Ohm:** Unit used to measure resistance to the conduction of electricity

The flow of electricity in relation to passing through an object is specifically described in terms of **Voltage**, **Amperage**, and **Ohms**, each of which play a role in the passage and effect of electricity on the human body.

In the next few sections, you will learn more about each of these and how they apply to the Karbon and its effects on the human body.

## Basic Principles of Electricity

- Electricity takes the path of least resistance
- There is a direct correlation between amperage and voltage (Ohms Law)
- Amperage or current is the number one factor in human fatalities
- Pulsed electricity at pre-determined intervals is non-lethal
- Ohms Law cannot be altered

These are basic principles of electricity and are always a constant by laws of physics. Electricity always works on what is called a circuit principle, in which electrical current needs a complete circular path or circuit to and from the source of power to be of any effect. When a partial circuit comes in contact with a conductive material, the electrical current from one part of the circuit travels through the least resistant part of the conductor to the opposite part of the circuit, thus completing the circle.

The main principle to remember is that high amperage in electricity is what causes death in humans, not the voltage.

## Ohms Law
$I = V/R$

       I – Current through the body (amperage)
       V – Voltage across the body (pressure)
       R – Resistance of the body

**R**

Imagine water flowing down a river (voltage), as the water flows down the river and it encounters some large boulders it has to flow around the boulders (resistance or R), therefore reducing the current going down the river (through the body or I).

Also imagine a car traveling down a road at 80 m.p.h., the car encounters a series of cones arranged in a pattern. The car has to slow down to maneuver through the cones. The car is the voltage and the cones are the resistance. When the current encounters the resistance it decreases the voltage through the body.

## Facts

- Resistance is measured in Ohms

- 250-500 Ohms simulates human body resistance (skin)

- Karbon displaces approximately 900-1,200 volts in the body.

Electronic stun devices must be rated to put out a high voltage output with lowered amperage to have the desired effect without causing permanent damage or serious injury to the subject.

## Voltage and Amperage
**Example:** one unit of flow (amperes) occurs with one unit of force (volts) divided by one unit of resistance (ohms).

Joules = a watt second. Electrical energy is defined in units of a joule.

Current flow, or amperes, is the most important single factor in human electrocution. By direct measurement and information derived from animal studies, the following approximations as to various effects of current flow in humans for 60-hertz alternating currents are generally accepted:

0.001 amps - barely perceptible tingle
0.016 "- "let go" current
0.020 "- muscular paralyses
0.100 "- ventricular fibrillation
2.000 "- ventricular standstills
20,000 "- common household fuse blows

## Neuromuscular Keying
The generated pulses project a frequency into the neuromuscular system of a subject and *Temporarily* interrupt *Voluntary* muscle control.

Pulsed electricity relates to the method in which the electrical shock is introduced. As opposed to a direct current shock where the voltage and amperage remains constant over a period of time, a pulse delivers a set voltage and amperage of the greatest strength upon initial contact, and then diminishes to a lower rate immediately. It only effects voluntary muscle groups and the effect is temporary. Pulse duration time is approximately 10 microseconds

**R**

Pulse voltage ratio is approximately 10.21 pgps (pulse groups per second).
Pulse voltage is ~1,000 volts in subject.

.

*The Karbon MPID electrical specifications are as follows:*

| | |
|---|---|
| **Pulse Rate:** | Mode 1 (~1.3 sec) 8.85 pgs; <br> Mode 2 (~1.3 sec) 9.7 pgs; <br> Mode 3 (~1.3 sec) 10.8 pgs; <br> Mode 4 (~1.3 sec) 11.5 pgs |
| **Pulse Duration:** | ~250us |
| **Peak Arc Volts:** | ~50KV |
| **Peak Loaded Voltage:** | ~1200v pk (500k ohm load, direct contact) |
| **DC Curr Avg:** | ~2.2mA |

**R**



# GENERAL EFFECTS
# OF THE KARBON

- .5 seconds        Startles subject
- 1 - 2 seconds     Causes a release action and minor muscle contractions
- 2 - 4 seconds     Causes a stunning action and knocks offender down
- 4 – 6 seconds     Temporary, short-term less lethal incapacitation state causes a loss of balance, loss of voluntary muscle control, confusion and disorientation

**NOTE:** *The effects are not the same on everyone.*

A 2-5 second application should be sufficient to gain compliance with most offenders under normal circumstances. Be aware that some individuals, especially on certain types of drugs such as PCP, may not react immediately or at all to the application of an electronic stun device. Others may require a longer pulse discharge; however, you must be cautious not to send too long of an application into a subject as it could raise the likelihood of injury.

The Karbon MPID utilizes high tech quality electronic components that precisely blend *Pulsed Electricity, High Voltage* and *Low Amperage* that mimic and override the body's individual electrical system and will achieve takedown capabilities while not causing damage or injury to the human body.

This is how the Karbon system works. As all body functions are controlled by electrical impulse from the brain, additional electrical pulses can disrupt these messages causing an overload in the neuro muscular systems of the contact areas, thus causing immobilization or rapid fatigue without causing permanent or serious damage to those systems.



## TRAINING DIRECTIVE #101-S-106

**Length of Contact**
In the event the use of a Karbon MPID is required in an effort to control a resisting or uncontrollable individual, it is recommended to be applied up to two (2) sequential approximate 5 second applications or only until resistance has been terminated – up to the 10 seconds and pursuant to respective agency policies and/or guidelines. Furthermore, it is suggested that officers will not unnecessarily or unreasonably endanger themselves or a third party in compliance with stated guidelines.

**Course of Action**
When a device is applied in the contact or firing mode to a combative/resisting individual, if there are NO noticeable results after (2) 5 second applications, Karbon Arms recommends in most circumstances that it be holstered and a secondary plan of control implemented. Should the device have a noticeable effect at any given time during the applications, Karbon Arms recommends it be discontinued after compliance is attained, but not exceeding 10 seconds (two 5-second applications).

Chances are that if the device does not work within the 10 second window, it is highly unlikely it will work at all. From the standpoint of over-use, or intentional abuse, extended duration of more than (2) 5-second sequential applications is discouraged.

When and where possible, during an application of a Karbon MPID, follow-up physical contact controls should be initiated as quickly and as safely as possible. Use of the Karbon MPID is intended to reduce the time an officer spends in a physical confrontation but it may NOT avoid a physical altercation. Officers must be prepared to use alternative methods commensurate with use of force policy and also realize physical contact is not ALWAYS inevitable and may not be avoidable. Thus, physical contact control techniques may be reality and must rely on an officer's abilities.

Providing the Karbon MPID has an effect upon an individual, immediate follow-up control should be initiated. However, after (2) intentional 5-second applications, if there are no noticeable results to a subject, Karbon Arms recommends there should be a 2-3 second officer discretional pause and a third 5-second application applied. Ultimate failure to work at a third stage deployment will require a transition to a different method/alternative application of force either equal to intended electrical immobilization or greater than, depending on respective agency policy.

Field experience with this technology for over 30 years indicates one of three results taking place. Consult with certified training instructors to learn more regarding these phases.

**NOTE:** *During an effective application of a device either during contact or distance firing modes, it is highly likely that if the officer gives an individual orders, failure to comply will be evident. This is a typical response because the individual hears the audible orders but the body is not capable of responding. Accordingly, officers misinterpret this as "failure to comply" and will administer subsequent applications. This is incorrect and must be avoided. An officer must **ALWAYS** be prepared to transition to a different force alternative if an applied option does not work.*

**I have read this page and fully understand its meaning.**

| | |
|---|---|
| _____ | _____ |
| SIGNATURE | DATE |
| _____ | _____ |
| PRINT NAME | INSTRUCTOR |

**White: Student        Yellow: Instructor**



# BODY APPLICATION INFORMATION

## Body Application Points

- Attempt to achieve application on nerve or muscle areas
- Bone and fat act as insulators and should be avoided when possible

Since muscles and nerves are controlled by electrical impulses from the brain, the key to proper utilization of the EID is to disrupt and/or confuse these areas by adding more electrical signals that the areas are accustomed too, which leads to the desired effect of immobility and loss of muscular function to react and resist.

Fat cells and Bone, which is a less porous material, do not rely on electrical impulse for function control and therefore striking the skeletal system or fatty tissue area with an electrical shock is very ineffective.

## Areas to Avoid When Possible and Practical Training Directive

Environmental

- Presence of Gases
- Atmosphere

Persons

- Body
- Conditional

Presence of flammable gases such as propane or even fumed gasoline could ignite an airburst fire when an electrical spark is introduced. If there is indication that a flammable gas is present, utilize alternate force options.

Be aware of effects of water, humidity, etc in regards to electricity and the human body especially in regards to the reduction of body resistance to electricity. Also, use extreme caution when using the device on an individual in proximity to a fall hazard such as a building rooftop, etc as a fall may seriously injure or kill the suspect or pose danger to the officers involved.

Body size and weight as well as physical condition also play key roles in the effectiveness of the Karbon. Be aware that electricity has different effects on different people as well.

**Areas to Avoid When Possible/Restrictions/Contact Stun Mode (CSM)**
The following is a list of environmental and individual conditions where the stun device should NOT be used, applied, or areas to be avoided in the Contact mode. However, points of application cannot be selected in the firing mode.

I. Environmental

    A. Gases

        1._____      2._____

        3._____

    B. Atmosphere

        1._____      2._____

        3._____

        Rule of thumb:

        _____

        _____

II. Persons

    A. Body

        1._____      2._____

        3._____      4._____

        5._____

    B. Conditional

        1._____      2._____

        3._____      4._____

        5._____      6._____

        7._____      8._____

                                          a. _____

                                          b._____

Name: _____      Date: _____





**BODY APPLICATION CHART / CONTACT MODE**



1.  PRIMARY STRIKE ZONE          2.  SECONDARY STRIKE ZONE

STUDENT NAME                                        DATE

**R**

White: Student          Yellow: Instructor

## Preferred Application Areas and Effects

**Shoulders (deltoids) and upper back:** Primary loss of upper arm strength and mobility, disorientation, then loss of grip strength and balance

**Stomach Area:** Disorientation, loss of balance, weakness and loss of appendage control

**Lower Back:** Loss of balance, weakness, loss of appendage control

**Legs *(thighs and calves)*:** Loss of balance, weakness

**Arms *(upper and lower)*:** Loss of strength, loss of grip strength, weakness, grip release

Application to large muscle groups will produce more of a desired effect and are generally easier targets to aim for. Officers should Target the back (upper and lower), the abdominal area, shoulders and thigh area of the legs.

When the Karbon MPID has been applied to a combative or resisting offender and there are no noticeable results after two, five second cycles, holster the device and transfer to an alternate force option.

If two, five second applications are not effective; the need to transition to another force alternative should be attempted. An agency's use-of-force policy will usually dictate what option(s) may be available to use, depending on environment, location, availability of backup, seriousness of offenses and officers' physical abilities. Officers must be familiar with their agencies respective use-of-force policies.

## Areas to Avoid in the Contact Mode

**Top of neck:** Too close to the brain stem.

**Throat:** Directed pressure in the CONTACT mode could "crush" the windpipe.

**Female breasts:** The breast is a gland and susceptible to damage. Application of a stun device to the breast area would raise concerns at a later time if the inability to function as a milk producing gland became apparent. It would also be susceptible to producing significant marks because of the sensitive type of glandular tissue.

**Head:** The head has a wealth of nerve endings in it and an individual could be rendered unconscious from an application from an electrical stun device directly to the head. Also the eyes are very sensitive and susceptible to serious damage or loss of sight from a puncture wound.

**Base of Sternum *(Xyphoid Process)*:** May cause a contraction of the diaphragm and effect breathing.

**The Groin:** An application to the groin could be viewed as torture or a sadistic act, and should be avoided.

**R**

## Application Marks/Signature/Evidence

Application of an EID to body tissue (even through clothing) will leave marks. In the past, these marks have been referred to as burns, friction abrasions or friction marks. Further evaluation of this fact has revealed that the marks are indicative of a simple medical phenomenon known as the Lewis Triple Response. The marks should be referred to as "SIGNATURE" marks. This reference pertains only to the products described in this manual as other devices lack tested and documented output characteristics. These other devices, due to electronic irregular proportions and inadequate monitoring systems, could be capable of producing burns.

An application of an EID, as described herein, to the human body for more than 1/8 of a second (both contact probes must touch the subject), will leave the appearance of two or four marks on the skin. These marks could be evidentiary in nature. Applications through clothes will usually leave marks. The thickness and composition of the fabric will determine the ultimate effect from the device.

A thermal electrical burn occurs only if the temperature of the skin is sufficiently raised for a long enough period of time to cause tissue damage. Therefore, whether or not burns will be generated is dependent on several factors:

1. Amperage - Current flow
2. Voltage - Force in the system
3. Time Duration - Length of contact time with tissue
4. Area of Contact - (Volume) will the energized source and the ground

Such are the characteristics of the Karbon MPID; low amperage and pulsed electrical output. Application for a sustained time period will not cause electrical burns. The evidentiary marks left as a result of an application(s) are actually signature marks or evidence. Darts fired directly into skin will leave small puncture marks which may cause bleeding.

## Variables that Determine Effectiveness

**Duration:** length of application

**Frequency:** how many times the offender is stunned and how much time between each application.

**Location:** location on the body of the application is applied to.

**Condition of Offender:** Variables that may diminish the effect of the Karbon on certain individuals.
- Mental State
- Body weight
- Drugs
- Demeanor

## Post Deployment Care

Medical Assistance
- Incapacitated Subject

Dart Removal
- Small Puncture Marks

After deployment of the Karbon MPID hand held stun device, the potential exists that the subject could be injured or face serious and even life threatening injuries. The officer should pursue medical evaluation of a subject that has been affected by an EID ONLY pursuant to agency policies.

Darts removed from body tissue should be treated as bio hazard material and properly handled. All darts should be retained as evidence if actually used to immobilize an individual. Dart removal should be pursuant to agency policy.

 # USE OF FORCE & FORCE CONTINUUM

A review of the definitions of *FORCE* as herein described.

Force means an aggressive act committed by any person, which does not amount to an assault and is necessary to accomplish your objective.

Lawful Force means an aggressive act committed by any peace officer in the performance of his official duties when it is necessary to accomplish any of the following:

- When necessary to preserve peace
- Prevent the commission of offenses or prevent suicide of self-inflicted injury
- When making lawful arrests and searches or preventing escapes from custody
- When in self-defense or defense of another against unlawful violence to his person or property
- When preventing or interrupting an intrusion on or interference with the lawful possession of property.

Necessary Force means the minimum amount of lawful force sufficient to achieve a legitimate law enforcement objective.

Deadly Force means force that is intended or known by the act or to cause or, in the manner of its use or intended use, is capable of causing serious bodily injury or death.

Custody means:

- Under arrest by a peace officer; or
- Under restraint by a public servant pursuant to an order of a court.

Escape means unauthorized departure from custody or failure to return to custody following temporary leave for specific purpose or limited period, but does not include a violation of conditions of parole or probation.

There are three basic restrictions that apply in the use of force. They are:

- Must be reasonable
- Must be justified
- Must be necessary

The Use of Force is a decision-making process. It would be useful to have a guide outlining parameters available in making the decision to use or to not use force, as well as how much force to use, but there is not black and white delineation.

Remember one thing while making this decision. The Fourth Amendment states that:

> "all persons shall be free from unreasonable searches and seizures..."

and the courts have said that the use of force as it applies to an arrest is a seizure and therefore the amount of and type of force used must be reasonable.

Also remember that as a law enforcement officer you are not getting paid to fight. Nor do you have to stand toe-to-toe with someone and use the same level of force or type of force that they are using... you can legally escalate to that level of force that is just above the level of force that is being used to resist your attempts to gain control. Because generally you cannot gain control when you use equal force, but you must believe your actions are reasonable.

The point is, when the decision is made to use force, it must be used quickly effectively and dynamically. GAIN CONTROL, thus preventing more force from being used as counter measures.

There are no magic bullets, no ultimate panacea when it comes to using technology to implement force regarding effectiveness and safety. And arrest situation can spiral out of control, thus it becomes a match of strength only fueled by the intention of an individual not to get arrested. Officers must not only use the appropriate amount of force, but only that force necessary to overcome resistance. Respective agency policies will guide officers in where, when and how much force should be used. Officers must select the proper alternative to fulfill the need of force while not exceeding given parameters.

## Use of Force Tactics.

The BUT for argument... Failure to assess alternatives; too hasty a response?

Officers are placed in situations where a weapon must be used in defense of him, fellow officers or citizens. It is at this point an officer must make a decision to de-escalate, avoid confrontation or use lethal force in split second timing.

It is always second-guessing if an officer should have kept distance or if he could have maintained distance in a secure position until additional manpower arrived. The officer MUST make that decision which ultimately determines the course of ever changing events.

There are several points here to be made:

- Officer training
- Officer judgment
- Available alternatives

Alternatives, which include hands-on physical control, must all be evaluated at the moment of confrontation and/or resistance. Although non-lethal force may be intended, death or serious injury may still occur because of human factors: misapplication, miscalculation, and excessive strength. Conversely, this can work against an officer and even be the cause of using more force.

While it is sound judgment to wait for assistance and superior odds when possible, many response situations (traffic stops, etc.) require immediate and direct action be taken.

The levels of force available to an officer become even more effective with the levels of force available when electronic waveform technology is used.

## Use of Force/Policies & Tactics

Every law enforcement and correctional agency maintains established Use of Force Policies. While some of these policies are similar, others are entirely different. It is not Karbon Arms responsibility to dictate where/when a Karbon may be deployed, but how it is deployed.

Unique as it is, the Karbon has levels of force built in from display mode to deployment in contact or dart firing modes (dart firing is a greater degree of force because it is body invasive and could cause serious injury). The following pagers will serve for informational purposes and not intended to dictate policy. They are suggestive in nature.

Basic and Advanced officer training includes recognizing individuals under the influence of drugs. Upon responding and observing such an individual, whether or not there is an intended Karbon deployment, EMT/Paramedics should be immediately contacted and deployed to the scene. An individual in such condition (cocaine induced Excited Delirium, cocaine abuse, etc.) is at a heightened critical state requiring immediate medical attention. Even if an electrical force alternative is NOT deployed, a sudden death syndrome incident may be experienced. Proactive planning is always better than reactive.

## Authority for Force

Departmental policy may dictate who can use force and when. For both Sworn and non-sworn officers state law usually dictates who has the powers of arrest and grants them the statutory authority to use force to affect an arrest.

Federal Law gives federal officers the authority to use force. Case Law from federal courts also dictates laws and policies relating to the use of force.

## Understanding Force

NIJ Definitions of Force

- Non-Lethal Force
- Less than Lethal Force

EID's and the Use of Force

- Device is deployed with the intend of resolving a conflict without the loss of life or serious bodily injury
- The potential for the loss of life is possible

Officers must evaluate and determine what force is reasonable for a given situation using these criteria and be prepared to justify their actions in written reports as well as possibly in court. When assessing a situation, be sure to use no more force than reasonably necessary to gain compliance, and upon choosing a method to use, prepare a back up, just in case.

Gaining compliance with the proper level of applied force for a situation is paramount in officer and subject safety. Ensure that the policies and regulations regarding use of force for your department or agency is followed at all times, whether using the Karbon, or any other control device or method.

## Types of Force - Alternative Force Implementation

1. Show of Force
    a) Mere presence
    b) Uniform authority
    c) Body language

2. Verbalization
    a) Ability to verbally communicate
    b) Direct commands
    c) Intimidation

3. Physical Contact (weaponless)
    a) Come-along techniques
    b) Joint restraints
    c) Pressure point control
    d) Punching
    e) Physical power restraint
    f) Pain compliance

4. Electronic Restraints
    a) Optional Compliance
    b) Repelling/grip breaking
    c) Stunning
    d) Complete, short term, non-lethal incapacitation (follow-up contact control)

5. Physical Contact (weapons) Category #1: Close contact
    a) Kubaton
    b) Chemical mace
    c) Black jacks/saps

6. Physical Contact (weapons) Category #2: Extended contact
    a) Impact weapons
    b) Batons/PR-24
    c) Expandable devices
    d) Flashlights

7. Lethal Force
    a) Firearms
    b) Hi-Powered weapons

**A Force Continuum**



This particular Use of Force continuum model shows you that you are not locked into a step by step process of the escalation or de-escalation of force when you are in a given situation.


Using this force continuum imagine that you have been dispatched to a call involving a man with a handgun. When you arrive on the scene the subject is waving the gun wildly and telling officers to get back. There are also civilians in the area that could be in immediate danger. At this time you are authorized to use Deadly Force if necessary to protect your life and the lives of others. You point your firearm at the subject and he throws down the gun. You give him commands to get on the ground which he initially refuses to do. The subject eventually complies and officers approach the subject in an attempt to handcuff him. When initial contact is made with the subject he begins to fight with officers and a struggle ensues. You deploy your Karbon in the contact stun mode, the subject ceases to resist, and is taken into custody without further incident. During this given situation you have escalated to deadly force and de-escalated to less lethal force. You have also used your mere presence and verbal commands as use of force options during this confrontation.

## Force Continuum Scale

| | Presence | Verbalization | Physical Contact / Weaponless Control | Electronic Restraints | Chemicals | Impact Weapon | Lethal Weapons |
|---|---|---|---|---|---|---|---|
| **Suspect:** Cooperative, but in close range with officer<br><br>**Officer:** Presence, body language, Verbalization | ■ | | | | | | |
| **Suspect:** Cooperative, but must be given Directions<br><br>**Officer:** Presence, body language, Verbalization | ■ | ■ | | | | | |
| **Suspect:** Not controlled by verbal direction / Passive resistance<br><br>**Officer:** Presence, body language, verbalization, intimidation, weaponless control | ■ | ■ | ■ | | | | |
| **Suspect:** Active resistance / Defensive Status<br><br>**Officer:** Presence, body language, verbalization, intimidation, weaponless control. Chemicals, ERD | ■ | ■ | ■ | ■ | ■ | | |
| **Suspect:** Active resistance / Offensive status (no weapon)<br><br>**Officer:** Presence, body language, verbalization, intimidation, weaponless control. Chemicals, ERD, impact weapons | ■ | ■ | ■ | ■ | ■ | ■ | |
| **Suspect:** Aggressive, posing harm to others (no weapon)<br><br>**Officer:** Presence, body language, verbalization, intimidation, weaponless control. Chemicals, ERD, impact weapons | ■ | ■ | ■ | ■ | ■ | ■ | |
| **Suspect:** Place life in jeopardy<br><br>**Officer:** Presence, body language, verbalization, intimidation, weaponless control. Chemicals, ERD, impact weapons, firearms | ■ | ■ | ■ | | ■ | | ■ |

**NOTE:** A handcuffed subject may be either passive and cooperative or resisting and offensive.

**ESCALATION**



**DE-ESCALATION**

**Transfer of Force**

Most officers know when it is appropriate to escalate the use of force but it is equally important to know when it is appropriate to de-escalate. In many cases, it may be possible to de-escalate a situation through verbal command or mere presence, which is desirable as the risk to both officer and subject diminishes. Seeing as this is not always the case, the scale here can fluctuate rapidly given potentially volatile situations. Be prepared for anything.

## ACLU Policy #207

A police officer may not use a degree of physical force - which is greater than that for which there are reasonable grounds to believe are necessary to stop an ongoing crime, effect a lawful arrest, prevent an escape from custody or defend himself/herself or a third person from what s/he believes to be imminent danger. Use of deadly physical force by a police officer is permissible only when s/he reasonably believes there is an imminent use of deadly physical force against himself/herself or a third person.

"Deadly physical force" refers to any physical force, not just firearms, which under the circumstances in which it is used is readily capable of causing death or other serious physical injury.

"Police training must include instruction on the techniques involving a gradually escalating degree of force for stopping ongoing crimes, effecting arrests, preventing escape from custody, and defending both the police officer and third persons from physical harm. Police officers must be trained in the use of alternatives to firearms and other non-deadly techniques, and must be required to use those techniques before they may resort to deadly physical force, unless immediate resort to deadly physical force reasonably appears necessary to prevent the use of imminent use of deadly physical force against the officer or a third person". (Board Minutes, June 12- 13, 1982)

*Current policy language of the American Civil Liberties Union as established by the National ACLU Board of Directors, and set forth in the official ACLU Policy Guide.*



360 South Third Street, Suite 150
Columbus, Ohio 43215
(614) 228-8951

**R**



# KARBON MPID TACTICAL DEPLOYMENT & PRACTICAL ASPECTS DEVICE CAPABILITIES

The Karbon MPID has 2 modes of operation. *Contact* and *Distance*. Within these modes are additional levels of less-than-lethal force.  The Karbon MPID also has 3 methods of activation: auto cycle (up to approx 5 seconds) and semi-automatic (up to approx 2 seconds) and officer control (up to approx 5 seconds).

**Mode 1 - *Contact*** (Without a cartridge loaded, cartridges already discharged, or only the Corrections Model).  A unique feature of the Karbon MPID permits the unit to be carried while loaded. However, if required, the cartridge can be quickly ejected with the trigger finger.

   1) **Display (Optional Compliance)**
      i.   An audible and visible display of electricity is usually enough to back someone down. It demonstrates more force than possessed by a suspect/subject. It serves as a deterrent.
   2) **Repelling**
      i.   Momentary contact of 1-2 seconds will push away or keep an attacker at a distance.
      ii.  It is also capable of inducing a release action.

   3) **Stunning**
      i.   Actual momentary immobilization by means of 2-4 seconds (1 cycle) will "surprise" or stun an individual.

   4) **Sustained Contact**
      i.   A prolonged application of 5-10 seconds (2 applications) will place an individual in less-lethal short-term incapacitation, thereby permitting follow-up control.

**Mode 2 - *Distance*** (Standoff) – Does NOT apply to the Corrections Model.
Use of the Karbon is relatively simple: grip, sight picture, sight alignment, trigger squeeze, objectives of use.

   5) **Firing/Repelling**
      i.   Once fired, momentary contacts will keep an attacker at a distance. It is also capable of inducing release actions.

   6) **Firing/Momentary Stun/Momentary multiple bursts from the Karbon (officer control mode)**
      i.   Actual momentary immobilization (attention getter, but could be prone to aggravation)

   7) **Firing/Sustained Stun/Maintaining contact with the trigger (automatic mode)**
      i.   A prolonged application of 2-4 second cycles will place an individual in less-lethal short-term incapacitation, thereby permitting follow-up control.

**R**

The Karbon is not designed to be a quick draw impromptu weapon although it may have to be deployed quickly by one officer. It is a specialty device designed to be used where and when lethal force is not required - where there is a high risk of serious physical resistance difficult to overcome. Anytime an officer must get physical to overcome resistance, there is a potential of both officer and violator/aggressor to get injured. Is this force not enough or is it too much? Many arrests, due to circumstances, are like trying to put an octopus in a coke bottle. If properly used (time and place), the Karbon is intended to prevent additional and greater force from being used because it potentially could terminate the confrontation. All physical encounters are fluid and rapidly unfolding.

There are two distinct uses of the Karbon:

**Spontaneous**
One-on-one/officer against violator where a situation quickly requires deployment to contain and control hostile activity.

**Standoff**
Where a violator is contained and time permits responding officers to respond as a team. One or two officers serve as Karbon operators or stands by with lethal force in the event the situation escalates to deadly threat or encounter. The other team officers become the control personnel where they will handcuff and secure the subject.

By far, the standoff scenario is the safer of the two because it allows for planning, whereas the spontaneous situation is more dangerous because of a lack of available manpower. The team response concept should be practiced with two, three or four officers facilitating efficient control tactics. One-on-one tactical deployment should also be practiced as an officer survival factor.

The Karbon is designed to subdue an individual by means of short-term non-deadly incapacitation, but follow-up physical contact is inevitable. Furthermore, it is always a possibility that even after the Karbon is applied, it may not have an effect, requiring physical force being used.

## Distance Firing vs. Contact Mode

It is a well-known fact that most law enforcement encounters take place within arm's reach (WAR). When resistance is incurred within hands-on proximity, the contact mode (CM) should be used when and where possible. Firing the device at such close range serves little purpose from the standpoint of lack of dart separation, although most agencies prefer the weapon to be carried with cartridges loaded. The point here is that even when the cartridges are not locked in, the Karbon is still loaded with high voltage of non-lethal electronic waveform pulse technology available in the contact mode. Placement of the device on the body is often times selective whereas the firing mode is prone to injury from the aspect of darts penetrating the skin and/or impacting an eye, breast or groin area.

The contact mode reflects an extension of an officer's arm loaded with immobilization power. The firing mode promotes distance but reflects possible injury from dart penetration. All of these factors must be assessed during confrontation. The point is that an officer goes hands-on 100% of the time during a physical arrest. Use of the contact or firing mode becomes a reasonable and conscious decision.

**R**

# LIABILITY ASPECT & COURT REVIEW

## Documentation of Deployment

- Written report by officers involved
- Facts involving the incident
- Criminal charges
- Injury/Non-injury
- Secondary injuries
- Photographs
- All officers involved should file a written report.

Be clear and concise when explaining the facts of the incident, making sure to cover the totality of the situation and steps taken to the point of force being applied. This will show that attempts to de-escalate the situation failed, and that the force applied for a particular incident was justified.

Reporting of all injuries whether primary or secondary will help to exonerate officers from liability charges after the fact in the case of subject injuries, and help substantiate the force applied in a situation in the case of officer injuries. Take photographs if there are visible secondary injuries and if available, make the TruVu™ recordings available for evidentiary review. Take photos only after the wound has been cleaned, safety first.

## Testifying in Court

Wear a small badge, don't be a macho cop.

- Be prepared, prepare clear, concise reports and testify directly from your report. Deviation in    story told to report may lessen your credibility.  Be sure to explain in full detail the situation as it happened.

- Put the jury in your shoes. Look directly and relate your story to them, if you were in fear tell them. You want the jury to completely understand why force was applied, the reasoning for it, and what justified its use on the level that the force was used.

## Areas of Civil Liabilities

- Excessive force violations
- Technology not being implemented
- Technology not being provided to officers
- Liability factors can be diminished through proper training and implementation of agency policies and procedures

Use of the Karbon MPID will reduce excessive force violations and complaints.

Departments may be sued by the subject or subject's family if the technology is available but not made available to officers therefore forcing the officer to resort to another force option which may cause severe injury or death to an offender.

Department may be sued by the officer or officer's family if the technology is available but not made available to an officer therefore causing the officer to be injured due to less lethal weapon not being available to them.

## Caldwell v. Moore
*US 6th Circuit Court of Appeals, 1992*

The court affirmed "It is not unreasonable for the jail officials to conclude that the use of a stun gun is less dangerous for all involved than hand to hand confrontation."

Further there was no deliberate indifference as plaintiff did not suffer a serious deprivation because his injuries were not serious enough to require immediate medical attention.

Allegations were brought against correctional officers who had utilized the contact stun device to subdue an inmate. The inmate claimed that his 8th amendment rights against cruel and unusual punishment had been violated with the use of this device.

Upon reviewing of the evidence in this case, the court decided that electric stun devices when used properly and in justified circumstances were not violating the 8th Amendment, and would only be doing so if used improperly as a device of torture.

This case basically states that the use of an EID is not cruel and unusual punishment and does not violate the 8th amendment.

## Haynes v. Marshall
*US 6th Circuit Court of Appeals, 1989*

The court affirmed where allegations of excessive force are concerned, it must be determined if the force was applied "maliciously for the purpose of causing harm".

Allegations were brought against correctional officers who had to forcefully remove and subdue an inmate who had not taken prescribed anti-psychotic medication. The inmate during the removal had acted violently towards the responding correctional officers who placed him in a "strip cell" where he later died due to injuries suffered in the struggle. It was alleged that the inmate was beaten to death by the officers who violated his 8th amendment rights against cruel and unusual punishment.

It was determined by the court that the officers had acted appropriately in dealing with the circumstances presented. The court detailed that in order for a use of force incident to be violating the 8th Amendment, the force had to be applied "maliciously and for the purpose of causing harm" to the subject.

## Considerations Regarding In-Custody and Sudden Deaths

Subduing and controlling violent and aggressive subjects during law enforcement encounters has been an ongoing endeavor of the Criminal Justice System.

Defensive tactics utilizing physical hands-on contact methods has always been primary use of force to control violent behavior (resisting arrest, assaults, etc.). It is during such activities that officers and suspects alike get injured. Often times a greater degree of force must be used to counter the aggressive nature of would be violators.

To assist officers in these use of force situations, a myriad of alternative tools have been invented. All have been implemented with one though in mind - to minimize time an officer must spend in a confrontation thereby reducing the chance of a greater amount or degree of force.

Unfortunately, a great portion of today's violators is on drugs, mentally ill, intoxicated or a combination of the three. Not only does this place innocent bystanders and enforcement personnel at great risk, but it also places the individual at significant risk from unknown personal undetected medical problems.

Extended fighting and struggling with officers after a foot pursuit places an abnormal strain on the heart. The combination of adrenalin rushes followed by adrenalin dumps and use of alcohol and/or drugs combine to form a potential of a lethal outcome. That outcome may happen even if no tools or alternatives were used. Now if an officer uses OC Spray or electronic immobilization technology as an assisting tool and the encounter results in a fatality, the death will be blamed on the tool, not everything that happened prior to using it. Even being unable to catch a breath after a severe struggle can result in death. It is human nature to blame an outside stimulus, not the individual who resist arrest and has willfully ingested unknown quantities of drugs and/or alcohol.

Indeed incidents involving sudden death while in police custody is an increasing phenomenon largely due to the increased use of illicit drugs. Determination of cause of death is often problematic, regardless of the causative rendered conclusions. Most deaths follow violent struggles with law enforcement officers and create potential for significant legal ramifications. Often times little pathological evidence is gather as the result of autopsies. The truth of the matter is that technological alternative (stun guns) are a benefits because they are actually intended to (and do) reduce the time spent in a physical altercation thereby reducing strain and stress on the body - even possibly preventing heart attacks in borderline situations.

Moreover, there is a lack of (or difficulty) interpreting pathological evidence. The cause of death may be misattributed to police action. Importance must be placed on the evaluation of the history, circumstances surrounding death and the fatal environment.

Research suggests that four or more conditions may account for the majority of custody related deaths: positional asphyxia, cocaine abuse and alcohol intoxication, excited delirium, and Neuroleptic Malignant Syndrome. The point is that an individual may have died anyway without the use of a stun device or OC Spray. After all, it is easy to blame the car not the driver. I guess it is very simple: Don't fight back, don't resist arrest - you probably will not die from that arrest incident.

**35** | K A R B O N   A R M S ,   I N C .

## Positional Asphyxia

This occurs when the body position interferes with breathing resulting in asphyxia. Usually maximally restrained individuals placed in a prone position. Unless seated upright after restrained, may become quiet and active. Breathing becomes strained and subsequently breathing stops. Further susceptibility can be experience due to alcohol/drug intoxication.

## Cocaine Abuse and Toxicity, Alcohol Intoxication

Cocaine is a agent that stimulates both the central nervous and cardiovascular systems. Pharmacologically cocaine constricts the blood vessels, elevates heart rate, raises blood pressure and body temperature and ultimately affects the nervous system. These effects alone have produced legal anatomic catastrophes in individuals without underlying preexisting anatomic disease. Cocaine has also been known to cause death in cardiovascular incidents where there is no abnormality (ref: Mittleman & Wetlie 1987). These effects can substantially compromise an already diseased heart and potentially culminate in death. Or course, the quantity and quality of drugs will impact the result. Add alcohol and it substantially increases the risk of sudden death when mixed with cocaine. Cardio toxic effects of alcohol potentates the cardio toxic effects of cocaine, thus increasing the risk of overdose death.

## Cocaine Induced Excited Delirium

Excited delirium is an acute mental disorder characterized by disorientation, impaired thinking, hallucinations and illusions. Behavior is consistent, purposeless and often violent. It can also be part of bipolar disease (manic depressant), schizophrenia and/or acute drug intoxication such as cocaine, PCP and amphetamines. Although treatable in onset, it is considered a medical emergency. Cocaine-induced excited delirium fatalities ten to occur in a stereotypical manner with individuals exhibiting similar behavior. Intense paranoia followed by violent and/or bizarre behavior: running, screaming, stripping off clothing. Subjects appear psychotic, exhilarant, great strength and have diminished threshold of pain. Sudden death occurs either during or immediately after a struggle. Autopsy findings are generally non-specific, revealing only injuries sustained from the struggle with officers.

## Neuroleptic Malignant Syndrome

Characteristics are similar to excited delirium but generally occur in psychiatric patients who are taking anti-psychotic medication. Physical exhaustion, dehydration and organic brain disease are predisposing factors. Individuals who are not being treated with medications can be diagnosed as acute exhaustive mania. This could also relate to a cardiac event due to stress. Psychological stress can indeed induce fatal heart events, however autopsy finding are generally negative, seldom revealing a pathological cause of death.

Once again, add the elements of alcohol, a struggle with officers, and respiratory problems - all are additional factors, which may not be detected but significant contributing factors to a fatal outcome.

If using technological alternatives - electronic stun technology, OC Sprays, rubber bullets, etc. - the obvious blame of death or cause of fatalities will be focused upon that specific tool when in essence, that tool averted longer drawn out confrontations.



## BASIC CERTIFICATION – KARBON ARMS ACKNOWLEDGMENT

I, _____, an officer with the _____ agency, in the city of _____, in the state of _____, do hereby acknowledge receiving training in the use of the Karbon Arms - Karbon MPID and agree to use the system pursuant to the guidelines and policies as set forth by my agency.

Furthermore, I fully understand that I could be held criminally and civilly liable should I intentionally and without provocation activate the described product without cause, or with the intention of causing torture, while it is being used on a designated individual.

I furthermore understand that this is a device for purposes of control and will maintain my best efforts to preserve the peace and prevent a crime from being committed in my presence.

| | |
|---|---|
| _____ | _____ |
| **NAME** | **WITNESS** |
| _____ | _____ |
| **DATE** | **INSTRUCTOR NAME** |

## CHECK AND SIGN EITHER #1 OR #2 – <u>NOT</u> BOTH

☐ **1.** I HAVE READ MY AGENCY'S POLICIES PERTAINING TO GUIDELINES OF USE FOR THE **KARBON MPID** AND UNDERSTAND SAME.

| | |
|---|---|
| _____ | _____ |
| **SIGNATURE** | **DATE** |

☐ **2.** I HAVE NOT YET READ MY AGENCY'S POLICIES PERTAINING TO THE **KARBON MPID** BUT WILL DO SO **PRIOR** TO MY USING THE SYSTEM.

| | |
|---|---|
| _____ | _____ |
| **SIGNATURE** | **DATE** |

White: Student       Yellow: Instructor



# BATTERY INFORMATION

With focus on battery maintenance as an essential factor for device operational efficiency, the power source becomes a key to unit acceptance. The power source is the "heart" of the device.

Batteries have limitations regarding maintenance and actual uses per charge. Each unit is restricted by its own battery limitations. The Karbon was engineered around a consumer buyable and replaceable lithium battery power source. This designated power source offers ultimate performance while remaining readily available and makes the device "user friendly".

Working with lithium batteries, a more than adequate power source has been developed to power several different stun devices. The significance of this development reflects a virtually maintenance-free power source good for many activations prior to replacement. Lithium batteries, known for their prolonged shelf life, have been used in emergency medical equipment as back-up power sources and in cameras because of extended power output capabilities.

Use only the designated battery in respective devices.

> **CAUTION:** *A low battery will not properly cycle the respective device and could virtually "energize" the individual it is used upon. Thus, it is crucial to maintain proper battery levels. Units should not be needlessly or carelessly played with.*

### General
Various EIDs have different requirements in the way of individualized power sources. There have different types of batteries due to the demands of the respective units.

| Power Source | Effective Operating Time | Battery Stock# |
|---|---|---|
| Four 3-volt Lithium | Approximately 250 firings (Use of camera reduces # of firings) | Duracell® CR-2 |

Available directly from Karbon Arms and world wide availability off-the-shelf.

Do NOT use alkaline batteries or any other battery not listed above.

Temperature range for batteries: -5° F to 167° F

### Lithium Battery Power Source Applicable to the Karbon
Inherent characteristics of lithium batteries portray an extremely long shelf life with significant power retention. Voltage demand draws minimal power while offering peak performance.

Circuit design and electronic components found in the Karbon permit the designated lithium batteries to operate the respective devices for up to 300 firings prior to replacement.

## Training Information

The specified lithium battery has extended operational power to cycle the unit. Therefore, any combination of seconds for applications, up to the indicated amount of available power because there is no degradation on a daily basis.

Karbon Arms, Inc. recommends replacing lithium batteries every 12 months or when the LED indicates, whichever occurs first. Closely monitoring daily uses of the device and documenting such activities could indicate more frequent replacement as could humid environmental conditions. Care must be taken not to exceed the upper limits of allocated power.

> **CAUTION:** *Temperature variables, such as extreme heat or cold, will automatically discharge any battery to unknown proportions. Care should be taken not to store or leave a unit in a vehicle for prolonged periods of time as the battery(s) will discharge. Lithium batteries* **CANNOT** *be recharged. Discard properly after useful life.*

## Tips

- Store extra batteries at room temperature
- Do not attempt to charge a lithium battery
- Use only the specified battery(s) for respective units
- Replace batteries every 12 months or when indicated by system

## Karbon Power Source & Battery Specifications

The power source of the Karbon was designed focusing on three (3) important factors:

- Performance
- Cost Effectiveness
- Availability

> **CAUTION:** *Do not attempt to charge or discharge a lithium battery. Do not use anything other than specified battery.*

## Data Dock

Indicates date, time, number and length of firings.  Consult separate operation instructions.

## Optional TruVu Camera

Full color, 15 frames/sec, Hi-res quality, approximately 2-hour record time.  Consult separate operation instructions.



# WEARING THE KARBON
# SIZE REQUIREMENTS

The Karbon MPID is designed for proven assistance or power enhancement; therefore it should be worn and used weak side (weak hand) or cross-draw. Always leave the weapon hand (strong hand) free for immediate action, especially for handgun use.

Holster design permits the device to be worn on the duty-belt for regular belt placement. Duty-belt size may necessitate sacrificing some equipment however Karbon Arms makes no suggestions as to what an officer should delete from the belt.

### Size
The size of the Karbon is a key issue to psychological deterrence as well as functional use.

The obvious appearance of the device alerts adversaries to an officer's possession of some type of distinctive but unknown weapon. It gives the user a "psychological" advantage as many individuals do not want to resist if they are aware that enforcement action involves using a weapon. The ominous appearance of the Karbon, especially with the electricity crashing from probe to probe, provides an officer with the tactical edge. And for those who choose to ignore the visible recognition when the Karbon is pressed into service, it gives a textbook performance.

Although not 100% effective on everyone, actual combat field testing shows increased takedown capability for shorter applications and longer lasting results affecting more individuals than ever before, including subjects intoxicated or under the influence of drugs.



# HANDS ON -
# PRACTICAL EXERCISES

## Hands On - Basic Techniques

Basic applications should be demonstrated for the students. They should physically practice the techniques in an effort to demonstrate a minimal level of proficiency.

1) Grasp/Grip

2) Floating Arm Technique

3) Balance

4) Bear Hug (approach from rear)

5) Frontal approach left (or right) arm swing Lock arm/pull suspect in/apply device

6) Frontal approach right (or left) arm swing - Force arm around in applicable direction, grab around throat/pull back/apply device to lower back or kidney area.

7) Front Choke - two hands on throat (against officer) - Apply device to upper chest area by shoulder - left hand to right shoulder or right hand to left shoulder.

8) Arm-bar Choke against officer from rear - Press device against suspect's upper forearm to cause a near immediate release, then drop down with arm and apply the device to the lower torso or leg area of the suspect behind you.

9) Vehicle extraction: DWUI or resistant suspect - hands on wheel - Apply device to back of hand or upper forearm to break grip/lock of the exposed arm back and pull suspect toward you applying device to underarm area. Extract and handcuff.

**NOTE:** *This training session is not intended to replace the use of defensive tactics. This program cannot make anyone a defensive tactics instructor, but it will offer a foundational approach to the use of electronic immobilization devices.*

## Hands On - Tactical Training Session

This section is directed toward actual application of the device to a suspect/subject.

1) Proper grip - make sure the device is held in the appropriate hand (strong hand/weak hand) as per Instructor explanation. Maintain a firm, tight grasp while maintaining contact of the first joint of the index (left or right) finger with the activator switch.

2) When finished with the device, place it in the corresponding holster. Never throw it on the ground after an application to affect an arrest, as it may be necessary to re-apply it a second time. Keep the device in its holster. Repeatedly dropping the device could damage it.

3) Upon application, maintain contact for as long as possible, up to, and a short time after, resistance has noticeably been terminated. A short application could result in the necessity of a second or third to achieve the desired results. If no results are apparent after ten (10) seconds of constant application, conventional or secondary methods of control should be employed. It is difficult to maintain contact in struggling situations, but failure to do so could result in non-effective uses.

4)  Any attempt to subdue or restrain an individual by means of an EID should be in conjunction with "HOLDING" onto that individual. By firmly grabbing the individual, contact with the ground will be minimized and sustained device application will be maximized. Pull the suspect into you while pushing against him/her with the device.

**NOTE:** *Training in this area is suggested on an ongoing basis and can be designed to lengthen a given program. Repetitive training in tactical applications will generally increase device effectiveness.*

5)  In contact mode do not "thrust" the unit. Most confrontations are by general rule, a wrestling or grappling type of situation. Where distance is apparent, the stun device should be employed in the firing mode. Nor should it be used against a handgun or knife. Maintain arm flexibility when applying the device as the body will tend to jump back during combat use. If an arm is in a full thrust position and body weight is not properly shifted, the device will break contact with the point of application.

6)  Most effective applications are primarily by two officers: (1) as an "interference" officer and (2) as the applicator or "control" officer. However, successful applications by one officer are the basic attribute of the device. Elements of surprise, effectiveness and technique knowledge will provide the officer with a tactical advantage.

7)  A loud crackling noise will indicate non-contact. A good, solid contact will be indicated by a muffled noise. Be cognizant of the fact that a sustained application will promote an individual to possibly scream and swear. These actions usually result in an officer removing the device too quickly. MAINTAIN CONTACT to effectively break resistance.

8)  The overall dimensions of the unit (7.5L x 1.375W x 2.0), permit it to be easily grasped. Research has indicated the smaller the unit, the more chance of dropping it during a confrontation.

**Practical Exercise**

- Identify nomenclature
- Manipulate Karbon controls
- Demonstrate use of laser aiming device
- Demonstrate contact stun
- Demonstrate trigger pull activation
- Exposure to dart tape application
- Perform two deployments for qualification
- Practical Scenarios

These practical exercises will help develop familiarity with the KARBON HANDHELD PROJECTILE STUN GUN. Please make sure that you have a firm understanding of how the device is set up, how it operates, and its limitations. Once familiarization is complete, you will be run through a series of practical scenarios utilizing the Karbon as a force option.

# APPENDIX



# FEATURES OF THE KARBON MPID



[1] Safety Mechanism On/Off Switch

[2] Battery Compartment

[3] Cartridge Ejection System (CES)

[4] Recessed Cartridge Bay

[5] LED Display

[6] Illuminated Front Site

[7] Laser Site

[8] Battery Strength Indicator Light

[9] Manual Site

[10] Side Illumination

[11] Trigger

[12] Contacts for Stun Mode

[13] Flashlight

[14] Front Blade Site

[15] Optional Camera inserted below barrel

# APPENDIX



# SPECIFICATIONS
# OF THE KARBON MPID

The Karbon MPID has an on-board micro computer that manages the flow of electricity. Because it can control the flow of electricity the Karbon MPID is programmed with a specific amount of energy that will be discharged. The Karbon MPID is actually "smart" because it communicates to the darts at the end of the gun to sense the resistance level at the target and will adjust the flow of electricity to deliver a steady known amount of energy each and every time you pull the trigger. Therefore, the Karbon MPID manages the energy flow depending on what the darts hit (coat, tee shirt, direct, etc.) The Karbon MPID is a smart gun technology that when deployed, it knows EXACTLY how much energy is put into the subject.

**Model: Karbon MPID**
- Model Karbon MPID
- Length: 190.5mm
- Height: 101.6mm (Not including sights)
- Width: 34.9mm (At widest point)
- Range: 7m (22')
- Pulse Group Rate:
  - 1st      Interval: 8.85pgs
  - 2nd      Interval: 9.7pgs
  - 3rd      Interval: 10.8pgs
  - 4th      Interval: 11.5pgs
- Pulse Duration: 250 Microseconds approx.
- Peak Open-Circuit Arcing Voltage: ~50,000 Volts Approx.
- Peak Loaded Voltage: ~1,200 V typ (direct contact: 500 Ohms)
- Average Current in Pulse Groups: ~2.2mA
- Temperature Range:
  - Storage: -20 C to 48 C
  - Operating: -5 C 45 C
- Humidity: 10% RH to 95% RH, non-condensing
- Battery: Duracell CR2, 3V Lithium; ~250 firings without TruVu and 100 firings with TruVu
- Weight: ~360 Grams with Batteries




# APPENDIX



# ABBREVIATIONS
# & DEFINITIONS

## Abbreviations

**CCC -** Close Contact Confrontation

**EID -** Electronic Immobilization Device, Stun Device, "Stun Gun"

**EPT -** Electronic Pulse Technology

**ERD -** Electronic Restraint Device, Stun Device, "Stun Gun"

**NMIW -** Neuromuscular Incapacitation Waveform

## Definitions

**Amperage -** the strength of amperage established current expressed in

**Ampere -** a unit of electric current in the meter-kilogram-second system

**ASM -** Auto-Sleep Mode

**Battery -** a device for generating an electrical current by chemical reaction; a source of continual power.

**Electricity -** current used or regarded as a source of power or derived from a defined source of power

**Electronic Pulse Technology -** a high voltage, low amperage discharge system combining electricity with frequency. Often referred to as a non-linear muscle relaxer as used for nerve or muscle stimulation within the medical profession

**Event -** each occurrence where a device is used from start to finish

**Joules -** the International System unit of energy equal to work done when a current of one amperage is passed through resistance of one ohms for one second. A measurement of one watt second

**Non-Lethal -** not likely to cause death

**Ohms -** a unit of electrical resistance equal to that of a conductor in which a current of one ampere is produced by a potential of one volt across its terminal; a unit of measure

**Resistance -** the opposition to electrical current characteristics of a medium, substance or circuit element

**Signature Marks -** the evidentiary marks left by the application of an electrical stun device

**Watt -** a unit of power in the International System equal to one joule per second

## Common Electrical Terms

**Voltage:** The measure of electromotive force in the system

**Amperage:** The measure of current flow per unit time

**Ohm:** Unit used to measure resistance to the conduction of electricity

The flow of electricity in relation to passing through an object is specifically described in terms of *Voltage*, *Amperage*, and *Ohms*, each of which play a role in the passage and effect of electricity on the human body.



## CLASS OVERVIEW, REVIEW & ACKNOWLEDGMENT

1. Review and understand agency policy/procedures and protocol regarding respective product use.
2. Never use an immobilization device to attempt to gain information from an individual by threatening.
3. Never use an immobilization device to intentionally inflict torture, abuse, self-gratification and/or punishment.
4. Be aware of the areas on the human body and gender restrictions where an EID should not be applied.
5. Be aware of the maintenance aspects of the respective EID.
6. Know where and how an EID may be used in and during USE OF FORCE incidents and the relationship between the need for force and the actual force applied.
7. Be aware that this technology does not affect everyone the same way.
8. Be aware that this is a device designed for immobilization and control and NOT as an offensive weapon.
9. Be aware that an EID is an alternative and must be used at the proper moment.
10. Know your own limitations with an EID.

I fully acknowledge receiving training in the above mentioned areas and understand my responsibilities when using an ELECTRONIC IMMOBILIZATION DEVICE.

_____
NAME

_____
AGENCY

_____
INSTRUCTOR (PRINT NAME)

_____
DATE

**White: Student          Yellow: Instructor**



## INSTRUCTOR REFERENCE GUIDE STUDENT PERFORMANCE OBJECTIVES PRACTICAL EXAMINATION FOR USE OF ELECTRONIC IMMOBILIZATION DEVICE

Student Name: _____ Date: _____

Agency: _____ Class Location: _____

## NOTE: #1-19 ARE <u>MANDATORY</u> FOR CERTIFICATION, #20 & 21 ARE OPTIONAL

|  | | ACCEPTABLE | UNACCEPTABLE |
|---|---|---|---|
| 1. | VERBALIAZTION | _____ | _____ |
| **CONTACT MODE** | | | |
| 2. | WORKING SAFETY PUSH BUTTON | _____ | _____ |
| 3. | DISPLAY (AIMING) | _____ | _____ |
| 4. | OPTIONAL COMPLIANCE MODE | _____ | _____ |
| 5. | TARGET AREAS | _____ | _____ |
| 6. | VEHICLE EXTRACTION | _____ | _____ |
| 7. | SEARCHING | _____ | _____ |
| 8. | GRIP RELEASE | _____ | _____ |
| 9. | MAINTAINING CONTACT | _____ | _____ |
| 10. | ARM LOCK / UPPER CHEST APPLICATION | _____ | _____ |
| **FIRING MODE** | | | |
| 11. | LOADING CARTRIDGES | _____ | _____ |
| 12. | MANUAL UNLOADING | _____ | _____ |
| 13. | CARTRIDGE EJECTION | _____ | _____ |
| 14. | TRANSITION TO CONTACT MODE | _____ | _____ |
| 15. | FIRING FROM _____ FEET | _____ | _____ |
| 16. | FIRING FROM _____ FEET | _____ | _____ |

| **APPLICATIONS** | | | | | |
|---|---|---|---|---|---|
| 17. | SELF APPLICATION TO THIGH | YES | ☐ | NO | ☐ |
| 18. | INSTRUCTOR APPLICATION TO UPPER CHEST | YES | ☐ | NO | ☐ |
| 19. | INSTRUCTOR APPLICATION TO RADIAL NERVE | YES | ☐ | NO | ☐ |
| 20. | FULL TAKE DOWN **(OPTIONAL)** CONTACT MODE | YES | ☐ | NO | ☐ |
| 21. | FULL TAKE DOWN **(OPTIONAL)** ALIGATOR CLIPS | YES | ☐ | NO | ☐ |

STUDENT SIGNATURE:_____

I certify that the above named individual has demonstrated his/her ability to properly utilize a Karbon MPID stun device according to Karbon Arms training guidelines and SPO's.

_____          _____
       INSTRUCTOR SIGNATURE                 DATE

**White: Student**          **Yellow: Instructor**

Exhibit 30

# KARBON

# ARMS, INC.

Single Shot Ballistic Firing / Contact Less-lethal
Electronic Immobilization Device

Karbon™ MPID™
Karbon™ MPID-C™ (Corrections Model)
Karbon™ MPID™ TruVu™

**OWNERS MANUAL**
**&**
**OPERATING INSTRUCTIONS**

Karbon Arms, Inc.
U.S.A.

⚠ CAUTION: *Read and understand completely prior to operating this device* **NOT** *to be used in lieu of certified training*

_____

*Unit Serial Number*

# YOU ARE IN POSSESSION OF A WEAPON CLASSIFIED BY BATF AS A FIREARM, PURSUANT TO RULE 80-20 OF THE GCA OF 1968.

## HANDLE AND TREAT THIS WEAPON AS YOU WOULD ANY FIREARM.

*   ALWAYS POINT DOWN UNLESS READY TO USE

*   TREAT IT AS LOADED AT ALL TIMES

*   KEEP FINGER AWAY FROM TRIGGER UNTIL READY TO FIRE

## NOTICE

The information provided herein is intended to familiarize the user with basic product operations. It is NOT designed, nor intended, to substitute for certified product training by an authorized instructor.



[1] Safety Mechanism On/Off Switch
[2] Battery Compartment
[3] Cartridge Ejection System (CES)
[4] Recessed Cartridge Bay
[5] LED Display
[6] Illuminated Front Site
[7] Laser Site
[8] Battery Strength Indicator Light
[9] Manual Site
[10] Trigger
[11] Contacts for Stun Mode
[12] Flashlight
[13] Front Blade Site
[14] Optional Camera inserted below barrel



Introduction ................................................................................................................... 6

Exactly What is T-Wave Avoidance ᵀᴹ (TWA) Technology.......................................... 7

Commentary for Prospective Users ............................................................................. 7

Disclaimer ................................................................................................................... 7

Cleaning and Maintenance of the Karbon ᵀᴹ MPID .................................................... 7

Product Description...................................................................................................... 8

Smart Stun Technology................................................................................................ 8

Power Source – User Friendly ..................................................................................... 8

On/Off Safety Switch................................................................................................... 9

LED Display ................................................................................................................. 9

Accountability / Data Recording.................................................................................. 9

Cartridge Description ................................................................................................. 10

Loading and Unloading Cartridge .............................................................................. 10

Loading and Unloading Tips ...................................................................................... 10

Site & Laser Application ............................................................................................. 11

Firing the Karbon MPID.............................................................................................. 11

Practice Firing / Range / Target Acquisition.............................................................. 11

Areas of Non-Use....................................................................................................... 12

Removing Darts ......................................................................................................... 12

Contact Stun Mode (CSM).......................................................................................... 12

Trouble Shooting Device Failures.............................................................................. 13

Manufacturing Statement........................................................................................... 13

Registration / Warranty Validation.............................................................................. 15

Product Return Form .................................................................................................. 17

## INTRODUCTION

Karbon Arms, Inc. ("Karbon") is pleased to present the Karbon MPID a unique, technologically advanced electronic "Smart" stun gun employing numerous features and advanced takedown power.

1.  **Advanced Technology:** T-WAVE AVOIDANCE TECHNOLOGY (TWA). Karbon Arms engineering has developed a superb method of delivering micro pulses rather than a large single pulse like in existing stun technologies. Each micro pulse requires less amperage than a single large pulse. The user does not "see" T-Wave Avoidance Technology but the receiver certainly experiences it! The electrical pulse width and rate are self adjusting which permits use of a smaller high voltage transformer and more controlled discharge of energy stored in the capacitor bank. The resulting neuromuscular incapacitation voltage waveform (NMIW) produces superior neuronal cramping for better effectiveness and efficiency.

    **Note:** Although the engineers whom developed the Karbon tried to incorporate features believed to improve the safety of the Karbon, the Company cannot assure the unit is completely safe. Injuries or perhaps fatalities have occurred after the use of other EID's. Therefore, no assurances can be provided that the Karbon is completely safe.

1.  **Compact:** Size is important. Today's officers are required to carry an array of equipment for a variety of confrontational situations. The Karbon MPID is small enough to be worn on a duty belt yet large enough to maintain a grip for effective aiming or contact application.

2.  **Concealable:** Sleek and slim, the Karbon MPID may be worn on outerwear duty gear or concealed under jackets or shirts for non-obviousness accessibility/plain clothes operations.

3.  **Affordable:** The Karbon MPID utilizes off-the-shelf batteries which are lower cost for on demand and extreme product operations. This is less taxing on agency budgets while affording more officers to have "less-lethal" options available for suspect control.

## UNIQUE FEATURES

a.  **CARTRIDGE EJECTION SYSTEM** ("CES") technology is unique to the Karbon MPID. The ambidextrous push button ejector is located forward of the trigger guard. By simply pushing the eject button, the cartridge is easily and quickly ejected with ONLY one hand. This permits the Karbon MPID to be quickly reloaded or emptied for "contact" use. In addition, the user's hand is not in front of a potentially live weapon.

b.  **INFORMATION TO PC** is accomplished by radio frequency ("RF") leaving the unit better sealed without a data port point of entry. This is one less place for water to enter potentially reducing the possibly of shorting the unit.

c.  **CONCEALED CARTRIDGE** - A recessed bay houses the cartridge preventing it from dislodging in the holster, snapping off or dislodging during actual shooting encounters.

d.  **DART SEPARATION** - A "tight" pattern is experienced by providing a 5.25 degree dart separation angle. At 6 feet to target there is a dart separation of approximately 6.6" and at 20 feet a separation of approximately 22" achieving excellent target acquisition. The dart cartridge is also reversible: it can be loaded upside down.

e.  **SAFETY MECHANISM** - The safety is a "top-mount" push on/off mechanism when activated there is an immediate boot up; no time delay.

## WHY DO WE NEED T-WAVE AVOIDANCE TECHNOLOGY?

To know why we need T-Wave Avoidance (TWA), you first need to know exactly what function the T-Wave plays when the heart beats.  The Cardiac T-Wave is part of the cycle at the end of a heart beat.  When the heart needs to beat again this is the signal that tells the heart to beat again!

## EXACTLY WHAT DOES T-WAVE AVOIDANCE TECHNOLOGY DO?

In theory, if an EID shoots at a steady pulse rate and that pulse rate is in sync with the T-wave, the EID may possibly interfere with the T-wave signal and the heart may not be able to reset itself again.  Since the T-wave occurs at a consistent interval and the Karbon MPID changes the pulse rate, Karbon Arms believes that its technology can offset the chance of interfering with this vital cardiac signal ....why take a chance with other EID technologies?  However, TWA is a theory developed by Karbon in an effort to try and reduce risk, however, risks still exist using EID technology.

## COMMENTARY FOR PROSPECTIVE USERS

While electronic immobilization technology has been available for use by the criminal justice system since 1973, Karbon Arms has added greater functionality and industry-leading documentation capability with its Karbon series projectile/contact stun guns. Less lethal by intended design, the Karbon MPID utilizes modern technology. The Karbon MPID is designed to provide law enforcement, corrections, professional security, and military personnel with a viable alternative to brute and deadly force options. When used properly, the Karbon MPID can significantly reduce officer and subject injuries.

The Karbon MPID is a capacitive discharge device that permits waveform pulse widths, spacings and capacitor bank sizing to be optimized for performance in both direct contact and non-contact (clothed) modes.

A novel additional feature of the Karbon MPID is the use of a staggered pulse rates during a shocking interval. These rates have been chosen in such a way that cardiac fibrillation on a stressed target is believed to be less likely. The pulse rates chosen tend to avoid alignment with the target's susceptible cardiac T-wave interval. This permits pulse energy to be increased above ordinary levels to assure muscle incapacitation on difficult targets while simultaneously enhancing cardiac safety.

The following pages will explain basic operating function and features of the Karbon MPID.

## DISCLAIMER

The Karbon technology is not without limitations and risks. It may not be instantly effective on subjects and while intended to be less lethal, it may cause serious injury or even death in extreme circumstances. Accordingly, CARE MUST ALWAYS BE EXCERCISED in the use of this product. Like all stun device products, the risk of injury to a subject can be increased by their use of drugs, pre-existing medical conditions as well as elevated metabolic rates and stress brought on by the confrontation itself. Risk of injury is also greatly increased by the overuse of this product. Karbon Arms, Inc. strongly recommends that after two stun cycles (See description below) an alternative means of subduing a subject be considered.

## CLEANING AND MAINTENANCE OF THE KARBON MPID

The Karbon MPID shell is comprised of a high-impact resistant plastic.  If needed, the Karbon MPID should be cleaned with a damp cloth with a small amount of mild detergent. The product should not be exposed to solvents or gun cleaners of any kind.  While the Karbon MPID is extremely weather resistant it is an electronic device and should not be placed underwater at any time as personal injury and damage to the product could result.

KEEP THE UNIT DRY and free from moisture. Water is a conductor of electricity. If the unit becomes wet, the user may experience a slight shock and the possibility of shorting out the unit. While the unit can be used in the rain, if it is submerged or drenched with water, it should be toweled off, batteries removed, cartridge removed and left to air-dry for at least 24 hours.

## PRODUCT DESCRIPTION
The Karbon MPID is a single cartridge, two dart projectile/contact stun gun designed to provide an alternative method of immobilizing and subduing potentially dangerous and violent individuals in situations in which the use of deadly force is not warranted. The Karbon MPID provides an effective operating range of up to 22 feet, up to the reactionary gap, providing the user time to respond to the incident thereby increasing safety for both the user and target alike.



Dart Included Angle, 5.25°

0.525"

| DISTANCE | SPREAD |
|----------|--------|
| 2ft. / .6m | 2.2" / 5.6cm |
| 6ft. / 1.82m | 6.6" / 16.8cm |
| 8ft. / 2.43m | 8.8" / 22.4cm |
| 12ft. / 3.65m | 13.2" / 33.5cm |
| 15ft. / 4.57m | 16.5" / 41.9cm |
| 20ft. / 6.09m | 22" / 55.9cm |

*Spread is approximate; variables in the field can change the outcome.

The effective operating range of a projectile stun gun is determined by two principal features: the distance that the darts travel and the spread of the darts. Maintaining an optimal spread between the darts is important to the effectiveness of the system. If the negative and positive darts are too close together, an insufficient area of the subject's body will be affected. The Karbon MPID maintains an effective yet tight spread throughout its range by ample disbursement of the darts.

## PULSE GROUP TECHNOLOGY
The Karbon MPID delivers high voltage, low amperage electricity in the form of pulse groups per second (PGPS). PGPS technology is different from traditional stun technologies in that rather than delivering single pulses of larger amounts of electricity, each "pulse" contains mini or micro pulses. As many as 7-8 micro pulses.

The theory of the micro pulses is to:

A. Deliver less brute force electricity than in a single pulse
B. Allow the pulse duration to be longer than traditional EID's which should allow for superior muscle lock up capability.

## POWER SOURCE - USER FRIENDLY
The Karbon MPID is powered by four (4) CR-2 lithium power cells. Available off-the-shelf or directly from Karbon Arms, Inc., these batteries maintain excellent shelf life, on demand use and provides up to 300 cycles prior to replacement.



To install the batteries in the unit, simply press in the battery cover plate from the bottom of the handle and slide out to the side of the weapon. It is designed to be a snug fit so the use of a small screw driver or a quarter may possibly help. To replace, slide the battery cover plate into the side of the gun and listen for a click to know that it is securely locked in place. For best performance Karbon Arms, Inc. recommends DURACELL® CR-2 batteries. Other brands may impact overall efficiency and ultimate effectiveness of the device. Make certain to place the batteries in the correct position as damage could result from improper installation.



**TIPS:**
- Store extra batteries at room temperature
- Do not attempt to charge a lithium battery
- Use only the specified battery(s) for respective units
- Replace batteries every 12 months OR when indicated by system
- Battery indicator lights:
  - Green-good battery,
  - Yellow-recommend replacing,
  - Red-must replace (gun shuts off)



**CAUTION:** Temperature variables, such as extreme heat or cold, will discharge ANY battery. Lithium batteries *CANNOT* be recharged. Discard properly after useful life.



Safety
On/Safe
Position

LED
Display

Battery
Indicator
Light

## ON/OFF SAFETY SWITCH

The Karbon MPID is shipped ready to use. First insert the batteries. To operate the Karbon MPID, depress the safety switch that is located on top near the rear of the unit. When the safety switch is depressed once, the Karbon MPID is on. Depress the safety switch a second time and the Karbon MPID will be in the off or "safe" position. A green dot, indicating a good battery, in the LED display indicates the unit is on. When the unit is turned on, the sight laser and the LED display are both activated.

## LED DISPLAY

The Karbon MPID has four (4) LED illuminated display lights. The display turns on and off automatically with the safety switch. If the unit is working correctly, when the device is turned on, all four lights will be green. If the batteries are sufficient to power the device but are beginning to reach low levels, when the device is turned on, the indicator will be a solid red light. If the batteries are below sufficient level to power the unit, when you turn the device on, the battery indicator will be flashing red, indicating the batteries need to be changed. If there is a problem with the unit's run time crystal or the camera / laser their respective lights will display as red lights.



Power   Battery Crystal Cam/Laser

## ACCOUNTABILITY / INFORMATION / RECORDING

Each Karbon MPID has the unique ability to provide information to a PC that will allow the PC to decipher critical information and display the date, time, voltage of batteries, duration and number of firings. The PC will recognize up to 1,300 firings when the unit wirelessly transmits the data to the PC via the docking station. The Karbon MPID has a unique feature that can convey information to computer. While the gun itself does not actually capture data an on-board crystal counts seconds. While counting seconds, markers can be put in when the gun is fired and stops firing. That information is then sent to a PC where the seconds are subtracted from the PC's clock to extrapolate an accurate time of firing.

## CARTRIDGE DESCRIPTION

SIZE:          1.75" L x 1.375" H x 1.25" W
COLOR:         Black with Yellow Blast Doors
WEIGHT:        .64 oz. or .025kg

Each cartridge contains 44 feet (22 feet per dart) of insulated wire. On the end of each wire is a small barbed dart affixed to an metal shaft to which the wire is connected. When the trigger is pulled, an electrical charge ignites primers, which ejects and propels the darts from the cartridge. The darts have a muzzle velocity of approximately 170 feet per second.

Two small panels on the front of the cartridge hold the wires and darts securely. Upon firing, these "blast-doors" are blown free from the front of the cartridge. When the cartridge is fired, there is a report of approximately 90 decibels.

If a blast door falls off a live cartridge, DO NOT attempt to glue it back  The cartridge should be disposed of properly and treated as would any other form of live ammunition.



## LOADING AND UNLOADING CARTRIDGES

The Karbon MPID has a recessed ammunition-firing bay to prevent the cartridge from being knocked off or damaged.  When possible do not attempt to load the Karbon MPID unless the safety button is enabled. To load, insert the cartridge into firing bay and press securely into place. When lodged correctly the cartridge should snap into place. To unload and remove cartridge, simply squeeze the side of the cartridge or use the ejector button. The spring inside the firing bay will help push the cartridge out. Do not place your hand directly in front of the door.

## LOADING / UNLOADING TIPS

- Verify the gun is not on by looking at the display screen.  If LED lights are displayed, turn the power off.
- When loading or unloading, always point the Karbon MPID toward the ground.
- Never have a finger on the trigger when loading or unloading.
- Never put your hand directly in front of the cartridge.

## SITING & LASER APPLICATION

The Karbon MPID has a built-in laser optic located to the right of the rear site. The laser serves as sight as well as a psychological deterrent possibly pre-empting actual firing of the device. Never aim the Karbon MPID at a subject's face. Serious injury could result if a dart lodges in an eye and the laser could cause damage to the eye even if the weapon is not fired.

- Never look directly into or towards the laser
- Always point the Karbon MPID away from your body
- Assume the Karbon MPID is loaded until checked by you

The laser can be adjusted (North/South & East/West) by simply inserting a screwdriver into the outside adjustment slots that are separated by 90 degrees.

## FIRING THE Karbon MPID – Trigger Pull Activation (TPA)

1. Officer control: The officer has total control on each application for approximately 5.1 seconds. He may let-off on the trigger at any given time up to four seconds thereby discontinuing the activation, or maintaining trigger pull at which time the unit will time-out at approximately 5.1 seconds of discharge. The trigger switch activates the unit and provides the user with total control of the stun cycle. When the unit is fired, constant contact with the trigger sends an electrical shock to the target for approximately 5.1 seconds; a full stun cycle. After approximately 5.1 seconds the unit disengages and can only be re-engaged by releasing and pulling the trigger again starting another approximate 5.1 second cycle. Letting up on the trigger at any time will terminate the cycle. Karbon Arms strongly recommends that shock cycles be terminated as soon as the subject submits and Karbon Arms recommends only two shock cycles be used on a subject due to the possibility of increased of risk of injury. After two full shock cycles, other means of subduing the subject are required. The aforementioned is also applicable to the CSM (Contact Stun Mode).

2. Semi-Auto bursts: Trigger pull and constant contact with the trigger will automatically time-out after approximately two seconds. The officer will then have to re-engage the trigger for subsequent activations.

3. Auto Cycle: Officer pulls the trigger and immediately releases it; the unit will still continue to operate for approximately 5.1 seconds. The Karbon MPID continually adjusts energy flow and time outs can vary depending on the target's resistance. The only way to interrupt this cycle in the middle of a four second operation is to engage the safety bolt to turn the unit "off".

These various modes of operation are ALL programmable by the agency by means of placing the unit in the download cradle and following directions. Units shipped from the factory are ALL in position 1: Officer Control.

NOTE: Units used by an agency should ALL be in the same mode from the aspect of continuity, standardization and training, for liability reasons, keeping in mind that the programmable mode, 1, 2, or 3 will be a function in the CONTACT STUN MODE as well as the firing mode.

## PRACTICE FIRING / RANGE / TARGET ACQUISITION

Required materials: polypropylene or foil target/tape/cardboard

NOTE: Special targets are available from Karbon Arms, Inc.

1. Select a safe location within a 22 foot range. Place the target on a cardboard backing to prevent damage and reduce the chance of darts bouncing off. Placing a target directly over a hard surface may cause the darts to bounce off the target and could damage the underlying surface.

2. Karbon Arms, Inc. recommends measuring off firing positions at 8 feet and 15 feet.  Load, disengage safety, aim laser, pull and hold down the trigger. The Karbon MPID will go through a full stun cycle. Repeat at different distances to familiarize yourself with the dart patterns.

3. Always hold the Karbon MPID level when firing. NEVER tilt the unit sideways as this will cause the darts to spread horizontally rather than vertically

## AREAS OF NON-USE

Do not use or activate the device in the contact or firing mode within the proximity of flammable gases or other flammable substances. Doing so could cause an explosion or fire. Also note that some self-defense sprays contain flammable components such as alcohol, therefore Karbon MPID should not be used on subjects that have recently been sprayed.

To lower the risk of injury, Karbon Arms, Inc., strongly recommends that you DO NOT SHOOT individuals that are under 90 pounds, elderly, pregnant, or wheel chair bound. Do not fire the unit if an individual is in or near a swimming pool, a lake or an ocean as the subject may drown. Do not fire the unit at a subject who is on a building top, roof, or cliff because falling from such a dangerous height could harm the subject.

## REMOVING DARTS – pursuant to agency policies and procedures

The darts are designed to lodge in clothing and conduct a stun through the clothing into the subject. A barb at the end of the dart helps the darts to embed and makes it difficult for the subject to remove. Accordingly, care should be taken in removing the darts as they could cause damage to clothing. It is possible that the darts could lodge in the skin of the subject. If this occurs simply cut the wire and have the dart removed by trained professional. If medical attention is not available, firmly pinch the area around the dart and quickly pull the dart out. If the dart is lodged in a sensitive area, the eyes, neck etc., cut the wire and seek medical attention immediately. Do not twist darts when removing them as this could result in injury and/or discomfort.

**NOTE/WARNING:** It is possible when firing the Karbon MPID, with the subject facing you, that a dart could penetrate an eye. If this happens, IMMEDIATELY discontinue stun cycle and seek immediate medical attention.

## CONTACT STUN MODE (CSM) - Power Drive Contact Capability

The Karbon MPID may be used as a contact stun device. Before operating in contact stun mode be certain that the Karbon MPID is not loaded with live cartridges. To operate, press the Karbon MPID firmly against the subject and depress the trigger. For the Karbon MPID to be effective in the contact mode, constant, firm pressure must be applied. Bare skin is a preferable contact point as the stun may not penetrate heavy outerwear such as winter jackets.

 

**NOTE/WARNING:** If the Karbon MPID is already loaded the CSM cannot be used because the cartridge(s) will fire first. The CSM feature may be used with an expended cartridge still in the device, but care should be taken as a stun will also be passed down the wire to the darts.

### Karbon MPID-C

The Karbon MPID-C / Corrections Model, is a specially designed Karbon MPID without the ability to fire darts. Many correctional agencies are reluctant to have dart firing capabilities available to their personnel but choose to employ the Power Drive Contact Capability. The Karbon MPID-C still collects firing information that may be transmitted to the PC.

### Features of the Karbon MPID-C:

- Bright Yellow in Color
- Blocked, so a cartridge cannot be placed in the unit
- Disconnect wrist strap disabling the unit if it is taken away from the user
- Total User Documentation - date, time, number, and length of firings
- Full certified training available

### TROUBLESHOOTING DEVICE FAILURES

Should the device fail to work or does not achieve the desired results, the reason should be determined. The following is a guideline in determining the issue at hand:

1.  Gun Fails to Power Up:
    a. Battery is discharged
    b. Safety is engaged
    c. Unit malfunction

2.  Gun Fails to Fire after Powering Up:
    a. Cartridges are not properly installed
    b. Contacts are dirty
    c. Cartridge is faulty
    d. Unit malfunction

3.  Stun Shock Fails to Subdue Subject:
    a. No connection
    b. Thickness of clothes prevents transfer of stun shock
    c. Too short of duration of application
    d. Recipient condition affected by drugs, stress, mental condition
    e. Unit malfunction

### MANUFACTURING STATEMENT

Karbon Arms, Inc. products are assembled in the United States. The Karbon MPID is specifically engineered to provide reliable use in field conditions and each gun is individually tested prior to shipping to insure it functions within design tolerances. Accordingly, Karbon Arms, Inc. warrants its products for a period of one year from the date of purchase.

### Limited One Year Warranty

Karbon Arms warrants that Karbon brand MPID projectile stun weapons are free from defects in workmanship and materials for a period of one (1) year from the date of delivery. Karbon Arms agrees to repair or replace such defective products which, under normal use as defined in the written instructions that accompany the product at time of purchase, fail to function provided that the disclosed defect is determined by Karbon Arms to be Karbon Arms fault. After one (1) year, Karbon Arms offers time and material repair services that vary according to the nature of the problem.

Customer has the responsibility to return the defective product to Karbon Arms via prepaid postage and provide written information as to the nature of the defect. If damage during the first year is determined by Karbon Arms to be caused by other than a defect in material or workmanship, Karbon Arms will charge for time and material repair services that vary according to the nature of the problem.

## Warranty Terms and Procedure

Karbon Arms sole responsibility under either warranty shall be to either repair or replace, at Karbon Arms sole option, any damaged product and return it via prepaid postage. This warranty is the only warranty and may not be changed or enlarged by any agent, distributor, dealer or other person.

To register a claim, file a claim notice and mail the defective parts, postage prepaid together with a printout of the claim notice to the address provided on the website. If you do not have internet access, please call (813) 281-1061 and ask for Customer Service. Please be prepared to provide a serial number, purchase date and a description of the problem.

Warranty Exclusions
KARBON ARMS WARRANTY AS STATED ABOVE IS THE EXCLUSIVE WARRANTY WITH RESPECT TO THIS PRODUCT. KARBON ARMS DISCLAIMS ANY AND ALL OTHER WARRANTIES, WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF MERCHANTABILITY, DESIGN OR FITNESS FOR A PARTICULAR PURPOSE OR ARISING FROM A COURSE OF DEALING, USAGE OR TRADE PRACTICE, OR ANY WARRANTY AGAINST PATENT INFRINGEMENT. IF THE EXCLUSION OF IMPLIED WARRANTIES IS PROHIBITED BY STATE LAW, THEN ANY APPLICABLE IMPLIED WARRANTIES SHALL BE LIMITED TO THE DURATION OF THE EXPRESS WARRANTY DESCRIBED ABOVE AND OTHER PROVISIONS CONTAINED HEREIN.

THE EXPRESS WARRANTY STATED ABOVE SHALL BE VOID AND KARBON ARMS SHALL NOT BE RESPONSIBLE FOR ANY LOSS, DAMAGE OR FOR ANY OTHER LIABILITIES ARISING FROM ALTERATIONS, ADDITIONS, ADJUSTMENTS OR REPAIRS WHICH ARE MADE TO THE PRODUCT BY OTHER THAN AUTHORIZED REPRESENTATIVES OF KARBON ARMS.

## Release and Limitation of Remedies

PURCHASER AGREES TO ASSUME ALL RISKS OF LOSS AND AGREES TO RELEASE KARBON ARMS FROM ANY AND ALL LIABILITY FOR ANY DAMAGES AND BODILY INJURY WHICH MAY RESULT FROM THE DEPLOYMENT, USE OR MISUSE OF THE PRODUCT BY THE PURCHASER OR ANY OTHER PERSON. KARBON ARMS IS NOT LIABILE FOR THE FAILURE OF THE PRODUCT TO PERFORM AND KARBON ARMS IS NOT LIABLE FOR ANY CLAIMS MADE BY A THIRD PARTY OR BY PURCHASER FOR OR ON BEHALF OF A THIRD PARTY. KARBON ARMS CUMULATIVE LIABILITY TO ANY PARTY FOR ANY LOSS OR DAMAGES RESULTING FROM ANY CLAIMS, DEMANDS, OR ACTIONS ARISING OUT OF OR RELATING TO THIS PRODUCT SHALL NOT EXCEED THE PURCHASE PRICE PAID TO KARBON ARMS FOR THE PRODUCT. IN NO EVENT WILL KARBON ARMS BE LIABLE FOR ANY SPECIAL, INDIRECT, INCIDENTAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES, HOWEVER CAUSED, WHETHER FOR BREACH OF WARRANTY, NEGLIGENCE, STRICT LIABILITY OR OTHERWISE, EVEN IF KARBON ARMS HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR IF SUCH DAMAGE COULD HAVE BEEN REASONABLY FORESEEN, AND NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE OF ANY EXCLUSIVE REMEDY PROVIDED HEREIN. SOME STATES DO NOT ALLOW FOR THE LIMITATION OR EXCLUSION OF LIABILITY FOR INCIDENTAL OR CONSEQUENTIAL.

**UNIT REGISTRATION / WARRANTY VALIDATION**
Individual or Agency remove from manual and send to:

Karbon Arms, Inc.
Attn: Product Warranty Registration
5505 Johns Road, Suite 702
Tampa, Florida 33634

Name: _____

Agency: _____

Street Address: _____
(No P.O. Box Addresses)

City: _____   State: _____   Zip: _____

Phone: _____   Email: _____

Unit Serial #: _____   Date Unit Returned:_____ / _____ / _____

Agency or Individual Purchase:_____

Dealer Name:_____

**Training Information:**

_____ I have been trained pursuant to Karbon's certification program
_____ I have not been trained
_____ I plan to obtain certified training
_____ I have read the directions thoroughly and understand they DO NOT replace certified training

_____
*Signature*

**All purchases must be validated!!**

PRODUCT RETURN FORM

THIS FORM <u>MUST</u> ACCOMPANY ALL PRODUCTS BEING RETURNED!

KARBON ARMS, INC.
ATTN: PRODUCT REPAIRS
5505 JOHNS ROAD, SUITE 702
TAMPA, FLORIDA 33634

WWW.KARBONARMS.COM

AGENCY / FACILITY:_____

ATTENTION:_____

STREET ADDRESS:_____
(NO P.O. BOX ADDRESSES)

CITY:_____STATE:_____ZIP:_____

UNIT SERIAL #:_____DATE RETURNED:_____/_____/_____

PHONE:_____EMAIL:_____

ITEMS RETURNED: LIST <u>ALL</u> PIECES / PARTS:

_____

_____

_____

_____

REASON FOR RETURN (BE SPECIFIC):

_____

_____

_____

_____

_____